EXHIBIT A

**LEASE AGREEMENT**

Between

**TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP,**
a Minnesota limited partnership

Landlord

and

**BED BATH & BEYOND INC.,**
a New York corporation,

Tenant

**Tamarack Village Shopping Center**
**Woodbury, Minnesota**

Dated: December 31, 2001

* * * * * *

## TABLE OF CONTENTS

Page

ARTICLE 1
BASIC TERMS AND DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.1    Basic Terms and Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE . . . . . . . . . . . . . . . . . . 5
    Section 2.1    Lease of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.2    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.3    Delivery Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.4    Unseasonable Delivery: Slack Period . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 2.5    Initial Co-Tenancy Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 2.6    Permits Contingency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 3
IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 3.1    Landlord's Work and Tenant's Work . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 3.2    Plan Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 3.3    Performance of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 3.4    Measurement; Adjustment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE 4
FIXED RENT AND TAXES : DETERMINATION AND PAYMENT . . . . . . . . . . . . 11
    Section 4.1    Fixed Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 4.2    Payment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 4.3    Real Estate and Other Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 5.1    Common Areas: Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 5.2    Common Areas: Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE 6
UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 6.1.    Utility Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 6.2.    Interruption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE 7
SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 7.1    Tenant's Building Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 7.2    Pylon Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Section 7.3    Signage: Alteration/Removal/Allocation . . . . . . . . . . . . . . . . . . . . 19
    Section 7.4    Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 7.5    Signage Restrictions and Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 7.6    Freeway Sign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Section 8.1    Alterations and Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 9
REPAIRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 9.1    Tenant's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 9.2    Landlord's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 9.3    Legal Compliance Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION . . . . . . . 22
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification . . 22

Section 10.2    Tenant's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Section 10.3    Landlord's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Section 10.4    General Insurance Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE 11
        FIRE AND OTHER CASUALTY; EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . 24
        Section 11.1    Fire and Other Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        Section 11.2    Eminent Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        Section 11.3    Abatement of Rent Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE 12
        COVENANTS, REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . 27
        Section 12.1    Quiet Enjoyment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Section 12.2    Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Section 12.3    Landlord's Covenants, Warranties and Representations. . . . . . . . . . . . 27
        Section 12.4    Environmental Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        Section 12.5    OEA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE 13
        USES AND RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        Section 13.1    Permitted and Prohibited Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        Section 13.2    Tenant's Exclusive in Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        Section 13.3    Exclusives Which Tenant Must Honor . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE 14
        CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE 15
        TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.1    Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.2    Intentionally Omitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Section 15.3    Collateral Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Section 15.4    Cure Rights of Original Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Section 15.5    Recognition Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        Section 16.1    Tenant Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        Section 16.2    Landlord Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        Section 16.3    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARTICLE 17
        RIGHT TO MORTGAGE AND NON-DISTURBANCE;
        ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        Section 17.1    Right to Mortgage and Non-Disturbance . . . . . . . . . . . . . . . . . . . . . . . 38
        Section 17.2    Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        Section 17.3    Existing Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE 18
        NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 19
        TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 20
        END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        Section 20.1    Surrender of Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        Section 20.2    Hold Over. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 21
        INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 22
        INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 23
    MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 23.1  Loading Facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 23.2  Liens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.3  Broker's Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.4  Force Majeure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.5  Consents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.6  Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.7  Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.8  Survival of Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.9  Non-Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 23.10  Rights Cumulative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.11  Definition of Landlord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.12  Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.13  Limitation of Landlord's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.14  Limitation of Tenant's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.15  Joint and Several Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.16  Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.17  Grammatical Usages and Construction . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.18  Table of Contents, Line Numbering and Paragraph Headings. . . . . . . 41
    Section 23.19  Definition of Hereunder, Herein, etc.. . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 23.20  Short Form Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 23.21  Entire Agreement and Modification. . . . . . . . . . . . . . . . . . . . . . . . . 42
    Section 23.22  No Joint Venture or Partnership Created by Lease. . . . . . . . . . . . . . 42
    Section 23.23  Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## EXHIBITS

Exhibit A      Legal Description of Shopping Center
Exhibit B      Site Plan
Exhibit C      Rent Commencement and Expiration Date Agreement
Exhibit D      Description of Landlord's Work
Exhibit D-1    Exterior Elevations of the Premises and Sidewalk Plan
Exhibit D-2    Approved Landlord's Plans
Exhibit E      Permitted Encumbrances
Exhibit F      Signage
Exhibit G      Subordination, Non-Disturbance and Attornment Agreement
Exhibit H      Recognition Agreement
Exhibit I      Intentionally Omitted
Exhibit J      Delivery Date Certification
Exhibit K-1    Existing Exclusives
Exhibit K-2    Existing Leases
Exhibit L      Percentage Rent
Exhibit M      Prohibited Uses
Exhibit N      Shopping Center Maintenance Approved Statement
Exhibit O      Special Assessments
Exhibit P      Form of Cost Plus Exclusives Letter

# LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of December ___, 2001 by and between TAMARACK VILLAGE SHOPPING CENTER A LIMITED PARTNERSHIP, a Minnesota limited partnership, having an office at c/o Robert Muir Company, 2850 Metro Drive, Suite 503, Bloomington, MN 55425 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## WITNESSETH:

## ARTICLE 1
## BASIC TERMS AND DEFINITIONS

Section 1.1    <u>Basic Terms and Definitions</u>.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1   <u>Additional Rent</u>:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2   <u>Affiliate</u>:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be. As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3   <u>Alternate Rent</u>: Payment of Percentage Rent as defined in and payable in the manner set forth in <u>Exhibit L</u> attached hereto, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the "Cap").  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains. If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4   <u>Common Areas</u>:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, maintenance room, lighting facilities, courts, landscaped areas, wetlands and tree preservation area, retention or detention areas and common utility lines.

1.1.5   <u>Common Areas Charges</u>:  As defined in Section 5.1 hereof.

1.1.6   <u>Delivery Date</u>: As defined in Section 2.3.2 hereof.

1.1.7   <u>Effective Date</u>: The date hereof.

1.1.8   <u>Event of Default</u>:  As defined in Section 16.1 hereof.

1.1.9   <u>Excused Periods</u>: Periods during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10   <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11  Fixed Rent:  The following amounts for the periods indicated (based upon a Floor Area for the Premises of Thirty-One Thousand Four Hundred Forty-Five (31,445) square feet, subject to adjustment pursuant to Section 3.4 hereof):  *31,726*

(a)  For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of Three Hundred Thirty-Nine Thousand Nine Hundred Twenty and 45/100 ($339,920.45) Dollars per year [based on Ten and 81/100 ($10.81) Dollars per square foot of Floor Area];  *342,958.06 = $28,579.84/Mo*

(b)  For the period commencing on the first February 1 occurring after the tenth anniversary of the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.42 below), at the rate of Three Hundred Sixty-One Thousand Six Hundred Seventeen and 50/100 ($361,617.50) Dollars per year [based on Eleven and 50/100 ($11.50) Dollars per square foot of Floor Area];  *364,849.00 = $30,404.09/Mo.*

(c)  In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Eighty-Five Thousand Two Hundred One and 25/100 ($385,201.25) Dollars per year [based on Twelve and 25/100 ($12.25) Dollars per square foot of Floor Area];  *388,643.50 = $32,386.96/Mo.*

(d)  In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Four Hundred Eight Thousand Seven Hundred Eighty-Five and 00/100 ($408,785.00) Dollars per year [based on Thirteen and 00/100 ($13.00) Dollars per square foot of Floor Area]; and  *412,438.00 = $34,369.84/Mo*

(e)  In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Four Hundred Thirty-Two Thousand Three Hundred Sixty-Eight and 75/100 ($432,368.75) Dollars per year [based on Thirteen and 75/100 ($13.75) Dollars per square foot of Floor Area].  *436,232.50 = $36,352.71/Mo.*

1.1.12  Floor Area:  The actual number of square feet of space contained on all floors (other than mezzanines used solely for non selling purposes) within any area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, seasonal sales areas within the Common Areas and trash compactor areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.  The Floor Area of the Shopping Center shall not include the floor area of the area labeled "Maintenance Room" on Exhibit B.

1.1.13  Force Majeure:  As defined in Section 23.4 hereof.

1.1.14  Ground Lessor:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15  Intentionally Omitted:

1.1.16  Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1.1.17  Inducement Tenants:  As defined in Subsection 2.3.1 hereof.

1.1.18  Landlord:  As defined in the preamble and Section 23.11 hereof.

1.1.19  Landlord's Mailing Address:  c/o Robert Muir Company, 2850 Metro Drive, Suite 503, Bloomington, MN 55425, with a copy to c/o Robert Muir Company, 850 N. E. 5th Avenue, Boca Raton, Florida 33432 or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  Provided Tenant is given notice setting forth the identity of any mortgagee of the Shopping Center and such mortgagee's address, Tenant shall also give such mortgagee a copy of any default notice given to Landlord.

**\*trash container areas**

1.1.20  Landlord's Work:  As defined in Section 3.1 hereof.

1.1.21  Lease Interest Rate:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22  Legal Requirements:  All laws, statutes, codes, acts, ordinances, judgements, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23    Mortgagee:  Any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24  Intentionally Omitted:

1.1.25  Intentionally Omitted:

1.1.26  Percentage Rent:  As defined in Exhibit L hereto.

1.1.27  Permitted Use:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.  Notwithstanding the generality of the foregoing, Tenant's use, including the sale of the Permitted Items, shall be subject to the provisions of Section 13.1 below.

1.1.28  Premises: Being the area cross-hatched on Exhibit B hereto having dimensions as shown on Exhibit B and containing approximately Thirty-One Thousand Four Hundred Forty-Five (31,445) square feet of Floor Area and one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling mezzanine space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29  Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30  Renewal Period(s): three successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31  Rent:  Fixed Rent and/or Additional Rent.

1.1.32  Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33  Intentionally Omitted:

1.1.34  <u>Shopping Center</u>: Part of the shopping center commonly known as Tamarack Village Shopping Center owned by Landlord, containing approximately five hundred fifty-two thousand eight hundred seventy-six (552,876) square feet of Floor Area, on the property located at Radio Drive, Tamarack Road and Hudson Road, Woodbury, Minnesota, and more particularly described in <u>Exhibit A</u> hereto, and the rights of Landlord under the OEA (as hereinafter defined) over the remaining parcels forming part of the Tamarack Village Shopping Center labeled "Mervyns", "Champps" and "Home Depot" on <u>Exhibit B</u>. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant in the name of the Shopping Center. The store labeled "Mervyn's" on <u>Exhibit B</u> together with a portion of the common area serving said premises is owned by Mervyn's, Inc. (hereinafter with any successor herein being referred to as "Mervyn's") and the stores labeled "Champps" and "Home Depot" together with a portion of the common area serving said premises on <u>Exhibit B</u> are owned by others. The property so owned shall not be subject to this Lease except to the extent provided by the terms of the OEA (as hereinafter defined).

1.1.35  <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36  <u>Taxes</u>:  As defined in Section 4.3.3 hereof.

1.1.37  <u>Tenant</u>:  As defined in the preamble hereof.

1.1.38  <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39  <u>Tenant's Property</u>:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.40  <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center, or a specified portion thereof, as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center.   Tenant's Pro Rata Share with respect to the whole of the Shopping Center shall not be greater than seven (7%) percent, unless Floor Area is removed or subdivided from the Shopping Center and the Common Areas Charges associated with that removed or subdivided Floor Area are excluded from the Common Areas Charges of which Tenant pays Tenant's Prop Rata Share, in which event the aforesaid cap on Tenant's Pro Rata Share shall be re-calculated accordingly. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center, or specified portion thereof as to which Tenant's Pro Rata Share of any costs is determined.

1.1.41  <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

1.1.42  <u>Term</u>:  A period (the *"Initial Term"*) of fifteen (15) years beginning on the Rent Commencement Date and ending at midnight on the <u>last day of January</u> following the fifteenth (15th) anniversary of the Rent Commencement Date (the "Expiration Date").  As used herein, *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby
leases from Landlord, the Premises together with any and all rights, benefits, privileges and
easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center,
arising out of any public or private grant or authority, including, without limitation, the
non-exclusive right and easement to use the Common Areas in common with other tenants and
occupants of the Shopping Center, subject in all respects to the OEA.

Section 2.2    Term.    *May. 5, 2002, - January 31, 2018*

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease
shall begin on the earlier of (such earlier date being referred to herein as the *"Rent Commencement
Date"*): (a) the date (the *"Grand Opening Date"*) which Tenant shall establish in its published
advertisement as its grand opening [but not later than the tenth (10th) day after the date upon which
Tenant shall initially open the Premises to the general public for business] or (b) the one hundred
twentieth (120th) day following the later of the Delivery Date or the "Permit Contingency Date"
(hereinafter defined).  The Term shall expire on the Expiration Date, unless earlier terminated as
herein provided.  When the Rent Commencement Date has been determined, as provided in this
Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written
statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

*St. Paul Sunday Paper* *April 31, 2002*

2.2.2    Renewal Options.  Tenant shall have the right and option (hereinafter a
*"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for
three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and
collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth.
Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy
(270) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    Delivery Date.

2.3.1    Definition.  Landlord shall be deemed to have delivered possession of the
Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all
of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall
have received from Landlord the Delivery Date Certification in accordance with the provisions of
Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following
shall have occurred:

(a)    Actual possession of the Premises shall have been delivered
to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound
condition, with that part of Landlord's Work described in Part 1 of Exhibit D
Substantially Completed, which Substantial Completion shall be evidenced by a
written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to
Tenant, upon request) all permits and approvals required from all applicable
governmental authorities, if any, to enable Tenant to occupy and use the Premises for
the conduct of its business in the Premises (exclusive of building permits and
certificates of occupancy which may be necessary for the performance of Tenant's
Work and any business licenses which Tenant may be required to obtain in order to
open and operate its specific business [and not a general retail business], collectively
"Tenant's Permits") which permits and approvals shall include, without limitation,
zoning approvals, environmental requirements, and a permanent certificate of
occupancy for the Premises (unless a certificate of occupancy for the Premises cannot
be obtained solely as a result of Tenant's Work not having been commenced or
completed, in which event the delivery of a certificate of occupancy for the Premises
shall not be a condition to the occurrence of the Delivery Date); and

(c)    The Common Areas, and all of the improvements thereto
shown on Exhibit B hereto shall have been Substantially Completed and operational,
and all off-site improvements (including, without limitation, street, storm drainage,
and traffic signalization improvements) required for the Shopping Center to open for

business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed. Notwithstanding the above, Common Areas disturbed to complete Landlord's Work and the work necessary for the other tenant of the former Home Place premises shall only be required to be returned to final operating condition when weather conditions and work on such other part of the former Home Place premises permit, provided that all such areas shall at all times be usable all weather access as described in <u>Exhibit D-2</u> and if Tenant is unable to obtain a certificate of occupancy for the Premises as a result of non-completion of such Common Areas, that portion of such work which is required to be completed to enable Tenant to obtain a certificate of occupancy shall be completed on or before April 15, 2002;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (h) and (j) of Section 12.3 below shall then be true and in effect; and

(e)    Landlord shall have delivered to Tenant in recordable form a subordination, non-disturbance and attornment agreement in the form attached hereto as <u>Exhibit G</u> or in such other form as is agreed between Tenant and the holder of each mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof executed by each such holder.

2.3.2    <u>Delivery Date</u>.

(a)    Landlord shall cause the Delivery Date to occur on February 1, 2002. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior such date.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in subparagraph (a) above, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, storage costs for fixtures, equipment, and inventory, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in subparagraph (a) above , then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of One Thousand Dollars ($1,000) for each day that the Delivery Date established in subparagraph (a) above is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3    <u>Delivery Date Certification</u>. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as <u>Exhibit J</u>.

2.3.4    <u>No Waiver</u>. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant, provided that upon acceptance of physical possession of the Premises the sixty (60) day period referred to in Section 2.2.1 hereof shall commence notwithstanding that some of the conditions of the Delivery Date shall not have occurred and upon opening for business the Term shall commence even if the Delivery Date conditions have not been met.

Section 2.4    <u>Unseasonable Delivery; Slack Period</u>.

If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on November 15 and ending on the January 31 next following (the "*Slack Period*"), then Tenant shall have, in addition to any other remedies, the right to:

(a)    accept physical possession of the Premises; or

(b)    delay its acceptance of physical possession of the Premises to a date not later than the end of the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the February 1 next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the January 31 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the *"Initial Co-Tenancy Condition"* shall mean that at least fifty percent of all of the existing tenants of the Shopping Center as of the date hereof as listed on Exhibit K-2 shall be open to the public for business.

2.5.2    If, on the date on which Tenant is ready to commence installing fixtures in, and merchandising the Premises for business to the general public, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    open the Premises for business to the general public, in which event, subject to any applicable provisions of this Article 2, the Rent Commencement Date shall occur on the Grand Opening Date, and thereafter, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied (any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease); or

(b)    delay opening the Premises for business to the general public, in which event, the Rent Commencement Date shall be delayed until the sixtieth (60th) day after the date on which the Initial Co-Tenancy Condition is satisfied (and Tenant receives notice from Landlord thereof), or, if such 60th day occurs during the period beginning on the commencement of the "Slack Period" (defined in Section 2.4 above) and ending on the March 31 next following, then the Rent Commencement Date shall be delayed until the April 1 next following said period or until Tenant opens for business, subject to any applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Co-Tenancy Condition has not been satisfied within one (1) year after the date on which Tenant is ready to commence installing fixtures in and merchandising the Premises for business to the general public, then Tenant shall have the right, at any time prior to the earlier of (x) the satisfaction of the Co-Tenancy Condition, or (y) ninety (90) days after the end of the aforesaid one (1) year period, upon giving Landlord at least sixty (60) days' prior notice, to terminate this Lease as of the date specified in said notice. If such notice is not given on or before such date then the termination right contained herein shall be deemed to have been waived by Tenant and Tenant shall at that time resume the payment of the Fixed Rent at the rate set forth in Section 1.1.11 hereof. Landlord may negate such termination by causing the Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) as set forth in Section 23.3 below, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed Twenty-Five Thousand ($25,000.00) Dollars.

Section 2.6    Permits Contingency.

2.6.1    Tenant shall apply for Tenant's Permits (defined in Section 2.3.1(b) above) on or before January 2, 2002 and shall use diligent efforts to obtain the same on or before February 10, 2002. Notwithstanding the provisions of this Article 2 to the contrary, if, despite Tenant's diligent

efforts, all of Tenant's Permits have not been obtained by said date, Tenant shall have the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's Permits, to: (a) delay its acceptance of physical possession of the Premises to the date on which all of the Tenant's Permits have been obtained, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant secures Tenant's Permits (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); or (b) terminate this Lease. Tenant's exercise of its rights under (a) above shall not preclude the subsequent exercise of its rights under (b) above prior to the unconditional grant of all of Tenant's Permits. The date on which all Tenant's Permits are unconditionally granted is referred to herein as the ***"Permit Contingency Date"***.

2.6.2. If all of Tenant's Permits have not been obtained by April 15, 2002 for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, than Landlord shall have the option, upon notice to Tenant prior to the unconditional grant of all of Tenant's Permits, to terminate this Lease.

2.6.3. In the event Tenant or Landlord elects to terminate this Lease pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and terminated as of the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except as set forth in Section 23.3 below.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D and shown on the "Approved Landlord's Plans" annexed hereto as Exhibit D-2 hereto (collectively, ***"Landlord's Work"***). Landlord shall Substantially Complete that part of Landlord's Work described in Part 1 of Exhibit D on or before the Delivery Date. Landlord shall complete the remainder of Landlord's Work on or before March 15, 2002 ("Landlord's Completion Date"). Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as ***"Tenant's Work"***) which Tenant desires to adapt the Premises to Tenant's use.  Landlord acknowledges that if it shall fail to Substantially Complete the reminder of Landlord's Work on or before April 15, 2002, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, storage costs for fixtures, equipment, and inventory, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.  If all of Landlord's Work is not completed on or before April 15, 2002, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of Three Thousand Dollars ($3,000) for each day that the Delivery Date established in subparagraph (a) above is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment  If all of Landlord's Work is not completed on or before April 15, 2002 and as a result thereof Tenant is unable to open for business, then, in addition to any other remedies available to Tenant under this Lease, the Rent Commencement Date shall be deemed to be delayed day-for-day until the substantial completion of that part of Landlord's Work required to be completed to enable Tenant to open for business.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.  Within thirty (30) days after the date hereof, Tenant shall deliver to Landlord Tenant's plans (***"Tenant's Plans"***) depicting Tenant's Work.  Landlord shall have ten (10) business days from its receipt of Tenant's Plans (or revisions thereto, as applicable) to approve or disapprove Tenant's Work depicted thereon.  Landlord's review of Tenant's Plans shall be limited to: (i) compliance with all Legal Requirements, (ii) any reduction of the structural soundness of the building containing the Premises, and (iii) whether Tenant's Work affects the exterior of the Premises or the roof of the building containing the Premises.  If Landlord rejects Tenant's Plans (Landlord acknowledging that Exhibit D-1 annexed hereto has been approved, Tenant shall resubmit such plans within ten (10) business days.  If Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said 10-day period, Tenant's Plans shall be deemed approved, but only if the submission thereof to Landlord states in bold print that failure to respond

in said 10 day period shall constitute approval. This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans.

3.2.2   Plan Changes.

(a)     Tenant shall have the right to request Landlord to subsequently make changes to the Exhibit D-2 (the "Changes"), subject to Landlord's approval of such changes.

(b)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 10% subcontractor profit and 10% general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(c)     If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then (i) the Rent Commencement Date shall be determined as if such delay had not occurred, and (ii) the commencement of the Slack Period and, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date and Landlord's Completion Date, shall by extended by the number of days of such net delay; provided, however, that, within five (5) days following its receipt of Tenant's notice describing the Changes, Landlord shall have notified Tenant in reasonable detail as to the nature and extent of such delay.

Section 3.3   Performance of Work.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, except as shown on Exhibit D-2, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained by the Delivery Date because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby. Both Landlord and Tenant shall use reasonable efforts not to interfere with the performance of each other party's work. Landlord's Work and Tenant's Work shall be performed using union labor.

3.3.2   If: (a) Landlord's Work has not been commenced by January 1, 2002, or (b) the Delivery Date shall not have occurred by May 1, 2002 (subject to Force Majeure, not to exceed ninety (90) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of Force Majeure promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)     terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not

to exceed Twenty-Five Thousand Dollars ($25,000); and/or

(ii)     avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)     extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3   Landlord's Work Performed After Delivery of Possession. On or before the Landlord's Completion Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within thirty (30) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 30-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant (i.e. only if doing such work during normal business hours would materially interfere with Tenant's work or business therein), any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises. Within ninety (90) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term *"Punch List Items"* shall mean such minor items which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4   Tenant's Right of Entry. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall enter at its own risk and shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5   Tenant's Leasehold Improvements. Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

3.3.6   Work Requirements After Delivery Date. Following the Landlord's Completion Date, any construction by Landlord affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)     all staging and storage of materials and parking of construction vehicles shall at all times occur in the area labeled "Staging" on Exhibit B; and

(b)     Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7   Tenant's Trailer. Tenant may install a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on Exhibit B hereto. Said trailer shall be removed within ten (10) days prior to the Rent Commencement Date.

3.3.8  Landlord's Right of Entry.  During the performance of Tenant's Work, Landlord, or its representatives, shall have a right, upon reasonable prior notice and only during work hours and with a representative of Tenant present, to enter upon the Premises to inspect Tenant's Work to determine whether or not the same complies with Tenant's Plans; provided that Landlord's inspection shall be limited to those aspects of Tenant's Work which Landlord has a right to review in Tenant's Plans as set forth in Section 3.2.1 hereof.

Section 3.4  Measurement; Adjustment of Rent.  Immediately after the demising wall for the Premises has been completed, exact measurements of the Floor Area of the Premises shall be made and certified to Tenant by Landlord's licensed architect, surveyor or engineer.  The measurements of Landlord's licensed architect, surveyor or engineer shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If the measurement of the Floor Area of the Premises determined as aforesaid, shows that the Floor Area of the Premises is less than thirty-one thousand two hundred (31,200) square feet, then Landlord shall notify Tenant of such deviation and Tenant shall have the right, to be exercised within three (3) business days of receipt of Landlord's notice, to require Landlord to take all steps necessary to cure the deviation from the Final Plans and Specifications which resulted in the Floor Area of the Premises measuring less than thirty-one thousand two hundred (31,200) square feet.  If Tenant exercises the right to require that the deviation be corrected then Landlord shall take all steps necessary to cure the deviation from the Final Plans and Specifications which resulted in the Floor Area of the Premises measuring less than thirty-one thousand two hundred (31,200) square feet.  If Landlord has failed to deliver such certification to Tenant as set forth above, Tenant shall have the right to (i) have such measurement made and certified to Landlord by Tenant's licensed architect, surveyor or engineer (the cost of such measurement(s), in an amount not to exceed One Thousand ($1,000.00) Dollars, shall be either credited to Tenant against the first payment of Rent due hereunder or, if Tenant terminates this Lease, as herein provided, paid by Landlord to Tenant within thirty (30) days of demand therefor), and (ii) if the Floor Area of the Premises is less than the threshold set forth above, to require Landlord to correct the deviation.  If Landlord fails to correct the deviation in the Floor Area of the Premises as required herein, then Tenant may, in addition to any other remedy in this Lease, at law or in equity, terminate this Lease upon notice to Landlord within thirty (30) days of Landlord's failure to correct the deviation as aforesaid.  Once the deviation has been corrected or if Tenant elects not to terminate, subject to Tenant's right to pursue any other remedy in respect of Landlord's failure to correct the deviation, Landlord shall cause exact measurements of the Floor Area of the Premises to be made and certified to Tenant by Landlord's licensed architect, surveyor or engineer, which measurement shall be subject to confirmation by Tenant as aforesaid at Tenant's sole cost and expense.  Subject to the immediately preceding sentences of this Section, the Fixed Rent and any other applicable provision of this Lease shall be amended based upon the final measurement of the Premises to conform to the exact measurement of the Premises and the parties hereto shall promptly execute an amendment to this Lease accordingly, provided that no such amendment shall be made to increase the Fixed Rent or Tenant's Pro Rata Share by more than three hundred (300) square feet of increased Floor Area of the Premises.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.1.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said mezzanine or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4
FIXED RENT AND TAXES : DETERMINATION AND PAYMENT

Section 4.1  Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2  Payment of Rent.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the **"Paying Agent"**), to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not

constitute, an assignment of any rights of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Commencing on the earlier of (i) the Rent Commencement Date or (ii) the date which Tenant shall establish in its published advertisement as its grand opening [but not later than the tenth (10th) day after the date upon which Tenant shall initially open the Premises to the general public for business (the "Grand Opening Date"), Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which are payable during any calendar year included in the Term, subject to the provisions of this Section 4.3. Any Taxes payable in a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the thirtieth (30th) day prior to the date on which such Taxes would become delinquent). Tenant's Pro Rata Share of Taxes shall be based on the ratio the total square foot Floor Area of the Premises bears to the total square foot of Floor Area of all buildings in the tax parcel in which the Premises is located ("Tenant's Tax Parcel").

4.3.3    As used herein, *"Taxes"* shall mean all general, ad valorem real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise (except on rental as a specific category, including sales taxes, but only if such tax is typically paid by retail tenants in the State of Minnesota or at least seventy (70%) percent by square footage of the tenants in the Shopping Center are obligated to pay such tax), profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease (unless retail tenants in the State of Minnesota typically pay such taxes on rentals or at least seventy percent by square footage of the tenants in the Shopping Center are obligated to pay such tax); (2) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (3) assessments for any public improvement arising from an expansion of the Shopping Center, (4) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord and any assessments which are permitted hereunder to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges other than those shown on Exhibit O.

4.3.4    At Tenant's request, Landlord shall contest the amount or validity of any

assessed valuation or Taxes on Tenant's Tax Parcel, failing which, Tenant (if Tenant is joined by other tenants occupying premises in Tenant's Tax Parcel who together with Tenant comprise a majority of the total square footage of Floor Area in Tenant's Tax Parcel) shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, without cost to Landlord, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

<div align="center">ARTICLE 5<br>COMMON AREAS, THEIR USE AND CHARGES</div>

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the State of Minnesota are operated, maintained, repaired and replaced, including, without limitation, common utility lines, ponds, fountains, clock tower, entrance monuments, and retaining walls, traffic regulation and control, recycling centers, maintenance rooms (including utilities therefor) snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers, bicycle racks and benches), landscaping (including, without limitation, landscaping irrigation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance (including insurance deductibles to the extent set forth in Section 10.3 hereof), supervision, use, parking lot paving and striping, drainage, security (as reasonably required), traffic regulation, and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements. Common Areas shall include the tree preservation area, ponds and wetlands in and adjacent to the Shopping Center to the extent Landlord as owner of the Shopping Center is obligated to maintain such areas.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    Commencing on the earlier of (i) the Rent Commencement Date or (ii) the Grand Opening Date, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) incurred by Landlord to operate, maintain, insure, repair and replace the Common Areas, including legal compliance except as prohibited in Section 5.1.3. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget. Tenant shall pay Landlord during the Term the reasonable costs of maintenance, painting (but not more than once every five (5) years) and repair of the exterior surface of the walls of the Premises, but not a complete renovation of the same, provided that such costs in respect of any other building or premises in the Shopping Center shall not be included in Common Areas Charges.

(b)    Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant as shown on Exhibit N, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted shopping center accounting principles consistently applied (the *"CAC Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. Upon Tenant's reasonable request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the

amount of any overpayment hereunder unless contested by Landlord, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges with respect to the first full calendar year of the Term exceed One and 35/100 Dollars ($1.35) per square foot of Floor Area (exclusive of snow removal and insurance premiums).

5.1.3   Exclusions from Common Areas Charges.

(a)   Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any capital improvements to the Common Areas or the cost of any capital replacement, except in relation to capital replacements if Landlord incurs a capital expenditure relating to a replacement to the Common Areas, which expenditure is (i) not required as a result of the act or omission of Landlord, (ii) unrelated to the wetlands or tree preservation area, and (iii) incurred after the first five (5) years after the Rent Commencement Date, the same may be included in Common Areas Charges provided the same shall be amortized in accordance with generally accepted accounting principles ("GAAP"), at the time such expenditures are incurred, over the useful life of the item so amortized, and only the amortized portion applicable to each year shall be included in Common Areas Charges and then only to the extent the capital expenditure is for a replacement similar in nature and quality to the improvement replaced; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1), except for the removal of such items as tires, gasoline, or batteries left in the Shopping Center by third parties up to a maximum cost to Tenant in any one year of Five Hundred Dollars ($500.00); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with laws which relate to (A) environmental laws, (B) the negligence of Landlord or any other tenant or any of their respective agents or employees, (C) contesting or curing violations of pre-existing laws, (D) a capital expenditure, provided that in the event that the cost of compliance with law involves a capital expenditure after the first five (5) years after the Rent Commencement Date, then such cost shall be included in Common Area Charges to the extent of that portion of the cost amortized over the useful life or ten (10) years whichever is shorter, in a particular year, (E) relate to the initial construction of the Shopping Center or any expansion thereof, (F) the specific needs of any other tenant in the Shopping Center; (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord in excess of $50,000.00 per annum; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13)costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord not reimbursed as a result of such lawsuit or other legal actions, provided, however, that so long as said lawsuits or other legal actions affect the Common Areas only and are resolved in favor of Landlord, then, without limiting the further provisions of this Section 5.13, the reasonable attorneys fees and court costs incurred by Landlord in connection therewith shall be included within Common Areas Charges so long as (A)

the matter of any such lawsuit or other legal action first arises after the Rent Commencement Date, (B) any such lawsuit or other legal action does not result from the acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, (C) any such lawsuit or other legal action does not arise from Landlord's Work, any matter of title, any dispute with Landlord's insurance carrier or any condemnation proceeding, (D) the decision in favor of Landlord will benefit all tenants of the Shopping Center, and (E) such Common Areas Charges shall be similarly imposed on all other tenants of the Shopping Center; (14) sums incurred as late payment fees, penalties or interest, unless caused by Tenant's default; (15) ground rent; (16) depreciation, except as expressly permitted pursuant to item 22 below; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting and main drive aisle lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (excluding, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) the cost in excess of $2,500 for any one item, of any mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life not to exceed ten (10) years, as determined in accordance with generally accepted accounting principles); (23) reserves for anticipated future expenses; (24) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, provided that the cost of maintaining the maintenance room shall be included and provided further that Landlord may include in Common Areas Charges an administration fee equal to seven and one-half (7½%) percent of Common Areas Charges, excluding utilities, taxes, insurance premiums and capital replacements; (25) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; or (26) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates. Except to the extent specified in subsection (21) above, Tenant acknowledges that Landlord may perform maintenance of the Common Areas with Landlord's own personnel or the personnel of an affiliate and such costs shall be included in Common Areas Charges.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges and such tenant or occupants Floor Area shall be excluded as to such charges.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    Tenant's Right to Audit. Tenant shall have the right (not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof within two (2) years after each year's annual statement. If Tenant fails to exercise its audit right within such two (2) year period then Tenant shall be deemed to have waived such audit right. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds four (4%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable

expenses of the audit (which shall not exceed the amount which would be charged by an accounting firm charging a reasonable fee on a time and cost basis) within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Tenant shall furnish the results to Landlord within thirty (30) days after completion of the audit and shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1   Continuous Access.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof.  Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein or to reasonably repair the same; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2   No Alterations.  The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads are substantially designated on Exhibit B.  Landlord shall not (i) in the area depicted as the "Control Area" on Exhibit B and all entrances and exits to the Shopping Center and driveways and access aisles therefrom to the Control Area (collectively, the "Control Area") alter the Shopping Center as shown on Exhibit B except as may be required as the result of a condemnation,* or construct or permit to be constructed any sign, tower or other structure or improvement, but Landlord shall have the right within the Control Area to construct items or amenities customary in first-class retail centers, such as light standards, benches and directional signage, provided the same do not unreasonably interfere with access to the Premises or visibility of Tenant's signage (ii) change the number, location, or layout of parking spaces within the Control Area except as required by law; (iii) construct additional structures or buildings in the Control Area except as shown in the Permitted Building Areas on Exhibit B; or (iv) in the Control Area, change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks except as may be necessary to conform to legal requirements; without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion without the application of Section 23.5 below. Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Control Area, including the Premises, (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.  Except as provided above, Landlord shall have the right to make reasonable changes to the Common Areas outside of the Control Area, provided such changes do not unreasonably interfere with Tenant's business, visibility of the Premises, ingress, egress or parking by Tenant and its customers, employees, contractors, agents and invitees.

5.2.3   Parking Area.  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) 4.5 ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces within the Control Area for use by other tenants or occupants of the Shopping Center (except for

* [See Insert Page 16a]
27641.0381-FINLSE.WPD
November 27, 2001                                    16

Circuit City's parcel pick-up area, Landlord agreeing to use reasonable efforts to enforce against Circuit City any provision in the Circuit City lease requiring Circuit City in exercising its right to use such parcel pick-up area not to unreasonably interfere with any other tenants of the Shopping Center), nor shall Landlord permit any person or entity to use the parking areas within the Control Area other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and invitees. Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area reasonably designated by Landlord from time to time as "Employee Parking" and Landlord shall take all reasonable measures to have other tenants and occupants of the Shopping Center do the same. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center.

5.2.4    Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, which shall include at least until 12:00 midnight Monday through Saturday and until at least 9:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas in the Control Area lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises in the Control Area (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.5    Repairs. During the Term, any construction or repair other than minor repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)    not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements; and

(b)    be performed in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.6    Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within thirty (30) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.7    Miscellaneous.

(a)    No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas in the Control Area, except the use by all tenants of the Shopping Center of the sidewalks immediately adjacent to each tenant's premises and the existing bank drive-through, for retail sales or for promotional purposes without Tenant's consent, provided that Tenant and other tenants or occupants of the Shopping Center shall be permitted to temporarily store shopping carts in cart corals in the Commons Areas.

(b)    Trash Compactor. Tenant shall be permitted to maintain and operate, at no extra charge, a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad". Tenant shall at its sole cost and expense keep the compactor area neat and clean and repair any damage caused by compactor use and storage. Tenant shall not store or leave pallets or other materials in the Common Areas of the Shopping Center.

(c)    Shopping Carts. Tenant shall be permitted to temporarily store

Insert to Page 16
[Section 5.2.2]

[it being agreed, however, that Landlord shall have the right, upon prior notice to Tenant, to relocate only that portion of the Control Area that constitutes the service drive located directly behind the premises currently occupied by Toys R Us and the respective store premises to the south of Toys R Us (i.e., those currently occupied by Office Max, JoAnn Etc. and the "Retail Shops - 4KSF", as shown on Exhibit B), subject to the following terms and conditions: (a) such relocated portion of the service drive shall extend no further than sixty (60) feet to the west of the westerly boundary of the current service drive located directly behind said store premises; (b) the relocated portion of the service drive shall thereafter be deemed included within the Control Area for all purposes under this Lease (and, at Tenant's request, Landlord shall enter into such amendment of this Lease to reflect the foregoing); (c) no such relocated portion of the service drive shall adversely affect, in other than an immaterial manner, Tenant's business operations (including without limitation access to and from (i) Tenant's "Loading Facilities" by delivery vehicles, in the manner shown and described on Exhibit B hereto, or (ii) the Trash Container Pad and Trash Compactor Pad, also as shown on Exhibit B hereto), ingress, egress or parking by Tenant or its customers, employees, contractors, agents and invitees; (d) during the course of such work, Landlord shall ensure that delivery and other vehicles servicing Tenant shall at all times have full access to and from Tenant's Loading Facilities, Trash Container Pad and Trash Compactor Pad; and (e) all other terms and conditions of this Lease shall remain in full force and effect during the Term with respect to such relocated portion of the service drive, including without limitation Section 5.2.3 hereof.]

during the day its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas and shall store the same either inside the Premises or inside the cart corals as shown on Exhibits B and D-1 hereto. [see insert -page 18a]

## ARTICLE 6
## UTILITIES

Section 6.1.    Utility Service.    From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord, unless: (i) the quality of the service(s) so provided satisfies Tenant's specifications so as to permit the normal operations of Tenant's business in the Premises; (ii) the cost of such service(s) shall not exceed the lesser of: (x) the cost of the same service if Tenant had obtained such service directly from its preferred utility service provider, either on a single-store or multi-store basis, or (y) the cost to Landlord for such service, and (iii) Landlord shall pay the costs of reconnection. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits, if any, in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2.    Interruption.    Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors (not including contractors or employees of the utility company furnishing the service), servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

## ARTICLE 7
## SIGNS

Section 7.1    Tenant's Building Signage.    Subject to compliance with the OEA and all Legal Requirements, Tenant shall supply and install Tenant's store signage (and obtain all permits and approvals therefor) as part of Tenant's Work in accordance with Exhibit F hereto, and with the additional provisions of this Lease. Thereafter, subject to Landlord's prior consent to the extent provided in Section 7.3 hereof, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements and the OEA. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Pylon Signage.    Landlord shall provide a pylon sign at the location shown on Exhibit B hereto designated as "Tenant's Shared Pylon" during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s), which shall be furnished by Landlord and paid for by Tenant, on all sides of such pylon, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The dimensions of Tenant's pylon sign panel(s) shall be as shown on Exhibit F. The background of Tenant's sign panel shall be consistent with any background theme consistently used on all panels on Tenant's Shared Pylon; provided that Tenant may deviate from such background theme with the prior written consent of Landlord. Landlord shall maintain Tenant's Shared Pylon, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the Tenant's Shared Pylon without

Insert to Page 18
[Section 5.2.7]

   (d) <u>Trash Container</u>. Tenant shall be permitted to maintain and operate, at no extra charge, trash containers in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Container Pad". Tenant shall at its sole cost and expense keep the containers neat and clean and repair any damage caused by such container use and storage. In connection with the foregoing, Tenant shall reimburse Landlord for Landlord's reasonable cost in performing that portion of Landlord's Work described in Exhibit D, Part 2, Note 5 of this Lease); such payment by Tenant shall be due and payable within twenty days following its receipt of an invoice therefor.

obtaining Tenant's prior consent. The cost of maintaining and repairing Tenant's Shared Pylon [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments], and the cost of any electricity used to illuminate them, shall be paid by Tenant paying its pro rata share of the said costs based on the ratio which the square foot area of Tenant's panel on the Tenant's Shared Pylon bears to (i) the square foot area of all panels on Tenant's Shared Pylon or (ii) in the case of electricity, the square foot area of all panels on all pylons which have electricity metered with Tenant's Shared Pylon. If the Tenant's Shared Pylon shown on Exhibit F needs to be replaced then Tenant shall reimburse Landlord for its pro rata share of the cost of such replacement based upon the ratio of the area of Tenant's panel thereon in relation to the area of all panels on such Tenant's Share Pylon.

Section 7.3    Signage: Alteration/Removal/Allocation. Subject to approval by Landlord of Tenant's plans therefore, which approval Landlord hereby agrees not to unreasonably withhold or delay, and any approval required by law from any governmental authorities having jurisdiction in respect of Tenant's signage and compliance with the OEA, Tenant shall also, at its own cost and expense, have the right to change its signs on the storefront and exterior of the Premises, as well as on Tenant's Shared Pylon, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same (which signs on the Building shall use individually lit letters without exposed raceways, without exposed neon lettering), and provided that Landlord's consent shall not be required in respect of any prototypical signage proposed by Bed Bath & Beyond Inc., or any affiliate thereof, or by any national retailer (meaning a retailer operating at least fifty (50) stores nation wide) or regional retailer (meaning a retailer operating at least twenty (20) stores in the geographical regional of the Shopping Center) occupying the Premises or any part thereof as long as such signs use individually lit letters without exposed raceways and without exposed neon lettering and are not in violation of the OEA. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from Tenant's Shared Pylon and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises, provided that the pylon sign rights shall not be subdivided. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; or (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers.

7.5.2    Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or Tenant's Shared Pylon.

Section 7.6    Freeway Sign.    Landlord hereby grants to Tenant the right to place its sign panel on the sign structure located adjacent to the I-94 Freeway, which sign panel shall be in the position thereon shown on Exhibit F. The background of Tenant's sign panel shall be consistent with any background theme consistently used on all panels on the Freeway pylon; provided that Tenant may deviate from such background theme with the prior written consent of Landlord. Tenant hereby acknowledges that the right to place a panel on such freeway sign structure is on the basis of a revocable license which may be terminated on thirty (30) days notice. Landlord shall install Tenant's panel on the said Freeway Sign and Tenant shall reimburse Landlord for the reasonable cost of such installation within thirty (30) days after Tenant's receipt of an invoice therefor.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural alterations or structural improvements

or exterior alterations to the Premises (except to the extent same pertain to Tenant's Work as shown in Tenant's Plans as approved by Landlord pursuant to Section 3.2.1 hereof) without the prior written approval of Landlord, provided that Landlord's consent in respect of exterior alterations shall be limited to whether or not such proposed alterations are architecturally harmonious with the balance of the Shopping Center and shall not be required in respect of any exterior signage, Landlord's consent for which shall be determined under Section 7.3 hereof. All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense after thirty (30) days notice to Landlord, in a good and workmanlike manner and in compliance with all applicable Legal Requirements and shall comply with the OEA. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make interior non-structural alterations and interior non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings. Landlord may post notices of non-liability on the Premises as provided by Minnesota law.

8.1.3   Tenant shall have the right to subdivide the Premises into two (2) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, and (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) screens and locates such installation as approved by Landlord.

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) business days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant or Tenant's Work) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance and other prototype features) without the prior consent of Tenant. If Tenant does not object to any approval sought by Landlord pursuant to this Section 8.1.7 within ten (10) days after Tenant's receipt of Landlord's request, then, provided such request outlines clearly in bold lettering on the first page thereof the consequences of Tenant's failure to respond, Tenant's approval shall be deemed to have been given.

ARTICLE 9
REPAIRS

Section 9.1   Tenant's Repairs. Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural store front, all doors, interior elements of the Premises (including plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls, and the electrical, plumbing, mechanical and/or fire alarm systems and monitoring systems, including

monitoring charges, located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning (*"HVAC"*) units exclusively serving the Premises. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs. Subject to the provisions of Article 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, structural portions of exterior walls (excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor slab, and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers, and other exterior building maintenance, including painting;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises (the cost of which shall be included in Common Areas Charges, subject to Section 5.1.3 hereof);

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises (the cost of which shall be included in Common Areas Charges, subject to Section 5.1.3); and

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical and/or fire alarm systems located in or serving the Premises) until the later of: (A) the expiration of any contractors', manufacturers', vendors', or insurers' warranties or guarantees, or (B) the first (1st) anniversary of the Delivery Date; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and except as specifically noted above, not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Notwithstanding the immediately preceding sentence, (i) during the Renewal Periods, Tenant shall be responsible for the maintenance and repair of the roof of the Premises, and (ii) Tenant shall reimburse Landlord for a pro rata share of the reasonable costs incurred by Landlord in performing the painting and other maintenance of the exterior walls of the building in which the Premises is located as set forth in Section 5.1.2(a) hereof. If during any of the Renewal Periods Tenant reasonably determines that the roof cannot be properly repaired and is in need of replacement then Landlord shall replace the same at Landlord's cost and expense, provided that Tenant shall reimburse Landlord for the cost of any such roof replacement (but not for the replacement of the roof of any other building in the Shopping Center), provided that the cost of such roof replacement is amortized at a rate of eight (8%) percent over a period of ten (10) years and only the portion of such cost amortized in a particular year shall be payable by Tenant in that year and Tenant shall have no liability for any amount amortized on such basis after the expiration of the Term or Landlord may if Tenant determines that said roof requires replacement, at its sole option, instead assume all responsibility for roof maintenance, repair and replacement at its sole cost and expense for the remainder of the Term. Landlord shall give Tenant at least five (5) days' prior notice

of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in the Premises (except in the case of an emergency posing imminent material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs to the extent possible only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and, except as provided in Sections 5.1.2 and 5.1.3 hereof, not includable in Common Areas Charges) for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of "Legal Compliance Work" pertaining to the interior elements of the Premises which are not structural and to Legal Compliance related to all components in the Premises related to Tenant's Work; provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) Landlord's repairs required in this Lease. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3    Mutual Indemnification.

(a)        Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees,

or for which any of said parties may be statutorily liable.

      (b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   <u>Tenant's Insurance</u>.

      10.2.1  <u>Tenant's Insurance</u>. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out the Premises and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) standard "All-Risk" property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

      10.2.2  <u>Self-Insurance</u>. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self- insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Two Hundred Fifty Million Dollars ($250,000,000) and such guarantor of Tenant's obligations affirmatively assumes in favor of Landlord such self insurance obligations; or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Twenty-Five Thousand Dollars ($25,000.00) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   <u>Landlord's Insurance</u>.

      10.3.1  <u>Liability Insurance</u>. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

      10.3.2  <u>"All-Risk" Property Insurance</u>. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term standard "All-Risk" property insurance (including loss of rents and Pro Rata Share of reimbursables for a minimum period of one (1) year) and endorsements for coverages for terrorism, flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center ; <u>provided</u>, <u>however</u>, in no event shall such insurance cover Tenant's Property. Tenant and Landlord hereby agrees that if Landlord reasonably determines that

flood and/or earthquake insurance is not required in respect of the Shopping Center that Tenant shall have the right to require that Landlord carry the same in respect of the building in which the Premises is located and in such event Tenant shall reimburse Landlord for the premium for the earthquake and/or flood endorsement to the casualty policy in respect of the whole building in which the Premises are located, provided that, before each such policy comes into effect or is renewed Landlord shall advise Tenant of the amount of the premium for the aforesaid earthquake and/or flood coverage and Tenant may elect, by notice to Landlord within five (5) days of Tenant's receipt of notice, to require Landlord not to carry the same. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding Twenty-Five Thousand Dollars ($25,000.00) (which sum shall be increased every five years by the increase in the Consumer Price Index for such period), unless self insurance requirements are satisfied, without Tenant's prior consent.

       10.3.3  Tenant's Pro Rata Share of Insurance Premiums.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

    Section 10.4    General Insurance Requirements.

       10.4.1  All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

       10.4.2  The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

<div align="center">ARTICLE 11<br>FIRE AND OTHER CASUALTY; EMINENT DOMAIN</div>

    Section 11.1    Fire and Other Casualty.

       11.1.1(a)  Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the

Shopping Center in the manner provided in this Section 11.1.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the Delivery Date). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2    In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of Force Majeure not to exceed thirty (30) days in the aggregate (other than in respect of a second intervening casualty in which case the aforesaid thirty (30) day cap on Force Majeure shall not apply), provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within thirty (30) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the

Shopping Center is located; or

(iii)     terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3  If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2   Eminent Domain.

11.2.1  As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)     ten (10%) or more of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)     as a consequence of any Taking or other governmental action: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has entrances from each of Radio Drive, Hudson Road and Tamarack Road, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)     any portion of the Shopping Center shall be Taken which materially interferes with visibility of the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(d)     more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(e)     five (5%) percent or more of the parking spaces located in the Control Area or twenty percent (20%) or more of the parking spaces in the balance of the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this

Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord and Tenant for any Taking shall be available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores

between such parcels or lots which are not owned by Landlord or other parties to the OEA;

        (c)     Other than the consent of Landlord's existing mortgagee, no third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

        (d)     Except as set forth in Exhibit E, Tenant's use of the Premises for sale of Permitted Items (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

        (e)     The Shopping Center now has, and, on the Delivery Date, shall have, access to Radio Drive, Tamarack Road and Hudson Road for the purpose of vehicular traffic;

        (f)     This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

        (g)     Except as specifically provided in this Lease, provided that the requirements of the OEA are complied with, as from the Delivery Date and thereafter, there shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work (and any permit or other authorization to proceed with Tenant's Work shall have been obtained by Tenant);

        (h)     As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit F hereof.

        (i)     Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "Existing Leases");

        (j)     Landlord has obtained all permits and approvals required from applicable governmental authorities to enable the Common Areas to be operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits (the parties agree and acknowledge that the Common Areas of the Shopping Center are currently being operated for the existing tenants of the Shopping Center); and

        (k)     Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear, or notify Tenant that it elects not to appear, in such proceeding and shall contest such proposed variance. If Landlord, elects not to appear, or fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its

own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate, without expense to Landlord, with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4   Environmental Matters.

   12.4.1   Definitions.

        (a)     As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

        (b)     As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos containing products, whether or not currently friable.

        (c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

        (d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

        (e)     As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation: consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

        (f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

   12.4.2   Compliance with Environmental Laws.   Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.   Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

   12.4.3   Responsibility for Releases of Hazardous Substances.   Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous

Substances are caused by Tenant Releases. Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4  _Standards_.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5  _Landlord's Representations and Warranties_.  Landlord represents and warrants that, except as set forth in that certain Phase One Environmental Site Assessment Tamarack Village, dated October 1997 prepared by B.A. Liesch Associates, Inc.: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6  _Documents_.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7  _Indemnity_.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, partners, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8  _Survival_.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9  _Conflict_.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5  OEA.

12.5.1  As used in this Lease, the term *"OEA"* shall mean that certain Operation and Easement Agreement by and between Mervyn's, Inc. and Landlord, dated as of April 10, 1996 and recorded on April 16, 1996 in the Transfer Record of Washington County, Minnesota (the *"Clerk's Office"*) as document number 881304 as amended by that certain First Amendment to Operation and Easement Agreement dated April 15, 1997 between Landlord, Mervyn's, Inc. and Home Depot U.S.A., Inc.

12.5.2  Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises.

12.5.3  Landlord shall, during the Term: (i) perform and observe all of the terms,

covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA (unless such breach was caused by Tenant); and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA to the extent necessary to enable Tenant to have all of the benefits granted to Tenant under this Lease.

          12.5.4    Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could materially diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion, which discretion may only be withheld in Tenant's good faith.  Tenant's consent shall be deemed to be given if (i) Tenant fails to respond to Landlord's application for Tenant's consent hereunder, (ii) Landlord's application contains a clearly stated warning of the consequences of Tenant failing to respond within thirty (30) days after Tenant's receipt thereof, and (iii) Tenant fails to respond within such thirty (30) day period.

          12.5.5    Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

          12.5.6    Landlord shall not amend, or modify the OEA if such amendment or modification could materially diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.  If Landlord requests Tenant's consent to an amendment of the OEA, Tenant's consent shall be deemed to be given if (i) Tenant fails to respond to Landlord's application for Tenant's consent hereunder, (ii) Landlord's application contains a clearly stated warning of the consequences of Tenant failing to respond within thirty (30) days after Tenant's receipt thereof, and (iii) Tenant fails to respond within such thirty (30) day period.

          12.5.7    In the event Landlord defaults in the performance of any of its obligations under the OEA, and such default could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA.  Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant may, upon ten (10) days' prior notice to Landlord, offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

          12.5.8    As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease as to the definition of Common Areas Charges, this Lease shall in all respects control.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1   Permitted and Prohibited Uses.

          13.1.1  Tenant's Permitted Use.  Subject to the terms of the next sentence hereof, the Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), nor in violation of the OEA, to the extent then applicable.

          13.1.2  Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping

centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or on any land (the **"Related Land"**) contiguous to the Shopping Center (excluding any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land owned by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned such Related Land (excluding, however, the Landlord originally named herein and its Affiliates).  In no event shall Landlord's lender who becomes a successor in title be in default hereunder as to any land not owned by such lender.

Section 13.2   Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1  Subject only to the Existing Leases as to which the provisions of this Section 13.2 shall not apply except as specifically stated herein, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (defined in Subsection 13.1.2 above) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, primarily for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the **"Exclusive Items"**).  For the purposes of this Section an occupant shall be primarily engaged in the sale, rental or distribution of the Exclusive Items if more than twenty-five (25%) percent of the Floor Area of its premises (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) in the aggregate are being used for the sale, rental or distribution of any one or more of the Exclusive Items.  Notwithstanding the exception of Existing Leases from this Subsection 13.2.1, existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that the lease between Landlord and any such tenant requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items."  It is agreed that notwithstanding the above, in no event shall the premises designated"Mervyn's", and "Home Depot" be subject to Tenant's exclusive, nor shall it apply to any land in or adjacent to the Shopping Center now owned by  any party other than Landlord or an affiliate of Landlord, unless Landlord or an affiliate of Landlord shall acquire such land.  Notwithstanding anything to the contrary herein the restriction on the Exclusive Items shall not apply to the sale of custom window blinds and custom window coverings.  It is agreed that the premises designated "Gaiyan's"or "Cub Foods" shall not be subject to this exclusive; provided that if Landlord regains control of either of such premises then Landlord hereby covenants and agrees with Tenant that Landlord shall not lease, rent or occupy or permit any subdivided (meaning separated by a demising wall and having its own entrance) part of either of such premises to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, by a direct competitor of Tenant (such as, by way of example only, "Home Goods" or "Linen & Things"), it being agreed that this "direct competitor" restriction shall not apply to a lease of the whole of the premises designated "Gaiyan's"or the whole of the premises designated "Cub Foods" or to a department which is an integrated part of a business being operated in either of such premises.

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional (i) department store [for example,  Wal-Mart, Macy's, Kohl's, Mervyn's or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).  Tenant hereby agrees at Landlord's request to enter into a Letter Agreement with Cost Plus regarding Tenant's and Cost Plus's exclusives on the terms attached hereto as Exhibit P.

13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the

benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least twenty-five thousand (25,000) square feet of the Premises.

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center or in the Related Land a provision which effectuates the exclusive rights granted to Tenant in this Section 13.2 and, despite such inclusion, such tenant has violated said exclusive right unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Fixed Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.    If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1    Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).   Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.   Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises. Landlord shall not be required to enforce or to incur any negative consequences for any such separate agreement.  Tenant shall deliver a copy of any such separate agreement to Landlord as soon as it has signed such separate agreement.

13.3.2    Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Article 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day fully fixtured and fully staffed, not later than the ninety (90th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence,  Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any

business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant after the date on which said 180-day period expires but before Tenant reopens for business or gives Landlord notice of its intention to do so and in fact so re-opens or begins re-fixturing within sixty (60) days after such notice, whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

15.1.2  Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice to Tenant (the *"Termination Notice"*) thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises as stipulated in the Assignment/Subletting Notice,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the "State(s) of Minnesota" or "the Twin Cities metropolitan area"; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2  Intentionally Omitted

Section 15.3  Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested, without being required to modify its rights under this Lease, by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4  Cure Rights of Original Tenant.

15.4.1  If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective as to Original Tenant until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord *("New Lease")*, provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5  Recognition Agreement.  In the event Tenant subleases all of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

ARTICLE 16

DEFAULT AND DISPUTE RESOLUTION

Section 16.1    Tenant Default.

16.1.1    If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2    Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the expense of Tenant, in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.    If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting all reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3    Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use all commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled

to as a result of an Event of Default, provided that Landlord shall not be required to favor the Premises over any other then unleased premises in the Shopping Center. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default. If Landlord shall fail to perform or observe any of the covenants or warranties or representations of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion) (being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the reasonable expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid, ; and/or

(d)    upon five (5) days additional notice may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (*i.e.*, posing imminent material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises) shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord. Notwithstanding anything to the contrary contained herein, if Tenant is owed any amount by Landlord pursuant to this Lease, any offset, withholding or deduction of such amount shall in no event exceed fifty (50%) percent of each of the next succeeding monthly installments of the Fixed Rent until a court of competent jurisdiction renders a final unappealable judgment that Landlord is in default under this Lease and thereafter the aforesaid limitation shall no longer be applicable. Further, if Tenant shall be unable to recoup the amounts owing to Tenant by offsetting or withholding the foregoing fifty (50%) percent of fixed rent during the remainder of the Term, the fifty (50%) percent limitation shall be increased to an amount each month required to enable Tenant to recover such amount monthly, amortized over the remaining months of the Term.

Section 16.3    Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Coon Rapids, Minnesota, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator

finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
### RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1   Right to Mortgage and Non-Disturbance.   Landlord reserves the right to subject and subordinate this Lease at all times to any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, or on such other form as is reasonably acceptable to Tenant and the lender, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.  Any mortgagee in respect of which Tenant has been provided with the name and address, shall have the right to cure any default by Landlord hereunder within thirty (30) days after the date of its receipt of a copy of the default notice (provided that if such default is not reasonably capable of being cured within such thirty (30) day period the permitted cure period shall be extended to such period as is reasonably required to cure the same on the basis the cure is promptly commenced and diligently pursued).

Section 17.2   Estoppel Certificate.   Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3)specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to Landlord's or Tenant's actual knowledge, Landlord or Tenant is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3   Existing Mortgages.   Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof or in such other form as Tenant and such holder shall agree upon, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Twenty-Five Thousand Dollars ($25,000), plus reasonable legal fees.

ARTICLE 18
NOTICE

Subject to the further provisions of this Article XVIII, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease. See Section 15.4 as to the possible requirement for an additional notice to the Original Tenant.

ARTICLE 19
TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest, except for a judgment lien. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property upon the terms of this Article 19, provided that Landlord shall not be required to modify its rights and obligations under this Lease in any such waiver.

ARTICLE 20
END OF TERM

Section 20.1    Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

ARTICLE 21
INTENTIONALLY OMITTED

ARTICLE 22
INTENTIONALLY OMITTED

ARTICLE 23
MISCELLANEOUS

Section 23.1    Loading Facilities.  Tenant shall have the exclusive right to utilize the loading

facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2  Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3  Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4  Force Majeure.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, inability to procure materials, failure of power, restrictive Legal Requirements, riots, insurrection, terrorism, war, earthquake, hurricane or tornado(or comparable weather conditions of unusual severity) or other reasons which are beyond the reasonable control of the party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure.

Section 23.5  Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10  Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11  Definition of Landlord.  The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12  Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13  Limitation of Landlord's Liability.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale after a default of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14  Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15  Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16  Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17  Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18  Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  Short Form Lease.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  Entire Agreement and Modification.   This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  Governing Law.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.


IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.


**LANDLORD:**

WITNESS:                                        TAMARACK VILLAGE SHOPPING CENTER A
                                                LIMITED PARTNERSHIP
                                                By: Tamarack Village Shopping Center Corporation
                                                its general partner

_E.J. Husser_                                   By: _____
                                                Name: _Robert C. Muir_
                                                Title: _Pres_

[SEAL]


**TENANT:**

WITNESS:                                        BED BATH & BEYOND INC.,
                                                a New York corporation

_Alan M. Free_                                  By: _____ AwF
ALAN M. FREEMAN                                     Warren Eisenberg
                                                    Co-Chief Executive Officer

[SEAL]

<u>INDEX OF EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Description of Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises and Sidewalk Plan |
| Exhibit D-2 | Approved Plans for Landlord's Work |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Recognition Agreement |
| Exhibit I | Delivery Date Notice |
| Exhibit J | Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Percentage Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | Shopping Center Maintenance Approved Statement |
| Exhibit O | Special Assessments |
| Exhibit P | Cost Plus Side Letter Form |

Exhibit A

Legal Description of Shopping Center

Lots  4 and 6, Block 1, together with appurtenant drainage and ponding easements over Outlot B, Tamarack Village, and Lot 2, Block 1 and Outlot A, Tamarack 2nd Addition, County of Washington, State of Minnesota.

Exhibit B

Site Plan



Exhibit C

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, _____, by and between TAMARACK VILLAGE SHOPPING CENTER A LIMITED PARTNERSHIP (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

**W I T N E S S E T H :**

WHEREAS, Landlord is the owner of a certain shopping center known as Tamarack Village Shopping Center (the *"Shopping Center"*), situated on Tamarack Road, Radio Drive and Hudson Road, Woodbury, Minnesota;

WHEREAS, by that certain lease dated _____, ____, 2001 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.     The Rent Commencement Date occurred on _____, 200_.

2.     The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.     The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.     The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.     The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.     Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

WITNESS:

TAMARACK VILLAGE SHOPPING CENTER A LIMITED PARTNERSHIP
By: Tamarack Village Shopping Center Corporation its general partner

_____

By:_____
Name:_____
Title:_____

[SEAL]

**TENANT:**

BED BATH & BEYOND INC.

By:_____
    Warren Eisenberg
    Co-Chief Executive Officer

Exhibit D

Description for Landlord's Work



*Woodbury, MN*

**Exhibit D – Landlord's Work**
11/12/01

[All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.  To the extent not inconsistent with the terms of this Exhibit D, the terms of the lease regarding Landlord's work shall be deemed to supplement the provisions of the Exhibit D.  It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturer's' specifications.]

Part 1

1.  Landlord agrees to fully perform at its sole cost all of the work indicated as *"Landlord's Work")*set forth below:

2.  Landlord has delivered to Tenant, (2) hard copy sets of as-built drawings of the Premises.

3.  Landlord shall construct the demising partitions as shall be necessary to separate the Premises from the balance of the building, which contains the Premises in substantial accordance with Tenant's floor plan. Such demising walls and partitions shall be metal studs covered with drywall (to have a minimum one [1] hour rating if required by code) which are taped, bedded and sanded smooth, with security mesh up to 12' a.f.f and in a condition ready for final finish to be applied by Tenant.  Landlord shall insure that the demising walls and partitions meet or exceed all applicable fire codes and insurance regulations and be structurally sound.  Landlord shall be responsible for capping existing sprinkler and plumbing lines and disconnecting circuits at existing panel as required to install the demising partition.  Landlord shall allow tenant to further modify sprinkler system in order to accommodate tenants specific storage requirements.

4.  The Premises shall be delivered to Tenant by Landlord in a neat and broom-clean condition, free of all tenants and occupants, and free of all store fixtures of prior occupants, with any damage to the permanent structure of the Premises caused by the removal of the fixtures of the prior occupant having been repaired (at Landlord's cost) to Tenant's reasonable satisfaction.

5.  The Premises shall be delivered in a structurally sound condition, free of hazardous materials, and with a completely watertight roof.

6.  Landlord shall provide tenant use of existing utilities, including electric, gas, water (fire and domestic), sanitary and telephone, as indicated on exhibit D-2.

7.  All existing electric, gas, water (fire and domestic); sanitary and phone utilities shall be in good working order, or as described herein or on exhibit D-2.

8.  Existing 277/480 v. 3 phase – 4 wire 1200 amp electrical service, as indicated on Exhibit D-2, will be utilized by Tenant.  Existing Main Distribution Panel located within Tenant's Premises may be reused by Tenant at Tenant's discretion.

9.  Landlord shall allow Tenant the right to remove existing rooftop air-conditioning units (RTU's) and to replace with new units. Tenant shall have the right to reconfigure roof framing. All changes to the structure shall be approved by the Landlord and Landlord's engineer of record.

10. All work performed in the Premises, whether performed by Landlord or Tenant, shall be done in a good and first class workmanlike manner; in accordance with all applicable laws, ordinances, codes and insurance requirements.  Landlord agrees to fully cooperate with Tenant and to assist Tenant (including without limitation performing any work outside of the Premises required by governmental authority) in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy or the local equivalent thereof. There shall be no cost to the Landlord for his cooperation in helping obtain governmental approvals except as outlined on Exhibit D-2.

11. Tenant shall have the right to come onto the Premises in order to take measurements and in order to commence Tenant's Work, including fixturing, even while Landlord is completing Landlord's Work, but such entry by Tenant shall be at Tenant's sole risk and shall not be deemed a waiver of Landlord's obligation fully to complete Landlord's Work.  Tenant agrees that any of its work conducted as aforesaid shall not unduly interfere with the completion of Landlord's Work.  If the completion of Landlord's Work is delayed solely as a result of the acts or omissions of Tenant or Tenant's agents, Landlord shall notify Tenant of the cause and estimated extent of such delay.  If after such notice, Tenant does not remedy the cause for delay within forty-eight (48) hours, the date by which Landlord must complete Landlord's Work shall automatically be extended day for day for so many days as Tenant's or its agent's acts or omissions shall, solely, have caused such delay.  Landlord and Tenant agree, to the extent reasonably possible, to coordinate their work in the Premises in order that the First Delivery Date may be met.

i

12.     Except as otherwise provided in this Lease and the exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As Is" physical condition. The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in this Lease as the responsibility of Landlord.

13.     Landlord shall assist, without cost to the Landlord, the Tenant in obtaining all governmental and/or local approvals for Tenant site modifications based on Tenants Plans.

14.     The existing dock leveler, overhead door, dock seals, bumpers, hood and dock lights are "as-is" and should be in good working order.

15.     The lighting level throughout the Shopping Center (parking areas, traffic drives, Service drives, etc.) shall be average (2) foot-candles, measured 30" above grade.

16.     Landlord shall provide temporary barrier at the front of the store, as described in Exhibit D-2.

**Part 2**

1.     Landlord shall construct Tenant canopy feature storefront and glazing as shown in Exhibit D-1. This includes all blocking and conduit for signage and lighting for glass block feature. Landlord shall reimburse Tenant for installation and material cost of 14'-0" wide Stanley entry door, within storefront. (Work shall be performed as per Exhibit D-1, rather than Exhibit D-2 shell drawing.)

2.     Landlord shall construct new dumpster pad and trash chute door, as indicated on Exhibit D-2. The new Dumpster Pad shall consist of 12" compacted sub-grade (95% compacted), 4" compacted granular base and 5" Portland cement concrete surface finish.

3.     Storefront sidewalk to have a minimum of one ADA curb, in front of Tenant entry location and Width to be as shown on Exhibit D-1 Building elevation and Partial sidewalk plan.

4.     Tenant shall make final connection to Landlord's connection cabinet at transformer, utilizing existing conduit and conductors

5.     Landlord shall provide 10'x 15'concrete pad for front loading "trash" container (containers provided by tenant). Landlord is obligated to provide truck-turning radius of a minimum of 35' to allow for pick-up, Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 5" Portland cement concrete surface finish. Reinforcing shall consist of #4 re-bars, 18" oc each direction. Slope shall not exceed ¼" per foot. Masonry screen walls and gates shall be as per standard details for the shopping center and in accordance with local governmental authorities.

6.     Tenant shall be responsible for the reasonable cost of two new-barrier free parking spaces- striping and poles.

 12/3/07

<u>Exhibit D-1</u>

<u>Exterior Elevations of Premises</u>
<u>and Sidewalk Plan</u>



<u>Exhibit D-2</u>

<u>Approved Plans and Specifications</u>



# TAMARACK VILLAGE
## SOUTHWEST QUADRANT
## SHELL BUILDING REMODEL

*Robert Muir Company*

**ARCHITECTURAL**

DRAWING INDEX
- T001 — TITLE SHEET
- A101 — GENERAL NOTES
- A201 — FLOOR/ROOF/CEILING PLANS
- A301 — EXTERIOR ELEVATIONS
- A401 — WALL SECTIONS
- A402 — WALL SECTIONS
- A501 — DETAILS

**MECHANICAL/ELECTRICAL**

DRAWING INDEX
- M10 — MECHANICAL PLAN
- E10 — ELECTRICAL PLAN
- E20 — ELECTRICAL SPECIFICATIONS

**STRUCTURAL**

DRAWING INDEX
- S1 — STRUCTURAL NOTES & TYPICAL DETAILS
- S2 — FOUNDATION PLAN & ROOF FRAMING PLAN
- S3 — TYPICAL DETAILS
- S4 — LOADING DOCK/COMPACTOR PLAN & DETAILS

**LOCATION SITE PLAN**

NOTE:
THESE DRAWINGS ARE FOR AN EXISTING SHELL BUILDING REMODEL ONLY AND NOT FOR OCCUPANCY. A SEPARATE PERMIT IS REQUIRED FOR EACH TENANT PRIOR TO OCCUPANCY

EXHIBIT D-2

**KKE**
Architects Inc.

HOMEPLACE
RE-TENANT
TAMARACK VILLAGE –
SOUTHWEST QUADRANT
WOODBURY, MN

DEVELOPED:

*Robert Muir Company*

TITLE SHEET





# GENERAL NOTES

1. TENANTS WHO UTILIZE NON-UNION LABOR WILL BE REQUIRED TO REIMBURSE THE LANDLORD FOR ALL COSTS AS A RESULT OF UNION/NON-UNION DISPUTES INCLUDING SECURITY COSTS, ADDED LANDLORD CONSTRUCTION COSTS, DELAYS IN LANDLORD WORK, ETC.
2. ASPHALT REPAIRS BY THE LANDLORD WILL BE MADE AS WEATHER ALLOWS. IT IS POSSIBLE THAT THE LANDLORD MAY HAVE TO TEMPORARILY PROVIDE GRAVEL AT ASPHALT LOCATION DURING THE WINTER MONTHS. THIS CONDITION MUST BE ACCEPTABLE TO THE TENANTS.
3. BED BATH & BEYOND SHALL PROVIDE TO THE LANDLORD A VIDEO TAPE OF ALL SEWER LINES RELATED TO THEIR SPACE AFTER CONSTRUCTION IS COMPLETE.
4. THE LANDLORD'S GENERAL CONTRACTOR SHALL PROVIDE ALL TEMPORARY UTILITIES FOR LANDLORD WORK, INCLUDING TEMPORARY HEAT. TENANTS SHALL PROVIDE ALL TEMPORARY UTILITIES FOR THEIR OWN WORK.
5. BED BATH & BEYOND IS RESPONSIBLE FOR COMPLYING WITH ALL APPLICABLE CODES, ORDINANCES AND GOVERNMENTAL REGULATIONS, WHETHER ANTICIPATED OR NOT, AT TENANTS SOLE COST, INCLUSIVE OF ALL COSTS.
6. ALL DEMOLISHED MATERIALS MUST BE REMOVED FROM THE SITE AND DISPOSED OF IN A LEGAL MANNER.
7. TENANTS ARE RESPONSIBLE FOR RESTORING ANY DAMAGE TO COMMON AREA ELEMENTS CAUSED BY THE CONSTRUCTION OF THEIR SPACE.
8. TENANT CONSTRUCTION DUMPSTERS SHALL BE LOCATED IN THE STAGING AREA AS INDICATED ON THE SITE LOCATION PLAN. IT IS THE RESPONSIBILITY OF THE TENANT AND TENANT'S CONTRACTOR TO REMOVE ALL TRASH AND DEBRIS FROM THE PREMISES ON A DAILY BASIS AND PLACE IN THE DUMPSTERS FOR THAT PURPOSE. IF THE TENANT'S TRASH IS ALLOWED TO ACCUMULATE WITHIN THE TENANT'S SPACE, THE LANDLORD MAY REMOVE THE TRASH AT THE TENANT'S EXPENSE.
9. ALL ROOFING WORK REQUIRED BY THE TENANT SHALL BE PERFORMED BY THE LANDLORD'S AUTHORIZED ROOFING CONTRACTOR AT THE TENANTS EXPENSE. AFTER COMPLETION OF CONSTRUCTION, THE TENANT SHALL PROVIDE A CERTIFICATION FROM THE ROOFING CONTRACTOR THAT ALL WORK WAS COMPLETED TO MAINTAIN THE WARRANTY.
10. THE LANDLORD'S AND TENANT'S CONTRACTORS SHALL BE RESPONSIBLE FOR THEIR RESPECTIVE STAGING AREAS. REFER TO THE SITE LOCATION PLAN. EACH STAGING ARE SHALL BE FENCED AND MAINTAINED. SNOW REMOVAL SHALL BE TO A LOCATION AGREED TO BY THE LANDLORD. AFTER COMPLETION OF CONSTRUCTION, CLEAN AND REPAIR AREA TO ITS ORIGINAL CONDITION.
11. ALL FIRE PROTECTION SPRINKLER WORK REQUIRED BY THE TENANT SHALL BE PERFORMED BY THE LANDLORD'S AUTHORIZED SPRINKLER CONTRACTOR AT THE TENANT'S EXPENSE.
12. ALL CONSTRUCTION PERMITS, CERTIFICATE OF OCCUPANCY, ETC. IS THE RESPONSIBILITY OF THE TENANT
13. ALL WATER SERVICE, STORM SEWER, SANITARY SEWER, TELEPHONE, FIRE ALARM, FIRE MONITORING SYSTEM, ELECTRICAL AND GAS PIPING, AND ANY RELATED WORK REQUIRED TO COMPLETE THE TENANTS WORK, WHETHER WITHIN OR OUTSIDE THE TENANT'S SPACE, IS THE RESPONSIBILITY OF THE TENANT AT THE TENANT'S EXPENSE.
14. STORE WIDTH INDICATED ON DRAWING A201 OF THIS EXHIBIT IS SUPERCEDED BY WIDTH INDICATED ON EXHIBIT B.

## TENANT WORK - CONTRACT CLOSEOUT

1.01 SUMMARY:

A. The Tenant shall provide an orderly and efficient project closeout and transfer of the completed work to the Landlord, including timely delivery of the following documents and related within the time requirements as further described in this section:

1. Local Jurisdiction Closeout Documents.
2. Building Permit and Final Certificate of Occupancy.
3. Construction Punchlist.
4. Spare Parts, Maintenance and Extra Materials.
5. Project Record Construction Documents.
6. Building Maintenance Manuals.

1.02 LOCAL JURISDICTION CLOSEOUT DOCUMENTS: The Tenant shall promptly provide to the Landlord any and all additional closeout documents, forms and applications which may be required for submittal to the local jurisdiction by the Architect of record or engineer(s) of record to satisfy local project closeout and Final Certificate of Occupancy requirements.

1.03 BUILDING PERMIT: The Tenant shall retain the original Building Permit and shall include a copy of that permit in the Building Maintenance Manuals.

1.04 FINAL CERTIFICATE OF OCCUPANCY: The Tenant shall obtain and install the Final Certificate of Occupancy in the Store.

1.05 CONSTRUCTION PUNCHLIST INSPECTION & COMPLETION: The Construction Punchlist Inspection will be provided by the Tenant Construction Project Manager on or about the Date of Substantial completion as defined in the Lease Agreement. A copy of the Construction Punchlist will be provided to the Landlord. All punchlist items must be completed by the Tenant Contractor no later than the Date of Final Completion as defined in the Lease Agreement.

1.06 SPARE PARTS MAINTENANCE AND EXTRA MATERIALS:

A. The Tenant shall provide all products, spare parts, maintenance and extra materials in quantities as may be specified in the individual project manual sections.

B. The Tenant shall deliver spare parts and maintenance materials to the project site and place in a location approved or designated by the Landlord.

1.07 PROJECT RECORD CONSTRUCTION DOCUMENTS:

A. The Tenant shall maintain one set of the following project Record Construction Documents on the jobsite throughout the course of construction. The Tenant shall transpose all revisions to the work from field-use construction documents to the Project Record Construction documents, shall record all pertinent information in a timely manner concurrent with the construction progress, and shall deliver the resulting prepared set of Project Record Construction Documents to the Landlord upon completion of all construction work.

1. Record Construction Drawings: The Tenant shall submit one (1) set of paper sepia reproducibles to, and shall include all revisions to the work noted by the Tenant, including but not limited to:

a. Measured horizontal and vertical locations of underground utilities and appurtenances, referenced to permanent surface improvements.
b. Measured locations of internal utilities and appurtenances concealed in construction, referenced to visible and accessible features of the work.
c. Record of all changes to the work authorized by Change Bulletin or other directive from the Tenant (if any).

2. The Tenant shall store Project Record Construction Documents at the jobsite, but shall keep these documents separate from the documents used for construction reference purposes and fieldwork.

B. The Tenant shall submit all Project Record Construction Documents to the Landlord.

C. Submittals, shop drawings, product data, and samples bearing the Tenant Contractor's/ Architect's/ Engineer's submittal review "approval" stamps shall be maintained at the jobsite throughout the course of construction, for use by the Landlord, Tenant, and/or Testing/ Inspection Agency for reference during construction.

1.08 BUILDING MAINTENANCE MANUALS:

A. Upon completion of all construction work, the Tenant shall compile and submit the Building Maintenance Manuals to the Landlord.

B. Building Maintenance Manual Format:

1. The Tenant shall prepare two (2) identical binder copies, bound in 8-1/2" x 11" text pages, three D-ring style, 3" capacity notebook binders, color White with plastic insert-type covers at front, back and spine.
2. The Tenant shall internally subdivide the binder contents with tabbed page dividers, logically organized with tab titles typewritten or laser-printed under reinforced plastic tabs.
3. Organizational Content:

a. Cover Photograph: The Tenant shall include a cover photograph of at least 5"x7" size, inserted into the plastic insert cover.
b. "Table of Content": The Tenant shall prepare a Table of Contents for each volume required.
c. "Part 1": The Tenant shall prepare a Directory, listing names, addresses, and telephone numbers of Architect, Consulting Engineers, Tenant, Subcontractors and Major Equipment Suppliers.
d. "Part 2": The Tenant shall compile all operation and maintenance instructions, subdivided by Project Manual 5-digit CSI Section and arranged within each CSI Section by system. At each Section, include a preface page which identifies the names, addresses, and telephone numbers of Subcontractors and Suppliers if not previously identified in Part 1. The following documentation shall be included:

1) List of equipment.
2) Parts list of each equipment component.
3) Operating instructions and significant design criteria.
4) Maintenance instructions for equipment and systems.
5) Maintenance instructions for special finishes, including recommended cleaning methods and special precautions, including the identification of detrimental cleaning agents.

e. "Part 3": The Tenant shall include the following:

1) Plumbing Sterilization Certificate.
2) HVAC Air Balance Report.
3) Ampacity Test Report.
4) The Tenant Construction Project Manager's Construction Punchlist with completion of all punchlist items indicated by the Tenant Contractor's sign-off.
5) Copy of Final Certificate of Occupancy.
6) Tenant Contractor's Project Warranty or Letter of Intent to furnish same.

f. "Part 4": The Tenant shall include a copy of each product warranty, service warranty and/or other guarantee document from Subcontractors, suppliers and manufacturers as specified.

1.09 LIST OF BUILDING MAINTENANCE MANUAL PARTS 2, 3 & 4 CONTENTS REQUIREMENTS:

| Section | Description | Building Maintenance Manuals (BMM) | BMM Part | Record Construction Documents or General Remarks |
|---|---|---|---|---|
| | BMM Table of Contents | To be included in BMM | - | - |
| | BMM Directory | To be included in BMM | Part 1 | - |
| 05500 | Metal Fabrications | | | |
| | Pre-engineered Stair Lifetime Warranty | To be included in BMM | Part 4 | - |
| 06200 | Rough & Finish Carpentry | | | |
| | Casework Mfr Warranty | To be included in BMM | Part 4 | |
| 07510 | Single Ply Membrane Roofing System | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 07920 | Sealants & Caulking | | | |
| | Mfr(s) product warranty(ies) | To be included in BMM | Part 4 | - |
| 08100 | Metal Doors & Frames | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | |
| 08300 | Special Doors | | | |
| | Sectional Door Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| | Double Acting Door Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 08410 | Aluminum Entrance Doors & Storefront | | | |
| | Storefront Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| | Auto. Sld. Entr. Dr. Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 08800 | Glazing | | | |
| | Glazing Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| | Window Film Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 09310 | Tile | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 09510 | Acoustical Ceiling | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 09650 | Resilient Flooring | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | |
| 09680 | Carpet | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 09670 | Concrete Floor Coatings | | | |
| | Mfr. Product Warranty | To be included in BMM | Part 4 | - |
| 15300 | Fire Suppression System | | | |
| | Operations Manuals | To be included in BMM | Part 2 | - |
| | Record Drawings | Provide ALL Construction Documents field revisions | | |
| 15400 | Plumbing | | | |
| | Operations Manuals | To be included in BMM | Part 2 | - |
| | Sterilization Certificate | To be included in BMM | Part 3 | - |
| | Mfr. Product Warranties | To be included in BMM | Part 4 | - |
| | Record Drawings | Provide ALL Construction Documents field revisions | | |
| 15500 | HVAC Systems | | | |
| | Operations Manuals | To be included in BMM | Part 2 | - |
| | Air Balancing Report | To be included in BMM | Part 3 | - |
| | HVAC System Startup Statement | To be included in BMM | Part 4 | - |
| | Mfr. Product Warranties | To be included in BMM | Part 4 | - |
| | Record Drawings | Provide ALL Construction Documents field revisions | | |
| 16000 | Electrical Systems | | | |
| | Operations Manuals | To be included in BMM | Part 2 | - |
| | Ampacity Test Report | To be included in BMM | Part 3 | - |
| | Mfr. Product Warranties | To be included in BMM | Part 4 | - |
| | Record Drawings | Provide ALL Construction Documents field revisions | | |

KKE

Korsunsky Krank Erickson
Architects, Inc
300 First Avenue North
Minneapolis, MN 55401
612/339-4200
FAX 342-9267

EXHIBIT D-2

HOMEPLACE
RE-TENANT

TAMARACK VILLAGE -
SOUTHWEST QUADRANT

WOODBURY, MN

DEVELOPED:

Robert Muir Company

Key Plan

GENERAL NOTES

12/21/01

12/31/01

I hereby certify that this plan, specification, or report was prepared by me or under my direct supervision and that I am a duly Licensed Architect under the laws of the State of Minnesota.

Printed Name: JACK AMDAL

Signature:

Date: 11/19/01 License #: 17421

| No. | Date | Revision Description |
|---|---|---|
| | 10-5-01 | OWNER REVIEW SET |
| | 11-5-01 | OWNER REVIEW SET (REVISED) |
| | 11-19-01 | ISSUED FOR PERMIT |

Project: 01-08-179-01
Date: September 18, 2001
Drawn by: KLD
Checked by: HH
Sheet: A101

















OVERALL FLOOR PLAN
CEILING PLAN
ROOF PLAN
ENLARGED FLOOR PLAN
DEMO PLAN
KKE
Korsunsky Krank Erickson
Architects Inc
300 First Avenue North
Minneapolis MN 55401
612/339-4200
FAX 342-9267
EXHIBIT D-2
HOMEPLACE
RE-TENANT
TAMARACK VILLAGE –
SOUTHWEST QUADRANT
WOODBURY MN
DEVELOPED:
Robert Muir Company
Key Plan
FLOOR / ROOF /
CEILING PLANS
A201

SECTION @ FRONT FACADE
SECTION @ FRONT FACADE
WALL SECTION
KKE
Korsunsky Krank Erickson Architects Inc
300 First Avenue North
Minneapolis, MN 55401
EXHIBIT D-2
HOMEPLACE RE-TENANT
TAMARACK VILLAGE - SOUTHWEST QUADRANT
WOODBURY, MN
DEVELOPED:
Robert Muir Company
Key Plan
WALL SECTIONS
A401

12/31/01

KKE
Korsunsky Krank Erickson Architects Inc
EXHIBIT D-2
HOMEPLACE RE-TENANT
TAMARACK VILLAGE – SOUTHWEST QUADRANT
WOODBURY, MN
DEVELOPED:
Key Plan
WALL SECTIONS
WALL SECTION
SCREEN WALL SECTION
TYP. CURB FOR MECH. ROOFTOP UNIT OPENINGS
TRASH ENCLOSURE GATE ELEVATION
TRASH ENCLOSURE GATES
DEMISING WALL SECTION
PLAN DETAIL
A402

12/31/01

EXHIBIT D-2

HOMEPLACE
RE-TENANT
TAMARACK VILLAGE —
SOUTHWEST QUADRANT
WOODBURY, MN

DEVELOPED:

Robert Muir Company

KKE
Korsunsky Krank Erickson
Architects Inc.

A501









KKE
Korsunsky Krank Erickson Architects Inc
300 First Avenue North
Minneapolis, MN 55401
W.J. SUTHERLAND & ASSOCIATES, INC.
CONSULTING ENGINEERS
HOMEPLACE RE-TENANT
TAMARACK VILLAGE – SOUTHWEST QUADRANT
WOODBURY, MN
EXHIBIT D-2
Key Plan
MECHANICAL PLAN
M1.0
MECHANICAL PLAN
LINETYPE LEGEND
ROOFTOP UNIT DETAIL
GAS FIRED – DOWN DISCHARGE
12/31/01

KEYNOTES ○

1. EXISTING PAD MOUNT UTILITY TRANSFORMER TO REMAIN.
2. PROVIDE 400A SERVICE FEEDERS FROM UTILITY TRANSFORMER TO DISCONNECT SWITCH. SEE ONE-LINE DIAGRAM. TRENCH AND PATCH BITUMINOUS DRIVE AS REQUIRED. COORDINATE WITH LANDLORD. COORDINATE WITH NEW UNDERGROUND SERVICES.
3. PROVIDE WEATHERPROOF CT CABINET, METER SOCKET AND DISCONNECT SWITCH. MOUNT ON EXTERIOR WALL FOR TENANT SPACE #101. SEE ONE-LINE DIAGRAM.
4. PROVIDE ELECTRICAL SERVICE. SEE ONE-LINE DIAGRAM.
5. DISCONNECT ROOFTOP UNITS RTU-5,6,9,11 AND 2 FROM EXISTING 1200A SWITCHBOARDS AND RECONNECT TO PANEL MP1. EXTEND EXISTING 1"C-3#8 AND 1#10 GND. PULL NEW WIRING AS REQUIRED. FIELD VERIFY REQUIREMENTS.
6. EXISTING 1200A SWITCHBOARD, PANELS AND TRANSFORMERS TO REMAIN.
7. DISCONNECT AND RECONNECT RELOCATED ROOFTOP UNIT RTU-8 TO EXISTING SWITCH IN 1200A SWITCHBOARD FOR BED BATH & BEYOND SPACE. PROVIDE NEW CONDUIT AND WIRING AS REQUIRED. COORDINATE RELOCATION OF ROOFTOP UNIT WITH MECHANICAL CONTRACTOR.
8. EXISTING 480V, 3PH, 4W, 1200A FEEDERS TO 1200A SWITCHBOARD TO REMAIN. RECONNECTION TO CONNECTION CABINET BY BBB AS REQUIRED.
9. PROVIDE J-BOX WITH DISCONNECT SWITCH FOR TENANT SIGN. PROVIDE 120V, 20A CIRCUIT FOR EACH J-BOX FROM LANDLORD'S PANEL PIN-102 AND CONTROLS. PROVIDE CIRCUIT BREAKERS, ADDITIONAL CONTACTS AND TIMECLOCKS AS REQUIRED. MATCH LANDLORD'S EQUIPMENT.
10. PROVIDE SOFFIT LIGHTING TYPE "A" AND CONNECT TO LANDLORD'S PANEL PIN-102 AND CONTROLS. PROVIDE CIRCUIT BREAKERS, RELAYS, AND TIME CLOCKS AS REQUIRED. VERIFY REQUIREMENTS AND LOCATION WITH LANDLORD. MATCH LANDLORD'S EQUIPMENT.

PROVIDE STRIP FLUORESCENT LIGHT FIXTURE TYPE "B" AND MOUNT IN SPACE PROVIDED BEHIND GLASS BLOCK. CONNECT TO LANDLORD'S PANEL PIN-102 AND CONTROLS. PROVIDE CIRCUIT BREAKERS, RELAYS AND TIME CLOCKS AS REQUIRED. VERIFY LOCATION AND MOUNTING WITH ARCHITECTURAL PLAN 1/A101. MATCH LANDLORD'S EQUIPMENT.

12. PROVIDE 3" CONDUIT WITH PULLWIRE TO TELEPHONE CO. DEMARCATION. COORDINATE LOCATION WITH TELEPHONE CO. COORDINATE WITH ALL EXISTING UNDERGROUND SERVICES. STUB UP IN FLOOR 6" A.F.F.
13. PROVIDE SIMPLEX FIRE ALARM PANEL 4005 WITH AUTO DIALER WITH PROVISION FOR TWO TELEPHONE LINES FOR MONITORING TAMPER/FLOW SWITCHES. CONNECT TAMPER/FLOW SWITCHES.
14. PROVIDE 5/8"X4'X8' FIRE TREATED TELEPHONE BACKBOARD. PAINT GRAY.
15. PROVIDE EXTERIOR LIGHT FIXTURE. MATCH EXISTING TYPE. TIE INTO EXISTING BUILDING EXTERIOR LIGHT CIRCUIT. FIELD VERIFY REQUIREMENTS AND MOUNTING HEIGHT.
16. DISCONNECT AND REMOVE ALL EXISTING LIGHT FIXTURES, CONDUIT AND WIRING IN "COST PLUS" SPACE #101.
17. DISCONNECT ALL EQUIPMENT AND DEVICES FROM EXISTING POWER SOURCE. REMOVE ALL WIRING AND CONDUIT WHERE ACCESSIBLE. REMOVE ALL WIRING IN UNACCESSIBLE CONDUIT AND ABANDON CONDUIT IN PLACE.

NOTE:
ANY REQUIRED MODIFICATIONS TO EXISTING FIRE ALARM PANELS, REMOTE DIALERS, FLOW VALVE SWITCHES, INDICATOR VALVES, WALL VALVES, ETC IN BBB SPACE SHALL BE AT THEIR COST.

1 E1.0 ELECTRICAL PLAN
0 4 8 16 32 FEET
1/16" = 1'-0

ONE LINE DIAGRAM KEY NOTES ○

1. EXISTING UTILITY TRANSFORMER, 480/277-3PH, 4W
2. PROVIDE/UPGRADE CONNECTION CABINET INCLUDING AND AND ALL ASSOCIATED EQUIPMENT. DISCONNECT AND RECONNECT EXISTING SECONDARY 1200A FEEDERS AND ANY ADDITIONAL TENANT SECONDARY FEEDERS AS REQUIRED. COORDINATE WITH LANDLORD AND UTILITY CO. FOR TEMPORARY SHUTDOWN OF ACTIVE TENANT'S SERVICE(S). FIELD VERIFY EXACT REQUIREMENTS PRIOR TO BID.
3. PROVIDE 4"C-4#500 KCMIL THHN-CU AND #/0 CU GND.
4. PROVIDE LOCKABLE 400A/3P/3R WITH 3-400A CLASS FUSES, CT CABINET AND METER SOCKET. MOUNT ON EXTERIOR OF BUILDING. METER AND CTS BY UTILITY CO. COORDINATE WITH UTILITY CO. MAKE FINAL CONNECTIONS.
5. 4"C-4#500 KCMIL-THHN-CU, 1#/0 CU GND.
6. PROVIDE PANEL MP1. SEE 1/E1 AND SPECIFICATIONS.
7. PROVIDE 2"C-3#3/0 THHN-CU
8. PROVIDE 480-120/208V, 3PH, 4W, 50 KVA TRANSFORMER. MOUNT ON FLOOR. SEE SPECIFICATIONS.
9. PROVIDE 1/0 BAR CU GROUND PER NEC.
10. PROVIDE 3"C-4#500 KCMIL THHN-CU.
11. PROVIDE PANEL LA 120/208V 3PH, 4W [illegible] 1-42P SECTION

2 E1.0 ONE-LINE DIAGRAM
NOT TO SCALE

| LIGHT FIXTURE SCHEDULE | | | | | | |
|---|---|---|---|---|---|---|
| TYPE | MANUFACTURER | CATALOG NO. | LAMPS | MOUNTING | VOLTS | REMARKS |
| A | JUNO | MB-70-PR | (1) M70/C/U/MED | RECESSED | 120 | LENSED HID RECESSED EXTERIOR DOWNLIGHT |
| B | LITHONIA | C248HO120 | (2) F48T12/D830/HO | SURFACE | 120 | WITH COLD WEATHER BALLAST |
| | | | | | | |

# KKE

Korsunsky Krank Erickson
Architects Inc
300 First Avenue North
Minneapolis, MN 55401
612/339-4200
FAX 342-9267

W.J. SUTHERLAND
& ASSOCIATES, INC.
CONSULTING ENGINEERS
6300 W. OLD SHAKOPEE ROAD
SUITE 140
BLOOMINGTON, MINNESOTA 55438
OFFICE (952) 346-4180
FAX (952) 346-4181
E-MAIL projects@wjsutherland.com

HOMEPLACE
RE-TENANT

TAMARACK VILLAGE -
SOUTHWEST QUADRANT

WOODBURY, MN

EXHIBIT D-2

Key Plan

ELECTRICAL
PLAN

I hereby certify that this plan, specification or report was prepared by me or under my direct supervision and that I am duly Licensed Professional Engineer under the laws of the State of Minnesota.
Typed or Printed Name:
Duane E. Engler
Signature:
Date: Reg. No. 10986

| No. | Date | Revision Description |
|---|---|---|
| | 10/10/01 | OWNER REVIEW SET |
| | 11/15/01 | OWNER REVIEW SET REVISED |
| | 11/28/01 | OWNER REVIEW SET REVISED |

Project 573-010 Sheet
Date October 10, 2001
Drawn by VJM
Checked by MDP
E1.0

Copyright © 2001 by Korsunsky Krank Erickson Architects, Inc.

12/31/01

## SYMBOL SCHEDULE

| Symbol | Description |
| --- | --- |
| $ | SWITCH – SINGLE POLE TOGGLE |
| $K | SWITCH – SINGLE POLE KEY-OPERATED |
| $d | SWITCH – SINGLE POLE DOOR JAMB |
| $ | SWITCH – SINGLE POLE WITH PILOT LIGHT |
| $3 | SWITCH – 3 WAY |
| | WALL RECEPTACLE – DUPLEX STRAIGHT BLADE |
| | WALL RECEPTACLE – FOURPLEX STRAIGHT BLADE |
| IG | RECEPTACLE – DUPLEX STRAIGHT BLADE, ISOLATED GROUND |
| IG | RECEPTACLE – FOURPLEX STRAIGHT BLADE, ISOLATED GROUND |
| GFI WP | RECEPTACLE – DUPLEX STRAIGHT BLADE, GROUND FAULT INTERRUPTER, WEATHER PROOF |
| | MULTIOUTLET ASSEMBLY (PLUGMOLD) |
| | TELEPHONE OUTLET – WALL MOUNTED |
| | DATA OUTLET |
| | MOTOR – HORSEPOWER, VOLTAGE AND PHASE AS NOTED ON DRAWINGS |
| | NON-FUSED DISCONNECT SWITCH – SIZE AS NOTED ON DRAWINGS |
| | FUSED DISCONNECT SWITCH – SIZE AS NOTED ON DRAWINGS |
| | MAGNETIC MOTOR STARTER – SIZE AS NOTED ON DRAWINGS |
| | JUNCTION BOX – WALL, CEILING |
| | SWITCHBOARD OR PANELBOARD |
| | TELEPHONE BACKBOARD |
| | BUZZER |
| | BELL OR CHIME |
| | PUSHBUTTON CONTROL STATION – WALL MOUNTED |
| | LOW VOLTAGE CONTROL TRANSFORMER |
| | TIME SWITCH |
| | CONTACTOR |
| | THERMOSTAT (BY MECHANICAL CONTRACTOR OR AS INDICATED) |
| | CONDUIT – CONCEALED ABOVE CEILINGS, IN WALLS IN FINISHED AREAS, OR EXPOSED IN UNFINISHED AREAS |
| | CONDUIT – IN OR BELOW FLOOR SLAB OR BELOW FINISHED GRADE |
| | CONDUIT HOMERUN TO PANEL – CROSSMARKS INDICATE NUMBER OF CONDUCTORS, NO CROSSMARKS INDICATES 2 CONDUCTORS, DOT ON CROSSMARKS INDICATES EQUIPMENT ISOLATED GROUNDING CONDUCTOR |
| | FLOOR RECEPTACLE |
| | FLUSH FLOOR TELEPHONE OUTLET |
| | UNDER FLOOR STUB UP |
| | SPEAKER |
| | EXIT LIGHT |
| | EMERGENCY FIXTURE |
| | FIRE ALARM AUDIO/VISUAL DEVICE |
| | FIRE ALARM VISUAL DEVICE |
| | FIRE ALARM SMOKE DETECTOR |
| A(4) CA-1 | TOP LETTER INDICATES LIGHT FIXTURE TYPE, ( ) INDICATES NUMBER. REFER TO LIGHT FIXTURE SCHEDULE. BOTTOM LETTER AND NUMBER INDICATES PANELBOARD DESIGNATION AND CIRCUIT NUMBER. LOWER CASE LETTER INDICATES SWITCH DESIGNATION. |
| B-16 | NOTE: LETTER AND NUMBER NEXT TO ALL DEVICES AND CONDUIT STUB-UPS INDICATES PANELBOARD DESIGNATION AND CIRCUIT NUMBER, TYPICAL. |

NOTE:
ALL IG RECEPTACLES SHALL BE ORANGE.
A SQUARE ENCLOSING A WIRING DEVICE SYMBOL INDICATES A FLUSH FLOOR DEVICE.

## ELECTRICAL SPECIFICATIONS

16000 – GENERAL PROVISIONS

0.01 PERFORMANCE: ELECTRICAL CONTRACTOR SHALL PERFORM ALL WORK SPECIFIED, INDICATED AND REQUIRED UNLESS OTHERWISE NOTED, INCLUDING FINAL CONNECTIONS, IN A WORKMANLIKE MANNER USING WORKERS SKILLED AND EXPERIENCED IN THE TRADE.

0.02 SITE EXAMINATION: EXAMINE SITE BEFORE BIDDING. CLAIMS FOR EXTRAS RESULTING FROM LACK OF KNOWLEDGE OF SITE CONDITIONS SHALL NOT BE ALLOWED OR APPROVED.

0.03 JOB SITE CONDITIONS: ACCEPT SOLE AND COMPLETE RESPONSIBILITY FOR CONDITIONS OF THE JOB SITE, INCLUDING SAFETY OF ALL PERSONS AND PROPERTY DURING PERFORMANCE OF THE WORK.

0.04 FULL FUNCTION: PROVIDE ALL MINOR ITEMS NECESSARY FOR COMPLETE AND FULLY FUNCTIONAL INSTALLATION.

0.05 ADMINISTRATION: PROVIDE EVIDENCE OF LICENSES, BONDING, AND INSURANCE, AND PERFORM OTHER ADMINISTRATIVE FUNCTIONS, AS REQUIRED.

0.06 PERMITS: PROCURE AND PAY FOR ALL REQUIRED PERMITS AND SERVICE CHARGES.

0.07 COORDINATION: CONFORM TO GENERAL CONSTRUCTION CONTRACT DOCUMENTS EXCEPT AS MODIFIED HEREIN. REFER ALSO TO STRUCTURAL AND MECHANICAL CONTRACT DOCUMENTS. COORDINATE ALL WORK WITH OTHER TRADES.

0.08 ROOF PENETRATIONS: COORDINATE WITH OWNER.

0.09 MECHANICAL SUBSTITUTIONS: INVOICE MECHANICAL CONTRACTOR, NOT TENANT, FOR COSTS INCURRED DUE TO SUBSTITUTION OF MECHANICAL EQUIPMENT HAVING ELECTRICAL REQUIREMENTS DIFFERING FROM THOSE INDICATED.

0.10 ADJUSTMENTS: MAKE MINOR ADJUSTMENTS TO WORK WHERE REQUESTED BY OWNER, WHEN SUCH ADJUSTMENTS ARE NECESSARY TO PROPER OPERATION AND WITHIN THE INTENT OF THE CONTRACT.

0.11 REFERENCE STANDARDS: COMPLY WITH NEC AND APPLICABLE STANDARDS OF NFPA, ANSI, NEMA, AND UL, EXCEPT AS SUPERSEDED BY LOCAL AUTHORITY. CONFORM WITH CONTRACT DOCUMENTS WHERE THEY EXCEED CODE MINIMUM REQUIREMENTS.

0.12 LOCAL REQUIREMENTS: COMPLY WITH THE REQUIREMENTS OF LOCAL CODES, OWNER, SERVING UTILITY, AND THE LOCAL AUTHORITY HAVING JURISDICTION. SECURE APPROVAL OF INSTALLATION BY OWNER, LOCAL AUTHORITY, AND OTHERS AS REQUIRED.

0.13 SCHEDULE: ORDER EQUIPMENT WITHIN 5 DAYS OF RECEIPT OF CONTRACT TO MAINTAIN CONSTRUCTION SCHEDULE.

0.14 TEMPORARIES: PROVIDE AND REMOVE ALL TEMPORARY SERVICE, LIGHTING AND POWER FOR ALL TRADES AS REQUIRED. REMOVE ALL TEMPORARIES BY THE TIME OF PROJECT COMPLETION.

0.15 MATERIALS AND EQUIPMENT: PROVIDE NEW, UL LISTED, COMMERCIAL GRADE MATERIALS, DEVICES, EQUIPMENT, AND FIXTURES, SUITABLE FOR ENVIRONMENT. REUSE EXISTING ONLY WHEN COMPLIANT WITH THE CONTRACT DOCUMENTS, IN GOOD CONDITION, AND APPROVED BY THE ENGINEER. COMPLIANCE WITH CURRENT CODES.

0.16 INSTALLATION: INSTALL ALL MATERIALS, EQUIPMENT AND SYSTEMS IN FULL ACCORD WITH MANUFACTURERS' RECOMMENDATIONS.

0.17 COMMISSIONING: THOROUGHLY TEST AND DEMONSTRATE PROPER OPERATION OF ALL SYSTEMS AND EQUIPMENT FURNISHED OR INSTALLED UNDER THIS CONTRACT. VERIFY PROPER MOTOR ROTATION OF ALL EQUIPMENT.

0.18 O & M MANUALS: AT COMPLETION OF PROJECT, PROVIDE TO OWNER ALL OPERATING AND MAINTENANCE MANUALS AND INFORMATION FOR MATERIAL, EQUIPMENT AND SYSTEMS INSTALLED UNDER THIS CONTRACT.

0.19 CORRECTIVE PERIOD: PROVIDE A CORRECTIVE PERIOD FROM DATE OF FINAL ACCEPTANCE OF NOT LESS THAN ONE (1) YEAR FOR THE ENTIRE INSTALLATION, DURING WHICH PERIOD UNCONDITIONALLY MAKE GOOD ANY DEFECTS IN MATERIALS OR WORKMANSHIP WITHOUT COST TO OWNER.

0.20 DRAWINGS ARE DIAGRAMMATIC: VERIFY ALL DIMENSIONS AND LENGTHS, AND ADJUST EQUIPMENT AND RACEWAY LOCATIONS TO AVOID CONFLICTS WITH OTHER CONSTRUCTION.

0.21 DOCUMENT PRIORITY: DRAWING INDICATIONS AND NOTATIONS SUPERSEDE THESE SPECIFICATIONS.

0.22 RATINGS: REFER TO DRAWINGS AND SCHEDULES FOR ADDITIONAL RATINGS AND REQUIREMENTS.

0.23 PROJECT REQUIREMENTS. REFER TO DRAWINGS FOR PARTICULAR PROJECT REQUIREMENTS, AS NOT ALL ITEMS SPECIFIED MAY BE REQUIRED FOR THIS PROJECT.

0.24 DOCUMENT ERRORS: NOTIFY THE ENGINEER OF ERRORS, DISCREPANCIES OR OMISSIONS BEFORE CONSTRUCTION OR FABRICATION OF AFFECTED WORK. FAILING SUCH NOTICE, BE RESPONSIBLE FOR CORRECTING SAME.

0.25 CERTIFICATION: PROFESSIONAL ENGINEER CERTIFICATION OF THESE DOCUMENTS DOES NOT EXTEND TO STANDARDIZED DESIGN OR INSTALLATION GUIDELINES PREPARED BY OTHERS AND REQUIRED BY A THIRD PARTY TO BE INCLUDED HEREON.

0.26 DEFINITIONS: THE TERMS LISTED BELOW ARE DEFINED AS FOLLOWS WHEN USED IN DIVISION 16 AND ONLY DIVISION 16.

A. FURNISH: OBTAIN, COORDINATE, SUBMIT THE NECESSARY DRAWINGS, DELIVER TO THE JOB SITE IN NEW CONDITION AND GUARANTEE.

B. INSTALL: RECEIVE AT THE JOB SITE, UNLOAD, STORE, SET IN PLACE, CONNECT, PLACE IN OPERATION AND GUARANTEE.

C. PROVIDE: FURNISH AND INSTALL.

D. REMOVE: REMOVE INSTALLATION BACK TO NEXT REMAINING POINT OF USE.

16100 – MATERIALS

1.01 RACEWAY: CONTINUOUS SYSTEM, 1/2" MINIMUM EMT EXCEPT: 3/4" MINIMUM RNC WITH GROUND CONDUCTOR WHERE EMBEDDED IN CONCRETE OR MASONRY; 3/4" MINIMUM GALVANIZED RMC OR IMC WHERE EXPOSED TO WEATHER (ALSO PERMITTED WHERE EMBEDDED IN CONCRETE OR MASONRY); AND FMC (OR LFMC IF WET LOCATION) FOR SHORT FINAL CONNECTIONS TO LIGHTING FIXTURES, TRANSFORMERS, AND MECHANICAL EQUIPMENT.

1.02 IG RACEWAY: PROVIDE SEPARATE RACEWAY SYSTEM FOR IG CIRCUITS.

1.03 RACEWAY INSTALLATION: CONCEAL RACEWAY IN FINISHED SPACES. ROUTE SQUARE WITH BUILDING LINES AND SUPPORT PER NEC. DO NOT ATTACH TO OR PENETRATE HVAC DUCTS. MAINTAIN HEADROOM AND EQUIPMENT AND FLUE CLEARANCE. FIRE/SMOKE – SEAL PENETRATIONS OF RATED CONSTRUCTION.

1.04 RACEWAY ADJUSTMENTS: WHERE INDIVIDUAL HOME RUNS ARE SHOWN FOR CLARITY, COMBINE AND ADJUST RACEWAY SIZE PER FIELD CONDITIONS.

1.05 WIRE: TYPE THHN, COPPER ONLY, 12AWG MINIMUM, STRANDED FOR 8AWG AND LARGER, LV WIRING FOR EMERGENCY LIGHTING, 10AWG MINIMUM. USE OF ALUMINUM CONDUCTORS SHALL NOT BE ALLOWED.

1.06 COLOR CODE: COLOR CODE ENTIRE WIRING SYSTEM FROM SERVICE DISCONNECT OR TRANSFORMER THROUGHOUT ALL BRANCH CIRCUITS AS FOLLOWS: FOR 120/208 VOLT SYSTEM, PHASE A – BLACK, PHASE B – RED, PHASE C – BLUE, NEUTRAL – WHITE; FOR 277/480 VOLT SYSTEM, PHASE A – BROWN, PHASE B – ORANGE, PHASE C – YELLOW, NEUTRAL – WHITE WITH TRACER OR GRAY, GROUNDING CONDUCTOR – GREEN.

1.07 WIRE SIZE: WHERE WIRES ARE SIZED PER 60 DEG. C TEMPERATURE RATING FOR SIZES UP TO 1 AWG, SUBJECT TO COMPLIANCE WITH EQUIPMENT UL LISTING, AND APPROVAL OF LOCAL AUTHORITY AND ENGINEER, SUCH WIRES MAY BE REDUCED TO 75 DEG. C RATED SIZE, WITH RACEWAY SIZE ADJUSTED ACCORDINGLY. WIRE SIZE PER 90 DEG. C TEMPERATURE RATING IS NOT APPROVED.

1.08 VOLTAGE DROP: FOR CONDUCTORS SIZED PER NEC ON DRAWINGS, INCREASE SIZE BY NUMBER OF STANDARD SIZES SHOWN IN TABLE TO COMPENSATE FOR VOLTAGE DROP. CONTACT ENGINEER FOR ASSISTANCE IF CIRCUIT LENGTH FROM SOURCE TO LOAD EXCEEDS MAXIMUMS SHOWN.

| CCT VOLTS/PH | CCT LENGTH FT | UPSIZE |
| --- | --- | --- |
| 120/1 | 75–150 | 1 |
| 120/1 | 150–200 | 2 |
| 208/3 OR 277/1 | 150–200 | 1 |
| 208/3 OR 277/1 | 200–250 | 2 |
| 480/3 | 300–450 | 1 |
| 480/3 | 450–550 | 2 |

1.09 NOT USED.

1.10 SPLICES: SPLICE ONLY IN ACCESSIBLE JUNCTION BOXES, USING "WIRENUT" CONNECTORS FOR 8AWG AND SMALLER, OR MECHANICAL COMPRESSION CONNECTORS WITH INSULATION KIT FOR 6AWG AND LARGER.

1.11 BOXES: NEMA OS1 IN INTERIOR DRY LOCATIONS, OS1 WEATHERPROOF TYPE IN WET LOCATIONS.

1.12 WALL SWITCHES: FED SPEC W-S-896, AC GENERAL USE, 20 AMP 120-277 VOLT, TOGGLE HANDLE. INSTALL 48" A.F.F TO CENTER.

1.13 WALL RECEPTACLES: FED SPEC W-C-596, NEMA 5-20R CONFIGURATION OR AS REQUIRED. PROVIDE IG (ISOLATED GROUND) AND GFCI/WP (GROUND-FAULT CIRCUIT INTERRUPTER) RECEPTACLES WHERE APPROPRIATE OR INDICATED. INSTALL 18" A.F.F TO CENTER, OR AS INDICATED.

1.14 WALL PLATES: SMOOTH PLASTIC.

1.15 WALL DEVICE AND PLATE COLOR: MATCH ADJACENT SURFACE, OR AS DIRECTED BY ARCHITECT. PROVIDE ORANGE IG RECEPTACLES.

1.16 MANUFACTURED WIRING SYSTEMS: PERMITTED FOR BRANCH CIRCUITS SUBJECT TO APPROVAL OF TENANT, LANDLORD, AND LOCAL AUTHORITY.

1.17 GROUNDING: PROVIDE CONTINUOUS, PERMANENT, AND EFFECTIVE GROUNDING SYSTEM. GROUND SEPARATELY DERIVED SYSTEMS TO NEAREST EFFECTIVELY GROUNDED BUILDING STRUCTURAL STEEL.

16400 – EQUIPMENT

4.01 DISCONNECT SWITCH: NEMA KS1, GENERAL DUTY, 3 POLE, S/N IF NEUTRAL IS PRESENT, NEMA 3R ENCLOSURE IF OUTDOORS, LOCK-OFF, NON-FUSIBLE UNLESS INDICATED WITH FUSES.

4.02 PANELBOARD: NEMA PB1 AS SCHEDULED, 32" WIDE SECTION, 8 1/4" DEEP, 400 AMP BUS SQUARE D I-LINE TYPE HCM 2364-4 WITH FRONT TRIM WITH LOCKABLE DOOR AND BOX 400A MAIN LUGS OR APPROVED EQUAL. INSTALL PER NEMA PB1.1. PROVIDE TYPEWRITTEN BRANCH CIRCUIT DIRECTORY. LOAD CENTERS NOT APPROVED. ALL COMBINATIONS OF EQUIPMENT AND MAIN/BRANCH OVERCURRENT PROTECTION SHALL BE FULLY RATED AIC.

4.03 CIRCUIT BREAKER: NEMA AB1 AS SCHEDULED, BOLT-ON, CENTER TRIP, SWD IF SINGLE POLE, COMMON TRIP IF MULTI-POLE, HACR IF REQUIRED BY LOAD. SQUARE D TYPE F FRAME 02 OR APPROVED EQUAL.

4.04 FUSE: UL CLASS J. WHEN FUSING EXISTING EQUIPMENT FUSES SHALL BE CURRENT LIMITING AND MATCH EXISTING FUSE MANUFACTURER. PROVIDE 3 SPARE OF EACH SIZE AND TYPE INSTALLED.

16500 – LIGHTING

5.01 CONTRACTOR – FURNISHED EQUIPMENT: FOR LIGHT FIXTURES SCHEDULED AS FURNISHED BY CONTRACTOR, FURNISH AND INSTALL COMPLETE, OR APPROVED EQUAL.

5.02 ACCESSORIES: PROVIDE ACCESSORIES, INCIDENTAL MATERIALS AND MOUNTING HARDWARE AS REQUIRED.

5.03 LOCATION: REFER ALSO TO ARCHITECTURAL DRAWINGS FOR FIXTURE LOCATIONS AND MOUNTING DETAILS.

5.04 INSTALLATION: PROPERLY INSTALL AND SUPPORT ALL FIXTURES PLUMB AND TRUE, AND FREE OF LIGHT LEAKS. CONFORM TO MANUFACTURER'S RECOMMENDATIONS AND INDUSTRY PRACTICE. LEAVE PROTECTIVE FILM IN PLACE ON FIXTURES UNTIL FINAL CLEAN-UP. INSTALL LIGHT FIXTURES IN RATED CEILINGS TO MAINTAIN THE RATING OF CEILING.

5.05 FLUORESCENT FIXTURES: IF FURNISHED BY CONTRACTOR, PROVIDE ELECTRONIC HPF, RAPID START, PARALLEL LAMP OPERATION, CBM, TYPE 1, CLASS P, SOUND RATED A, THD<20%, CCF<1.5, NAECA COMPLIANT WHERE APPLICABLE, ENERGY SAVING BALLASTS.

5.06 RECESSED INCANDESCENT FIXTURES: IF FURNISHED BY CONTRACTOR, PROVIDE FMC AND 150 DEGREE C FIXTURE WIRE FROM LAMP HOUSING TO INDEPENDENT BRANCH CIRCUIT OUTLET BOX.

5.07 HID FIXTURES: IF FURNISHED BY CONTRACTOR, PROVIDE ANSI C82.4 COMPLIANT, HPF, ENCAPSULATED BALLASTS. ADVANCE SERIES 738 OR EQUAL.

5.08 FINAL ADJUSTMENT: AFTER TRADE FIXTURES ARE INSTALLED BY OTHERS, CLEAN ALL LIGHTING FIXTURES, REPLACE ALL EXPIRED LAMPS, AND ADJUST DIRECTIONAL LIGHTING AS DIRECTED BY TENANT AND ARCHITECT.

16700 – SYSTEMS

7.0 TELEPHONE SYSTEM ROUGH-IN: PROVIDE DEDICATED 3" CONDUIT WITH PULL WIRE FROM TELEPHONE COMPANY DEMARKATION. COORDINATE WITH OWNER AND TELEPHONE COMPANY. CONDUIT TO BE REAMED AND CAPPED ON BOTH ENDS AND MARKED FOR TELEPHONE USE.

## PANEL SCHEDULE

No: MP1 | LOCATION: SPACE 1?? | MOUNTING: SURFACE | RATED AIC: 22,000 | 277/480 VOLT 3 PHASE 4 WIRE, MAIN: LO, 400 AMP

| CIRCUIT DESCRIPTION | KVA | CB | No. | No. | CB | KVA | CIRCUIT DESCRIPTION |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 1 | 2 | | | SPACE |
| PANEL-1A | | 200/3 | 3 | 4 | | | SPACE |
| | | | 5 | 6 | | | SPACE |
| | 11.1 | | 7 | 8 | | 11.1 | |
| RTU-5 | 11.1 | 50/3 | 9 | 10 | 50/3 | 11.1 | RTU-6 |
| | 11.1 | | 11 | 12 | | 11.1 | |
| | 11.1 | | 13 | 14 | | 11.1 | |
| RTU-11 | 11.1 | 50/3 | 15 | 16 | 50/3 | 11.1 | RTU-9 |
| | 11.1 | | 17 | 18 | | 11.1 | |
| SPACE | | | 19 | 20 | | 11.1 | |
| SPACE | | | 21 | 22 | 50/3 | 11.1 | RTU-12 |
| SPACE | | | 23 | 24 | | 11.1 | |
| SPACE | | | 25 | 26 | | | SPACE |
| SPACE | | | 27 | 28 | | | SPACE |
| SPACE | | | 29 | 30 | | | SPACE |
| SPACE | | | 31 | 32 | | | SPACE |
| SPACE | | | 33 | 34 | | | SPACE |
| SPACE | | | 35 | 36 | | | SPACE |
| SPACE | | | 37 | 38 | | | SPACE |
| SPACE | | | 39 | 40 | | | SPACE |
| SPACE | | | 41 | 42 | | | SPACE |

CONNECTED LOAD: 240 AMPS MAX. 202.1 KVA — A: 68.1 B: 66.8 C: 66.8
CALCULATED CODE DEMAND LOAD: 210.5 KVA 254 AMPS

**KKE**

Korsunsky Krank Erickson
Architects Inc
300 First Avenue North
Minneapolis, MN 55401
612/339-4200
FAX 342-9267

W.J. SUTHERLAND
& ASSOCIATES, INC.
CONSULTING ENGINEERS
6300 W. OLD SHAKOPEE ROAD
SUITE 140
BLOOMINGTON, MINNESOTA 55438
OFFICE (952) 346-4180
FAX (952) 346-4181
E-MAIL projects@wjsutherland.com

HOMEPLACE
RE-TENANT

TAMARACK VILLAGE –
SOUTHWEST QUADRANT

WOODBURY, MN

EXHIBIT D-2

Key Plan

ELECTRICAL
SPECIFICATIONS

I hereby certify that this plan, specification or report was prepared by me or under my direct supervision and that I am duly Licensed Professional Engineer under the laws of the State of Minnesota.
Typed or Printed Name: Duane E. Engler
Signature:
Date: Reg. No. 10068

| No. | Date | Revision Description |
| --- | --- | --- |
| | 10/10/01 | OWNER REVIEW SET |
| | 11/19/01 | OWNER REVIEW SET REVISED |
| | 11/29/01 | OWNER REVIEW SET REVISED |

Project: 579-010 Sheet
Date: October 10, 2001
Drawn by: WJA
Checked by: WJS

E2.0

Copyright © 2001 by Korsunsky Krank Erickson Architects Inc.

Rec. 12/31/01





















KKE
Korsunsky Krank Erickson Architects Inc
300 First Avenue North
Minneapolis, MN 55401
612/339-4200
FAX 342-9267
ANDERSON & URLACHER
STRUCTURAL ENGINEERING
322 FIRST AVENUE NORTH, SUITE 300
MINNEAPOLIS MINNESOTA 55401
PHONE (612) 692-9958 FAX (612) 692-9960
HOMEPLACE RE-TENANT
TAMARACK VILLAGE – SOUTHWEST QUADRANT
WOODBURY, MN
EXHIBIT D-2
Key Plan
STRUCTURAL NOTES & TYPICAL DETAILS
S1
STRUCTURAL NOTES:
TYP. STEPPED FOOTING DETAIL
DETAIL FOR PIPES PARALLEL TO FOOTINGS
DETAIL FOR PIPES PERPENDICULAR TO FOOTINGS
TYP. ADD'L SLAB ON GRADE REINFORCING @ TS COLUMNS
TYP. SLAB ON GRADE CONSTRUCTION JOINT
TYPICAL SLAB ON GRADE CONTROL JOINT
ADDITIONAL REINFORCING @ FLOOR OPNG'S, TYP. DETAIL
ADDITIONAL SLAB ON GRADE REINFORCING AT REENTRANT CORNERS TYP. DETAIL
TYP. 8"Ø ANCHOR BOLT DETAIL
TYP. MASONRY BOND BEAM CORNER DETAIL
TYPICAL SLAB DEPRESSION
TYP. ROOF EQUIP. SUPPORT DETAIL FOR NEW EQUIPMENT
BEAM BRG. PERP. TO CMU WALL
FRAMING FOR NEW METAL ROOF DECK OPNG'S
CONNECTION DETAIL
TYPICAL BASE PLATE DETAILS
SPECIAL INSPECTION & TESTING SCHEDULE FOR STRUCTURAL ITEMS
STRUCTURAL SHEET INDEX
S1 – STRUCTURAL NOTES & TYP. DETAILS
S2 – FDN. PLAN & ROOF FRAMING PLAN
S3 – DETAILS
S4 – LOADING DOCK/COMPACTOR PLAN & DETAILS
12/13/01

ROOF FRAMING PLAN
FOUNDATION PLAN
BEARING PLATE SCHEDULE
CONCRETE PIER SCHEDULE
FOOTING SCHEDULE
COLUMN SCHEDULE
KKE
Korsunsky Krank Erickson Architects Inc
ANDERSON-URLACHER STRUCTURAL ENGINEERING
HOMEPLACE RE-TENANT
TAMARACK VILLAGE – SOUTHWEST QUADRANT
WOODBURY, MN
EXHIBIT D-2
Key Plan
FOUNDATION PLAN & ROOF FRAMING PLAN
S2

NEW TO EXIST. CONSTRUCTION JOINT
SECTION @ NEW WALL & EXISTING WALL
TYPICAL STOOP DETAIL
SECTION @ MASONRY PIERS
COLUMN/PIER DETAIL
FOUNDATION SECTION @ COLUMN/PIER
FOUNDATION SECTION @ COLUMN/PIER
FOUNDATION SECTION @ COLUMN/PIER
SECTION
DETAIL @ WINDOW INFILL
DECK BEARING @ CANOPY
DETAIL @ CANOPY
ROOF DETAIL @ STORE FRONT
DETAIL @ CANOPY
TS 5x5 BRG DETAIL @ EXIST.
SECTION @ MASONRY PIERS
DETAIL @ CANOPY
SECTION @ TS COLUMN CONNECTION
KKE
Korsunsky Krank Erickson Architects Inc
300 First Avenue North Minneapolis, MN 55401
ANDERSON URLACHER
STRUCTURAL ENGINEERING
HOMEPLACE RE-TENANT
TAMARACK VILLAGE – SOUTHWEST QUADRANT
WOODBURY, MN
EXHIBIT D-2
Key Plan
TYPICAL DETAILS
S3

FOUNDATION PLAN
LINTEL NOTES
LINTEL BEARING DETAIL
SECTION @ COMPACTOR SCREEN WALL
LINTEL SCHEDULE
KKE
Korsunsky Krank Erickson Architects Inc
ANDERSON URLACHER
STRUCTURAL ENGINEERING
HOMEPLACE RE-TENANT
TAMARACK VILLAGE – SOUTHWEST QUADRANT
WOODBURY, MN
EXHIBIT D-2
Key Plan
LOADING DOCK/COMPACTOR PLAN & DETAILS
S4

Exhibit E

Permitted Encumbrances

1.  Access restrictions shown on Highway Right of Way Plat No. 26, filed as Document No. 405439.

2.  Drainage, utility and ponding easement shown on the recorded plat of Tamarack 2nd Addition.

3.  Drainage, utility and ponding easements shown on the recorded plat of Tamarack Village, except as partially vacated by document no. 915762.

4.  Driveway easement in favor of William L. Bruggeman Jr. and Eugene Zugschwert, as Trustee of the Builders Wholesale, Inc. Profit Sharing Trust dated December 4, 1995, filed April 16, 1996, as Document No. 881307.

5.  Terms and conditions of and easements contained in Operation and Easement Agreement between Mervyn's, Inc. and Tamarack Village Shopping Center, A Limited Partnership, dated April 10, 1996, filed April 16, 1996, as Document No. 881304, which includes possible liens for private charges and assessments.  Amended by First Amendment to Operation and Easement Agreement dated April 15, 1997, filed April 17, 1997 as Document No. 928434.

6.  Mutual Access Easement dated April 10, 1996, filed April 16, 1996, as Document No. 881305, between Tamarack Village Shopping Center, A Limited Partnership and Mervyn's Inc.

7.  Terms and Conditions of Supplemental Agreement dated April 15, 1997, filed April 17, 1997, as Document No. 928435 between Tamarack Village Shopping Center, a Limited Partnership, and Home Depot USA, Inc.

8.  Terms and conditions of Special Use Permit, Amended Planned Unit Development for Tamarack Village, by the City Council of Woodbury, filed August 14, 1996, as Document No. 898780.

9.  Easement Agreement dated August 31, 1997, filed November 10, 1997, as Document No. 952377 between Tamarack Village Shopping Center, A Limited Partnership, and Home Depot U.S.A., Inc.

Exhibit F

Signage


INFORMATION CONTAINED IN THIS DRAWING IS THE SOLE PROPERTY OF COLLINS SIGNS. ANY REPRODUCTION IN PART OR WHOLE WITHOUT THE WRITTEN PERMISSION OF COLLINS SIGNS IS PROHIBITED.

NOTES:

ALUMINUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE TRIM AND FACE TO THE SIGN BODY. THE MAXIMUM SPACING SHALL NOT EXCEED 1'-6" AND NO FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE TIE TO PREVENT LOOSENING OF THE WIRE TIE.

ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.

EQUIPMENT GROUND REQUIRED.

ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED ELECTRICAL CONTRACTOR.

COLORS:
SHAPE(S):

FACE COLOR TO BE DETERMINED BY LOCATION)

OUTSIDE:
☐ WHITE   ☐ #313 DARK BRONZE   ☐ BLACK
☐ #3/16" 7328 WHITE PCB

INSIDE:
☑ PAINT WHITE   ☐ #3/16" 2793 RED PCB

RETAINER:
1" TRIMCAP (COLOR TO MATCH RETURNS)

ELECTRICAL SPECS:
☐ RED NEON / 30mA TRANSFORMER(S)
AMPS: 48 45
# OF 20 AMP CIRCUITS (RECOMMENDED): 4
VOLTS: 120

☐ WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 54 05
# OF 20 AMP CIRCUITS (RECOMMENDED): 4
VOLTS: 120

☑ WHITE NEON / 60mA TRANSFORMER(S)
AMPS: 105 75
# OF 20 AMP CIRCUITS (RECOMMENDED): 8
VOLTS: 120

TUBESUPPORT W/PAD ON Z-BRACKET
090 ALUM BACK(S)-STAPLED ON
CONDUIT, CONN AND STRAIN RELIEF

STD TRANSFORMER (60mA IN COLD WEATHER) (SEE ELECTRICAL SPECS)
DISCONNECT SWITCH
063 ALUM RETURNS (SEE COLORS)
050 ALUM RETAINER (SEE COLORS)
LEXAN FACE(S) (SEE COLORS)
15MM NEON 3" O.C. - TURNBACK W/ELECTRO-BITS BOOTS (SEE COLORS)
EQUIPMENT GROUND REQ'D
3/8" THREADED ROD OR LAG BOLT-AS REQ'D
SILICONE BEAD AROUND INTERIOR SEAM.
1/4"ø WEEP HOLES

TYPICAL SELF-CONTAINED DETAIL
SCALE: NTS

WHIPS 12 FT

EXHIBIT 'F'
WOODBURY, MN.

1 OF 4

8'-6"
4'-1½"
3'-3 3/16"
34'-0"

**COLLINS SIGNS**
405 INDUSTRIAL BLVD
ADAM, ALABAMA 35005
PH 205 961 3979
FAX 205 961 3979

| | | BY | | | BY |
|---|---|---|---|---|---|
| RELEASED FOR | | | PREVIOUS | | |
| PRODUCTION | | | THIS RUN | | |
| PROGRAM APPROVED BY | | | PROGRAM APPROVED BY | | |
| DRAWING APPROVED BY | | | DRAWING APPROVED BY | | |

SCALE: 3/4"=1'-0"
SCALES: VARIOUS
DATE: 1-4-8
SHEET: 89

FILE DESCRIPTION
6'-6" X 34'-0" STACKED LAYOUT SELF-CONT CHL

SHIP LOAD (INFO)

PAGE LAYOUT
**BED BATH & BEYOND**
PRESENTATION

DESIGNER
JOHNSON
SALESPERSON
ISGRAFT
SALES REP
2888

ITEM NUMBER
BED13001

| |
|---|
| ECR | REV | REVISIONS | DATE | BY |

- EXHIBIT F-



ROUT OUT
PANELS -
BACK W/
LEXAN
ACRYLIC
RED
2793 LOGO

**mervyn's**
*California*

BED BATH &
BEYOND

COST PLUS SIGN PANEL

OFF-WHITE
ALUM PANEL

INTERNALLY ILLUM.
SIGN PANEL

PREFINISHED METAL
SURROUND - COLOR 'B'

BRICK 'C1' SOLDIER

VENT - COLOR 'A'

BRICK 'A2' - TYP.
BRICK 'B' - TYP.

BACKLIT GLASS BLOCK

STEEL TUBE - PAINT
TO MATCH BRICK 'C'

BRICK 'C1' ROWLOCK -
CORBEL 1/2"

BRICK 'A2'

MTL LOUVERED ACCESS DOOR-
PAINT TO MATCH BRICK 'A'

CONC. SLAB

FOUND PIERS BY SIGN CONTR.

NOTE: DO NOT PROCEED W/ BBB
GRAPHICS UNTIL AN ELECTRONIC
FILE OF LOGO IS OBTAINED
FROM TENANT

JB
12/14

EXHIBIT F
PYLON SIGN
WOODBURY, MN.
2 OF 4

OFF-WHITE ALUM.
PANELS, POKE OUT
PANELS - BACK W/
LEXAN ACRYLIC
RFO 2783 LOGO

LOGO SIZE 2'6 X 6'2"
(STRETCHED STACK)

* EITHER VERTICAL OR HORIZ.
EDGE OF LOGO SHOULD COME TO
2" FROM PANEL EDGE

EXH. F - WOODBURY, MN.

PYLON

INTERSTATE

TAMARACK VILLAGE

BED BATH & BEYOND

CIRCUIT CITY

GALYAN'S

mervyn's California

CUB foods

HOME DEPOT

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 2001, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (hereinafter called the *"Mortgage"*) covering a parcel of land owned by Tamarack Village Shopping Center A Limited Partnership, a Minnesota limited partnership (hereinafter called *"Landlord"*) together with the improvements erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, together with the building or portion thereof located thereon (said premises and the improvements thereon being hereinafter referred to as the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For New Leases:** WHEREAS, as an inducement to Tenant to enter into the Lease, Section 2.3.1 thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and**]**

_____

**[For Existing Leases:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.**]**

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)      bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)      Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.      Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.      Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.      Any notices or communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.      This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns and sublessees.

9.      This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.      This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:
[Corporate Seal]                    _____

_____          By: _____
(Assistant) Secretary              Name: _____
                                   Title: _____

**TENANT:**

ATTEST:                            BED BATH & BEYOND INC.

[Corporate Seal]

_____          By: _____
(Assistant) Secretary                  Warren Eisenberg
                                        Co-Chief Executive Officer

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

On this ___ day of _____,2001, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

Exhibit H

Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__, by and between TAMARACK VILLAGE SHOPPING CENTER A LIMITED PARTNERSHIP, a Minnesota limited partnership, having an address at c/o Robert Muir Company, 2850 Metro Drive, Suite 503, Bloomington, MN 55425 (*"Landlord"*); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ (*"Subtenant"*).

R E C I T A L S:

A.    Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated as of _____ ____, 200__, a short form of which has been recorded in _____, which demises certain premises (the *"Premises"*) located in the Tamarack Village Shopping Center, Woodbury, Minnesota, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.    Section 15.4 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ (the *"Sublease"*), Tenant has subleased [a portion of] the Premises to Subtenant (the *"Subleased Premises"*).

D.    The parties hereto desire to effectuate the provisions of Section 15.4 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(i)    that it is the fee owner of the Premises,

(ii)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)    that the term of the Lease expires on _____, but is subject to [three] renewal periods of [five] years each and

(iv)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

3.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or

deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

4.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided that in such event Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

5.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

6.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

7.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

8.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

WITNESS:

TAMARACK VILLAGE SHOPPING CENTER A
LIMITED PARTNERSHIP
By: Tamarack Village Shopping Center Corporation
its general partner

_____

By: _____
Name:_____
Title:_____

[SEAL]

**TENANT:**

BED BATH & BEYOND INC.

By:_____
    Warren Eisenberg
    Co-Chief Executive Officer

**SUBTENANT:**

_____

By:_____
Name: _____
Title: _____

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

   On this ___ day of _____, 2001, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

             _____
                Notary Public

My Commission Expires:

_____

Exhibit I

Intentionally Omitted

Exhibit J

Delivery Date Certification

[Letterhead of Landlord]

_____, 2001

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 2001 (the "Lease"), between TAMARACK
       VILLAGE SHOPPING CENTER A LIMITED PARTNERSHIP, as landlord ("Landlord"),
       and Bed Bath & Beyond Inc., as tenant ("Tenant"), with respect to certain retail premises
       (the "Premises") located in the Tamarack Village Shopping Center, Woodbury, Minnesota

Gentlemen:

    In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby certifies
to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as defined in
the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is defined in the
Lease) will be deemed to be _____, 200__ [INSERT THE DATE WHICH IS TWO DAYS
AFTER THE DATE OF THIS LETTER]. This notice shall constitute the Delivery Date
Certification referred to in Subsection 2.3.3 of the Lease.

                         TAMARACK VILLAGE SHOPPING CENTER A
                         LIMITED PARTNERSHIP
                         By: Tamarack Village Shopping Center Corporation,
                         its general partner


                         By:_____
                              Print Name:_____
                              Print Title:_____


cc:    [Edward M. Schotz, Esq.]
       [Allan N. Rauch, Esq.]

Exhibit K-1

Existing Exclusives

Tenant agrees that Tenant will not put the Premises to any use which is violative of the following exclusives granted to or reserved for specific major tenants (the term "primary use" as hereafter used in this Section B shall mean any use or combination of uses which exceeds 25% of Tenant's floor area).

     1.     as a supermarket, grocery store, food store, drug store or pharmacy.

     2.     For the retail sale of pets, pet food or other pet products or pet services as a primary use.

     3.     For the sale of consumer, office or automotive electronic products or major appliances as a primary use.

     4.     The retail sale of office, home office, school or business products, office, home office, school or business supplies or equipment; or office furniture as a primary use or for the primary purpose of a copy center or "kinko" type of operation.

     5.     For the sale of toys, outdoor play equipment, children's wheel goods (the foregoing shall not apply to a full line bicycle store), layettes, infant furnishings, infant, juvenile and children's furniture, infant, juvenile and children's books and records, family and adult games, video and electronics games and game equipment or computers and accompanying software, used primarily for game purposes as a primary use.

     6.     The sale, offering for sale and/or display of sporting goods or sporting equipment, including boats, motors, boat trailers, guns, hunting equipment, racquet sports equipment, golf equipment, archery equipment, swimming, scuba and other marine equipment, athletic footwear, fishing tackle and equipment, water skis, snow skis, bicycles, camping equipment exercise and non-motorized camping trailers.

     7.     For the sale and/or rental of prerecorded audio and/or video products or books, or any of them, including, without limitation, records, discs, tapes and/or video records as a primary use.

Exhibit K-2

Existing Leases

Exhibit K-2

Existing Leases

| Tamarack Village | |
| --- | --- |
| **Tenant** | **Square Feet** |
| US Bank | 3,091 |
| Kids Hair | 959 |
| Jo-Ann, ETC. | 45,215 |
| Office Max | 23,600 |
| Toys R Us | 31,268 |
| Circuit City | 28,711 |
| HomePlace | 53,514 |
| Seasonal Concepts | 10,217 |
| Galyan's | 81,019 |
| Collectors Gallery | 5,571 |
| Old Navy | 15,059 |
| Comp USA | 26,503 |
| Home Depot | 113,785 |
| Mervyn's | 81,801 |
| Lands' End | 10,544 |
| Hallmark | 7,527 |
| Lane Bryant | 6,632 |
| LensCrafters | 4,052 |
| Carlson Travel | 904 |
| Stride Rite Shoes | 819 |
| Fast Frame | 1,175 |
| Blimpies | 1,222 |
| GNC | 1,598 |
| Casual Male/Big & Tall | 3,202 |
| Mail Boxes | 1,404 |
| Funan | 2,401 |
| Zantigo | 2,390 |
| Angelo's | 1,599 |
| Einstein Bagels | 2,413 |
| Boston Market | 3,290 |
| Wendy's | 5,003 |
| C'est-Si'Bon! | 1,820 |
| Pendleton | 1,845 |
| Gymboree | 2,055 |
| The Men's Wearhouse | 6,878 |
| Bath & Body | 2,756 |
| Gap/Gap Kids | 10,221 |
| Invision | 1,666 |
| Chico's | 1,725 |
| Sonnie's | 6,645 |
| Rocco Altobelli | 5,700 |
| Flowers on the Park | 1,823 |
| Shane Company | 9,060 |
| Champps | 11,112 |
| Cub Foods | 75,826 |
| Great Clips | 994 |
| Clean 'N' Press | 1,156 |
| Beauty First | 2,843 |
| Oreck Floor Care | 1,311 |
| Knights Formal Wear | 1,183 |
| Weight Watchers | 1,210 |
| PetsMart | 26,177 |
| Pier 1 | 8,970 |
| Total | 759,574 |

Exhibit L

Alternate Rent

1.    During the applicable period(s) described within Sections 2.4 and/or 2.5 of the Lease, Tenant shall pay as "Alternate Rent" an amount equal to three (3%) percent of all "Gross Sales" (as hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty (50%) percent of the amount of Fixed Rent which otherwise would have been payable during such period (the "Cap"), plus all Additional Rent.

2.    As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including redemption of gift certificates, orders for merchandise taken from or filled at or from the Premises and deposits not refunded to customers. A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (A) the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (B) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (A), (B) or (C) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall exclude (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged provided that the sales were made from the Premises, (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (8) fees paid to independent third party credit and debit card companies in connection with sales charged to or debited from customers' credit cards or debit cards, as applicable, (9) proceeds from delivery, wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates, and (15) sales filled from, but not taken at, the Premises.

3.    Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains. Such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.    Tenant shall maintain at the Premises or at its principal office in the United States, complete books and records reflecting all elements of Gross Sales. Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and

shall be retained by Tenant for not less than two (2) years following the end of the calendar year to which they refer.

     5.  Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month.

     6.    Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law, or to its accountants, attorneys, *bona-fide* prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

Exhibit M

Prohibited Uses

As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

(1)     Any use which emits an obnoxious odor or sound which can be heard or smelled outside of any building in the Shopping Center.

(2)     Any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store, "surplus" store, except a high class store selling new and used merchandise such as Play It Again Sports or Once Upon a Child, as now conducted, shall be allowed outside of the Southwest and Northeast Quadrants of the Shopping Center;

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation, and in the Southwest Quadrant of the Shopping Center, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or Laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

(8)     Any automobile, truck, trailer, boat or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)     Any theater, cinema or sporting event or, in the Southwest Quadrant, live performance theater, meeting hall, auditorium or other entertainment use, or catering or banquet hall;

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising facilities in the Southwest or Northeast Quadrants of the Shopping Center; and any veterinary hospital which contains more than 5,000 square feet of floor area or any facility, regardless of floor area, which provides any animal raising facilities, in the balance of the Shopping Center;

(13)     Any mortuary or funeral home;

(14)     Any "adult bookstore", night club, discotheque, massage parlor, any establishment which provides live "adult" entertainment or any establishment which sells, rents, licenses or exhibits drug-related paraphernalia or pornographic or obscene materials, except that this provision shall not prohibit (A) videotape sale and rental stores which sell or rent primarily non-"X"-rated videotapes (that is "G" to "R"-rated video tapes) but which also rent or sell "X"-rated or non-rated videotapes for off-premises viewing only, provided such "X"-rated or similar videotapes, and the place and procedure for selection thereof, precludes viewing or selection by minors and with no promotional, advertising or other depiction or description in respect of any "X"-rated or non-rated or similar videotape displayed or utilized within or outside of the store, or (B) book stores and other stores such as drug stores which sell primarily general audience books and other reading, listening and/or materials which are not perceived to be, or hold themselves out as "adult book" stores, but

which incidentally sell books, magazines and other such periodicals, records, CD's and tapes which may contain pornographic materials so long as such sale is not from any special or segregated section in the store;

(15)    Any bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds, if located in the Southwest Quadrant within 250 feet from the Premises or Northeast Quadrants of the Shopping Center, thirty percent (30%), or if located elsewhere in the Shopping Center, 50% of gross revenues of such business, provided that a bar, tavern, or restaurant shall not be permitted within 150 feet of the Premises;

(16)    Any health spa, fitness center or workout facility;

(17)    Any flea market, car wash or dance hall;

(18)    Any amusement or video arcade, pool or billiard hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by Tenant incidental to the conduct of its business at the Shopping Center, or except in the Northeast Quadrant of the Shopping Center, to incidental instruction, such as music lessons, in connection with retail use;

(20)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by Tenant;

(21)    Any pawn shop, government surplus store, gun shop, tattoo parlor, goodwill store, salvage store, Salvation Army store or liquidation store;

(22)    Operation of a convenience type food store or gas station;

(23)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(24)    A produce market or meat market or dairy store (an ice cream store shall not be considered to be a dairy store for the purposes of the foregoing), or a full line bakery (a bagel shop, specialty cookie, donut or specialty bun shop or similar store shall not be considered to be a baker for the purposes of the foregoing).

In addition the following shall not be permitted in the Southwest Quadrant of the Shopping Center:

(1)    Any carnival, amusement park or circus;

(2)    Any medical offices (except where incidental to another permitted use)  or medical clinics;

(3)    Any supermarket, except that an upscale, boutique-type food store (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall be located at least 150 feet away from the Premises;

(4)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Minneapolis/St. Paul metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 150 feet away from the Premises, and not more than ten thousand (10,000) square feet of Floor Area in the Southwest Quadrant, in the aggregate, shall be devoted to such uses.

(5)    hotel/motel;

(6)    daycare center; or

(7)    karate center.

<u>Exhibit N</u>

<u>Shopping Center Maintenance Approved Statement</u>

Exhibit N

Shopping Center Maintenance Approved Statement

## TAMARACK VILLAGE SHOPPING CENTER
## HOMEPLACE CAM RECONCILIATION - 2000

Square Footage:        53,514

| CAM CATEGORY | TOTAL COST | PRO-RATA SHARE % | TENANT TOTAL COST | ANNUAL TOTAL COLLECTED | AMOUNT OWED LANDLORD |
|---|---|---|---|---|---|
| Liability Insurance | $28,783.21 | 7.05% | $2,027.78 | | |
| Casualty insurance | $23,995.81 | 12.14% | $2,913.09 | | |
| Operations/Repairs | $37,802.85 | 7.05% | $2,663.21 | | |
| Operations/Roof Repairs | $0.00 | 0.00% | $0.00 | | |
| Operations/Fire Sprinkler Monitor | $4,833.16 | 0.00% | $0.00 | | |
| Signage/Traffic | $43,376.44 | 7.05% | $3,055.87 | | |
| Cleaning/Sweeping | $48,312.00 | 7.05% | $3,403.58 | | |
| Common Area Trash | $3,056.10 | 7.05% | $215.30 | | |
| Tenant Trash Removal | $27,504.90 | 0.00% | $0.00 | | |
| Paving, Curbs, Walks | $34,782.48 | 7.05% | $2,450.43 | | |
| Landscaping | $151,041.78 | 7.05% | $10,640.89 | | |
| Irrigation Maint/Repairs | $20,105.77 | 7.05% | $1,416.45 | | |
| Snow Removal | $345,026.51 | 7.05% | $24,307.12 | | |
| Common Utility Lines | $0.00 | 0.00% | $0.00 | | |
| Utilities - Water/Sewer | ($2,932.94) | 0.00% | $0.00 | | |
| Utilities - Irrigation | $9,189.35 | 7.05% | $647.39 | | |
| Utilities - Parking Lots | $40,476.95 | 11.22% | $4,541.51 | | |
| Utilities - Permanent Drive Lanes | $39,700.05 | 7.05% | $2,796.87 | | |
| Utilities - Pylon Sign | $2,251.89 | 16.67% | $375.32 | | |
| Decorations | $13,024.71 | 7.05% | $917.59 | | |
| Security | $69,035.98 | 7.05% | $4,863.58 | | |
| On-Site Maintenance | $108,789.50 | 7.05% | $7,664.22 | | |
| Penny per Foot | $7,595.74 | 7.05% | $535.14 | | |
| SUB-TOTALS | $1,055,752.24 | | $75,435.34 | $74,050.56 | $1,384.78 |
| Administration Fee (Fixed) | | | $5,300.00 | $5,300.04 | ($0.04) |
| TOTALS | | | $80,735.34 | $79,350.60 | $1,384.74 |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>Exhibit O</u>

<u>Special Assessments</u>

Exhibit O

Special Assessments

**STATE COPY**
ENCLOSE THIS COPY WITH FORM M-1PR WHEN FILING FOR A REFUND FROM THE MINNESOTA DEPARTMENT OF REVENUE

If this box is checked, you owe delinquent taxes.

PROPERTY I.D.: R04.028.21.31.0011

TAXPAYER
TAMARACK VILLAGE SHOPPING
CENTER INC-%R MUIR CO
2850 METRO DR -STE 503
BLOOMINGTON MN  55425

**STATEMENT OF PROPERTY TAX PAYABLE IN 2001**
**WASHINGTON COUNTY, MINNESOTA**

4260

|  | 2000 | 2001 |
|---|---|---|
| Estimated Market Value: | 23,629,500 | 25,992,500 |
| New Improvements: |  |  |
| Taxable Market Value: | 23,629,500 | 25,992,500 |
| M-1PR Line 2 Amount: | $ | $ |
| M-1PR Line 2 Amount: |  |  |
| Line 6 Amount | 1,051,224.38 | 1,060,345.66 |
| Property Class: | COMM | COMM |

---

**TAXPAYER COPY**
TAXPAYER:

TAMARACK VILLAGE SHOPPING
CENTER INC-%R MUIR CO
2850 METRO DR -STE 503
BLOOMINGTON MN- 55425

PROPERTY I.D.: R04.028.21.31.0011

TAMARACK 2ND ADDITION
LOT-002 BLOCK-001

TAX DESC:  IV Main Centers

**STATEMENT OF PROPERTY TAXES PAYABLE IN 2001**
**Washington County**
Department of Assessment, Taxpayer Services & Elections
14949 62nd Street North
P.O. Box 200
Stillwater, MN 55082-0200
(651) 430-6175  Non-metro: (800) 927-4229 or 800-WASHTAX

| 82511  66988 | 2000 | 2001 |
|---|---|---|
| New Improvements: |  |  |
| Estimated Market Value: | 23,629,500 | 25,992,500 |
| Taxable Market Value: | 23,629,500 | 25,992,500 |
| Property Class: | COMM | COMM |

1. Use this amount on Form M-1PR to see if you're eligible for a property tax refund. File by August 15. If this box is checked, you owe delinquent taxes and are not eligible. □   $ 0.00

2. Use this amount for the special property tax refund on schedule 1 of Form M-1PR.   $ 0.00

**Your Property Tax And How It Is Reduced By The State**

| | | 2000 | 2001 |
|---|---|---|---|
| 3. Your property tax before reduction by state-paid aids and credits. | $ | 1,786,120.37 | 1,823,240.56 |
| 4. Aid paid by the State of Minnesota to reduce your property tax. | | 734,895.99 | 762,894.90 |
| 5. Credits paid by the state of Minnesota to reduce your property tax: | | | |
| A. Education homestead credit and education agricultural credit. | | 0.00 | 0.00 |
| B. Other credits | | 0.00 | 0.00 |
| 6. Your property tax after reduction by state-paid aids and credits. | $ | 1,051,224.38 | $ 1,060,345.66 |

**Where Your Property Tax Dollars Go**

| | | 2000 | 2001 |
|---|---|---|---|
| 7. County. | | 150,604.20 | 161,662.96 |
| 8. City or Town. CITY OF WOODBURY | | 120,786.27 | 136,590.15 |
| 9. School district: 0622 A. State Determined Levy | | 207,068.92 | 204,314.50 |
| B. Voter Approved Levy | | 69,500.92 | 92,076.91 |
| C. Other local levies | | 56,388.94 | 45,184.64 |
| 10. Special Taxing Districts: A. METROPOLITAN SPECIAL TAXING DISTRICTS | | 27,921.58 | 32,219.64 |
| B. OTHER SPECIAL TAXING DISTRICTS | | 19,954.70 | 19,518.20 |
| C. TAX INCREMENT | | 0.00 | 0.00 |
| D. FISCAL DISPARITY | | 389,438.34 | 359,530.81 |
| 11. Non-school voter approved referenda levies. | | 9,508.51 | 8,847.85 |
| 12. Total property taxes before special assessments. | $ | 1,051,224.38 | $ 1,060,345.66 |
| 13. Special Assessments | | 197,861.62 | 161,076.34 |

13. Special Assessments
| WASTE MGMT | 2,700.00 | | | |
| SEWER/WATER | 21,369.00 | SPEC ASMT | 45,312.18 | |
| STREET | 27,017.24 | | | |
| STORM SEWER | 38,475.40 | | | |
| STREETS | 26,202.52 | | | |

| 14. Your total property tax and special assessments. | $ | 1,249,086.00 | $ 1,221,422.00 |

Please save this tax statement for future reference.

Pay this amount no later than  MAY 15  $ 610,711.00
Pay this amount no later than  OCTOBER 15  $ 610,711.00

27641.0381-2099319.10
November 27, 2001

O-1

Special Assessment Summary
Parcel 04-028-21-31-0011

**Rolls**

| | |
|---|---|
| 7582591 | $ 20,288.98 |
| 7580671 | $ 27,017.24 |
| 7580672 | $ 38,475.40 |
| 7580758 | $ 26,202.52 |
| 7580763 | $ 45,312.18 |
| 7580868 | $ 13,031.78 |
| | $ 170,328.10 |

**Rolls**

| | |
|---|---|
| 7582591 | $ 19,208.98 |
| 7580671 | $ 27,017.24 |
| 7580672 | $ 38,475.40 |
| 7580758 | $ 26,202.52 |
| 7580763 | $ 45,312.18 |
| 7580868 | $ 12,579.18 |
| | $ 168,795.48 |

**Rolls**

| | |
|---|---|
| 7582591 | $ 18,128.94 |
| 7580671 | $ 27,017.24 |
| 7580672 | $ 38,475.40 |
| 7580758 | $ 26,202.52 |
| 7580763 | $ 45,312.18 |
| 7580868 | $ 12,126.58 |
| | $ 167,262.86 |

**Rolls**

| | |
|---|---|
| 7582591 | $ 17,048.91 |
| 7580671 | $ 27,017.24 |
| 7580672 | $ 38,475.40 |
| 7580758 | $ 26,202.52 |
| 7580763 | $ 45,312.16 |
| 7580868 | $ 11,673.98 |
| | $ 165,730.23 |

**Rolls**

| | |
|---|---|
| 7582591 | $ 8,254.47 |
| 7580671 | $ 27,017.24 |
| 7580672 | $ 38,475.40 |
| 7580758 | $ 26,202.52 |
| 7580763 | $ 45,312.18 |
| 7580868 | $ 11,221.38 |
| | $ 156,483.19 |

Post-It® Fax Note 7671  Date 8/22/q  pages 3
To Kathy Ostertag  From Judy Afdahl
Co./Dept. Robert Mwr Co.  Co. City of Woodbury
Phone #  Phone # 714-3516
Fax # (952) 854-9549  Fax #

O-2

**Special Assessment Summary**
Parcel 04-028-21-31-0011

████████████████████████████████

**Rolls**

| | | |
|---|---|---|
| 7582591 | $ | - |
| 7580671 | $ | - |
| 7580672 | $ | - |
| 7580758 | $ | 26,202.52 |
| 7580763 | $ | 45,312.18 |
| 7580868 | $ | 10,768.78 |
| | $ | 82,283.48 |

████████████████████████████████

**Rolls**

| | | |
|---|---|---|
| 7582591 | $ | - |
| 7580671 | $ | - |
| 7580672 | $ | - |
| 7580758 | $ | - |
| 7580763 | $ | - |
| 7580868 | $ | 10,316.18 |
| | $ | 10,316.18 |

████████████████████████████████

**Rolls**

| | | |
|---|---|---|
| 7582591 | $ | - |
| 7580671 | $ | - |
| 7580672 | $ | - |
| 7580758 | $ | - |
| 7580763 | $ | - |
| 7580868 | $ | 9,863.58 |
| | $ | 9,863.58 |

████████████████████████████████

**Rolls**

| | | |
|---|---|---|
| 7582591 | $ | - |
| 7580671 | $ | - |
| 7580672 | $ | - |
| 7580758 | $ | - |
| 7580763 | $ | - |
| 7580868 | $ | 9,410.98 |
| | $ | 9,410.98 |

████████████████████████████████

**Rolls**

| | | |
|---|---|---|
| 7582591 | $ | - |
| 7580671 | $ | - |
| 7580672 | $ | - |
| 7580758 | $ | - |
| 7580763 | $ | - |
| 7580868 | $ | 8,958.37 |
| | $ | 8,958.37 |

Special Assessment Summary
Parcel 04-028-21-31-0011

**Rolls**

| Roll | Amount |
|------|--------|
| 7582591 | $ - |
| 7580671 | $ - |
| 7580672 | $ - |
| 7580758 | $ - |
| 7580763 | $ - |
| 7580868 | $ 8,505.77 |
| | $ 8,505.77 |

**Rolls**

| Roll | Amount |
|------|--------|
| 7582591 | $ - |
| 7580671 | $ - |
| 7580672 | $ - |
| 7580758 | $ - |
| 7580763 | $ - |
| 7580868 | $ 8,053.17 |
| | $ 8,053.17 |

**Rolls**

| Roll | Amount |
|------|--------|
| 7582591 | $ - |
| 7580671 | $ - |
| 7580672 | $ - |
| 7580758 | $ - |
| 7580763 | $ - |
| 7580868 | $ 7,800.57 |
| | $ 7,800.57 |

**Rolls**

| Roll | Amount |
|------|--------|
| 7582591 | $ - |
| 7580671 | $ - |
| 7580672 | $ - |
| 7580758 | $ - |
| 7580763 | $ - |
| 7580868 | $ 7,147.97 |
| | $ 7,147.97 |

**Rolls**

| Roll | Amount |
|------|--------|
| 7582591 | $ - |
| 7580671 | $ - |
| 7580672 | $ - |
| 7580758 | $ - |
| 7580763 | $ - |
| 7580868 | $ 6,895.37 |
| | $ 6,895.37 |

O-4

Exhibit P

Form of Cost Plus Exclusives Letter

Exhibit P

Form of Cost Plus Exclusives Letter



**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888

_____, 2001

Tamarack Village Shopping
    Center a Limited Partnership
c/o Robert Muir Company
2850 Metro Drive, Suite 503
Bloomington, Minnesota 55425

Re:    Lease Agreement dated _____, 2001 (the *"Lease"*) by and between Tamarack
       Village Shopping Center a Limited Partnership (the *"Landlord"*), and Bed Bath & Beyond
       Inc. (the *"Tenant"*), demising certain premises in the Tamarack Village Shopping Center,
       located at Radio Drive, Tamarack Road and Hudson Road, Woodbury, Minnesota (the
       *"Shopping Center"*)

Gentlemen:

       Capitalized terms used, but not otherwise defined herein, shall have the meanings
ascribed to them in the Lease.

       We understand that you are about to enter into a lease (the *"Cost Plus Lease"*) with
Cost Plus, Inc. (*"Cost Plus"*) for certain premises (the *"Cost Plus Premises"*) in the Shopping
Center, as shown on the site plan attached hereto as <u>Exhibit A</u>. Our Lease contains certain
restrictions on the types of use and sales activities which may be conducted in the Shopping
Center. Our respective signatures below shall constitute our agreement to all of the following
terms and conditions:

       1.    The provisions of Section 13.2.1 of the Lease shall not apply to the business
operations in the Cost Plus Premises of: (i) Cost Plus or its "Affiliates" (hereinafter defined),
<u>provided</u> that they are operating as a typical Cost Plus store, or (ii) any non-Affiliated assignee
of the Cost Plus Lease or non-Affiliated sublessee of all or any portion of the Cost Plus
Premises, which assignee or sublessee is engaged in substantially the same use as Cost Plus
(for example, that retailer commonly known as *"Pier 1"*); <u>provided</u>, <u>however</u>, that not more than
the lesser of: (a) ten percent (10%) of the Floor Area in the Cost Plus Premises, or (b) two
thousand one hundred thirty-five (2,135) square feet of Floor Area in the Cost Plus Premises,
shall be used for the sale, rental or distribution of linens and/or bathroom items. As used
herein, *"Affiliate"* shall mean a person or entity which controls, is controlled by, or is under
common control with, Cost Plus. As used herein, *"control"* shall mean the possession, direct or
indirect, of the power to direct or cause the direction of the management and policies of a
person or entity, whether through the ownership of voting securities or rights, by contract, or
otherwise.

J:\FORMS\EXCLUSVE\CostPlus\Woodbury.wpd

Dec-11-01  19:10     From-BEDBATHABEY   CORPORATE OFFICE                    T-125  P.03/04  F-240

Tamarack Village Shopping
Center a Limited Partnership
_____, 2001
_____
Page 2

2.      The provisions of Section 13.2.1 of the Lease shall apply to the business
operations of any non-Affiliated assignee of the Cost Plus Lease or non-Affiliated sublessee of
all or any portion of the Cost Plus Premises, and which is not engaged in substantially the same
use as Cost Plus.

3.      It shall be a condition precedent to the agreements herein set forth that Cost
Plus shall have entered into a lease or occupancy agreement for the Cost Plus Premises on or
before the first anniversary of the date hereof; upon the satisfaction of such condition
precedent, the provisions of this agreement shall continue in force during such time(s) as:
(x) the BBB Lease and the Cost Plus Lease (and any renewals, extensions or replacements
thereof) remain in full force and effect, (y) the Premises is open for business and operating in
substantially the same manner as that in which it is operated as of the date of this Agreement,
and (z) Cost Plus or its Affiliate is open and operating in the Cost Plus Premises as a typical
Cost Plus Store, or an entity described in clause (ii) of paragraph 1 above is engaged in
substantially the same use as Cost Plus in the Cost Plus Premises.

Very truly yours,

BED BATH & BEYOND INC

By:_____
        Steven H. Temares
        President - Chief Operating Officer


ACCEPTED AND AGREED:

DDR DB DEVELOPMENT VENTURES LP

By:     DDR DB Opportunity Sub Inc.
        General Partner


        By:     _____
        Name:   _____
        Title:  _____


J:\FORMS\EXCLUSVE\CostPlus\Woodbury.wpd

Received   Dec-11-01  19:07      From-              To-Cole Schotz Meisel    Page 003

Dec-11-01  18:10   From-BEDBATH&BEY   CORPORATE OFFICE                                    T-126  P.04/04  F-240

Tamarack Village Shopping
Center a Limited Partnership
_____, 2001
Page 3

### Exhibit A -- Site Plan



Received  Dec-11-01  18:07      From-                    To-Cole Schotz Meisel      Page 004

11/4/03    12/03/03

# FIRST LEASE AMENDMENT

THIS FIRST LEASE AMENDMENT ("First Amendment") is entered into as of the ___2___ day of __March__, 2004 by and between TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership ("Landlord") and BED BATH & BEYOND INC., a New York corporation ("Tenant")

## RECITALS:

A.  Landlord and Tenant are the parties to a lease dated as of December 31, 2001, as supplemented by Rent Commencement and Expiration Date Agreement, dated as of July 22, 2002   (together the "Lease") relating to premises in the Tamarack Village Shopping Center, in Woodbury, Washington County, State of Minnesota.

B.  The parties have agreed to enter into this First Amendment to evidence their acceptance of changes in the Shopping Center Site Plan and OEA.

NOW THEREFORE, in consideration of the foregoing and One Dollar and other good and valuable consideration, the Landlord and Tenant hereby agree as follows:

1.  The foregoing Recitals are incorporated into and made a part of this First Amendment by this reference.  All terms used in this First Amendment which are not defined in this First Amendment but which are defined in the Lease, shall have the meaning assigned to such term in the Lease

2.  The Site Plan attached to the Lease, Exhibit B, is hereby amended by modifying the plan for the Northwest Quadrant as shown on Exhibit B-1 hereto annexed The Site Plan for the Southwest Quadrant, Southeast Quadrant and the Northeast Quadrant shall remain unchanged as shown on Exhibit B  From and after the date of this First Amendment, the Site Plan shall be said Exhibit B as modified by the attached Exhibit B-1.

3.  Tenant agrees that the OEA for the Shopping Center referenced in the Lease may be amended by the Second Amendment to Operation and Easement Agreement attached hereto as Exhibit I ("Second OEA Amendment").  The parties agree that all references to OEA in the Lease shall hereafter be deemed to refer to the OEA as amended by the First and Second OEA Amendments thereto  The parties agree that notwithstanding the Second OEA Amendment, Landlord shall not have the right to build any Buildings in the New Building Area in the Southwest Quadrant of the Shopping Center without obtaining Tenant's prior written consent in each instance, which consent may be withheld in Tenant's sole and absolute discretion.

11/4/03    12/03/03

4. Section 1.1.19 is hereby amended to read as follows:

<u>Landlord's Mailing Address</u>: c/o Robert Muir Company, 7650 Edinborough Way, Suite 375, Edina, MN 55435, with a copy to c/o Robert Muir Company, 850 N.E. 5th Avenue (Rear Building), Boca Raton, Florida 33432, and with a copy to Paul Anderson, Attorney at Law, Messerli & Kramer, 1800 Fifth Street Towers, 150 South Fifth Street, Minneapolis, MN 55402-4218, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof. Provided Tenant is given notice setting forth the identify of any mortgagee of the Shopping Center and such mortgagee's address, Tenant shall also give such mortgagee a copy of any default notice given to Landlord.

5. Except as specifically set forth in this First Amendment, all of the terms and conditions of the Lease shall continue in full force and effect without change.

IN WITNESS WHEREOF, the undersigned have entered into this First Amendment on the date set forth above.

LANDLORD:

TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership
By Tamarack Village Shopping Center Corporation, its General Partner

By _____
Its _____Vice President_____

TENANT:

BED BATH & BEYOND INC.
a New York Corporation

By: _____
Its _Steven H. Temares_____
_President - Chief Executive Officer_

11/4/03    12/03/03

CONSENT

      The undersigned, GMAC Commercial Mortgage Corporation, Mortgagee of the Shopping Center which is subject to the foregoing First Amendment hereby consents to the above First Amendment

<div align="right">

GMAC COMMERCIAL MORTGAGE
CORPORATION, a California corporation

By _____
Title _____

</div>

J:/Backup/Docs/Leases/BedBath&Beyond-FirstLeaseAmendment-IV(12/03/03)



SITE PLAN

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

EXHIBIT I

SECOND AMENDMENT TO
OPERATION AND EASEMENT AGREEMENT

THIS SECOND AMENDMENT TO OPERATION AND EASEMENT
AGREEMENT (the "Second Amendment") is made as of _____, 2003 by and
among TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP,
a Minnesota limited partnership (the "Developer") TARGET CORPORATION, a
Minnesota corporation, (successor by merger to "Mervyn's Inc.") (Mervyn's) and HOME
DEPOT, U.S.A., INC., a Delaware corporation ("Home Depot").

WITNESSETH:

WHEREAS, Developer is the owner and Approving Party for a certain
tract of land located within the Tamarack Village Shopping Center (the "Shopping
Center") in the City of Woodbury, County of Washington, State of Minnesota described
in Exhibit B-1 to the First Amendment, as hereafter defined.

WHEREAS, Mervyn's is the owner and Approving Party for a certain
tract of land located within the Shopping Center described in Exhibit A to the OEA, as
hereafter defined and identified as the "Mervyn's Tract" on Exhibit X-2 attached hereto
(the "Site Plan").

WHEREAS, Lot 5 is owned by a third party; and

WHEREAS, Developer and Mervyn's as Approving Parties for the
Developer Tract and Mervyn's Tract, respectively, have the right and authority to amend
the OEA without the joinder of the Party for Lot 5, pursuant to the authority granted in
Section 6.8(E) of the OEA;

WHEREAS, Home Depot is the Owner of the Home Depot Tract, as
defined in the First Amendment;

WHEREAS, Home Depot has the right to approve this Second
Amendment pursuant to a Supplemental Agreement with Developer dated April 15, 1997
and recorded with the Office of the Washington County Recorder as Document No. _____
_____; and therefore hereby joins herein;

WHEREAS, Developer and Mervyn's entered into an Operation and
Easement Agreement (the "OEA") dated April 10, 1996 and recorded April 16, 1996
with the Office of the Washington County Recorder as Document No. 881304 with
respect to the Shopping Center;

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

WHEREAS, Developer, Mervyn's and Home Depot entered into a First Amendment to Operation and Easement Agreement ("First Amendment") dated April 15, 1997 and recorded in the Office of the Washington County Recorder as Document No. ___ _____

WHEREAS, the parties desire to amend the OEA as amended by the First Amendment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties agree to amend the OEA as amended by the First Amendment as follows:

1. Exhibit X-1 to the OEA is hereby deleted and the attached Exhibit X-2 is substituted in its place. From and after the date hereof all references to Exhibit X or Exhibit X-1 in the OEA shall be deemed to refer to Exhibit X-2. It is specifically agreed that Developer may construct Buildings in the areas labeled "New Building Area" on Exhibit X-2. Notwithstanding the foregoing, in no event shall the Building in each of the two areas labeled "New Building Area" exceed 25,000 square feet of Building Area nor shall the total square foot area of the Buildings in both areas labeled "New Building Area" exceed 45,000 square feet of Building Area.

2. The last sentence of Section 1.9 is hereby deleted.

3. The introductory phrase of Section 3.2 (E) is hereby amended to read as follows:

The parking area in the Shopping Center shall contain sufficient ground level parking spaces in order to comply with the following minimum requirements.

4. Section 3.2 (E) (ii) is amended to read as follows:

(ii) In the remainder of the Shopping Center, the greater of the (A) minimum requirements of the zoning code for the City of Woodbury or (B) four and 5/10 (4.5) parking spaces for each one thousand (1,000) square feet of floor area in the balance of the Shopping Center, with not more than 10% compact parking spaces; provided that at least 80% of the parking spaces in the NW Quadrant must be located east of the buildings thereon.

5. The parties hereby agree that the "New Buildings" will comply with the architecturally compatible theme for the exterior of the Shopping Center if constructed substantially as shown on the exterior plans attached hereto and made a part hereof as Exhibit "A" and that Developer shall not be required to submit additional plans or other submissions pursuant to Section 3.3(B) of the OEA.

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

      6.  Section 5.1(E) is amended to delete the following from the first sentence hereof "and except for use by the occupant of the building designated "Galyans" on the Site Plan within the Galyans Outdoor Demonstration Area".

      7.  Section 5.1 (F) (i) is amended by substituting "3,500 square feet" for "2,500 square feet" therein.

      8.  Section 5.1(G) is hereby amended as follows:

(i)  the reference to "Montgomery Ward" in the first sentence is deleted.

(ii) Subsection (i) is amended to delete the first two sentences as obsolete.

      9.  Section 6.2 (ii) is amended to substitute "Wells Fargo Bank National Association" for "Norwest Bank, Minneapolis National Association" therein.

     10. Section 6.4 is amended to change the following notice addresses.

Mervyn's       Mervyn's
                c/o Target Corporation Property Development
                Attn: Property Administration
                1000 Nicollet Mall
                Minneapolis, MN  55403
                Fax: (612) 340-6008

Developer:    Tamarack Village Shopping Center,
                A Limited Partnership
                c/o Robert Muir Company
                7650 Edinborough Way, Suite 375
                Edina, MN  55435
                Fax: (952) 857-2801

With a copy to:Tamarack Village Shopping Center,
                A Limited Partnership
                c/o Robert Muir Company
                850 N.E. 5th Avenue
                Boca Raton, FL  33432
                Fax: (561) 392-9900

Operator:     Tamarack Village Shopping Center,
                A Limited Partnership
                c/o RCM-Minnesota Corporation
                7650 Edinborough Way, Suite 375
                Edina, MN  55435
                Fax: (952) 857-2801

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

Home Depot:  Home Depot U.S.A., Inc.
2455 Paces Ferry Road
Building C, 20th Floor
Atlanta, GA  30339-4024
Attn: Vice President-Real Estate Law Group
Fax: (770) 384-3042

With a copy to:Home Depot U.S.A., Inc.
Attn: Brett Soloway
1400 West Dundee Road
Arlington Heights, IL  60004

11. Section 6.11 is amended to add "and acts of terrorism" after the word "casualty" in the first sentence thereof.

12. (a) Except as specifically modified hereby, the OEA as amended by the First Amendment shall continue in full force and effect and is hereby ratified and confirmed by the Second Amendment.

(b) This Second Amendment will be construed, interpreted and enforced under the Laws of the State of Minnesota.

(c) This Amendment is binding upon and shall inure to the benefit of the parties and their permitted successors and assigns under the OEA.

(d) All capitalized terms not defined in this Second Amendment shall have the same meaning ascribed to those terms in the OEA.

(e) In the event of any conflict between the terms of this Second Amendment and the terms of the OEA, the terms of this Second Amendment shall govern and control.

(f) This Second Amendment may be executed in several counterparts, each of which may be deemed as original and all such counterparts together shall constitute one and the same Second Amendment.

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

IN WITNESS WHEREOF, the Parties hereto have caused these presents
to be duly executed the day and year first above written:

DEVELOPER:
TAMARACK VILLAGE SHOPPING
CENTER, A LIMITED PARTNERSHIP
A Minnesota limited partnership

By: Tamarack Village Shopping Center
Corporation
Its: General Partner

By: _____
Its: _____
Dated:_____

STATE OF _____)
                         ) ss
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____
day of _____, 2003 by _____ the _____
_____ of Tamarack Village Shopping Center Corporation, general partner of
Tamarack Village Shopping Center, A Limited Partnership, a Minnesota Limited
Partnership on behalf of the limited partnership

_____
Notary Public
_____ County _____

My Commission Expires: _____
MERVYN'S
TARGET CORPORATION, A Minnesota
Corporation

By: _____
Its: _____
Dated:_____

STATE OF MINNESOTA )
                       ) ss
COUNTY OF HENNEPIN)

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

       On this _____ day of _____, 2003, before me, a Notary Public within and for said County, personally appeared _____ to me personally known, who being first by me duly sworn, did say that he is the _____ _____ of Target Corporation, a Minnesota Corporation, and that the foregoing instrument was signed by him on behalf of said corporation by authority of its Board of Directors and _____ acknowledged said instrument to be the free act and deed of said corporation.

_____
Notary Public

HOME DEPOT

HOME DEPOT U.S.A., INC.
A Delaware corporation

By: _____
Its: _____
Dated: _____

STATE OF GEORGIA      )
                    ) ss
COUNTY OF _____)

The forgoing instrument was acknowledged before me this _____ day of _____ _____, 2003 by _____ the _____ of Home Depot U.S.A., Inc. a Delaware corporation, on behalf of the corporation.

_____
Notary Public
_____ County, Georgia
My Commission Expires: _____

April 29, 2003
Revised 5/19/03, 5/21/03, 10/10/03

[NEED TO ADD LENDER'S CONSENT]



SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (this "*Second Amendment*"), is made and entered into this 16th day of July, 2010, by and between TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership ("*Landlord*"), and BED BATH & BEYOND INC., a New York corporation ("*Tenant*").

WITNESSETH:

WHEREAS, Landlord and Tenant entered into a certain Lease Agreement dated as of December 31, 2001 (the "*Original Lease*"), as supplemented by Rent Commencement and Expiration Date Agreement, dated as of July 22, 2002, and amended by that certain First Amendment to Lease, dated as of March 2, 2004 (as amended collectively, the "*Lease*"), wherein Landlord leased to Tenant certain premises in the Tamarack Village Shopping Center, in Woodbury, Washington County, State of Minnesota (the "*Shopping Center*").

WHEREAS, the premises leased by Tenant under the Lease comprises thirty-one thousand seven hundred twenty-six (31,726) square feet of Floor Area and one thousand (1,000) square feet of mezzanine level space for office purposes (the "*Original Premises*"); and

WHEREAS, Landlord and Tenant mutually desire to relocate the Original Premises to other premises located within the Shopping Center, comprised of approximately twenty-nine thousand five hundred thirty (29,530) square feet of Floor Area, as depicted on Exhibit A attached hereto and made a part hereof (the "*Relocated Premises*").

WHEREAS, Landlord and Tenant mutually desire to modify the terms of the Lease in the manner hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the Lease is hereby amended as follows:

1.    Incorporation/Capitalization/Conflict.    The    foregoing    recitals    are incorporated herein by reference.    Capitalized and defined terms used in this Second Amendment shall have the same meanings as those ascribed to them in the Lease unless the context clearly requires otherwise.    In the event that the terms of this Second Amendment conflict with the terms of the Lease, the terms of this Second Amendment shall control.

2.    <u>Lease of Relocated Premises</u>. As of the Relocated Premises Delivery Date (as defined in Paragraph 5 of this Second Amendment), Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Relocated Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Relocated Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center, on all the same terms and conditions applicable to the Original Premises under the Lease, except as otherwise expressly modified by this Second Amendment.

3.    <u>Improvements.</u>

(a)    <u>Landlord's Work and Tenant's Work</u>. Landlord shall, at its sole cost and expense, perform the work and obligations described on <u>Exhibit B</u>, <u>Exhibit D-2</u>, and <u>Exhibit F-1</u> hereto (including, without limitation, supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with <u>Exhibit B</u>, <u>Exhibit D-2</u>, and <u>Exhibit F-1</u> hereto) and the "Final Landlord's Plans and Specifications" (hereinafter defined in Section 3(b)(i)(G)) (collectively, ***"Landlord's Work"***), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as ***"Tenant's Work"***) which Tenant desires to adapt the Premises to Tenant's use.

(b)    <u>Plan Approvals</u>.

(i)    <u>Preparation of Plans and Specifications</u>.

(A)    Prior to the date hereof (i) Landlord delivered to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Relocated Premises (the ***"Preliminary LOD"***) [Limits of Demised]; (ii) Tenant delivered to Landlord its revisions thereto (the ***"Revised LOD"***), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions; (iii) Landlord delivered to Tenant a final LOD (the ***"Certified LOD"***), certified by Landlord, which incorporates all of the elements of the Revised LOD; and (iv) Tenant notified Landlord of Tenant's approval thereof. Any further changes to the Certified LOD by Landlord shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord. Tenant shall not have the right to change the

2

Certified LOD without Landlord's prior written approval (which may be withheld in its sole discretion).

(B)    By not later than July 16, 2010, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, **"Tenant's Plans"**), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(C)    Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, **"Landlord's Plans and Specifications"** (as defined in Exhibit B hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least eighty-five (85%) percent complete, in Tenant's reasonable judgment.  Landlord's Plans and Specifications shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits A, B, D-2, and F-1 hereto.

(D)    Within fifteen (15) business days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits A, B, D-2, and F-1 hereto.

(E)    Within ten (10) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be one hundred (100%) percent complete and shall address all of Tenant's comments.

(F)    Within ten (10) business days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(G)    In the event that Landlord's re-submittal of Landlord's Plans and Specifications is not approved by Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all of Tenant's comments and re-submit them to Tenant for Tenant's review and approval.  The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within ten (10) days of receipt of Tenant's notice that the previous submittal has not been approved. The process described in this paragraph shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications. Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the **"Final Landlord's Plans and Specifications"**.

(H)    Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit A, Exhibit B, Exhibit D-2, and Exhibit F-1 hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit A, Exhibit B, Exhibit D-2, and Exhibit F-1 shall govern and prevail.

(I)    All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, the Final Landlord's Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad 2002"* up to *"Autocad 2007"*.

(ii)    Plan Changes.

(A)    Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit B hereto (collectively, the ***"Prototype Standards/Specifications"***), and/or to require Landlord to subsequently make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (the ***"Changes"***). Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall be accompanied by all back-up supporting the cost increases or delays. If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(B)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding seven (7%) percent subcontractor profit and seven (7%) percent general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Relocated Premises Delivery Date.

(C)    If the Changes occur during the preparation of any of the plans described in Section 3(b) above, then the deadlines for preparation and delivery

4

of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Relocated Premises Rent Commencement Date shall be determined as if such delay had not occurred; and (ii) with respect to Changes requested after the relocated Premises Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 4(c) below, the Relocated Premises Delivery Date shall be extended by the number of days of such net delay.

<div style="text-align:center">(iii)   <u>Performance of Work</u>.</div>

(A)   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, *"Tenant's Permits"*). Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Relocated Premises. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Relocated Premises Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

(B)   If: (a) Landlord's Work has not been commenced by November 1, 2010, or (b) the Relocated Premises Delivery Date shall not have occurred by February 1, 2011 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(1)   terminate this Second Amendment, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) the Lease shall remain in full force and effect, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Second Amendment (including, without limitation, costs associated with the preparation and

<div style="text-align:center">5</div>

review of plans and specifications, attorney's fees, and the performance of Tenant's Work), not to exceed Fifty Thousand ($50,000.00) Dollars; and/or

(2)    avail itself of the remedies set forth in Section 16.2 of the Lease (provided, however, that the cure period set forth therein shall not be applicable); and/or

(3)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity provided such remedy is elected prior to the default being remedied.

(C)    The portion of Landlord's Work pertaining to the portion of the Relocated Premises in the Original Premises designated as the "Back Room" on Exhibit A hereto annexed (the *"Back Room"*) is hereinafter referred to as the *"Back Room Work"*. The Back Room Work shall only be commenced 20 days after the "Relocated Premises Delivery Date" or 2 days after the Tenant opens for business in the Relocated Premises, whichever is earlier ("Access Date") (defined in Section 4(a) below) and shall be Substantially Completed within twenty-one (21) days thereafter (the *"Back Room Delivery Date"*). Landlord shall be permitted to enter upon the Original Premises after the Access Date to perform the Back Room Work. Landlord and Tenant shall reasonably cooperate in the scheduling and performance of the Back Room Work. If any portion of the Back Room Work would materially interfere with or disrupt the normal conduct of any business operations in the Relocated Premises because of interruption of utilities or life safety systems, Landlord shall perform such work only after the regular hours of operation of Tenant, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. Landlord shall indemnify, defend and hold Tenant harmless from and against any and all claims, actions, damages, liabilities, costs and losses to the extent same arise from the Landlord's entry upon the Relocated Premises and the Original Premises to perform the Back Room Work, except to the extent caused by Tenant, its agents, employees, or contractors. Prior to entering upon the Relocated Premises and Original Premises in accordance with the foregoing provisions of this subsection (C), Landlord shall maintain such insurance as may then be required pursuant to Article 10 of the Lease, and Landlord's general contractor shall provide Tenant with a certificate of insurance with coverage customary and reasonable for licensed contractors in Minneapolis-St. Paul metropolitan area performing work similar to the Back Room Work and otherwise reasonably satisfactory to Tenant.

4.    Delivery Date.

(a)    Landlord shall be deemed to have delivered possession of the Relocated Premises to Tenant on the date (the "***Relocated Premises Delivery Date***") following the day on which all of the following conditions (the "***Relocated Premises Delivery Conditions***") shall have occurred and Tenant shall have received from Landlord the Relocated Premises Delivery Date Certification [as defined in subsection (d) below], which shall constitute Landlord's written certification that all of the following shall have occurred:

(i)    Landlord shall have delivered possession of the Relocated Premises to Tenant in water-tight condition, free of Hazardous Substances, in a good, structurally sound condition with Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant, except for the Back Room Work (which shall not be required to be Substantially Completed as of the Relocated Premises Delivery Date);

(ii)    Landlord shall have obtained (and delivered copies thereof to Tenant upon request) all permits and approvals required from all applicable governmental authorities, if any, to enable Tenant to occupy and use the Relocated Premises for the conduct of its business (exclusive of building permits which may be necessary for the performance of Tenant's Work and any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business), which permits and approvals shall include, without limitation, zoning approvals, environmental requirements, and a permanent certificate of occupancy for the Relocated Premises (unless a certificate of occupancy for the Relocated Premises cannot be obtained solely as a result of the Back Room Work or the Tenant's Work not having been commenced or completed, in which event (1) the delivery of a certificate of occupancy for the Relocated Premises shall not be a condition to the occurrence of the Relocated Premises Delivery Date), (2) the obtaining of a temporary certificate of occupancy or other evidence that Tenant may occupy the Relocated Premises shall be a condition to the occurrence of the Relocated Premises Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work and/or the Back Room Work);

(iii) the representations and warranties of Landlord set forth in subparagraphs (a) through (e) of Paragraph 14 of this Second Amendment shall then be true and in effect; and

(iv) Landlord shall have delivered to Tenant the Amended Memorandum of Lease in the form attached hereto as Exhibit C.

7

(b)    Landlord shall give Tenant at least sixty (60) days prior notice of the Relocated Premises Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit E (the *"Relocated Premises Delivery Date Notice"*).    Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Relocated Premises Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Relocated Premises Delivery Date be deemed to occur prior to the Relocated Premises Delivery Date established in the Relocated Premises Delivery Date Notice.  No event of Force Majeure occurring prior to the giving of the Relocated Premises Delivery Date Notice shall serve to delay the Relocated Premises Delivery Date thereby established.

(c)    Landlord acknowledges that if it shall fail to satisfy all of the Relocated Premises Delivery Conditions by the Relocated Premises Delivery Date on or prior to the date set forth in the Relocated Premises Delivery Date Notice or shall fail to Substantially Complete the Back Room Work by the Back Room Delivery Date, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, storage costs for fixtures, equipment, and inventory, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.  If the Relocated Premises Delivery Date does not occur by the date set forth in the Relocated Premises Delivery Date Notice or the Back Room Work is not Substantially Completed by the Back Room Delivery Date, then, in addition to any other remedies available to Tenant under the Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of One Thousand ($1,000.00) Dollars for each day that the Relocated Premises Delivery Date is delayed beyond the date set forth in the Relocated Premises Delivery Date Notice, and the sum of One Thousand ($1,000.00) Dollars for each day that the Substantial Completion of the Back Room Work is delayed beyond the Back Room Delivery Date. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(d)    Upon the satisfaction of all of the Relocated Premises Delivery Date Conditions, Landlord shall certify to Tenant that the Relocated Premises Delivery Conditions have been satisfied, using the form of Delivery Date Certification attached to the Lease as Exhibit F (the *"Relocated Premises Delivery Date Certification"*).

(e)    Neither Tenant's acceptance of physical possession of the Relocated Premises nor Tenant's opening of the Relocated Premises for business to the public prior to the Relocated Premises Delivery Date, shall relieve Landlord of any obligation under this Second Amendment, unless such condition or obligation is expressly waived in writing by Tenant.

(f)    If, for any reason (including, without limitation, Force Majeure), the Relocated Premises Delivery Date occurs during August, or during the period commencing on November 8 and ending on the January 1 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to: (i) accept delivery of physical possession of the Relocated Premises; or (ii) defer its acceptance of delivery of physical possession of the Relocated Premises to a later date within the Slack Period, whereupon the Relocated Premises Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Relocated Premises (subject to the other provisions of this Section 4 and the continuing satisfaction of the Relocated Premises Delivery Date Conditions).

5.    <u>Surrender of Original Premises</u>.    Tenant agrees to surrender the Original Premises to Landlord as of the date which is thirty-six (36) days after the Relocated Premises Delivery Date (the *"Surrender Date"*).    Notwithstanding anything to the contrary contained in Section 20.1 of the Lease, Tenant shall not be required to remove its fixtures or other personal property from the Original Premises, nor shall Tenant be require to deliver the same to Landlord in broom clean condition.  Landlord shall accept surrender of the Original Premises from Tenant and the parties hereto declare and agree that as of the Surrender Date, said Original Premises is released and discharged from the operation of the Lease.

6.    <u>Early Entry</u>.  Prior to the Relocated Premises Delivery Date, Tenant may, at Tenant's sole risk, enter upon the Relocated Premises during normal business hours for the purposes of inspecting the Relocated Premises, taking measurements, making plans, erecting temporary or permanent signs (which signs shall be subject to the terms of the Lease) and doing such other preparatory work as may be reasonably appropriate without being deemed thereby to have taken possession (it being agreed that Tenant, as a condition to commencing any such work, shall obtain any required governmental permits, certificates or approvals pertaining thereto).  Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims, actions, damages, liabilities, costs and losses to the extent same arise from Tenant's entry upon the Relocated Premises, including without limitation, Landlord's costs of defending against the foregoing, such costs to include reasonable attorneys fees.  Prior to entering upon the Relocated Premises in accordance with the foregoing provisions of this Paragraph 6, Tenant shall maintain such insurance as may then be required pursuant to Article 10 of the Lease, and Tenant's general contractor shall provide Landlord with a certificate of insurance with coverage customary and reasonable for licensed contractors in the metropolitan area in which the Shopping Center is located, performing work similar to the Tenant's Work and otherwise reasonably satisfactory to Landlord.  Notwithstanding the forgoing, Tenant's entry pursuant to this Section 6 shall be permitted only if such entry does not delay Landlord's Work.  In addition to the other requirements above, if Tenant's early entry delays Landlord's Work, Landlord shall, without Landlord incurring the penalty described in (c),

have the right to delay the Relocated Premises Delivery Date for a period commensurate with the actual delay.

7.    <u>Premises Redefined</u>.  Effective as of the Relocated Premises Delivery Date, Subsection 1.1.28 of the Lease entitled "Premises" is hereby deleted and the following substituted therefore:

"<u>Premises</u>:  Being the area cross-hatched on the Site Plan attached as <u>Exhibit A</u> to the Second Amendment to this Lease (having dimensions as shown on such Site Plan) and containing twenty-nine thousand five hundred thirty (29,530) square feet of Floor Area."

It is the intention and agreement of the parties hereto that from and after the Relocated Premises Delivery Date, the Relocated Premises is substituted in place of the Original Premises except that the terms of this Lease shall also apply to the Original Premises until Tenant has surrendered  the Original Premises pursuant to Section 5 above except as provided in Section 9 below.

8.    <u>Site Plan</u>.  The Site Plan attached hereto as <u>Exhibit A</u> shall amend and replace the Site Plan attached to the Lease as <u>Exhibit B</u>.  Landlord agrees that Tenant may stage and store materials and park construction vehicles during Tenant's construction of the Relocated Premises in the area marked "Staging" on <u>Exhibit A</u> attached hereto.

9.    <u>Relocated Premises Rent Commencement Date</u>.  Anything contained in this Second Amendment to the contrary notwithstanding, in no event shall Tenant be obligated to pay Fixed Rent, Tenant's Pro Rata Share of Taxes, Tenant's Pro Rata Share of Common Areas Charges and any other items of additional rent relating to the Relocated Premises until the date (such date being referred to herein as the *"Relocated Premises Rent Commencement Date"*) upon which the earlier shall occur: (i) forty-five (45) days after the Relocated Premises Delivery Date; and (ii) the date Tenant opens the Relocated Premises for business to the public.  Tenant's obligation to pay Fixed Rent, Tenant's Pro Rata Share of Taxes, Tenant's Pro Rata Share of Common Areas Charges with respect to the Original Premises shall terminate on the Relocated Premises Rent Commencement Date provided that Tenant surrenders the Original Premises as required by Section 5 above.

10.    <u>Term</u>.  Notwithstanding anything in the Lease to the contrary, the Lease is hereby amended to provide that as of the Relocated Premises Rent Commencement Date the Initial Term shall be for a period of fifteen (15) years beginning on the Relocated Premises Rent Commencement Date and expiring at midnight on the last day of January following the fifteenth (15th) anniversary of the Relocated Premises Rent Commencement Date (the *"Termination Date"*), unless the Relocated Premises Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the

fifteenth (15th) anniversary of the Relocated Premises Rent Commencement Date. The Renewal Options provided in Section 2.2.2 of the Lease shall continue to apply, if exercised by Tenant, commencing upon the expiration of the Initial Term, as extended herein. The parties agree to enter into a written statement substantially similar to Exhibit G hereto specifying the Relocated Premises Rent Commencement Date, the Extended Expiration Date and the revised dates for the commencement of the Renewal Periods.

11.    Fixed Rent. Section 4.1 of the Lease entitled "Fixed Rent" is hereby amended to provide that as of the Relocated Premises Rent Commencement Date, Tenant shall pay to Landlord as Fixed Rent for the Relocated Premises, the sums set forth on the Schedule A attached hereto and made a part hereof. If the Relocated Premises Rent Commencement Date falls other than on the first day of a month then the Fixed Rent payable for such calendar month shall be prorated based on the annual rental rates provided in the Lease and in this Second Amendment.

12.    Additional Rent. As of the Relocated Premises Rent Commencement Date, Tenant shall pay to Landlord Tenant's Pro Rata Share of Taxes and Common Areas Charges pursuant to Sections 4.3, 5.1.2 and 10.3.3 of the Lease based upon the Floor Area of the Relocated Premises.

13.    Tenant Allowance. Landlord shall pay Tenant the sum of Four Hundred Twenty-Six Thousand Seven Hundred Ninety-Five ($426,795.00) Dollars (the *"Tenant Allowance"*), which Tenant Allowance is in consideration for Tenant's construction of Tenant's Work. Landlord shall pay to Tenant the Tenant Allowance as a monthly credit against one hundred (100%) percent of the Fixed Rent payable by Tenant under the Lease (as amended herein) commencing on the Relocated Premises Rent Commencement Date and continuing monthly until the Tenant Allowance has been paid in full.

14.    Representations. Landlord covenants and represents, as the case may be, to Tenant as follows:

(a)    As of the date hereof, no governmental or third party consents that arise from documents or instruments to which Landlord or to Landlord's actual knowledge, its predecessors, are a party to, other than that of Landlord's mortgagor, are required for Tenant to perform Tenant's Work;

(b)    As of the date hereof, Landlord's interest in the Shopping Center is not encumbered by a ground lease, mortgage or deed of trust other than an Amendment and Restatement of Mortgage and Security Agreement (the "Mortgage") held by Landlord to The Northwestern Mutual Life Insurance Company dated as of March 10, 2005 and recorded in the official records of Washington County;

(c)    Landlord has good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the Mortgage described in sub-paragraph (b) above and the encumbrances described on <u>Exhibit E</u> of the Original Lease;

(d)    Subject to the provisions of Section 13.1 of the Lease as of the date hereof, Tenant's use of the Relocated Premises for the sale of Permitted Items will not violate any exclusive use provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    To Landlord's actual knowledge, except for any permits or approvals required in connection with the Tenant's Work, there are no restrictions or other legal impediments imposed by any public or private instrument which would prevent the relocation by Tenant to the Relocated Premises; and

(f)    To Landlord's actual knowledge, except as disclosed in the Lease, no Hazardous Substances are located at, on, in, under or emanating from the Relocated Premises and no underground storage tank exists at the Relocated Premises. The foregoing representation shall in no way serve to vitiate Landlord's obligation to remove Hazardous Substances pursuant to Paragraphs 3 and 4 hereof or Tenant's obligation to remove Hazardous Substances pursuant to Section 12.4 of the Lease. Notwithstanding anything herein to the contrary, if any Hazardous Substances are found in or on the Relocated Premises (including, without limitation, in the roof system thereof) which pre-date the Relocated Premises Delivery Date and were not introduced by Tenant Related Parties, then Landlord shall promptly remove or abate the same in compliance with all applicable laws at Landlord's sole cost and expense, and, to the extent such work delays the Relocated Premises Work, then the Relocated Premises Rent Commencement Date shall be delayed on a day for day basis for each day of such delay.

15.    <u>Temporary Storage Containers</u>. Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on <u>Exhibit B</u> hereto during the Term, subject to applicable Legal Requirements.

16.    <u>Jury Trial</u>. To the extent permitted by applicable law, Landlord and Tenant hereby waive all right to trial by jury in any claims, action, proceeding or counterclaim by either Landlord or Tenant against each other or any matter arising out of or in any way connected with this Second Amendment, the relationship of Landlord and Tenant or Tenant's use or occupancy of the Premises.

17.    <u>Broker</u>. Landlord and Tenant each warrant and represent to the other that they did not deal with a real estate broker in connection with the negotiation, execution and delivery of this Second Amendment. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or

arising out of any claims made by any other real estate broker, agent or finder with respect to this Second Amendment in breach of the foregoing representation. The provisions of this Paragraph shall survive the expiration or earlier termination of the Lease.

18.    <u>Binding Effect</u>.  This Second Amendment, and all covenants, provisions and conditions herein contained shall inure to the benefit of, and be binding upon, the successors and assigns of Landlord and Tenant

19.    <u>Entire Agreement</u>.  Except as hereinabove set forth, all other terms and conditions of the Lease shall remain in full force and effect.

20.    <u>Condition</u>.  This Second Amendment is contingent on Landlord obtaining a binding written Lease with Gordmans, Inc. in the Shopping Center.  If Landlord has not waived or satisfied the foregoing condition by August 1, 2010, Landlord or Tenant may elect to terminate this Second Amendment and thereafter neither party shall have any further obligations under this Second Amendment except:  (i) the Lease shall remain in full force and effect, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Second Amendment (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work), not to exceed Fifty Thousand ($50,000.00) Dollars.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

## Schedule A
## Rent Schedule

| Period | Monthly Fixed Rent | Annual Fixed Rent |
| --- | --- | --- |
| Relocated Premises Rent Commencement Date through end of the Initial Term | $28,353.41 | $340,240.97 |
| First Renewal Option | $33,098.08 | $397,178.50 |
| Second Renewal Option | $34,943.83 | $419,326.00 |
| Third Renewal Option | $36,789.46 | $441,473.50 |

14

Signature Page for Landlord on Second Lease Amendment between Tamarack Village Shopping Center, A Limited Partnership and Bed Bath & Beyond, Inc.


IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first above written.


WITNESSES AS TO LANDLORD:         LANDLORD:

**TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP,**
a Minnesota limited partnership

By: Tamarack Village Shopping Center Corporation, its general partner

By: _____

Print name: _Linda DiLAURA_         Name:   Robert C. Muir

Print name: _S. COLLER_              Title:    President

Signature Page for  Tenant on Second Lease Amendment between Tamarack Village Shopping Center, A Limited Partnership and Bed Bath & Beyond Inc.

WITNESSES AS TO TENANT:                 **TENANT:**

 

 

**BED BATH & BEYOND INC.**
a New York corporation

By: _____

Print Name: _Zanna Lentzman_           Print Name: _Warren Eisenberg_

Print Name: _Scott R. Smith_            Title: _Co-Chairman_

 

## [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]



<u>Exhibit A</u>
<u>Site Plan</u>
(attached)

A-1

27641/0381-6453688v8

<u>Exhibit B</u>

Specifications for Landlord's Work

*Woodbury, MN*
Exhibit B - Landlord's Work



03/25/10 **(rev. 6/15/10)**

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit B. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I. Landlord's Plans & Specifications

A.   Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following :

1.   **Tenant's Plans** : Site-specific design-development drawings prepared by Tenant which shall include :

   a)   F1 - FIXTURE PLAN
   b)   F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
   c)   F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
   d)   F4 - LIGHTING PLANS AND NOTES
   e)   F5 - HIGH PILE STORAGE PLAN
   f)   Additional F-drawings as may be required to address atypical site-specific conditions

2.   **Tenant's Prototype Drawings & Specifications** –  [developed by Casco Corporation ,St. Louis, MO) which consist of :

   a)   **Bed Bath & Beyond – PROTOTYPE VERSION 1.2009 – Drawings (dated 07/15/09)**

| | | | |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | P1.1 | Plumbing Riser Diagrams and Fixture Schedule |
| A0.2 | Generic Site Requirements Plan | P2.1 | Plumbing Floor Plan |
| A1.1 | Site Details | P3.1 | Plumbing Enlarged Plans & Details |
| A1.2 | Demolition Plan | | |
| A2.1 | Cable Clip/Store Fixture/Egress Path Plan & Notes | FP1.0 | Fire Sprinkler Plans & Details |
| A2.2 | Floor Plan | FP1.1 | Fire Sprinkler Notes and Details |
| A2.3 | Floor Finish Plans | | |
| A2.4 | Reflected Ceiling Plans & Notes | FA1.0a | Fire Alarm Plans & Notes Base System |
| A2.5 | Roof Plan, Details & Notes | FA1.0b | (Alternate) Fire Alarm Plans & Notes – |
| A3.1 | Finish Schedule, Storefront Types & | | Occupant Notification |
| | Vestibule Elevations | FA1.0c | (Alternate) Fire Alarm Plans & Notes - |
| A3.2 | Door Hardware, Door Schedules & | | Full Smoke Detection |
| | Door Types | FA1.1a | Fire Alarm Details - Base System |
| A3.3 | BBB National Account Vendors & Specified | FA1.1b | (Alternate) Fire Alarm Details – |
| | Manufactures w/ Distribution Schedule | | Occupant Notification |
| A4.1 | Exterior Elevations | FA1.1c | (Alternate) Fire Alarm Details – |
| A5.1 | Building Sections, Interior Wall Sections | | Full Smoke Detection |
| A5.2 | Exterior Wall Sections | FA1.2a | Fire Alarm Device Lists & Calcs - Base System |
| A5.3 | Exterior Wall Sections | FA1.2b | (Alternate) Fire Alarm Device Lists & Calcs - |
| A5.4 | Exterior Wall Sections | | Occupant Notification |
| A5.5 | Interior Wall Sections | FA1.2c | (Alternate) Fire Alarm Device Lists & Calcs - |
| A5.6 | Alternate Scissor Lift Plan, Section, | | Full Smoke Detection |
| | Specification & Notes | | |
| A6.1 | Exterior Details | M1.1 | Mechanical General Information |
| A6.2 | Interior and Exterior Details | M2.1 | Mechanical Floor Plan |
| A6.3 | Slatwall Details | M2.1a | (Alternate) Mechanical Floor Plan |
| A7.1 | Large Scale Details | M3.1 | Mechanical Enlarged Plans & Details |
| A7.2 | Large Scale Plans & Partition Types | M4.1 | Mechanical Schedules |
| A8.1 | Interior Details | | |
| A8.2 | Interior Details | E1.1 | Electrical General Information & Schedules |
| A8.3 | Customer Service Desk | E2.1 | Power Plan |
| A8.4 | Register Bays and Remote Service Desks | E2.2 | Lighting Layout Plan |
| A9.1 | Interior Elevations | E2.3 | Lighting Circuiting Plan |
| A9.3 | Alternate Plans, Elevations & Details | E2.4 | Specialty Lighting Plans & Diagrams |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | E2.5 | Specialty Lighting Elevations |
| A9.5a | (Alternate) – Vertical Core Sections | E3.1 | Electrical Large Scale Plans & Details |
| A9.5b | (Alternate) – Vertical Core Plans Elevation & Details | E3.2 | Lighting Sequencing |
| A9.6a | (Alternate) - Awning Elevations & Details | E3.3 | Electrical Details |
| A9.6b | (Alternate) - Awning Details | E4.1 | Electrical Schedules |
| A9.6c | (Alternate) – Awning Wall Sections | E4.2 | Electrical Diagrams |
| | | E4.3 | Power Wall Details, Security Details, Sign Schedule |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | E4.4 | Novar Wiring Details |
| | | E4.4a | (Alternate) Novar Wiring Details for |
| S1.1 | Structural General Information & Typical Details | | Non-Lennox RTU's |
| S2.1 | Foundation Plan | E4.5 | ETM Wiring Details for Lennox RTU's |
| S2.2 | Roof Framing Plan | E4.5a | (Alternate) ETM Wiring Dtls for Non-Lennox RTU's |
| S3.1 | Foundation Details | E5.1 | FTG Power, Lighting, Specialty Lighting |
| S3.2 | Roof Framing Details | | |

   b)   **Bed Bath & Beyond – PROTOTYPE VERSION 1.2009 – Project Manual (dated 07/15/09)**

3.   **Lease Exhibits** : Landlord's Plans & Specifications shall conform to all provisions of Exhibits A, B, D-2, and F-1 to this Lease.

6/16/10

B.   Landlord's Plans & Specifications shall also include the following items:

   1.   **NA**

   2.   **NA**

   3.   **Complete civil engineering documents that describe planned improvements as relates to the new work being performed to the specific Tenant's Premises.**

   4.   **NA**

C.   Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements. Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings and Specifications". Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas (incl. protection of openings through fire-rated partitions); Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc.. Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D.   Hierarchy :

   1.   In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
        a.   Lease Exhibits **A, B,** [excluding Tenant's Prototype], **D-2 & F-1**
        b.   Tenant's Plans
        c.   Tenant's Prototype Drawings and Specifications
        d.   Landlord's Plans and Specifications

   2.   To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant **and the changes shall be implemented in the build-out of the space. Landlord is to provide a full and complete representation of all site specific added elements required by all Governing Agencies having Jurisdiction in the final set of closeout documents.**

E.   Quality Control Review :

   1.   At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set. Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($2,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   2.   Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications. Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($1,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   3.   Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to immediately disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

   4.   Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

## II. Site Specifications

A.   All parking areas and traffic drives in the Shopping Center **are existing.** Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B.   All truck access drives in the Shopping Center **are existing.** Grading of these areas are not to exceed a slope of 3% unless specifically approved in writing by Tenant.

C.   Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad **are existing.**

D.   **NA**

E.   The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be in compliance with the requirements of the Governing agencies having Jurisdiction. In the "Control Area" in front the **Tenant's Premises, Landlord shall repair any damaged light fixtures and re-lamp the fixtures which are not operational.** The Landlord shall also provide low level security lighting, min. (1) foot-candle throughout center, that will remain illuminated until after all of the Tenant's Store Employees exit the Premises for each evening and meeting applicable Zoning and Building Code criteria for the Governing agencies having Jurisdiction for parking lot lighting from dusk to dawn seven days a week as required.

### III. Building Requirements

The following section both (a) highlights elements of Landlord's Work which are already specified in "Tenant's Prototype Drawings & Specifications" and (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications":

A. Clear Height : All Building Systems shall be designed to allow Tenant to stock merchandise to 16'-6"a.f.f. Various systems shall be designed to conform with the following criteria :
1. 13'-10"  minimum clear height to underside of all structural system components.
2. 15'-8"  minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
3. 12'-6"  minimum clear height to underside of all mechanical system components [i.e. - ductwork]
4. 12'-6" maximum clear height to underside of all mechanical supply and return ducts
5. 16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
6. 1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
7. 17'-10" maximum clear height at the lowest point of the underside of roof/floor deck above (excluding elevator override)

B. Fire Protection : Landlord shall furnish and install both a fire alarm system and a fire sprinkler system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

1. Landlord shall issue one complete submittal each for: (i) the fire alarm system and (ii) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval.  Each initial submittal must be received by Tenant's Consultant no later than (8) weeks prior to projected Delivery Date.  Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($625 for Fire Alarm + $625 for Fire Sprinkler) directly to Tenant's Consultant.  If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit.  Prior to the commencement of Consultant's review of any re-submittal, Landlord shall pay a fixed fee ($400 each) directly to Tenant's Consultant.  All payments must be made in US Dollars or the foreign equivalent thereof.

2. Landlord shall be responsible for monitoring the fire alarm system up to 30 days following the Delivery Date.

3. Fire Alarm system components shall be purchased by the Landlord thru Tenant's National Account vendor (ADT / Pat Piske / 800-453-2247 x2165).

4. **The sprinkler system shall be designed to allow merchandise to be stored within 18" of the sprinkler heads.  The system shall comply with 2002 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity solid shelves, minimum 4-foot aisles [typically, .486 GPM over 2000 sf will be required].  Under no circumstances will the Landlord provide a Fire Protection system that will not allow the Tenant to operate the Premises in a manner that meets the standards as defined in the Tenant's Prototypical Plans and Specifications.**

5. The sprinkler system shall NOT utilize a fire pump.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises.  Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition), and shall otherwise maintain the fire pump.

6. Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials in accordance with standard industry rates . If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

7. Tenant's National Fire Protection Consultant :     Mr. Will Smith / Code Consultants, Inc.  (CCI)
1804 Borman Circle Drive
St. Louis, MO   63146-4136
(314) 991-2633 [ph]
(314) 991-4614 [fax]
wills@codeconsultants.com

### C. Sprinkler Corrosion : NA

D. Floor System : The concrete floor slab is existing.  The floor system shall be designed to accept a minimum 125 lbs. per square foot of live load.

E. Utilities : Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer and phone services) are separately metered exclusive of all other tenants and occupants in the Shopping Center.  Tenant's utility services shall be provided directly by the Utility company (sub-metering is prohibited). Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises.  Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date.  Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date.  If landlord and Tenant are unable to complete transfer at time of Delivery Date, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

F. Intumescent Paint : In the event that fire-proofing of exposed structural elements is required, then Landlord shall use i intumescent fire resistant coating to achieve the required fire rating.  Application shall be neat & clean and in accordance with manufacturer's recommendations.

G Exit Signs - Any existing Self Luminous Exit Signs containing Tritium Gas shall be removed from the Premises at the Landlord's cost (if applicable).

---

> *The following five paragraphs ( H, I,J, K and L) shall only apply in the event that the Premises includes more than one level of sales / pre-sales / reeiving -or- any portion of the store operations is located on a different floor level (excluding the standard office mezzanine) :*

H.  NA

I.  NA

J.  NA

K.  NA

L.  NA

M.  NA

N.  Security Equipment: Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements.  Landlord shall purchase such equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / douglasthomas@adt.com). If any of the existing Security equipment that is in the existing Tenant's Premises meets the Tenant's current Prototype Design Criteria,  then Landlord can re-use and relocate such equipment subject to Tenant's approval.

O.  Sanitary Survey - Landlord shall perform a videographic, fiber optic camera survey of the existing sanitary drainage system 7-days prior to Delivery.  The survey shall include the entire sanitary line serving the Premises to a minimum of 50-feet outside the building.  Sanitary lines shall be "jetted" prior to starting the survey(s) to remove any existing waste, construction debris or standing clogs.  Camera recording shall indicate the operating camera depth.  Camera recording shall include a verbal narrative by the technician (including technician's name, company name, store number, store address, starting location of survey, and a brief description of any problems, deficiencies or points of interest identified throughout the inspection).  Camera recording shall be submitted in VHS or DVD format and shall contain only the camera survey for this project.  Camera recording shall be clearly labeled with store number, store address, date of inspection, name of inspector and Inspection Company.  Camera recording shall be accompanied by a written evaluation report highlighting any problems, deficiencies or points of interest and shall include a schematic diagram of the sanitary line which indicates the size, slope and material of the pipe and all cleanout locations.

P.  Landlord shall make all the specified roof repairs to the existing roof system at the Premises as defined in the roofing repot prepared by Top-All Roofing Inc., dated may 7, 2010.  All scheduled work will be completed at time of Delivery Date.

Q  Landlord is to furnish and install a new Prototypical Trash Compactor with all required parts and equipment for a complete installation in compliance with Tenant's standard operational criteria.

R.  Landlord is to furnish and install all new Prototypical RTUs for the Tenant's premises with all required parts and equipment for a complete installation in compliance with the Tenant's standard operational criteria.

S.  Landlord, in accordance with the Stanley Door's Survey report, is obligated to service the existing Stanley sliding door entry system. Landlord is to repair and or replace any deficient parts/equipment as described in noted report in order for the existing entry system to function in compliance with the Tenant's standard operational criteria.

T.  Landlord shall furnish and install, 5 days after Tenant's acceptance of the Premises, and 8' x 8' wall opening in the demised wall between the new Tenant's Premises and the adjacent vacated Premises (location of opening to be determined by Tenant at future date). New opening to be structurally supported as required and be secured with 2 plywood swinging doors with locking mechanism. Wall opening to be closed and subsequently finished to match adjacent final wall finishes 30 days after the initial opening was prepared.

## IV. Construction Coordination Requirements

A.  Schedule : Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B.  Photographs : Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work.  All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : BBB.2000photos@bedbath.com

C.  Vendor Coordination : Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

## V. Building and Site Signs

A.  Building Signs – Landlord shall furnish and install all new building signs shown on Exhibits D-2 and F-1 of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor.  Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations.  Landlord shall execute a purchase order with Tenant's specified vendor no later than eight (8) weeks prior to Delivery Date.  If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease.  If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B.  Remote Building Sign(s) – NA

C. <u>Pylon Signs</u> -- Pylon signs, as shown on Exhibit F to the existing Lease, shall remain in the position where they are currently located.

D. <u>Temporary Signs</u> -- Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below.  Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
   1. Two double sided temporary banners mounted to the Premises bearing the phrase :
      Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
      Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
   2. Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
      Banners #1 & #2 - "Coming Soon"
      Banners #3 & #4 - "Now Open"
   3. One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
      "Now Hiring" (side a) and "Now Open" (side b).
   At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

   Landlord shall secure banners through the following vendor:

   Sarah Dehebreard / Corporate Identification Solutions
   5308 N. Northwest Highway
   Chicago, IL 60630
   (773) 763-9600 [ph]
   (773) 763-9606 [fax]
   sdehebreard@corporateidsolutions.com
   www.corporateidsolutions.com

E. Shop Drawings : NA

## VI. Permits and Approvals

A. Landlord shall be obligated to secure <u>all</u> permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises.  Such permits may include (but shall not be limited to) the following : Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0"] and Signage Permits.

   **Only if seismic calculations, plans and details are required,** then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date.  Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application.  Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).

   Sal Fateen or Genie Fateen / Seizmic Inc.
   161 Atlantic Street, Pomona, CA 91768
   (909) 869-0989 [ph]

   Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VII. Construction Closeout

A. <u>Electronic Format</u> : Within thirty (30) days following the "Substantial Completion" date, Landlord shall be obligated to issue one (1) hard copy of ALL required Closeout Documents to :

   Digital Reliance Incorporated (DRI)
   386 Charmel Place
   Columbus, OH 43235
   (614) 430-5950 [ph]
   ja@digital-reliance.com

   Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700. DRI shall scan all documents to disk for Tenant's future use.  **Payment for any fees for the scanning of the required closeout documents will be the tenant's responsibility.**

   Prior to scanning the documents, DRI will review the submittal for general conformance with the base minimum submittal requirements (per "Tenant's Prototype Drawings & Specifications").  DRI shall inform Landlord directly of any missing documents.  After <u>all</u> Closeout Documents have been received by DRI and scanned, a disk with electronic files will be issued to Tenant's Construction Project Manager. DRI will <u>not</u> review items for content.  Content will be reviewed by Tenant's Construction Project Manager after receipt of electronic files from DRI.  If Tenant's Construction Project Manager notifies Landlord that a resubmittal is required due to incorrect content, Landlord shall resubmit amended documents to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

B. <u>Warranties</u> : Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work.  All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant.  Two (2) months prior to the end of the warranty period, **upon receipt in writing from the Tenant,** Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C. <u>Late Closeouts</u> : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed **Forty-Five (45)** day period, then Tenant may provide Landlord with notice of such failure.  If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.  <u>Itemized Budget</u> : Landlord shall provide Tenant, **upon written  notification,  "final cost" for all of Landlord's Work within thirty (30) days following the Substantial Completion Date. At no time shall the information provided be utilized by the Tenant to renegote after  the agreed to rent defined in the lease**

E.  <u>Energy Rebate Information</u> : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy **use rebate programs** that are in force by the Authority Having Jurisdiction and/or the utility provider.

Exhibit C

Amended Memorandum of Lease

**Prepared by and after**
**Recording, Return to:**
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attention: Alan M. Freeman, Esquire

_____
(The Above Space for Recorder's Use Only)

## AMENDED MEMORANDUM OF LEASE

      **THIS AMENDED MEMORANDUM OF LEASE**, made as of
_____ ____, 2010, by and between TAMARACK VILLAGE SHOPPING
CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership ("*Landlord*"),
having an office at 7650 Edinborough Way, Suite 375, Edina, MN 55435, and BED
BATH & BEYOND INC., a New York corporation ("*Tenant*") having an office at 650
Liberty Avenue, Union, New Jersey 07083.

      Landlord is the fee owner of certain real property located in Tamarack Village
Shopping Center, Woodbury, Minnesota, as more particularly described on Exhibit A
hereto annexed, together with improvements constructed thereon (the **"Shopping
Center"**). Landlord and Tenant are parties to a Lease Agreement dated as of December
31, 2001 (the **"Original Lease"**), as supplemented by Rent Commencement and
Expiration Date Agreement, dated as of July 22, 2002, and amended by that certain First
Amendment to Lease, dated as of March 2, 2004 and Second Amendment dated _____
_____, 2010 (as amended collectively, the **"Lease"**), wherein Landlord leased to
Tenant certain premises in the Shopping Center as more particularly described therein
(the **"Premises"**). In connection with the execution of a certain Second Amendment to
Lease dated as of the date hereof (**"Second Amendment"**) the Premises were relocated to
other premises located within the Shopping Center, as more particularly described in the
Second Amendment. Landlord and Tenant have entered into this Amended
Memorandum of Lease to reconfirm the Lease and to provide notice to any interested
party of the terms and provisions of the Second Amendment.

      1.    A Memorandum of Lease dated December 20, 2001 evidencing the
Original Lease was recorded on February 6, 2002, as instrument number 3211396 in the
Official Records of Washington County, State of Minnesota.

      2.    The terms and conditions of the Lease and the Second Amendment are
incorporated herein as though set forth in full, whereby Tenant may have and hold the

C-1

27641/0381-6453688v8

Relocated Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated.

3.      This Amended Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, as amended, and is not intended, and shall not be construed, to define, limit or modify the Lease, as amended.

4.      The Lease and the Second Amendment contain numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease and the Second Amendment directly with respect to the details of such terms, covenants and conditions.  The Lease and the Second Amendment and exhibits thereto are hereby incorporated by reference in this Amended Memorandum of Lease and the parties hereby ratify and confirm the Lease.  In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.

5.      Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

27641/0381-6453688v8

Signature Page for Landlord on Amended Memorandum of Lease Between
Tamarack Village Shopping Center, A Limited Partnership and Bed Bath & Beyond Inc.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended
Memorandum of Lease as of the day and year first above written.

WITNESSES AS TO LANDLORD:          LANDLORD:

                                   TAMARACK VILLAGE SHOPPING
                                   CENTER A LIMITED PARTNERSHIP, a
                                   Minnesota limited partnership

                                   By:  Tamarack Village Shopping Center
                                   Corporation, its general partner

_____
Print name:_____       By: _____
                                   Name:    Robert C. Muir
_____      Title:    President
Print name:_____


STATE OF                  )
                          )ss:
COUNTY OF                 )

On _____ _, 2010, personally appeared the above-named Robert C. Muir, the
President  of TAMARACK VILLAGE SHOPPING CENTER CORPORATION, general
partner of TAMARACK VILLAGE SHOPPING CENTER, A LIMITED
PARTNERSHIP, a Minnesota limited partnership, and he acknowledged the foregoing
instrument to be the free act and deed of TAMARACK VILLAGE SHOPPING
CENTER, A LIMITED PARTNERSHIP, before me.


                                   _____
                                   Notary Public
My Commission Expires:_____

C-3

Signature Page for Tenant on Amended Memorandum of Lease Between
Tamarack Village Shopping Center, A Limited Partnership and Bed Bath & Beyond Inc.

WITNESSES AS TO TENANT:                    TENANT:
                                           **BED BATH & BEYOND INC.,**
                                           a New York corporation


_____       By: _____
Print Name: _____          Title:_____
                                           Print Name:_____


_____
Print Name:_____


STATE OF NEW JERSEY          )
                             )ss:
COUNTY OF UNION              )

   On _____ _, 2010, personally appeared the above-named _____, the
_____ of BED BATH & BEYOND INC., a New York corporation and he
acknowledged the foregoing instrument to be the free act and deed of BED BATH &
BEYOND INC., before me.


                             _____
                             Notary Public
                             My Commission Expires:_____


                                    C-4

27641/0381-6453688v8

EXHIBIT A
TO
AMENDED MEMORANDUM OF LEASE
Legal Description of Shopping Center

Lots 4 and 6, Block 1, together with appurtenant drainage and ponding easements over
Outlot B, Tamarack Village, and Lot 2, Block 1 and Outlot A, Tamarack 2nd Addition,
County of Washington, State of Minnesota.

C-5

27641/0381-6453688v8

<u>Exhibit D-2</u>
<u>Exterior Elevations of the Relocated Premises, and Sidewalk Plan</u>

D-1

27641/0381-6453688v8





BED BATH & BEYOND
WOODBURY, IN 55128
EXHIBIT D-2 (SHEET 2 OF 2):
EXTERIOR ELEVATIONS
OF PREMISES AND SIDEWALK PLAN
06-03-10







BED BATH & BEYOND
WOODBURY, IN 55125
EXHIBIT D-2 (SHEET 1 OF 2):
EXTERIOR ELEVATIONS
OF PREMISES AND SIDEWALK PLAN
08-05-10

Exhibit E
Form of Delivery Date Notice

[Letterhead of Landlord]

_____, 2010

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Lease Agreement dated as of _____, 2010 (the "*Lease*"), between Tamarack
        Village Shopping Center, A Limited Partnership, as landlord ("*Landlord*"), and
        Bed Bath & Beyond Inc., as tenant ("*Tenant*"), with respect to certain retail
        premises (the "*Premises*") located in the Tamarack Village Shopping Center,
        Woodbury, Minnesota

Gentlemen:

        In accordance with the provisions of Subsection ____ of the Second Amendment,
the Landlord hereby informs the Tenant that the Delivery Date shall take place at 8:00
A.M. on _____, 2010. This notice shall constitute the Delivery Date Notice
referred to in Subsection ____ of the Second Amendment.

                                        TAMARACK VILLAGE SHOPPING
                                        CENTER A LIMITED PARTNERSHIP,
                                        a Minnesota limited partnership

                                        By: Tamarack Village Shopping Center
                                            Corporation, its general partner

                                        By:_____
                                            _____, (Vice) President

cc:     [_____, Esq.]
        [Allan N. Rauch, Esq.]

E-1

27641/0381-6453688v8

Exhibit F

Form of Delivery Date Certification

[Letterhead of Landlord]

_____, 2010

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn:  Warren Eisenberg

Re:    Lease Agreement dated as of _____, 2010 (the "*Lease*"), between Tamarack
        Village Shopping Center, A Limited Partnership, as landlord ("*Landlord*"), and
        Bed Bath & Beyond Inc., as tenant ("*Tenant*"), with respect to certain retail
        premises (the "*Premises*") located in the Tamarack Village Shopping Center,
        Woodbury, Minnesota

Gentlemen:

In accordance with the provisions of Subsection _____ of the Second Amendment,
Landlord hereby certifies to Tenant that, as of the date of this certification, all of the
Delivery Date Conditions (as defined in the Lease) have been satisfied, and that, as a
result, the Delivery Date (as such term is defined in the Lease) will be deemed to be
_____, 200__ .  This notice shall constitute the Delivery Date Certification
referred to in Subsection _____ of the second Amendment.

TAMARACK VILLAGE SHOPPING
CENTER A LIMITED PARTNERSHIP,
a Minnesota limited partnership

By:  Tamarack Village Shopping Center
       Corporation, its general partner

By:_____
_____, (Vice) President

cc:    [_____, Esq.]
       [Allan N. Rauch, Esq.]

F-1

27641/0381-6453688v8

Exhibit F-1

Signage – Relocated Premises

F-2



**TEMPORARY BUILDING BANNERS**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)



**TEMPORARY BANNERS (BUILDING OR BBB HIRING TRAILER)**




VINYL COLORS



**TEMPORARY SITE SIGNAGE**

**LOCATION SHOWN ON EXHIBIT B.**

**TEMPORARY SITE BANNERS**

4' x 8' - TYVEK

(VERSION 1)

(VERSION 2)





**TEMPORARY NON STICK VINYL GRAPHIC**

BANNER STYLE



CORNER STYLE



NOTE:
o VINYL TO BE RED IPMS 187 OR EQUIVALENT BACKGROUND WITH WHITE LETTERS IN A SIMILAR FONT AS SHOWN.
o TENANT IS RESPONSIBLE TO PROVIDE, INSTALL AND REMOVE AS REQUIRED BY BBBY.
o TENANT TO APPROVE THE STYLE (BANNER, CORNER, ETC) AND LANGUAGE PROVIDED RENDERING FOR EACH PANEL LOCATED ON PYLON, MONUMENT OR OTHER SIGN PANEL STRUCTURE.
o TENANT TO DETERMINE PHRASE (COMING SOON, NOW OPEN, ETC) ON TEMPORARY VINYL.
o VINYL TO BE 3M NON STICK VINYL OR EQUIVALENT, NO LASTING RESIDUE OR MARKS AFTER THE VINYL IS REMOVED.







Exhibit G

Relocated Premises Rent Commencement Agreement

THIS ADDITIONAL PREMISES RENT COMMENCEMENT AGREEMENT ("Agreement")
made as of the ____ day of _____, 2010, by and between TAMARACK VILLAGE
SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership
(*"Landlord"*) and BED BATH & BEYOND INC., a New York corporation (*"Tenant"*).

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as
Tamarack Village Shopping Center (the "*Shopping Center"*), situated in Woodbury,
Minnesota;

WHEREAS, by that certain Lease Agreement dated as of December 31, 2001 (the
*"Lease"*), as amended by that certain First Amendment to Lease dated as of March 2,
2004, Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant, as
more particularly described in the Lease;

WHEREAS, by that certain Second Amendment to Lease dated as of
_____, _____ (the "*Second Amendment"*), the Premises were relocated and the
Landlord and Tenant have, pursuant to paragraph 4(d) of the Second Amendment,
entered into this Agreement to confirm the Relocated Premises Rent Commencement
Date, the Extended Expiration Date, and the revised dates for the commencement of the
Renewal Periods.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Relocated Premises Rent Commencement Date occurred on
_____, 201_.

2.      The **Extended Initial Term** of the Lease shall expire on January 31, 202_
unless Tenant exercises any option to extend the Term of the Lease or unless the Lease
terminates earlier as provided in the Lease.

3.      The revised date of commencement of the **first Renewal Period** shall be
February 1, 202_____, if Tenant effectively exercises its option in respect thereof, and if
Tenant does so, the Term of the Lease shall expire on January 31, 203_, unless Tenant
exercises any option to further extend the Term of the Lease or unless the Lease
terminates earlier as provided in the Lease.

4.      The revised date of commencement of the **second Renewal Period** shall be
February 1, 203_____, if Tenant effectively exercises its option in respect thereof, and if
Tenant does so, the Term of the Lease shall expire on January 31, 203_, unless Tenant

G-1

exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The revised date of commencement of the **third Renewal Period** shall be February 1, 203____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 204_, unless the Lease terminates earlier as provided in the Lease.

6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

WITNESSES AS TO LANDLORD:          LANDLORD:

**TAMARACK VILLAGE SHOPPING CENTER A LIMITED PARTNERSHIP**, a Minnesota limited partnership

By:  Tamarack Village Shopping Center Corporation, its general partner

Print name:_____          By: _____
                                     Name:
                                     Title:

Print name:_____


WITNESSES AS TO TENANT:          TENANT:
                                 **BED BATH & BEYOND INC.,**
                                 a New York corporation

Print name:_____          By: _____

                                     Print Name:_____

Print name:_____          Title:_____

27641/0381-6453688v8