**Exhibit A**

**Exhibit A**



# ChannelAdvisor Corporation Mirakl Integration Agreement

THIS MIRAKL INTEGRATION AGREEMENT ("**Agreement**") is entered into as of the last-dated signature below ("**Effective Date**") by and between ChannelAdvisor Corporation, a Delaware corporation with its principal place of business located at 3025 Carrington Mill Boulevard, Suite 500, Morrisville, NC 27560 ("**ChannelAdvisor**") and **Bed Bath & Beyond Inc., (together with its current and future affiliates and subsidiaries)** a New York corporation, having its principal place of business at 650 Liberty Ave, Union, NJ 07083 ("**Company**"). The Agreement includes the following Exhibits: Exhibit A – Integration Responsibilities; Exhibit B – Fees & Payments; Exhibit C – Data Privacy.

Company owns and operates the channel referenced in the signature lines hereto in the Geography of United States (the "**Company Site**"). Geography is defined as the geographic territory associated with a ChannelAdvisor account. ChannelAdvisor provides proprietary cloud-based e-commerce marketplace management software and services enabling sellers to sell on multiple channels ("ChannelAdvisor Platform"). ChannelAdvisor desires to provide sellers who have a written agreement with ChannelAdvisor authorizing them to use the ChannelAdvisor Platform to sell on Company Site ("**Clients**") access to the Company Site via a pre-existing integration between the ChannelAdvisor Platform and the Mirakl online marketplace platform ("**Mirakl**") so that Clients may display merchandise to end users of the Company Site. In consideration of the premises, mutual covenants and consideration contained herein, the sufficiency and adequacy of which is hereby acknowledged, the parties agree as follows:

**1.0  Party Responsibilities.**

**1.1  General.** The parties will undertake the responsibilities set forth in **Exhibit A -- Integration Responsibilities**. The parties agree that in their performance of their obligations under this Agreement, they will comply with applicable requirements of federal, state, local and other laws, ordinances, administrative rules and regulations, including but not limited to applicable export laws or regulations.

**1.2  Fees.** Company shall compensate ChannelAdvisor for setup, configuration and ongoing maintenance as set forth in Exhibit A and Exhibit B.  Unless expressly stated in Exhibit B otherwise, all fees shall be paid within forty-five (45) days of Customer's receipt of invoice. The parties' obligations to develop the Integration shall be completed and fees shall be deemed earned upon: (a) written confirmation from Company; (b) successful completion of ChannelAdvisor's testing; or (c) ninety (90) days from the anticipated Launch Date, whichever comes first.

**1.3  Scope.** Company understands and agrees that within the ChannelAdvisor Platform, Clients will only have access to the Integration within the Geography listed in this Agreement. "Geography" is defined as the geographic territory associated with a ChannelAdvisor account. These Geographies are as follows: United States.

Expansion of the Integration to additional Geographies or to additional Company Sites will be subject to the additional fees set forth in **Exhibit B**.

**1.4  Data Privacy.** The parties acknowledge and confirm their obligations under **Exhibit C – Data Privacy**.

**2.0  Intellectual Property Rights.**

**2.1  Licenses; Usage Rights.**  Each party shall retain all right title and interest in and to its respective pre-existing technology and website and products ("**Materials**"). ChannelAdvisor shall own all right, title, and interest in its developments and work product in performing under this Agreement ("**ChannelAdvisor Materials**"). Company shall own all right, title, and interest in Company API interfaces and other development materials, and Company Marks ("**Company Materials**"). Company grants ChannelAdvisor a nontransferable, worldwide, royalty-free license to access and use, via the Internet, any necessary Company Materials to allow ChannelAdvisor to display its Clients' merchandise to the Company Site on behalf of its Clients.

**2.2  Marks Licenses.** Each party hereby grants to the other a limited, non-exclusive, non-assignable, non-transferable license, without right to sublicense, to use its trademarks of a particular logo or marks ("Marks") in connection with the activities authorized under this Agreement. Marks must be reproduced as exact copies and all use of the Marks is subject to the licensor's usage guidelines as revised from time to time and available from the

licensor. Licensee acknowledges and agrees that all right, title and interest in the licensor Marks is exclusively owned by the licensor, its licensors, or a third party and that all use of licensor Marks inures to the benefit of licensor. Licensee shall not assert any Intellectual Property rights in the licensor Marks or in any element, derivation, adaptation, variation or name thereof, and licensee shall not contest the validity of, or licensor's ownership of, any of the licensor Marks and shall not, in any jurisdiction, adopt, use, or register, or apply for registration of, whether as a corporate name, trademark, service mark or other indication of origin, or as a domain name, any licensor Marks, or any word, symbol or device, or any combination confusingly similar to any of the licensor Marks. Licensee may not alter licensor Marks in any manner, or use licensor Marks in any manner that may dilute, diminish, or otherwise damage licensor's rights and goodwill in its Marks and may not use licensor Marks in any manner that implies sponsorship or endorsement by licensor of licensee services and products other than those expressly authorized by licensor. ChannelAdvisor marks are referred to herein as "**ChannelAdvisor Marks**." Company Marks are referred to herein as "**Company Marks**."

**3.0 Term and Termination.** This Agreement commences on the Effective Date and continues in full force and effect for twenty-four (24) months thereafter ("**Initial Term**"). At the close of the Initial Term, the Agreement may renew for additional one-year terms ("**Renewal Term(s)**"). The annual Program Fee for any subsequent Renewal Term shall be invoiced to Company on or about the anniversary of the Renewal Term and Company shall remit payment and pay the Monthly GMV Fee in accordance with Section 1.2 herein. The then-current Initial Term or Renewal Term is referred to herein as "the **Term**." Following the passage of the Initial Term, either party may terminate this Agreement upon written notice of termination received no less than 180 days prior to the desired termination date. This Agreement may be terminated by either party upon written notice other than at the end of a Term if: (a) the other party materially breaches the terms of the Agreement and, where capable of cure, such breach is not cured within thirty (30) days after written notice of the breach and ; (b) Mirakl fails to meet the technical integration components required in the agreement between ChannelAdvisor and Mirakl or otherwise breaches such agreement; (c) the other party makes a general assignment for the benefit of creditors, files a voluntary petition of bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject to a petition in bankruptcy not dismissed in sixty (60) days, has wound up or liquidated, or has ceased to operate a marketplace Mirakl. If any of the above events occur, the affected party shall immediately notify the other party of its occurrence. In the event the functionality of Company Site is substantially impaired or ceases to operate for any reason for more than five (5) days, ChannelAdvisor may terminate this agreement upon ten (10) days written notice. Upon termination or expiration of this Agreement, all licenses granted herein shall terminate unless the parties expressly agree otherwise in writing, and ChannelAdvisor may remove and/or disable the integration for the Company Site from the ChannelAdvisor Platform. Each party agrees that its obligations under this Agreement shall be performed in a timely and workmanlike manner in accordance with best practices in the industry. ChannelAdvisor agrees that it shall maintain its information technology systems and working environment in accordance with physical and electronic information security standards which constitute best practices in the industry and it shall maintain reasonable security procedures and practices appropriate to the nature of the Confidential Information from unauthorized access, destruction, use, modification or disclosure.

**4.0 Warranties and Representations; Limitation of Liability.** Each party represents that it is duly organized, validly existing and in good standing, that it has full power and authority to enter into this Agreement, and that its performance hereunder will not violate any agreement to which it is a party. Each party represents that it is duly organized, validly existing and in good standing, that it has full power and authority to enter into this Agreement, and that its performance hereunder will not violate any agreement to which it is a party. ChannelAdvisor represents and warrants that: (i) Services under this Agreement shall be performed in a timely and workmanlike manner in accordance with best practices in the industry; (ii) ChannelAdvisor shall maintain its information technology systems and working environment in accordance with physical and electronic information security standards which constitute best practices in the industry; and (iii) ChannelAdvisor shall maintain reasonable security procedures and practices appropriate to the nature of the Confidential Information from unauthorized access, destruction, use, modification or disclosure.

EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE PARTIES MAKE NO WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT. EACH PARTY DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY WARRANTIES AGAINST INFRINGEMENT AND IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EXCLUDING INDEMNITY OBLIGATIONS, THE TOTAL LIABILITY OF A PARTY ARISING OUT OF THIS AGREEMENT SHALL BE LIMITED TO THE GREATER OF (A) FIVE THOUSAND DOLLARS ($5,000.00) OR (B) THREE (3) TIMES THE AMOUNT PAID OR PAYABLE UNDER THIS AGREEMENT.  NOTWITHSTANDING THE PRECEDING, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, OR INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS) WHETHER FORESEEABLE OR NOT, REGARDLESS AS TO WHETHER ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR NOT, AND REGARDLESS AS TO THEORY OF LIABILITY (WHETHER IN CONTRACT, TORT, STATUTORY OR OTHERWISE), AND NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. NOTWITHSTANDING THE PRECEDING LIMITATIONS IN THIS SECTION 4, NO LIMITATIONS SHALL BE CONSTRUED TO LIMIT CLAIMS OF: (1) INDEMNITY OBLIGATIONS, (2) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, OR (3) GROSS NEGLIGENCE OR WILLFUL MISCONDUCT,  NOTWITHSTANDING THE PROVISIONS OF THIS SECTION 4.0, THIS AGREEMENT SHALL NOT LIMIT THE LIABILITY OF EITHER PARTY FOR THE PERSONAL INJURY, INCLUDING DEATH, ARISING FROM THE NEGLIGENCE OF SUCH OTHER PARTY'S EMPLOYEES ACTING IN THE COURSE OF THEIR EMPLOYMENT.

**5.0  Indemnification**. Each party ("**Indemnitor**") shall indemnify, defend and/or settle, hold harmless the other party and its affiliates, directors, officers, employees, agents, and permitted assigns (collectively, "**Indemnitee**") from any and all claims, damages, losses, liabilities, costs and expenses (including reasonable attorney's fees), pursuant to any third party claim or assertion brought against Indemnitee arising out of or related to (as applicable):

5.1        (a) Indemnitee's use of Indemnitor's Materials; or (b) a the gross negligence or willful misconduct of the other party; or (c) Indemnitor's breach of the data protection or confidentiality terms of this Agreement.

5.2        Provided however, Indemnitee must notify Indemnitor within a reasonable time in writing of any such claim, promptly tenders the control of the defense and settlement of any such claim to Indemnitor (at Indemnitor's expense and with Indemnitor's choice of counsel), and reasonably cooperates with Indemnitor (at Indemnitor's request and expense) in defending or settling such claim, including but not limited to providing any information or materials reasonably requested and necessary for Indemnitor to perform the foregoing. Indemnitor will not enter into any settlement or compromise of any such claim without Indemnitee's prior consent, if the settlement would require admission of fault or payment by Indemnitee.

**6.0  Confidentiality; Prohibitions on Insider Trading.**

"**Confidential Information**" means any information disclosed by either party to the other during the Term of this Agreement either directly or indirectly, in writing, orally or by inspection of tangible objects, which is designated as "**Confidential**," "**Proprietary**" or some similar designation, or which is reasonably understood by its nature to be confidential. Confidential Information will not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party and not subject to confidentiality obligations; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; or (v) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information. The Receiving Party agrees that breach of this provision may cause the Disclosing Party irreparable damage that cannot be fully remedied through the payment of monetary damages.  Accordingly, the Disclosing Party shall have the right to seek injunctive relief upon the Receiving Party's breach or threatened breach. This remedy is in addition to any other remedies available at law or equity. The Receiving Party agrees (i) not to disclose any Confidential Information to any third parties, (ii) not to use any Confidential Information for any purposes except to carry out its

rights and responsibilities under this Agreement, and (iii) to keep the Confidential Information confidential using the same degree of care the receiving party uses to protect its own confidential information, but no less than reasonable care. If either party receives a subpoena or other validly issued judicial process requesting, or is required by a government agency (such as the SEC) to disclose Confidential Information of the other party, then the receiving party shall notify the disclosing party, unless doing so would violate the subpoena or process, and shall reasonably cooperate to seek confidential treatment or to obtain an appropriate protective order to preserve the confidentiality of the Confidential Information. All obligations under this Section survive after termination of the Agreement. The parties acknowledge and agree that this Agreement does not in any way limit either party's right at any time to independently develop, market, license, or otherwise distribute, any product, in any manner that it chooses, provided a party does not do so in breach of this Agreement. ChannelAdvisor may from time to time provide Company with contact information of certain sellers that have expressed interest in receiving invitations to sell on new marketplaces ("**the Purpose**"). That contact information shall be Confidential Information as such term is defined herein, and may only be used by Company for the Purpose and not for general marketing communications or any other purpose. Each party and its personnel are prohibited from purchasing, selling or otherwise trading in securities of the other party or arranging for or encouraging others to do so, while in possession of material, nonpublic information concerning the other party (this conduct is commonly referred to as "insider trading"); and/or communicating material, nonpublic information concerning the other party to non-authorized persons outside the other party (this conduct is commonly referred to as "tipping").  If there is any doubt as to whether information is material, nonpublic information, the information in question should be treated as material and nonpublic.  In addition, this prohibition includes any entity controlling, under common control with, or controlled by a party, as well as a party's personnel's spouse and members of the immediate family sharing the same household with a party's personnel.

**7.0  Miscellaneous.**

**7.1  Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the state of New York, USA, without regard to its conflicts of laws provisions.

**7.2  Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter contained herein and supersedes all previous and contemporaneous agreements, proposals and communications, written or oral. No modification, alteration, waiver or change in any of the terms of this Agreement shall be valid or binding upon the parties hereto unless made in writing and duly executed by both of the parties hereto; provided that either party may assign this Agreement in without the other's consent in the case of a reorganization, merger, consolidation, or sale of all or substantially all of its assets. Each party has the right to assign any of its rights or delegate any of its obligations hereunder to any of its affiliates so long as the affiliate is not a direct competitor to Company.  This Agreement will be binding upon and inure to the benefit of the permitted successors and assigns of the respective parties in this Agreement.

**7.3  Severability.** If any provision of this Agreement is held or made invalid or unenforceable for any reason, such invalidity shall not affect the remainder of this Agreement, and the invalid or unenforceable provisions shall be replaced by a mutually acceptable provision, which being valid, legal and enforceable comes closest to the original intentions of the parties hereto and has like economic effect. This Agreement is not intended to benefit, nor shall it be deemed to give rise to, any rights in any third party.

**7.4  Counterparts.** This Agreement may be executed in one or more counterparts each of which shall be deemed an original but all of which taken together shall be deemed one and the same instrument. The headings/captions used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof. This Agreement is not intended to create any relationship other than that of independent contractors performing the services described in this Agreement. No party is a partner or a legal representative of the other for any purpose whatsoever. No party is authorized to make any contract, agreement or warranty on behalf of any other party. Under no circumstance shall one party's employees be construed to be employees of any other party.

**7.5  Notice.**  All required communications shall be in writing, in English, and shall be addressed to the parties as set forth below (or to such addresses or persons as either party may specify in writing from time to time) and shall be



sufficient if delivered by hand, by email notification as long as "NOTICE" or "LEGAL NOTICE" appears in the subject line of the email and the email is set up to show a delivery confirmation, or by commercially reputable overnight courier and shall be considered duly delivered when recorded at the addresses of the parties:

**If to ChannelAdvisor**:

> See address in preamble of Agreement
> Email: legal@channeladvisor.com

**If to Company**: Bed Bath & Beyond Inc.
> 650 Liberty Avenue
> Union, NJ  07083
> Attn:  Senior Director, Procurement

With a required copy (which itself shall not constitute notice) to:  Attn: General Counsel, Bed Bath & Beyond Inc., at the same Company delivery address above.

**7.6  Press Release.**

Neither party shall make any public announcement or other form of public disclosure concerning the terms of this Agreement without first (i) offering the other party reasonable time to review and comment on the press announcement or other form of public disclosure; and (ii) receiving the other party's written approval with respect to such announcement or other disclosure, which approval shall not be unreasonably withheld or delayed.

**7.7  Survival.** The terms and provisions of this Agreement that by their meaning and context are intended to survive the performance of such term or provision or of this Agreement shall so survive. Waiver by either party of a default or breach or a succession of defaults or breaches, or any failure by either party to enforce any rights hereunder, shall not be deemed to constitute a waiver of any subsequent default or breach with respect to the same or any other provision hereof, and shall not deprive such party of any right to terminate this Agreement arising by reason of any subsequent default or breach.

**7.8  Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute but one instrument.

7.9     **Remedies.**  The parties acknowledge and agree that the remedies at law for breach of any term in this Agreement may be inadequate and that either Party shall be entitled to injunctive relief for any breach of this Agreement.  Nothing herein shall be construed as limiting either Party's right to any other remedies at law, including the recovery of damages for breach of this Agreement.

**7.10     Insurance.**  During the term of this Agreement and for a period of two years after the termination of this Agreement, ChannelAdvisor shall, at its own cost and expense, obtain and maintain in full force and effect, the following minimum insurance coverage: (a) Workers' Compensation insurance in accordance with all applicable federal, state and local statutory requirements and Employer's Liability coverage in an amount not less than $500,000 per occurrence; (b) Commercial Automobile Liability insurance (including bodily injury and property damage coverage) for owned, non-owned and hired vehicles, with a combined single limit of $500,000 per accident; (c) Commercial General Liability insurance on an occurrence basis with $1,000,000 per occurrence and $1,000,000 aggregate; (d) Technology Errors and Omissions liability insurance, including Network Security and Privacy Liability, with a limit of $5,000,000 per claim and $5,000,000 aggregate; and (e) Umbrella Liability insurance with limits of $5,000,000 per occurrence in excess of the limits specified above for Employer's Liability, Automobile Liability, and Commercial General Liability insurance. ChannelAdvisor shall furnish to Company, evidence of such insurance upon Company's written request.

**7.11     Force Majeure**.  Neither Party shall be held liable for any loss, damage or failure due to causes beyond its control, including strikes, riots, earthquakes, epidemics, wars, fires, floods, weather, power failure, acts of God or

any other failure, interruption or error not directly caused by that Party and beyond the reasonable control of the affected Party. The affected Party whose performance has been so affected shall immediately give notice to the other Party and shall do everything reasonably possible to resume performance.

**7.12 Conduct Policy**. It is the policy of each party and its subsidiaries and affiliates to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act). A party shall not, directly or indirectly, solicit or accept from, nor offer, promise or pay to, any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money or anything else of value. This includes, but is not limited to, any improper payment in exchange for a party's execution of this Agreement. Each party will also require any subcontractor (of any level) to adhere to the same standards, and will appropriately monitor its subcontractors to ensure such adherence. In addition, any individual who is employed by or who represents a party is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money or anything else of value. If any such improper actions are observed, as to ChannelAdvisor: contact Company's Legal Department (Attention: General Counsel) at the address set forth above by telephone at 908-688-0888, so that the incident may be fully investigated. Incidents can also be reported anonymously by calling 800-241-5689 in the US (800-522-7285 in Mexico) or via the following website: bedbath.ethicspoint.com; as to Company: contact ChannelAdvisor's Legal Department via email at legal@channeladvisor.com.

IN WITNESS WHEREOF, this Agreement is accepted and agreed to by the parties:

| **ChannelAdvisor Corporation** | **Bed Bath & Beyond Inc.** |
|---|---|
| *Paul Colucci* | *Andrew Rickert* |
| Name (Signature) | Name (Signature) |
| Paul Colucci | Andrew Rickert |
| Name (Print) | Name (Print) |
| Chief Revenue Officer | VP, eCommerce |
| Title | Title |
| 2/24/2022 | 2/24/2022 |
| Date | Date |
|  | www.bedbathandbeyond.com |
|  | www.buybuybaby.com |
|  | Company Site (URL) |



# Exhibit A – Integration Responsibilities

1.1  **General.** Company wishes to leverage the integration between Mirakl and the ChannelAdvisor Platform to allow Clients to connect to and utilize the Company Site. Company understands and agrees that ChannelAdvisor and Mirakl have already developed an integration connecting the ChannelAdvisor Platform to Mirakl ("the Integration"). Company shall perform the tasks required to assist ChannelAdvisor in successfully connecting the ChannelAdvisor Platform to Company's Site via the Integration within Mirakl. Once completed, Company shall provide the necessary support to assist ChannelAdvisor in finalizing the setup and configuration of the Integration to work with Mirakl, which includes integration of the Mirakl "P43" API (or use of MCM), and a direct support contact for issues arising throughout the Term.

1.2  **ChannelAdvisor agrees to:** (i) promote Company in a mutually agreed-upon press release and marketing campaigns to both existing Clients and prospects (ChannelAdvisor may also provide a quote for a Company press release if requested, and will list Company as a "supported marketplace" in ChannelAdvisor's promotional and selling materials), (ii) provide technical support to Clients (for the avoidance of doubt, this support will cover the ChannelAdvisor functionality and some issues may still require Clients to contact Company support for resolution if they are not related to the ChannelAdvisor Platform), (iii) provide training and launch services for Clients to enable them to utilize the ChannelAdvisor Platform to sell on Company Site (ChannelAdvisor reserves the sole right to determine the scope and pricing for these offerings), (iv) provide an optional full-service offering to support a seller campaign on Company Site (ChannelAdvisor reserves the sole right to determine the scope and pricing for this offering), and (v) train its sales team to include and promote Company as a supported marketplace to which Clients can push inventory (with Company's assistance), (vi) maintain the ChannelAdvisor Platform .

1.3  **Company agrees to:** (i) maintain the Company Site for Client access during the Term and inform ChannelAdvisor of any changes to the Company Site that would affect the integration, (ii) provide ChannelAdvisor with one (1) test account on the Company's staging/test system to allow integration testing, and one (1) account in the production system for the purpose of retrieving up-to-date taxonomy using Mirakl's Hierarchies, Attributes, and Value Lists APIs, (iii) impose no additional fees on Clients that would result in Clients paying higher fees than a comparable seller who is not using the ChannelAdvisor integration to sell products on Company Site, and (iv) establish a direct contract with Clients that governs the terms of their relationship between the Client and Company. In consideration of the benefits provided to Company by ChannelAdvisor under this Agreement, Company agrees that during the Term, it will not engage in any activities intended to solicit or invite Clients to directly integrate to the Company Site, whether via Company API or any other method that would allow a Client to bypass the Integration. If a Client communicates an interest to Company in such a direct integration, Company will make ChannelAdvisor aware of such inquiry. Company understands and agrees that its Clients' access to Mirakl via the ChannelAdvisor Platform is wholly dependent on the completion and continuing integration of the ChannelAdvisor Platform with Mirakl. ChannelAdvisor is not responsible for functional deficiencies in Mirakl or other integrations thereto, and does not bear any obligation to collect fees from Clients on behalf of Company.

1.4  **Templates.** As part of the services detailed herein, ChannelAdvisor will develop a custom Template for Company. "**Template**" is defined as a seller-facing version of Company's data model and/or taxonomy. Upon request, ChannelAdvisor will provide Company with up to two (2) updates or modifications to the Template per annual period of the Term at no charge. After the first two (2) Template updates, ChannelAdvisor will provide additional Template updates (each, a "**Template Update**") for the additional fees set forth in Exhibit B. A Template Update shall be required in the event Company makes changes to its data models, taxonomies, or hierarchies.



# Exhibit B– Fees & Payments

Company shall pay the following fees to ChannelAdvisor as set forth below:

1. **Program Fee.** On the Effective Date and annually on each anniversary of the Effective Date, Company shall pay a nonrefundable Program Fee to ChannelAdvisor in the amount of one hundred fifty thousand dollars (**$150,000.00);**

And

2. **Monthly GMV Fee**. Company shall pay a monthly GMV fee (the "**Monthly GMV Fee**") to ChannelAdvisor in the amount of one percent (**1.0%**) of the total amount of monthly GMV from all ChannelAdvisor customers selling products on the Company Site that exceeds $50,000,000.00 in GMV. For avoidance of doubt, no Montly GMV Fee shall be charged on the first $50,000,000.00 in such GMV. "**GMV**" or "**Gross Merchandise Value**" means the sum equal to the value of the products processed for sale via the integration between the ChannelAdvisor Platform and the Company Site. GMV excludes shipping, sales tax, and, where applicable, VAT and GST, if the Company Site itemizes these amounts. GMV is calculated at the time of completion of checkout by a buyer. For purposes of calculating GMV, GMV is converted to the currency stated herein on a daily basis (using Greenwich Mean Time (GMT) as the standard time) applying the applicable rates at http://www.currencysystem.com/currencyserver/feeds/ or a similar service that ChannelAdvisor reasonably designates from time to time.

And

3. **Fee for Additional Templates.** Company shall pay to ChannelAdvisor a fee of $3,000.00 per Template Update requested by Company after the first two (2) Template changes have been provided per annual period.

And

4. **Fee for Additional Geographies.** If the parties agree to add an additional Geography or Company Site, Company shall pay to ChannelAdvisor a one-time fee of $7,500.00 per additional Geography or Company Site.



**Exhibit C - Data Privacy**

For the purposes of this section, the terms "Data Subject," "(Joint-)Controller," "Personal Data," "Processing," and "Processor" shall have the meaning as defined in Article 4 of EU Regulation No. 2016/679 regarding the protection of personal data 2016/679 and, mutatis mutandis, the UK Data Protection Act 2018, and their subsequent amendments (either referred to as "GDPR").

The relationship between the Parties shall be construed as that of two distinct Controllers, each determining independently the purposes and means of the respective Processing operations and each Party shall thus be construed as independent Controller ("Independent Controller"). As a consequence, nothing in this Agreement shall be regarded as characterizing either a Joint Controller relationship under Article 26 GDPR or a Data Controller to Data Processor relationship under Article 28 GDPR.

In that regard, each Party shall be bear sole responsibility for processing the Personal Data pertaining to the other Party for the purpose of the management of the Agreement in compliance with applicable law, to maintain the information of the relevant Data Subjects belonging to the other Party's personnel who may be involved in the performance of the Agreement.

The foregoing is without prejudice to any data processing implemented by ChannelAdvisor in the name and on behalf of, and further to the instructions of its own customers ("Sellers") for the purpose of the performance of the agreement between ChannelAdvisor and the Seller. ChannelAdvisor bears sole responsibility for such relationship between a controller (Seller) and ChannelAdvisor acting as its processor.

Additionally, where ChannelAdvisor handles the Personal Information of California residents on Company's behalf in connection with the Services, the parties will comply with the California Consumer Privacy Act of 2018, Cal. Civil Code § 1798.100 et seq., ("CCPA") and the following terms will apply: (a) ChannelAdvisor at all times under the Agreement is acting as Company's Service Provider and has been engaged by Company for the Business Purpose of providing the Services detailed herein; (b) ChannelAdvisor will not Sell Personal Information it handles in connection with the Services; (c) ChannelAdvisor will not retain, use or disclose Personal Information for any purpose other than for the specific Business Purposes authorized by Company; (d) ChannelAdvisor will cooperate with Company's reasonable requests related to individual requests involving Personal Information and comply with Company's reasonable instructions as to the handling of that information to the extent required by applicable law. All capitalized terms in the foregoing sentence not otherwise defined in the Agreement shall have the meaning detailed in the CCPA.



## AMENDMENT #1 TO THE CHANNELADVISOR CORPORATION MIRAKL INTEGRATION AGREEMENT

THIS AMENDMENT #1 ("Amendment") is entered into as of the last-dated signature below (the "Amendment Effective Date"), and is made a part of the ChannelAdvisor Corporation Mirakl Integration Agreement dated February 24, 2022 (the "Agreement"), entered into by and between Bed Bath & Beyond Inc. ("Company") and ChannelAdvisor Corporation ("ChannelAdvisor").  The parties entered into the Agreement and now have a desire to amend certain provisions of the Agreement. In consideration of the mutual covenants and conditions contained herein, and intending to be legally bound hereby, the parties mutually agree as follows:

**1.  Preamble.** As of the Amendment Effective Date, the first sentence within the second paragraph of the preamble shall be deleted and replaced with "Company owns and operates the channel referenced in the signature lines hereto in the Geography of United States and Canada (the "Company Site")." All other provisions in that section shall remain the same.

**2.  Geographies.** As of the Amendment Effective Date, the Geographies listed in Section 1.3 of the Agreement shall be deleted and replaced with "United States; Canada." All other provisions in that Section 1.3 shall remain the same.

**3.  Fee for Additional Geographies.**  On the Amendment Effective Date, Company shall pay a one-time nonrefundable Fee to ChannelAdvisor in the amount of USD $7,500.00.

**4.  Conflict of Terms**.  In the event the terms in this Amendment conflict with any term in the Agreement, the terms of this Amendment shall take precedence.  Any terms in capital letters not defined in this Amendment shall have the meaning as set forth in the Agreement.

**5.  Entire Agreement**. The Agreement as modified by this Amendment constitutes the entire agreement between the parties relating to its subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether oral or written; provided, however, that the Agreement, as modified by this Amendment, remains in full force and effect.  No officer, employee, servant or other agent of ChannelAdvisor is authorized to make any representation, warranty or other promise not expressly contained herein with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties have caused their duly authorized representative to enter into this Amendment as of the Amendment Effective Date set forth above.

| **ChannelAdvisor Corporation** | **Bed Bath & Beyond Inc.** |
|---|---|
| By (Signature): *Paul Colucci* (DocuSigned) | By (Signature): *Umesh Sripad* (DocuSigned) |
| Name (Printed): Paul Colucci | Name (Printed): Umesh Sripad |
| Job Title: Chief Revenue Officer | Job Title: SVP, Digital |
| Date: 5/26/2022 | Date: 5/26/2022 |

ChannelAdvisor Confidential
C007 v.3 – 11SEP19

© ChannelAdvisor Corporation
All Rights Reserved