# EXHIBIT "1"

ASSESSORS' HANDBOOK
SECTION 504

# ASSESSMENT OF PERSONAL PROPERTY AND FIXTURES

OCTOBER 2002

REPRINTED JANUARY 2015

## CALIFORNIA STATE BOARD OF EQUALIZATION

SEN. GEORGE RUNNER (RET.), LANCASTER     FIRST DISTRICT
FIONA MA, CPA, SAN FRANCISCO     SECOND DISTRICT
JEROME E. HORTON, LOS ANGELES COUNTY     THIRD DISTRICT
DIANE L. HARKEY, ORANGE COUNTY     FOURTH DISTRICT
BETTY T. YEE, SACRAMENTO     STATE CONTROLLER

CYNTHIA BRIDGES, EXECUTIVE DIRECTOR



# FOREWORD

Assessors' Handbook Section 504 (AH 504), *Assessment of Personal Property and Fixtures*, is a complete rewrite and compilation of three original manuals no longer in circulation: Assessors' Handbook Section 571 (AH 571), *Appraisal of Equipment, Inventory, and Supplies*, Section 221 (AH 221), *Tax Situs of Property,* and Section 572 (AH 572), *General Audit Guidelines*. AH 504 includes some text from the original manuals and material concerning subjects not previously covered in the three prior handbook sections.

This manual is a complete reorganization of topics. The rewrite was undertaken by staff members of the Assessment Policy and Standards Division (APSD) in conjunction with the staff of the Property Taxes Section of the Legal Department of the State Board of Equalization and is the product of staff writing at the direction of the Board.

The objective of this manual is to give property tax appraisers, auditor-appraisers, and other interested parties an understanding of issues concerning personal property and fixtures for assessment purposes. The manual builds on the basic knowledge of generally accepted accounting principles and appraisal concepts. It should serve as a guide for the appraisal and assessment of personal property and fixtures.

If there is an inconsistency resulting from the absence of technical data in this manual and a more advanced, specific manual is available, the more specific manual controls. Moreover, in the interest of accuracy and thoroughness, appraisers, auditor-appraisers, and other interested parties are advised to consult with qualified experts and other authoritative sources regarding the technical aspects of valuing any complex property.

As part of the process of producing this manual, meetings were held with assessors, industry representatives, and other interested parties. Conflicts regarding the content of the manual were identified, and most were resolved. Those issues not resolved were voted on by Members of the Board of Equalization after hearing testimony from interested parties and Board staff. The results of the voting are reflected as Board positions on issues in the manual. The Board originally approved this manual on December 10, 1998 and the Board approved an update on June 15, 2000. This second update of the manual was approved by the Board on October 3, 2002.

Under Government Code sections 15606 et seq., the Board is charged with the duty of administratively enforcing and interpreting the statutes governing the local assessment function.

While regulations adopted by the State Board of Equalization are binding as law, Board-adopted manuals are advisory only.  Nevertheless, courts have held that they may be properly considered as evidence in the adjudicatory process.[1]  The citations and law references in this publication were current as of the writing of the manual.

David J. Gau
Deputy Director
Property and Special Taxes Department

---

[1] *Coca-Cola Co.* v. *State Board of Equalization* (1945) 25 Cal.2d 918; *Prudential Ins. Co.* v. *City and County of San Francisco* (1987) 191 Cal.App.3d 1142; *Hunt Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163.

# TABLE OF CONTENTS

CHAPTER 1:  INTRODUCTION ................................................................................................ 1

WHAT IS TAXABLE ............................................................................................................. 1
WHAT IS TAXABLE PERSONAL PROPERTY ........................................................................... 1
GENERAL OVERVIEW OF THE SEVEN FACTORS OF AN ASSESSMENT .................................... 3
  *Assessability of Property* ............................................................................................. 3
    Taxable Property v. Exempt Property ................................................................... 3
    Statute of Limitations ............................................................................................ 4
    Lien Date .............................................................................................................. 4
  *Assessee of Property* ................................................................................................... 5
    Owner, One Who is in Possession or Control ....................................................... 5
    Joint Assessees ..................................................................................................... 6
    Unknown Owner ................................................................................................... 7
  *Situs of Property* ......................................................................................................... 7
  *Description of Property* ............................................................................................... 7
  *Classification of Property* ........................................................................................... 7
  *Security of Property* .................................................................................................... 8
    Secured Property Defined ..................................................................................... 8
    Unsecured Property Defined ................................................................................. 8
    Securing Personal Property ................................................................................... 8
  *Value of Property* ........................................................................................................ 9

CHAPTER 2:  CLASSIFICATION ........................................................................................... 11

IMPORTANCE OF CLASSIFICATION .................................................................................... 11
GENERAL CLASSIFICATION TYPES AS REQUIRED BY LAW ............................................... 11
  *Land* .......................................................................................................................... 12
  *Improvements* ........................................................................................................... 12
  *Personal Property* .................................................................................................... 12
CLASSIFICATION FOR VALUATION PURPOSES ................................................................... 12
  *Improvements (Structure v. Fixture)* ......................................................................... 13
    Structure Item ..................................................................................................... 13
    Fixture ................................................................................................................ 13
      Three Tests for Determining Whether an Article is a Fixture ...................... 13
    Importance of Classification as Structure versus Fixture ...................................... 17
    Classification Guidelines ..................................................................................... 17
    Special Classification Issues ................................................................................ 18
      Classification of ATM's ............................................................................... 18
      Classification of Telephone Systems ............................................................ 18
      Classification of Service Station Improvements ........................................... 19
      Classification of Partitions ........................................................................... 19
      Classification of Liquefied Petroleum Gas Tanks ........................................ 20
      Classification of Wind Machines ................................................................. 20
  *Tangible Personal Property (General Categories)* .................................................... 20
    Equipment ........................................................................................................... 21
    Supplies ............................................................................................................... 21
    Business Inventory Exemption ............................................................................. 21
      Questions and Answers Regarding Classification of Supplies Versus Inventory ..... 22
    Vehicles, Vessels, Aircraft, and Manufactured Homes ......................................... 28
      Vehicles ....................................................................................................... 28

Vessels, Aircraft, and Manufactured Homes ................................................................ 29

**CHAPTER 3:  SITUS OF PERSONAL PROPERTY** ........................................................... 30

WHAT IS TAX SITUS:  PERMANENT VERSUS TEMPORARY SITUS ............................................ 30
DETERMINING SITUS OF MOVABLE PROPERTY ........................................................................ 31
*General Situs Rules  (Rule 205)* ............................................................................................ 31
Over Six Months Prior to the Lien Date ........................................................................ 31
Less Than Six Months Prior to the Lien Date ............................................................... 32
Movable Property In-Transit ......................................................................................... 32
Situs Other Than at Location ......................................................................................... 32
Habitual Presence or Substantial Average Rule ........................................................... 32
Habitual Situs at More Than One Location in California ......................................... 33
Habitual Situs Both in California and in Another State or Nation ........................... 33
Example:  Situs of Movable Property .......................................................................... 35
*Situs of Leased or Rented Property (Rule 204)* ................................................................... 36
Single Assessment for Leased Personal Property .......................................................... 36
*Situs of Property In-Transit (Rule 203)* ............................................................................... 37
Property Moving in Interstate or Foreign Commerce ................................................... 37
Commencement of Transit ........................................................................................ 37
Termination of Transit .............................................................................................. 37
Interruption of Transit .............................................................................................. 38
Property Moving in Intrastate Commerce .................................................................... 38
Situs of Property Being Transported by an Owner .................................................. 38
Situs of Property Being Transported to a Buyer ..................................................... 38
Interruption of Transportation ................................................................................. 39
OTHER SPECIAL SITUS SITUATIONS ........................................................................................... 39
*Aircraft* .................................................................................................................................. 39
Definitions ..................................................................................................................... 39
General Aircraft ........................................................................................................ 39
Certificated Aircraft .................................................................................................. 39
Air Taxi ..................................................................................................................... 39
Situs of Aircraft ............................................................................................................. 40
General Aircraft and Unscheduled Air Taxis ........................................................... 40
Certificated Aircraft and Scheduled Air Taxis ........................................................ 40
Aircraft Repair and Replacement Parts .................................................................... 41
*Vessels* ................................................................................................................................... 41
Definition of Documented and Nondocumented Vessels .............................................. 41
Situs of Documented Vessels ........................................................................................ 42
Situs of Nondocumented Vessels .................................................................................. 43
Situs of Intercounty Ferryboats .................................................................................... 43
Situs of Seagoing Vessels / Home Port Doctrine ......................................................... 43
Application of Situs Determination ............................................................................... 46
*Situs of Linen Supply* ........................................................................................................... 47
*Situs of Vending Equipment/Games* ..................................................................................... 47
*Situs of Containers* ............................................................................................................... 47
Returnable Containers ................................................................................................... 47
Semi-Permanent Containers .......................................................................................... 48
*Situs of Artificial Satellites* .................................................................................................. 48
*Situs of Racehorses* .............................................................................................................. 48
*Situs of Personal Property Owned by Members of the Armed Forces* ................................... 48

**CHAPTER 4:  VALUATION OF PERSONAL PROPERTY** ............................................................ 49

REVIEW OF THE VALUE CONCEPT ............................................................................................ 49
APPROACHES TO VALUE ......................................................................................................... 50
   *Cost Approach* ................................................................................................................ 50
      Reproduction Cost Approach ................................................................................... 51
      Replacement Cost Approach .................................................................................... 51
      Historical Cost Approach ......................................................................................... 51
      Variations of the Cost Approach .............................................................................. 52
      Valid Cost Components ........................................................................................... 53
         Direct and Indirect Costs .................................................................................. 53
         Trade Level ....................................................................................................... 63
      Depreciation of Machinery & Equipment ................................................................ 70
         Types of Depreciation Defined .......................................................................... 71
         Methods of Estimating Depreciation and Value ................................................. 72
      Limitations of the Cost Approach ............................................................................ 81
   *Comparative Sales Approach* .......................................................................................... 83
   *Income Approach* ........................................................................................................... 85
      Processing the Income Stream ................................................................................. 87
         Vacancy (Idle Time) and Collection Losses ...................................................... 87
         Expenses ........................................................................................................... 87
      Valuation Methodology .......................................................................................... 88
         Summary of the Income Approach ..................................................................... 89
RECONCILIATION AND VALUE CONCLUSION ............................................................................ 90

**CHAPTER 5: ASSESSMENT OF IMPROVEMENTS RELATED TO BUSINESS PROPERTY** .. 91

DEFINITIONS OF RELEVANT TERMS .......................................................................................... 91
   *Improvements* ................................................................................................................ 91
   *Building Improvements* .................................................................................................. 91
   *Landlord Improvements* ................................................................................................. 92
   *Leasehold (or Tenant) Improvements* ............................................................................. 92
   *Structure Items* ............................................................................................................. 92
   *Fixtures* ........................................................................................................................ 93
      Types of Fixtures .................................................................................................... 93
         Trade Fixtures ................................................................................................... 93
         Fixed Machinery and Equipment ...................................................................... 94
CLASSIFICATION ..................................................................................................................... 95
   *Classification on the Property Statement* ........................................................................ 95
   *Why Classification is Important* ..................................................................................... 95
      Fixtures are a Separate Appraisal Unit When Measuring Declines in Value ............... 95
      Fixtures may be a Separate Appraisal Unit for Supplemental Roll Purposes ............... 96
      Fixture Value Included in Value Criterion for Mandatory Audit ................................. 97
APPRAISAL OF IMPROVEMENTS RELATED TO BUSINESS PROPERTY ............................................ 97
   *General* ......................................................................................................................... 97
   *Some Valuation Issues* ................................................................................................... 98
      New Construction ................................................................................................... 99
      Valuation of Abandoned Leasehold Improvements ................................................. 100
      Valuation of Fixtures Under Decline in Value ........................................................ 101
DETERMINATION OF ASSESSEE ............................................................................................. 102
COORDINATION IN THE ASSESSMENT OF LANDLORD IMPROVEMENTS AND LEASEHOLD IMPROVEMENTS
............................................................................................................................................. 103

*Establish a Comprehensive Set of Written Procedures Regarding Assessment of Landlord and
Leasehold Improvements* ............................................................................................... *103*
*Clearly Identify Landlord and Leasehold Improvements on Appraisal Records* ........................... *104*
*Coordination of Landlord and Leasehold Improvement Appraisal* ................................................ *104*

**CHAPTER 6:  SPECIAL ISSUES** ...................................................................................... **105**

VALUATION OF OTHER TYPES OF PERSONAL PROPERTY ........................................................ 105
  *Leased Equipment* ........................................................................................................ *105*
    Assessability ............................................................................................................ 105
    Assessee ................................................................................................................. 105
      Leasing with Exempt Entities ............................................................................... 106
    Situs ....................................................................................................................... 110
    Description:  Types of Leases ................................................................................. 111
      Short-Term Leases ................................................................................................ 111
      Extended-Term Leases .......................................................................................... 111
      True Leases ........................................................................................................... 112
      Conditional Sales Contracts or Financing Leases ................................................. 112
    Valuation of Leased Equipment ............................................................................... 114
  *Supplies* ..................................................................................................................... *114*
  *Construction in Progress* ............................................................................................ *115*
  *Computer and Related Equipment* ............................................................................... *116*
    General Valuation .................................................................................................... 116
    Storage Media for Computer Programs ................................................................... 116
SPECIAL CONSIDERATIONS ...................................................................................................... 118
  *Idle, Unused, or Obsolete Equipment* ......................................................................... *118*
  *Equipment Purchased Used* ........................................................................................ *118*
  *Vehicles* ..................................................................................................................... *121*
  *Expensed Equipment* ................................................................................................. *123*
  *Containers* .................................................................................................................. *123*
  *Liquefied Petroleum Gas Tanks* .................................................................................. *124*
  *Oak Barrels* ................................................................................................................ *124*
  *Animals and Migratory Livestock* ................................................................................ *125*
  *Special Value Allowances* ........................................................................................... *125*
    Works of Art ........................................................................................................... 125
    Motion Pictures ....................................................................................................... 126
    Business Records .................................................................................................... 126
  *One-Way Paging Companies* ....................................................................................... *126*
  *Biopharmaceutical Industry Equipment and Fixtures* ................................................... *127*
  *Possessory Interests* .................................................................................................. *128*
  *Pawn Shops* ............................................................................................................... *128*
VALUATION OF AIRCRAFT AND VESSELS .................................................................................. 128
BANKRUPTCY ............................................................................................................................ 129
  *Assessee of a Business in Bankruptcy Protection* ....................................................... *129*
  *Special Valuation Issues Surrounding Bankrupt Entities* ............................................. *129*

**CHAPTER 7:  PROPERTY STATEMENTS** ....................................................................... 132

DISCOVERING ASSESSABLE PERSONAL PROPERTY ................................................. 133
OBTAINING STATEMENTS ....................................................................................... 136
*Filing Requirements* ....................................................................................... 136
*Direct Billing* ................................................................................................. 137
PROCESSING PROPERTY STATEMENTS ...................................................................... 138
*Preliminary Review:  Required Information* .................................................. 138
Contents of Statement ..................................................................................... 138
Situs .................................................................................................................. 138
Description of Property .................................................................................... 139
Tax Day ............................................................................................................ 139
Authorized Signature ....................................................................................... 140
*Specific Sections of The Property Statement* ................................................ 140
Part I:  General Information ............................................................................. 141
Part II:  Declaration of Property Belonging to You ......................................... 142
Supplies ..................................................................................................... 142
Construction-In-Progress (CIP) ................................................................ 143
Schedule A ................................................................................................ 143
Schedule B:  Proper Classification of Fixture and Structure Items  (Schedule B) .................... 143
Supplemental Schedule .............................................................................. 144
Part III:  Declaration of Property Belonging to Others .................................... 144
*Inconsistent Reporting* ................................................................................... 144
*Review of Previous Audit Findings* ................................................................ 145
*Property Statement Checklist* ......................................................................... 145
*Valuation* ....................................................................................................... 147
*Late Filings and Non-Filings* ........................................................................ 147
Verification of Existing Business ..................................................................... 147
*Business Close-Outs* ...................................................................................... 148
*Low Value Property (Low Value Ordinance)* ................................................ 148
*Property Statements for Special Types of Property* ...................................... 148
Aircraft ............................................................................................................ 149
Vessels ............................................................................................................. 149
Racehorses ....................................................................................................... 150

**CHAPTER 8:  PROPERTY TAX AUDITS** ..................................................................... 151

AUDIT OBJECTIVE .................................................................................................. 151
STATUTORY PROVISIONS ......................................................................................... 151
GENERALLY ACCEPTED STANDARDS ....................................................................... 155
*General Standards* ......................................................................................... 156
*Standards of Field Work* ................................................................................ 156
AUDIT SELECTION .................................................................................................. 156
*Types of Audits* .............................................................................................. 157
Mandatory Audits ............................................................................................ 157
Nonmandatory Audits ...................................................................................... 157
Waivered Audits (Waiver of Statute of Limitations) ....................................... 157
Exempt Organization Audits ............................................................................ 158
California Counties Cooperative Audit Services Exchange (CCCASE) ............ 159
Audits by Correspondence ............................................................................... 159
Office Audits .................................................................................................... 159
PREPARATION FOR AUDIT ....................................................................................... 159

*Review of Information*................................................................................................*159*
*Contact assessee* ....................................................................................................*160*
CONDUCTING AN AUDIT ..............................................................................................161
*Gather General Information Regarding Company*........................................................*162*
*Review Records*.......................................................................................................*164*
Verification of Machinery and Equipment..................................................................164
Reconciliation of Sources...................................................................................164
Sampling to Confirm Accuracy ...........................................................................165
Other Adjustments.............................................................................................165
Classification.....................................................................................................166
Verification of Improvements ....................................................................................166
Verification of Supplies ............................................................................................166
Verification of Construction In Progress ....................................................................166
Verification and Identification of Leased Equipment ...................................................167
Items or Audits Requiring Special Attention ..............................................................168
In General ........................................................................................................168
Special Situations .............................................................................................168
Total Property Audits ........................................................................................170
Audits of Leasing Companies .............................................................................171
INSPECTION OF PROPERTY ..........................................................................................174
AUDIT VALUATION AND SUMMARIZED FINDINGS ..........................................................174
*Compare Audited Cost to Reported Cost*....................................................................*174*
*Audited Value* .......................................................................................................*175*
*Compare Audited Value to Assessed Value* .................................................................*176*
*Final Product: Audit Work Papers* ..........................................................................*176*
Table of Contents ....................................................................................................176
Summary of Findings................................................................................................177
Audit Checklist ........................................................................................................177
Audit Narrative .......................................................................................................177
Other Working Papers...............................................................................................177
*Review by Supervisor*.............................................................................................*178*
*Notify assessee of findings* .....................................................................................*178*
Notice for Filing an Application ................................................................................181
*Processing Roll Changes*.........................................................................................*182*

**CHAPTER 9:  ROLL PROCEDURES** .....................................................................**183**

IDENTIFYING ROLL ERRORS .......................................................................................183
ESCAPE ASSESSMENTS ...............................................................................................183
*Tax Rate and Interest*.............................................................................................*185*
*Penalty* .................................................................................................................*185*
*Statute of Limitations*..............................................................................................*186*
*Notice of Proposed Escape Assessment*......................................................................*186*
*Entry on Roll*..........................................................................................................*187*
ROLL CORRECTIONS ...................................................................................................187
REFUNDS ..................................................................................................................188
BASE YEAR VALUE CORRECTIONS ...............................................................................189
SUMMARY OF REVENUE AND TAXATION CODE SECTIONS REGARDING ROLL PROCEDURES ..............189

**CHAPTER 10:  MORGAN PROPERTY TAXPAYERS' BILL OF RIGHTS** ................**192**

LEGISLATIVE INTENT ................................................................................................192
NOTICE OF PROPOSED ESCAPE ASSESSMENT ...............................................................193

RECORDS AVAILABLE TO THE ASSESSEE .................................................................. 193
RIGHT TO APPEAL ................................................................................................... 194

**APPENDIX A:  IMPROVEMENTS AS STRUCTURE ITEMS VERSUS FIXTURES** ..................... 196

**APPENDIX B:  COORDINATION OF LANDLORD AND LEASEHOLD IMPROVEMENT APPRAISALS** .................................................................................................... 201

DEVELOP AN INTER-DEPARTMENTAL MEMORANDUM FOR COORDINATION ....................... 201
*Description of Method* ....................................................................................... 201

**APPENDIX C:  DEFINITION OF SALES TAX BUSINESS CLASSIFICATION CODES** .............. 206

**APPENDIX D:  SAMPLE BUSINESS PROPERTY STATEMENT** ....................................... 208

**APPENDIX E:  SAMPLE AUDIT CHECKLIST** ........................................................... 211

**APPENDIX F:  SAMPLE STATUTE OF LIMITATIONS WAIVER** ................................... 216

**APPENDIX G:  SAMPLING** .................................................................................. 217

GENERAL ............................................................................................................ 217
*Representativeness* ............................................................................................. 217
*Sample Size* ....................................................................................................... 218
*Stratification* ..................................................................................................... 219
*Measurement* ..................................................................................................... 220
*Outliers* ............................................................................................................. 220
VALIDITY OF RESULTS .......................................................................................... 220
SUMMARY ............................................................................................................ 221

**APPENDIX H:  APPLICATION OF THE MARKET METHOD** ........................................ 222

DEVELOPING COMBINED FACTORS ........................................................................... 223
*Method 1:  Compute Changes Between Current Lien Date and Previous Years* ............ 223
  Example ............................................................................................................ 223
*Method 2:  Compute Historical Changes in Price* .................................................. 223
  Example ............................................................................................................ 224
SUMMARY ............................................................................................................ 224

**APPENDIX I: LIFING STUDIES** ........................................................................... 225

DATA SOURCES ..................................................................................................... 226
GENERAL STEPS .................................................................................................... 227
*Calculating the Survivor Curve* ............................................................................ 227
*Matching to Known Patterns of Survival* ............................................................... 228
*Applying the Parameters of the Matching Curve* .................................................... 228

**APPENDIX J: SUMMARY OF COURT CASES** .......................................................... 235

**GLOSSARY OF TERMS** ...................................................................................... 243

**BIBLIOGRAPHY** ................................................................................................ 254

# CHAPTER 1:  INTRODUCTION

## WHAT IS TAXABLE

Article XIII, section 1 of the California Constitution defines taxable property:

Unless otherwise provided by this Constitution or the laws of the United States.

>   (a) All property is taxable and shall be assessed at the same percentage of fair market value.  When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value.  The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value.

>   (b) All property so assessed shall be taxed in proportion to its full value.

All property is taxable (or assessable) unless it is exempt by the Constitution or statutes.[2]  This taxable property may be defined as real property and personal property.  This section of the Assessors' Handbook deals with appraisal and assessment procedures for taxable personal property and fixtures, and it includes discussions of property tax audits, roll changes, and reporting requirements.

## WHAT IS TAXABLE PERSONAL PROPERTY

Real property is specifically defined by the law.  Real property, or real estate, is:

>   (a) The possession of, claim to, ownership of, or right to the possession of land.

>   (b) All mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto.

>   (c) Improvements.[3]

---

[2] The county assessor is responsible for the assessment of most property.  However, the California Constitution (article XIII, section 19) requires the Board of Equalization to assess property (except franchises) owned or used by regulated railway, telegraph or telephone companies, car companies operating on railways in the state, and companies transmitting or selling gas or electricity.  The California Constitution also requires the Board to assess pipelines, flumes, canals, ditches, and aqueducts lying within two or more counties.  The assessed values as determined by the Board (except for the railway car companies) are allocated to the counties and other local tax jurisdictions.

[3] Revenue and Taxation Code section 104. (All section references in this section of the Assessors' Handbook refer to Revenue and Taxation Code sections unless otherwise noted.)

Personal property, on the other hand, is defined by exception; personal property is all property except real estate.[4]   Tangible personal property is defined as all "property that may be seen, weighed, measured, felt, or touched, or which is in any manner perceptible to the senses" except real property as defined above.[5]

Not all property defined as personal property is taxable.  Unlike real property, personal property may, in whole or in part, be exempted by the Legislature.  Examples of current exemptions provided by legislative statute include: business inventories, personal household furnishings, personal effects, and pets.  But, in general, personal property remains taxable.[6]

Assessment of taxable personal property relies on the same basic value concepts applicable to real property, and both are taxed at the same maximum percentage (1 percent) of full cash value (or market value).[7]   However, personal property is treated differently in many other respects.  Some of the most notable differences, also identified in Assessors' Handbook Section 501 (AH 501), *Basic Appraisal*,[8] are:

- Special assessments are levied on real property only.[9]

- The Legislature has wide authority pursuant to article XIII, section 2, of the Constitution concerning the taxation and/or exemption of personal property.

- Personal property cannot be assessed to insurance companies or banks;[10] fixtures are assessable, however.

- Real property is governed by article XIII A (and assigned a base year value), while personal property is appraised at market value annually.[11]

- There is no taxable possessory interest in personal property, except as provided for in section 201.5.

- Before declines in value can be recognized, machinery and equipment classified as improvements must be separated from other improvements.[12]

---

[4] Section 106.
[5] Rule 123 of Title 18 of the California Code of Regulations.  (All rule references in this section of the Assessors' Handbook refer to the Property Tax Rules in Title 18 of the California Code of Regulations.)
[6] Regarding the treatment of intangible assets and rights, see the discussion in AH 502, commencing at page 150.
[7] California Constitution, article XIII, section 1 and article XIII A, section 1.  The Article XIII A, section 1(b) 1 percent limitation does not apply to bonded indebtedness.
[8] All references to Assessors' Handbook sections refer to handbooks published and produced by the California State Board of Equalization.  Publication dates will vary and will be noted, with page numbers, if specific to the discussion.
[9] Section 3972 defines *special assessment* to mean "any assessment levied pursuant to any of the improvement acts of the State of California, whether or not represented by a bond, and which are liens upon a specific parcel of real property."
[10] California Constitution, article XIII, sections 27 and 28 and Revenue and Taxation Code section 23182.
[11] Manufactured homes and floating homes, although classified as personal property, are assessed in the same manner as real property. See section 229 and sections 5802 et. seq.
[12] Section 51(d), Rule 461(e).

An appraiser or auditor-appraiser assessing personal property should be familiar with the differences listed herein, as well as other basic appraisal concepts as discussed in AH 501, *Basic Appraisal*, and generally accepted accounting principles (GAAP). This handbook section builds on that basic understanding with a focus on guidelines for the appraisal and assessment of personal property, as it differs from real property, and fixtures.

## GENERAL OVERVIEW OF THE SEVEN FACTORS OF AN ASSESSMENT

The making of an assessment requires the determination of seven factors for that assessment to be proper and complete. These seven factors are especially important regarding personal property and fixtures because they can be difficult to determine and they often tend to change. The seven factors are *Assessability*, *Assessee*, *Situs*, *Description*, *Classification*, *Security*, and *Value*.

A brief description of each of the factors is included here as a foundation for additional information presented in the text. A more thorough study of *Situs*, *Classification*, and *Value* is necessary to make an accurate assessment of personal property and fixtures; these factors are each discussed in detail in separate chapters of this manual.

## ASSESSABILITY OF PROPERTY

### Taxable Property v. Exempt Property

In the making of an assessment, the first determination is whether the property is taxable (or assessable)[13] or exempt. As previously noted, article XIII, section 1 of the California Constitution states that, unless otherwise exempt as provided by the State Constitution or the laws of the United States, all property is taxable. While real property may be exempt specifically by the State or U.S. Constitution only, the Legislature has been granted general power to exempt personal property in whole or in part. Article XIII, section 2 of the California Constitution states, in part:

> The Legislature may provide for property taxation of all forms of tangible personal property, shares of capital stock, evidences of indebtedness, and any legal or equitable interest therein not exempt under any other provision of this article. The Legislature, two-thirds of the membership of each house concurring, may classify such personal property for differential taxation or for exemption.

Personal property is and can be exempt by reason of its *ownership, use,* and/or *type.* For example, personal property owned by banks, financial corporations, and insurance companies is exempt by *ownership*[14] while property used by free public libraries is exempt by *use.*[15] Business

---

[13] For purposes of property tax assessment and this text, "taxable" and "assessable" are used almost synonymously. "Assessable" has the same meaning as "taxable" as used earlier in this chapter and in AH 501.

[14] California Constitution, article XIII, section 28 prohibits taxation of personal property to insurance companies. California Constitution, article XIII, section 27 and Revenue and Taxation Code section 23182 provides for

inventories and household personal property are exempt by *type*.[16]  Property may be exempt by one or more of these reasons.  For instance, section 241 exempts from property taxation the first $50,000 of employee-owned hand tools.[17]  This is an exemption by *ownership* and *use*.

Certain exemptions exist under the State or U.S. Constitution, apart from Legislative enactment, due to a *lack of tax assessment jurisdiction*.  For example, personal property on certain military reservations (federal enclaves) and Indian reservations is immune from taxation due to *lack of jurisdiction*.

Article XIII, section 3 and the 200 and 900 sections of the Revenue and Taxation Code identify real and personal property exemptions as granted by the Constitution and the Legislature, respectively.  It is important for an appraiser to be aware of exemptions in general in order to determine the assessability of the property being appraised.  It is also important to note that not all exemptions are automatic.  Some are allowed only if appropriate forms are filed timely.[18]  In these cases, the property remains assessable unless an exemption claim is filed and approved.

## Statute of Limitations

Sections 51.5 and 532 establish *Statutes of Limitations* on the assessor, which affect the assessability of property.  Although a property itself is not exempt, an assessment must be made timely to be valid.  Unless the assessee intentionally evades taxation, as discussed in sections 502, 503, and subdivision (c) of 51.5, an assessment must normally be made within four years of the assessment period in which the property escaped assessment or was underassessed.  (This topic is discussed further in Chapter 9, *Roll Procedures*.)

## Lien Date

Sections 2192 and 722 identify the lien date as January 1.[19]  Personal property is assessable only if taxable on this date.

Following is an example of how the lien date affects the assessment as determined by the assessor:

---

exemption of personal property owned by banks and financial corporations; this exemption does not apply to personal property owned by federal credit unions.
[15] California Constitution, article XIII, section 3.
[16] Section 219 and section 224, respectively.
[17] Section 241 was amended to increase the exemption allowed from $20,000 to $50,000, beginning with the January 1, 2002 lien date.
[18] Contact the county assessor and/or see Assessors' Handbook Section 222 (AH 222), *Standard Form List*, Section 267 (AH 267), *Welfare, Church, and Religious Exemptions*, and Section 265 (AH 265), *Cemetery Exemption,* for information regarding exemptions and requirements necessary to qualify and receive an exemption.
[19] Effective January 1, 1997, the lien date for locally assessed property was changed from 12:01 a.m. March 1, to 12:01 a.m. January 1.

---

**EXAMPLE 1.1**
**LIEN DATE**

On the lien date, January 1, 2002, a boat owned by owner A is located in Sacramento.  The assessee (owner A) sells the vessel to a boat dealer (owner B) on January 15, 2002.  It becomes inventory to owner B on that date.

Owner A receives a tax bill for the fiscal year July 1, 2002, through June 30, 2003, for the assessment of the vessel.  The assessee does not own the boat during the fiscal year the bill covers, but the bill is valid based on ownership on the lien date (owner A was the owner on the lien date, January 1, 2002).  Taxes on unsecured property are due on the lien date.

If the sale were reversed, and the dealer sold the boat to owner A after the lien date, the boat would be exempt as inventory even though owner A owned the boat from January 15 through June 30, 2002.  Generally, ownership on the lien date determines the taxability, situs, and assessee of the property.

---

## ASSESSEE OF PROPERTY

In determining the assessee, the assessor is not limited to only the fee owners of the property.  Sections 405 and 611 authorize the assessor to assess the owners, persons in possession or control, joint assessees, and/or unknown owners of any property.

### Owner, One Who is in Possession or Control

Section 405 identifies the assessee as the "persons owning, claiming, possessing, or controlling it on the lien date."  Under most circumstances, this will be the owner.  However, the assessee may be one who is simply in possession or control although not the legal owner.  This is often the case with leased equipment and improvements related to business property.

It is important that the assessee's name is accurately spelled or abbreviated.  A person must be able to reasonably ascertain that he or she is the assessee.  "A mistake in the name of an owner or supposed owner of property on the unsecured roll which does not prevent the person from reasonably ascertaining that he or she is the assessee does not render invalid an assessment or any tax sale."[20]

---

[20] Section 613.

## Assessee of Leased Equipment

With regard to leased equipment, either the lessor or the lessee may be the assessee. Typically:

- if the lease is a true lease, the lessor is considered the owner;
- if the lease is a finance lease or conditional sales contract, the lessee is technically the owner, and may be the assessee.

However, in practice, leasing transactions can be complicated and the determination of the assessee may not be straightforward. For example, if the lessor is unknown (in either case listed above) the lessee may be assessed. If the lessor is a bank or financial institution (financial corporation) which is exempt from personal property taxes, section 235 provides that the *lessee* is the *owner* (and therefore the assessee) for assessment purposes. Communication with the two parties to the lease and/or review of the lease or financing agreement helps to alleviate problems. (See also discussion of leased equipment in Chapter 4 and Chapter 6).

## Assessee of Improvements

Improvements can also cause similar problems in identifying the assessee. Improvements installed by tenants may be assessed to either the landlord (the lessor) or the tenant (the lessee). Nevertheless, improvements that are considered an integral part of the landlord's structure are generally assessed to the landlord on the secured roll. Fixtures owned by the tenant, which are improvements by definition (section 105), and tenant-owned fixed machinery and equipment are assessed to the tenant on the unsecured roll. However, as with leased equipment, the assessee should be determined according to facts specific to each case.

Again communication with the two (probable) assessees is helpful, but the appraiser's and auditor-appraiser's cooperation also assists in resolving problems and clarifying factual questions. As will be discussed later in the manual, Chapter 2, *Classification*, and Chapter 5, *Assessment of Improvements Related to Business Property*, the two appraisers should review the lease agreement and coordinate their fact-gathering efforts where ambiguity exists.

### Joint Assessees

In every situation an effort should be made to determine the appropriate assessee. It is preferable to assess only one party to avoid administrative difficulties, but the assessor has the authority to assess taxable property to the lessor, the lessee, or both parties.[21]

When both parties are assessed, tax bills are required to be sent to both parties. This requirement presents a difficulty in that dual tax bills may result in dual payments. The assessor cannot indicate primary and secondary liabilities; the property tax statutes do not recognize such differences. Should both persons pay the tax, the tax collector must accept the first payment and return the second. Therefore, the assessor should confine the joint assessment procedure to those cases in which a collection problem is anticipated.

---

[21] Section 405(b).

## Unknown Owner

In contrast to section 405, section 611 requires the assessor to assess property to unknown owners if the owner of the property is not known.  If the property is assessed to unknown owners, the property may be seized and sold in order to pay property taxes.[22]

## SITUS OF PROPERTY

Pursuant to the California Constitution, article XIII, section 14, all property taxed by local government shall be assessed in the county, city, and district in which it is situated.  Thus, situs determination is important.

Situs is seldom a problem with property that remains in one location, as in the case of real property, but many problems are encountered when determining the situs of movable property such as personal property.  Rules 201 through 206 were adopted to deal with situs problems involving movable property.  A complete discussion of these rules and situs in general is included in Chapter 3 of this manual.

## DESCRIPTION OF PROPERTY

An accurate assessment requires a description of the property assessed.  Personal property, as required by section 445, must be described in the detail requested on the property statement.  The description includes the cost of the property, if the information is within the knowledge of the assessee or is available to him/her from his/her own or other records.[23]

The property statement, mandated by section 441, is a vital link in the communication system between the property owner and the assessor.  It requests a variety of information regarding taxable property needed by the appraiser and/or auditor-appraiser for making an annual review and accurate assessment of the property.  A detailed discussion of property statements, the nature of the reporting process, and variations of property statements related to different types of property is found in Chapter 7 of this manual.

## CLASSIFICATION OF PROPERTY

In accordance with the California Constitution and related statutes, all property on the roll must be classified as land, improvements, or personal property.[24]  Rules 121 through 124 identify the proper classification.  Classification is one of the more complex and important of the seven factors of a legal assessment.  It is covered in detail in a separate chapter (Chapter 2) of this manual.

---

[22] *Weyse* v. *Crawford* (1890) 85 Cal. 196.
[23] Section 445.
[24] California Constitution, article XIII, section 13 and sections 602 and 607 of the Revenue and Taxation Code.

## SECURITY OF PROPERTY

An *assessment roll*, as defined in section 109, is the entire listing of all taxable property within the county.[25]    (The assessor actually prepares two separate rolls each year: the *regular assessment roll* and the *supplemental assessment roll*.)    The assessment roll consists of two parts—secured and unsecured.

### Secured Property Defined

The "secured roll" is that part of the roll containing state assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes.[26]    The taxes on the secured roll are a lien on the real property.

### Unsecured Property Defined

The remainder of the roll is the "unsecured roll."[27]    The taxes on the unsecured roll are a personal liability of the assessee.

Assessments on the two parts of the roll have different due dates, delinquency dates, and tax collection procedures.    In addition, in any given year, the tax rates between the secured and unsecured rolls may be different; the tax rate on the unsecured roll is the rate "for the preceding tax year upon property of the same kind where the taxes were a lien upon land sufficient in value to secure their payment."[28]    Therefore, it is necessary to determine whether each assessment will be listed on the secured or the unsecured roll.

### Securing Personal Property

Most personal property has a degree of mobility; it can be moved from location to location or out of the taxing jurisdiction in which it had situs on the lien date.    This can create difficulties in tax collection.    It is therefore desirable to secure personal property to real property, which has a fixed situs, to facilitate payment of the taxes.

In determining whether personal property may be placed on the secured roll, the assessor is guided by sections 2189 et seq. and by Assessors' Handbook Section 201 (AH 201), *Assessment Roll Procedures*.    Under section 2189, personal property may be placed on the secured roll when the property is physically located on the real property on the lien date and is assessed to the person or entity which owned the real property.    Upon assessee request, personal property at a different location may also be secured to real property under section 2189.3; this is known as *cross-securing*.    When personal property is cross-secured, the assessor will determine whether or not the real property is sufficient to secure the payment of the taxes.    If so, a *Certificate of Security* for taxes on personal property will be issued which must be recorded with the county recorder on or before the lien date.

---

[25] The entire assessment roll includes the "local roll" which is the county assessor's duty to assess, and the "Board roll," which is part of the secured roll, containing state assessed property.

[26] Section 109.

[27] Section 109.

[28] California Constitution, article XIII, section 12.

When personal property is secured to real property and the real property (but not the personal property) is sold after the lien date but before the assessment is made, administrative difficulties may occur.  The new owner of the realty may be assessed for personalty that he or she never owned or possessed.  In this case, even though the initial assessment was valid due to the conditions on the lien date, the assessor is required to transfer the personal property assessment to the unsecured roll.[29]

## VALUE OF PROPERTY

Value, for property tax purposes, is *market value*.  This is the price (the amount of money) that a property will bring when it is sold in an open market.  It is a dollar amount determined by the utility of the property, as manifested through the purchasing power of those who are interested in acquiring it, the relative scarcity of the commodity, and the difficulty involved in overcoming this scarcity.  In other words, value (market value) is determined by supply and demand.[30]

The California Supreme Court, in a benchmark decision, defined the term *market value* as used in the context of property tax assessment.

> It provides, in other words, for an assessment at the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. It is a measure of desirability translated into money amounts . . . and might be called the market value of property for use in its present condition.[31]

Similarly, the Legislature has defined the term in sections 110 and 110.1.  Section 110(a) states:

> Except as is otherwise provided in Section 110.1, "full cash value" or "fair market value" means the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes.

Of the seven factors in an assessment, value is consistently the most difficult.  AH 501, *Basic Appraisal*, includes a comprehensive study of the value concept in general and an in-depth discussion of value as applied to real property.[32]  In many respects, the same basic principles discussed in that section apply to personal property.  However, unlike most real property, personal property is assessed at market value every year; it is not governed by the value limitations under Proposition 13 (California Constitution, article XIII A).  Except for manufactured homes and floating homes, there is no base year value for personal property and

---

[29] Section 2189.
[30] Supply and demand are the market effects of scarcity and utility.
[31] *De Luz Homes Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 561-562.
[32] Valuation of personal property is also discussed briefly in AH 501, Chapter 7.

the appraisal date is always the lien date, January 1.  Further discussion of value, specific to personal property and fixtures, is a major portion of this section of the Assessors' Handbook.  It is included in Chapter 4, *Valuation of Personal Property*, Chapter 5, *Assessment of Improvements Related to Business Property*, and Chapter 6, *Special Issues*.

# CHAPTER 2:  CLASSIFICATION

## IMPORTANCE OF CLASSIFICATION

Classification is an important and required factor of the (local) assessment function for several reasons.[33]  Principally, it is important because property tax law requires that land, improvements (including fixtures), possessory interests, personal property, and other classes of property (as defined by the State Board of Equalization) must have separately assessed values shown on the roll.[34]  It is also significant because of the assessment differences between real property and personal property, which include the following: (1) special assessments are levied only on real property, (2) the tax rate on personal property on the unsecured roll is the rate of tax on personal property on the prior year's secured roll,[35] (3) personal property is appraised annually at market value and not governed by article XIII A of the California Constitution, and (4) fixtures are a separate appraisal unit when measuring declines in value.

## GENERAL CLASSIFICATION TYPES AS REQUIRED BY LAW

Section 602 provides, in part, that the local roll shall show:

(e) The assessed value of real estate, except improvements.

(f) The assessed value of improvements on the real estate.

(g) The assessed value of improvements assessed to any person other than the owner of the land.

(h) The assessed value of possessory interests.

(i) The assessed value of personal property, other than intangibles.

This means that all property listed on the roll must be classified as (1) land, which is all real property except improvements, (2) improvements, (3) possessory interests, (4) personal property, or any other things required by the Board.[36]

---

[33] Classification does not apply to state assessed properties.  "The Board may use the principle of unit valuation in valuing properties of an assessee that are operated as a unit in a primary function of the assessee.  In valuing such properties, the Board must appraise them at their full values when put to their beneficial and productive uses.  Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets such as land or buildings, or even separate kinds of assets such as realty or personalty."  *GTE Sprint Communications Corp.* v. *Alameda County* (1994) 26 Cal.App.4th 992.

[34] Rule 252, and sections 602 and 607.

[35] California State Constitution, article XIII, section 12.

[36] Section 602(l).  Per section 20, the word "Board" means the State Board of Equalization.

Each class of separately enrolled property is defined in the Revenue and Taxation code (sections 103, 104, 105, 106, and 107) and by Title 18 of the California Code of Regulations (Rules 121, 122, 122.5, 123, 124, and 131). Some of the definitions are summarized here for ease of use and reference.

## LAND

Land is identified by section 602(e) as real estate, or real property, except improvements. It includes:

(a) The possession of, claim to, ownership of, or right to the possession of land.

(b) All mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto.[37]

## IMPROVEMENTS

Section 105 defines improvements as:

(a) All buildings, structures, fixtures, and fences erected on or affixed to the land.

(b) All fruit, nut bearing, or ornamental trees and vines, not of natural growth, and not exempt from taxation, except date palms under eight years of age.

Examples of property generally classified as improvements are listed in Rule 124(b). The listing is a guide to classification of those named and similar items.

For valuation purposes, all improvements should be subclassified as structure items or fixtures. This separation and distinction is extremely important and encompasses a large portion of the discussion in the remainder of the chapter.

## PERSONAL PROPERTY

*Personal property* includes all property except real estate.[38] It is property that may be exempted, in whole or in part, by the Legislature. A discussion of personal property categories (taxable and exempt) is included in a later portion of this chapter.

## CLASSIFICATION FOR VALUATION PURPOSES

As required by law for enrollment purposes, property must be classified as land, improvements, or personal property - pursuant to the definitions provided in the previous section. For valuation purposes, however, property is categorized as land, structure items (improvements), fixtures (improvements), and personal property.

---

[37] Section 104(a) and (b). See also Rule 121.
[38] Section 106.

## IMPROVEMENTS (STRUCTURE V. FIXTURE)

Both structure items and fixtures are improvements; they are not taxed separately. However, they are treated differently and separately for valuation purposes. It is therefore important to discuss and understand the terms in order to classify the improvements properly.

### Structure Item

*A structure* item (or improvement) is "an edifice or building; an improvement."[39] It is an item commonly referred to as an improvement. The Business Property Statement defines *structure* as an improvement whose:

> . . . primary use or purpose is for housing or accommodation of personnel, personalty, or fixtures and has no direct application to the process or function of the industry, trade, or profession.

### Fixture

In contrast to structure, *fixture* is a somewhat vague term in that it has different meanings to different people. For example, certain items (such as bathroom 'fixtures') may be denoted as "fixtures" by a business owner or an accountant, even though the property tax appraiser classifies them as structure improvements (rather than fixture improvements) for assessment purposes.

For assessment purposes, pursuant to Rule 122.5, a *fixture*[40] is:

> . . . an item of tangible property, the nature of which was originally personalty, but which is classified as realty for property tax purposes because it is physically or constructively annexed to realty with the intent that it remain annexed indefinitely.

In discussions with taxpayers and accountants, the auditor-appraiser should keep in mind that the concept of fixtures for assessment purposes is not necessarily the same concept used by taxpayers. Where there is a contradiction between the assessee's or accountant's concept of classification and the express language of statutory and rule provisions, the statutes and rules are controlling for assessment purposes.

### Three Tests for Determining Whether an Article is a Fixture

In determining whether an article is a fixture, the application of the three tests set forth in Rule 122.5 must be applied to the evidence available. The three tests are:

- Physical Annexation (manner of annexation),
- Constructive Annexation (adaptability), and

---

[39] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, s.v. "structure."
[40] For property tax assessment purposes, fixtures include *trade fixtures* and *fixed equipment*. See also Chapter 5, *Assessment of Improvements Related to Business Property*.

- Intent.

### Physical Annexation (Test)

The term "affixed to land" is the key to the physical annexation test.  Section 660 of the Civil Code includes a definition of the term, which reads in part as follows:

> A thing is deemed to be *affixed to land* when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster nails, bolts, or screws. . . .

Thus, the test for physical annexation under Rule 122.5(b)(1) may be summarized as follows:

- If the property being classified cannot be removed without substantially damaging it or the real property with which it is being used, it is considered physically annexed.  It is classified as a fixture.

- If the property can be removed without material damage but is actually attached, it is classified as a fixture, unless there is an intent manifested by outward appearance or historic usage, that the item is to be moved and used at other locations.

- Property may be considered physically annexed if the weight, the size, or both are such that relocation or removal of the property would be so difficult that the item appears to be intended to remain in place indefinitely.

- Property shall not be considered physically annexed to realty solely because of attachment to the realty by "quick disconnect" attachments, such as simple wiring and conduit connections.

### Constructive Annexation (Test)

An item may be classified as a fixture even if it is not physically fastened to a building or other structure.  This is the concept of constructive annexation, the second test.  Constructive annexation per Rule 122.5(c)(1) may be summarized as follows: if the property is not physically annexed to realty, but is a necessary, integral, or working part of the realty, it is constructively annexed.  Factors to be considered are: (1) is the nonattached item designed and/or committed for use with specific realty, and/or (2) whether the realty can perform its desired function without the nonattached item.

Constructive annexation, as well as physical annexation, is "installation specific."  As such, visual inspection of the actual annexation or relationship of the item to the real property or improvements may be necessary.  If the installation and/or removal aspects of the item remain unclear even after visual inspection, further information should be requested from the assessee.  For instance, the assessee may be requested to provide the detailed procedures involved in the installation or removal of the item and an accounting of all costs before a final determination can be made.

Following is a list of items, which were formerly personal property, that are classified as improvements due to constructive annexation based on decisions of the court (and information specific to each case).  The list should serve as a guideline for determining whether an item is classified as an improvement using the test of constructive annexation.

---

**EXAMPLE 2.1**

**PROPERTY CLASSIFIED AS FIXTURES (IMPROVEMENTS) DUE TO CONSTRUCTIVE ANNEXATION**

- A ship anchored at a specially constructed pier.  The support lines for water, sewage, air conditioning, heating, etc. were of a type used for permanent rather than temporary installation; motive power for the ship was partly removed and the rest permanently disabled; the ship could be moved only at great expense and could not be moved beyond the harbor; and extensive land-based facilities including roads, bridges, and a parking lot were constructed especially for the visitors to the ship.  *Specialty Restaurants, Corp*. v. *Los Angeles County* (1980) 111 Cal.App.3d 607 (Queen Mary case).

- Cranes mounted on specially installed rails at a wharf area.  The area of the wharf containing the rails was extensively reinforced to accommodate the great weight of the cranes.  Without the cranes, the facility could not function in consonance with its purpose and design.  *Seatrain Terminals of California, Inc*. v. *County of Alameda* (1978) 83 Cal.App.3d 69.

- Movable structures anchored to realty by the force of gravity.  *Rinaldi* v. *Goller* (1957) 48 Cal.2d 276.

- Portable buildings, platforms, tracks, machinery and shipyard equipment owned by the government and located on private property.  The government's contractual right to remove its buildings and fixed equipment did not affect classification of the items as improvements for property tax purposes.  *Kaiser Co*. v. *Reid* (1947) 30 Cal.2d 610.

- Pumps of such a size they are not easily moved and from outward appearances, to third parties, appear to be permanent.  *Bell* v. *Bank of Perris* (1942) 52 Cal.App.2d 66.

- Vault doors, although removable without damage to the vault, are functionally and physically integrated with the vault itself.  Vaults alone without doors would not be useful as vaults and would fail in their intended purpose.  *San Diego Trust* & *Savings Bank* v. *County of San Diego* (1940) 16 Cal.2d 142.

- Head sets and stools specially designed for use with affixed central telephone office equipment.  *Southern California Telephone Company* v. *State Board of Equalization* (1938) 12 Cal.2d 127.

---

### Intent (Test)

Intent is the most important of the three tests and may be the deciding factor regarding classification of property.  Rule 122.5 (d)(1) states:

> Intent is the primary test of classification.   Intent is measured with—not separately from—the method of attachment or annexation.  *If the appearance of the item indicates that it is intended to remain annexed indefinitely, the item is a fixture for property tax purposes.*  Intent must be inferred from what is reasonably

> manifested by outward appearance.  An oral or written agreement between
> parties, such as a contract between lessor and lessee, is not binding for purposes
> of determining intent.  [Italics added.]

Intent must be determined by physical facts, and is the means of applying the physical and
constructive annexation tests.  For instance, great expense or difficulty in removal is indicative
of intended permanence.[41]  Intent cannot be a hidden matter, but is "reasonably manifested by
outward appearances."[42]  If an item appears physically attached to real property, an appraiser can
assume that the intent of the annexation is that the item will remain attached unless there is other
evidence that indicates the attachment is only temporary.

The guiding precedent for determining intent is the California Supreme Court case, *Crocker
National Bank* v. *City & County of San Francisco* (1989) 49 Cal.3d 881.  Here the Court found
that computer equipment is personalty even when a newly constructed building includes a data
processing center.  The inclusion of safety, security, cooling, power, and fire suppression
systems designed into the building specifically for the computer center did not change the
classification of the equipment from personalty to a fixture.  Excerpts from the decision provide
instruction on the importance of intent:

> . . . in determining whether an item constitutes a fixture, three criteria must be
> taken into consideration:  (1) the manner of its annexation to the realty; (2) its
> adaptability to the use and purpose for which the realty is used; and (3) the
> intention with which the annexation is made.  It is also settled that for tax
> purposes, the "intention" must be determined by the physical facts or reasonably
> manifested outward appearances.

> . . . In resolving whether an item placed on the premises constitutes a fixture or
> personal property, the aforelisted three elements do not play equal parts.  In
> making the determination in a particular case, the element of intent is regarded as
> a crucial and overriding factor, with the other two criteria being considered only
> as subsidiary ingredients relevant to the determination of intent.  . . . Because the
> legal problem here is taxability, . . . and because the "intent" here is constructive
> and not actual, the test reduces itself to whether a reasonable person would
> consider the item to be a permanent part of the property, taking into account
> annexation, adaptation, and other objective manifestations of permanence. . . .

> Finally, there are no other objective manifestations of permanence that are
> sufficient to outweigh the manifestations revealed by the evidence bearing on
> annexation and adaptation - viz., that the [computer] equipment did not constitute
> a permanent part of the building.  . . . Accordingly, we conclude that a reasonable

---

[41] *Morse Signal Devices* v. *County of Los Angeles* (1984) 161 Cal.App.3d 570, *Allstate Insurance Co.* v. *County of Los Angeles* (1984) 161 Cal.App.3d 877, *Security Pacific National Bank* v. *Los Angeles County* (1984) 161 Cal.App.3d 877, *Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881.
[42] *Trabue Pittman Corp.* v. *County of Los Angeles* (1946) 29 Cal.2d 385, 397.

person, taking into account annexation, adaptation, and other objective manifestations of permanence, would not consider the equipment at issue to constitute a permanent part of the building.  [Emphasis added.]

## Importance of Classification as Structure versus Fixture

As mentioned earlier, it is important to sub-classify improvements as structure items or fixtures because they are treated differently for valuation and assessment purposes.[43]  Structure items and fixtures are treated differently in that:

- Fixtures are a separate "appraisal unit" when measuring declines in value (Rule 461(e)).

- Fixtures are treated differently than other real property (i.e., structure items) for supplemental roll purposes.

- Fixtures and personal property values are components in the value criterion for determination of a mandatory audit.

Thus, care must be taken to properly classify improvements as structure items or fixtures.  The danger with respect to improper classification of an item is that it could become subject to double assessment or may escape assessment.  If an item such as a compressor, for example, is included in the real property appraisal of the building in which it is located (per Rule 124(b)), and the assessee lists the compressor on the Business Property Statement as a fixture used in the trade or industry, it may also be included in the appraisal of the business property, subjecting it to a double assessment.  While this problem is addressed in detail in Chapter 5, and Appendices A and B, it bears repeating that much caution must be exercised in compiling and comparing appraisal data and making accurate classifications in order to avoid escapes and duplicate assessments.

## Classification Guidelines

An appraiser should consider all three tests when classifying property: physical annexation, constructive annexation, and intent.  Each test affects the final classification of the property based upon the evidence available.  However, intent, as the courts have stated, is the most important and must be measured with--not separately from--the method of physical attachment or constructive annexation.

Although the three tests (physical annexation, constructive annexation, and intent) for determining whether or not an item is classified as a fixture have been provided by the code and by the court, lack of detailed statutory definitions has led to some confusion when attempting classification regarding improvements, structure versus fixture.  Rule 463(c) defines a fixture in general ("an improvement whose use or purpose directly applies to or augments the process or function of a trade, industry, or profession"), but no specific examples are given in the statutes. Assessors' Handbook Section 581 (AH 581), *Equipment Index and Percent Good Factors,* provides some clarification by listing improvements by type, that is, when an improvement

---

[43] See Chapter 5, *Assessment of Improvements Related to Business Property.*

relates primarily to the structure (structure), and when an improvement relates mainly to the function of a trade, industry, or profession (fixture). This list is included in Appendix A for review and ease of use. Each example in this list is classified only on the limited description offered. In practice, classification of a property should be based on all relevant facts concerning that property. For example, dual purpose improvements should be classified as to their primary purpose.

## Special Classification Issues

Certain types of property consistently create classification problems: automatic teller machines (ATM's), telephone systems, partitions, service station fixtures, liquefied petroleum gas tanks (propane tanks), and wind machines. These categories of property and the classification issues involved with each are discussed below.

### Classification of ATM's

ATM's may be classified as personal property or fixtures. The determination must be made on a case by case method. Most ATM's are owned by banks and financial institutions which by law are exempt from personal property tax (and are subject to an in-lieu franchise tax).[44] Therefore, classification of ATM's may determine taxability. Using the three tests of a fixture (physical annexation, constructive annexation, and intent) will aid an appraiser in the proper classification.

Rule 122.5(e)(9) classifies ATM's that are installed as free standing or counter-top units within a building (such as a bank, supermarket, or other retail establishment), as personal property. An ATM installed in a structure that was built primarily for the purpose of housing the ATM is a fixture, because the realty cannot perform its main function without the ATM. Similarly, an ATM installed through the wall of a building is a fixture because that portion of the realty was designed or modified for the specific purpose of housing the ATM.

### Classification of Telephone Systems

Telephone systems (not including state assessed telephone companies) often pose problems because there may be many different components making up the system as a whole, and each component must be analyzed and classified separately. The components integrated into the structure are physically annexed, generally having permanence (intended to be annexed indefinitely), and are therefore structure items. However, components that plug into the wiring system are not physically annexed to the structure. These components are necessary in order for the operation of the system (constructively annexed), but they are portable and can be used in other structures. Use of these components is not limited to only one system. The intent of the property owner is that these components be movable (i.e., when the realty is sold, the portable telephone components are not sold with it). This part of the telephone system is personal property.

---

[44] Exempt banks and financial institutions do not include federally chartered credit unions. Personal property and real property owned by federally chartered credit unions are not exempt from property taxes.

**Classification of Service Station Improvements**

Service station improvements may also be made up of many components. Each component should be identified, tested, and classified individually consistent with existing statutory law, property tax rules, and standard appraisal principles. In general, fixtures include items such as signs, hoists, and tanks if they directly augment the function of the service station trade. Structure items include other improvements such as buildings, curbing, and landscaping; their primary use and purpose is for housing or accommodation of personnel, personalty, or fixtures. Items that have a dual purpose will be classified according to their primary purpose.

Following (Table 2A) is a generalized listing of property typically found in connection with service stations and their appropriate classification as proposed by industry.[45] As technological advancements are made and other changes occur in this industry, these general categorizations may need to be modified.

| TABLE 2A CLASSIFICATION OF SERVICE STATION IMPROVEMENTS | |
| --- | --- |
| **Structures** | **Fixtures** |
| Buildings | Island Curbing |
| Curbing | Signs |
| Paving | Hoists |
| Restrooms | Compressors |
| Walls | Air & Water Wells |
| Fencing | Dispensers/Pumps |
| Yard Lighting | Tanks & Related Equipment |
| Landscaping | |
| Island Canopy | |

**Classification of Partitions**

Partitions may be classified as either personal property, structure items, or fixtures. Each partition must be classified on the physical characteristics of the item.

Most partitions currently used in office buildings are not permanently attached or built into the structure. The partitions are designed to be rearranged easily to accommodate the current needs of the business. These types of partitions are properly classified as personal property.

Partitions built into the structure or designed to function only in a specific structure are improvements. They are physically annexed and can be classified as fixtures or structures as appropriate. Partitions that are floor-to-ceiling height, and for the most part constructed at the time the building is constructed, are structure improvements. Partitions in an office space that

---

[45] Classification recommendation supplied by the Western States Petroleum Association Marketing Property Task Force.

are less-than-ceiling height, attached to the floor, and constructed with studs and sheetrock or masonry materials are fixtures.  In either case, the partitions may remain indefinitely.

**Classification of Liquefied Petroleum Gas Tanks**

Liquefied petroleum gas tanks, commonly referred to as propane tanks, may be classified as personal property or fixtures.  The determination must be made on a case by case basis depending upon the facts available.  The three tests for determining whether an article is a fixture (i.e., physical annexation, constructive annexation, and intent), as discussed earlier in this chapter, should be considered and applied by the appraiser in order to make this determination.  Rule 124 recognizes that propane tanks "which remain in place are categorized as improvements."

For example, if the tank and related equipment cannot be removed without material damage to real property and the intent "manifested by outward appearances" or historic usage indicates that the property will remain indefinitely, the property should be classified as a fixture.  If, on the other hand, the intent of the owner is to move the property and use it at other locations the property should be classified as personal property.  Again, the determination must be made based on the facts available in each individual situation.

**Classification of Wind Machines**

Wind machines may be classified as fixtures or personal property.  Wind machines are used in the agricultural industry to protect crops, trees, and vines from adverse weather conditions.  These machines consist of a large fan mounted on a tower, a motor to drive a fan, a fuel tank or electrical hookup, and other related equipment necessary for operation.

A wind machine that is physically annexed to realty with the intent that it remains annexed indefinitely is a fixture.  Rule 122.5(e), example (10) specifically states that wind machines annexed to realty are not considered a building, structure, or a fence.  For property tax assessment purposes, they are fixtures.  On the other hand, wind machines attached to or resting on a truck or other type of moveable equipment are properly classified as personal property.[46]

## TANGIBLE PERSONAL PROPERTY (GENERAL CATEGORIES)

Tangible personal property is defined in Rule 123 as:

> All property that may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses, except land and improvements, is tangible personal property.

In general, personal property is sub-classified according to type as provided on property statements: equipment, supplies, vessels, aircraft, and manufactured homes.  Each of these general categories is discussed below.  Since not all personal property is assessable, it is

---

[46] Rule 122.5, *Fixtures*, was amended to include an example of wind machines, effective February 6, 2002.  Please refer to the rule for further guidance on the proper classification of wind machines.

important to sub-classify this property further (e.g., business inventory, licensed vehicles, etc.). In some cases, classification affects not only valuation but it affects taxability as well.

## Equipment

The term *equipment* is a general term.  The Business Property Statement subdivides equipment into the following five primary categories: (1) *machinery and equipment*, (2) *office furniture and equipment*, (3) *other equipment*, (4) *tools, molds, dies, and jigs*, and (5) *computer equipment*. *Machinery and equipment* includes equipment that is directly related to a particular industry (including equipment that is driven and controlled by a computer that is an integral part of the production equipment).  For example, washers and dryers are types of equipment that laundromats would include in this category.  The category titled *tools, molds, dies, and jigs* is limited to manufacturing industries; generally, it is self-explanatory to those industries.  Other categories, *office equipment* and *computer equipment*, on the property statement represent equipment used by most types of businesses.  Items such as desks, tables, chairs, and filing cabinets are included in o*ffice equipment*.  The column entitled *computer equipment* represents not only non-production computer components but also related equipment.[47]

## Supplies

Supplies are items that are used in the normal operation of the business and are not intended for sale or lease on the lien date.  They are assessable as personal property at their current replacement cost, or market value.  Assessable supplies do not, however, include any items that become a component part of a product that is manufactured or sold in addition to items that are sold with the product.  Examples of supply items which are exempt inventory when they are sold with the product include packaging boxes, pallets, price tags, and cash register tapes.  These items are inventory and are exempt.[48]  Examples of assessable supplies (items that do not become part of the product) include stationery and office supplies, chemicals, and precious metals used to produce a chemical or physical reaction, janitorial and lavatory supplies, fuel, and sandpaper.  Medical,[49] legal, or accounting supplies held by a person in connection with a *profession* that is primarily a service activity may also be reportable as supplies.  Items that are to be delivered to a customer as part of a *nonprofessional* service, such as chemicals added to a customer's pool by a swimming pool maintenance company, are inventory.

## Business Inventory Exemption

It is important to distinguish supplies, which are assessable, from inventory items, which are exempt.  Rule 133(a) identifies business inventory.[50]  In short, business inventory includes all items of personalty that become part of or are themselves a product that is held for sale or lease in the ordinary course of business.  The key phrases *ordinary course of business* and *goods*

---

[47] The Business Property Statement requests computer equipment (and related equipment) be reported separately based on cost of the computer system.

[48] Sections 129 and 219, Rule 133.

[49] Some medical supplies are considered inventory.

[50] Rule 133(b) describes property not eligible (exclusions) for the business inventory exemption.

*intended for sale or lease* must apply for the property to qualify for the business inventory exemption.  For example, a retailer in the business of selling shoes is also requesting a business inventory exemption on a vessel he/she is trying to sell on the lien date.  Since the sale of vessels is not part of his/her *ordinary course of business*, the vessel would not qualify for the inventory exemption.  If a copier leasing company holding machines for lease uses one of the machines prior to the lien date or intends to use the copier after the lien date, that copier is no longer part of the *goods intended for sale or lease* and would not qualify for the business inventory exemption even if it is held for lease on the lien date.

In general, basic provisions under Rule 133(a) are:

- Personal property (including animals, crops, and feed) sold in the ordinary course of business is exempt business inventory.

- Items incorporated into a product and held for sale in the ordinary course of business are exempt business inventory.

- Goods transferred incidental to the rendition of a professional service are not eligible for the business inventory exemption.  (Examples are given later in this chapter.)

- Goods transferred in the rendition of a nonprofessional service are eligible for the business inventory exemption.  (Examples are given later in this chapter.)

- Animals used in the production of food or fiber are exempt business inventories.

- Property held for lease in the normal course of business on the lien date is exempt business inventory.

Tangible personal property that is owned or used rather than intended for sale or lease does not qualify for the business inventory exemption.  Such equipment is assessable.

### Questions and Answers Regarding Classification of Supplies Versus Inventory

Following are some common questions and answers regarding the business inventory exemption. The questions are grouped into five categories: manufacturing, retailing, professional and service enterprises, agricultural enterprises, and property held for lease.

### *Manufacturing*

**DO MANUFACTURING SUPPLIES QUALIFY FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes.  Manufacturing supplies, that will be incorporated in a product that is to be sold, such as welding rods, nuts, bolts, and screws, are eligible.

No.  Supplies such as oxygen and acetylene for welding, drill bits, and similar items that are consumed in the manufacturing process but that are not physically incorporated into the product are not eligible.  Also not eligible are catalysts used to accelerate chemical or physical reaction but which are not intentionally incorporated into the product.

**ARE OAK BARRELS USED IN THE MANUFACTURING OF WINE (OR BRANDY) ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes, if used to impart flavor or aroma. Particles of chemical components of oak barrels transfer to wine (or brandy) during the aging process, adding flavor, aroma, and color. This enhancement process is the primary purpose for aging wine (or brandy) in oak barrels instead of other containers. During the time oak wine barrels are used or held to be used as a raw material to impart the flavor and aroma-enhancing chemical compounds of the oak into wine (or brandy), such property is business inventory. (See Rule 133(a)(2)(B).)

No, if used solely for storage. An oak barrel used in the manufacturing process is not eligible for the business inventory exemption when it is not, or is no longer, used to impart the flavor and aroma of the oak into the wine (or brandy). Such an oak barrel is used merely for the storage of wine and subject to assessment as property used in the "ordinary course of business." (See Rule 133(a)(2)(B).)

**DO TOOLS, MOLDS, DIES, OR JIGS HELD FOR USE QUALIFY FOR THE BUSINESS INVENTORY EXEMPTION?**

No. Tools, molds, dies, or jigs are assessable property when used or intended to be used in the ordinary course of business.

**ARE PARTS HELD BY MANUFACTURERS TO PERFORM WARRANTY SERVICE ON PRODUCTS THEY SELL ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes. Although the parts are not sold outright, they are held for repair (replacement of defective parts) of products that are sold. The selling prices of the products will include amounts to cover normal warranty repairs.

**IS SAND AND GRAVEL HELD BY A LICENSED CONTRACTOR FOR INCORPORATION INTO A BRIDGE OR ROADBED ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes. Business inventories include all materials held by a licensed contractor which will be incorporated into real property, except those to be incorporated into real property which the contractor is constructing for his own use.

**IS FACTORY BUILT HOUSING HELD FOR SALE BY THE MANUFACTURER ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes. If held for sale as individual sections of a building, they would be eligible. They would also be eligible where the manufacturer is also a licensed contractor and assembles the sections at a building site, then sells the buildings.


### *Retailing*

**IS FARM OR CONSTRUCTION EQUIPMENT, THAT WAS PREVIOUSLY USED BY A FARMER OR CONTRACTOR, ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION ONCE IT IS CONSIGNED TO AN AUCTIONEER FOR SALE?**

Yes, the equipment is held for sale by the auctioneer whose normal business is selling such goods.

**FARM OR CONSTRUCTION EQUIPMENT IS HELD AND ADVERTISED BY A FARMER OR CONTRACTOR FOR SALE AS A MEANS OF DISPOSING OF OLD OR EXCESS EQUIPMENT. IS SUCH EQUIPMENT ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

No. It is not held for sale in the normal course of business. His or her business is farming or contracting, not selling used equipment.

**ARE DISPLAY ITEMS ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes, unless they have been altered to the point where it is unlikely they will be sold. An example of a display that is not eligible is a cut-away of a tire showing the interior construction. Such an item would not be sold by the retailer; thus, it is not eligible for the exemption.

**ARE SALESPERSON'S SAMPLES AND DEMONSTRATION EQUIPMENT ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes, if items are sold from the samples and/or demonstration equipment or if the samples and/or demonstration equipment are periodically rotated and returned to stock for sale.

**A RETAILER SELLING OFFICE MACHINES AND EQUIPMENT PERIODICALLY REMOVES EQUIPMENT FROM INVENTORY FOR USE AS HIS OFFICE EQUIPMENT. THE EQUIPMENT IS USED FOR A PERIOD OF TIME THEN RETURNED TO INVENTORY FOR SALE. IS THE EQUIPMENT BEING USED AS OFFICE EQUIPMENT BY THE RETAILER ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

No.  The equipment is in use at the consumer level and is not being displayed or otherwise offered for sale.  Property which has been used by the holder prior to the lien date is NOT eligible for the inventory exemption, even though held for lease on the lien date (see Rule 133(b)(4)).


### *Professional and Service Enterprises*

GOODS TRANSFERRED IN THE RENDITION OF A "PROFESSIONAL SERVICE" ARE NOT ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION, WHILE GOODS TRANSFERRED IN THE RENDITION OF A "NONPROFESSIONAL SERVICE" ARE ELIGIBLE.  WHAT CRITERION DETERMINES WHETHER A SERVICE IS PROFESSIONAL OR NONPROFESSIONAL?

A "profession" is a vocation where the labor and skill is predominantly mental or intellectual, rather than physical or manual.  A "profession" requires knowledge of an advanced type in a given field of science or learning gained by a prolonged course of specialized instruction and study.

A "nonprofessional service" is generally defined as a vocation requiring skill of a manual or mechanical nature.  Courts tend to classify a "nonprofessional service" as a business as opposed to a profession.  Examples may include barbers, carpenters, and plumbers.

Rule 133(c) gives examples of medicine, law, architecture, or accountancy as "professional services."  It lists dry cleaners, beauty shop operators, and swimming pool service companies as examples of "nonprofessional services."  There are, of course, many services in between that are more difficult to assign to one group or the other.

ARE EMBALMING FLUIDS OF A MORTUARY ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION AS GOODS TRANSFERRED IN THE RENDITION OF A NON-PROFESSIONAL SERVICE?

Yes.  The skills required of an embalmer are of a manual or mechanical nature.

ARE MEDICINES THAT A DOCTOR KEEPS ON HAND BUSINESS INVENTORIES?

No, because they are typically transferred to patients incidental to the rendition of the professional service.

ARE MEDICINES HELD BY A HOSPITAL PHARMACY ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?

Yes, if the hospital pharmacy holds medicines dedicated for sale to the general public (out-patients and/or walk-in customers) that portion held for resale is eligible for the business inventory exemption.

No, medicines held by the hospital pharmacy for issue to in-patients as part of a service are not eligible for the business inventory exemption.

**IS THE FOOD HELD FOR SERVING TO HOSPITAL PATIENTS AS PART OF THE DAILY HOSPITAL SERVICE ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

No.  The meals are incidental to the rendition of the professional service.  However, food held for sale in the hospital cafeteria is eligible.

**AN ACCOUNTANT MAINTAINS A STOCK OF ACCOUNTING BOOKS WHICH HE OR SHE PASSES ON TO HIS CLIENTS AS A PART OF HIS SERVICE.  HE/SHE HAS A RETAILER'S PERMIT.  DO THE BOOKS QUALIFY AS BUSINESS INVENTORIES?**

No.  However, if the accountant regularly bills clients for the books as a separate item in addition to his services, the books would qualify for the exemption.

**ARE CLOTHES HANGERS AND PLASTIC BAGS HELD BY DRY CLEANERS SUBJECT TO THE BUSINESS INVENTORY EXEMPTION?**

Yes, because they are delivered to customers regularly as part of the non-professional service performed.

**ARE CHLORINE TABLETS HELD IN STORAGE BY A SWIMMING POOL SERVICE COMPANY BUSINESS INVENTORIES?**

Yes, because they are delivered to customers as an item regularly included in the non-professional service.

## *Agricultural Enterprises*

**ARE INSECTICIDES, FUEL, AND FERTILIZER HELD BY A FARMER SUBJECT TO THE BUSINESS INVENTORY EXEMPTION?**

No, because these items are held for use rather than for sale.

**IS FEED THAT IS HELD BY A FARMER FOR FEEDING TO ANIMALS USED IN THE PRODUCTION OF FOOD OR FIBER ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

Yes.  See Rule 133 (a)(2)(D).

**ARE FARM ANIMALS HELD FOR BREEDING PURPOSES SUBJECT TO THE BUSINESS INVENTORY EXEMPTION?**

Yes, if their offspring are normally used as food for human consumption or for the production of fiber useful to man.

ARE STALLIONS AND MARES HELD FOR THE PRODUCTION OF OFFSPRING ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION AS "ANIMALS HELD FOR THE BREEDING OF LIVESTOCK?"

No.  Those qualifying for exemption as "animals held for the breeding of livestock" are animals that produce offspring that will be used for food or fiber for human use or consumption.

## *Property Held for Lease*

ARE PACK ANIMALS USED BY A GUIDE TO PACK CAMPERS INTO THE MOUNTAINS ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?

No.  However, if the pack animals are held for lease to campers, are directly under the campers' control, and are not otherwise used by their owner, they would be eligible.

ARE GOODS HELD FOR LEASE ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?

Yes.  "Held for lease" means that the property is not actually out on lease on the lien date and is not used by or intended to be used by the lessor for some purpose other than the prospective sale or lease of that property.  Also, the property while on lease must be placed under the control of the lessee.

ARE VENDING MACHINES HELD IN THE OWNER'S HANDS THAT ARE NORMALLY PLACED ON SITE TO DISPENSE FOOD ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?

No, unless the machines are held for rent.  Placing them on site does not constitute a rental.  Sharing of the receipts with the site owner constitutes payment for use of the site. (Note:  The food in the vending machines is exempt.)

ARE ITEMS ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION IF HELD FOR LEASE BY A PERSON WHO LEASED THE ITEMS FROM SOMEONE ELSE?

Yes.  The determining factor is the status of the items on the lien date; i.e., they are held for lease in the normal course of business.

ARE BOATS HELD FOR RENTAL PURPOSES ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION IF, ON THE LIEN DATE, THE RENTAL OPERATION IS CLOSED FOR THE WINTER?

Yes.  When boats are rented, and control of the property transfers to the lessee during the rental term, the rental of this property qualifies as a lease for assessment purposes. Property leased or held for lease in the ordinary course of business is eligible for the inventory exemption.  Even though the boats are not "held for rent" on the lien date due to the operation being closed for the winter, they are still eligible for the exemption since they are held for rent in the normal course of business.

**ARE GOLF CARTS AVAILABLE FOR USE (RENTAL) ONLY ON A SPECIFIC GOLF COURSE ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

No.  Assuming that the golf carts are only available for use on a golf course, the golf carts would not be eligible for the exemption.  They are personal property, used in the ordinary course of business, assessable to the owner.  To qualify as a lease, the property must be under the control of the lessee during the lease term.

**ARE THE SUPPLIES OF MOTOR FUELS HELD BY A RENTAL OPERATION ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION WHERE THE FUELS WILL BE PROVIDED TO A CUSTOMER WITH THE RENTAL OF A MACHINE?**

Yes.  The fuel supplies are eligible whether billed separately or included in the rental charge.

**ARE LINEN SUPPLIES THAT ARE LEASED OR RENTED TO CUSTOMERS ELIGIBLE FOR THE BUSINESS INVENTORY EXEMPTION?**

No, not if on lease, or committed to lease, or rented on the lien date.

## Vehicles, Vessels, Aircraft, and Manufactured Homes

Vehicles, vessels, aircraft, and manufactured homes not on permanent foundations are also classified as personal property.  They are assessable personal property to the owner, whether the owner is an individual, a business, or otherwise.  To be assessable, there is no requirement that they be used for business purposes as required for other types of personal property.

### Vehicles[51]

Vehicles are broadly defined by both the statutes and case law.  Section 670 of the Vehicle Code defines a vehicle as:

A "vehicle" is a device by which any person or property may be propelled, moved, or drawn upon a highway, excepting a device moved exclusively by human power or used exclusively upon stationary rails or tracks.

Motor vehicles (including trailers and recreational vehicles), that are "of a type subject to registration under the Vehicle Code," pay licensing fees to the Department of Motor Vehicles (DMV) which are in lieu of property tax.[52]  However, vehicles exempt from DMV registration requirements, per Vehicle Code Section 4000-4020, are assessable personal property.

---

[51] See also Chapter 6.

[52] Section 10758.  Section 225 specifically exempts from personal property taxation a trailer, semitrailer, logging dolly, pole or pipe dolly, or trailer bus, that have valid identification plates issued pursuant to section 5014.1 of the Vehicle Code, or any auxiliary dolly or tow dolly.  However, this exemption does not apply to a logging dolly that is used exclusively off-highway.

Based on the Vehicle Code and court decisions, a device could be illegal to operate on the highway and exempt from vehicle registration but may still be a *vehicle*.  Thus, the court held that a forklift met the definition of a vehicle in *Travelers Indemnity Co.* v. *Colonial Ins. Co.* (1966) 242 Cal.App.2d 227.

> Transport argues that a forklift is neither designed nor used to haul persons or property on a public highway; that the forklift here involved was not so used; and that the Vehicle Code provisions exempting forklifts from registration show a legislative intention not to include them in the definition of "motor vehicle."  We disagree.

Accordingly, tractors, backhoes, forklifts, crawler loaders, golf carts, riding lawnmowers, unlicensed racecars, and any other type of equipment that is self propelled or is designed to be moved by something other than "exclusively human power" may qualify as vehicles.  These items therefore do not qualify for the exemption provided by section 224.

Vehicles such as golf carts and riding lawn mowers are not exempt either as personal effects or as vehicles which pay in lieu fees to the Department of Motor Vehicles.  Section 155.20 authorizes the county board of supervisors to provide for a low-value exemption ordinance of up to $5,000.  Such an exemption, if implemented in a county, will eliminate assessment of most household vehicles.  However, no exemption would be available for vehicles such as tractors or backhoes with a market value greater than a county's low-value exemption.  Such vehicles are not exempt as household personal property.

**Vessels, Aircraft, and Manufactured Homes**

Assessment of vessels, aircraft, and manufactured homes are discussed in separate handbooks to give each subject the attention required.  Vessels are discussed in Assessors' Handbook Section 576 (AH 576), *Assessment of Vessels*.  Aircraft are discussed in Assessors' Handbook Section 570 (AH 570), *Assessment of Commercial Aircraft*, and Section 577 (AH 577), *Assessment of General Aircraft*.  Manufactured homes are discussed in Assessors' Handbook Section 511 (AH 511), *Assessment of Manufactured Homes and Parks*.

# CHAPTER 3:  SITUS OF PERSONAL PROPERTY

"All property taxed by local government shall be assessed in the county, city, and district in which it is situated."[53]  Situs, the place where property is legally situated, is therefore one of the essential factors of a valid assessment.  For real property, situs usually needs to be determined only once.  It will always be the same.  Personal property, however, is mobile property with no fixed situs.  Situs may always be the same or it may be different year to year, month to month, or day to day.

A property tax appraiser or auditor-appraiser is concerned with the property's tax situs on the January 1 lien date.[54]  On the lien date, property with a tax situs in California is assessable in California; property with a tax situs outside of California, almost without exception, is not assessable here.  Similarly, property with a tax situs in the jurisdiction of a taxing agency is assessable by that agency.

## WHAT IS TAX SITUS:  PERMANENT VERSUS TEMPORARY SITUS

Article XIII, section 14, provides that a property's tax situs is the location where the property is "situated."  "Situated" connotes a more or less permanent location, or situs.  Thus, taxation of property in the state must be based on the fact that it is to some extent kept or maintained in California rather than here casually or in transit.[55]  The statute does not refer to the temporary location of property, but to its permanent situs.[56]

If property stays in one place, as does real property, this location is the permanent and tax situs.  However, when property is moved periodically, a tax situs is established at a given location on the lien date.  For example, property which is normally located in a taxing jurisdiction, moved on the lien date, and then immediately moved back does not avoid taxation at this situs.  Although gone on the lien date, the property has not established permanent situs elsewhere.  Therefore, its permanent situs and thus taxable situs, remains at the original location.

Since there is no requirement to keep one's property in a specific jurisdiction where it is subject to taxation, an assessee may move property in an attempt to avoid taxation.  In doing so, the property must attain situs elsewhere.  A degree of permanency must attach to that situs before that can happen.[57]  Again, the word "situated" connotes a more or less permanent location or situs.  Property may be removed to avoid the imposition of taxes if the removal is permanent.  "If the removal is intended to be temporary, only for tax reduction purposes or otherwise, the property remains taxable at its permanent situs."[58]

---

[53] California Constitution, article XIII, section 14.
[54] Prior to 1997, the lien date was on March 1.  In 1997, the lien date was changed to January 1.
[55] *People* v. *Niles* (1868) 35 Cal. 282.
[56] *Rosasco* v. *County of Tuolumne* (1904) 143 Cal. 430.
[57] *Brock & Co.* v. *Board of Supervisors* (1937) 8 Cal.2d 286.
[58] Ibid.

On the other hand, property that is in California temporarily but has a permanent tax situs outside of California is not assessable in California. The California constitutional requirement (article XIII, section 1) that all property be taxed in proportion to its full value does not require or allow assessment of all property temporarily in this state. Property is assessable only in the county, city, and district in which it is situated or has situs.[59] At all times there is property that is being transported across this state, from one foreign state to another, that no one would claim should be assessed in California.[60]

In summary, permanent versus temporary situs must be considered when determining tax situs for property tax purposes. This principle was upheld in the case of *Seegmiller* v. *County of Nevada* (1997) 53 Cal.App.4th 1397. An assessee moved his business property from a permanent location in California to a permanent location in the State of Nevada during August of the fiscal tax year. There was no dispute that the location of the equipment on the March 1 lien date was Nevada County, California, but the assessee sued for a prorated assessment to avoid possible duplicate assessment of the property at the new location. The court found Nevada County's entire assessment valid based on permanent situs of the property (in that county) on the March 1 lien date. A permanent situs on the lien date is the basis for the assessable situs.

### DETERMINING SITUS OF MOVABLE PROPERTY

Property which is frequently moved, such as transportation equipment and construction equipment, is defined as *movable property* under Rule 205.

> Movable property is all property which is intended to be, and is, moved from time to time from one location to another.

The situs of such property should be governed by the duration of its stay at any location as discussed generally in Rule 205, *Movable Property,* and referenced further in Rule 204, *Leased Equipment,* and Rule 203, *Property in Transit.* These rules are discussed below.

### GENERAL SITUS RULES (RULE 205)

### Over Six Months Prior to the Lien Date

Movable property has situs where located on the lien date if (1) it has been in the county for more than 6 of the 12 months immediately preceding the lien date and (2) the objective facts indicate it will remain in or return to the county for any substantial period during the 12 months immediately succeeding the lien date. (Rule 205 does not apply to vessels, certificated aircraft, and racehorses. Situs for each of these exceptions is discussed later in this chapter.)

---

[59] California Constitution, article XIII, section 14.
[60] *City and County of San Francisco* v. *Talbot* (1883) 63 Cal. 485.

## Less Than Six Months Prior to the Lien Date

Movable property which has been in the county for less than 6 of the 12 months immediately preceding the lien date, but which is committed to use in the county for an indeterminate period or for more than 6 months, has situs there regardless of whether the use extends through or commences with the lien date.  (Rule 205.)

If the property does not meet the qualifications for situs as discussed above, the situs of the property is the location where it normally returns between uses.

## Movable Property In-Transit

Movable property may be in-transit on the lien date, and this may affect the property's assessable situs.  As explained later in this chapter, situs and even assessability may be based on the destination of the property (whether in interstate, intrastate, or foreign commerce) and the terms of transit.

## Situs Other Than at Location

Movable property that does not have permanent situs where it is located on the lien date has assessable situs at the location where it is normally returned between uses.  If there is no such location, the situs is the principal place of business of the owner.  (Rule 205.)

## Habitual Presence or Substantial Average Rule

In cases where property does not remain in one location long enough to establish a permanent location or situs, and does not have a location it normally returns to, its assessable situs is the place where it is frequently present or habitually located.[61]  Instruments of commerce (commercial aircraft, railroad cars, barges, etc.), linen supplies, and returnable containers are common examples of property that attain assessment situs because there is a substantial average or habitual presence at a specific location.

Special rules have evolved for assessing and determining situs for most types of instruments of commerce.  Where such statutes or rules do not exist, the courts have traditionally supported any reasonable method of apportionment.  In *Sea-Land Services, Inc.* v. *County of Alameda*[62] the court found that an assessment of cargo containers based on an "average presence" was proper.  In another case involving cargo containers, the United States Supreme Court also approved the concept of a property tax assessment based on average presence.[63]  The assessment in this case was voided by the Court, however, because the cargo containers were foreign-owned instrumentalities of international commerce and a state may not tax such property.[64]

---

[61] *GeoMetrics* v. *County of Santa Clara* (1982) 127 Cal.App.3d 940.

[62] (1974) 12 Cal.3d 772.

[63] *Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434.

[64] All ocean-going cargo containers of 1,000 cubic feet or more are now exempt under section 232.  This exemption does not affect the principle of tax situs due to habitual or average presence however.

**Habitual Situs at More Than One Location in California**

The habitual presence rule is applicable only to property which is (1) used in California *and* in other states or foreign nations and (2) not assessable under other regulatory formulas. Property that has tax situs in California on the lien date is assessable at only one location, based on its value as of that date, even though the property may have substantial presence at more than one location.[65] Thus, if a property is in county "A" for seven months and County "B" for five months, County "A" will assess the entire property and County "B" will not assess the property at all. No apportionment of the assessment is required.

**Habitual Situs Both in California and in Another State or Nation**

The rules of situs are often affected by the requirements of apportionment where the property has a substantial presence in more than one state. Apportionment is a process used to allocate or eliminate, based on the time of presence, the assessments or the taxes for time spent out of the state. Apportionment is allowed under current law and is expressed in relatively recent court decisions which are discussed below. First, however, a brief discussion of federal law versus a state's power to tax is appropriate.

### Federal Law Versus State Law

Federal and state law must both be observed when determining situs and assessability of items which concern or have a tax situs in states other than California because in several matters the federal government regulates interstate commerce. For example,

- the "commerce clause" (United States Constitution, article I, section 8, clause 3) grants to Congress the power to regulate interstate and foreign commerce;

- the "import-export clause" (United States Constitution, article I, section 10, clause 2) prohibits states from levying taxes on imports or exports without the consent of Congress; and

- the President of the United States (United States Constitution, article II, section 2, clause 2) has the power, with the advice and consent of the Senate, to make treaties with foreign nations.

While federal statutes do not limit ad valorem taxation by the states[66] and federal courts are prohibited from taking jurisdiction in tax assessment cases (unless it can be proved that a plain, speedy, and efficient remedy does not exist under state law),[67] related federal law does take precedence if a controversy arises.

---

[65] An exception to this rule is certificated aircraft, scheduled air taxis, and inter-county ferryboats. See *Other Special Situs Situations*.

[66] With the exemption of railroads under the 4-R Act (section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976) which prohibits discriminatory taxation against railroad cars traveling interstate.

[67] 28 U.S.C. section 1341.

It is clear that neither federal law nor the courts prohibit taxation of property that has presence in more than one state.  However, apportionment may be required.  Although there have been many state and federal court cases that deal with apportionment of taxes on instruments of interstate commerce,[68] neither the courts nor the Congress has ever specified any particular method of allocation or taxation.  Several courts have commented that a slight overlapping of taxes (which occurs accidentally because different states have different rules regarding situs) is permissible.  In general, the courts have only said that the state's tax system must provide for fair apportionment, not discriminate against interstate commerce, and be fairly related to the services provided by the state.

### *Apportionment Between States and/or Foreign Nations*

As a result of *Ice Capades, Inc.* v. *County of Los Angeles*[69] it became necessary to apportion taxes on property that has established tax situs (1) in California, and (2) in another state.  The court's ruling in this case (resulting in the *Ice Capades Rule*) made it clear that where multiple tax situs between states exists, taxes must be apportioned.  This apportionment should be based on the time of the property's presence, regardless of whether or not the other state(s) are actually assessing the property.

*Ice Capades, Inc.* v. *County of Los Angeles* involved a touring ice show which owned and operated facilities in both California and New Jersey.  The California Appellate Court held, among other things, that:

- apportionment applies only where property has a tax situs in more than one state;

- an assessee contending that some portion of property is not taxable by the state of domicile has the burden of proving by sufficient evidence that situs has been established elsewhere;

- in a borderline situation, it is reasonable to apportion the tax if the other jurisdiction actually levied a tax;

- transitory contact with other states does not establish tax situs even though the visits were annual; and

- the transitory contact of certain types of property with various states is different than "habitual presence" of other types of property (instruments of commerce) typically present at a given location.

When property has situs in California but has its permanent or primary situs in another state or country, it is taxable here only to the extent of time spent here.  When property is here on a transitory basis this rule does not apply; the property is not assessable here.  Apportionment should be calculated based on the time that property had tax situs in California versus total time (e.g., 60 days in California divided by 365 days) when a sufficient quantum of contact has established (assessable) situs here and in another state.  When the multiple situs' are verified,

---

[68] See AH 570, *Assessment of Commercial Aircraft*, for discussion of several cases involving allocation of instruments of interstate commerce.
[69] (1976) 56 Cal.App.3d 745.

apportionment may be appropriate.  A tax bill from another state, for example, is one method of verifying a situs out-of-state.  It may be relevant evidence in determining multiple tax situs, although the dollar amount of the other state's tax bill is irrelevant.

Consistent with *Ice Capades*, if a California property has a substantial presence in another nation, the California assessment should be apportioned to eliminate that time the property has established situs outside the state, whether or not the foreign nation actually taxed the property.[70] However, the assessee must prove that such substantial presence exists.  Transitory contact, such as may occur when a vessel or aircraft makes a round-the-world voyage, does not establish substantial presence.  Tax situs of the property would remain in California.

## Example:  Situs of Movable Property

Following is an example of situs determination using movable property owned by an assessee whose primary business location is outside of California.  General rules of situs were employed to make the determination.

| EXAMPLE 3.1<br>OUT-OF-STATE CONSTRUCTION COMPANY |
| --- |
| An out of state construction company worked on a two-year gas pipeline project in California.<br><br>• The equipment did not leave California during the project.<br><br>• The equipment used on the project moved into ABC County in December 2001.<br><br>• The equipment used on the project moved out of ABC County in March 2002.<br><br>• It was typical that the equipment moved in and out of a county in less than six months.<br><br>**DID THE PROPERTY ESTABLISH SITUS IN ABC COUNTY ON THE 2002 LIEN DATE, JANUARY 1?**<br><br>Under Rule 205, the property established a tax situs in California but did not establish a tax situs in a specific county.  (The property was not in transit; therefore Rule 203 does not apply.)  The equipment moved frequently, but remained in California on the lien date and for a time period both before and after, although the equipment did not remain in any county long enough to meet the six month test required in Rule 205.<br><br>Situs in the appropriate county becomes dependent on article XIII, section 14 of the California Constitution; property is taxable in the county, city, and district in which it is situated or has situs.  Thus, the property established a tax situs in **ABC County, California** on the 2002 lien date. |

---

[70] *GeoMetrics* v. *County of Santa Clara* (1982) 127 Cal.App.3d 940.  (This case involved aircraft which were not "instruments of commerce."  They were involved in airborne geophysical surveys.  The assessor was required to apportion the value of aircraft physically abroad for all or substantial parts of the year, though domiciled in California.)

## SITUS OF LEASED OR RENTED PROPERTY (RULE 204)

Situs of leased equipment is determined not only on the basis of physical location of the property, but also on the intent of the owner.  Determination of situs regarding this property is governed by Rule 204, *Leased Property*:

> Property leased or rented on a daily, weekly or other short-term basis has situs at the place where the lessor normally keeps the property.  Temporary absences from that location do not change the situs of the property.

> The situs of property leased or rented for an extended, but unspecified, period or leased for a term of more than six months shall be determined on the basis of the lessee's use.

The intent of the lessor and the lessee as demonstrated by objective facts is the determining factor in ascertaining the situs of leased or rented property.  For example, property leased to a contractor for a period of one month has situs at the lessor's location.  It is clearly the intent of both parties that the property returns to this original location; this is its permanent and tax situs.  However, where the contractor has leased the equipment for an unspecified period which would appear to extend beyond six months, the equipment is taxable at its actual location on the lien date.

### Single Assessment for Leased Personal Property

When a property owner has multiple taxable items leased throughout a county, *precise* situs of each lease becomes less important.  Section 623 provides a definition for situs by allowing assessors to combine the multiple assessments for leased equipment, owned by the same lessor, into one assessment.  Section 623 states:

> The assessor may place a single assessment on the roll for all leased personal property in the county that is assessed with respect to the same taxpayer.  Any property assessed pursuant to this section shall, in the absence of evidence establishing otherwise, be deemed to be located at the taxpayer's primary place of business within the county.

A "primary place of business" is the taxpayer's headquarters, office, or facility within the county.  If the company has more than one facility within the county, the facility with the largest equipment value is the situs that should be used for all leased equipment.  In the absence of a "primary place of business within the county", the location having the greatest value of a company's leased equipment should be considered that company's primary place of business within the county.  On the other hand, if a company has an office, warehouse, or other "primary place of business within the county", but has nearly all of its leased equipment located at a single site in a different tax-rate area, the situs where the majority of the equipment is located should be used for all of the company's leased equipment in the county.

Section 623 only applies to leased personal property assessed to the same assessee. It does not affect personal property that is not leased, and combining assessments in the manner authorized by section 623 is strictly an option for assessors to use, not a requirement.

## SITUS OF PROPERTY IN-TRANSIT (RULE 203)

Although property is normally taxable at the location where it has established permanent situs on the lien date, what is the situs of property in transit on the lien date? The answer is determined by the destination of the property, the legal owner of the property on the lien date, and the application of Rule 203, *Property in Transit*.

### Property Moving in Interstate or Foreign Commerce

Property in transit on the lien date, to or from interstate or foreign destinations, is exempt from taxation. However, it is important that the property actually be *in* transit to be exempt. Property that is otherwise taxable remains taxable until transit has commenced and may become taxable once again when transit has ended. For example, property being held or stored in railroad cars for the convenience of the owner is not in interstate transit even though it remains in the shipping cars. Property is not in interstate transit if the holding by the carrier is not incidental to its transportation.

Note that the exemption of property in interstate or foreign transit does not include instruments of commerce or property that has a permanent situs but is leaving or entering the state on a temporary basis as of the lien date. This exemption applies to property that is being moved from one established situs to another, such as equipment being shipped from a distribution warehouse to a retail store or otherwise being relocated from one factory to another.

### Commencement of Transit

Transit commences when property has either started moving on its interstate or foreign journey or has been committed to a common carrier for that purpose. However, property deposited at the point of shipment in interstate commerce but not committed to a carrier is still subject to taxation.[71]

### Termination of Transit

In general, transit has terminated when the property reaches the hands of the owner at the destination point. Property brought into the state is taxable at the point transit ends. For property tax purposes, "reaching the hand of the owner" does not, however, always mean physically. For example, when the carrier becomes entitled to make storage, demurrage, or other charges for keeping the property or when the carrier acts as a warehouse by operation of law, the property is considered to have reached the owner. Likewise, when the owner is notified that property is available for unloading, it has reached the hands of the owner. If the holding of the property by the carrier is not merely incidental to its transportation, then the transit has most likely terminated.

---

[71] *Coe* v. *Errol* (1885) 116 U.S. 517.

**Interruption of Transit**

If the temporary suspension of the movement of the property is required in order to facilitate its transportation, to prevent its destruction, or to change the method of its carriage, it is still considered in transit and remains exempt. Property may be subject to taxation when the interruption in transit is for purposes unconnected with its transportation. Otherwise, it remains exempt. The courts have distinguished between suspension and termination of transit, stating:

> Where property has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the state and is thus subject to its taxing power.[72]

## Property Moving in Intrastate Commerce

Unlike property in interstate or foreign commerce, property remains taxable while in transit within California (in intrastate commerce). Tax situs of this property among counties therefore becomes the issue.

**Situs of Property Being Transported by an Owner**

If an owner of property is transporting his or her own property on the lien date, the property has situs at the point of origin of the shipment regardless of the mode of transportation or the ownership of the means of conveyance.[73]

**Situs of Property Being Transported to a Buyer**

Property being transported to a buyer has its situs at the point of destination unless the buyer demonstrates that the seller had title until delivery, in which case it has situs at the point of origin.

Title transfer is normally an agreed upon item in the purchase agreement; property will be purchased and shipped "F.O.B. shipping point" or "F.O.B. destination." F.O.B. (free on board) designates whether the seller or the purchaser will pay freight or transportation charges and determines when title transfers. "F.O.B. shipping point" means the purchaser is responsible for the property, and title transfers, at the point of origin (at the shipping point). "F.O.B. destination" means that title remains with the seller, and he/she bears the cost of transportation, until the property reaches its destination. The Uniform Commercial Code provides that the free on board (F.O.B.) designation, unless otherwise agreed between a seller and buyer, constitutes a term of delivery. Title to property remains with a seller until he or she has completed delivery by making the property available for disposition by the buyer at the F.O.B. point. Retention of a security interest by a seller must be disregarded for purposes of determining situs.[74] If questions

---

[72] *Minnesota* v. *Blasius* (1933) 290 U.S. 1.
[73] Rule 203(a)(1).
[74] Rule 203(a)(2).

arise regarding situs or assessee, a buyer should provide the purchase agreement and/or shipping agreement in order to demonstrate the timing of the title transfer.

## Interruption of Transportation

As previously discussed, the interruption of transportation for purposes incidental to transportation does not remove property from its "in-transit status."  Interruption of transportation for business purposes or profit of the property owner terminates the transportation and generally creates a situs for taxation at the place where the property is situated on the lien date.[75]

# OTHER SPECIAL SITUS SITUATIONS

## AIRCRAFT

The guidelines for situs of aircraft depend on aircraft type.  For assessment purposes, aircraft are typed or classified as *general aircraft*, *certificated aircraft*, or *air taxis*.  Each is briefly defined below in order to properly discuss situs in relation to this property.[76]

## Definitions

### General Aircraft

General aircraft is any contrivance used or designed for the navigation of or for flight in the air which has been flown at least once.[77]  It is not a parachute or similar emergency safety device, a rocket or missile, or a certificated aircraft or scheduled air taxi as defined below.

### Certificated Aircraft

Certificated aircraft is aircraft operated by an air carrier or foreign air carrier engaged in air transportation while there is in force a certificate or permit issued by the Civil Aeronautics Board of the United States, or its successor (Federal Aviation Administration), or a certificate issued by the California Public Utilities Commission authorizing such air carrier to engage in such transportation.[78]

### Air Taxi

Air taxi means aircraft used by an air carrier which (1) does not utilize aircraft having a maximum passenger capacity of more than 30 seats, (2) does not have a maximum payload capacity of more than 7,500 pounds in air transportation, and (3) does not hold a certificate of public convenience and necessity or other economic authority issued by the Civil Aeronautics Board of the United States, or its successor, or by the California Public Utilities Commission, or

---

[75] Rule 203(a)(2).
[76] For a complete in-depth discussion and definition of aircraft types, see AH 570, *Assessment of Commercial Aircraft* and AH 577, *Assessment of General Aircraft*.
[77] Section 5303.
[78] Section 1150.

its successor.[79]  This definition can be further broken down to scheduled and unscheduled air taxis.  Scheduled air taxis are treated similar to certificated aircraft and unscheduled air taxis are treated similar to general aircraft.

## Situs of Aircraft

### General Aircraft and Unscheduled Air Taxis

General rules of situs apply to general aircraft as they do to other personal property.[80]  Situs is the location where the aircraft is habitually kept or to which it returns, when not in service.[81] When an aircraft substantially divides its time between two or more airports in California, situs becomes determinable based on a time test but no apportionment is necessary.  Rule 205(b) states:

> . . . An aircraft that spends a substantial amount of ground time at each of two or more airports has its tax situs at the airport where it spends the greatest amount of ground time.

If an aircraft establishes tax situs both in California and outside California, apportionment may be necessary and the rules established in *Ice Capades, Inc.* v. *County of Los Angeles* and *GeoMetrics* v. *County of Santa Clara* apply.

- For California aircraft, the assessment must be apportioned to eliminate the time the aircraft has established tax situs outside California.  All the remaining time—whether or not in California—is allocated to the California airport where it spends the greatest amount of ground time.

- For an aircraft that has a primary situs outside of California, but has established some situs in this state, the California assessment is based on the time actually in this state—at the airport where it spends the greatest amount of ground time—and all other time is allocable elsewhere.

### Certificated Aircraft and Scheduled Air Taxis

Certificated aircraft and air taxis using airports within this state while engaged in interstate, intrastate, or foreign commerce are taxable for an apportioned value of the aircraft based on time in this state when tax situs has been established in California.[82]  Specific statutes, sections 1150 through 1156, govern the method of apportionment when tax situs is established here.  To establish tax situs within California, intentional physical contact involving actual embarking or disembarking of crew, passengers, or freight must be made.  Emergency contact does not, in and

---

[79] Section 1154.
[80] One exception is found in section 220, *Aircraft Being Repaired*.  Out-of-state aircraft in California solely to undergo repairs are exempt from property taxation under this section even though they may be in California on the lien date.
[81] Rule 205(b).
[82] *Flying Tiger Line, Inc.* v. *County Los Angeles* (1958) 51 Cal.2d 314.

of itself, establish situs any more than does flying over the state without landing.[83]    The apportioned value is justified, even though an instrument of commerce, by the fact that the taxing jurisdiction extends opportunities, benefits, and protection to the property (the aircraft) engaged in interstate or foreign commerce during the pro rata time that the property is physically present within that jurisdiction.[84]

However, where an aircraft is foreign-owned, based, registered, and serving California airports exclusively in foreign commerce, the state is precluded from taxation.  No permanent, tax situs has been established here and thus it is not taxable.[85]

### Aircraft Repair and Replacement Parts

Aircraft parts have situs where habitually located pursuant to Rule 201, in most circumstances, but aircraft components may occasionally acquire situs elsewhere.  The following example identifies one of these situations.

| EXAMPLE 3.2 |
| :---: |
| SITUS OF AIRCRAFT REPAIR AND REPLACEMENT PARTS |
| An air carrier at all times rotates eight engines between storage repair and installation.  Two engines are normally found at the place of storage, two at another location for repair, and four are installed in operating aircraft at any one time.  The number of engines normally located at each location has situs and is assessable there. |

## VESSELS

Vessels are classified as personal property for property tax purposes.  Similar to other property, vessels may be assessed the ad valorem tax or qualify for full or partial exemptions depending upon their value, ownership, use, and/or type.  Similar to many other types of personal property, identifying a vessel's property taxing authority is a central issue many assessors contend with – that is, determining the tax situs for this type of transitory property.  Therefore, a brief discussion of vessel types and situs related to various vessels follows.  See AH 576, *Assessment of Vessels* for more information and for a discussion on vessels qualifying for exemptions.

### Definition of Documented and Nondocumented Vessels

The Revenue and Taxation Code defines vessels as "every description of watercraft used or capable of being used as a means of transportation on water, but does not include aircraft."[86]  Vessels are sub-defined as *documented vessels* and *nondocumented vessels* for assessment purposes.

---

[83] Rule 202(b).
[84] See Rule 202(c) *Allocation Formula* and AH 570, *Assessment of Commercial Aircraft*, for discussion of allocation formulas for various types of aircraft.
[85] *Scandinavian Airlines Systems, Inc.* v. *County of Los Angeles* (1961) 56 Cal.2d 11.
[86] Section 130(a).

*A documented vessel* is defined by section 130 as:

> . . . any vessel which is required to have and does have a valid marine document
> issued by the Bureau of Customs of the United States or any federal agency
> successor thereto, except documented yachts of the United States, or is registered
> with, or licensed by, the Department of Motor Vehicles. . . .

A *nondocumented vessel* is defined by exception in section 1141 as any vessel not required to be
documented.

It is important to understand the meaning of both terms for the purposes of applying vessel situs
statutes.  The term *documented vessel* has a different meaning to non-property tax agencies.  To
the U.S. Coast Guard and the Department of Motor Vehicles (DMV), the term *documented* refers
only to a vessel that is required to and does have a valid marine document issued by the U.S.
Coast Guard and not to vessels licensed by DMV.[87]  For property tax assessment purposes,
however, the definition of *documented vessels* in section 130 includes all vessels required to be
registered with DMV, as well as those documented with the U.S. Coast Guard.  Therefore, to the
property tax appraiser, both U.S. Coast Guard registered vessels and DMV licensed vessels are
*documented vessels* and are within the provisions of sections 130, 1139, and 1140.  Although
documented by the Coast Guard, vessels of more than 50 tons net burden and engaged in the
transportation of freight or passengers are not subject to the statutes set forth for other
documented vessels, as such vessels are wholly exempt from taxation.[88]

## Situs of Documented Vessels

A vessel, although transitory in nature, is assessable in California if the vessel has established
situs here.  Thus, the determination of where a vessel is legally situated has an effect on whether
or not a vessel is assessable by a California county.  As with aircraft, situs may depend on vessel
type. A documented vessel shall be assessed at the place of documentation unless the place of
documentation does not represent the situs of the vessel.[89]  Such cases may occur when:

- a vessel owner has permanently removed the vessel from its original designated situs to
  another location where the vessel has become habitually moored and the owner has so
  informed the proper assessor in writing.[90]

- an assessor can show, despite the place of documentation, original situs designation, or a
  notice that a vessel has been removed, that the vessel is permanently located in his/her
  county, provided the original county indicated that the vessel is not assessed there.[91]

---

[87] Vehicle Code section 9840 sets forth a list of all types of vessels and prescribes which ones must be registered
with DMV (and are thereby documented as defined by the assessor).
[88] Article XIII, section 3, subdivision (l).
[89] Sections 1137-1141.
[90] Section 1139.
[91] Article XIII, section 14 of the California Constitution (". . . in the county. . .  in which it is situated") takes
precedence over provisions of sections 1139 and 1140 of the Revenue and Taxation Code.

- Coast Guard documentation of a new vessel occurred after 1995.  Since that time, all documentation occurs at the National Vessel Documentation Center in West Virginia rather than in regional centers in this State.  For these vessels, the place of documentation does not represent the situs of a vessel.

- a vessel is documented outside of the state, but travels regularly in California waters, and the owners reside in this state.[92]

- a vessel that is documented in this state or when the vessel's owner is domiciled in California, the vessel may, by being indefinitely and exclusively employed within the waters of another state, acquire an actual situs there that will permit the vessel to be taxed in that state.

The county where the DMV registers a vessel, the place of documentation, is typically the county where the vessel is located and assessed.  The address indicated on the registration certificate is the mailing address of the registered owner but it does not indicate where the vessel is habitually moored, which may be different from the owner's mailing address.  The DMV stores the situs information in its computer system and passes the information along to the assessors in their reports.  To facilitate the tracking of vessel owners and vessel locations, many assessors have also established an on-line communication link with the DMV to access its database.

## Situs of Nondocumented Vessels

Nondocumented vessels, those not required to be documented by the DMV or by the U.S. Coast Guard, establish situs in the county where they are habitually moored when not in service.[93] Smaller boats that are not habitually kept at a mooring but are lifted from the water and kept in a boathouse or transported by trailers to the owner's residence or another location are taxed at the location where the boat is habitually kept.

## Situs of Intercounty Ferryboats

The tax situs of intercounty ferryboats is regulated by statute.  When a ferry connects ports in more than one county, it is assessed in equal proportions in each of the counties.  The wharves, storehouses, and stationary property ancillary to the ferryboat operation are assessed in the county or counties where they are located.[94]

## Situs of Seagoing Vessels / Home Port Doctrine

Vessels plying the high seas may constantly move between ports throughout the year.  Such vessels are generally bound by the "home port" doctrine that permits only the taxing authority of

---

[92] Section 1138.
[93] Section 1141.
[94] Section 1137.

a home port to impose a tax.  No other jurisdiction, including those ports visited by the vessel during its voyages, has the power to tax it.[95]

The "home port" doctrine, established under common law, is a doctrine which permits vessels engaged in foreign or interstate commerce to be taxed at the domicile of the owner or at the port of registration regardless of where the vessel actually happens to be located on the lien date. This doctrine has limited application in modern times, as both the United States Supreme Court, in *Japan Line, Ltd.* v. *County of Los Angeles*,[96] and the California Supreme Court, in *Sea-Land Service, Inc.* v. *County of Alameda*,[97] have described the home port doctrine as anachronistic;[98] however, the home port doctrine may be applied to seagoing vessels when no permanent situs has otherwise been established for a vessel.  Prior to 1995, owners typically documented these vessels at the port nearest to their place of domicile, which was considered the vessel's tax situs.

Annual renewal of a Certificate of Documentation for vessels documented prior to 1995 will continue to show the original port of documentation on the certificate.  Since 1995, a "hailing port," as opposed to a "home port," is now used on the Certificate of Documentation.  As a result, the tax situs for seagoing vessels put into service since 1995 is the domicile of the owner.

The home port doctrine was developed for and applied to the taxation of vessels, as distinguished from the apportionment rule that has been applied to railroad rolling stock and aircraft.  The United States Supreme Court granted the domiciliary state the power to tax in full and denied the power to tax to all other jurisdictions, regardless of where the vessel happened to be actually located on the lien date.[99]  This ruling has been consistently applied to vessels by California courts.

Despite the home port designated by an owner, a vessel's home port should be determined by a ship's actual operations and not by the fictitious home port created solely by registry.  A home port is to be distinguished from a "port of convenience".  A port of convenience has no taxing authority as it is a port where a vessel primarily at sea enters temporarily between ocean voyages to deliver goods, obtain provisions, and make repairs.[100]  If a seagoing vessel is inactive and not engaged in any kind of commerce for a period of time that cannot be considered temporary, however, it acquires a tax situs where it is anchored or moored, irrespective of any so-called home port.[101]

Due to the nature of interstate or foreign commerce and travel, the physical presence of a vessel may not establish permanent situs.  A vessel may establish a habitual or significant presence at one or more locations.  However, unlike some other types of personal property, vessels (other

---

[95] *Hays* v. *Pacific Mail S.S. Co.* (1855) 17 How (58 U.S.) 596.

[96] 441 U.S. 434, 443 (1979).

[97] 12 Cal.3d 772, 786-787 (1974).

[98] Both the *Japan Line, Ltd.* and *Sea-Land Service, Inc.* cases addressed the taxability of cargo containers.

[99] *Hays* v. *Pacific Mail* S.S. Co., supra.

[100] *Martinac* v. *County of San Diego* (1967) 255 Cal.App.2d 175.

[101] *Continental Dredging Co.* v. *County of Los Angeles* (1973) 366 F.Supp. 1133.

than intercounty ferries) are not subject to apportionment.  When sites are temporary, even when a habitual or significant presence is established, tax situs is not acquired for property tax purposes.  The tax situs of a vessel is not determined by an owner's designation of a home port but depends upon the existence of sufficient contacts, such as the use and employment of a vessel within the jurisdiction and the opportunities, benefits, or protection afforded a vessel by the jurisdiction, to satisfy due process.[102]

A sea-going vessel, therefore, regardless of whether the vessel has a "home port" or a "hailing port" designation, can acquire a new tax situs, if the vessel becomes habitually moored at a new location.

---

[102] *County of San Diego* v. *Lafayette Steel Company* (1985) 164 Cal.App.3d 690.

## Application of Situs Determination

The following is an example of making a determination of tax situs for a vessel using the sections and rules described above.  The conclusion regarding situs is specific to the information given.

| EXAMPLE 3.3 |
| :---: |
| SITUS OF VESSEL |

An assessee/vessel owner purchased a boat December 1, 2001, and registered it with the Department of Motor Vehicles (DMV) using a mailing address in XYZ County.  On February 1, 2002, the assessee filed a vessel property statement with XYZ County using the same address for purposes of registration as the assessee's mailing address and habitual place of mooring.  However, on the back of the form, he noted that the boat was now moored in Mexico.

To determine situs and taxability, the assessor contacted the assessee and gathered the following information:

- The boat was purchased in San Jose, California on December 1, 2001.
- The boat was registered January 1, 2002, and the registration address (in XYZ County) shown was the domicile of the owner's son.
- The assessee claims (without documentation) that the boat is now habitually moored in Baja, Mexico, but is unable or unwilling to verify the date or permanent address (situs) of the new habitual mooring location.  The situs address on the DMV registration certificate in XYZ County remains unchanged.
- Assessee claims permanent domicile in the State of Washington.
- The state of Washington will not register vessels without a physical inspection.

**BASED ON THE FACTS PROVIDED, THE TAX SITUS OF THIS VESSEL ON LIEN DATE JANUARY 1, 2002 IS *XYZ COUNTY* FOR THE FOLLOWING REASONS (IN ORDER OF IMPORTANCE):**

- Application for a CF number and registration with the DMV establishes situs for vessels; thus, the tax situs is XYZ County, since the assessee indicated an XYZ County address as both his mailing address and the place of habitual mooring on the registration for his vessel (section 1139).  Under California law: "Every undocumented vessel using the waters or on the waters of this state shall be currently numbered." (Vehicle Code section 9850).  The assessee's intention was to use the boat in the waters of this state.
- The assessee stated on the property statement that the boat was located in XYZ County.  This statement was signed under penalty of perjury.  (The remarks on the back of the form are not sufficient documentation verifying a different situs for the vessel.)
- If a vessel is (permanently) moved from the registered situs, an owner is required to notify the DMV by changing the address on the registration certificate or by filing another property statement or other documentation notifying the assessor pursuant to section 1139.  Since this did not occur, the situs of the vessel for property tax purposes is **XYZ County**.

## SITUS OF LINEN SUPPLY

Towels, uniforms, and other laundered linen are items normally supplied by linen supply companies.[103]  For a monthly rental fee, the company supplies linen with the understanding that the items will be replaced periodically with a fresh supply.  Soiled linen is taken back to the owner's business location for cleaning and redistribution.  In general, these linens are exempt business inventory items when not committed to lease on the lien date.[104]  Linens that are committed to lease; i.e., the lessee has a contractual right to a *specific quantity of linens* or *specific linens* (company uniforms, towels, etc.), and under the contract has a right to control the use of the linens, the *specific linens* are not eligible for the inventory exemption.

Tax situs of linens must be determined based on the type and length of the lease involved pursuant to Rules 204 and 205.  According to these rules, if the linens are rented on a short-term basis (six months or less or substantially shorter than the life of the property), they are to be assessed at the location where they are returned for cleaning.  On the other hand, if the linens are rented on a long-term basis (more than six months, or for a major portion of the expected life), they attain a situs at the lessee's location.  For example, laundries often lease readily identifiable industrial garments to service stations on a continuous basis.  Often, these garments are temporarily taken to the laundry for normal maintenance and cleaning, but they are returned to the same user (lessee) where they are used until worn out.  As such, these items are retained by the lessee for the major portion of their lives and attain a situs at the service station where they are used.  Trade level per Rule 10 and the provisions of section 623 concerning a single assessment of leased property should be considered.

## SITUS OF VENDING EQUIPMENT/GAMES

Vending machines (such as coin-operated pinball machines, food and drink vending machines, and music machines) are typically placed at various locations for extended periods of time and are only returned to the owner's business location for repair or for storage prior to disposition.  Since these machines are more or less permanently situated at various locations, they have situs where located on the lien date.

## SITUS OF CONTAINERS

### Returnable Containers

Cylinders, beer barrels, and steel drums are types of returnable containers.[105]  Typically, returnable containers require a deposit as they are not intended for sale.  The sole purpose of such containers is to provide a moveable vessel for their contents that have been sold, such as

---

[103] Similarly, linen supply hardware such as towel cabinets, soap dispensers, and soiled rag containers are supplied to remain at the customers' locations for the duration of the contract.  Situs of these items is typically the lessee location based on general situs rules.
[104] Rule 133.
[105] It should be noted that containers held for sale or lease are exempt from property taxation under the business inventory exemption.  See section 129 and Rule 133.

compressed gas, beer, and solvents.  The situs of such containers is the location to which they are returned for reprocessing or refilling (i.e., the owner's business location).

Returnable containers for soft drink beverages, pursuant to section 996, "shall be assessed only to the person in possession thereof on the lien date."  Therefore, situs of this type of returnable container is the place of possession.

Where returnable containers originate from out-of-state and are returned to the out-of-state location for refilling, the "average presence" rule set forth in *Sea-Land Service, Inc.* v. *County of Alameda* is applicable in determining tax situs.

## Semi-Permanent Containers

There are various containers that are more or less permanently located at a particular site. Examples are butane or propane tanks used for fuel storage.  These tanks are refilled at the respective locations and remain there for considerable periods.  Situs for assessment purposes is the place where they are located on the lien date.

## SITUS OF ARTIFICIAL SATELLITES

"An artificial satellite permanently located in outer space does not have a tax situs in this state."[106]  Satellites are launched into outer space and guided to their FCC approved orbital assignment where they remain until they are no longer operative.  After satellites are launched, they never return to earth.  Satellites no longer operative are moved to a location known as a "space graveyard."

## SITUS OF RACEHORSES

Section 5720.6 states that the tax situs of racehorses, subject to in-lieu taxation, is the home ranch of the owner or other place where the racehorses are quartered or domiciled and to which they normally return when not racing or in training at a race track.  If the racehorses are not quartered at a home ranch or other location when not racing or in training to race, the situs is the residence of the owner.  This determination is made at 12:01 a.m., on the lien date January 1, each year.

## SITUS OF PERSONAL PROPERTY OWNED BY MEMBERS OF THE ARMED FORCES

The Soldiers' and Sailors' Civil Relief Act provides that non-business personal property owned by active duty service personnel has a tax situs in the state of the owner's legal residence.[107] Under this act, a property's physical location may be California, but its tax situs may be in New York if the owner's legal residence is in that state.  The personal property of a service member who files a statement with the assessor declaring his or her legal residence to be in another state is therefore exempt from taxation in this state.

---

[106] Rule 206, *Assessment of Artificial Satellites*, effective January 1, 2002.
[107] Title 50 United States Code Annotated, section 574.

# CHAPTER 4:  VALUATION OF PERSONAL PROPERTY

AH 501, *Basic Appraisal,* includes a personal property chapter that gives a basic overview of the appraisal of personal property for property tax assessment purposes.  Generally, as indicated in that chapter, basic appraisal principles apply to both real property and personal property.  However, there are differences between the two.

This chapter focuses on basic and advanced valuation issues as related to personal property specifically.  In order to discuss the topics in a complete manner, some review of information previously covered in other Assessors' Handbook sections is necessary.

## REVIEW OF THE VALUE CONCEPT

Value is defined as the present worth of anticipated future benefits, or the monetary worth of a property at a given time.  It is one of the most important and complex appraisal concepts.  AH 501 includes a comprehensive discussion of the topic.  This chapter discusses value as it applies specifically to personal property.  Although the approaches to value are similar, real property and personal property differ significantly in that auditor-appraisers must estimate the market value of personal property on the lien date every year.  Annually, it must be taxed in proportion to its value as defined in section 110:

> . . . the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes.[108]

Unlike real property, personal property (with the exception of manufactured homes and floating homes) is not governed by the base year value limitations of article XIII A of the California Constitution (Proposition 13).

The annual lien date value of personal property, which must reflect market value, is unrelated to net book value (capitalized cost less depreciation) reflected on an assessee's books.  Fair market value as defined in appraisal terms and net book value as defined in accounting terms are separate concepts.  Any similarity is merely coincidental.  It is important to recognize the difference.  The court has said,

> The accountant deals with past historical cost to the present owner and by the process of amortization spreads the cost of property over its useful life.  The

---

[108] Section 110(a).

unamortized cost reflected on the balance sheet has no relation to the "full cash value," i.e., the price that a willing buyer would pay a willing seller.[109]

As mentioned earlier, an appraiser's concept of value is full cash value, or fair market value, or simply market value, as of the lien date.   In contrast, the accountant's concept of value is normally the book value of the property, the capitalized asset's acquisition cost less depreciation. This may or may not be the same as market value, as stated by the court in *De Luz Homes, Inc.* v. *County of San Diego*.   In some cases, the "historical" cost basis for property tax purposes is different from what is recorded as the book cost of the asset.   (Costs applicable to valuation for assessment purposes are discussed later in this chapter.)

APPROACHES TO VALUE

Rule 3, *Value Approaches,* which applies to both real property and personal property, discusses five approaches to value.   The three major appraisal approaches for estimating value (cost, comparative sales, and income) as discussed regarding real property, are applicable to personal property as well.   Although all three approaches to value should be considered, the use of all three may not always be appropriate.   The nature of the property, its market, and the availability of data will normally indicate which approach(es) is most applicable.   This is supported by Rule 3, which states, in part:

> In estimating value as defined in section 2, the assessor shall consider one or more of the following [approaches to value], *as may be appropriate for the property being appraised*.  (Italics added.)

The auditor-appraiser, therefore, should analyze all available information to determine the most applicable and reliable approach(es).   An appraiser should have knowledge of each approach as it applies to personal property and business fixtures to make this determination.

## COST APPROACH

The cost approach to value estimates the value of an asset or a group of assets as the original or historical cost of the asset (or group of assets), adjusted to account for changes in value since purchase and/or installation.   It is the method of valuation used most frequently to value personal property and business fixtures for assessment purposes because it lends itself to mass appraisal[110] and is employed based on information provided on yearly property statements.   As stated in Rule 6, the cost approach is particularly appropriate for property that is not over- or under-improved, and is not affected by other forms of depreciation or obsolescence.   Use of the cost approach is preferred if the following conditions exist: (1) no reliable sales data are available, (2) no reliable income data are available for the property being valued, and (3) the income of the

---

[109]  *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546.
[110]  *Mass appraisal* is "the process of valuing a universe of properties as of a given date utilizing standard methodology, employing common data, and allowing for statistical testing" according to the Appraisal Institute, *The Dictionary of Real Estate Appraisal,* Third Edition, p. 224.

property being valued is not so regulated as to make current replacement costs irrelevant to value.

Rule 6 allows and prescribes more than one type of cost approach that an appraiser may use. The three variations of the cost approach provided are reproduction cost, replacement cost, and historical cost. Although an appraiser may not utilize each variation, general knowledge of the terms and concepts associated with each is important to a thorough understanding of value in the context of property tax appraisal. Each variation is briefly described below.

## Reproduction Cost Approach

The reproduction cost approach, as a variation of the cost approach, has limited usefulness because it uses reproduction cost (the cost to replace an existing property with an identical property, a replica) as a basis for estimating value. It is frequently not possible or desirable to duplicate an existing property, due either to the lack of certain materials or trade skills or the functional obsolescence of a property.

The difficulty of using reproduction cost increases as a property ages. When a property would not be exactly duplicated, as is often the case, reproduction cost loses validity as an indicator of market. This lack of validity can be overcome if depreciation is accurately estimated, but this can be somewhat difficult to determine for an exact replica.

## Replacement Cost Approach

*Replacement cost* is the cost to replace an existing property with a property of equivalent utility[111] as of a particular date. The replacement cost concept is the most meaningful as far as the principle of substitution is concerned.

In the replacement cost approach, elements of a property that would clearly not be included in a substitute of equal utility are excluded from the estimated replacement cost. For example, a buyer may not look for an identical new property to replace an older property. The buyer would look instead for the best way to perform the same function(s). The best way may be to use the latest state-of-the-art technology and materials, or may be another used piece of equipment able to perform to specifications of equivalent utility. In making this decision, a buyer would look at various aspects of available properties. These considerations include, but are not limited to, the cost to acquire each property, the age of the properties, the remaining expected lives of the properties, and the expected cost to operate each in comparison to the property being replaced and to each other.

## Historical Cost Approach

*Historical cost* reflects the level of cost at the time of a property's original construction or acquisition, and is discussed in Rules 3 and 6 in two contexts: (1) as a method of estimating

---

[111] Rule 6(d) provides that the "replacement cost of a reproducible property may be estimated . . . by applying current prices to the labor and material components of a substitute property capable of yielding the same services and amenities, with appropriate additions . . . ".

reproduction cost or replacement cost and (2) as the *historical cost/historical cost less depreciation approach* used in the valuation of rate-regulated properties.

The replacement or reproduction cost approach is applicable to any property whose earnings or benefits are not regulated; that is, the assessor may use historical or original cost as a method of estimating reproduction or replacement cost new using price indexes or data on current prices for similar property. (The estimate must then be reduced by the amount of estimated depreciation to arrive at an indicator of fair market value.)

The *historical cost/historical cost less depreciation approach* referred to in Rule 3(d), is a variation of the cost approach frequently applied to investor-owned, regulated public utilities. The approach has little application to the county assessor and is not discussed in this manual.

## Variations of the Cost Approach

The reproduction cost approach and the replacement cost approach, as discussed in Rule 6, are the variations most commonly used to value personal property and business fixtures at the county level. In general, these variations of the cost approach use historical or original cost[112] information to estimate a reproduction cost new (current cost new to reproduce an *identical* property) or replacement cost new (current cost new to replace a property with a *similar* property of the same utility). Then, the reproduction or replacement cost new is adjusted to reflect depreciation to arrive at an assessable value.[113]   AH 582, *Explanation of the Derivation of Equipment Percent Good Factors,* and the yearly update of AH 581, *Equipment Index and Percent Good Factors,* discuss this procedure in detail and provide suggested index factors and percent good tables for use by auditor-appraisers. Use of indexes and percent good factors provided in the AH 581 based on the indicated remaining economic life of the subject property give an estimate of what the market value *should* be for a property based on a broad, but similar "market basket." In most cases it is a practical method to apply for mass appraisal purposes, although it does not always reflect all types of depreciation for all types of property; additional adjustments are necessary. Market data may also be used to develop such factors, when data are available.

When using the factors and valuation method contained in the Assessors' Handbook, an appraiser should not only estimate a full economic cost (replacement cost new or reproduction cost new) and consider all forms of depreciation that apply to a particular property, but should also be aware of the limitations inherent to this approach. It is important for an appraiser to recognize the limitations of the cost approach in regard to a specific property because adjustments may be needed, or a different approach to value utilized. The annual Business Property Statement allows property owners to identify all property specific conditions that would warrant adjustment

---

[112] Rule 6 uses the terms historical cost and original cost synonymously, the cost of the property when new. The term *acquisition cost* is, in the Rule, used as the cost to the current owner. For purposes of this manual, the terms are used as defined in Rule 6.

[113] Alternatively, one factor may be developed and used to estimate value using one mathematical operation (*original/historical cost x value factor = value estimate* as opposed to *original/historical cost x index factor x percent good factor = value estimate).*

beyond normal appreciation and depreciation guidelines.  Supplemental information that may be presented by the assessee may be valid, whether or not submitted with the Business Property Statement.  Cost components, depreciation, and the limitations of the cost approach are discussed below.

## Valid Cost Components

A property's recorded purchase price does not necessarily reflect all costs required to estimate value for assessment purposes, nor does it necessarily exclude costs which do not contribute to value.  In other words, not all costs contributing to value are booked and not all costs booked contribute to value.  For example, the booked cost may represent acquisition cost as opposed to historical cost, acquisition cost being the cost to the current owner, and historical cost being the original cost when new.  If either the historical cost or the cost to the current owner does not accurately reflect all valid cost components or market value at the time the property was purchased,[114] resulting cost approach value estimates may not be good indicators.

It is important to be aware of all cost components.  Rule 6 and Rule 10 define these costs as including labor, material, entrepreneurial services, interest on borrowed or owner-supplied funds, freight or shipping costs, installation costs, sales or use tax, and "other costs typically incurred in bringing the property to a finished state (or to a lesser state if unfinished on the lien date)."[115]

### Direct and Indirect Costs

Cost for assessment purposes may be thought of as *full economic cost*.  Full economic cost should include all market costs, both direct and indirect, necessary to purchase or construct equipment and make it ready for its intended use.  Costs which add value, direct and indirect, associated with manufacturing the equipment and/or making it ready for its intended use should be included in the full economic cost.  Not all costs add value, for example, relocation costs are not costs contributing to the assessable value of the property.  *Direct costs*, or "hard" costs, are expenditures for the labor, materials, and direct factory overhead required to construct the property whether purchased in the form of raw materials or a finished product.  *Indirect costs*, or "soft" costs, include expenditures other than labor and material necessary to make the equipment ready for its intended use.

The following listing illustrates typical costs which should be included in full economic cost, that is, those costs typically incurred in bringing the property to a finished state.  Some of the more common items are discussed in more detail in the pages following the table.

---

[114] *Dennis* v. *County of Santa Clara* (1989) 215 Cal.App.3d 1019.
[115] Personal property leased for a period of six months or less (Rule 10(c)) and certain liquefied petroleum gas tanks as provided by Rule 153 are treated differently.  See the discussion of these issues in Chapter 6.

---

**TABLE 4A**
**TYPICAL VALID COST COMPONENTS**

**Purchased Equipment**

Direct Costs

- Purchase price including sales tax, freight, trade-in allowances, and installation less discounts—(with all features & attachments)[116]

Indirect Costs

- Unbooked sales/use tax,[117] freight-in,[118] installation, etc.

**Self-Constructed Equipment**

Direct Costs

- Materials

- Labor used in construction

- Sub-contractor's fees

- Charges for equipment or equipment rentals

- Materials storage facilities (on site)

- Profit (if appropriate)

- Direct overhead

Indirect Costs

- Freight-in

- Installation (foundations, pilings, utility connections, trial runs, debugging)

- Trade-in allowances

- Interest on borrowed or owner supplied funds for construction only (finance charges for purchased equipment are not components of cost)

- Testing costs, sometimes referred to as *debugging costs* (in some instances)

- Indirect labor (construction supervision, engineering fees, administration, etc.)

- Legal fees

- Indirect overhead

- Other costs required to make equipment ready for its intended use

---

[116] Purchase price is the total consideration whether money or otherwise, section 110.

[117] *Xerox Corporation* v. *County of Orange* (1977) 66 Cal.App.3d. 746;   *County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 140 Cal.App.3d. 52.

[118] *Xerox Corporation* v. *County of Orange* (1977) 66 Cal.App.3d. 746; *County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 140 Cal.App.3d. 52.

## Purchase Price

Normally, a recent purchase price is the best evidence of the value of an asset. The Revenue and Taxation Code permits the assessor to presume fair market value from a property's full purchase price (less allowable discounts), but does not bind the assessor to rely upon it.[119]

Rule 6 contemplates the use of the original cost of the property and adjusted for subsequent price level changes. However the Rule states: "If the property was not new when acquired by its present owner and its original cost is unknown, its acquisition cost may be substituted for original cost in the foregoing calculation…." The calculation referenced here is the one involving the application of price index factors to the original cost to determine replacement or reproduction cost new.

However, the assessor should determine whether the purchase price accurately represents market value at the time of acquisition. If evidence shows that price is not a good indicator of value, it should not be used.[120] For example,

- if a seller were in dire straits and was required to sell an asset, the price might be below the maximum value a "willing" buyer in the market would pay in other circumstances; the asset may be sold for less than "fair market value";[121]

- if the transaction was between related parties (i.e., not an "arms-length" transaction), the price might be below the maximum value a "willing" buyer in the open market would pay;

- a total sale price may have been allocated to various property types (e.g., land, improvements, equipment, and goodwill); the allocation may not be an accurate indication of market value; or

- if the sale is of an ongoing business or operation, or includes non-assessable intangible property, the sales price might be above the value of the assessable property.

Therefore, the circumstances surrounding a sale should be considered: Was the property or business offered for sale in the open market? Was this an "arms length" transaction, was the sale between related parties? Was the business in financial distress?

If the acquired property includes personalty, and/or business fixtures, the auditor-appraiser must then estimate the remaining economic life of the acquired property, to determine the fair market value at valuation dates subsequent to the acquisition date. Acquisitions of entire businesses, or total assets of an entity, should be given very close scrutiny. Frequently, liabilities are assumed, intangible property may be present, and the costs recorded on the books for the various acquired asset categories are merely allocations of the purchase price, and do not reflect the true market value of the taxable, tangible personal property, business fixtures, and leasehold or tenant improvements.

---

[119] *Dennis* v. *County of Santa Clara* (1989) 215 Cal.App.3d 1019.
[120] Section 110(b) discusses use of purchase price in relation to valuation of real property. This section can be applied to personal property where appropriate.
[121] Section 110.

## Sales/Use Tax, Freight, and Installation

The general rule in determining market value is that where price is the basis of value, sales/use tax, freight, and installation cost are elements of that value.[122]    These elements should be included in full economic cost since they are part of value when they are paid.  Moreover, if these costs would have been applicable to a similar consumer using the equipment at a similar *trade level,* they may be assessable even when not paid.[123]    The costs apply at the same rate as those that apply to a similar consumer, whether actually paid or not.

However, there are exceptions to the general rule.  Equipment rented to federal instrumentalities and aircraft used by common carriers (neither of which are subject to sales tax), for example, are valued without sales tax as an element of value.  The reason in both cases is that the consumer (the federal government or the air carrier) is never liable for sales tax on purchases of such equipment.  Consequently, the reproduction or replacement cost of such property should not include sales tax, unless or until the property is put to private use or rented to a private party.[124]

Other exceptions to the general rule include a partial sales tax exemption on the purchase and lease of farm equipment and machinery, commercial timber harvesting equipment and machinery, and racehorse breeding stock.  Beginning September 1, 2001, qualified sales and purchases (including lease payments made after that date) of these types of property are exempt from the state general fund portion of the sales tax.[125]    (The partial exemption also applies to the repair and replacement parts for these categories of equipment and machinery.)  The partial exemption does not apply to any local, city, county, or district taxes.  Local, city, county, and district portions of the sales tax will continue to be included in the full economic cost of the property for property tax valuation purposes.

With regard to the exemption allowed on the equipment, the property must be purchased by a *qualified person* to be used *primarily* in the industry identified in the exemption.  *Qualified person* means any person engaged in the line of business described in each exemption and

---

[122] *Xerox Corp.* v. *Orange County* (1977) 66 Cal.App.3d 746.

[123] Property must be valued at the level situated on the lien date.  This is the trade level concept.  Thorough discussion of this topic is included later in this chapter.

[124] See the Sales and Use Tax Law for more information regarding sales tax requirements.

[125] It should be noted that there is a difference between the state sales and use tax rate ("state rate") and the state general fund portion of the sales and use tax rate.  For example, as of January 1, 2002, the state rate is 6.00%, while the state general fund portion of the sales and use tax rate is only 5.00%, as 1.00% of the state rate is directed towards local revenue funds.  The partial exemption discussed above is limited to the state general fund portion of the sales and use tax rate.  Please see the table attached to LTA No. 2002/029 for the appropriate adjustment to a property's full economic cost, based upon the asset's acquisition date.

*primarily* means used 50 percent or more of the time for such purposes. Property qualifying for this partial exemption includes:

- farm equipment and machinery purchased to be used by a person engaged in the agricultural industry and used for producing and harvesting agricultural products.[126]

- commercial timber harvesting equipment and machinery purchased to be used by a person engaged in the commercial timber harvesting industry and used for harvesting timber.[127]

- racehorse breeding stock capable of reproduction and for which the purchaser states that it is the purchaser's sole intent to use the horse for breeding purposes.[128]

For all three partial exemptions, the purchaser must complete a partial exemption certificate (as described in Sales and Use Tax Rule 1667) in order for the retailer to claim the partial exemption. Therefore, if the purchaser qualifies for the exemption and completes an exemption claim, their reported cost should only include a sales tax component for any local, city, county, or district tax. The reported cost should not include a sales tax component attributed to the state general fund portion of the sales tax.[129]

## Trade-In Allowances

In some cases, a buyer will pay for property in part or in whole with a trade-in of older property or equipment. This is a *trade-in allowance* and an element of value when using the cost approach. This allowance is part of the price paid for the property, although the price was not paid in cash. Had the trade-in allowance not been accepted as payment, the cash price would have been higher. Appraisers must, therefore, add-back any trade-in allowances subtracted from the purchase price or booked cost.

## Capitalized Interest (Interest During Construction)

Self-constructed property, property constructed by the user and put to productive use in that business, has an interest cost associated with it regardless of whether the source of funds is debt or equity and whether or not the interest is actually incurred. Therefore, an increment of interest must be identified and included when valuing self-constructed property.[130] This only applies to financing costs during the construction period. Financing costs, actual or imputed, attributable to the holding of the property after the completion of construction, including purchase financing,

---

[126] Section 6356.5 provides the exemption for farm equipment and machinery; in addition, see Sales and Use Tax Rule 1533.1.
[127] Section 6356.6 provides the exemption for timber harvesting equipment and machinery; in addition see Sales and Use Tax Rule 1534.
[128] Section 6358.5(a)(2), in part, see code section for further information regarding this exemption; in addition, see Sales and Use Tax Rule 1535.
[129] For further guidance on how this sales tax exemption affects the economic cost of property for property tax purposes, see LTA 2002/029.
[130] Rule 6.

should not be included in the cost of construction. Care must be taken to include only the interest attributable to the piece of equipment under construction.

When identifying the cost of the capital rate to apply, the following criteria should be considered:

- The rate derived should be the typical rate for the specific industry of the assessee.

- The rate should be the weighted average cost of capital, taking into consideration the typical debt-equity ratio for the industry.

- The cost of debt for long-term capital projects in most industries typically relates to long-term bonds, rather than short-term prime rate borrowing.

- Interest cost is related to and measured against the typical pattern for use of funds on any given project.

---

**EXAMPLE 4.1**
**COMPUTING CAPITALIZED INTEREST**

**FACTS:**

- A candy company constructed candy manufacturing equipment. The construction activity started on March 1, 2001, and the equipment was ready for use on December 1, 2001 (a nine-month acquisition period).

- On March 1, 2001, at the beginning of construction, the company borrowed $400,000 at 15 percent for five years to pay for the parts and material acquired for use in construction.

**WHAT IS THE INTEREST COST COMPONENT NECESSARY TO INCLUDE WHEN USING THE COST APPROACH TO VALUE?**

    Funds Borrowed to Begin Construction x Interest Rate x Time = Interest Cost

        $400,000 x 0.15 x 9/12 = $45,000

**WHAT IS THE TOTAL ORIGINAL COST OF THE EQUIPMENT (BASED ON THE INFORMATION PROVIDED)?**

    Funds Borrowed to Begin Construction + Cost During Construction = Total Cost

    $ 400,000 + 45,000  = $445,000

*Note: No interest cost is capitalized after the equipment is placed in use on December 1, even though interest continues to accrue on the $400,000 loan for the acquisition of parts and material needed for the construction of the equipment.*

---

## Testing Costs

*Testing costs* are those costs incurred during construction or installation of a production line or equipment.  Some of these costs may be assessable.

*Machinery testing costs* are costs incurred in the process of verifying that the production line is working correctly.  They are part of the installation process and are necessary in bringing the property to a finished state.  Machinery testing costs are assessable as valid cost components.

*Product testing costs*, on the other hand, are costs incurred in the research and development stage of a product, rather than during the construction or installation of the equipment.  Product testing costs would be incurred when a product is developed, for example.  These costs should not be included in an appraiser's estimate of the full economic cost of the assessable equipment.  These costs are part of inventory (part of the product) and are unrelated to the matter of bringing the manufacturing equipment to a finished state.

## FDA Validation Costs

The FDA (Federal Food and Drug Administration) defines *validation* as "confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use *can be* consistently fulfilled."[131]  It is the responsibility of the user to develop and conduct such examinations to ensure compliance with FDA guidelines specific to the industry or to a property.  Equipment or processes which must be validated may include, for example, processes such as sterilization, molding, and welding.  Thus, *FDA validation costs* are those costs incurred to establish:

> . . . evidence which provides a high degree of assurance that a specific process
> will consistently produce a product meeting its predetermined specifications and
> quality characteristics.[132]

These costs are not assessable attributes of the property to which they are associated.  Validation costs are generally incurred once at the start of a process, as distinguished from *verification costs* which may continue periodically over the life of a process.  The FDA defines *verification* as "confirmation by examination and provision of objective evidence that specified requirements *have been* fulfilled;"[133] a cost associated with maintaining property.

## Research and Development Costs

Research and development (R&D) costs are appropriately included as elements of full economic cost only when they relate to machinery or other assessable property.  Even then, R&D may be

---

[131] www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/showCFR.cfm?CFRPart=820&s, March 19, 2002.

[132] www.fda.gov/ora/inspect_ref/igs/gloss.html, March 19, 2002.

[133] www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/showCFR.cfm?CFRPart=820&s, March 19, 2002.

assessable or non-assessable depending on the specific set of facts involved.  For example, R&D relating to design or development of a tangible product which the taxpayer intends to sell is inventory and therefore non-assessable.

R&D costs may be appropriately included in assessable property when they relate specifically to the successful development and construction of machinery or other assessable property used to produce a product.  However, the appraiser must carefully scrutinize these R&D costs to determine the appropriate value added rather than simply including the total cost incurred.  R&D often involve a trial and error process, with success following a number of failed attempts. Moreover, the appraiser must be careful not to include in the value of assessable tangible personal property the value of non-assessable property created by the R&D, such as patents, trade secrets, etc.

Finally, there may be timing and allocation questions to consider.  For example, R&D costs may be incurred to successfully design, develop, construct, and test a piece of equipment to be used in a manufacturing or testing process.  To the extent that R&D is properly includable in the cost of the tangible personal property, some reasonable method should be used to recognize the contribution of the includable R&D to the value of the initial and each subsequent machine.  It would be inappropriate to allocate includable R&D costs to the first such self-constructed piece of equipment where the taxpayer plans to build additional machines of the same or similar type utilizing such R&D information.

## Discounts/Adjustments

The purchase price of equipment may reflect discounts allowed due to payment within a pre-determined period or due to the quantity purchased.  For example, a seller may offer a discount (say, 2 percent) if the equipment is paid for in-full within a short time (say, 30 days).  If the purchaser takes advantage of this discount and pays timely, the booked value of the asset would reflect the discount.  Likewise the seller may offer discounts that escalate based on the quantity purchased, and would exceed that which may be offered on smaller orders.

Discounts and rebates offered by a seller are a normal part of supply and demand in the process of setting market value, where the prudent buyer pays as little as reasonably possible and the seller charges as much as possible.  The price paid for the property after recognition of discounts and rebates represents the amount received by the seller as well as the cost to the buyer.[134] (Discounts between related parties may require further examination.)  Discounts and rebates are therefore excluded from the full economic cost of equipment for property tax assessment purposes.

Income tax credits, by contrast, are simply reductions of federal income tax liability.  They are

---

[134] The price paid by the buyer may include a sales tax component and is a valid cost component for valuation purposes.  Sales tax is not part of the compensation retained by the seller.

similar to depreciation or amortization charges against income for income tax purposes.  Other allowances that are treated similarly to income tax credits include energy tax credits and manufacturers' investment credits.  These items are therefore included in the full economic cost of equipment for property tax assessment purposes.

The purchase agreement may include a clause that provides liquidated damages in the event of the untimely delivery of equipment.  *Liquidated damages* means:

> An amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches.  If the parties to a contract have agreed on liquidated damages, the sum fixed is the measure of damages for a breach, whether it exceeds or falls short of the actual damages.[135]

In certain situations, timeliness of delivery is a critical component of a transaction.  The company purchasing the property may be in a situation where money may be lost if the equipment is not delivered by a certain date.  Consequently, a clause may be included in the purchase contract that provides for a stated amount of damages to be recovered by the purchaser if the property is not delivered by that stated date.

Liquidated damages are not part of the consideration paid for a property.  The damages a company may receive if the property is not delivered timely is not a valid adjustment to market value.  Liquidated damages are not the same as discounts, which are a normal part of supply and demand.  Discounts, a reduction in the purchase price of equipment, may be due to a payment received within a pre-determined period or due to the quantity purchased.  Liquidated damages are amounts recovered due to a breach in contract.

Other items are excluded from a property's full economic cost when "other assets" are included in a purchase contract.  Full economic cost does not include extended service plans or extended warranties, supplies, or other assets or business services that may have been included in a purchase contract.[136]  Adjustments to a purchase price for these items should be made if they contribute value to the total contract purchase price.  In addition, the effect on the purchase price for any included financing should be considered and an adjustment made, if appropriate.

The following chart is an outline of types of adjustments discussed above and the proper treatment for assessment purposes.

---

[135] *Black's Law Dictionary*, Seventh Edition (1999), page 395.
[136] Rule 10(b) and (e).

| TABLE 4B DISCOUNTS/ADJUSTMENTS | | |
|---|---|---|
| Description | Excluded from Full Economic Cost | Included in Full Economic Cost |
| Quantity discount | X | |
| Cash discount | X | |
| "Other" assets or business services included in purchase contract[137] | X | |
| Seller rebates | X | |
| Income tax credits | | X |
| Energy tax credits | | X |
| Manufacturers' investment credit | | X |
| Liquidated Damages | | X |

## Other Applicable Costs

Other costs, whether booked or otherwise, should be considered on an individual basis in relation to how they affect a property's market value.

Other costs may include, for example, those incurred in a major overhaul of a piece of equipment.  If an overhaul extends the life of an asset or increases its utility, the value of the asset may be affected.  (This should not be confused with minor repairs, overhauls, and maintenance required to continue the existing use of a piece of equipment; these costs do not represent assessable property.)  The costs associated with a major overhaul may be expensed or may be booked as a capitalized asset.  In any event, it is important to consider major overhaul costs in the valuation of equipment if the costs add value.

---

[137] Full economic cost does not include extended service plans or extended warranties, supplies, or other assets or business services that may have been included in a purchase contract.  (Rule 10(b) and (e).)

**Trade Level**

Consistent with the definition of full cash value, property must be assessed at the proper level of trade based on its location and use on the lien date.  An appraiser must recognize that property normally increases in value as it progresses through production and distribution channels, and to the consumer, whether or not the cost or value added is booked.

The trade level concept is applicable when book cost does not provide adequate information for making a fair market value appraisal.  It is a cost component which is most frequently applicable to leased equipment and self-constructed equipment.  Rule 10(a), *Trade Level for Tangible Personal Property*, explains the concept of trade level and reads in part:

> In appraising tangible personal property, the assessor shall give recognition to the trade level at which the property is situated and to the principle that property normally increases in value as it progresses through production and distribution channels.  Such property normally attains its maximum value as it reaches the consumer level.  Accordingly, tangible personal property shall be valued by procedures that are consistent with the general policies set forth herein.

Under the provisions of the rule, personal property is assessed on the basis of how it is situated or used on the lien date rather than at the book cost of the owner.  In effect, the rule provides for equal value for properties equally situated.[138]

This concept is more easily understood using the following example.

---

[138] Fixtures, and other real property, should be assessed at the appropriate stage of production as discussed in AH 501, *Basic Appraisal* (January 2002), page 12.

| EXAMPLE 4.2 |
| --- |
| TRADE LEVEL |

**FACTS:**

- ABC Grading Company purchases a bulldozer for $250,000 and uses it to prepare land for subdivision development.

- At the same time, Dozer Sales, a bulldozer dealer, purchases an identical bulldozer for $200,000 (dealer's cost) and rents it on a one-year lease to JKL Grading Company. JKL uses the bulldozer to prepare land for subdivision development, in competition with ABC.

- Concurrently, the bulldozer manufacturer (GHI) provides an identical bulldozer to its subsidiary, RST Grading Company (a competitor of ABC and JKL). The manufacturer's cost is $150,000. RST uses the bulldozer to prepare land for subdivision development, in competition with ABC and JKL.

Logically, the full economic cost for each piece of equipment should be the same. In each situation, the bulldozer is used for the same purpose or at the same trade level. If no trade level adjustments were made and the book costs were used as the sole basis for appraising, the assessments would not be the same; they would be substantially different. The trade level principle, per Rule 10, requires the assessor to estimate fair market value for the three machines and provide uniformity of assessment.

Based on the information above, Dozer and GHI's costs would require two different trade level adjustments to arrive at the $250,000 (consumer level) value. Dozer's cost ($200,000) is a dealer cost that would not include retail items such as sales tax and the dealer's profit margin. GHI's cost ($150,000) is the manufacturer's cost which does not yet include retail items missing from the dealer cost, plus items such as profit margin normally added in when the manufacturer sells the product to either the dealer or a retailer. In this case, the dealer cost is adjusted 125% ($250,000 / $200,000) and the manufacturer's cost is adjusted 167% ($250,000 / $150,000) to arrive at the proper trade level.

As illustrated in Example 4.2, the trade level concept requires adjustments based on what a consumer at that level of consumption would pay. If another consumer of like property at that level of trade would be subject to a cost (i.e., sales tax), the full economic cost should include that cost component whether or not the cost was actually incurred. However, quantity discounts, as discussed on page 66, should be excluded from full economic cost. In *Xerox Corporation* v. *County of Orange,* (1977) 66 Cal.App.3d 746,[139] the Court indicated that under the market value concept, where price is the basis of value, the sales tax and freight charges are elements of value. Consumer trade level includes sales tax, freight and installation charges and the property is valued in accordance with the comparative sales, cost or income method. The courts have also supported the trade level concept by allowing inclusion of a markup in value for interdivisional transfers of manufactured goods for purposes of delivery or to facilitate marketing.[140]

---

[139] Decision supported in *County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 140 Cal.App.3d 52.
[140] *Beckman Instruments, Inc.* v. *County of Orange* (1975) 53 Cal.App.3d 767.

Internal Revenue Code section 482 states that the Internal Revenue Service (IRS) may allocate or apportion income between two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests.  For example, if a company has a product manufactured by its related offshore manufacturer, the product's cost to the U.S. entity for income tax purposes may include the cost to manufacture the equipment plus an additional element for profit.  The standard cost plus intercompany profit is called the *transfer price*.  If the transfer price is used to determine the book cost of self-manufactured equipment, then the book cost contains or includes a trade level adjustment.  The transfer price may or may not be equal to the market value at the time of transfer since transfer price is an adjustment for income tax purposes.  An auditor-appraiser should recognize that a profit element is included in book cost and relate this cost to market value at the time of transfer to determine the appropriate trade level adjustment for assessment purposes.

The following table simplifies the application of the trade level principle:

| EXAMPLE 4.2 (CONTINUED) TRADE LEVEL | | | |
|---|---|---|---|
| | **ABC Grading** | **Dozer Sales Lease to JKL** | **GHI Manufacturer** |
| **Manufacturer's Cost** (Cost incurred to produce equipment, costs incurred to bring equipment to finished state) | | | $150,000 |
| + Value Added as Moved to Next Trade Level (mark up to include profit to manufacturer) | | | 50,000 |
| **Dealer's Cost** | | $200,000 | $200,000 |
| + Value Added as Moved to Next Trade Level (mark up to include profit to dealer, sales tax, freight, installation, and other necessary charges) | | 50,000 | 50,000 |
| **Consumer Level Cost / Full Economic Cost** | $250,000 | $250,000 | $250,000 |

In practice, determination of a trade level adjustment may be more complex because of (1) uniqueness of the equipment, (2) the infrequency of sales, and (3) the unavailability of facts necessary to determine its marketability on the lien date.  To simplify the process, keep in mind the example provided here and first determine how the property is actually held or used on the lien date.

In gathering data to determine a proper trade level adjustment, the use of a property prior to and after the lien date should be considered since it may influence how it is valued on the lien date. For example, if a lessor of copy machines uses a copier prior to and/or after the lien date but places the copier in its inventory on the lien date, that copier is properly classified as assessable equipment at the consumer trade level.

Include all costs necessary and appropriate for the property's trade level, and make adjustments for any discounts that may be appropriate.[141]   For example, if the consumer is a company that typically receives quantity discounts due to the amount of equipment purchased, it generally is appropriate to reflect such a discount in the adjusted cost (see also *Discounts/Adjustments*).

Following is an example of trade level adjustment incorporating quantity discounts:

---

**EXAMPLE 4.3**
**TRADE LEVEL WITH QUANTITY DISCOUNT**

**FACTS:**

- Alpha Company purchases a computer for $2,500 and uses it in its business.

- Beta Company purchases 1,000 identical computers for $2,100 per computer and uses them in its business.  The price difference is from a quantity discount.

- At the same time, Comp Sales, a computer dealer, purchases 1,000 identical computers for $1,700 (dealer's cost with a quantity discount) and rents them on a one-year lease to Kappa Company.  Kappa uses the computers in its business, in competition with Alpha and Beta.

- Concurrently, the computer manufacturer (Sigma) withdraws 2,000 identical computers from inventory.  The manufacturer's cost is $1,500 per unit.  Sigma uses the computers in its business, in competition with Alpha, Beta, and Kappa.

---

Logically, the cost per unit and the full economic cost of the piece of equipment to Alpha Company is $2,500 per unit.  The cost per unit and the full economic cost for each piece of equipment to Beta Company is $2,100 per unit.  It is important to recognize that trade level does not extinguish a quantity discount.  The full economic cost for each piece of Comp Sales equipment should be $2,100 per unit, since Beta Company and Comp Sales purchased the same quantity.  The quantity discount allowed for Sigma (manufacturer) needs to be determined by the auditor-appraiser.  The auditor-appraiser needs to examine the greatest quantity discount given by the manufacturer, and make an appraisal judgment to determine if a greater quantity discount is justified.  The quantity discount allowed the manufacturer, when it is its own largest customer, should be at least as large as its largest external wholesale or retail customer.

---

[141] See *Valid Cost Components* in this chapter for a discussion on full economic cost.

| **EXAMPLE 4.3 (CONTINUED)** **TRADE LEVEL WITH QUANTITY DISCOUNT** | | | | | |
|---|---|---|---|---|---|
| | **Alpha** | **Beta** | **Comp Sales** | **Sigma** |
| **Manufacturer's Cost** (Cost incurred to produce equipment, costs incurred to bring equipment to finished state) | | | | $1,500 |
| + Value Added as Moved to Next Trade Level (Mark up to include profit to manufacturer) | | | | 200 |
| **Dealer's Cost** | | | $1,700 | 1,700 |
| + Value Added as Moved to Next Trade Level (Mark up to include profit to dealer, sales tax, freight, installation, and other necessary charges) | | | 400 | 400 |
| **Consumer Level Cost/Full Economic Cost** | $2,500 | $2,100 | $2,100 | $2,100 or some value less than $2,100 |

A unique trade level problem arises when a manufacturer of equipment is also its own largest consumer, and the manufacturer routinely awards significant purchase discounts to others.  In valuing such equipment used for internal consumption, Rule 10 mandates assessment at the price this equipment could be purchased for from an outside supplier.  Such purchases would probably reflect at least the largest purchase discount awarded to any other consumer.   Additional adjustments should be made for differences in the self-constructed equipment and equipment sold to the manufacturer's customers.  Such discounts and/or appropriate retail selling prices for internally used equipment can be determined through (1) analysis of sales transactions, which reflect large customer discounts or (2) use of a gross margin mark up method.  When actual sales data are available, the first method is preferred.

Previous examples demonstrate the determination of trade level through analysis of sales transactions.   The second method of determining full economic cost when a trade level adjustment is necessary is called the gross profit method.  The auditor-appraiser may use the manufacturer's gross margins on United States sales to determine the trade level adjustment. This method should be used with caution, and only when the manufacturer has actual sales at the retail level.

| EXAMPLE 4.4<br>TRADE LEVEL ADJUSTMENT USING GROSS PROFIT METHOD | |
|---|---|
| Total Sales to End Users Only (Net of value added retailers and original equipment manufacturers) | $10,000,000 |
| Cost of Goods Sold (Net of marketing and administrative costs if not included in book costs) | 7,500,000 |
| Gross Profit | 2,500,000 |
| Gross Profit Percentage | 33.33% |
| Trade Level Adjustment (1 + Gross Profit Percentage) | 1.3333 |
| Full Economic Cost with Added Trade Level ($1,500 x 1.333 = $2,000) | $      2,000 |

To determine appropriate adjustments, information should be gathered from available sources (which may include review of accounting records to determine normal profit margin added at each level, review of cost guides, and gathering of information from equipment dealers). This information should be evaluated and determined to be appropriate prior to use. For example, when using the gross profit method, total sales should include all sales at the appropriate level; and the trade level adjustment should result in the property's full economic cost at the user's level. For any given situation, information gathering relevant to cost and evaluation of this information is an important part of the process and value estimate.

Caution must be exercised when the gross margin mark up method is used. The gross margin should reflect only those sales to end-users. If the manufacturer only sells at the wholesale level of trade, use of the gross margin method to extract a trade level factor will not bring the costs to the retail trade level. Further analysis of sales or other data will be required to determine an appropriate increment to add to achieve the retail, or end user level.

Sales to value-added retailers (VARs) and to original equipment manufacturers (OEMs) are not sales to end-users. Financial data pertaining to the sales to value added retailers or original equipment manufacturers should be extracted from the "total sales revenue" and the "cost of goods sold" to isolate those sales at the retail level. Caution should be exercised when using income statements and annual reports, because they reflect combined sales and cost of goods sold data, i.e., sales to all customers, both wholesale and retail, are consolidated for reporting purposes.

The auditor-appraiser should analyze the underlying sales records to isolate revenue, discounts, and cost of goods sold data to end users only. Sales journals of actual invoices and purchase contracts will provide relevant information concerning the appropriate quantity discounts to be reflected in the final trade level factor.

The auditor-appraiser's analysis should include an analysis of the booked costs of the self-manufactured assets, as well as the components of the cost of goods sold.  These costs should include comparable components of cost if the gross profit method is being used.  If they are not comparable the trade level factor applied will not reflect the retail level.  For example, booked costs may include material, labor, and some overhead, while "cost of goods sold" usually includes material, labor, overhead, marketing and administrative costs.  The "cost of goods sold" amount in the financial statements must be adjusted to remove marketing and administrative costs prior to calculation of the trade level factor.

During the analysis of the booked costs of the self-manufactured assets, the auditor-appraiser should review for the inclusion of sales tax on materials.  Some manufacturers pay the sales tax on materials and include it in the standard, or booked costs.  An adjustment should be made to recognize this in the final calculation of a trade level factor.

Only sales within the United States should be considered when calculating a trade level factor from the assessee's financial records.  The mark-up on exported products may vary considerably from the mark up on the sale of domestic products.

If the manufacturer is diversified and sells a wide range of products and services, caution should be exercised to isolate revenue and costs from the sale of products that are comparable to the self-manufactured asset that are being appraised.

While the trade level principle is most frequently relevant when assessing leased and self-constructed equipment, it is also important regarding other property where book cost is not indicative of costs generally incurred by the market, considering the location and use of the property.  However, caution must be exercised when applying the trade level principle.  Consider the rental of the bulldozer by Dozer Sales to JKL Grading Company in Example 4.2.  If the rental had been for less than six months (short-term lease) instead of the one-year lease specified in the example, Rule 10 directs that the bulldozer shall be assessed at Dozer's acquisition value ($200,000 dealer cost with sales tax added) instead of the $250,000 consumer-level cost.  The lessor would then be considered the consumer pursuant to subdivision (c) of Rule 10.

Trade level is an important concept in the assessment valuation process.  The Business Property Statement requires that assessees report costs at the proper trade level.[142]  During the course of an audit the auditor-appraiser should verify that the assessee compiled and reported at the proper trade level, and that all necessary and appropriate adjustments have been made.

---

[142] Rule 10.

**Depreciation of Machinery & Equipment**

*Depreciation*, for appraisal purposes, is a loss in value from any cause. It is the difference between the value of a hypothetical new, similar property and the current value of the subject property; the total measure of the reduced value at a particular point in time. In other words, it is a by-product of the value estimate.

For appraisal purposes, depreciation occurs in two different ways. First, and probably most important, the remaining economic life of a property may decline. Instead of yielding benefits for ten years as when new, a property may now have only eight years remaining service. Second, there may be a reduction in net benefits from the property. Fewer benefits may be provided, or the same benefits are provided at a higher cost (thus, fewer net benefits are provided). Thus, a decline in the remaining life or the efficiency of property causes depreciation.

The appraiser's definition and use of depreciation is fundamentally different from the accountant's definition and use of depreciation, as discussed earlier regarding value. The accountant uses depreciation to amortize a property's cost over the life of the property. Each year the accountant estimates depreciation, based on a preselected life, to recover the cost of the equipment in the most beneficial legal manner for GAAP and/or income tax purposes.

These definitional differences are represented mathematically below:

*Replacement Cost New  -  Depreciation  =  Current Market Value (Appraiser)*

*Reproduction Cost New  -  Depreciation  =  Current Market Value (Appraiser)*

*Capitalized Cost  -  Depreciation  =   Book Value (Accountant)*

The appraiser should recognize that depreciation from reproduction cost new is different from depreciation from replacement cost new when these costs are different. In situations where equipment has undergone minimal changes in technology, reproduction cost and replacement cost are likely to be similar. The appraiser cannot use the accountant's depreciation estimate when valuing an asset because he or she must determine an estimate of depreciation which directly relates to the actual loss in value the property has incurred. Accountants are not concerned with representing market value at any point in time, but are concerned only with writing off the cost incurred to purchase the asset. If book value (capitalized cost - depreciation = book value) has any relation to market value, it is only coincidental. Rather than using depreciation computed for accounting purposes as an estimate, appraisers should use methods of estimating depreciation that represent the loss in value a property has suffered.

Although depreciation may be, and most often is, estimated in a lump sum, it is important to be aware of each type of depreciation in order to determine (1) if all necessary adjustments have been made and (2) that there are no duplicate allowances for any one type. Each type of depreciation: physical deterioration, functional obsolescence, and external obsolescence, is defined and discussed below.

## Types of Depreciation Defined

A property may suffer from one or more forms of depreciation. That is, a single piece of equipment may contain elements of physical deterioration as well as both functional and external obsolescence. In some cases, calculation methodologies may be used to separately estimate the amount of depreciation attributable to each cause. In many situations, however, it may be impossible to categorize the amount of depreciation attributable to each cause. Regardless of whether total depreciation is calculated as a whole or as a sum of parts, recognizing and identifying the types of depreciation applicable to a property may aid in estimating total depreciation to arrive at value.

### *Physical Deterioration*

Physical deterioration is the loss in value which may be the result of wear and tear either from use or exposure to various elements. This type of depreciation is expected on most equipment. Virtually all properties deteriorate as they age, and it is not abnormal unless equipment is put to excessive use or misused. Good maintenance will slow the process, while lack of maintenance and overuse will increase physical deterioration.

Most physical deterioration can be corrected. However, the relationship between the costs involved and the economic benefit derived determines whether it is economically feasible to correct or repair physical deterioration. An element of physical deterioration is considered *curable* when the cost to correct the deficiency is less than the economic benefit resulting therefrom. When the cost to correct the deficiency is greater than the resulting economic benefit, the element of physical deterioration is considered *incurable*.

### *Functional Obsolescence*

Functional obsolescence is the loss of value in a property caused by the design of the property itself. When the capacity of a property to perform the function for which it was intended declines, functional obsolescence is present. Functional obsolescence may include such things as changes in taste in the marketplace, changes in equipment design, materials, or process, or poor initial design.

Changing technology commonly creates functional obsolescence for machinery and equipment, and some functional obsolescence can be or should be considered normal to varying degrees (depending upon the industry and equipment type). Older machines and sometimes newer machines or entire lines of equipment, even though still in use, may be made obsolete by new technologies and manufacturing processes and the market value may be reduced because of functional obsolescence.

Functional obsolescence may be less tangible or visible than physical deterioration, but it may be more significant. However, it may be curable. An element of functional obsolescence is considered *curable* when the cost to correct the deficiency is less than the resulting economic benefit. When the cost to correct the deficiency is greater than the resulting economic benefit, the element of functional obsolescence is considered *incurable*.

### *External Obsolescence*

External obsolescence, also known as economic obsolescence, is a loss in value resulting from adverse factors external to the property that decrease the desirability of the property.  This type of depreciation may include the loss of value due to: inflation, high interest rates, legislation, environmental factors, reduced demand for the product, increased competition, changes in raw material supplies, and increasing costs of raw material, labor or utilities without a corresponding price increase of the product.

Loss in value attributable to external obsolescence is usually beyond the owner's control and is mostly atypical depreciation.  It can, however, be normal in industries where markets have shown long-term, sustained, and predictable shifts, such as the market for semiconductor and other high-technology equipment.  It can be identified by studying the overall market conditions for a property.  For example, if the output of a machine is superseded in the marketplace by output of a different material (i.e., fiberglass for metal or plastic for wood), and the market no longer absorbs the superseded output, then the machinery has suffered external obsolescence.

## Methods of Estimating Depreciation and Value

There are several methods of estimating depreciation and value for appraisal and assessment purposes.  Appraisers may need to use one or more of these methods while determining depreciation from all causes.  Again, the appraiser's methods are not the same as the accountant's methods because an accountant uses depreciation to recover cost over a preselected useful life of the property as determined by GAAP and/or federal and state income tax laws while an appraiser uses depreciation to estimate market value.[143]

### *Market Method*

The Market Method of calculating value factors (and/or developing depreciation tables) relies on market data, with adjustments made for relevant property characteristics incorporated (see Appendix H).  It is a method of estimating a property's total depreciation directly without utilizing indirect engineering economics calculations.  The market method is the preferred method when reliable data[144] are available because it captures all forms of depreciation, including both external and functional obsolescence.

Using a variation of this methodology, an analyst and/or appraiser may gather market data for identical or similar property to compare the used price of an asset to the original new price of that same asset.  The difference is the analyst and/or appraiser's estimate of percent good (used price / new price = percent good factor or value factor)[145] at the age it was at the time of

---

[143] Assessors tend to utilize equipment index factors and percent good factors published by the Board for the majority of appraisals concerning machinery and equipment, and fixtures.  However, different methods of estimating depreciation and value may be appropriate.

[144] See AH 501, *Basic Appraisal*, Chapter 6, under the discussion of the cost approach for information regarding data collection and analysis.

[145] Using the market method, a combined factor may be estimated similar to the result of multiplying the index factor and the percent good factor used from AH 581 tables discussed in this chapter.

sale. The estimates are reduced to a table of value factors (similar to a depreciation table and/or the percent good tables published by the Board) and arrayed on a scattergram. A best-fit curve, passing through the entire mass of points, estimates average value factors at each age and the average decline in value per year. (It is usually set to 100 percent at age 0 in order to correspond with the assumption that a new asset is purchased at its market value when new.)

The Board used a similar market methodology to calculate the computer valuation schedules from market data. (These tables are provided in the annual update of AH 581, *Equipment Index and Percent Good Factors*.) The Board also recommends this method in AH 501, *Basic Appraisal*, as applied to real property.[146] When reliable, accurate, and representative data are available regarding machinery and equipment, and fixtures, use of this approach (or a modified version) is the preferred method.

### Equipment Index Factors and Percent Good Factors

The valuation of personal property and business fixtures for assessment purposes most often involves the use of a mass appraisal method. The property statement is organized to facilitate the use of such a method, specifically equipment index and percent good factors. Property (normally equipment) is valued based on information reported on property statements. Each piece of equipment is not identified and valued separately, but rather, the equipment is valued as a group based on the type of business and the classification of the property.[147] The first step in the calculation process is to "trend" the historical cost of the property to an estimated reproduction or replacement cost new (cost x index factor). This trending is accomplished using an equipment index factor. The next step is to multiply the trended historical/original cost by a percent good factor to estimate the market value of the property, reproduction or replacement cost new less normal depreciation.

As explained in AH 581, *Equipment Index and Percent Good Factors,* and AH 582, *Explanation of the Derivation of Equipment Percent Good Factors,* equipment index factors and percent good factors are computed and published by the Board for use in estimating reproduction cost new and equipment value, respectively. The tables provided in AH 581 are based upon data for different types of property. Percent good factors in AH 581 use the present worth relationship principle. These factors also assume a constant rate of net income decline. If a rate of income decline different from that assumed in the tables occurs and can be demonstrated, a recomputation should be made by adjusting the income adjustment factor. This in turn will alter the percent good factors to be used. A discussion of the factors, the equipment index factor and the percent good factor, is included here in a general context. This discussion is not meant to represent a study of the topic, but rather an overview to facilitate the application of the factors. For more information, refer to AH 581 and AH 582.

---

[146] AH 501, Chapter 6, under the heading "Measurement of Accrued Depreciation."
[147] An exception is Form AH 571-F (Agricultural Property Statement). Each piece is listed separately on this form. See Chapter 7 for a complete discussion of property statements.

**Equipment Index Factors**

Equipment index factors are developed for use in mass appraisals and are generally reliable and practical for converting historical or original cost to estimates of reproduction cost new or replacement cost new for mass appraisal purposes. Index factors are used to adjust a property's original cost for price level changes since the property was acquired.   The index factors recommended by the Board, updated and distributed annually, include three separate index factor tables: Table 1, Commercial Equipment, Table 2, Industrial Equipment, and Table 3, Agricultural and Construction Equipment.   The tables rely on indexes published by the U.S. Government Bureau of Labor Statistics (BLS) and on information published by Marshall & Swift Publication Company.

The indexes published by the BLS and Marshall & Swift are intended to track price changes for an identical product sold under identical terms over time, such that the indexes approximate an estimate of reproduction cost new.  Thus, when the original cost of property is multiplied by the Board's index factor for the year of acquisition, the product typically approximates current reproduction cost new.

Reproduction cost is the cost to replace an existing property with an identical property, a replica. Replacement cost is the cost to replace an existing property with a property of equivalent utility. The significance of the difference between these two types of the cost approach arises when property has experienced significant functional obsolescence.  Functional obsolescence is the loss of value in a property caused by the design of the property itself.  In cases where the property has experienced significant functional obsolescence, the original piece of equipment would not be replaced by an identical substitute.  The buyer would instead look for the best way to perform the same functions.  In either case, replacement cost or reproduction cost, the cost of equipment should be adjusted for depreciation to arrive at an estimate of market value.

As indicated earlier, the index factors provided by the Board include three separate index factor tables – commercial equipment index factors, industrial machinery and equipment index factors, and agricultural and construction equipment index factors.  Prior to 2002, the commercial equipment index factors (Table 1) were presented in AH 581 as 12 separate classes of equipment and the industrial equipment index factors (Table 2) were presented as 6 separate groups of industries.  Beginning with the January 1, 2002 lien date, the commercial equipment index factors were averaged into one table and the industrial equipment index factors were averaged into one table.  Averaging of the multiple categories of equipment index factors continues to produce results within an acceptable band of value.  In addition, the averaging provides administrative benefits to assessors when assessing business property.  The index factors in AH 581 are intended to be used to provide a time-efficient method of making reasonable estimates of reproduction cost for typical properties; the factors are a tool for estimating fair market value.

Price Changes

Price changes are usually an increasing factor (inflation).  During those periods of time when the cost of raw material and/or labor actually declines, however, price changes may be a decreasing factor (deflation).  Price changes are measured from a base year, in which a beginning index number is typically set at 100.  If raw materials, labor and other costs rise, the index will probably increase.  In a period when the costs of the factors of production decline, the index may decrease.

Effects of Technological Progress

If technological progress has occurred since the acquisition date of an asset, the cost of producing a functionally superior but physically similar asset may now be lower.  Consequently, the current replacement cost new of previously existing assets will probably decline.  High technology equipment, for example, typically suffers greater than normal functional obsolescence due to technological progress.

In situations where equipment has undergone minimal changes in technology, reproduction cost and replacement cost are likely to be similar.  In industries where equipment is undergoing rapid changes in technology, further adjustments are likely to be needed.  Board staff has identified a few industries where equipment has experienced rapid changes in technology.  AH 581 includes separate tables for the valuation of computers and related equipment, semi-conductor manufacturing equipment, and biopharmaceutical industry equipment and fixtures.[148] Indications of changes in technology may include increased capacity of new equipment, changes in equipment design, material, or process, or lower costs for new equipment.  The effects of technological advance may include the increased capacity of new equipment, changes in equipment design, materials and processes, and lower costs for new equipment.  Forces that may cause obsolescence include changes in taste in the marketplace and regulatory requirements.

Assessees may present evidence to the assessor to support their estimation of market value when they believe that application of the index factors does not produce results within an acceptable band of value.  Evidence presented to the assessor should be reviewed and considered. (Evidence presented to the assessor at the time that the business property statement is filed allows the assessor time to review and consider the evidence prior to the closing of the assessment roll.)  The evidence may be presented in the form of an independent appraisal, a market study, price lists for new equipment, and/or data from used equipment price guides.

An independent appraisal is an appraisal conducted by an unrelated firm that specializes in the valuation of personal property and fixtures.  The appraisal typically includes a listing of all of the

---

[148]  In years 1997, 1998, and 1999 valuation tables for computer related and semi-conductor manufacturing equipment were distributed via *Letters To Assessor*s.  Beginning in year 2000, the valuation tables were included in AH 581.  The "interim" biopharmaceutical industry valuation table, effective January 1, 1999, was distributed via LTA No. 99/54; this table is now also included in AH 581.  Index factors for state assessed properties are available upon request.

property included in the valuation.  The appraisal may include itemized valuations of each piece of equipment or a total value estimate.  The format presented must clearly identify the appraisal approach and may vary depending on the appraisal approach (i.e., cost, comparative sales, and income) utilized by the appraiser.

The evidence may also be presented in the format of a market study.  An example of a market study is described as the market method presented earlier in this chapter and in Appendix H.  The market method is any method of calculating value factors (and/or developing depreciation tables) which relies on market data, with adjustments made for relevant property characteristics incorporated in the data.  Data used for the market study should include recent market sales that meet all conditions of an arms-length transaction.  Data from bankruptcy and/or liquidation sales would not provide indications of market value.

Price lists for new equipment and price guides for used equipment are other sources that may be used to value personal property.  When reliable evidence of current replacement costs is available in a viable format, it is more appropriate to use market-indicated costs rather than trended historical costs.  Price lists and used equipment price guides provide market-indicated costs.  If price lists for new equipment are utilized, adjustments may be necessary if the equipment being valued is no longer available in the market.  In addition, depending on the technological advances in some industries, the price lists for new equipment may not provide any benefit.  With regard to used equipment price guides, if no market exists for used equipment in a particular industry, such guides may not be a useful alternative.

The methods mentioned above are provided as examples of methods that may be utilized to determine fair market value when it is necessary to test whether the application of index factors and percent good factors in AH 581 provide an acceptable value indicator. Other methods may be presented depending on the type of data available.

Some areas the assessor should consider when reviewing evidence presented include the following:

- Are causes of rapid change of technology apparent in the industry?

- Does the appraisal utilized by the assessee to estimate fair market value include appropriate adjustments?

- Are the data provided by the property owner verifiable?

- Were the data applied/interpreted correctly?

**Percent Good Factors**

In a mass appraisal program, percent good factors are frequently used in estimating depreciation. Percent good, as a percentage, is the complement of depreciation. For example, if total depreciation is 20 percent, then percent good is 80 percent. The percent good concept is used in the appraisal process for two reasons: (1) it focuses the appraisal on the benefits remaining or the economic life remaining in the property rather than the benefits used; and (2) it saves one arithmetical operation when estimating market value.

Percent good factors are provided by the Board in AH 581, *Equipment Index and Percent Good Factors,*[149] for use in valuing personal property and fixtures. In general, an average service life[150] estimate is needed in order to utilize the table. In mass appraisal situations, estimating life for each piece of equipment is not practical; therefore, service life is not generally estimated on an individual basis. (It may occur in practice, however, when the assessee files an appeal, when an audit is conducted, or when equipment is self-constructed.) Average service life can be estimated by an appraiser based on a mortality study of individual acquisitions and retirements (see Appendix I), historical usage of property, useful life expectancy as reflected by the applicable industry, or other information as available. When an item is not new, the tables may be applicable based on the item's *remaining economic life*[151] since the remaining economic life is usually greater than the original average service life minus age. This occurs because in any group of equipment, some items "die" prematurely, so the life of the remaining items would generally exceed the average service life.

Any percent good table or depreciation schedule, including those published by the Board, should be used only as a guide in the estimation of value. They may reflect more or less depreciation than the actual market indicates. If equipment has experienced abnormal, excessive, or even less-than-expected depreciation, the percent good factors may not be reliable. In this case, a percent good factor could be used in combination with another method of depreciation calculation, or it may be necessary to use another approach to value altogether. This is also true if the equipment is unique, if limited cost information is available, or if age or expected life estimates cannot be accurately determined. There may be instances when an appraiser should verify reproduction or replacement cost new less depreciation by other approaches before accepting a mass-appraisal indicator such as the indicator developed from an AH 581 table as the best indicator.

---

[149] AH 582 discusses derivation of the percent good factors included in AH 581.
[150] The average life term of a group of items.
[151] The expected remaining life of the property on the appraisal date.

### Sampling

Indexes published in AH 581 are based on government price indexes derived by market sampling. When necessary, and resources are available, the assessor may conduct similar such studies to derive his or her own indexes.

In order to promote uniformity in appraisal practices and values throughout the state, the Board issues information and data relating to commercial and industrial property. This information includes, but is not limited to, appropriate index factors and percent good factors. Most counties do not have the staff to conduct independent and statistically sound sampling procedures to develop their own valuation factors. Moreover, when counties develop and use different valuation factors for property, value inequities may result between counties for the same type of property.

Most notably, where the equipment index and percent good factors provided by the Board and other approaches to value and methods of estimating depreciation are not good indicators of value, an assessor may wish to use some type of sampling methodology to develop his or her own factors. To use sampling, assessors and auditors must develop and use recognized methods that will be accepted with confidence by the Board and assessees. In developing a sample plan, technique, and program, an interested reader should consult a textbook on statistics for information on the theory and application of sampling. For an example, see the Board's *Sales and Use Tax Audit Manual*, Chapter 13: *Statistical Sampling*.

### Straight-Line or Age-Life Method

Under this approach, depreciation is estimated by dividing the actual or effective age of the property by the estimated economic life. The straight-line or age-life method is based on the relationship between physical age and estimated economic life. Physical life, or age, is the time the equipment has existed. Economic life of a property represents the period of time during which the property has value.

Although straight-line depreciation may have little or no bearing on market value, effective age should be recognized whenever data reasonably indicates that effective age is different than actual age. *Effective age* is the "age indicated by the condition and utility of a structure"[152] (or property). Because there may be a large variation in the condition of property having the same age, the effective age (as opposed to the actual age) is the best indicator of the market's perception of age.

This approach does not reflect the relationship between the present worth of the future earnings of the property versus the present worth of future earnings of a new replacement property. It ignores the principle that money has a time value (income earned in the near future has a greater value than the same amount of income to be earned in the distant future). Thus it tends to understate the economic value of older property that is producing a current income comparable to the current income that would be produced by a new replacement. Conversely, this method

---

[152] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, s.v. "effective age."

does not reflect additional depreciation that should be recognized if the existing property benefits are *less* than the benefits that would be earned by a new replacement.

### Cost to Cure Technique

This technique may be used to measure physical deterioration and curable functional obsolescence. It requires the appraiser to estimate the cost to cure items of physical deterioration and functional obsolescence that are in fact curable. However the cost to cure technique cannot measure incurable functional obsolescence or external obsolescence.

### Production Output or Service Hours Method

The Production Output Method is based on the assumption that an asset is acquired for production, and it depreciates in relation to units produced. To use this method of calculation, an estimate of total ultimate output is required. (The estimate can be in production units or service hours.) Full economic cost divided by the estimate of total ultimate output gives the depreciation charge for each unit of output. Like the straight-line method, this method ignores the economic value of future earnings and thus understates the value of a property if net operating income is comparable to a new replacement property, and overstates the value to the extent net operating income is less than a new replacement property.

### Utilization Adjustment

A utilization adjustment to a Replacement Cost Less Normal Depreciation (RCLND) estimate may be appropriate when equipment is significantly underutilized, that is, it may be appropriate when property is not used at design or expected capacity. This condition of underutilization may exist because of functional obsolescence, external obsolescence, or a combination of both, but usually originates with external forces. These external forces diminish the demand for use of the property which results in the existence of property with capacity that would not be replaced. The condition may also occur due to errors in initial planning. The adjustment is analogous to an abnormally high vacancy factor used to calculate net operating income for use in the capitalized income approach to value.

Utilization adjustments may be made when there is excess capacity that is beyond the control of a prudent operator that is recognized by the market. Generally, the amount of obsolescence is a function of the difference between the replacement cost new of the existing property versus the replacement cost new of a property with a capacity that is adequate for the foreseen requirements. However, operation at below design capacity will not always translate to an equivalent percentage amount of obsolescence (i.e., operating at 75 percent of design capacity may only equate to a 10 percent increase in obsolescence). An explanation of this seeming incongruity is demonstrated in pipeline valuation. Much of the cost of constructing a pipeline is the same regardless of the design capacity because installation charges do not vary proportionally to the diameter of the pipe. Cost is much the same regardless of the design capacity. Consequently, a pipeline with a physical utilization of 90 percent of design capacity is considered to be at 100 percent of economic utilization because the replacement cost new of a

pipeline with the lower design capacity would cost essentially the same as the replacement cost new of the existing capacity.

To make a utilization adjustment when appropriate, for excess capacity affecting value, information should be gathered and an appropriate means for estimating the adjustment should be determined.  The Board's Valuation Division, for example, has a formula for reducing the RCLND of pipelines that are clearly oversized for the foreseeable future.  The calculation begins with knowledge of the level of the foreseeable physical utilization of a pipeline segment (the "load" factor) which is expressed as a percentage amount.  This "load" factor is converted to a "utility" factor which is also expressed as a percentage amount; this calculation is non-linear.  The utility factor represents the ratio of needed capacity to design capacity and it is applied to an RCLND estimate to reach an estimate of Replacement Cost Less Depreciation (RCLD).  In similar fashion, the American Society of Appraisers utilizes a calculation which captures loss in value due to underutilization.  The appraiser must use care in applying this methodology.[153]

As mentioned above, this type of adjustment is not appropriate for all or even most types of properties (or equipment).  Even when a property operates significantly below design capacity, there may be no under-utilization and a utilization adjustment would not be appropriate.  However, when evidence reasonably demonstrates that replacement property would have a lower capacity, a utilization adjustment may be appropriate.  Sound appraisal judgment is necessary to determine if such an adjustment is appropriate.  A study of the facts pertaining to that particular property is necessary to determine how to arrive at any appropriate adjustment.

Following are some suggested items, but not a complete list, to consider if there is a question of excess capacity.

- Is full capacity ever needed or expected?

- Does the definition of capacity take into consideration down time for repairs and maintenance?

- Does the capacity reflect intended product mix?  (Different product mixes may create different capacities.  A finer product may take longer to mill than a coarser product, for example.)

- What is the normal utilization for users of similar equipment (what utilization do purchasers of new similar equipment anticipate, what is the property owner's definition of capacity)?

- How does the current and future expected utilization compare with the utilization when new?

- What is the cause of the excess capacity?  (External obsolescence is a valid reason; normal seasonal or even daily variations do not constitute excess capacity.)

---

[153] American Society of Appraisers, *Appraising Machinery and Equipment*, McGraw-Hill (1989) p. 104-105.

- Could a larger capacity machine have been installed to take advantage of off-peak utility rates?

- Is the problem industry-wide or is it the individual owner?  (An industry-wide excess capacity is indicative of external obsolescence; individual excess capacity may be a business enterprise problem that should not be reflected in the value of the property.)

- Is there evidence that the equipment would be replaced with substitute equipment of lower capacity?

## Limitations of the Cost Approach

An appraiser cannot assume that the cost approach, or any approach, automatically provides the best indicator of value.  All available information must be analyzed to determine the best indicator of value.  When available or possible, it is best to compare the estimated value to actual market value of similar property to verify accuracy of results.

The cost approach, like other approaches to value, is not valid unless it is made as of a specific date.  The fluctuating purchasing power of money, together with changes in the efficiency of labor and changing techniques of production, and other economic factors cause costs and depreciation to vary over time.  It is therefore essential to specify that costs are as of a certain date (i.e., the appraisal date) in order for the principle of substitution to be meaningful.  The more current the costs, the newer the property, the more reliable and valid the cost approach to value will be.

The cost approach is also limited by the accuracy of the information used.  If the cost and depreciation estimates are skewed or otherwise unrepresentative of the property, the resulting value will not be an appropriate representation of the property's market value.

### *Summary of the Cost Approach:  Example*

The following example illustrates the valuation of a piece of equipment using the cost approach method of valuation.  Keep in mind, however, when the cost approach is applied to personal property and fixtures it is normally applied to groups of equipment and fixtures (rather than on a piece by piece basis) and such detailed information may not be available.  The example illustrates an application of the approach and is used to summarize the discussion in the text.  It is not controlling in all situations.

| EXAMPLE 4.5 |
| :---: |
| USE OF THE COST APPROACH |

Company C acquired a bookbinding machine in 2000.  Details of the acquisition are as follows:

- Invoice cost (including sales tax) $40,000.
- A 1 percent discount was allowed because payment was made in cash within 30 days.
- Company C's Transportation cost of $1,200 was paid to deliver the machine to the factory.
- Cost of installation was $2,430.  This included labor, materials, including a raised flooring to accommodate the new machine.
- The engineer spent 2/3 of her time during July on trial runs of the new machine.  Her monthly salary is $9,000 per month.
- An allowance of $5,500 was granted by the supplier because the machine proved to be of less than standard performance.
- One year extended service warranty included in purchase cost, retail value $500.  One-year supplies (exempt as inventory) included in purchase cost, retail value $500.

**NO MAJOR TECHNOLOGICAL CHANGES HAVE BEEN MADE TO THIS TYPE OF PROPERTY SINCE ACQUISITION.  WHAT IS THE MACHINE'S ASSESSABLE VALUE ON THE 2002 LIEN DATE?**

**A.  Computation of Full Economic Cost:**

| | | |
| :--- | :--- | ---: |
| Invoice Cost | | $40,000 |
| Less: | Discount | (    400) |
| | Rebate/Allowance | (  5,500) |
| | Non-property items | (  1,000) |
| Add: | Transportation Cost | 1,200 |
| | Installation Costs | 2,430 |
| | Machinery Testing  Cost ($9,000 salary x 2/3) | 6,000 |
| **Full Economic Cost** | | **$42,730** |

**B.  Computation of Value**

Using the Board's index factors and percent good factors, the auditor-appraiser determined that the equipment falls into Table 2: Industrial Machinery and Equipment Index Factors with an estimated economic life of 15 years.  From the tables, the index factor is 1.01 and the percent good factor is .90.  Using this information, the full cash value (assessable value) is estimated:

$42,730 x 1.01 x .90   =                                    **$38,842**

**C.  Computation of value using known current Replacement Cost New**

If the current replacement cost new of a comparable machine (including sales tax, freight, installation, etc.) is known, that RCN should be used rather than the index factored original cost in the calculation of value.

## COMPARATIVE SALES APPROACH

The comparative sales approach may be defined as any approach that uses direct evidence of the market's opinion of value of a property.  It is based upon the principle of substitution, that is, the fair market value of an item is closely and directly related to sales price (under the conditions of fair market value) of comparable, competitive properties.  Thus, this method presumes that the value of a property will approximate the selling prices, listings, offers, the opinions of owners and appraisers, and appraisals of competitive substitutes.  Ideally, however, value is estimated based not only on an opinion of value (such as list price), but measured by actual purchases of comparable properties.

Sale prices of comparable properties provide an indication of what the market is willing to pay for that type of property at that time.  For personal property, value guides and price schedules which reflect the going market price for comparable equipment and which estimate the current value of specific types of equipment can be used as the basis for determining market value of similar equipment.  Adjustments should be made when the condition of the subject property is above or below average.  Additional elements of value seldom reflected in sales comparison value guides are sales tax, freight, discounts, and other costs unique to specific equipment.  These costs must be added to (or subtracted from) the sales price of equipment where appropriate to arrive at full cash value for property tax purposes.[154]

The comparative sales approach is limited in its application to personal property and business fixtures, and is used less often than is the cost approach to value, because (1) most types of personal property and business fixtures are resold infrequently (limited sales data are available), (2) sales data, when available, are generally limited by comparability, and (3) in many cases, personal property and business fixtures are not sold without affecting other property (whether real or personal property).  This approach is, however, applicable to personal property and business fixtures that are frequently exchanged in the market when their exchange does not affect other items, such as agricultural and construction equipment, boats, and airplanes.  Sales comparables would usually not be good indicators of value for other types of property that require extensive testing or considerable installation costs.

### Sources of Information

The appraiser may utilize valuation guides in making the appraisal estimate when sufficient information regarding the make, model, etc., of the equipment is reported on the property statement, or otherwise available (such as through audit), and when such guides are available.  When using the comparative sales approach to value real property, numerous sources of data are available.  When valuing personal property and/or fixtures, this is not always the case.  The following table includes a short list of valuation guides available for use in valuing personal property.  Other available publications, which may be helpful, are listed in *Appraising Machinery and Equipment*.[155]

---

[154] *Xerox Corp.* v *Orange County* (1977) 66 Cal.App.3d 746.
[155] American Society of Appraisers, *Appraising Machinery and Equipment,* pages 53-57.

| TABLE 4C | | |
| SOURCES OF INFORMATION | | |
| Equipment Type | Name of Publication | Phone Number |
| --- | --- | --- |
| Agricultural Equipment | *National Farm Tractor and Implement Blue Book* | 800-654-6776 |
| Agricultural Equipment | *Official Guide — Tractors and Farm Equipment* | 707-678-8859 |
| Construction Equipment | *Green Guide for Construction Equipment* | 800-669-3282 |
| Vessels | *BUC Used Boat Price Guide* | 800-327-6929 |
| Vessels | *N.A.D.A. Appraisal Guides* | 800-966-6232 |
| Vessels | *National Boat Book Official Used Marine Valuation* | 800-654-6776 |
| Aircraft | *Aircraft Bluebook Price Digest* | 800-654-6776 |
| Aircraft | *Vref Aircraft Value Reference* | 800-773-8733 |

When reliable comparables are available, whether from sales in the market, value guides, or other sources, the comparative sales approach may be preferable to other value approaches. Following is an example where such sales are available and value is determined using the comparative sales approach as discussed in this section.

| EXAMPLE 4.6 |
| USE OF THE COMPARATIVE SALES APPROACH |
| --- |
| John Jetski purchased a new 1990 Bayliner boat with a 110 HP mercury engine and trailer in 1990 for $15,000.  On the 2002 lien date, this boat was located in the county and was assessable.<br><br>The following information was available to and gathered by the appraiser:<br><br>&bull; The assessee is planning to sell the boat to his brother next month for $1,000 because he is moving out of state.<br><br>&bull; A similar boat (with trailer) was seen advertised in the local newspaper for $9,000.<br><br>&bull; Research in two separate value guides found a value range from $6,500 to $8,000 for this particular boat in average condition.<br><br>&bull; An inspection of the boat and a conversation with the assessee found the boat to be in average condition for its age.<br><br>The assessee argues that the boat's value is $1,000.<br><br>**USING THE COMPARATIVE SALES APPROACH TO VALUE, WHAT IS THE ESTIMATED TAXABLE VALUE OF THIS VESSEL?**<br><br>The estimated taxable value of the boat is between $6,500 - $8,000 using two separate used-boat value guides.  The assessee's estimate of value, $1,000, does not represent market because it is not an arm's length transaction, has not occurred under normal circumstances, and is not a "sale" (the sale has not occurred yet).  The appraiser in this case estimates the value at **$7,500, which includes sales tax**. |

## INCOME APPROACH

The income approach to value includes any method of converting an anticipated income stream into a present value estimate. This approach can be considered as an approach to value when the subject property meets three assumptions:

1. Value is a function of income (i.e., the property is purchased for the income it will produce).

2. Value depends upon the quality and quantity of the income stream (i.e., the investor demands a return of and on his/her investment in the property).

3. Future income is less valuable than present income (i.e., the value of the property is the sum of the present worth of its anticipated/future net benefits).

When any of these do not correspond to the reality of the property, the income approach to value should not be given great weight as an indicator of the property's current market value.

The income approach has limited application to personal property and fixtures because it is often extremely difficult to attribute an income stream directly to individual items of personal property and fixtures. However, the income approach can be applied to leased personal property or other personal property to which an income stream can be attributed. The approach can also be used to estimate personal property as a residual amount. For example, the value of an entire manufacturing plant can be estimated using the income approach, with the value of the constituent personal property then estimated as a residual by subtracting out the (presumably) known values of any real property and other assets.

A general discussion and explanation of the income approach to value is included in AH 501, *Basic Appraisal,* and the income approach chapter of AH 502, *Advanced Appraisal*. These sections will not be repeated here. Below is a short discussion of how, and when, the approach can be applied to personal property. When using this technique, refer to the above mentioned sections for additional in-depth discussion of the income approach.

There are several aspects of appraising personal property that may differ from those encountered in the valuation of real property. These include:

- Verification that the income is truly attributable to the property. In many cases, the "rental" or "lease" income is significantly influenced by business activity, personal services, sales or services directly related to the rented property (the rental amount could be artificially high or artificially low), or other non-property factors. In such cases, the income approach is unlikely to measure the value of the personal property unless the income attributable to the property can be isolated.

- Caution in the selection of the remaining economic life. Since personal property usually has a much shorter economic life than real property, an error in the estimate of remaining economic life will have a much greater impact than it will for real property.

- Difficulty in finding market evidence for capitalization rates for personal property as compared to real property.

Despite the problems, where income(s), capitalization rates, and economic life estimates are available and reliable, the income approach is equally valid for personal property as it is for real property.

The income approach is often most applicable in the case of leased personal property because an income stream can often be directly attributable to leased personal property. Much of the following discussion is in the context of leased personal property. As discussed below, other issues arise in an appraisal of leased personal property under the income approach.

The components that make up the value of personal property are the costs of manufacturing the item, transportation of the item, installation of the item, and profit markups. Additionally, a sales tax or a use tax component must be added. The components of the value of personal property may be borne by either the lessor or the lessee. Payment of expenses by the lessee does not diminish the value of the personal property. The terms of the lease agreement or rental contract should be carefully analyzed to insure that all costs are included in the valuation process. When the costs of transportation or installation are paid by the lessee, the economic income may have to be adjusted to include a charge for these expenditures in the valuation process, or the costs may be added as a lump sum to the capitalized earning ability of the income stream. However it is done, all property expenditures must have been properly identified and included in the value of the (leased) equipment.

Maintenance of the property, on the other hand, may make up part of the lease cost but is not a component of value. For instance, if the lessor is charging the lessee for maintenance under the lease contract, the auditor-appraiser must deduct a maintenance charge from the income stream. One method to estimate this charge is to make an estimate of service time, and then relate this to prevailing labor rates, as shown:[156]

| **EXAMPLE 4.7** |
| --- |
| **ADJUSTING INCOME FOR MAINTENANCE CHARGES** |
| A machine requires 3 hours of service each month at a rate of $95 per hour: A monthly cost of $285 ($95 x 3 = $285) |
| If the monthly rental is $1,500: Then, the maintenance is 19% of gross income ($285 / $1,500 = .19, or 19%) |
| Gross annual income is then $18,000 ($1,500 x 12 = $18,000), annual expenses are $3,420 ($285 x 12 = $3,420), and the net annual income is $14,580 ($18,000 - $3,420 = $14,580) |

---

[156]Service time, rates, costs, and maintenance expenses estimates and percentages may be obtained from various sources in the marketplace (for instance, the lessor may be able to supply the actual service time for the preceding year), and this could serve as a guide when reconstructing the operating statement.

## Processing the Income Stream

The steps for processing the rental income stream for personal property are the same steps that are used for processing real property income.  The steps are as follows:

|  | Potential Gross Income (PGI) |
|---|---|
| (less) | Vacancy and Collection Losses (V & C) |
|  | Effective Gross Income (EGI) |
| (less) | Operating Expenses |
|  | **Net Income Before Recapture and Property Taxes (NIBR&T)** |
| (less) | Property Taxes |
|  | Net Income Before Recapture (NIBR) |
| (less) | Allowance for Recapture |
|  | Net Income (Yield Income) |

As with real property, it is the *anticipated* income stream of personal property that is processed when deriving income multipliers and rates.  In the valuation of personal property, the income stream cannot be processed below NIBR&T.[157]

## Vacancy (Idle Time) and Collection Losses

Personal property that is held for lease or sale by a retailer or wholesaler on the lien date may be exempt from taxation.  Because these items are exempt for the entire year, it can be argued that it is improper to allow for vacancy (idle time) and collection losses.  However, it is also reasonable to take the position that an item may be out on lease on the lien date (and therefore taxable) but returned to the retailer or wholesaler prior to the expiration of the lease period.  Consequently, the retailer or wholesaler may very well suffer a loss of income because of vacancy (idle time) or collection loss.  An allowance made for vacancy (idle time) and collection loss should be based on the actions of the market place.

## Expenses

As with real property, all lessor-borne expenses that are necessary to maintain the equipment's income stream should be deducted as an operating expense.  If the expenses are paid by the lessee, they are not deductible from the income stream.  Maintenance expense is a good example. If the lessee pays the maintenance charges, the lessor will generally charge a lesser rent and the expenses are not allowed.  If the lessor is responsible for maintenance, the rents will reflect this expense.  An adjustment will be necessary similar to that shown in Example 4.7.

Particular care must be given to analyzing expenses.  They may have been paid by either the lessor or the lessee, and therefore included on either or both books.  The lessor's books may show an expense for maintenance.  If the lessee has purchased a maintenance contract from the

---

[157] When calculating NIBR&T for business property, status, category and trade level of the property are important factors to consider.

lessor, the price of the contract must be added to the rental fees before processing the income stream. If it is not, then the expenses for maintaining the item are not deducted as an expense.

## Valuation Methodology

Both direct and yield capitalization methods can be used to value machinery and equipment. Yield capitalization is often used. In the case of leased equipment, for example, the income to be capitalized can be divided into two segments (1) the lease, or rental, payments (net of allowable expenses) over the term of the lease, estimated as the present value of an annuity; and (2) a reversionary payment representing the estimated market value of the property at the end of the lease, estimated as the present value of a single payment. Thus:

Value of property = present value of an annuity + present value of the reversion

The reversion income is usually the salvage value of the property. Salvage value is the net amount the owner expects to obtain when disposing of the property, which is not necessarily the residual value stated in a lease contract. The stated residual value, sometimes called the "buy-out cost," is often not an accurate indicator of the market value of the leased property at the end of the lease: for example, a $1 buy-out cost usually does not represent market value. The reversion is usually positive, although it can be a negative amount (i.e., representing a cash outflow). Sometimes it is zero or a nominal amount. The total value of the property is as follows:

PV OF THE ANNUITY
+ PV OF THE REVERSION
TOTAL VALUE

---

**EXAMPLE 4.8**
**USING THE INCOME APPROACH TO VALUE PERSONAL PROPERTY**

---

A manufacturer leases machines to various businesses within your county. The number of machines on lease in the county as of the lien date is 50. The machines are leased for a one-year term. The average annual gross income of each machine on lease is $2,700 per machine. The rental income includes a component for sales tax.

You have determined that the machines have an average total life of seven years; however, the average remaining economic life of the machines on lease, as of the lien date, is estimated at four years. Property taxes are one percent of the full cash value. Yield rates derived from sales indicate a 13.5 percent return. The return on the investment is based on a constant terminal income stream premise. The present worth of one per period (PW1PP) at 14.5 percent (13.5 + 1.0) = 2.88409.

Other pertinent information:

• The salvage value per machine is $500.

• Typical annual expenses of machine on lease are $500 for maintenance and $200 for insurance.

| | EXAMPLE 4.8 (CONTINUED) | |
|---|---|---|
| | USING THE INCOME APPROACH TO VALUE PERSONAL PROPERTY | |

**WHAT IS THE ESTIMATED TAXABLE VALUE OF THE MACHINES?**

| | Per Machine | Total (50 Machines) |
|---|---|---|
| **A. VALUATION OF THE RENTAL INCOME** | | |
| | | |
| Market Potential Gross Income | $2,700 | $135,000 |
| Less:  Vacancy & Collection Loss | 0 | 0 |
| Effective Gross Income | $2,700 | $135,000 |
| Expenses:  (Maintenance $500 + Insurance $200) | ( 700) | ( 35,000) |
| Net Income Before Recapture & Taxes (NIBR&T) | $2,000 | $100,000 |
| | | |
| NIBR&T x PW1PP (2.88409) | **$5,768** | **$288,409** |
| | | |
| **B. VALUATION OF THE SALVAGE VALUE** | | |
| | | |
| Salvage Price | $   500 | $  25,000 |
| PW $1 (13.5% Yield + 1% ETR)[158] | 0.581806 | 0.581806 |
| Present Value of Salvage Income | **$291** | **$14,545** |
| | | |
| **C. TOTAL PROPERTY VALUE** | | |
| | | |
| Present Value of Rental Income | $5,768 | $288,409 |
| Present Value of Salvage Income | 291 | 14,545 |
| | | |
| **TOTAL VALUE** | **$6,059** | **$302,954** |

**Summary of the Income Approach**

The income approach can be applied to leased equipment or other personal property appraisal units that independently produce income because it converts expected rental income to a present value estimate, but it is normally not applicable to most types of personal property.  Personal property, in general, is not purchased to independently produce income.  It is often difficult to assign or estimate an expected income to that individual property.  The example above helps to illustrate how the income approach to value can be used in the appraisal of personal property.  In practice, each situation is different and this should be taken into consideration by the auditor-appraiser.

---

[158] Present worth of $1 at 14.5%; factor from compound interest table.

# RECONCILIATION AND VALUE CONCLUSION

The final step in the appraisal process is to reconcile value indicators from the separate approaches utilized into a final estimate of value, when more than one approach to value is applied.  Resolving the differences among the value indicators is called *reconciliation*.  The result of the reconciliation is the final value estimate.

In the reconciliation process, consideration should be given to any factors influencing value that are either not reflected or only partially reflected in the indicators.  The greatest weight should be given to that approach or combination of approaches that best measures the type of benefits the subject property yields.  The reconciliation step should involve an analysis of:  (1) the relative appropriateness of the approaches applied; (2) the accuracy of the data collected and calculations made in each approach; (3) the quantity of data available for each approach; and (4) the consistency in the manner in which the approaches to value were applied.

For example, a cost estimate should be reviewed for the realism of the depreciation estimate and whether it is supported by market data.  If the sales comparison approach was used, a check should be made to determine whether the indicator was based on sufficient market data or relies heavily upon only one sale.  In reviewing the income approach, the appraiser should reexamine the estimates of economic rent, economic life, expenses, and capitalization rate.  Alternative estimates should be considered.  Additionally, the appraiser should avoid estimates that are consistently optimistic or pessimistic.

Although containing an element of judgment, the analysis of value indicators should be based upon indicators derived from objective data, plus general overall value influences (economic, physical, political, and social factors).  If a value indicator were perfect, it would already reflect these value influences.  However, in actual practice, any value indicator is usually far from perfect.  As indicated above, if the appraiser has adequate and reliable data, the greatest reliance should be placed on that indicator and approach which best measures the type of benefits the subject property is expected to yield.

# CHAPTER 5: ASSESSMENT OF IMPROVEMENTS RELATED TO BUSINESS PROPERTY

Improvements related to business property include improvements reported on Schedule B of the Business Property Statement and other improvements owned by or made for a business. Many variables exist regarding the valuation of these improvements. Factors required to make a valid assessment—especially property classification, identification of assessee, and valuation—may be difficult to determine. Depending on the data source, the assessment can be processed by either the real property appraiser, the auditor-appraiser or both, on either the secured or unsecured roll, creating a situation that may result in duplicate or escape assessments. Assessment of improvements related to business property is, therefore, an important topic for discussion within this section of the Assessors' Handbook. The discussion is divided into five main sections: definitions of relevant terms, classification, appraisal, determination of assessee, and suggested procedures. It is directed to both real property appraisers and auditor-appraisers.

## DEFINITIONS OF RELEVANT TERMS

The purpose of this section is to define and describe the following relevant terms: improvements, building improvements, landlord improvements, leasehold (or tenant) improvements, structure items, and fixtures as used in the context of this section.

### IMPROVEMENTS

As defined in section 105, improvements include:

(a) All buildings, structures, fixtures, and fences erected on or affixed to the land.

(b) All fruit, nut bearing, or ornamental trees and vines, not of natural growth, and not exempt from taxation, except date palms under eight years of age.

Improvements within this statutory definition are reported, classified and subclassified on the Business Property Statement, Schedule B.[159] Examples of such improvements are provided in Rule 124(b).

### BUILDING IMPROVEMENTS

As used on the property statement, *building improvements* are all improvements to a structure. They may include improvements made by the landlord and improvements made by or for the tenant. They can be sub-classified as structure items and fixtures.

---

[159] No classification between structure items and fixtures is required for State assessed leasehold improvements.

## LANDLORD IMPROVEMENTS

For purposes of this discussion, building improvements made by the real property owner are referred to as *landlord improvements*. This term includes improvements paid for by the landlord whether they benefit the landlord or the tenant. A landlord improvement is either a structure item or a fixture, as discussed below.

## LEASEHOLD (OR TENANT) IMPROVEMENTS

For purposes of this discussion, the terms *leasehold improvement* and *tenant improvement* are used synonymously to mean all "improvements or additions to leased property that have been made by the lessee."[160] Leasehold improvements include structure items as well as fixtures paid for by the lessee.

For example, two tenants move into separate units,

- Tenant A moves into a shell and makes basic improvements (e.g., a drop ceiling, floor finish, floor to ceiling partitions for an office) to finish the interior of the structure.

- Tenant B moves into a space ready for occupancy and only makes improvements designed for a specific trade business, or profession (e.g., shelving attached to a wall or dressing rooms in the case of retail apparel sales).

As the definitions below will indicate, Tenant A has made improvements classified as structure items. Tenant B has made improvements classified as fixtures. However, in both cases, the improvements made by the tenants are leasehold (or tenant) improvements.

## STRUCTURE ITEMS

A *structure* may be defined as "an edifice or building; an improvement."[161] Structure items are integral parts of the structure by nature. The Business Property Statement further describes structure items:

> An improvement will be classified as a structure when its primary use or purpose is for housing or accommodation of personnel, personalty, or fixtures and has no direct application to the process or function of the industry, trade, or profession.

Structure items are reported on the property statement on Schedule B, column 1, *Structure Items*. A listing of items commonly reported and classified as structure items can be found in Appendix A and also in Chapter 7 of AH 581, *Equipment Index and Percent Good Factors*.

---

[160] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, s.v. "leasehold improvement."
[161] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, s.v. "structure."

# FIXTURES

Rule 122.5(a)(1) defines *fixtures*:[162]

> A fixture is an item of tangible property, the nature of which was originally personalty, but which is classified as realty for property tax purposes because it is physically or constructively annexed to realty with the intent that it remain annexed indefinitely.

Rule 122.5(a)(2) sets forth three tests to determine what constitutes a fixture for property tax purposes:

> The manner of annexation, the adaptability of the item to the purpose for which the realty is used, and the intent with which the annexation is made are important elements in deciding whether an item has become a fixture or remains personal property. Proper classification, as a fixture or as personal property, results from a determination made by applying the criteria of this rule to the facts in each case.[163]

Fixtures are reported on the Business Property Statement, Schedule B, Column 2, *Fixtures Only*. A listing of items commonly reported and classified as fixtures can be found in Appendix A and also in Chapter 7 of AH 581, *Equipment Index and Percent Good Factors*. It is important to note, however, that these items are fixtures only when they are *not* an integral part of the building, but their "use or purpose directly applies to or augments the process or function of a trade, industry, or profession."[164]

## Types of Fixtures

### Trade Fixtures

In the context of property tax, a *trade fixture* is merely a type of fixture that is "trade-related." All fixtures, including trade fixtures, have received the same treatment by the courts. In the interest of uniformity, neither the statutes nor the courts base the classification of fixtures on whether they are trade-related. As expressed by the court in *Trabue Pittman Corp., LTD.* v. *County of Los Angeles* (1946) 29 Cal.2d 385,

> To classify trade fixtures as real property is not to obliterate the distinction between fixtures and trade fixtures for all purposes, nor to introduce an innovation into the law of trade fixtures. It is well settled that for purposes of taxation the definitions of real property in the revenue and taxation laws of the state control whether they conform to definitions used for other purposes or not. . . . Section 104 of the Revenue and Taxation Code declares that real estate shall include "improvements," and section 105 defines improvements as "fixtures." No

---

[162] See also Chapter 2 of this manual.
[163] Intent is the primary test of classification. Rule 122.5(d).
[164] Rule 463(c).

exception is made in the case of trade fixtures.  According to Burby, a trade fixture is merely a particular type of fixture, one for which the law makes a special provision permitting its removal under certain circumstances by a lessee from the lessor's real property to which it has been annexed.  (See Burby Hornbook of the Law of Real Property (1943) p.28.)

In a subsequent case deciding similar issues, the court held:

It follows [from *Trabue Pittman* above] that the applicable statutes do not permit the division of trade fixtures into classes or distinctions contended for by defendants, and on the contrary require all fixtures or trade fixtures to be taxed as improvements.[165]

Additionally, "trade fixture" in section 469 and "fixture" in Rule 192(a) are used synonymously in the determination of a mandatory audit.  Thus, trade fixtures are merely a particular type of fixture and must be evaluated under the three-part test in Rule 122.5.

**Fixed Machinery and Equipment**

*Fixed machinery and equipment* (FME) is another type of fixture.  FME is equipment which is physically or constructively annexed and intended to remain indefinitely with the realty.  Rule 122.5(c) sets forth the standard for constructive annexation and some examples are provided in subdivision (e).  The concept of *constructive annexation* of equipment has long been recognized by the courts.

In addressing the question of annexation, we initially observe that the common law test of technical affixation of the article to the realty is no longer an absolute prerequisite to "fixture status." On the contrary, the modern trend of case law underlines that fixtures include articles such as heavy machinery whose permanent annexation is not manifested by the use of bolts, screws, and the like, but which are of such weight that the mere retention in place of gravity is sufficient to give them the character of permanency and therefore affixation to the realty.[166]

An assessee may erroneously report FME as personal property (i.e., machinery and equipment) on Schedule A of the Business Property Statement.  The assessee may report such property as machinery and equipment because of its use/function as machinery or equipment.  However, if the property's weight or method of attachment and the intent as reasonably manifested by outward appearance is that the property remain annexed indefinitely, then based on Rule 122.5, such equipment is actually FME, that is, a fixture.  Often, the incorrect classification is discovered by physical inspection.

---

[165] *Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303.
[166] *M.P. Moller, Inc.* v. *Wilson* (1936) 8 Cal.2d 31.

## CLASSIFICATION

### CLASSIFICATION ON THE PROPERTY STATEMENT

Schedule B (including the supplemental schedule) of the Business Property Statement requests information regarding building improvements (landlord and leasehold improvements) in relation to a specific property or business.  It provides valuable information and may be used by both auditor-appraisers and real property appraisers.  Items reported in Column 1 and Column 2 are structure items and fixtures, respectively, as defined earlier.  Items reported in Column 3, *Land Improvements*, include such things as blacktop, curbs, and fences; and items reported in Column 4, *Land and Land Development*, include such things as fill and grading.

### WHY CLASSIFICATION IS IMPORTANT

Property tax law requires that improvement value be shown separately from land value and personal property value on the assessment roll.  However, there is no requirement that fixtures value be shown as a separate category of improvements.[167]  Nonetheless, it is necessary for the appraiser to make the distinction between fixtures and other improvements prior to enrollment, because classification may affect the audit procedures and valuation of property.

It is important to properly classify fixtures separate from other improvement items for several reasons:

1. Fixtures are a separate appraisal unit when measuring declines in value (Rule 461(e)).[168]

2. Fixtures are treated differently than other real property (i.e., structure items) for supplemental roll purposes.

3. Fixtures and personal property values are components in the value criterion for determination of a mandatory audit.

### Fixtures are a Separate Appraisal Unit When Measuring Declines in Value

Proposition 8, amended article XIII A of the State Constitution to require the assessor to recognize declines in value (of real property) if market value on the lien date falls below the property's factored base year value.  Section 51 requires that the assessor annually enroll the lower of either (1) a property's base year value factored for inflation, or (2) its full, or market, value as of the lien date.  Thus, declines in value under Proposition 8 are determined by

---

[167] Section 602.

[168] However, as exceptions to the general rule that fixtures are a separate appraisal unit for declines in value, Rules 469(e)(2)(C) and 473(e)(4)(C) – in the context of mineral and geothermal properties, respectively – provide that for the purpose of declines in value, certain fixtures may be valued in an appraisal unit comprising land, improvements (other than fixtures), and reserves, rather than valued as a separate appraisal unit.  In terms of mineral properties, "[e]ach leach pad, tailings facility, or settling pond shall be considered a separate appraisal unit for purposes of determining its taxable value on each lien date subsequent to the lien date upon which its initial base year value was determined."  (Rule 469(e)(2)(C).)

comparing the current full value (i.e., current market value) of an appraisal unit to the factored base year value of the unit on the lien date.[169]

Appraisal unit is defined in section 51(d) as the unit that (1) persons in the marketplace commonly buy and sell as a unit or (2) that is normally valued separately. Land and improvements, for example, are an appraisal unit because improvements are typically bought and sold with land. Fixtures not typically bought and sold separately in the market are also considered a separate appraisal unit under this section, because they are normally valued separately. Rule 461(e) provides that fixtures, and other machinery and equipment classified as improvements, are a separate appraisal unit when measuring a decline in value.[170]

### Fixtures may be a Separate Appraisal Unit for Supplemental Roll Purposes

Generally, all property that changes ownership or is newly constructed after the lien date is assessed as of the date of change in ownership or date of completion of new construction and is subject to supplemental assessment. An exception to this requirement applies to certain fixtures and certain taxable possessory interests. Section 75.5 removes from the definition of "property" subject to supplemental assessment, "fixtures which are normally valued as a separate appraisal unit from a structure" and possessory interests, as specifically identified in the section. Section 75.5 states:

> "Property" means and includes manufactured homes subject to taxation under Part 13 (commencing with Section 5800) and real property, other than the following:
>
> (a) Fixtures which are normally valued as a separate appraisal unit from a structure.
>
> (b) Newly created taxable possessory interests, established by month-to-month agreements in publicly owned real property, having a full cash value of fifty thousand dollars ($50,000) or less.

With regard to fixtures, this exclusion from supplemental assessment applies only to fixtures that are normally valued as a separate appraisal unit from the land and other improvements on which they are located. It does not apply to fixtures that are included with other property as part of a single appraisal unit that changes ownership or is newly constructed. If an entire property containing land, structures, and fixtures is valued as a single appraisal unit upon a change in ownership or new construction, the fixtures included in the unit are subject to supplemental assessment.[171]

---

[169] Rule 461.

[170] See *County of Orange* v. *Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, where the appellate court held that under Rule 461(e), "the components of taxable property may be separated for valuation purposes," and that section 51, subdivision (e) "states, albeit ungrammatically, that an appraisal unit can be that which are [sic] normally valued separately. Taken as a whole, neither section 51 in general, nor subdivision (e) in particular, mandates appraisal of the property as a single unit."

[171] See LTA No. 91/59; section 75.15 also addresses the supplemental assessment of fixtures.

**Fixture Value Included in Value Criterion for Mandatory Audit**

The combined total value of personal property and fixtures determines whether an audit is mandatory; the value of structure items is not included in this determination. Section 469(a), in part, states:

> In any case in which locally assessable trade fixtures[172] and business *tangible personal property* owned, claimed, possessed, or controlled by a taxpayer engaged in a profession, trade, or business has a full value of four hundred thousand dollars ($400,000) or more, the assessor shall audit the books and records of that profession, trade, or business at least once every four years.[173] (Emphasis added.)

Caution should be exercised to avoid misclassification. If fixtures are misclassified—notably, if fixtures are classified as structures or visa versa—the value criterion for mandatory audits cannot be applied properly.

## APPRAISAL OF IMPROVEMENTS RELATED TO BUSINESS PROPERTY

### GENERAL

In general, improvements related to business property (i.e., landlord improvements, leasehold/tenant improvements, structure items, and fixtures) are valued, as is other real property, in accordance with section 51. As previously discussed, section 51 requires county assessors to value taxable real property at the lesser of its factored base year or its full cash value as defined in section 110.[174]

In accordance with section 110.1, a property's base year value is its fair market value as of either the 1975 lien date or the date the property was newly constructed, or underwent a change in ownership after the 1975 lien date. Base year value is generally estimated using one or more of the generally accepted and authorized approaches to value discussed in Rule 3 (i.e., the comparative sales approach, the cost approach, or the income approach). The base year value can be adjusted for the effects of inflation up to a maximum of 2 percent per year based on the California Consumer Price Index. For example, an improvement with a 2001-2002 base year value of $100,000 (and a 2002 inflation factor of 2 percent) has an adjusted base year value of $102,000 in year 2002-2003.

Base Year Value x Inflation Factor = Indexed Base Year Value
$100,000 x 1.02 = $102,000

---

[172] Fixtures and trade fixtures are synonymous terms in this context, as discussed earlier.
[173] The change in the threshold level for mandatory audits (from $300,000 to 400,000) was effective January 1, 2001.
[174] Fixtures, although real property, are often valued in a manner similar to personal property.

The full cash value on the lien date is the property's current market value.  This value is also estimated by one or more approaches to value allowed by Rule 3.  If the current market value of a property is below its factored base year value, the property is temporarily reassessed to reflect the lower value, that is, the property's current market value or its full cash value on the lien date (section 51(a)).  Properties valued under Proposition 8 (Rule 461(e)) guidelines are reviewed annually.  In some future year, if and when the property's market value exceeds its factored base year value, the factored base year value is restored to the assessment roll.  Assume that the improvement mentioned above, with a factored base year value of $102,000, has a current market value of $95,000.  Since the market value ($95,000) on the 2002-2003 lien date is less than the indexed based year value ($102,000), the market value is enrolled until such time that the market value exceeds the factored base year value.

The valuation of structure items is normally conducted by the real property appraiser since he or she has the market data, cost manuals, and requisite experience to properly value all real property.  In certain circumstances, however, the auditor-appraiser may be required to value this property.  In other circumstances, the real property appraiser may be required to value fixtures when they are commonly bought and sold in the marketplace with the land and improvements and are so integrated with the realty such that the highest and best use of the property depends on the valuation of the appraisal unit as a whole.

Fixtures are normally valued and assessed by the auditor-appraiser.  Since fixtures are property that directly apply to or augment the process or function of a trade, industry, or profession, it follows that fixtures should be valued by the same appraiser (i.e., the auditor-appraiser) valuing other business property.

In most cases concerning fixtures, the lower value is the full cash value on the lien date.  This is the current market value of the property estimated by the auditor-appraiser using an appropriate approach to value (the cost approach, the comparative sales approach, or the income approach).

When determining the taxable value of new building improvements (i.e., landlord or tenant improvements), the appraiser should ensure that the value of these improvements is not already included in the existing assessment.  For example, if an office building changes ownership and is valued using the comparative sales and/or income approach, the value indicator and resulting assessment on the secured roll *may* include some or all of the value of the building improvements.  Such improvements should not then be doubly assessed on the unsecured roll.

## SOME VALUATION ISSUES

In valuing improvements related to business property (i.e., landlord and leasehold (tenant) improvements, both structure items and fixtures), careful consideration should be given to new construction, leasehold improvements abandoned on the lien date, and fixtures which have declined in value.  Several issues and questions arise and should be addressed regarding these types of improvements.  The following discussion addresses these issues.

## New Construction

Property tax law governing the valuation of new construction is primarily contained in sections 70 through 74.6 and Rules 463 and 463.5. Also, AH 502, Chapter 6 discusses the subject of new construction; and that discussion is generally applicable to new construction involving improvements related to business property.

Rule 463(b) defines new construction to include (1) "any substantial addition to land or improvements, including fixtures", (2) "any substantial physical alteration of land which constitutes a major rehabilitation of the land or results in a change in the way the property is used", (3) "any physical alteration of any improvement which converts the improvement or any portion thereof to the substantial equivalent of a new structure or portion thereof or changes the way in which the portion of the structure that had been altered is used", or (4) "any substantial physical rehabilitation, renovation or modernization of any fixture which converts it to the substantial equivalent of a new fixture or any substitution of a new fixture."

Rule 463(b)(4) excludes construction or reconstruction performed for "the purpose of normal maintenance and repair" from the definitions. Underground storage tanks that must be improved or replaced after September 7, 1999 to comply with federal, state, and local regulations shall not be considered new construction. These tanks shall be considered to be replaced for normal maintenance and repair.[175]

In the context of fixtures, rehabilitation, renovation, or modernization of a fixture that converts the fixture to the substantial equivalent of new is new construction. Rule 463(b), relating to fixtures, provides that "substantial equivalency shall be ascertained by comparing the productive capacity, normally expressed in units per hour, of the rehabilitated fixture to its original productive capacity." Repair to a fixture does not qualify as the substantial equivalent of new. Normal or routine maintenance in order to continue the use of function of the unit (i.e., a new roller to replace the old one in a printing press) is also not considered new construction.

Landlord and leasehold (tenant) improvements, both structure items and fixtures, are frequently renovated, rehabilitated, or modernized. This is often done in order to provide an interior or exterior "facelift" for the space. Existing improvements may be removed and new improvements added, even before the useful life of the existing improvements is over. If such construction activity converts the existing improvements to substantially equivalent to new or is the installation of a new fixture or the replacement of an existing fixture, such activity is new construction.

When new construction of landlord and/or leasehold improvements occurs, relevant information may be received by the assessor from different sources. Information may originate from (1) the Business Property Statement (Schedule B) as reported by the assessee, (2) building permits, (3) county health permits required for some types of construction, or (4) a lease agreement. The Business Property Statement is received by the business property division, and building permits

---

[175] Section 70(e).

are received by the real property division.  An assessee may report information on the property statement that has also been provided to the real property appraiser in the form of a permit (and perhaps a follow-up construction activity questionnaire submitted by the assessee).  Since information is received by both divisions, the landlord and/or leasehold improvements may be assessed by both divisions (or may escape assessment) if a system of effective coordination is not in place.  Methods for ensuring such coordination are discussed later in this chapter and in Appendix B.

After the information regarding construction activity is received, improvements should be classified as a structure item or fixture.[176]  The descriptions of additions and deletions should be reviewed by both an auditor-appraiser and real property appraiser and valued appropriately.  The appraiser should examine the data received to determine whether any demolition costs have been excluded, whether some elements of reported cost reflect normal maintenance and hence not new construction, and whether, and to what extent, the new construction adds value.

The following example illustrates a fixture qualifying as new construction because it is an addition since the last lien date.

---

**EXAMPLE 5.1**
**VALUATION OF NEW CONSTRUCTION (FIXTURES)**

On February 1, 2001, an assessee purchased and installed a new walk-in refrigerator (not an integral part of the building).  The total installed cost of the refrigerator was $10,000.  At acquisition, it had an estimated *average service life* of 12 years.  The inflation factor for the current year is 2%.
**What is the assessed value on the 2002 lien date, January 1, 2002?**

| | Cost | Index Factor | Percent Good Factor[177] | Fair Market Value | Inflation Factor | Indexed Value |
|---|---|---|---|---|---|---|
| Total 2001 Cost | $10,000 | 100 | .93 | $9,300 | | |
| Total 2001 Cost | $10,000 | | | | 1.02 | $10,200 |
| **Enrolled Value** | | | | **$9,300** | | |

**What is the supplemental assessment value?**
No supplemental assessment applies to this fixture.  The fixture is a separate appraisal unit, and is not part of a larger appraisal unit; therefore, the property is not subject to supplemental assessment.

---

## Valuation of Abandoned Leasehold Improvements

Improvements installed by a tenant, but left at a vacant rental space are called abandoned leasehold improvements.  The real property appraiser and/or auditor-appraiser may encounter difficulties when assessing this property.  For example, to whom are the structure items and

---

[176] See *Why Classification is Important*, which is discussed earlier in this section.

[177] Percent good factor from "Table 4: Machinery and Equipment Percent Good Factors," 12 year life, AH 581, January 2002.

fixtures assessed, and what is their value?  No two cases will be the same.  Facts related to each scenario will differ and appraisal must be based on those facts.

Following is an example of one possible scenario involving abandoned leasehold improvements.

---

**EXAMPLE 5.2**
**ABANDONED LEASEHOLD IMPROVEMENTS**

- A retail business moves into a new indoor mall in 2000.  The mall space is leased to the tenant as a shell.  It is the tenant's responsibility, and expense, to finish the space to his or her specifications.  The retail business spends $20,000 to install leasehold improvements.  The leasehold improvements, improvements paid for by the lessee, include structure items (dropped ceiling, finished walls, lighting fixtures, and carpet) and fixtures (burglar alarm system, and permanent partitions-less than floor to ceiling).

- After two years at this location, the retail business moves out of the space to another mall.  The leasehold improvements installed two years earlier are abandoned and the space is left vacant on the lien date, January 1, 2002.

Because the tenant has abandoned the improvements and the leased space in the scenario above, any improvements left behind revert to the owner of the mall; therefore, the mall owner is the assessee.  The structure items and fixtures are assessable to the mall owner on the lien date.

The improvements may continue to have value because, in theory, another tenant using the same space and improvements may not be required to spend the same amount of time and money in order to utilize the space for his or her needs.  The value, on the other hand, may be less than indicated by the cost approach, since a future tenant may have different needs than the original tenant.  Professional judgment is needed to determine whether the abandoned improvements have the same value, lower value, or no value.

---

## Valuation of Fixtures Under Decline in Value

Measuring declines in value can be simple when only one appraisal unit is involved.  Fixtures, for example, as a separate appraisal unit are valued at current market value on the lien date and at the indexed base year value, and the lower value is enrolled.  However, measuring declines in values may become more difficult in a total property appraisal because more than one appraisal unit is involved.  When a decline in value(s) of such property occurs, the first part of Rule 461(e) is extremely important and must be applied.

> Declines in value will be determined by comparing the current lien date full value of the *appraisal unit* to the indexed base year full value of the same unit for the current lien date.  (Emphasis added.)

In other words, each appraisal unit must be considered separately.  The following example illustrates how declines in value and appraisal units should be treated under Rule 461(e).

| | Market Value on the Lien Date (Prop 8 Value) | Factored Base Year Value (Prop 13 Value) | Total Property Value (Assessed Value) |
|---|---|---|---|
| **EXAMPLE 5.3** <br> **TOTAL PROPERTY APPRAISAL UNDER DECLINE IN VALUE** | | | |
| **Appraisal Unit 1** | | | |
| Land | $515,000 | $100,000 | |
| Building | 60,000 | 85,000 | |
| Unit 1 Value | $575,000 | **$185,000** | $185,000 |
| **Appraisal Unit 2** | | | |
| Fixtures | 40,000 | 52,000 | |
| Unit 2 Value | **$ 40,000** | $ 52,000 | $ 40,000 |
| **Total Property Value (Unit 1 + Unit 2)** | | | **$225,000** |

As indicated in the above example, the proper unit values are "Appraisal Unit 1" (land and building) value of $185,000 and the "Appraisal Unit 2" (fixtures) value of $40,000. The correct total value of this property is $225,000. The appraisal units must be defined properly when applying Rule 461(e) and recognizing declines in value. If the appraisal units are not defined properly, the assessed value of the property would be erroneous and not in compliance with property tax law.

# DETERMINATION OF ASSESSEE

When the owner of a business is also the owner of the land and building, there is no question as to the proper assessee of the improvements related to business property (i.e., the landlord or tenant improvements). In this case, taxable property is assessed to one account on the secured roll. In the case where the owner of the real property (other than fixtures) does not own the business, however, other possibilities arise. Improvements related to business property may be constructed and paid for by either the landlord (landlord improvements) or the tenant (leasehold improvements) and in either case are assessable to either party.

When new construction of landlord or tenant improvements occurs, the added value of the new construction is typically assessed to the party who paid for the improvements. A tenant in a shopping center, for example, is typically assessed on the unsecured roll for leasehold improvements—structure items and fixtures—since they are constructed at the tenant's expense. Such construction is generally reported on the Business Property Statement. On the other hand, the landlord is typically assessed on the secured roll for landlord improvements since they are constructed at the building owner's expense. (Such new construction is usually discovered by a building permit.)

As a general rule, whether short-term or extended-term leases, if improvements are constructed on leased land, and the ground lease provides that the lessee has the right to remove the improvements at the end of the lease term per Civil Code section 1013, the "owner" of the improvements is

presumed to be the ground lessee.  On the other hand, if the lease states that the ground lessor retains ownership of the improvements at the end of the lease term (and the ground lessee has no right of removal), the "owner" of the improvements is the ground lessor."

However, the above procedure is not a legal requirement.  Section 405 allows the assessor to assess property to "the persons owning, claiming, possessing, or controlling it on the lien date." In the case of landlord improvements and leasehold improvements, the courts have interpreted this to mean either the lessor or lessee may be the assessee, even if the improvements have been paid for by the opposite party.[178]

## COORDINATION IN THE ASSESSMENT OF LANDLORD IMPROVEMENTS AND LEASEHOLD IMPROVEMENTS

Close cooperation between auditor-appraisers and real property appraisers is essential when valuing and assessing landlord and leasehold improvements, because special difficulties arise concerning the uniform assessment and proper enrollment of this type of property.  Record management for accurate tracking of base year values and ownership of this type of property may be complex and tedious but extremely important in order to ensure correct valuation and assessment.  As discussed earlier, information regarding this type of property is received from various sources and may be submitted to either auditor-appraisers and/or real property appraisers.  The value may be enrolled on either the secured roll or the unsecured roll, and the assessee may be either the landlord or the tenant.

Internal procedures in assessors' offices should be designed to ensure that all landlord improvements and leasehold improvements are (1) valued on and at the appropriate date and amount, (2) not assessed on multiple accounts, (3) assessed on the proper roll (i.e., secured or unsecured), and (4) assessed to the proper assessee.  The means by which this coordination is accomplished may differ from county to county, but general guidelines for coordination should be maintained in all assessment programs.

### ESTABLISH A COMPREHENSIVE SET OF WRITTEN PROCEDURES REGARDING ASSESSMENT OF LANDLORD AND LEASEHOLD IMPROVEMENTS

A comprehensive set of written procedures that describes how to systematically identify and assess landlord and leasehold improvements can help promote uniform assessment.  As noted above, the assessment of landlord and leasehold improvements requires record management for proper tracking of base year values and ownership.  Written procedures clarify each staff member's responsibilities in the valuation process for this type of property, making appraisal and record management easier to maintain.

---

[178] *Valley Fair Fashions, Inc.* v. *Valley Fair* (1966) 245 Cal.App.2d 614, *Tele-Vue Systems, Inc.* v. *Contra Costa County* (1972) 25 Cal.App.3d 340, and *Ventura County* v. *Channel Islands State Bank* (1967) 251 Cal.App.2d 240.

## CLEARLY IDENTIFY LANDLORD AND LEASEHOLD IMPROVEMENTS ON APPRAISAL RECORDS

Proper notes on appraisal records concerning the establishment of value is an important step in the appraisal process. Appraisal notes should include information regarding the existence of landlord and leasehold improvements, a description of the improvements, and the basis for valuation. If the improvements involve more than one account, the appraisal records should indicate in what manner the improvements are assessed (i.e., to whom, secured or unsecured roll, and assessor's parcel number or business property account number). This information will not only assist appraisers and auditor-appraisers who may work on the subject parcel or related business account(s) in the future, but will also help to avoid duplicate or escape assessments.

## COORDINATION OF LANDLORD AND LEASEHOLD IMPROVEMENT APPRAISAL

Appendix B describes and suggests one method of coordinating the appraisal of landlord and leasehold improvements that is used in some assessors' offices. It is not the only proper method. An example is included as illustration. The example starts with the source documents and goes through several steps including classification, determination of assessee, valuation, and enrollment of value.

# CHAPTER 6:  SPECIAL ISSUES

## VALUATION OF OTHER TYPES OF PERSONAL PROPERTY

### LEASED EQUIPMENT

Valuation and assessment of leased equipment can be one of the more difficult tasks an auditor-appraiser encounters.[179]  Many impediments are generated by a lack of complete, up-to-date information.  Other problems are based on the nature of the property.  Leased equipment is usually easily movable, and it may change ownership (or possession) and situs frequently.  This can make it difficult to analyze the factors (assessability, assessee, situs, description, and classification) necessary to make an appropriate opinion of value and a valid assessment.

### Assessability

Assessability of leased equipment, or equipment intended for lease, is the first consideration an appraiser encounters.  As discussed in Chapter 1, personal property leased on the lien date is assessable unless exempt.  However, personal property held for lease on the lien date is inventory.  Leased equipment, or property intended for lease, is assessable when:[180]

- property is actually leased or rented on the lien date.

- property is being used by the owner for purposes not directly associated with the prospective sale or lease of that property.

- property has been used by the owner prior to the lien date, even though "held for lease" on the lien date.

- property is intended to be used by the lessor after being leased (or during intervals between leases), even though "held for lease" on the lien date.

### Assessee

A person who owns, claims, possesses, or controls property on the lien date is the assessee of that property.  This is either the lessor or the lessee.  Under section 405, the assessor may assess leased property to either, or both, whether or not there is a private agreement between the parties to the lease.  Section 405 specifically states, in part:

(b)  The assessor may assess all taxable property in his county on the unsecured roll jointly to both the lessee and lessor of such property.

(c)  Notices of assessment and tax bills relating to jointly assessed property on the unsecured roll shall be mailed to both the lessee and the lessor at their latest addresses known to the assessor.

---

[179] Leased equipment reported to the State Board of Equalization by public utility companies is assessed at the state level.  However, the Board may delegate to a local assessor the duty to assess a property used but not owned by a state assessee on which the taxes are to be paid by a local assessee.
[180] See Rule 133(b), *Business Inventory Exemption, Exclusions.*

However broad this statute, the courts and most counties have reasonably construed the language.[181]    That is, property is generally *not* assessed jointly although the assessor has that option pursuant to section 405.  Property under true lease is usually assessed only to the lessor and property under conditional sales contract only to the lessee.  Exceptions to this rule mainly occur when the lessor requests to be assessed to ensure the taxes are paid or one of the parties to the lease is an exempt entity.

**Leasing with Exempt Entities**

***Banks and Financial Institutions***

Tangible personal property owned by banks and financial corporations (commonly referred to as financial institutions or financials) is exempt from property taxation by the in-lieu tax provisions under article XIII, section 27 of the California Constitution, and sections 23154, and 23181 through 23183 of the Revenue and Taxation Code, improvements or fixtures are assessable however.  These businesses pay an in-lieu "franchise tax on net income" instead.  A listing of banks and financials qualified under these sections is maintained by the Franchise Tax Board with confidential copies distributed to assessors annually by the Board of Equalization.[182]  The in-lieu exemption does not apply to banks and financial corporations whose principal activity consists of leasing tangible personal property (see section 23183(b)).    Generally such corporations are not shown on the list.  Any questions in this regard should be directed to the Franchise Tax Board.

If a lessor bank or financial is shown in the listing of banks and financials, the leased property is assessable to the lessee (unless the lessee is also exempt from property taxation) pursuant to section 235.  Section 235 states:

> For purposes of this division, the lessee of tangible personal property owned by a bank or financial corporation shall be conclusively presumed the owner of that property.

However, where personal property is leased to an exempt bank or financial, it is assessable to the owner/lessor (unless the owner/lessor is also exempt from property taxation).  The owner/lessor holds title to the property and does not benefit from the lessee's in-lieu exemption.

---

[181] 61 Ops.Cal.Atty.Gen. 472, 475 (1978).

[182] As of year 2000, state chartered credit unions are exempt from paying the bank and corporate in-lieu franchise tax (section 23701y).  Therefore, state chartered credit unions no longer appear on the *Confidential List of Banks and Financial Corporations*.  Assessors need to independently evaluate, on a case by case basis, whether these entities qualify as a financial corporation for assessment purposes.  The personal property of those qualifying as financial corporations remains exempt from property tax.  Generally, state-chartered credit unions are (1) not subject to the bank and corporation in-lieu tax, (2) subject to real property tax, and (3) not subject to personal property tax.  Federally-chartered credit unions are (1) not subject to the bank and corporation in-lieu tax, (2) subject to real property tax, and (3) subject to personal property tax.

### Insurance Companies

Personal property owned by insurance companies is exempt from property taxation, regardless of how the property is used by that insurance company, pursuant to article XIII, section 28, of the California Constitution.[183]  Property leased to insurance companies, rather than owned by them, however, remains assessable to the lessor (unless the lessor is also exempt from property taxation).

### Government Entities

Property leased to or from a federal, state (California), or local governmental (county, city, district in California) entity is not taxable to that entity, although the property may remain taxable to another party.  It is not taxable to the governmental entity because:

- The federal government is immune from taxation pursuant to the United States Constitution. It is a "governing constitutional principle that the properties, functions, and instrumentalities of the federal government are immune from taxation by state and local governments."[184]

- The California Constitution, article XIII, sections 3 and 5 expressly exempt from taxation all property owned by the state or local governments, except as provided in section 11(a) of the California Constitution, article XIII (which applies only to land and improvements outside the boundaries of the local government).

### Personal Property

Personal property owned by the government is immune (federal) or exempt (state or local) from all taxation, as discussed above, and it is not subject to possessory interest as is real property (with one exception).[185]  "The legislature has not defined personal property as including a right to its possession as it has real property."[186]

Privately owned personal property leased to and held by the government is *not* immune (federal) or exempt (state or local) where title remains with the lessor.  In such cases, the property is taxable to the owner/lessor, even if its situs is located on government-owned land.  (The exceptions are Congressional grants of immunity for the privately held personal property of Indians located on Indian reservations and personal property located on federal enclaves.)

Frequently, in cases where federal immunity or state/local exemption is claimed regarding leases of property with the government, the question is who "owns" the property?  In one case, for example, a court found that title to tools, equipment, and material owned by federal government but used by a private contractor doing government construction remained with the government

---

[183] *Mutual Life Insurance of New York* v. *City of Los Angeles* (1990) 50 Cal.3d 402 overturned *Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco* (1982) 129 Cal.App.3d 876
[184] *TRW Space & Defense Sector* v. *County of Los Angeles* (1996) 50 Cal.App.4th 1703, 1710.
[185] See section 201.5.
[186]*General Dynamics Corp.* v. *County of Los Angeles* (1958) 51 Cal.2d 59.  An exception is set forth in section 201.5 for personal property owned by or for the California Pollution Control Financing Authority.

and were therefore immune from taxation.[187]  In another case, a court found that title to personal property consisting of materials and inventory used by a private contractor doing government construction never vested in the government, even though the government fully reimbursed the costs to the contractor.  The nature of the property involved was mere overhead, "the common staples of any ongoing business; the contractor was the owner."[188]  In a subsequent case, however, a court found that title to overhead property vested in the government, pursuant to the terms of the contract, and was not assessable to the contractor.[189]

Where the question of ownership is not clear, proper analysis of the lease agreements and other sales or financing documents is important.  In establishing ownership for tax assessment purposes, the assessor should determine who holds the *essential indicia of ownership.*[190]

> A title clause standing alone is not conclusive of ownership for tax purposes when it appears that the taxpayer retains the *essential indicia of ownership. . .* Accordingly, it is necessary to examine the terms of the contracts to determine whether plaintiffs retained rights in the property inconsistent with its ownership by the United States for tax purposes.[191]  (Italics added.)

Several factors have been identified by the court(s) under the *essential indicia of ownership* test as evidence that the government holds title.  The tests can be applied when the government is either the lessor or the lessee and title is not physically held by the government.  When the government is a lessee, for example, *essential indicia of ownership* may be apparent if:

1. title automatically passes to the government (lessee) at the end of the lease term (the title clause of the lease agreement);

2. the property itself is used as security for any unpaid lease payments (in the event of default, the lessor would sell the property to pay off the debt and the remainder would go to the government);

3. the government (lessee) has full authority to alter the property at will;

4. the government (lessee) is required to maintain the property.

Again, no one factor standing alone is indicative of *essential indicia of ownership*, or proper owner for assessment purposes.  The ultimate decision must be made upon consideration of all the facts.

---

[187] *General Dynamics Corp.* v. *County of Los Angeles* (1958) 51 Cal.2d 59.
[188] *TRW Space & Defense Sector* v. *County of Los Angeles* (1996) 50 Cal.App.4th 1703.
[189] *Hughes Aircraft Co.* v. *County of Orange* (2002) 96 Cal.App.4th 540.
[190] *Mayhew Tech Center Phase II* v. *County of Sacramento* (1992) 4 Cal.App.4th 497.
[191] *General Dynamics Corp.* v. *County of Los Angeles* (1958) 51 Cal.2d 59.

**<u>Fixtures (and Other Real Property)</u>**

Fixtures owned by the federal government and leased to a private party are immune (federal) or exempt (state or local) from property taxation, to the same extent as other real property.  Fixtures are not assessable to the government owning the property, but the *possessory interest* in the fixtures is assessable to the lessee as any other type of real property leased from the government.  The assessment is on the entire interest of the lessee.  It is a *possessory interest* in real property.[192]    A possessory interest within an area in which the United States has exclusive jurisdiction (so-called "federal enclaves") is excluded from the meaning of "taxable possessory interest" and is immune from taxation.

Thus, determination of ownership becomes less of an issue; the property is either assessable as an improvement or a possessory interest.  If, however, ownership does become an issue, it should be determined based on the *essential indicia of ownership* as discussed earlier.

## Summary of Lease Situations with a Governmental Agency as Either Lessor of Lessee

The following table summarizes the discussion regarding the assessability of leased property wherein the federal, state, or a local government agency is either the lessor or lessee.  The table is not controlling in all situations and, again, *essential indicia of ownership* (referred to as *owner (title with)* in the table) should be determined based on all facts.

---

[192] Section 107.

| | | OWNER (TITLE WITH) | | |
|---|---|---|---|---|
| **LESSOR** | **LESSEE** | | **TYPE OF PROPERTY** | **ASSESSEE** |
| Private Party | Government | Lessor | Personal Property | Private Party |
| Private Party | Government | Lessee | Personal Property | No assessment (Immune or Exempt) |
| Private Party | Government | Lessor | Fixtures (and other real property) | Private Party |
| Private Party | Government | Lessee | Fixtures (and other real property) | Private Party (Possessory Interest) |
| Government | Private Party | Lessor | Personal Property | No assessment (Immune or Exempt) |
| Government | Private Party | Lessee | Personal Property | Private Party |
| Government | Private Party | Lessor | Fixtures (and other real property) | Private Party (Possessory Interest) |
| Government | Private Party | Lessee | Fixtures (and other real property) | Private Party |

**TABLE 6A**
**ASSESSABILITY OF LEASES INVOLVING GOVERNMENT**

### *Other Exempt Entities or Institutions*

Property leased to other exempt entities and institutions may be eligible for exemption, but each situation must be considered individually.   In some cases, the property may be automatically exempted; in others, claim forms must be filed in order for the applicable exemption or reduction to be granted.   For example, a lessor who leases equipment to public libraries, museums, schools, community colleges, state colleges, and the University of California is not automatically exempt from taxation on the property.   The lessor may file a claim for exemption if (1) the leased equipment is "used exclusively" by an aforementioned entity as lessee and (2) it is demonstrated that the benefit of the exemption has inured to the lessee institution.   A lessor's exemption claim should only be filed when the lease has been adjusted for taxes and the public entity has already received the benefit of the reduction.   Where the lessor does not claim the exemption, the lessee must file a claim in order to receive the refund of tax that the lessor has paid to the county.

A discussion of exemptions is located in Assessors' Handbook Section 267, *Welfare, Church and Religious Exemptions*.   Reference to code sections governing exemptions (sections 202 et seq., 203, 214 et seq.) is also necessary to determine whether equipment leased to qualifying entities is deemed eligible or if a claim must be filed.

### Situs

Physical situs of leased equipment may change frequently, as previously discussed in Chapter 3. Determination of tax situs for this type of property is generally governed by Rule 204 and section 623.

Prior to January 1, 1996, Rule 204, *Leased Equipment,* was the sole authority governing situs determination.  It requires a determination of a *precise* situs for each piece of leased equipment (a time consuming process in many cases).  However, section 623 has made *precise* situs of leased equipment less important by allowing a single assessment for leased personal property assessed to the same assessee:

> The assessor *may* place a single assessment on the roll for all leased personal property in the county that is assessed with respect to the same taxpayer.  Any property assessed pursuant to this section shall, in the absence of evidence establishing otherwise, be deemed to be located at the taxpayer's primary place of business within the county.  (Italics added.)

## Description:  Types of Leases

A lease is generally defined as any contract that gives rise to a lessor and lessee relationship in real or personal property.  There are many different types of leases and lease situations.  To properly determine property tax reporting and assessment questions, it is important to define and consider each type of lease, and the terms associated with them: short-term leases, extended-term leases, true leases, and financing leases or conditional sales contracts.

### Short-Term Leases

Leases or rentals of property on a daily, weekly, or other short-term basis (defined as a period of six months or less) are *short-term leases*.  The property is assessable to the lessor at the lessor's principal location, regardless of actual location or control on the lien date.[193]  The lessor is considered the owner, and value is estimated by reference to the owner's cost of the property.[194]

### Extended-Term Leases

An *extended-term lease* (commonly referred to as *long-term lease*) is any lease whose duration is more than six months, or for an unspecified period.  In many cases, property leased under this type of lease eventually becomes property of the lessee.  For example, a lessee leases a computer for five years.  At the end of the five-year lease period, the lessee has the option to buy the computer for $1.  Essentially, from the start of the lease, the lessee is the owner of the equipment whether or not title has actually passed.  During the lease term the assessor may assess this equipment to either the lessor or the lessee, and situs for assessment purposes is generally the actual location of the leased equipment, subject to the provisions of section 623 as discussed above.

Extended-term leases, business property leased for a term of more than six months or for an extended (even though unspecified) period, must be valued as if in the hands of the lessee, after all costs of production, including marketing costs, profit, sales tax, freight, and installation costs have been added.  The lessee is considered the consumer of the property, and the property is

---

[193] Rule 204.
[194] See trade level discussion in Chapter 4.

therefore valued at the consumer trade level.  In the example, the lessee may record a $1 buy-out cost on his or her books.  The actual value for assessment purposes should be based on the total acquisition cost at the inception of the lease (if the cost approach is utilized) or the present value of the lease payments made during the lease (if the income approach is utilized).

**True Leases**

*True leases*, whether short-term or extended-term as defined earlier, are agreements under which an owner gives up possession and use of his/her property for valuable consideration and for a definite term and at the end of the term, the owner has the absolute right to retake, control, or convey the property.  It is an agreement under which there is no intention of transferring ownership.  At termination of the lease, the property will be returned to the lessor.

**Conditional Sales Contracts or Financing Leases**

*Conditional sales contracts* or financing leases (agreements) are purchases rather than true leases.  They can be short-term or extended-term agreements whereby the seller (vendor) accepts periodic payments for the purchase price while retaining title to the property for security purposes.  Possession of the property transfers to the buyer (vendee) without full legal title until payment of the purchase price or a predetermined date occurs.[195]

These contracts provide possession, use and control to the buyer.  The buyer or lessee is the beneficial owner of the property, and therefore becomes the assessee, regardless of whether or not they hold title.

### *Differentiating Between a True Lease and a Conditional Sales Contract*

It is often difficult to distinguish between a true lease and a conditional sales contract, and no precise formula has been devised for separating the two types of contractual arrangements.[196]  An agreement identifying itself as a lease may, in actuality, be a conditional sales contract and vice-versa.  Proper distinction is of prime importance because assessability, exempt status, appropriate assessee, and value depend on this distinction.

According to the Uniform Commercial Code, in determining whether an instrument is a lease or a sales contract, the contract form is not as important as the intent of the parties.  Following are some issues related to the lease contract that will help determine the intent of the parties of the contract.  In any contract, some of the issues may be indicative of a true lease while others may be indicative of a conditional sales contract.  The intent of the parties should be determined by the express terms of the contract.  Some terms such as liability for insurance, taxes, and other expenses may not establish ownership.  These terms are, therefore, not considered in the table below.

---

[195] Miller & Starr, *California Real Estate*, 2d "Specific Real Estate Contracts," section 2:42.
[196] 61 Ops.Cal.Atty.Gen. 472 (1978).

| Issue | | True Lease | Conditional Sale |
|---|---|---|---|
| | **TABLE 6B** **ISSUES TO REVIEW WHEN VERIFYING LEASE TYPE** **(TRUE LEASE V. CONDITIONAL SALES CONTRACT)** | | |
| Lease Period | • Lease period is approximately the same as the anticipated life of the property. | | X |
| | • Lease is for a fixed period with a nominal option payment (i.e., $1) required to transfer title. | | X |
| | • Lease is cancelable on a monthly or annual basis. | X | |
| | • Optional purchase clause is at market value. | X | |
| Rent | • Present value of contractual rental payments is equal to or greater than the current purchase price. | | X |
| | • Present value of contractual rental payments is considerably less than the purchase price. | X | |
| Ownership Terms | • The contract contains specific provisions retaining ownership with the lessor. | X | |
| | • The contract transfers all ownership responsibility, with the exception of title, to the lessee. | | X |
| Accounting Treatment by Lessor or Lessee (FASB 13) | • Lessor is treating the property as a depreciating asset. | X | |
| | • Lessor is treating the property as a note, contract, or account receivable. | | X |
| | • Lessee is treating the property as a depreciating asset. | | X |

As mentioned earlier, like any factual determination, analysis of any one item cannot determine lease type. All evidence must be weighed. Reliance on any one factor may lead an appraiser to the wrong conclusion. For instance, treatment (by either the lessor or the lessee) for financial accounting purposes can be misleading.

## Statement of Financial Accounting Standards No. 13 (FASB 13)

Accounting for leases can be a controversial area of financial accounting. Many lessees structure their lease agreements to avoid capitalization for financial accounting purposes or to improve their financial position. The Statement of Financial Accounting Standards No. 13 (FASB 13) was developed to govern accounting for leases. This standard, FASB 13, provides

lessees and lessors with established criteria for classifying leases and also requires reporting and disclosure of leases on financial statements based on the classification made by the lessor and/or the lessee. Thus, when an audit is conducted, or taxpayer's records are reviewed, leased equipment can be identified. The nature of the leasing arrangement and activities must be disclosed regardless of the lease type.

Recognition of these requirements for classifying and reporting leases for financial accounting purposes under FASB 13 is useful in that a substantial amount of information about the property may be discerned. However, such information does not necessarily determine property tax classification, assessability, or value. Accounting records alone are not conclusive, although they may greatly assist the auditor-appraiser in gathering and evaluating all the facts. A lease, for example, does not necessarily need to be capitalized for it to be assessed to the lessee. Possession, claim, or control in itself may determine the assessee (section 405).

## Valuation of Leased Equipment

When valuing leased equipment, all three approaches to value should be considered: the replacement or reproduction cost approach, the comparative sales approach, and the income approach. Each approach, when appropriate, should be applied as discussed in Chapter 4 of this section.

Regardless of which approach(es) is used, leased property must be valued at the proper trade level. The proper trade level depends on the term of the lease. Under extended-term leases (more than six months), the lessee is considered to be the consumer of the equipment and thus is assessable at that level, the consumer trade level. The appraiser should determine the selling price new of the equipment to consumers, plus sales tax and delivery and installation costs, then adjust for depreciation. In short-term leases or rentals (six months or less), the lessor is considered to be the consumer of the equipment, and the value is determined at the lessor's trade level.

## SUPPLIES

Supplies are classified as personal property.[197] The historical cost of supplies on hand as of the lien date is reportable by the assessee on the Business Property Statement.

Normally, the value of supplies can be based on cost information and/or physical examination of supplies on hand. The cost approach is an appropriate approach to value because of the relatively short economic life of the property. Current purchase price often reflects value. In some cases it is necessary to adjust the purchase price or recorded cost to include supplies not included in the assessee's books, to adjust for trade level or discounts, or to reflect general price level changes. These adjustments usually are addressed primarily as a result of an audit.[198]

---

[197] See discussion of supplies in Chapter 2 for determination of items included in assessable supplies.
[198] See discussion of auditing for assessment purposes in Chapter 8.

It is important, when utilizing the cost approach and the assessee's accounting records, to ensure that inventory is not misclassified or reported as supplies. Supplies should not be confused with inventory. Supplies are items used in the ordinary course of business but not incorporated into the product sold or held for lease. Inventory, on the other hand, are products held for sale or lease, which include items incorporated into the product or transferred with the product when sold. An in-depth discussion of this topic is included in Chapter 2, *Classification,* of this section.

The cost and value of assessable supplies may be estimated by the percentage of annual purchases method. This method summarizes total yearly supplies purchased, and estimates the supplies turnover rate based on frequency and quantities of supplies purchased during the year. Total annual supplies purchased divided by this supplies turnover rate (Total Annual Supplies / Turnover Rate = Estimated Supplies on Hand) generally results in a reasonable estimate of the value of the supplies on the lien date. The reasonableness of this estimate can often be verified during the physical inspection of the business when an audit is conducted. Caution should be used if supplies are seasonal when using the percentage of annual purchases method.

## CONSTRUCTION IN PROGRESS

Construction in progress (CIP) is also an item required to be reported on the Business Property Statement. CIP is assessable at full cash value on the lien date.[199] The income and sales comparison approach are of limited use because property under construction is typically not producing any income, and it is difficult to find comparable sales of partially completed projects. For this reason, the cost approach is nearly always used to value this type of property. Costs incurred as of the lien date represent total costs, including preliminary direct and indirect costs such as planning and engineering charges. These costs may or may not represent actual market value on the lien date. Ultimately, the value should be based on what the property in its partially-constructed condition would bring in the market place involving a willing buyer and seller. The seller would attempt to recover all costs if the equipment under construction was sold in a partially constructed state.

The instructions on the Business Property Statement request an attachment of an itemized listing of costs for construction in progress for improvements to land, machinery, equipment, furniture, buildings or other improvements, or leasehold improvements. Reported CIP may include both real property and personal property items that may be hard to distinguish depending on the stage of completion. Reported costs may also include direct and indirect costs that were discussed earlier in Chapter 4, *Valuation of Personal Property*, which may or may not influence value. Review of the costs included in CIP is important to determine assessability, classification, and contribution to value. Coordination between the real property appraiser and the auditor-appraiser is equally important to correctly classify building and leasehold improvements, and avoid duplicate and escaped assessments (see Chapter 5 for more information on this topic).

---

[199] Construction in progress regarding personal property is assessable only when actual construction has begun by the lien date. If actual construction has not yet begun, any costs incurred (i.e., engineering fees) are exempt from taxation for the entire year.

## COMPUTER AND RELATED EQUIPMENT

Non-production computers and related equipment must be reported separately from other types of personal property on the Business Property Statements. This equipment includes non-production computers (excluding computer-operated machinery and equipment), monitors, printers, scanners, disk drives, and cables. These items have relatively short-lives, and are influenced by rapidly changing technology and user needs.

Production computers (computer operated machinery and equipment or computers embedded in machinery) are not reported, considered, or valued with non-production computer equipment on Schedule A, Column 5, *Computers*. They are valued as other types of machinery and equipment specific to an industry, and are normally reported on Schedule A, Column 1, *Machinery and Equipment for Industry, Profession, or Trade*. When computerized equipment is encountered, a special study of the equipment and the industry it serves may be required to determine the appropriate valuation method.

### General Valuation

Valuation of non-production computers and related equipment has become increasingly difficult, yet important, due to rapid changes in technology and changing needs of users. Because of typically shorter lives, rapid depreciation, and little salvage value in many circumstances, the Board has provided three separate valuation tables to aid the appraiser using the cost approach to value. These tables segregate computers by original cost, and apply different factors based on past value trends. As with most equipment, these factors are not appropriate for all computers. In some cases, other approaches to value will be more appropriate. Sound appraisal judgment is necessary to determine the appropriateness of applying the factors to specific computers and estimating the accuracy of the resulting value.

### Storage Media for Computer Programs

Section 995 provides that storage media for computer programs are to be valued as if there were no computer programs on such media except basic operational programs. Otherwise, computer programs shall not be valued for purposes of property taxation. Section 995.2 defines the terms "basic operational program" and "processing program." Rule 152 explains how to properly determine the classification of computer software.

### *Basic Operating Programs*

Basic operational programs are those programs that are "fundamental and necessary to the functioning of a computer." They are, according to section 995.2:

> . . . that part of an operating system including supervisors, monitors, executives, and control or master programs that consist of the control program elements of that system.

A *basic operational program* is a control program, as defined in section 995.2, that is included in the sale or lease price of the computer equipment. The assessable value of storage media

containing basic operational programs includes the value of the storage media *and* the value of the program embedded on it.  The basic operational programs in personal computers and mainframe computers are the basic input output system (BIOS) and licensed internal code (LIC or microcode).

Often, computer equipment is purchased or leased at a single price.  When the price is not segregated, or not able to be segregated, between taxable and nontaxable property and programs, the total purchase price may be used as an indicator of taxable value.[200]  Pursuant to Rule 152(f), when an assessee can identify and segregate the costs (and supply information to support such separation) the value must be adjusted appropriately.

The assessee is determined by the ownership and control of the storage media.  The value of the storage media is assessable to "the person owning, claiming, possessing, or controlling the storage media on the lien date."[201]  Storage media shall not be assessed to the owner of the copyright of the computer program embodied or stored on the media unless the owner of the copyright also owns, claims, possesses, or controls the storage media on the lien date.  If the licensee of a basic operational program owns the storage media on which a program is stored, then the licensee is the assessee.  If the storage media is leased, then the assessor has the option of making the assessment to the owner (lessor), the lessee, or to both according to section 405(b).

### Processing Programs

A processing program is a program used to develop and implement the specific applications that the computer is to perform.  It consists of:

> . . . language translators, including, but not limited to, assemblers and compilers; service programs, including, but not limited to, data set utilities, sort/merge utilities, and emulators; data management systems, also known as generalized file-processing software, and application programs, including, but not limited to, payroll, inventory control, and production control.  Also excluded from the term "basic operational program" are programs or parts of programs developed for or by a user if they were developed solely for the solution of an individual operational problem of the user. . . .[202]

Its operation is possible only through the facilities provided by the basic operational program (or control program).  By itself, however, a processing program is not fundamental and necessary to the functioning of a computer.

---

[200] Rule 152(e).
[201] Section 405.
[202] Section 995.2.

Only the storage media for processing programs are assessable and they are valued as if there were no computer programs on them.  This value is assessable to "the persons owning, claiming, possessing, or controlling on the lien date."[203]

## SPECIAL CONSIDERATIONS

### IDLE, UNUSED, OR OBSOLETE EQUIPMENT

Idle, unused, or obsolete equipment has value, even if only salvage or scrap value.[204]  Therefore, the auditor-appraiser must estimate value and assess this type of equipment.  Idle, unused, or obsolete equipment may need to be valued separately from in-use, active equipment of a similar type.

First, an auditor-appraiser must consider all the reasons why equipment is idle on the lien date.  This may or may not influence value for assessment purposes.  For example, consider a printing press no longer in use because it was replaced by a newer model.  The old press is stored in the office break room because there is no other place to put it until sold, donated, or otherwise disposed of.  The older model has value although not in productive use and the value can be computed in the same manner as a similar piece of equipment that is in productive use.  On the other hand, consider a second example of a printing press no longer in use because it needs repair.  Assume the part needed to repair the press is no longer manufactured; there is no way to repair the part or the printing press; and it would not interface with modern equipment in use if it were repaired.  This printing press has value, but the value may only be the salvage value of the property, or the value of the tangible materials since the printing press in essence is unusable or obsolete.  As illustrated here, to value idle, unused, or obsolete equipment, an appraiser must determine the reason(s) for non-use.  It influences value and the resulting assessment.

### EQUIPMENT PURCHASED USED

Valuation of equipment purchased used is peculiar in that the equipment index and percent good factors, normally utilized by the assessor in mass appraisal, may or may not produce results reflective of market value.  This may be due to differences between total economic life and remaining economic life, and between historical cost (cost to the original owner) and acquisition cost (cost to current owner).  The equipment index factors provided by the Board (in AH 581) include separate tables for new and used agricultural and construction equipment, but does not include separate tables (new and used) for other types of equipment.  An appraiser should take care to determine how the results of applying factors, both trending and estimation of depreciation, relate to the actual market value of equipment purchased used.  If the results are not indicative of market value, another method of estimating depreciation, as discussed in Chapter 4, or another valuation approach should be utilized.

---

[203] Section 405.

[204] This discussion could also be applied to the valuation of equipment that is abandoned in place, and back up equipment.

Another method of estimating cost and implementing the equipment index factors and percent good factors, used infrequently but one which may have validity in certain situations, is reverse trending.  Where application of table factors does not accurately represent market, index factors can be applied (to acquisition cost) in a reverse sense in order to estimate the historical cost (cost to the original owner).  Then, the appraiser can apply traditional methodology to estimate value.  In order to utilize this approach, an auditor-appraiser should be assured that the results are indicative of market value on the lien date.

Reverse trending is a method of recognizing, and removing from the final valuation conclusion, assets that are still recorded on the assessee's books, but no longer exist, and have been replaced.  This method is particularly useful for hotel/motel or retail businesses, where periodic refurbishing occurs, but layers of prior costs are still recorded on the books of the property owner.

### *Steps in the Reverse Trending Process*

1.  Verify that in fact the books and records, and reported costs, appear to lack periodic updating for disposed assets.  Such an inference can be drawn when the original reported costs for each initial acquisition year indicate little or no change from lien date to lien date.

2.  Verify that costs of new replacements have actually been reported.  Assessees do not always report replacement costs.

3.  Determine year original asset(s) acquired.  If original acquisition year unknown, remove the estimated original cost from the earliest year, and then the next earliest year, etc., until all of the cost is deleted.

4.  Find appropriate price index factor(s) for the original asset's acquisition years.

5.  Divide the new replacement cost(s) by the price index factor(s) determined in step 4.

6.  Subtract the cost(s) determined in step 5 from the total cost(s) reported for the original assets' acquisition years.

| EXAMPLE 6.1 |
| --- |
| REVERSE TRENDING |

An assessee owns a machine shop and the start-up costs in 1987 for all equipment was $535,981.  Over the years the assessee has consistently reported $535,981 as 1987 acquisition costs.

The original acquisition in 1987 included the cost of a Bridgeport Mill, but the assessee does not know how much it cost in 1987, and does not have any other records to substantiate its cost.  In 2001 the assessee replaced the old Bridgeport Mill with a new one that cost $81,763, including sales tax, freight, and installation.

Use the following method to estimate the original cost to be deducted from the total recorded 1987 acquisition costs:

- From the AH 581, *Equipment Index and Percent Good Factors*, January 2002, Industrial Machinery and Equipment Table, , the 1987 price index factor is 134.

- Divide the new replacement cost, $81,763 by 1.34; the result is an estimated base cost for a Bridgeport Mill in 1987 of $61,017.

- Subtract $61,017, from the reported 1987 acquisition costs of $535,981.

| EXAMPLE 6.2 |
| --- |
| REVERSE TRENDING |

- A hotel owner expended $3,203,102 in 2001 for the refurbishment of 150 rooms in a 500-room complex.

- Although some costs have been deleted from the records over time, the property owner has not deducted any original costs relative to the 150 refurbished rooms.

To estimate the cost adjustment, index the earliest historical costs, and begin deleting costs, until an amount equivalent to the current dollar expenditure is removed.  (The commercial equipment index factors are taken from AH 581, January 2002.)

Begin with the audited fixed asset machinery and equipment costs (column titled F/A Cost), and adjust the indexed 2002 lien date assessable historical costs as shown on the following table.

| | | | | | |
|---|---|---|---|---|---|
| | | | EXAMPLE 6.2 (CONTINUED)<br>REVERSE TRENDING | | |
| Year | F/A Cost | Index Factor | Restated in 2002 $s | Cost to Remove | Full Economic Cost |
| 2001 | $ 3,203,102 | | | | $ 3,203,102 |
| 2000 | 123,784 | | | | 123,784 |
| 1999 | 56,223 | | | | 56,223 |
| 1998 | 72,358 | | | | 72,358 |
| 1997 | 1,225,488 | | | | 1,225,488 |
| 1996 | 2,789,321 | | | | 2,789,321 |
| 1995 | 698,354 | | | | 698,354 |
| 1994 | 3,579,684 | | | | 3,579,684 |
| 1993 | 7,899,642 | 114 | $9,005,592 | $414,823 | *7,535,762 |
| 1992 | 467,892 | 116 | 542,755 | 542,755 | |
| 1991 | 1,325,879 | 118 | 1,564,537 | 1,564,537 | |
| 1990 | 567,489 | 120 | 680,987 | 680,987 | |
| | | | | | |
| Total | $22,009,216 | | | $ 3,203,102 | $ 19,233,133 |

*2002$s   9,005,592 − 414,823 = 8,590,769
 1993$s   8,590,769/1.14 = 7,535,762

## VEHICLES

Vehicles subject to license by the Department of Motor Vehicles (DMV) for on road use *are not* subject to property tax assessment. The license fee imposed is in lieu of all property taxes levied for State and local purposes. However, vehicles exempt from DMV registration and license fee *are* subject to assessment by the assessor. They are considered "implements of husbandry" or "special vehicles" and are specifically exempted from DMV registration under Vehicle Code Sections 4000-4020.

"Implements of husbandry" include, but are not limited to, any tool, machine, equipment, appliance, device or apparatus used in the conduct of agricultural operations, and any additional items defined by the Vehicle Code.[205]   "Special vehicles" include steel-wheeled, track-laying, and rubber-tired equipment, and other vehicles which are not subject to the license fees by DMV.[206]  Also exempt from registration is special equipment, "special construction equipment"

---

[205] Section 411.
[206] Section 994.

and "special mobile equipment", as defined by the Vehicle Code.  Section 565 of the Vehicle Code, states:

"Special construction equipment" is:

(a)  Any vehicle used primarily off the highways for construction purposes and which moves only occasionally over the highways and which because of the length, height, width, or unladen weight may not move over the public highways unladen without the permit specified in Section 35780.

(b)  Any vehicle which is designed and used primarily either for grading of highways, paving of highways, earth moving, and other construction work on highways, or for construction or maintenance work on railroad rights-of-way, and which is not designed or used primarily for the transportation of persons or property and which is only incidentally operated or moved over the highway.  It includes, but is not limited to, road and railroad construction and maintenance machinery so designed and used such as portable air compressors, air drills, asphalt spreaders, bituminous mixers, bucket loaders, tracktype tractors, crawler tractors, ditchers, leveling graders, finishing machines, motor graders, paving mixers, road rollers, scarifiers, earth moving scrapers and carryalls, lighting plants, welders, pumps, water wagons, power shovels and draglines, speed swings, skip loaders, weed mowers, self-propelled and tractor-drawn earth moving equipment and machinery, including dump trucks and tractor-dump trailer combinations which either (1) are in excess of 96 inches in width or (2) which, because of their length, height or unladen weight, may not be moved on a public highway without the permit specified in Section 35780 of this [Vehicle] code and which are not operated laden except within the boundaries of the job construction site, and other similar types of construction equipment.[207]

"Special mobile equipment" is defined as "a vehicle, not self-propelled, not designed or used primarily for the transportation of persons or property, and only incidentally operated or moved over a highway, excepting implements of husbandry."[208]

All of these are subject to assessment by the assessor because they are exempt from license fees by DMV, except by one-trip or special permit.  Although identification plates may be found on these vehicles, they are not evidence that the vehicle is registered and the DMV license fee paid.  Vehicles bearing these identification plates are exempt from registration and should be assessed.[209]  The value should be determined using the same standards and guides used to value

---

[207] "Special construction equipment" does not include a vehicle originally designed for the transportation of persons or property to which machinery has been attached (unless specifically designated in section 565 of the Vehicle Code) or dump trucks originally designed to comply with the size and weight provisions of the Vehicle Code. (Section 570 of the Vehicle Code.)

[208] Section 575 of the Vehicle Code.

[209] Identification plates are obtained from DMV for a minimal fee, similar to the fee paid to register a vessel with a CF number.

other types of personal property according to section 413.  However, in some cases, the assessee of such property may be allowed to deduct from the amount of property tax any fee paid on such vehicle (i.e., temporary licenses or special permits including a fee for property tax).[210]    For example, if a permit costing $20 (paid for prior to the lien date for the calendar year in which the lien date occurs) included $5 for a registration or service fee and $15 for an in-lieu property tax, it may be appropriate for the total property tax dollar amount as determined by the tax collector (based on the assessor's estimated value) to be reduced by the amount of the in-lieu property tax paid ($15).

Other types of property, sometimes used in the ordinary course of business, that may be required to be registered by DMV include truck mounted equipment and relocatable offices.  Equipment that is permanently attached to a licensed vehicle is not subject to local property taxation because it is considered part of the vehicle.  When this equipment is attached to the vehicle the assessee is required to notify DMV so that the value of the vehicle can be adjusted.  (However, it is not assessable regardless of whether it is actually registered with DMV.)  Similarly owners of relocatable offices, usually utilized by construction companies, may register the trailer with DMV.[211]    These trailers are classified as commercial coaches by DMV, and the license can be verified with the yearly DMV (or HCD, the Department of Housing and Community Development) registration.  Since the assessee pays an annual "in-lieu fee" for these trailers to DMV, they are not subject to local property taxation.

## EXPENSED EQUIPMENT

Equipment expensed by an assessee for accounting purposes is assessable personal property as is any personal property used in the ordinary course of business.  Expensed equipment may include any type of equipment from small hand tools such as a screwdriver to large machinery.  Expensed equipment should be reported on the property statement yearly until disposed, but may go unreported.  In the course of an audit, an auditor-appraiser should investigate to determine reporting, classification, and assessment of these items.  When discovered, all valuation and assessment procedures are the same as those used for similar types of property.

## CONTAINERS

Compressed gas cylinders, beer barrels, and steel drums are examples of types of containers that are typically returned for refill and reuse.[212]    A deposit may be required, but there is generally no intention by the buyer to sell the containers but only the product contained within that container.  The value of such items is most often determined using the cost approach (cost less

---

[210] Section 994.

[211] The relocatable office may be registered with either DMV, HCD, or may be assessable by the assessor similar to mobile homes.  See Vehicle Code section 4010 and *Mobilease Corp* v. *County of Orange* (1974) 42 Cal.App.3d 461, where the court held that relocatable office trailers leased to various companies and registered with DMV were not subject to property tax.

[212] See Chapter 2 for discussion of situs of containers.

depreciation).  In some cases, a trade level adjustment may be appropriate.  However, the value shall not be less than the deposit or similar charge paid by the buyer.[213]

## LIQUEFIED PETROLEUM GAS TANKS

To promote assessment uniformity of liquefied petroleum gas tanks (commonly referred to as *propane tanks*), Rule 153 was adopted regulating the assessment and valuation of liquefied petroleum gas tanks.  Rule 153 defines *liquefied petroleum gas tanks* (*LPG tanks),* includes guidelines to determine if the property is leased or rented, identifies the ultimate consumer of the tanks, and describes valuation procedures.  An LPG tank is defined as:

> …a tank used as a means of storage, delivery, or transfer of liquefied petroleum gas products.  The term also includes related equipment, apparatus, gauges and meters, attached to or installed on the tank.[214]

The LPG tank defined is considered leased or rented "if the purchaser of the liquefied petroleum gas is required to pay: (1) sales or use tax measured by the purchase price or a separately stated lease or rental price of tank, or (2) installation fees or charges, maintenance fees or charges, rent, or any other separately stated periodic charge on the LPG tank."  The ultimate consumer of the tank is determined based on the length of the lease[215] or, if not leased or rented, the ultimate consumer of the property is considered to be the owner of the tank.  Once the ultimate consumer is defined, the assessor can value the tank accordingly.

## OAK BARRELS

Oak barrels are often used in the manufacturing of wine or brandy.  This property may be assessable; however, in many cases oak barrels qualify as business inventory.  Rule 133(a)(2)(B) states, in part, that "business inventories" include:

> New and used oak barrels used in the manufacturing process that physically incorporate the flavor- and aroma-enhancing chemical compounds of the oak into wine or brandy to be sold, when used for this purpose.  However, an oak barrel is no longer business inventory once it loses the ability to impart the chemical compounds that enhance the flavor and aroma of the wine or brandy.  An "oak barrel" used in the manufacturing process is defined as having a capacity of 212 gallons or less.  Oak barrels not used in the manufacturing process but held for sale in the ordinary course of business are also considered business inventory.

When oak barrels qualify as business inventory as indicated by Rule 133, the property is exempt from taxation.

---

[213] Section 996.
[214] Rule 153(a).
[215] A lessee or renter is the ultimate consumer of the tank if the property is leased or rented for an extended period over six months (Rule 153(c)(1)).  The owner of the LPG tank is the ultimate consumer of the tank if the property is leased or rented for six months or less (Rule 153(c)(2)).

## ANIMALS AND MIGRATORY LIVESTOCK

Animals and livestock, where classified as personal property and not exempt as business inventory, pets, or otherwise, are assessable at full cash value on the lien date in the county where they have established situs. Taxable animals include those used in riding stables, pack station operations, or rodeos, stallions or broodmares held for breeding, and registered or show horses even when located on premises which belong to a person other than the property owner. Animals involved in the production of food and fiber, such as dairy cattle and bulls, beef cattle and bulls, draft animals, swine, sheep, and poultry, and animals held for sale or lease on the lien date are exempt from taxation as inventory.

Determining location, or situs, may be difficult due to the constant movement of the "property." It often moves from city to city, county to county, or even state to state. The rules of situs apply. In the case of livestock, location may include more than one county; livestock may graze on land that is on the county line, or the livestock may be physically moved from field to field between counties.[216] Where this occurs in significant proportions, section 990 allows for proration by the assessors' concerned. Section 990 states:

> Where migratory livestock are ranged in two or more counties during the year, the assessors of the counties interested may meet and prorate the number of stock to be assessed in each county, taking into consideration the time such stock ranged in each county.

Racehorses are also taxable as personal property. However, valuation is not required. Unlike other types of property, the owner computes and reports the tax due based on section 5722. The statement is then filed directly with the tax collector.[217] See Chapter 7, *Property Statements,* for more information on the assessment of racehorses.

## SPECIAL VALUE ALLOWANCES

### Works of Art

The value of a work of art still owned by the artist who created it that has never been sold nor exhibited for profit, for assessment purposes, is the "full value of the materials which constitute the work of art."[218] Works of art, antiques, and other decorations used in conjunction with a business and not otherwise exempt, should be assessed at their full cash value.

---

[216] For other types of animals, situs should be determined based on the situs rules discussed in Chapter 3, *Situs*.

[217] The assessor must mail Board prescribed forms to owners of racehorses although the assessees file the statements with the tax collector (Rule 1045(a)(2)). The assessor must also audit the records of any racehorse owner who had a gross tax liability that exceeds $2,000 for each of four consecutive years pursuant to Rule 1045(a)(3).

[218] Section 986.

## Motion Pictures[219]

The value of motion pictures (including the negatives, prints, and videocassettes), for property tax assessment purposes, is "the full value of only the tangible materials upon which such motion pictures are recorded."  Section 988 states:

> . . . Such full value does not include the value of, or any value based upon, any intangible rights, such as the copyright or the right to reproduce, copy, exhibit or otherwise exploit motion pictures or the negatives or prints thereof.

## Business Records

The assessment of business records (records of persons engaged in a business or profession) is governed by section 997.  The value of this property, for assessment purposes, is "the cash value only of the tangible material upon which, or in which, such records are recorded, maintained, or stored" (section 997(a)).  Similar to motion pictures, the value must be "determined without inclusion of or consideration of the intangible value of the information or data so recorded, maintained or stored, nor the intangible right to utilize such information or data."

## ONE-WAY PAGING COMPANIES

For the 1996 lien date and thereafter, one-way paging service companies utilizing facilities that are licensed by the Federal Communications Commission (FCC) are assessable by the county assessors.  This is due to deregulation of the industry that prompted amendment to section 234 of the Public Utilities Code.[220]   Previous to 1996 and this deregulation, these companies were assessed by the State Board of Equalization.  Assessors now have jurisdiction over the one-way paging companies; while the Board continues to have assessment jurisdiction over the radio telephone companies regulated by the California Public Utilities Commission (CPUC).[221]

Most often, equipment owned by these companies is valued using the cost approach (Reproduction Cost New Less Depreciation - RCNLD).  It is important to have a general knowledge of the equipment to be valued in order to apply appropriate equipment index and percent good factors.  Following is a listing of equipment normally applicable and assessable to one-way paging companies.  This equipment should be reported on the Business Property Statement when applicable, to the county, and should be looked for when conducting audits of these types of accounts.

### Control and Message Center Equipment
- Radio-telephone control consoles
- Equipment and wiring

---

[219] Assessment of motion picture negatives.  *Michael Todd Co.* v. *County of Los Angeles*  (1962) 57 Cal.2d 684.

[220] A telephone corporation (company) does not include any one-way paging service utilizing facilities that are licensed by the Federal Communications Commission, including but not limited to, narrow-band personal communications services described in Section 24.100, Part 24 of Title 47 of the Code of Federal Regulations in effect on June 13, 1995.

[221] The Board's Valuation Division maintains a list of state assessed companies.

- Interconnect equipment, and associated apparatus used in receiving, forwarding, and terminating calls and messages and for other control purposes

- Monitoring and measurement equipment installed for regular control purposes

### Fixed Station Equipment
- Transmitters

- Receivers

- Antennas

- Associated equipment and wiring used in base station and repeater operations

- Microwave facilities

- Other equipment used for control of base station operations

### Mobile Equipment for One-Way Radio Service, Signaling, or Paging
- Receivers

- Decoders

- Mobile antennas

- Associated apparatus that is mounted in vehicles or is hand portable (Note: mobile units in stock may be subject to the business inventory exemption.)

### Shop and Test Equipment[222]
- Instruments

- Tools

- Other equipment located in offices, shops, or vehicles and used in testing, maintaining, and constructing a radio-telephone plant.

## BIOPHARMACEUTICAL INDUSTRY EQUIPMENT AND FIXTURES

Effective January 1, 1999, the Board adopted guidelines pertaining to the assessment of specific property owned and/or used by the biopharmaceutical industry.[223]   The biopharmaceutical industry is defined as:

> Firms engaged in research and/or manufacturing activities that use organisms, or materials derived from organisms, and their cellular subcellular and molecular components to discover and/or provide products for human or animal therapeutics and diagnostics.  Biopharmaceutical activities make use of living organisms to develop and/or produce commercial products, as opposed to conventional pharmaceutical activities, that make use of chemical compounds to develop and/or produce commercial products.  Firms engaging in agriculture, animal

---

[222] Note that in many cases, paging companies charge small tools and instruments or other equipment costing $50 or less directly to operating expense at the time of purchase.
[223] LTA 99/54.

husbandry, and pharmaceutical delivery in the area of research and/or manufacturing are specifically excluded.

The guidelines adopted by the Board include direction regarding reporting of equipment and fixtures on property statements (i.e., Form 571-L), a sample listing of equipment covered by the guidelines, and a suggested valuation table for use in mass appraisals of reported equipment. When appraising property owned and/or used by a biopharmaceutical company, reference to LTA 99/54 for specific information is helpful.

## POSSESSORY INTERESTS

As discussed earlier regarding leases with governmental entities, except for property not exempt pursuant to section 201.5 (California Pollution Control Financing Authority), the Legislature has not defined "taxable possessory interest" as applicable to personal property.[224] With the exception of the air pollution control provision, there is no possessory interest in personal property. Possessory interest is applicable to real property, including property that was formerly personal property but is now classified as fixtures.[225] The value of the taxable *possessory interest* is based on the value of the right to possess or use publicly-owned real property.

When an auditor-appraiser encounters leased real property (structure items or fixtures) owned by an exempt public entity, the real property division should be consulted to determine whether a taxable possessory interest exists. The value of this interest is assessable to the lessee on the same basis or percentage of value as other property under section 107.1.

## PAWN SHOPS

Property in possession of a pawnbroker, for sale or held for sale by the pawnbroker, is not assessable to him or her.[226] This is exempt inventory to him/her whether or not the property is owned by him/her unless used in the ordinary course of business.

## VALUATION OF AIRCRAFT AND VESSELS

Valuation of aircraft and vessels is unique. Unlike other personal property, this property is normally valued using the comparative sales approach. Sales of similar types of property are usually the best indicators of value. Valuation of both aircraft and vessels is discussed in-depth in separate Assessors' Handbook sections.

---

[224] *General Dynamics Corp.* v. *County of Los Angeles* (1958) 51 Cal.2d 59. Section 201.5
[225] Section 107.
[226] Section 989.

## BANKRUPTCY

Bankruptcy is a legal process under federal law with the most common provisions being:

- Chapter 7 – A complete cessation of business and almost complete liquidation of assets of the petitioner to provide for the satisfaction of creditor claims.  Certain assets may be allowed exemption from liquidation.

- Chapter 11 – Allows a reorganization of a business to promote and facilitate a rehabilitation or restructuring it finances in order to continue operations and avoid liquidation.  The filing of a Chapter 11 petition automatically institutes a stay of debt collections and lien enforcement while a reorganization plan is negotiated with creditors based on the future earning capacity of the business.  The stay on the bankruptcy estate are terminated when the plan is confirmed by the court.

- Chapter 13 – Allows individual debtors the opportunity to develop a new repayment program for financial obligations.  Debtors receive protection from creditors' collections while their debt adjustment plan is being developed.  Once the plan is approved by the court, the bankruptcy estate terminates and the plan is executed.

Each type of bankruptcy provides a measure of protection to the petitioner by prohibiting legal action by creditors against the petitioner.  In the case of petitions under both Chapter 11 and Chapter 13, the petitioner usually retains possession and control of the assets.

### ASSESSEE OF A BUSINESS IN BANKRUPTCY PROTECTION

Although the filing of a petition for bankruptcy under Chapters 7, 11, or 13 creates a separate and distinct estate, the estate of the bankrupt, the beneficial use of the bankrupt's assets is not transferred upon the creation of the estate.  Therefore, the assets do not undergo a reappraisable change in ownership upon the creation of the estate.

Property in an estate should be enrolled, whether the assessment is a regular one or an escape, in the name of the estate or in the name of the beneficiary who will receive the particular property.  If the property has been distributed, the assessment, regular or escape, should be in the name of the beneficiary only since the executor's/administrator's liability to pay taxes ceases once the estate is distributed.

Frequently, the State Board of Equalization discovers information concerning bankruptcy filings in conjunction with the Policy, Planning, and Standards Division's Legal Entity Ownership Program (LEOP).  This information is forwarded to the county assessors upon discovery.

### SPECIAL VALUATION ISSUES SURROUNDING BANKRUPT ENTITIES

Once a bankruptcy petition is filed, the federal bankruptcy court assumes jurisdiction, and can determine the assessed value of property under certain circumstances.  Since taxes take

precedence over some other claims, interested parties may seek to have the court reduce the assessed value, thus affecting the related taxes that are due.  In this manner, other unsecured creditors will receive a larger share of the funds available.

Sales of assets from a bankruptcy estate should not necessarily be considered valid indicators of market value under the definition of Revenue and Taxation Code section 110.  The buyer of property from a bankrupt's estate has the ability to take advantage of the exigencies of the seller. Frequently, the trustee's desire to liquidate the assets in an abbreviated period of time further impinges on the concept of "open market transaction."

A write-down of the assets after a discharge in bankruptcy to net book value, or some other amount, should also be carefully reviewed.  The newly recorded amounts may not represent historical costs, or fair market value, as defined for property tax purposes.

This page intentionally left blank.

# CHAPTER 7:  PROPERTY STATEMENTS

Property statements are declarations of assessable property signed under penalty of perjury.  The property statements filed by assessees are used by assessors to gather information and ultimately determine the assessable value of property.[227]

> The property statement shall show all information as of 12:01 a.m. on the lien date.[228]

> Except as otherwise specifically provided, all tax liens attach annually as of 12:01 a.m. on the first day of January preceding the fiscal year for which the taxes are levied.[229]

The statement shall show "all taxable property owned, claimed, possessed, controlled, or managed by the person filing it and required to be reported thereon."[230]  The property statement shall also show the situs of the property,[231] and a description of the property in the detail required.[232]

In compliance with section 451, the information on a property statement filed by assessees is confidential information.  This section reads:

> All information requested by the assessor or furnished in the property statement shall be held secret by the assessor.  The statement is not a public document and is not open to inspection, except as provided in Section 408.

In general, property statements are similar from county to county.  All property statements are prescribed by the Board as set forth under Rule 171, which reads in part:

> Except as specifically authorized by the board with respect to heading, name and address of the taxpayer, location of the property, assessor's use columns, and the like, the assessor shall not change, add to, or delete the specific wording of property statement forms or mineral production report forms prescribed by the board or change the sequence of the questions, but he may otherwise arrange the content and alter the size and design of a property statement or mineral production report form to meet the needs of his office procedures and facilities.

Each year, the Board prescribes the property statements that are available for use by assessors for the forthcoming assessment year.  The assessor is required to notify the Board of the forms

---

[227] There are several types of property statements based on type of property: business property, agricultural property, apartments, vessels, aircraft, etc.  Most of these property statements are prescribed by the Board.  For state assessed properties, property statements are governed by Part 2, Chapter 4, Article 5 commencing with section 826 through 834.
[228] Section 448.
[229] Section 2192.
[230] Section 442.
[231] Section 443.
[232] Section 445.

(including exemption claim forms, which are also prescribed by the Board) that will be reproduced using the Board's template, the forms that will not be used, and forms originated by the Board that may have been rearranged by the assessor. Rearranged forms must be submitted to the Board for approval. A checklist provided by the Board accompanies a copy of the forms and instructions submitted to the Board by the assessor.

Assessors commonly develop their own forms to supplement the use of property statements. Such forms or questionnaires may be used in lieu of property statements unless the assessee is required by law to file a property statement. For example, section 441(a) requires that every person who owns taxable personal property (other than a manufactured home) in the county that costs $100,000 or more must file a property statement. For smaller accounts, the assessor may require the person to file a property statement or may use a questionnaire instead. The key difference between property statements (which must be prescribed by the Board) and questionnaires is that the assessee is subject to a 10 percent penalty for failure to file a property statement timely,[233] but the assessor cannot impose a penalty for failure to respond to a questionnaire. The only exception is that in the case of general aircraft, section 5365 provides that the assessor may ask the owner to file a statement (not Board-prescribed) setting forth the make, model, and year of manufacture of the aircraft, and section 5367 provides for a 10 percent penalty for failure to file the statement timely.

The assessor may request any person within his county to file a property statement.[234] It is, however, much more efficient to request a statement only from those actually owning, possessing, or controlling personal property. An assessor, therefore, should have a program to (1) discover assessable personal property, (2) obtain declarations (or property statements) and (3) process these statements once filed. This chapter will discuss each of these aspects.

## DISCOVERING ASSESSABLE PERSONAL PROPERTY

The business climate is ever changing with businesses opening, closing, transferring, and changing locations constantly. (Other types of personal property, vessels and aircraft for example, also exist in ever changing environments.) Therefore, the assessment roll regarding personal property and fixtures must be continually updated. Developing a program for discovering information regarding taxable personal property and fixtures, and for verifying new and existing information, is the best assurance that the assessment roll is complete, accurate, and valid.

Discovery methods may differ from county to county. These methods may involve procedures tracking property transfers, city and county business permits, sales tax permits, business questionnaires, telephone and reverse telephone directories, newspapers, BOE Forms 600B and 600R, FAA (Federal Aviation Association), California Race Horse Association, and Department of Motor Vehicle (DMV) records. It may also include conducting a field canvass and field

---

[233] Section 463.
[234] Section 453.

checks.  Due to budgetary and time constraints, an assessor may use any or all of these methods depending upon what works best and is most cost effective in that particular county.

## Property Transfers

If a business or property transfer is processed through escrow, a statement of bulk sale or tax clearance from the county tax collector may be required.  These statements contain helpful information regarding the existing business and ownership in addition to information regarding the buyer.  If a sale does not go through escrow, information regarding the sale may be provided by the seller.  In some situations, to prevent future tax liability, sellers notify the assessor when their business is sold.  Whether obtained from the tax collector, the seller, the buyer or another source, the information regarding the sale of a business can be used to update the assessor's inventory of assessees who may have taxable personal property or fixtures in the county.

## Business Permits

If a business operates (or is planning to operate) within city or county limits, the owner may be required to apply for a business permit.  The application normally requests, in addition to other information, the business name, owner's name, business location, and phone number.  Therefore, business permit records can provide a valuable source of information to the assessor for property tax purposes.  Some cities and counties have monthly summaries of new businesses that they make available to the assessor.  (It is in the city's best interest to aid the county assessor since a portion of collected tax dollars are allocated to them.)

## Sales Tax Permits

On a monthly basis, the Board of Equalization prepares sales tax permit registration information for counties.[235]  This information includes owner and business names, D.B.A. (Doing Business As), address, type of business, and other information pertinent for a business acquiring or updating a sales or use tax permit in the county.  The information can be used to update and/or verify business information.  In respect to the type of business, the classification code provides a description of the business.  A listing of the classification codes is included in Appendix C for reference purposes.

## Business Questionnaires

Business questionnaires can be a low-cost, yet valuable tool, for following up on other source documents and public records.  If data received from other sources do not provide all information required to initiate a new account, or verify information on an existing account, a questionnaire specifically designed by an assessor's business division to request pertinent information may save the time of the field visit (field check).

---

[235] In the past, this information has been supplied on 3" x 5" cards, but is now also available on computer disc.  (To receive the information on computer disc, call the State Board of Equalization's Local Revenue Allocation Section at (916) 324-1321.)

**Telephone Directory and Reverse Telephone Directory**

A telephone directory or a reverse telephone directory, especially if published near the lien date, can be a useful resource for discovery of businesses.  Basic information found here can be used to send business questionnaires or arrange field checks in order to gather enough data to establish or update business accounts.

**Newspapers**

Useful information concerning business formations, dissolutions, transfers and other changes are found in newspapers.  Items referring to newly established businesses or closings are helpful to update the assessment roll.  In addition, items regarding new products, or acquisition of a new subsidiary are helpful when establishing an audit list or preparing for an audit.

**Valuation Form 600B and 600R**

Forms 600B and 600R are forms sent from the Valuation Division of the Board of Equalization to the county assessors.  The forms include lists of equipment leased by State-assessed companies that should be locally assessed.  State-assessed companies, such as public utilities, are assessed by the Board, but the Board may delegate to county assessors the duty to assess property used but not owned by the state assessee.[236]

**Department of Motor Vehicles (DMV)**

The DMV is a good source for verifying information regarding vessels, special vehicles, or other licensable equipment.  Based on the vehicle license number (i.e., CF number for a boat), DMV can provide information such as owner's name, mailing address, location of the property, date of purchase, and purchase price.

**Field Canvas**

Field canvassing is a technique that involves physically viewing every business location.  It is used to confirm current business information in comparison to the assessor's roll, and it can be a reliable technique for discovery.  However, the field canvas method of discovery is very time consuming and thus may be inappropriate for frequent use.

**Field Checks**

A field check is a modified version of the field canvas.  Instead of visiting every business, an appraiser visits only those where information, or partial information, is already available.  For example, field checks can be used as a follow-up on undelivered Business Property Statements and when property statements are not filed for an account in consecutive years.

Valuable information may be discovered when the auditor-appraiser is physically at the business location.  In addition to obtaining information regarding the owner, the auditor-appraiser can

---

[236] Article XIII, section 19.

secure data necessary to estimate the value of the business property.  Such data, and the value estimate, becomes essential if the assessee does not file the Business Property Statement.

### Other Sources of Information

Other sources of information that are available to assessors for the discovery of new businesses include, but are not limited to: change in ownership statements, building permits, certificates of occupancy, health permits, documents filed with the Secretary of State, and business web sites. Each may provide valuable information that is necessary to make a valid assessment.  Discovery methods differ from county to county and each county should determine the most effective means of discovering new businesses and updating information on existing businesses.

## OBTAINING STATEMENTS

### FILING REQUIREMENTS

Some assessees are required to file property statements.  Others are required to file only upon request of the assessor.  Section 441(a) identifies the requirements, as follows:

> Each person owning taxable personal property, other than a mobilehome subject to Part 13 (commencing with Section 5800), having an aggregate cost of one hundred thousand dollars ($100,000) or more for any assessment year shall file a signed property statement with the assessor.  Every person owning personal property that does not require the filing of a property statement or real property shall, upon request of the assessor, file a signed property statement.  Failure of the assessor to request or secure the property statement does not render any assessment invalid.

When the county assessor mails or otherwise provides a property statement to an assessee, the assessor has thereby requested the assessee to file.  These statements must then be filed timely and signed under penalty of perjury by the deadline as prescribed under section 441.[237]  If a property statement is filed by May 7, as required by section 441, a property owner may amend the statement for errors or omissions that were not the result of willful intent to erroneously report until May 31.

If the assessee does not file the property statement by May 7, the assessor shall estimate a value and add a 10 percent penalty to that estimated assessed value.[238]  For existing businesses, this value might be the value from the previous roll year.  For new businesses, this value may be estimated by the appraiser based on similar businesses or based on the initial information received when the business was originally added to the assessment roll.  No matter what method

---

[237] Property statements should be filed with the assessor between the lien date (January 1) and 5 p.m. on April 1.  A late penalty applies if the statement is filed after May 7.
[238] Section 501 and section 463.

is used to estimate the current roll value, it should be a reasonable estimate of market value based on available information.[239]

When a property statement is filed timely in duplicate (on or before the prescribed deadline), the assessee may request the assessor to provide the full value computed by the assessor for each category (supplies, equipment, etc.). Under section 443.1, the assessor has the obligation to comply. Further, the assessor is required to return the duplicate, with the full value for each category, to the assessee by July 15th of the year in which the statement was filed.

## DIRECT BILLING

For smaller businesses and other selected accounts, assessors may use direct billing.[240] Direct billing systems select accounts to appraise periodically, normally once every three or four years, in lieu of annual property statements. When the total (personal property and fixture) value of a business changes very little from year to year, direct billing can have a number of advantages over annually sending a property statement. The advantages for both the assessor and the property owner are efficiency and cost savings. The process (1) reduces the number of property statements mailed out, received, and processed each year, thus reducing administrative costs, and (2) deletes the filing requirement for the assessee (unless material changes are made to taxable property in that year).

Accounts appropriate for direct billing are usually established (older) businesses, having tangible personal property costing less than $100,000, and minor changes in equipment holdings from year to year. Small barbershops and small retail stores with minimal equipment holdings are good examples. The total personal property and fixture value of these businesses usually does not change much annually.

Many accounts are not appropriate for direct billing. Direct billing cannot, for example, be used for accounts whose tangible personal property cost is $100,000 or more, since these accounts are required to file in accordance with section 441. New businesses, no matter what the value, should not be put on direct billing. New businesses tend to acquire equipment more often than do older businesses of similar type. Even if a new business seems to fit the description of a business that could appropriately be put onto the direct billing system, the assessor may wish to have property statements for the first year(s) in the business file. These property statements would establish a starting point for determining a valid assessment and confirm that the account is a good candidate for direct billing due to little or no change in property acquisitions or disposals.

---

[239] Section 501.
[240] *Direct billing* is not mandated or even discussed in the statutes. Direct billing is a system of assessment developed by the counties. Taxpayers cannot be required to participate in a direct billing system. In addition, the assessor is not precluded from processing roll corrections if applicable.

# PROCESSING PROPERTY STATEMENTS

## PRELIMINARY REVIEW: REQUIRED INFORMATION

Upon receipt of a property statement, the statement should be logged as received and verified as complete. If the statement is not complete, an accurate assessment cannot be accomplished. The guidelines used in the determination of a complete property statement are identified in the statutes and are discussed below.

To verify completeness pursuant to these sections, and to aid in processing a statement, it may be helpful to use a checklist. An example of a property statement checklist is found later in this chapter.

In lieu of completing the property statement provided by the assessor, an assessee may furnish information as attachments to the property statement (i.e., assessee prepared computerized version of the property statement). This filing is acceptable provided that the property statement attachments (1) are in a format specified by the assessor, (2) include one copy of the property statement, as printed by the assessor and executed by the taxpayer, and (3) include appropriate reference to the data. The property statement (and attachments) should be reviewed, as is any other property statement pursuant to guidelines discussed below.

### Contents of Statement

"The property statement shall show all taxable property owned, claimed, possessed, controlled, or managed by the person filing it and required to be reported thereon."[241]   The property statement is made up of several sections, titled "parts" in addition to Schedule A and Schedule B. Each section requests information necessary for a valid assessment. It is important to review each section of the statement for possible errors.

### Situs

A valid assessment requires a specific location; property must be assessed in the appropriate county, city, and district. Therefore, the property statement shall also show: (a) the county where the property is taxable and (b) if taxable in the county where the statement is made, any city or revenue district where it is situated.[242]   This generally requires the assessee to report the physical address of the property or the assessor's parcel number on which it is located. The statement is not complete if the location of the property, as specified in section 443, is not shown.

It is not only important to verify that the situs of the property is reported, but that the property is reported to the appropriate county. It is not uncommon for an assessee, owning several businesses at various locations in California, to file a statement with the wrong county. At times, erroneous assessment(s) can be avoided simply by reviewing the reported situs on the property statement. (Other times, however, situs errors may not be identified until an audit is conducted.)

---

[241] Section 442.
[242] Section 443. Each city or district may have different tax rates within the jurisdiction.

## Description of Property

"The property statement shall show a description of property, in the detail required."[243]  Such detail shall include the cost of the property, if the information is within the knowledge of the assessee or is available from his or her own or other records, and the classification of the equipment (the physical description).[244]  The property statement instructs the assessee to report the equipment by category (machinery and equipment, office equipment, computer equipment, etc.) year of acquisition, and cost.  Further description (other than total cost by year and classification) is required for reported additions and deletions of improvements and construction in progress.

It is important to determine whether the property is properly described in order to make an accurate assessment.  Some statements, for example, are received with the total cost reported on the front sheet, but without costs classified or reported by year of acquisition on Schedule A.  Others are received with a valid signature but no costs reported anywhere on the form (or with a statement "same as last year").  Still other statements may be filed with costs which appear inappropriate (i.e., the rendition does not resemble the costs that were reported in the previous year).  Review of property statements filed in previous years or a phone call to the assessee, or both, may clear up some discrepancies or inconsistencies in the current property statement.  In some cases it is necessary to mail the statement back to the assessee to request that the omitted information be submitted.  (It may be advisable for the assessor to keep a copy of the statement prior to sending the statement back.)  In these situations, the statement is not considered filed by the assessee unless the deficiencies are corrected and the completed statement is returned prior to the filing deadline.

## Tax Day

As previously noted, a property statement shall show all information as of 12:01 a.m. on the *lien date*.[245]  The lien date, pursuant to sections 2192 and 722, is January 1.[246]

It is important to remind assessees that an assessment is based on information (as reported on the property statement) and value of property owned on the preceding lien date, although the tax bill may not be received until either July[247] or November[248] of that same year. An assessee filing a 2002 property statement (which declares property owned as of 12:01 a.m. January 1, 2002), for

---

[243] Section 445.
[244] As noted earlier the statement is signed under penalty of perjury.  Therefore, unless additional information indicates otherwise, it must be assumed that the taxpayer classified the property accurately.
[245] Section 448.
[246] Prior to January 1, 1997, the lien date was 12:01 a.m. March 1 pursuant to these sections.
[247] In general, section 2910.1 requires that the tax collector mail or electronically transmit the tax bills (or copies) for property on the unsecured roll no later than 30 days prior to the date on which taxes are delinquent.  Unsecured taxes are delinquent on August 31 (section 2922).
[248] In general, section 2610.5 requires that the tax collector mail or electronically transmit tax bills (or copies) for property on the secured roll on or before November 1.

example, will receive a tax bill for:

- an unsecured account by mid-July 2002 for the fiscal year July 1, 2002 - June 30, 2003.[249]

- a secured account in November 2002 for the fiscal year July 1, 2002 - June 30, 2003.

The tax bills, in both cases, reflect property reported on 2002 property statements as of the lien date, January 1, 2002; the cost of all taxable property acquired and owned or controlled as of or through December 31, 2001.  Sale or disposal of the personal property (business property, vessels, and aircraft) between the lien date and start of the fiscal year does not relieve the assessee of any tax liability[250] unless the assessment is secured and the new real property owner does not own, claim, possess, or control the personal property at any time between the lien date and the date the assessment was made.[251]  Personal property taxes are not prorated and are assessed to the owner on the lien date.

## Authorized Signature

Property statements and mineral production report forms prescribed by the Board, and filed with the assessor or the Board, must be signed by the assessee, a partner, a duly appointed fiduciary, or an authorized agent.[252]  Statements filed on behalf of a corporate assessee must be signed by an officer or by an employee or agent for whom the board of directors has submitted written authorization to sign on behalf of the corporation.  When signed by an agent who is not a member of the bar, a certified public accountant, a public accountant, an enrolled agent, or a duly appointed fiduciary, then the assessee must authorize appointed agents by filing a statement with the assessor's office.

Facsimiles or copies of original signatures are not acceptable as valid signatures.  A copy of the original may be accepted, but the original document and signature should be provided timely to constitute a valid filing since facsimiles and copies merely represent the likeness of the original.  A property statement that is unsigned, or signed by an unauthorized agent, does not constitute a valid filing.[253]  Such a statement is incomplete and invalid, and should be returned to the assessee.  (It may be advisable to keep a copy of the statement prior to sending the statement back.)

## SPECIFIC SECTIONS OF THE PROPERTY STATEMENT

When it is concluded that a property statement is complete, it is a valid filing.  The next phase is reviewing the reported information and processing the data into an estimate of value.  The appraiser should initially review sections on the form that may require extra attention or where the assessee needs to be contacted for additional information or clarification.  For example, costs

---

[249] Unsecured taxes are due on January 1: therefore, some counties mail the unsecured tax bills as soon as the assessments are prepared.
[250] See Example 1.1.
[251] Section 2189 provides that in such a case the assessment of the personal property must be transferred to the unsecured roll.
[252] Rule 172.
[253] Rule 172.

reported as construction in progress and costs reported on Schedule B usually require review and coordination by both a real property appraiser and auditor-appraiser. If the itemized and detailed descriptions of these costs are missing from the filing, the assessee may need to be contacted.

Besides reviewing specific areas that may require special attention or follow up work, it is also important to focus on the statement in whole. That is, does the total reported cost for this type of business seem appropriate? Review (and processing) of specific parts of the property statements are discussed below. The Business Property Statement is used as an example, although there are other statements filed with the business division of the assessor's office.[254] In all cases, the statements request data on the owner, location, and cost of the property.

## Part I:  General Information

This section of the property statement provides general information on the business and indicates (a) the type of business, (b) the telephone number, (c) if the assessee owns the realty where the business is located, (d) when the business started at this location, (e) confirms the business location, (f) where the records are located, (g) if a change in ownership or control has occurred during the last year, and (h) if the company or business has any related business entities in the county.

(a)      **Type of business**: Business type (retail, manufacturing, service, etc.) is information useful when applying appropriate valuation factors and for gauging whether the reported costs appear reasonable for that type of business.

(b)      **Telephone number**: The phone number provides a convenient way to contact the assessee in the event questions arise during the review and processing of the statement.

(c)      **Owner of realty**: Business personal property can be secured to realty if in fact the owners of the personal property and the real property are one in the same. It is, therefore, important to determine the ownership of the realty where the business is located. Business personal property held by a corporation, for example, cannot be secured to real property if held in the name of an individual.

(d)      **Date business started at current location**: It is important to know when the business started at the current business location. It is possible that the business was at a different location within the county, operating in another county or escaped assessment in prior years.

(e)      **Business location**: The business location, or situs of property, indicates whether the business is physically located in the county and it is used to designate the appropriate tax rate area.

(f)      **Location of records**: If an audit is required or needed, the audit is normally conducted at the location of the original books and accounting records (which may or may not be at the business location within the county).

---

[254] A sample of a Business Property Statement is included in the appendix for reference purposes.

(g)    **Change in ownership or control during the last fiscal year**: A change in ownership of the real property or a change in control of the partnership, corporation or legal entity owning the property is important information that must be conveyed to the real property division.   An appraiser should also note how this section is completed because it may affect the costs reported in Part II of the statement.

(h)    **Related business entities in the county**: If the assessee owns other businesses in the county, all the assessments of personal property and fixtures must be accumulated to determine whether the business is subject to mandatory audit.  It could also be a source of information in the discovery of new businesses, and other related businesses.

## Part II:  Declaration of Property Belonging to You

This is the section of the statement where the assessee reports property owned by the business. The property is reported by type including (a) supplies, (b) equipment, (c) equipment out on lease or rent to others, (d) buildings, building improvements, and/or leasehold improvements, land improvements, land and land development, and (e) construction in progress.

With the exception of supplies and construction in progress (discussed below), property reported by the assessee should be classified and reported by year of acquisition.  The statement gives instructions to the assessee on classification of the property and applicable costs to be included in the reported cost of the property.  However, the assessee is not required to value the property.[255] Valuation is conducted by the assessor's office.[256]

### Supplies

Supplies are a category of personal property that is frequently not reported, although the majority of assessees have at least minimal taxable supplies.  Many times the cost is low and it is simply forgotten by the assessee.  In reviewing the statement, an auditor-appraiser should check the reported supplies figure.  Is a supplies cost reported?  If so, is it appropriate for that type of business?  If not, what should it be?

Following is an example of supplies reported on a Business Property Statement.

---

[255] *Clunie* v. *Siebe* (1896) 112 Cal. 593.
[256] Classification and valuation are discussed in other chapters of this manual.

---

**EXAMPLE 7.1**

**SUPPLY COSTS REPORTED ON THE BUSINESS PROPERTY STATEMENT**

---

The owner of a small video rental store reports $21,500 of supplies, $15,000 of equipment, and $5,000 of leasehold improvements.

**DOES THE REPORTED SUPPLIES COST APPEAR REASONABLE (IN TERMS OF QUANTITY, COST, AND TYPE) IN RELATIONSHIP TO THE SIZE, LOCATION, AND TYPICAL OPERATION OF A VIDEO STORE?**

No.  The reported supplies cost does not appear reasonable based on a "typical" video store.  It appears that the assessee either misclassified property, or reported property that is considered business inventory for property tax purposes.  The assessee may have reported the total cost of the movies in the rental stock.  If so, supplies are overreported.  Only the movies out on rent on the lien date are reportable and assessable.  The movies "held for rent" are exempt inventory.  The appraiser should contact the assessee to clarify what cost items are included in the $21,500 cost reported as supplies on the property statement.  The value of a videotape is the assessable value of the blank videotape only.

---

As shown in the example above, it is important to review reported supplies for reasonableness and contact the assessee or other sources for more information if necessary.

### Construction-In-Progress (CIP)

The instructions require the assessee to attach a schedule supporting CIP reported on the property statement.  This schedule should identify all of the costs which make-up the reported CIP total.  Using this schedule, the costs can be classified; the total may include costs that are not assessable, and/or costs that should be allocated between the secured or real property assessment and the personal property assessment.  It is important to coordinate the classification and assessment of these items with a real property appraiser to avoid duplicate or under assessment.

### Schedule A[257]

On the Business Property Statement, Form 571-L, Schedule A includes seven categories of equipment: (1) *machinery and equipment for industry, profession, or trade*, (2) *office furniture and equipment, (3) other equipment, (4) tools, molds, dies, jigs, (5) computers* (component cost of $25,000.00 or less), (6) *computers* (component cost of $25,000.01 to $500,000.00), and (7) *computers* (components costing $500,000.01 or more).  All equipment should be reported here at the proper trade level, including short-lived and expensed equipment, and equipment acquired through lease-purchase agreement at the selling price effective at the inception of the lease.

### Schedule B:  Proper Classification of Fixture and Structure Items  (Schedule B)

Schedule B includes four categories of improvements: structure items only, fixtures only, land improvements, and land and land development.[258]  These costs should be reviewed to avoid

---

[257] The Agricultural Property Statement includes similar schedules, but also includes Schedule D, Movable Farm Equipment.  This schedule requests each piece of equipment to be reported separately.  See Form 571-F, *Agricultural Property Statement*.

erroneous assessments.  Not only should proper classification be verified (i.e., reported in the appropriate column?), but coordination between the real property appraiser and the auditor-appraiser must take place to ensure that an accurate and valid assessment is made.  Chapter 5 of this manual provides a discussion on the classification and valuation of improvements related to a business property.

### Supplemental Schedule

BOE-571-D, *Supplemental Schedule for Reporting Monthly Acquisitions and Disposals of the Business Property Statement*, usually furnished with the annual Business Property Statement, provides an opportunity for businesses to provide detail as indicated.  A careful review of this information should assist in this important task of coordination and classification.

## Part III:  Declaration of Property Belonging to Others

Part III, *Declaration of Property Belonging to Others*, on the Business Property Statement applies to equipment that may be assessable to an assessee other than the one filing the statement.  As discussed in Chapter 6, title to the property may be held by a party other than the one who files the statement and it may be assessable to that other party.

Equipment reported in this section is reported by type: leased equipment, lease-purchase option equipment, capitalized leased equipment, vending equipment, other businesses, and government-owned property.  They are also reported by tax obligation: lessor or lessee.  Each lease should be cross-referenced with renditions received from the lessors to avoid duplicate assessments or escaped assessments, and to ensure accurate assessment of the equipment.  For example, the assessee (lessee) may classify a lease as a capitalized lease assessable to the lessee.  Referencing the statement received from the lessor indicates it is a true lease assessable to the lessor.  Reconciling these differences prior to assessment, and close of the roll, will help to avoid subsequent roll changes.

Cross-referencing may involve an additional step when there are changes in ownership: e.g., when one leasing company buys the portfolio of another or when a lessee experiences an ownership or name change.  The lessee(s) may continue to reference the former company in Part III of their statement; the lessor may continue to reference the former lessee's name in his or her reporting.  In such cases, the assessor's system of cross-referencing is extremely important to minimize erroneous, duplicate, and escape assessments.

## INCONSISTENT REPORTING

Sometimes costs reported on property statements are not consistent with costs reported in previous years.  Differences may be due to equipment transfers or dispositions within the last year, a buyout of previously leased equipment, or simply misreporting.  Differences, particularly changes other than dispositions, should be researched and analyzed as much as possible prior to enrolling an assessed value.

---

[258] For thorough discussion of classification, see Chapter 2, *Classification* and Chapter 5, *Assessment of Improvements Related to Business Property.*

When it is found that inconsistencies affect past assessment years, roll changes may be necessary.  In most instances, these roll changes will be done at the close of the current year's roll.  These changes are discussed further in Chapter 9, *Roll Procedures*.

## REVIEW OF PREVIOUS AUDIT FINDINGS

When an audit is conducted it is important to use the audited costs, or incorporate audit findings as appropriate, in subsequent years when a property statement is processed.  Although a property statement as filed may reflect costs as reported in the previous year, rather than recommendations made through the audit, an appraiser should make an effort to identify and correct problems prior to enrollment.

## PROPERTY STATEMENT CHECKLIST

Following is a sample *property statement checklist* that may be used to verify completeness of a property statement.  The checklist also provides a summary of the information discussed in this section.

| TABLE 7A |
| --- |
| SAMPLE PROPERTY STATEMENT PROCESSING CHECKLIST |

☐ Log property statement as received.

☐ Check signature, if not authorized signature property statement not valid (some counties retain a copy prior to returning original for signature).

☐ Check statement for any changes to situs, mailing address, and/or business name; make any necessary changes.

☐ Check for any change of ownership regarding business and/or real property.  Make any necessary changes (e.g., notify the real property division, make changes to unsecured account).

☐ Confirm that the account is appropriately classified as secured or unsecured (review responses to Part I: General Information questions).

☐ Confirm that property is reported and described as required.

☐ Are costs summarized on the front of the form classified and broken down by year of acquisition on schedules A and B?

☐ Does the statement include a description of costs reported as construction in progress, and costs added to or deleted from Schedule B?

☐ Did the assessee report supplies?  If yes, does the reported cost seem reasonable.  If it is not reasonable, estimate supplies on hand on lien date.  (For suggested method of estimating supplies, see the section on *Supplies* in Chapter 6.)

☐ Did the assessee report leased equipment?  If yes, cross-reference to lessor files to confirm reported information and to prevent duplicate assessment or escaped assessments.

☐ Check current reported costs with costs reported in previous years.  Are the costs consistent?  If not, a phone call to the assessee may be required.

☐ Are CIP (construction in progress) costs reported?  If yes, reference description of costs provided by assessee and coordinate assessment with real property appraiser.

☐ Are CIP costs from the previous year accounted for on the current year's property statement?

☐ Are additions (or deletions) reported on Schedule B, *Buildings, Building Improvements, and/or Leasehold Improvements, Land Improvements, Land and Land Development*?  If yes, reference description of additions/deletions provided by assessee and coordinate assessment with real property appraiser.

## VALUATION

Finally, after the property statement has been reviewed and is considered complete, the auditor-appraiser must value the taxable property reported on the statement.  As discussed earlier, in most cases, this involves using the cost approach to value and the application of equipment index factors and percent good factors.  Sound appraisal judgment is required to determine which factors or approach(es) applies in each situation.  For new accounts, reviewing the factors or approach adopted by the assessor's business division and reviewing lives given to the equipment used by similar businesses will help with this process.  For older or existing accounts, and statements that show little or no change from previous assessment years, the same approach, table and/or economic life estimate as previously assigned are usually appropriate.  Referring to the previous year's property statement electronically or in the physical file will verify the factors used.  Additionally, refer to equipment index and percent good factors included in AH 581, *Equipment and Percent Good Factors.*

In some cases, as the result of physical inspections, audits, assessment appeals, income approach estimates, sales data, or other data gathered in prior years, the assessor's office has agreed that the standard cost approach is not appropriate for specific accounts.  The agreed upon approach should be reviewed and used, when appropriate, in subsequent years.  This will avoid the same problem from occurring year after year.

## LATE FILINGS AND NON-FILINGS

> If any person who is required by law or is requested by the assessor to make an annual property statement fails to file an annual property statement within the time limit specified by Section 441 or make and subscribe the affidavit respecting his or her name and place of residence, a penalty of 10 percent of the assessed value of the unreported taxable tangible property of that person placed on the current roll shall be added to the assessment made on the current roll. . . .[259]

The penalty of 10 percent applies if the property statement is filed after May 7.  If that date falls on a Saturday, Sunday, or legal holiday, property statements filed on the next business day are considered timely filed.  The postmark date as affixed by the United States Postal Service, or a date certified by a bona fide private courier service, shall serve as the date filed.[260]

In the case of late filings, the 10 percent penalty is added to the value computed using the reported costs on the property statement filed late.  If a statement is not filed, the 10 percent penalty is applied to the auditor-appraiser's best estimate of value based on the best information available.

## Verification of Existing Business

If a statement is not filed for one or more years (time period at the discretion of the assessor), existence of the business should be verified.  Verification may be accomplished with a phone call

---

[259] Section 463.
[260] Section 441.

or a field check of the business.  If the verification process indicates that the business is no longer in operation, the next step is to confirm when the business ceased operation to prevent any erroneous assessments.  Confirmation of the closing date can be accomplished by contacting the subject business owner (if possible), landlord, neighboring tenants, or the current tenant of the same location.

## BUSINESS CLOSE-OUTS

Information regarding business close-outs may come from any one of the sources indicated earlier, or from the business owner who uses the property statement to notify the assessor that the business is no longer in operation in the county.  This is also an opportunity to identify new businesses.  Is a new business at the site, or is the site vacant?  What happened to the assessable property?

## LOW VALUE PROPERTY (LOW VALUE ORDINANCE)   Exemption Limit $10,000 - See LTA 2009/061

When a property statement is processed, resulting in classes[261] of (1) personal property with a value so low that, if not exempt, the total taxes, special assessments, and applicable subventions on the property would amount to less than the cost of assessing and collecting them and/or (2) real property/fixtures base year value or full value of $5,000 or less, the assessment may be exempt if authorized by the county board of supervisors.[262]  Pursuant to section 155.20, *Exemption of property having a low value*, the board of supervisors may adopt an ordinance implementing these low value provisions in that county.  Most counties have enacted a low value ordinance (section 155.20) using various minimum values.  Others have not enacted the ordinance at all, and therefore have no value minimum.

## PROPERTY STATEMENTS FOR SPECIAL TYPES OF PROPERTY

Other property statements that are filed and processed in the business division of an assessor's office include agricultural, apartment, aircraft, and vessel property statements.  One type of property statement, the racehorse property statement, is filed with the tax collector.  The format of the forms is different, the type of property that is reported is different, but the purpose of the forms is the same.  The forms are filed by the assessee, and signed under penalty of perjury, and used by the assessor (or the tax collector) to determine the assessable value (and/or tax) of the property located in the county on the lien date.

The steps in processing the agricultural and apartment statements are similar to the processing of the business return.  Thus, a discussion of each individual statement will not be included here.  The aircraft, vessel, and racehorse property statements, however, are unique and require mention.

---

[261] For purposes of section 155.20, "class" is defined as a statutory class of property or other class of property separately enrolled and designated by the board of supervisors as eligible for exemption.
[262] This limitation is increased to $50,000 "in the case of a possessory interest, for a temporary and transitory use, in a publicly owned fairground, fairground facility, convention facility, or cultural facility." (Section 155.20(b)).

## Aircraft

Section 5365 specifically discusses the aircraft statement. "Upon request of the assessor of the county in which an aircraft is habitually based, the owner shall file with him a statement setting forth the make, model and year of manufacture of the aircraft." As previously discussed, this is the one statement that is not Board-prescribed but a penalty is applicable if the owner does not return the statement timely.

In addition, section 5366 requires airport owners and/or operators to file statements reporting aircraft located at their airports. This section of the code, in part, states:

> Owners, as well as operators, of private and public airports shall, within 15 days following the lien date of each year, provide the assessor of the county in which the airport is situated with a statement containing a list of names and addresses of the owners, and the make, model, and aircraft registration number, of all aircraft which were using the airport as a base.

For the most part, the discovery of aircraft located in a county is through the statements filed by the airport owners and/or operators. After the discovery of an aircraft (in a particular) county, an account is established by the assessor's office and an aircraft statement is mailed to the owner of the aircraft. Two basic sets of forms are used for the assessment of aircraft; one is designed by the assessor for the assessment of general aircraft, and several Board-prescribed statements are designed for certificated aircraft. Specific statutes exist for each type. Thorough discussions of aircraft assessment are contained in AH 570, *Assessment of Commercial Aircraft*, and AH 577, *Assessment of General Aircraft.* A discussion on situs of aircraft is included in Chapter 3, *Situs*, of this manual.

## Vessels

The requirements set forth in section 441, *Property statement; other information*, also apply to property statements filed for vessels. A standard property statement used for all types of vessels includes questions that require the assessee to describe the vessel in a manner sufficient for an accurate assessment. Similar to other types of personal property, vessels are assessed at market value each year. The information received from the assessee on the vessel property statement identifies the vessel type, the cost, the age, and the size, and it significantly aids in the valuation of the property. Many assessors use questionnaires in lieu of property statements for smaller vessels (less than $100,000 cost).

Sources and methods that may be used to discover vessels located in the county on the lien date include records from the DMV, Certificates of Documentation, referrals from other counties, the use of field canvassing, reports from marinas, and reports from other types of boat storage facilities. Registration information is received monthly from DMV regarding (1) vessels moved in and out of the county, and (2) sales of new or used boats to assessees that claim situs in the county. Many assessors have also established an on-line communication link to the DMV's database. Operators of marinas and other boat storage facilities are requested by the assessor to annually file reports that list boats located at their facilities on the lien date. For further

information on vessels see Chapter 3 of this manual (situs of vessels) and AH 576, *Assessment of Vessels*.

## Racehorses

"Property statements" utilized for taxation of racehorses are unique and are treated differently than other types of property statements.[263]  Most significantly, as provided in section 5782, this Board prescribed form, AH 571-J, *Annual Racehorse Tax Return* (provided by the assessor) is filed with the tax collector's office rather than the assessor.  No valuation is required by the assessor because the assessee reports an annual tax due based on a schedule in the statute.[264]  The lien date regarding the assessment of racehorses is the same as other types of personal property, January 1, but unlike other types of property, the tax becomes delinquent at 5 p.m. February 15 of the same calendar year.[265]

---

[263] The taxation of racehorses is discussed in sections 5701 through 5790 (Part 12) and Rules 1045 through 1047.
[264] Section 5722.
[265] Section 5762.

# CHAPTER 8:  PROPERTY TAX AUDITS

## AUDIT OBJECTIVE

A property tax *audit* is a means of collecting data relevant to the determination of taxability, situs, and value of property.[266]  It is used to verify an assessee's reported cost and other information that may influence the assessment of all items that are taxable under property tax law.  An *audit program* is a system used to select and conduct these audits.  Both are used to sample property tax assessments to ensure that taxable property and related information have been reported accurately by the assessee and have been assessed properly by the assessor.

The primary objective of a property tax audit is to confirm that taxable property is being assessed properly and uniformly.  Although most assessees report their taxable property in good faith, errors do occur on the part of both the assessee and the assessor.  Audits, and the audit program as a whole, help to identify problems, correct inaccurate existing assessments, and increase the likelihood that future assessments will be accurate through improved reporting by the assessee and improved understanding of the property by the assessor's office.

The purpose of this chapter is to provide helpful information regarding the audit procedures employed by auditor-appraisers, thereby improving the post-audit program and assessments made to business personal property and fixtures.  An auditor-appraiser's experience, training, and good judgment are not meant to be replaced.  The discussion should assist in making an audit complete and accurate, and/or aid the assessor in the development or improvement of his or her own auditing procedures and manuals.

## STATUTORY PROVISIONS

Statutes not only authorize the assessor to conduct audits, but require audits in certain circumstances.  Sections 441(d), 469, and 470, and Rules 191, 192, and 193 provide the assessor with the basic statutory authority to review an assessee's records.  For assessees owning or possessing tangible business personal property and fixtures with a full cash value of $400,000 or more, section 469 *requires* an audit at least once in each four-year period.[267]

---

[266] Rule 191.

[267] Audits of racehorse owners are also required, pursuant to Rule 1045, when the taxpayer had a gross tax liability that exceeds $2,000 for each of four consecutive calendar years.

When an auditor-appraiser contacts an assessee, to make an audit appointment for any type of audit, the assessee may question the auditor-appraiser's authority and may be reluctant to provide records.  An auditor-appraiser should assure the assessee that the audit is:

- routine (i.e., certain audits are mandated under section 469)

- beneficial (i.e., an audit is an assessee's best opportunity to verify the accuracy of past assessments)

- helpful (i.e., the audit results will be made available to the assessee)

- corrective (i.e., if the results indicate an overassessment, the assessee may be entitled to a cancellation of tax or the right to file a claim for refund)

- fair (i.e., if the results indicate that property is subject to an escape assessment, the assessee has the right to file an appeal on the escape assessment)

It is also helpful to inform the assessee of any relevant statutory provisions authorizing audits under the Revenue and Taxation Code.

Section 441(d) states:

> At any time, as required by the assessor for assessment purposes, every person *shall make available* for examination information or records regarding his or her property or any other personal property located on premises he or she owns or controls. . . . (Italics added.)

Section 470 states:

> Upon request of an assessor, a person owning, claiming, possessing or controlling property subject to local assessment *shall make available* . . . a true copy of business records relevant to the amount, cost, and value of all property that he or she owns, claims, possesses, or controls within the county.  (Italics added.)

And section 469, as quoted earlier, requires an audit by stating:

> . . . a taxpayer engaged in a profession, trade, or business has a full value of four hundred thousand dollars ($400,000) or more, the assessor *shall audit* the books and records of that profession, trade, or business at least once each four years. . . . (Italics added.)

Many assessees and/or their agents are especially reluctant to show an auditor copies of income tax returns.  The auditor can further cite section 462, which provides:

> Every person is guilty of a misdemeanor who, after written request of the assessor does any of the following:
>
> (a) Refuses to *make available* to the assessor any information which is required by Section 441(d). . . . (Italics added.)

The auditor can also refer the assessee to *Lyons* v. *Estes* (1969) 6 Cal.App.3d 979, where the court upheld legislative history and the statute authorizing assessor review of taxpayer's records. The court specifically stated that the county assessor is a tax official, as defined by the Revenue and Taxation Code, who may inspect income tax returns to assist him/her in assessing property.

In extreme cases, where an assessee cannot be persuaded to make records available, records may be subpoenaed. Sections 468 and 454 provide the assessor the power to subpoena. Section 468, *Failure to furnish information; assessor's remedy*, authorizes the assessor to apply to the superior court to order the person to appear before the court. Section 454, *Examinations*, states that the assessor may subpoena and examine any person in relation to assessable personal property and fixtures in his or her county.

Alternatively, the assessor is authorized to estimate the value of the property. If, after written request, any person has failed to comply with the requirements to make available information on the property statement under section 441 or pursuant to audit under section 470, the assessor is authorized to estimate value based on the information in his/her possession.[268]

Following is a summary of Revenue and Taxation Code sections and Rules related to audits, concerning both the assessee's and assessor's rights and responsibilities. These sections will also be discussed in the remainder of the chapter.

---

[268] Section 501.

| TABLE 8A<br>SUMMARY OF REVENUE & TAXATION CODE SECTIONS RELATED TO AUDITS | |
| --- | --- |
| **R&T Reference** | **Remarks** |
| Section 408(e)(1) | *Assessor's Records*.  The assessor shall, upon request, permit the assessee or assessee's designated representative to inspect or copy all documents, including but not limited to audit narratives and work papers, relative to the appraisal and assessment of the assessee's property. |
| Section 441(d) | *Property statement; other information*.  A taxpayer shall make records available upon assessor request. |
| Section 454 | *Examinations*.  The assessor may subpoena and examine a person regarding any statement furnished him, or any statement disclosing property stored, possessed, or controlled by that person. |
| Section 462 | *Refusal to give information*.  A person is guilty of a misdemeanor who refuses to make information available as required by section 441(d). |
| Section 468 | *Failure to furnish information; assessor's remedy*.  If a person fails to furnish requested information, the assessor has the power to subpoena that information. |
| Section 469 | *Audit of profession, trade, or business*.  A profession, trade, or business which has a full value (personal property and fixtures) of $400,000 or more shall be audited at least once every 4 years.  (See also Rules 191, 192, and 193.)  With respect to an audit, regardless of the full value (i.e., mandatory or nonmandatory), an assessor may discover property that is subject to an escape assessment for any year under review.  Upon discovery of such escaped property, the assessee has a right to appeal the assessed value of all the property, except property previously equalized, at the location of the profession, trade, or business that is the subject of the audit, regardless of whether the assessor actually enrolls an escape assessment.[269]  NOTE: If there is a refund only and there is no *property subject to an escape assessment* at the location for that year, the assessee has no appeal rights.  (For additional information regarding appeals, see the Board's *Assessment Appeals Manual*.) |
| Section 470 | *Business Records*.  A taxpayer shall make records available, upon assessor request, at his or her principle place of business or at a mutually agreeable place.  For out of state audits, the taxpayer may be required to reimburse the county the reasonable and ordinary expenses incurred performing the audit.  Authorizes nonmandatory audits. |

---

[269]  Rule 305.3.

| R&T Reference | Remarks |
|---|---|
| **TABLE 8A (CONTINUED)** **SUMMARY OF REVENUE & TAXATION CODE SECTIONS RELATED TO AUDITS** | |
| Section 501 | *Failure to furnish information*.  If after written request by the assessor, any person fails to comply with sections 441 and/or 470 (i.e., provide information), the assessor shall estimate value based on the information available. |
| Section 532 | *Statute of Limitations*.  Eight year statute of limitations where 25% penalty applies. Four year statute of limitations where no penalty, or the 10% penalty, applies. |
| Section 532.1 | *Extension of time for making escape assessment*.  Extends the time period specified in section 532 for making an escape assessment. |
| Rule 191 | *Property Tax Audits, General*.  Defines the purpose of an audit in general and gives requirements regarding notification of findings to taxpayers and taxpayers rights following an audit. |
| Rule 192 | *Mandatory Audits*.  Defines Mandatory Audit.  See also section 469.  (Rule 192(e) also refers to nonmandatory audits.  See also section 470.) |
| Rule 193 | *Scope of Audit*.  Rule 193(a) authorizes "sampling" of one year within the four-year audit period.  Rule 193(b) discusses use of audit findings resulting from a Board assessment practices survey. |
| Rule 305.3 | *Application for Equalization Under Revenue and Taxation Code Section 469.* Discusses assessment appeal rights if the audit results with property subject to an escape assessment.  Includes definitions of relevant terms and examples. |
| Rule 1045 | *Administration of the Annual Racehorse Tax.*  Discusses assessors', tax collectors', and auditors' responsibilities concerning the racehorse tax.  Requires the assessor to audit the records of any racehorse owner who had a gross tax liability that exceeds $2,000 for each of four consecutive calendar years. |

## GENERALLY ACCEPTED STANDARDS

Property tax audits must be conducted in a professional manner.  The auditors are called upon to exercise their highest skill and best and most impartial judgments throughout the performance of their official duties.  Sound professional judgment must be exercised in developing procedures and conducting tests that meet the scope and achieve the audit objectives.

The primary objective of the property tax audit is to determine that a correct assessment has been made.  The auditor, therefore, must apply generally accepted auditing standards and utilize generally accepted accounting, *and* appraisal principles.  There may be instances when these concepts conflict.  Application of the trade level requirement of Rule 10 is an example.  Under such circumstances, the auditor may need to supplement application of generally accepted accounting principles and generally accepted auditing standards with sound appraisal principles to arrive at a correct assessment as required by law.  Since these audits are done for property tax assessment purposes, appraisal principles may take precedence.

Following are standards set forth by the American Institute of Certified Public Accountants (AICPA) as applied to the property tax auditor.  These standards should guide the auditor in all audit situations.

## GENERAL STANDARDS

1. An auditor should have adequate technical training and proficiency as an auditor (and as an appraiser).[270]

2. In all matters relating to an assignment, an independence in mental attitude should be maintained by the auditor.

3. Due professional care should be exercised in the performance of the examination, in the preparation of the report, and in the maintenance of confidentiality.

## STANDARDS OF FIELD WORK

1. The work should be adequately planned, and supervised as appropriate.

2. There should be a proper evaluation of existing internal controls as a basis for reliance. This will determine and restrict the auditing procedures.

3. Sufficient competent evidential matter should be obtained through inspection, observation, inquiry, and confirmation to afford a reasonable basis for an opinion regarding the financial statements under examination.

## AUDIT SELECTION

An important part of the audit program is the selection of accounts to be audited.  As discussed earlier, some audits are required by law (*mandatory*) while additional audits (commonly referred to as *nonmandatory*) can be selected by the assessor as a means of sampling the system as a whole.  Each can be conducted in a variety of ways.  Several categories of audits and means for conducting audits are discussed briefly in the following section.

---

[270] This standard, as set forth by the AICPA, did not refer to appraisers.  It has been applied to the property tax auditor-appraiser.  Certification as appraiser and auditor must be maintained pursuant to section 670 and section 671.

## TYPES OF AUDITS

### Mandatory Audits

Audits required by law, *mandatory audits*, are the most important for an auditor to complete in a timely manner.  As required by section 469 and Rule 192, for assessees owning, controlling, or possessing tangible business personal property and fixtures with a full cash value of $400,000 or more, these audits must be completed at least once in each four-year period.  For any racehorse owner who had a gross tax liability that exceeds $2,000 for four consecutive calendar years, Rule 1045 requires an audit within 5 years of the date on which the annual tax first became due.

However, an in-depth audit is not always required for each year in the four-year period.  The auditor is allowed to "sample" one year in the four-year audit period.[271]  If no material discrepancy or irregularity is found, there is no requirement to audit the remaining years.  If a discrepancy is found, the auditor must continue and audit the remaining years unless (1) the discrepancy or irregularity in the "sample" year is peculiar to that year and (2) the discrepancy or irregularity did not result in an escape assessment.

### Nonmandatory Audits

*Nonmandatory audits* are audits not required by law, but are authorized by sections 469 and 470 and Rule 192(e).  They should be done in addition to mandatory audits, and are selected at the discretion of the assessor because an audit program is not complete unless it includes a representative sample from all sizes and types of property.  Performance of nonmandatory audits is part of the representative sample.

The assessor is not prohibited from auditing any assessee during any period allowed under the statute of limitations.  The assessor may audit a taxpayer every year if it is necessary.  However, this would not be prudent or efficient for either the taxpayer or the assessor in most situations.

Depending on the resources available, it may be difficult to complete a large number of nonmandatory audits.  Counties may therefore develop criteria for selecting these audits rather than just random selection.  Examples of criteria appropriate for selection may include: identified discrepancies, accounts just below the mandatory audit cut-off, inconsistent, incomplete, or nonfiled property statements, taxpayer's request for audit, and/or selection by type of business.

### Waivered Audits (Waiver of Statute of Limitations)

In most cases, audits must be completed within four years after July 1 of the assessment year the property escaped assessment (i.e., an escape assessment for the year 1999-2000 must be enrolled prior to July 1, 2003) because roll changes resulting from audits are subject to the statute of limitations pursuant to section 532.[272]  If any audit (mandatory or nonmandatory) cannot be

---

[271] Rule 193.
[272] If conditions exist that warrant a penalty application of 25 percent, as provided in sections 502 and 504 (section 863 for state assessed property) the time limit is extended to 8 years.  (Section 532(b) for locally assessed property and section 866 for state assessed property.)

completed prior to that time, the assessee may agree to waive the statute of limitations (i.e., extend the allowable time period) by signing a waiver.

Section 532.1 allows for the extension of time when the assessee and the assessor have agreed in writing to extend the time allowed for making an *escape assessment, correction, and refund*.[273] Section 532.1, *Extension of time for making escape assessment*, in part reads:

> (a) If, before the expiration of the period specified in Section 532 for making an escape assessment, the taxpayer and the assessor have agreed in writing to extend the time for making an assessment, correction, or claim for refund, the assessment may be made at any time prior to the expiration of the period agreed upon. The period may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

## Exempt Organization Audits

Exempt organizations are subject to audit as are any other type of business under section 470 and 469. The provisions of section 470 require any person "owning, claiming, possessing, or controlling property subject to local assessment" to make available a copy of business records. An exempt organization is a "person" owning or possessing property that is *subject to assessment*. The provisions of section 469 apply to a *taxpayer* who has *locally assessable fixtures and personal property* and is *engaged in a profession, trade, or business*. It is proper to consider an exempt organization (such as a church or a nonprofit hospital) as a *taxpayer* since the organization would be assessed and taxed on the value of such property, but for the exemption.

Property owned by an exempt organization is assessable, even though there may not be a net taxable value.[274] However, the type of audit performed for an exempt organization should focus primarily on (1) whether the property is used exclusively for religious, hospital, scientific, or charitable purposes per section 214 and (2) whether the property is owned and operated by the charitable organization. If the exemption has been properly granted, the books and records should receive a limited review. The relevant items to audit and the extent (thoroughness) of such an audit should be determined in cooperation with the assessor's exemption department.

---

[273] A waiver which does not specifically state that it extends the time for *corrections and refunds* only extends the time allowed for an *escape assessment*.

[274] An exempt organization may pay taxes in certain circumstances and they may have possession of property taxable to another assessee. For example, many exempt organizations pay taxes on non-qualifying property. Some may pay taxes because they filed an exemption claim late, and in other cases they may be contractually required to pay taxes on leased equipment. Commonly, exempt organizations lease equipment from non-exempt lessors. Also, the land and buildings of exempt organizations are subject to special assessment levies even though the property qualifies for exemption from general property taxes.

## California Counties Cooperative Audit Services Exchange (CCCASE)

Many counties conduct audits through the intercounty cooperative audit program. This program is called the California Counties Cooperative Audit Services Exchange (CCCASE). It can be an efficient and effective means of audit for both the assessor and the assessee. Using this program, the assessor's staff in the county where the assessee is headquartered gathers information for the audit for all participating counties, but makes no value judgment. A similar arrangement is used for assessees headquartered out-of-state. One auditor may go to a particular state or city and gather information for all counties who have audit accounts there.

## Audits by Correspondence

As indicated earlier, section 470 requires the assessee to make records available upon request of the assessor at the assessee's principal place of business in California, or at a mutually agreeable location. This may be difficult if the business records and/or the business headquarters are out-of-state or out-of-county. In this case, the assessor may use the intercounty cooperative audit program (as discussed earlier) or the taxpayer may pay the county for the auditor's travel expenses.[275] Another solution is to conduct the audit by correspondence, whether mandatory or nonmandatory. Although audit by correspondence is an option, it may only be feasible for specific types of audits (e.g., accounts audited in the past with minimal changes in the current period). Policy on conducting audits by correspondence should be determined by each individual assessor and department.

## Office Audits

Another alternative for performing either mandatory or nonmandatory audits is to conduct office audits. Using this system, the assessee is requested to bring applicable records and information to the assessor rather than the assessor going to the assessee's location. The assessor may find this has limited use however. When volumes of information are needed, it is not logical for the assessee to physically transport his or her records.

## PREPARATION FOR AUDIT

### REVIEW OF INFORMATION

An auditor should review all applicable information available prior to an audit appointment in order to become familiar with the assessee, the nature of the business, and the potential problems that may be encountered. This review may include, but is not limited to:

1. Review of property statements and attachments as filed (or change of ownership statements, if applicable)

2. Review of prior audit (if any)

3. Review of real property land and structure records

---

[275] Section 470(b).

4. Review of applicable Revenue and Taxation Code sections

5. Identification of suspected problems needing attention (e.g., trade level adjustments, reporting inconsistencies, possibility of double assessment, etc.)

6. Review of lessor files for lease, cost, and assessment information if the subject company leases equipment

7. Review of assessment roll for associated entities[276]

8. Review of prior owner's property statements, if the business has undergone a change in ownership recently or if a change in ownership affects the current owner's reported cost and/or value

9. Review of assessment appeal files, correspondence, and other data that identifies past and current issues regarding the appraisal and assessment of the property

The review will give the auditor-appraiser a preview of the audit ahead and will promote a smoother audit appointment.  In some cases, the auditor will find no obvious problems or areas of concern.  In other cases, potential problems will be clearly evident.  In such cases, the auditor can concentrate on these potential problems and/or discuss them with the assessee during the initial phases of the audit.  The review will also help determine what specific records may be needed for pre-identified problem areas.

## CONTACT ASSESSEE

An auditor-appraiser representing the assessor shall contact the assessee to inform he/she that an audit will be conducted pursuant to Rule 191, and arrange a place and time where and when the audit will be conducted.  (It is also helpful to determine with whom the audit will be conducted.)  An audit appointment should be scheduled to give the assessee (or his or her agent) sufficient time to prepare for the visit.  Setting an appropriate and convenient date for both parties can help to avoid canceled appointments and/or second visits to an assessee's office.

It is also critical to inform the assessee of what records will be necessary and to verify that the records will be available for audit prior to arriving on site.  This allows the assessee to schedule accordingly and also aids in avoiding unnecessary delay.[277]  Basic records to be available on site include:

1. Chart of Accounts

2. General ledger and subsidiary ledgers supporting the general ledger

3. Detailed fixed asset list or depreciation schedule

---

[276] If there are associated entities, it may be proper to audit all associated accounts.
[277] A follow-up letter can also help by confirming the appointment and by providing a more detailed list of the records which will be required.

4. Income tax returns

5. Invoices and other source documents (purchase orders, receiving records, lease agreements, appropriation records and work orders for construction projects, etc.)

6. Financial statements and/or annual reports

7. Accounting procedures manuals

8. Independent audit reports (if any)

9. Insurance policy(ies)

10. sales tax audit report(s) (if any)

11. Assessee's work papers reconciling books and records to property statement filing(s)

12. Articles of incorporation and amendments, as applicable

This list can be expanded based on the preliminary review, and discussions with the assessee.  If the assessee has more than one account or location in the county, or if property owned by others is at the situs of the business, the list and the audit may include records for more than one company and/or assessor's account numbers.  If the assessee is unique, such as a leasing company, the assessee may have "unique" records.  These records may be necessary for review in addition to the typical records listed above.

## CONDUCTING AN AUDIT

Professionalism is important when conducting an audit.  The pre-audit review, as discussed earlier, helps to organize the auditor and contributes to a professional attitude and image.  In addition, some basic audit rules should always be observed:

1. Maintain confidentiality of any information obtained

2. Be professional, courteous, and cooperative

3. Decline offers of gratuity

4. Avoid conversations unrelated to the audit, such as: political, religious, or argumentative discussions

5. Avoid drawing premature conclusions

6. Disrupt the assessee as little as possible.  Wait until you have several items to discuss before approaching them.

At the audit appointment, the auditors should accomplish three main tasks: (1) gather general information regarding the company, (2) review records pertaining to the valuation of property, and (3) take a tour of the facility and equipment being audited.

## GATHER GENERAL INFORMATION REGARDING COMPANY

A short initial interview with the assessee (or agent) at the beginning of an audit appointment can help to quickly acquaint the auditor with the books and records and the company's concerns. This generally facilitates the remainder of the audit, and allows the assessee to continue business with fewer interruptions.

A pre-audit review and the audit checklist[278] help to determine relevant questions that should be asked at this interview. Such questions may include inquiries pertaining to:

1. <u>Ownership type</u> – sole proprietor, partnership, corporation, or other

2. <u>Explanation of records provided</u> – year-ending, organization of records, etc.

3. <u>Control</u> – verification if there has been a change in control during the audit period (Legal Entity Ownership Program (LEOP) section 64, compare state tax returns)

4. <u>Type of accounting system</u> – (Accrual Basis v. Cash Basis)

   *Accrual Basis*
   The accrual system of accounting gives recognition to income items during the fiscal period in which they were earned although the cash may not have been received. Expenses are recorded when incurred even though the actual payment has not been made. The accrual system theoretically provides for the timely recording of accounting data by the assessee and is generally acceptable for purposes of audit. However, late postings are common. Actual posting practices should be verified.

   *Cash Basis*
   The cash basis of accounting gives recognition to income and expense only when actually received or paid. When a cash basis system is encountered, the auditor-appraiser may need to make adjustments to the accounting data for assessment purposes. For example, the assessee may only be capitalizing cash payments actually made instead of the total purchase price.

5. <u>Capitalization policy</u>: What is the capitalization policy (including lease buy-outs)? When are capitalized assets recorded? (Important in determining if all assets are booked on lien date.) What is the minimum value for capitalizing assets? How are cost components treated: sales/use tax, installation charges, freight, trade-in allowance, repairs, etc.?

---

[278] See sample audit checklist in Appendix E.

6.  Construction in progress:  How is construction in progress treated in the accounting records?  Is it reported?  What is included?  Are expenditures posted when incurred, when invoiced (frequently contractors do not send a bill until weeks or months after some of the work has been completed), or when paid (even "accrual basis" companies sometimes use "cash basis" for construction in progress).  Is overhead recorded?  Is construction interest recorded?  How are change orders recorded?

7.  Policy of writing off assets:  How are fully depreciated assets treated?  Are they listed on the depreciation schedule and on the books?  How are scrapped or sold assets treated?  How often are they taken off the books and the depreciation schedule?  How often is a physical inventory of fixed assets conducted?

Note:  An assessee's policy and procedure for recording disposals aids an auditor in determining how accurately an asset listing represents the assets owned and possessed by the assessee.  However, it is significant to note that the process of retirement and disposal is generally not as rigid as the purchase.  There may be assets on the books that have been disposed of.  It may be necessary to request supporting documentation from the assessee if this is a contention.

8.  Situs:  Where are assets located?  Are all the assets located at one location?  Are all the assets in the county?  Are all the assets in the state?

9.  Recording trade in allowances:  How are trade-in allowances treated on the books and on the depreciation schedule?

10. Internal control – A company's system of internal control, including EDP (electronic data processing) data entry and retrieval and software controls, is vital evidence in support of the recorded transactions and financial statements.  Basic characteristics of sound internal control include: appropriate segregation of responsibilities, reasonable accounting control over assets, liabilities, revenues, and expenses, and sound practices followed by quality personnel in the performance of duties and functions in each department.

These questions should be expanded upon and altered based on the auditor's review of information prior to the audit, the assessee's responses provided during the interview, and as further information is gathered.  Answers to these questions will allow the auditor to focus more research into identified problems from the start.

## REVIEW RECORDS

The records requested from and provided by the assessee are related to the company's financial statements and position as asserted by management.[279]   Once these records are gathered, the auditor must identify all data pertinent to the audit in order to verify full economic cost and/or full cash value on each lien date.

## Verification of Machinery and Equipment

### Reconciliation of Sources

In the verification of machinery and equipment, the auditor is primarily concerned that full economic property costs and years of acquisition were properly reported.  This information is normally found in two sets of sources (1) general ledger fixed asset accounts or subsidiary ledgers, and (2) on depreciation schedules or fixed asset listings.

When two sources are available, they should be reconciled.  This reconciliation can aid in compiling a complete and accurate asset list, cost summary, or a complete listing of revenue and expenses, as needed, that can be used as a basis for the audit.  An example of reconciliation of sources is listed below:

| EXAMPLE 8.1 RECONCILIATION OF SOURCES DEPRECIATION SCHEDULE AND GENERAL LEDGER ACCOUNT | |
| --- | --- |
| Total Depreciable Asset Cost Per Depreciation Schedule (FYE 2002) | $ 125,000 |
| Machinery & Equipment Asset Account #XX1 Per General Ledger (FYE 2002) | (100,000) |
| Difference Depreciation Schedule – General Ledger | $ 25,000 |
| Less:  Non-assessable Licensed Vehicles (included in General Ledger Account #XX2) | ( 15,000) |
| Goodwill  (included in General Ledger Account #XX3) | ( 5,000) |
| Disposals Unrecorded on Depreciation Schedule | ( 5,000) |
| Difference Depreciation Schedule – General Ledger | $ 0 |

When both cost totals (cost per depreciation schedule and cost per general ledger fixed asset accounts) are reconcilable, as in Example 8.1 above, the auditor can use the depreciation schedule (which contains specific equipment information) as a basis for the audited cost and

---

[279] Based on generally accepted accounting principles (GAAP) the financial statements are implied or expressed representations by management.  Management makes, in these financial statements, assertions regarding (1) existence and occurrence of assets, obligations, and equities, (2) completeness of the statements, (3) rights and obligations (i.e., assets are the rights of the company and liabilities are the obligation of the company), (4) valuation and allocation (i.e., asset, liability, equity, revenue, and expense have been included in the financial statements at the proper amount under GAAP), and (5) presentation and disclosure (i.e., the financial statements are classified, described, and disclosed properly).

make adjustments as necessary. When the cost totals are not reconcilable, the auditor should make an effort to determine why there is a difference before using audited cost as a basis for the cost approach or before utilizing another method of appraisal (e.g., comparative sales or income approach). For instance, in Example 8.1 three adjustments were made to the cost per books. If any one of those had not been identified (non-assessable licensed vehicles, goodwill, or unrecorded disposals), a difference would have resulted. An auditor would then need to (or attempt to) determine what adjustment was missed.

## Sampling to Confirm Accuracy

An auditor can also use the compiled asset or cost listing (or revenue and expense summary) to select source documents to sample and compare to the booked cost. This may include such items as purchase invoices, transportation invoices, and receiving reports. This sampling serves two purposes. First, it enables an auditor to verify correctness of acquisition date as recorded on the asset listing or accounting records. Second, it enables an auditor to verify that the property's full economic cost is equal to the cost reported on the asset listing or accounting records. The recorded cost may not include all cost components necessary to use the cost approach. The cost components (sales tax, freight, trade-in allowances, etc.) should be verified to include all cost items necessary to put the equipment to use.[280]

## Other Adjustments

After reviewing the source documents selected for sampling and determining accurate cost and acquisition date information, an auditor should also determine if any other machinery and equipment or other personal property and fixtures exist (including self-constructed assets) that are not on the depreciation schedule or in the fixed asset accounts. Small, short-lived equipment is an example of equipment which may not be included here (i.e., on the depreciation schedule, in the general ledger asset accounts) since this equipment may not be capitalized. Equipment such as hand tools are commonly expensed rather than capitalized, depending upon the assessee's capitalization policy. Expense accounts should be reviewed for these types of items as well as leased equipment. Leased equipment may not be physically identifiable in most cases, but can be located by reviewing accounting records. Payments for these leases may be noted in Notes Payable and/or Expense Accounts and can be easily missed, if an auditor is not careful to identify them.

Farm audits, in particular, require special attention to items that may have been sold, traded-in, junked, or otherwise abandoned. Farm asset lists tend to be out-of-date more often than other types of business and can be more difficult to reconcile. While the assessee should in all situations substantiate any and all changes and deletions not indicated on the books, the auditor should attempt to identify problems and discuss them as soon as possible. This will make for easier post-audit work and audit recommendations.

---

[280] See also Chapter 4, *Valuation of Personal Property*, Valid Cost Components.

**Classification**

The auditor should also verify that the property was classified correctly when reported by the assessee. For example, were computers and printers reported in the proper column on the property statement and properly classified or were they erroneously reported as office equipment and therefore incorrectly valued? Classification is important, since value relies upon it.[281]

Equipment should not necessarily be classified based solely on the classification groups provided on the property statement (equipment, office equipment, tools, molds, and dies, etc.). The asset listing of a business may include several different groups of equipment and the business may operate distinct units (manufacturing, packaging, warehousing, etc.), whose values fluctuate independently. Thus, it may be necessary for each group of equipment to be classified and valued separately.

## Verification of Improvements

Verification of improvement and building accounts is similar to verification of machinery and equipment. As with machinery and equipment, the auditor must make sure that reported costs, acquisition dates, and classifications are accurate. Improvements are frequently included with machinery and equipment on the depreciation schedule, but will generally be separated in the general ledger accounts.

When it is determined that information gathered regarding improvements is accurate and that proper classifications have been made, the auditor should also verify that (1) improvements were not also assessed with the real property assessment, and (2) all improvements were assessed (i.e., no escapes). This usually involves coordination with a real property appraiser and/or review of the real property appraisal record.

## Verification of Supplies

The audit of supplies consists primarily of ensuring that supplies on hand on the lien date have been properly reported by the assessee. "Properly reported" means that (1) exempt inventory items were excluded, and (2) all assessable supply items were included.

Where the assessee maintains a supply inventory account in the general ledger, the auditor must verify that the account is properly maintained and contains all purchases received prior to the lien date. A review of inventory accounts for supply items is often warranted also, as some items booked as inventory may be assessable supply items. Where supplies are expensed, the auditor must review the supply expense accounts over the prior year. Based on this review, discussions with the assessee regarding the amount of supplies on hand and observation during the facility tour, an auditor should be able to effectively estimate a lien date supply amount.

## Verification of Construction in Progress

The verification of construction in progress (CIP) involves matching expenditures to the existence of physical property as well as properly classifying that property. Where progress

---

[281] Chapter 2, *Classification*, discusses classification in detail.

payments are being made, the assessee's books may reflect a considerable amount of expenditures in the construction in progress account. However, the assessee may not yet have possession of the property, or the property may not have existed on the lien date or, as mentioned earlier, the property may have been received or constructed well before the expenditures were posted. Existence and ownership of the items on the lien date are required elements for proper assessment. For example, if construction has not started as of the lien date, no value is assessable, assuming any material on hand belongs to the contractor and is classified as business inventory. If construction has started, an assessment of CIP is appropriate.[282]

Similar to verification of leasehold improvements, verification of construction in progress also involves proper classification. Coordination between the auditor and the real property appraiser is necessary to avoid duplicate assessments and escape assessments.

## Verification and Identification of Leased Equipment

Errors in reporting and assessing leased equipment frequently occur as discussed in Chapter 6. Thus, an audit should include testing for leased equipment.

By reviewing the various records and accounts maintained by an assessee, an auditor can discover, identify, and verify all leases or security arrangements. The principal sources of obtaining information for leased equipment are:

1. <u>General Ledger</u> – Accounts (such as lease and rental expense, accounts payable, and notes payable) in the general ledger will indicate whether the assessee was making lease or rental payments on the lien date.

2. <u>Cash Disbursements Journal</u> – This record will indicate the amounts and payees of lease and rental payments.

3. <u>Lease Contracts</u> – The monthly lease payment indicated on the lease contract should be compared to the amounts shown in the expense accounts. This will verify that all leases are accounted for and what costs are included in the lease payment/cost.

4. <u>Financial Statements</u> – The financial statements may indicate not only the existence of leases but may also give important information associated with such leases. The footnotes give a summary of the rental and lease commitments regarding operating leases (short-term or cancelable leases, which the risks of ownership lie with the lessor, FASB 13). The balance sheet gives information regarding leases similar to that found in the general ledger accounts.

5. <u>Other Sources</u> – Discussions with the assessee and/or physical inspection of the premises may indicate the existence of leased equipment.

---

[282] Determination of value should be based on market value on the lien date. See Chapter 7, *Special Issues*, for further discussion of construction in progress valuation.

When the auditor has identified all leases, a comparison should be made between the lessor and the lessee accounts maintained by the assessor to confirm accurate reporting (i.e., was the appropriate cost(s) reported at the appropriate trade level) and correct assessment (i.e., was valued correctly, no duplicate assessment occurred, and no proper assessment was omitted).

## Items or Audits Requiring Special Attention

### In General

Certain items tend to cause problems in reporting and valuations.  In reviewing an assessee's records and reported costs, an auditor may avoid some problems by discovering information sufficient to answer the following questions:

1.  Does the reported or booked cost include all property costs?  (sales/use tax, freight, installation, etc.)

2.  Is all taxable property listed in the accounting records?  (fully-depreciated equipment, leased equipment, property belonging to other entities, expensed personal property, equipment purchased near lien date, interest during construction, etc.)

3.  Do all booked costs contribute to assessable value?  (goodwill, covenant not to compete, unrecorded disposals, exempt property, rental equipment not on rent on the lien date, inventory, licensed vehicles, commercial coaches, etc.)

To determine other items that may require special attention in certain circumstances, reference should be made to the three valuation chapters in this section:  Chapter 4, *Valuation of Personal Property,* Chapter 5, *Assessments of Improvements Related to Business Property,* and Chapter 6, *Special Issues.*

### Special Situations

Equipment located at an assessee's place of business, but not owned by the assessee needs special attention and consideration.  This equipment may not be capitalized.  Vending equipment, loaned equipment, and government-owned equipment are good examples.[283]  A discussion regarding auditing for this type of property is discussed below since different audit procedures are necessary in discovery and valuation.

### *Vending Equipment*

Vending equipment may or may not involve a written contract between the owner and the possessor.  The possessor does not normally incur any expenses regarding the equipment but may derive income from the source.  Therefore, miscellaneous income accounts should be analyzed to obtain information regarding this type of income and property.

---

[283] Leased equipment is also equipment located at an assessee's business location that may not be owned by them. Verification and identification of leased equipment was discussed earlier in the chapter.

### *Loaned Equipment*

Discovery of loaned or borrowed equipment is a particularly difficult area in terms of discovery because the possessor of the property, the assessee under audit, may or may not derive any income or incur any expense from the property.  The following items may aid the auditor in the discovery and assessment of such equipment:

1.  Capitalized installation charges

2.  Royalty payments for items produced on loaned equipment

3.  Expensed maintenance or repairs on the equipment

4.  Memorandum entries

5.  Insurance policies

6.  Contract or other written agreement(s) between the owner and the possessor

### *Government-Owned Equipment*

Another item to consider when conducting an audit is government-owned property.  Property owned by the government and used by a taxable entity may be subject to a possessory interest assessment only, but the property remains an item under audit (see also *Leases With Exempt Entities* (*Government Entities*) in Chapter 6)*.*  The primary sources for discovering and obtaining information regarding government-owned property and contracts with the government are:

1.  Facilities Contracts and/or Supplies and Services Contracts – companies holding government-owned equipment will generally have a Facilities Contract and/or a Supplies and Services Contract with the government.  These contracts require the firm to maintain accounting and property controls for the equipment and to make periodic status reports to the controlling governmental agency.  These records will generally identify each equipment item and the specific location.

2.  Physical Inspection of the Premises – most government-owned property is required to be tagged, or otherwise visually identifiable as being government property.

3.  Capitalized Installation or Other Costs – the assessee may have capitalized installation or other costs in connection with government-owned equipment.  An analysis of the structures, leasehold improvement and equipment accounts may alert the auditor of the existence of government-owned equipment.

When government-owned property is identified, it is imperative that the auditor ascertains which items should be classified as fixtures and which items are personal property.  *Only* fixtures and other real property, owned by the government but possessed by a taxable entity, are subject to

assessment (possessory interest).[284]  Possessory interests in personal property are not taxable.[285]
As discussed in detail in Chapter 2, *Classification*, this classification should be based on:

1. The manner of annexation

2. The adaptability to the use and purpose for which the realty is used

3. The intention of the party making the annexation as indicated by the physical facts

**Total Property Audits**

Total property appraisals refer to appraisals in which the entire property (consisting of land, building, and equipment) is appraised as "one appraisal unit," normally in concert with the real property appraiser.  Total property appraisals typically involve the most complex and valuable properties.  All three approaches to value may be considered in arriving at the final appraised value.

A total property audit, therefore, involves the verification of considerably more information than a typical audit that focuses primarily on equipment and supplies.  It is important to verify all information that is relevant to the appraisal of the entire property.  In addition to basic records, the auditor will also need to focus on:

1. Profit and Loss Statements – for use in income approach

2. Production Data – (A) Units produced and units sold  (B) F.O.B. Plant selling price and units  (C) Selling price and units  (D) Other distributors –for use in income approach

3. Tenant Improvements – costs included in a total property appraisal

4. Lease Agreements – important in certain operations such as shopping centers and office building rentals.  The essential terms of the contract must be extracted (lease term, monthly rent, maintenance provisions, tax provisions, etc.). Where possible, a copy of the entire contract may be helpful.

5. Construction Contracts – furnish a general description of the type of construction and also identify any special items such as special foundations not readily discernible through a physical inspection.  Also, excess costs of construction, if any, might be indicated.

6. Plant Utilization – data concerning whether the facilities – especially the structures and fixed equipment – are being used for purposes originally intended.  Also, whether there is unused capacity.

---

[284] Taxable possessory interests are defined in section 107.
[285] There is one exception.  Section 201.5 specifies that possessory interests in pollution control property--whether real property or personal property--acquired by or for the California Pollution Control Financing Authority are taxable.

7. <u>Market Studies and Forecast</u> – supply the expectation of future business for the firm. May indicate how soon any unused capacity might be utilized.

8. <u>Plot Plan</u> – detailed plot plans should be received from all total property assessees.

**Audits of Leasing Companies**

Audits of leasing companies involve unusual and distinct problems.  The auditor must verify that:

1. All equipment owned by the company located in the county has been reported.

2. The correct location of the equipment has been furnished on the property statement.

3. The correct cost and sales information has been reported by the lessor.

4. The costs reported correspond with the appropriate level of trade at which the equipment is situated on the lien date (i.e., the cost is reported at the proper trade level).

In addition to the books of original entry and property records found in most types of businesses, the following items may be required to gather the necessary information for an audit of a leasing company:

1. <u>Lease Contracts</u> – furnish complete information on lease costs and lease dates.  A primary requirement of leasing company audits is that the auditor obtain (at least) several copies of invoices and executed lease contracts including purchase contracts for lessees in the County.

2. <u>Audit Referrals</u> – in addition to the accounting records of the lessor, use of leased equipment referral forms (resulting from processing property statements or conducting audits of lessees), may be helpful.  The referrals will contain information from property statements filed by lessee(s) and information extracted during audits of lessees.  This information can be compared to the lessor's records to determine whether the lessor has reported all equipment.

3. <u>Control Records</u> – geographic controls for sales and use tax purposes which can be utilized to verify leases in a particular county.  This is particularly critical since in many cases, lessors record their leases at the lessee's headquarters but in fact the lessee may relocate the equipment to a different situs.

4. <u>Accounts Receivable Ledger and/or Billing List</u> – furnishes names and other information about customers, which may aid in discovery.  In some cases, such as short-term leases or rentals, this may be the most reliable source of information.

5. <u>Retail Pricing Lists</u> – furnishes current selling prices of similar equipment, which may aid in verification of estimated value and determination of proper trade level cost.

The auditor is responsible for establishing the total in place replacement or reproduction cost new of leased equipment in order to implement the cost approach to value. For review, the total cost may include (but is not limited to):

1. Purchase price of equipment

2. Sales or use tax

3. Freight

4. Installation and set up costs

5. Machinery foundation costs

6. Cost of major repairs that extend the useful life of the equipment or materially increase its capacity

7. Trade level adjustments where applicable

Each of these costs should be verified. It may be necessary to also review the lessee's accounting records to gather all applicable information (e.g., situs) and costs, and ultimately determine total cost subject to assessment.

In determining this total cost and reviewing an assessee's property statement, an auditor should take care to look for common problems listed below.

COMMON PROBLEM AREAS REGARDING AUDITS OF LEASING COMPANIES:

1. Situs Dates

   Some companies consider an item leased only when the item is operational or when the monthly billings commence. Monthly billing may not start until after long extensive testing is completed, especially on complex types of equipment. To determine proper treatment on the lien date, it is important to ascertain the various dates an assessee uses (i.e., define the term such as date of installation, rental date, effective date, termination date, shipping date, acceptance date, and date of manufacture).

2. Recognition and Reporting of Proper Trade Level

   A leasing company may be reporting booked cost of an asset that does not correspond to the level at which the property is being used on the lien date. For example, when the lessor is also the manufacturer of the leased equipment, the booked (and reported) cost may be the manufactured cost. The actual value of the equipment to the user/lessee on the lien date may be more than that manufacturer's cost (to include profit margin, sales tax, etc.). The auditor should determine what the proper trade level cost is per Rule 10, and whether it is being reported. (See also trade level and leased equipment valuation discussions in Chapter 4 and Chapter 6.)

3.  Assignment of Leases and Lease Rights

An assignment occurs when one lessor (the assignor) "transfers" or sells property out on lease to another lessor (the assignee).  Assigned leases may not be reported by either party (the assignor or the assignee), and may not be reported by the lessee holding the property.  An audit of a leasing company should include a review of records concerning assignments to ensure that all such equipment is reported.

4.  Lease Purchase

A leasing company may or may not report Purchase-Option Leases.  These are leases which are essentially sales, rather than "true leases" as defined in Chapter 6.  When purchase-option leases are not reported by the leasing company, neither the lessor nor the lessee may be reporting the equipment.  A review of the lessor's records may identify such unreported property.

5.  Sales-Lease Backs

Many companies advance money to customers using existing equipment as collateral.  These "leases" may or may not reflect the true cost of the equipment because many of these arrangements are based on the lessee's ability to pay, and not on the cost of the equipment.  Documents concerning sale-lease backs, including the original purchase documents, should be reviewed to estimate the full economic cost.  A physical inspection of the property may also be necessary to confirm the appropriate value.

6.  Service and Warranty Contracts

Leases may include costs for non-assessable service items.  These costs should be deducted when they do not influence the value of the property, and they can be estimated.

7.  Computer Software

Leases may include costs for non-assessable software.  These costs should be deducted where appropriate under the exemption of section 995 and Rule 152 as discussed in Chapter 6.

8.  Special Leases

Many lessors have separate controls for those items that are special purpose leases or are not currently active.  The auditor should make certain that the following categories of leases have been accounted for:

- Leases in litigation

- Terminated leases

- Lease purchases

- Government Service Administration (GSA) leases

- Education leases
- Local Government leases
- Software Leases
- Sub-Leases

## INSPECTION OF PROPERTY

At some point during an audit, the auditor should take a tour of the premises to physically inspect the property being appraised.  This is an important part of the audit process.  A tour and inspection of the property being audited (appraised) contributes to the audit in the following ways:  (1) confirms the existence and the location of the property, (2) confirms the correct classification of the property, (3) verifies the condition of the property, (4) verifies that all property is recorded in the books and/or reported on the property statement, (5) verifies that all property on the books actually exists at the location, and (6) verifies that valuation of the property as a whole is reasonable and accurate.

It is not necessary for the auditor to specifically identify each and every piece of equipment.  It is; however, important to compare and reconcile a sample of the assets compiled based on review of the records against actual existing assets viewed during the tour and vice versa.  This sample should be large enough to reasonably conclude the accuracy and completeness of the records being used as a basis for the assessable value.

## AUDIT VALUATION AND SUMMARIZED FINDINGS

When all information is gathered and reviewed, an auditor must analyze the data and summarize the results.  Within this portion of the audit, an auditor will (1) compare audited cost, classification, and acquisition dates to reported information and/or revenue and expense information, (2) appraise the property and estimate audited value, (3) compare audited value to assessed value, and finally, (4) produce findings in audit work papers.

### COMPARE AUDITED COST TO REPORTED COST

Comparing audited cost to assessee's reported cost (and/or assessed value based on cost if different from reported cost) by year of acquisition and classification type is the first step in the summarization process.  This will determine where and how costs were misreported, if at all, and will provide insight into how the overall value may be affected.

For complex audits, a reconciliation of audited cost to assessee's reported cost may be appropriate.  Following is an example that illustrates how the difference between audited cost and reported cost can be reconciled.  The example is for illustration purposes only.  In practice, the reconciliation of audited cost to reported cost may include more detailed explanations of the

difference, such as acquisition years of property listed under the differences section of the worksheet and audit years affected by the differences.  In other circumstances, the cause of a difference may not be identifiable.

| | Machinery | Office Equip. | Computers | Fixtures | Total |
|---|---|---|---|---|---|
| **EXAMPLE 8.2** | | | | | |
| **RECONCILIATION OF REPORTED COST TO AUDITED COST** | | | | | |
| Reported Cost (FYE 2002) | $ 100,000 | $ 25,000 | 0 | $ 25,000 | $ 150,000 |
| Audited Cost  (FYE 2002) | 120,000 | 20,000 | 5,000 | 25,000 | 170,000 |
| Difference | $  20,000 | ($  5,000) | $  5,000 | $        0 | $  20,000 |
| Difference due to: | | | | | |
| Unreported freight & installation | $  10,000 | $  5,000 | | | $  15,000 |
| Misclassified equipment | | (5,000) | 5,000 | | 0 |
| Exempt software | | (5,000) | | | (5,000) |
| Unrecorded assets acquired and received prior to lien date | 10,000 | | | | 10,000 |
| Total Difference | $  20,000 | ($  5,000) | $  5,000 | $        0 | $  20,000 |

## AUDITED VALUE

Once the auditor-appraiser has determined through the audit process that all assessable property has been reported on the property statement or identified as having escaped assessment or identified as having been assessed in error, an audited value for each class of property is estimated and/or a total audited value (of all these classes) is computed.  The auditor-appraiser should determine the best approach to utilize in the valuation process.  Most often this is the cost approach and mass appraisal techniques; however, the audit process may disclose other relevant information that may lead the auditor-appraiser to consider a valuation method other than the cost approach (i.e., comparative sales or income approach) or to consider obsolescence factors (functional, technological, or external) in addition to valuation techniques already used.  The audit process is an opportunity to arrive at or confirm that the assessable value is as close as possible to the constitutionally-mandated value.  For a thorough discussion of value see Chapter 4.

## COMPARE AUDITED VALUE TO ASSESSED VALUE

The audited value is compared to the original assessed (enrolled) value. The difference determines the net value change (escape assessment or correction) appropriate for that year.[286] Following is an example of a format used for this comparison:

| **EXAMPLE 8.3**<br>**ASSESSMENT YEAR XXXX** | | | | | | |
|---|---|---|---|---|---|---|
| | As Enrolled | | Per Audit | | Difference | |
| Asset | Cost | Full Value | Cost | Full Value | Cost | Full Value |
| Supplies | | | | | | |
| CIP | | | | | | |
| Machinery/Equipment | | | | | | |
| Office Equipment | | | | | | |
| Other Equipment | | | | | | |
| Tools, Molds, Dies | | | | | | |
| Computer Related | | | | | | |
| Real Property (except fixtures) | | | | | | |
| Fixtures | | | | | | |
| Total | | *(1)* | | | | |
| *(1) Ties to original Tax Bill* | | | | | | |

## FINAL PRODUCT:  AUDIT WORK PAPERS

Every audit, regardless of its complexity or its size, should contain certain basic information in the form of working papers that flow logically.  These working papers include schedules of analysis and supporting documents that are a summary of the events of the audit and a summary of the audit findings.  Without organization, the audit cannot be used by the auditor, by a reviewer, by the assessee, or by others to ensure that the audit results are reasonable and for purposes of appraising the property in the future.

Minimum contents of an audit should include (1) a table of contents, (2) a summary of findings, (3) audit checklist, (4) a written narrative summarizing the events and audit process, and (5) other working papers.  The format and/or order of these documents should be determined by each individual county, but should be consistent for each audit within that county.

## Table of Contents

A table of contents, with a description of the audit documents and their corresponding page numbers, should be included for quick and easy reference especially on the more complex audits.

---

[286] Roll procedures for processing escape assessments and corrections are discussed in Chapter 9.

## Summary of Findings

A summary of findings should be included in the first few pages of an audit. This is where the audited cost and value are compared with the original cost and value, and the net differences (escapes, correction, or refunds) are noted for each year audited.

## Audit Checklist

An audit checklist is vital for an audit to be thorough, efficient, and complete. It contains questions pertinent to the assessee as well as reminders relating to the various segments of the audit. In the case of an audit that is limited in scope, the checklist clarifies that only specific items were examined. These reminders may be checked off as covered. A sample checklist is included in Appendix E of this manual.

## Audit Narrative

The audit narrative is a key feature of an audit in that it allows the audit to be quickly reviewed or used by others (users may include the audit supervisor, the assessee, another auditor or appraiser, the appeals board, etc.) in the future. It details and explains the summary of findings (including the areas of discrepancy and their causes), the auditor's conclusions as a result of the findings, and the recommendations made for or against penalties. The narrative must describe in sufficient detail the work performed, and the auditing standards and procedures used to support the conclusion(s). All of these facts must be presented in a concise manner without eliminating significant substantive matter, and should logically follow the sequence of the working papers. It is particularly important to report clearly any unusual adjustment to cost or valuation procedures to guide the assessee and appraisers for making future reporting and assessments.

## Other Working Papers

Other working papers included in an audit package will consist of all documents necessary to support the information on the summary sheets and in the narrative to make the audit complete. These papers will differ from county to county and even between audits. But in all cases, they serve to:

- Provide support for the audit report

- Aid in the planning, performance, and review of audits

- Document whether the audit objectives were achieved

- Provide support in the event that an assessee disputes or appeals

- Demonstrate compliance with property tax laws and state guidelines

- Provide clear directions on adjustments made to costs, for trade level, for obsolescence, and other items so that problems encountered in the audit are less likely to be repeated by the assessee and/or assessor's staff.

Audit working papers should be complete and include support for all audit conclusions reached. Among other things, audit working papers may include:

- Audit contact person, location and date of the audit

- Audit report and assessee responses

- Control questionnaires, flowcharts, checklists, and narratives

- Value calculations, assumptions, and conclusions

- Analysis and tests of transactions, processes, and account balances (i.e., spreadsheets developed by the auditor)

- Copies of depreciation schedules (or asset lists), invoices, etc.

- Sampling method utilized

- Audit correspondence if it documents audit conclusions reached

- Information about operating and financial policies

- Planning documents and audit programs

- Notes resulting from interviews

Regardless of the type of papers included in this section, the audit should be logically organized and, if lengthy, clearly indexed. A reader should be able to follow the progression and use the audit to determine how the final conclusion was reached.

## REVIEW BY SUPERVISOR

After the fieldwork is completed and the audit write-up is finalized, the audit is submitted to an appropriate reviewer for verification of technical and legal correctness. The audit report, audit findings, and all working papers are reviewed to ensure that the proper audit procedures have been performed, and that the findings are supported by evidence and substantiating documents. Upon completion of review, the supervisor will return the audit for further explanations or corrections deemed necessary. At this point, the audit is essentially complete. The next step is to notify the assessee of findings, and process roll corrections.

## NOTIFY ASSESSEE OF FINDINGS

Pursuant to Rule 191 and section 469(b)(1), the assessor is required to notify the assessee, in writing, of audit results "with respect to data that would alter any previously enrolled assessment." Rule 305.3 requires the assessor to notify the assessee in writing if the audit discloses *property subject to an escape assessment*. Additionally, section 408(e)(1) permits the assessee or representative "to inspect or copy all information, documents, and records, including auditors' narrations and workpapers…".

Audit findings should include an explanation of differences found, problems identified, and the net result, if any. If there are differences that would change the previously enrolled assessment, the findings should include an audit summary, similar to the one in Example 8.3, which shows a

comparison between the original full value assessment of all classifications of equipment and improvements at the location as assessed per the original tax bill, to the audited full value of these classifications of equipment and improvements.  In addition, if any individual item was underassessed or not assessed, the audit findings must disclose that escape even in situations when the escape is offset by an overassessment of other property.  *Property subject to an escape assessment* is defined in Rule 305.3 as follows:

> "Property subject to an escape assessment" means any individual item of a assessee's property that was underassessed or not assessed at all when the assessor made the original assessment of the assessee's property, and which has not been previously equalized by an appeals board, regardless of whether the assessor actually makes or enrolls an escape assessment.  Property is subject to an escape assessment even if the audit discloses an overassessment of another portion of an item of the property, and the amount of the underassessment could be offset completely by the amount of overassessment.  If the audit discloses that any property was subject to an escape assessment, the assessor shall include that fact as a finding presented to the taxpayer as required by Rule 191.  If no such finding is made by the assessor, the taxpayer may file an application and present evidence to the board of the existence and disclosure of property subject to escape assessment.  If the board determines that property subject to escape assessment was disclosed as a result of an audit, the board shall permit the taxpayer's section 469 appeal.

As indicated earlier, the summary and/or description of property subject to an escape assessment shall be communicated in writing to the taxpayer.  Where an escape assessment applies, a *Notice of Proposed Escape Assessment* must also be sent at least 10 days prior to entry on the roll as required by section 531.8.[287]

Rule 191 states, in pertinent part, as follows:

> After having considered the results of the audit, including discussions with and written comments of the taxpayer, the assessor shall inform the taxpayer of his conclusions as to the value of the property and may (1) cause an escape assessment to be made, (2) make an assessment subject to penalty, or (3) inform the taxpayer of his right to a cancellation of assessment or refund of taxes.[288]

It is not required under the rule or statutes, but it is advisable for the auditor-appraiser to explain the audit findings and conclusions to the assessee and/or his or her agent in some situations.

The assessee then has the option to agree, dispute, or request amendment to the audit.  When the assessee agrees to the audit findings, roll corrections are processed as necessary.  When the

---

[287] See Chapter 9 for more discussion of section 531.8.
[288] Rule 191.

assessee disputes the findings, the assessee and the assessor should try to (and in some cases can) resolve areas of disagreement before the audit results are enrolled.

## APPEAL AFTER AN AUDIT

In the case where disagreements cannot be resolved and the audit discloses property subject to an escape, the assessee may file an application for changed assessment.[289]  Rule 305.3(a) states:

> In addition to any rights of appeal of escape or supplemental assessments as described in Rule 305(d)(2) of this subchapter, if the result of an audit discloses property *subject to an escape assessment* for any year covered by the audit, then, pursuant to section 1605 of the Revenue and Taxation Code, an application may be filed for review, equalization, and adjustment of the original assessment of *all property of the assessee* at the *location of the profession, trade, or business* for that year, except any property that has previously been equalized for the year in question. (Italics added.)

If the auditor discovers *property subject to an escape assessment*, that fact must be disclosed to the assessee.  *Property subject to an escape assessment* means "any individual item of the assessee's property that was underassessed or not assessed at all when the assessor made the original assessment of the assessee's property, and which has not been previously equalized by an appeals board, regardless of whether the assessor actually makes or enrolls an escape assessment."[290]  Property subject to an escape assessment in terms of "not assessed at all" is self-explanatory.  Property subject to an escape assessment in terms of an "underassessment" may be due to

- misclassification of the property by the assessee that resulted in an underassessment,

- the reported cost of the property did not include all market costs, both direct and indirect, necessary to purchase or construct equipment and make it ready for its intended use, or

- a processing error by the assessor's staff that resulted in an underassessment.

If the audit discloses property subject to an escape assessment but an escape assessment is not made due to an offset of an overassessment, the assessee has the right to file an assessment appeal for *the original assessment of all property of the assessee* at that location for the year that property was subject to an escape assessment.  If the assessor does not present audit work papers to the assessee illustrating that the audit disclosed property subject to an escape assessment, the assessee may present such evidence to the appeals board so the board may determine whether it has jurisdiction to hear the matter.

---

[289] See sections 469 and 1605, and Rule 305.3 for information pertaining to filing an application for appeal following an audit.

[290] Rule 305.3(b)(2).  Property shall be deemed previously equalized for the year in question only if the board previously made a final determination of full value for that item, category, or class of property that was the subject of an assessment appeals hearing or was the subject of a stipulated agreement approved by the board and specifically identified.  (Rule 305.3(b)(7)).

"'*All property of the assessee*' means any property, real or personal, assessed to the assessee, or the assessee's statutory or legal predecessor in interest, at the location of the profession, trade, or business for the year of the audit."[291] If computer equipment is discovered (through an audit) that was not previously assessed and the assessee owned the personal property and fixtures at the *location* audited, the assessee has the right to appeal the original assessment of the personal property and fixtures.  If the assessee did not own and was not assessed property taxes for the land and building, he/she does not have the right to appeal the original assessment of the land and building.[292]

The definition of *location* is as follows:

> *"Location of the profession, trade, or business"* means a site, as determined by the board, where the property subject to the escape assessment is located.  Site includes all property within the same appraisal unit as the property that is subject to escape assessment.

> Site also includes other property not within the same appraisal unit as the property that is subject to escape assessment, when the other property and the property that escaped assessment function as part of the same economic unit of the profession, trade, or business.  A "location of the profession, trade, or business" may include multiple parcels of real property, noncontiguous parcels, parcels with separate addressees, and parcels in separate revenue districts within the county. (Italics added.)[293]

Mandatory audits must be completed at least once in each four-year period.  Typically, when nonmandatory audits are conducted, a four-year audit is also completed.  In situations when the audit (mandatory or nonmandatory) discloses property subject to an escape assessment, the assessee can only file an assessment appeal (on the original assessment of all property of the assessee at the location) for the year that the property escaped assessment, not all years covered in the audit period (unless property escaped assessment in all years).[294]

## Notice for Filing an Application

If the results from an audit disclose property subject to an escape assessment, an application must be filed with the clerk within 60 days of the date the notice is mailed to the assessee.  The mailing date of the notice is the date printed on the notice or the postmark on the notice, whichever is later. The notice necessary for filing an application is dependent on whether the assessor makes an escape assessment and whether the escape assessment is enrolled.

---

[291] Rule 305.3(b)(5).

[292]  See Rule 305.3(c) examples 1 and 2 for more information on who may file an appeal after an audit.

[293]  Rule 305.3(b)(6).  In addition, Rule 305.3(e), examples 3, 4, and 5 provide clarification in regards to what is meant by "location of the profession, trade, or business."

[294] In addition, if the assessor discovers property that escaped assessment but not through an audit, the assessee can not appeal the original assessed value of all property at the location.  The right to appeal the original assessment of all property of the assessee at the location applies only when property subject to an escape assessment is discovered through an audit.

- If an escape assessment is enrolled by counties of the first class or counties that have adopted a resolution pursuant to section 1605(c), the notice is the tax bill.  A formal appeal must be filed within 60 days of the date of mailing printed on the tax bill or the postmark date on the envelope in which the tax bill was mailed, whichever is later.

- If an escape assessment is enrolled by counties that are not counties of the first class and not a county that adopted a resolution pursuant to section 1605(c), the notice of escape assessment pursuant to section 534 shall serve as the notice.[295]  A formal appeal must be filed within 60 days after the date of the notice or the postmark date on the envelope in which the notice was mailed, whichever is later.

- If an escape assessment is not enrolled, the notice shall be the audit results showing the property subject to an escape assessment.  A formal appeal must be filed within 60 days after the date noted on the audit results or the postmark date on the envelope in which the audit results were mailed, whichever is later.

## PROCESSING ROLL CHANGES

Roll changes are the final step in the audit process.  As discussed earlier in the chapter, escape assessments or corrections must normally be completed within four years after July 1 of the assessment year the property escaped assessment or otherwise pursuant to sections 532 and 532.1.  They must also be processed at the tax rate applicable to the year they should have been originally assessed.  Chapter 9 discusses this topic.

---

[295] The notice given by the assessor as required by section 531.8 shall not serve as the notice required for filing an application for changed assessment.

# CHAPTER 9:  ROLL PROCEDURES

## IDENTIFYING ROLL ERRORS

For a wide variety of reasons, the initial assessment roll inevitably contains errors.  Common errors include errors in value judgment, "clerical" (calculation) errors, errors caused by the failure of property owners to report correctly (or to report at all), and various misunderstandings.  Typical examples specific to the business division include:

- A property statement disclosing information erroneously omitted in previous year(s) (either by the assessee when reported or by the assessor when processing)

- An audit resulting in a net change (increase or decrease) in assessed value

- An assessee failing to inform the assessor that a business was closed and/or assets were disposed of prior to the lien date

- An assessor discovering a business owning taxable property after the initial year of operation and assessability

Such errors result in overassessments, underassessments, misclassifications, assessments to the wrong assessees, assessments assigned to the wrong tax-rate jurisdictions, and other problems that result in incorrect assessments.

In general, California law provides procedures for correcting errors and omissions on the assessment roll, regardless of the cause of the error or omission and regardless of whether the error resulted in an overassessment or an underassessment.  If the value of property that should be on the roll is determined to be different than the enrolled value (an audit resulting in a net increase, for example), the enrolled value must be corrected according to statutory provisions.  Both the limitation on time (i.e., statute of limitations), if applicable, and the procedure for making a correction vary greatly according to the nature and the cause of the error.  The procedures set forth in the statutes must be followed.

## ESCAPE ASSESSMENTS

An *escape assessment* is an assessment made after the completion of the regular assessment roll, as an addition to that roll.  The regular assessment roll is complete after the assessor has certified the completion of the local roll prepared pursuant to section 601.[296]  An escape assessment is any addition to that roll regardless of the reason.

Section 531 requires the assessor to make an escape assessment if (1) the assessee does not file a property statement and the result is no assessment, or (2) upon discovery of any other

---

[296] Escape assessments for state assessed properties may either be added to the fiscal year in which it is discovered or included with the assessments for the succeeding fiscal year (section 864).

underassessment of property. When an escape is based on failure to file a property statement (including circumstances where the statement is incomplete when filed and returned to the assessee), the assessor is also required to add penalties and interest to the assessment.  Section 531 states:

> If any property belonging on the local roll has escaped assessment, the assessor shall assess the property on discovery at its value on the lien date for the year for which it escaped assessment.  It shall be subject to the tax rate in effect in the year of its escape except as provided in Section 2905 of this code.

> Property shall be deemed to have escaped assessment when its owner fails to file a property statement pursuant to the provisions of Section 441, to the extent that this failure results in no assessment or an assessment at a valuation lower than would have obtained had the property been properly reported.   Escape assessments made as the result of an owner's failure to file a property statement as herein provided shall be subject to the penalty and interest imposed by Sections 463 and 506, respectively.  This paragraph shall not constitute a limitation on any other provision of this article.

Escape assessments are also required when it is discovered that an exemption was granted in error,[297] and when the business inventory exemption was incorrectly applied.[298]  The statutes also provide for escape assessments when assessees do not provide accurate information requested by the assessor necessary to compute a valid assessment.  When accurate information is available to the assessor that indicates a higher assessment is required than that originally enrolled, the additional value is enrolled as an escape assessment.  Sections 531.3 and 531.4 both provide for escape of the property incorrectly reported.  Section 531.3 provides, in part:

> If the assessor requires an assessee to describe personal property in such detail as shows the cost thereof but the assessee omits to report the cost of the property accurately, notwithstanding that this information is available to the assessee, to the extent that this omission on the part of the assessee causes the assessor not to assess the property or to assess it at a lower valuation than he would enter upon the roll were the cost reported to him accurately, that portion of the property as to which the cost is unreported, in whole or in part, shall be assessed as required by law. . . .

Section 531.4 specifically discusses escape assessments in terms of inaccurate property statements.  In part, it reads:

> When an assessee files with the assessor a *property statement* or report on a form prescribed by the board with respect to property held or used in a profession, trade or business and the statement fails to report any taxable tangible property

---

[297] Section 531.1.
[298] Section 531.5.

accurately, regardless of whether this information is available to the assessee, to the extent that this failure causes the assessor not to assess the property or to assess it at a lower valuation than he would enter on the roll if the property had been reported to him accurately, that portion of the property which is not reported accurately, in whole or in part, shall be assessed as required by law.  (Italics added.)

In addition, both sections 531.3 and 531.4 discuss the application of penalties and interest as provided in sections 504 and 506.  When it is discovered that an additional assessment is required for a previous roll year, it is important to determine the reason for the missed assessment.  For example, the missed assessment may be due to either an assessor or assessee error.  If it is an assessee error, the failure to report costs accurately may be due to an unintentional mistake or willful misreporting.  Provisions in the code allow for penalties and interest depending in part on the reason for the escape assessment.

## TAX RATE AND INTEREST

Section 506 indicates the appropriate tax rate and interest to be applied to escape assessments. The language provides that the tax rate applicable to any escape assessment shall be:

> . . . the tax rate to which the property would have been subject if it appeared upon the roll in the year when it should have been lawfully assessed.  To the tax there shall be added interest at the rate of three-fourths of 1 percent per month from the date or dates the taxes would have become delinquent if they had been timely assessed to the date the additional assessment is added to the assessment roll.

Basically, the *tax rate* is the rate of the year of escape, and the *delinquency date* is the date the taxes would have become delinquent if the property was reported timely.  The date the escape assessment is entered on the roll (the *date of enrollment*) is important in terms of the interest computation.  The *date of enrollment* of the escape is the date the interest computation stops (interest computation starting with delinquency date if the property was reported and assessed timely).  The *interest rate* is applied for the number of months from delinquency date to roll entry date (three-fourths of 1 percent per month).

## PENALTY

Penalties are applied to escape assessments under certain conditions.  If the property statement is not filed or was not filed timely in accordance with sections 441 and 463, a 10 percent penalty must be applied to the assessed value.  The application of the penalty may only be abated by the county board of equalization or assessment appeals board.  Therefore, if an assessee does not agree with the penalty and wishes to have the penalty abated, an application for changed assessment (appeal) must be filed.

A 25 percent penalty may be applied to the assessed value if the assessor discovers that the assessee or agent willfully concealed information that resulted in a lower assessed value.[299] Section 503 provides for the application of a 75 percent penalty to the assessed value if it is discovered that the property is underassessed due to a fraudulent act or omission, or fraudulent collusion between the assessee (or the assessee's agent) and the assessor (or the assessor's deputy).  The interest and the penalties (if appropriate) of the additional assessed value are added to escape assessments calculated on that additional assessed value.

## STATUTE OF LIMITATIONS

In most cases, escape assessments must be made within four years after July 1 of the assessment year the property escaped assessment.  This time period is extended to eight years if conditions exist that warrant the 25 percent penalty application in sections 502 and 504.[300]

The statutory time period for making an escape assessment is also extended if the assessee and the assessor agree in writing to extend the time.  Section 532.1 in part reads:

> If, before the expiration of the period specified in Section 532 for making an escape assessment, the taxpayer and the assessor have agreed in writing to extend the time for making an assessment, correction, or claim for refund, the assessment may be made at any time prior to the expiration of the period agreed upon.  The period may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

This agreement in writing may also be known as a waiver.  Each county develops its own form; therefore the titles of the forms, in addition to the actual agreements, may be different.[301]  In all cases, however, the waiver should indicate that it extends the time allowed for making an escape assessment, correction, and refund.  If the waiver does not specifically state that it extends the time for corrections and refunds, then it only extends the time for making an escape assessment.

## NOTICE OF PROPOSED ESCAPE ASSESSMENT

It is required that the assessee be notified using a *Notice of Proposed Escape Assessment* at least 10 days prior to the entry of a value on the roll, pursuant to section 531.8.  In relevant part, section 531.8 reads:

> No escape assessment shall be enrolled under this article before 10 days after the assessor has mailed or otherwise delivered to the affected taxpayer a "Notice of Proposed Escape Assessment" with respect to one or more specified tax years.

The intent is to provide assessees with advance notice of an escape assessment before its enrollment, thereby increasing their opportunity to ask questions and prepare to file an appeal.

---

[299] Sections 502 and 504.
[300] Section 532.
[301] The form with the agreement that extends the time limitation for processing an escape is not a Board-prescribed form.  The format and title of the form may differ between counties.

The notice may differ in appearance and content from county to county (as it is not required on a Board-prescribed form), but certain information must be included in order to meet the statutory requirements. For example, every *Notice of Proposed Escape Assessment* must show the amount of any escape assessment as estimated by the assessor; provide a name and phone number of a person at the assessor's office who is knowledgeable with respect to the proposed escape assessment and to whom the assessee can voice any concerns, submit additional information, or otherwise discuss the assessment; and have a prominent heading stating the statutory title of the Notice. This notice must be sent by the assessor prior to enrolling any escape. Absent such notice, no escape assessment may be levied and if levied is invalid and void. When an audit results in escape assessments, the *Notice of Proposed Escape Assessment* may be attached to audit findings or may be sent independently along with other sources of information.

## ENTRY ON ROLL

When an escape assessment is made, the entry on the roll must reference the year the property escaped assessment and applicable sections of the Revenue and Taxation Code. Section 533 gives specific wording that must be entered on the roll. In part, the section states:

> . . . if this is not the roll for the assessment year in which the property escaped assessment, the entry shall be followed with "Escaped assessment for year 19__ pursuant to Sections _____ of the Revenue and Taxation Code."

Since appropriate sections of the Revenue and Taxation Code must be referenced when the entry on the roll is made, it is important to determine if the missed assessment was due to an assessee error or an assessor error and/or concealment or fraud. The cause of the escape determines the appropriate section references.

As indicated earlier, an escape assessment shall not be enrolled unless the assessor has mailed or delivered a Notice of Proposed Escape Assessment at least 10 days prior to the entry of the value on the roll.[302] After an escape assessment is enrolled, section 534 requires that the assessor mail a Board-prescribed notice to the assessee to notify the assessee that the escape assessment was enrolled.[303]

## ROLL CORRECTIONS

Errors and omissions not involving the assessor's value judgment must be corrected within four years after making the original assessment. A change to the original entry on the assessment roll is a *roll correction* when:

- A clerical error is caused by the assessor or another county official, whether the error resulted in an increase or a decrease to the original entry on the roll (section 4831).

---

[302] Section 531.8.
[303] See section 534, Rule 305.3, and the section titled *Notice for Filing an Application* in Chapter 8 for more information.

- A clerical error is caused by an assessee, based on a defect of description or other information discovered upon an audit, and the error resulted in an assessment at a higher valuation than would have otherwise been entered on the roll (section 4831.5).[304]

Roll corrections are different from escape assessments in several respects.

- No penalties are involved with roll corrections.

- While escape assessments may result from a roll correction, a roll correction cannot be made for escape assessments when caused by the assessee's failure to report the information required under section 441.

- Roll corrections are limited to clerical errors only, and cannot be made for errors or omissions involving the exercise of value judgment except in limited circumstances per section 4831(b).

- The roll correction could result in a refund to the assessee, and if based on an assessor error, the assessee is entitled to interest.[305]

## REFUNDS

If a roll correction decreases the amount of taxes because of an error by either the assessee or the assessor, a refund of the overpayment of taxes is possible.  Refunds of taxes paid are authorized solely under the conditions described in sections 5096 through 5180.  While a thorough discussion of these sections (sections 5096 through 5180) is not within the realm of this manual, it is important to note that it is the assessor's duty to deliver the corrected entry to the auditor, who is required by section 4834 to implement correction procedures.  The tax collector is required to notify the assessee of the right to file a refund claim.

It may be appropriate for taxes to be offset by the auditor and the tax collector pursuant to section 533.  In part, the section reads:

> If the assessments are made as a result of an audit which discloses that property assessed to the party audited has been incorrectly assessed either for a past tax year for which taxes have been paid and a claim for refund is not barred by Section 5097 or for any tax year for which the taxes are unpaid, the tax refunds resulting from the incorrect assessments shall be an offset against proposed tax liabilities, including accumulated penalties and interest, resulting from escaped assessments for any tax year covered by the audit.

---

[304] Assessee error that results with an addition to the roll is an escape assessment, see sections 501 to 534.
[305] Section 5151.

## BASE YEAR VALUE CORRECTIONS

Although applicable only to real property (including fixtures) valued under article XIII A, it is important to make the distinction between *roll corrections* and *base year value corrections*.  Roll corrections and base year value corrections are not identical.

Section 51.5 provides authority for assessors to make corrections to a base year value whenever it is discovered that a base year value does not reflect applicable constitutional or statutory valuation standards or the base year value was omitted.  If an error or omission involves the exercise of the assessor's judgment as to value, the error can be corrected only if it is placed on the current roll or roll being prepared within four years after July 1 of the assessment year for which the base year value was established.  Escape assessments, refunds or the cancellations of taxes are authorized where appropriate as the result of a base year value correction.

## SUMMARY OF REVENUE AND TAXATION CODE SECTIONS REGARDING ROLL PROCEDURES

The following table represents a summary of the Revenue and Taxation Code sections referenced regarding roll procedures (escape assessments, corrections, refunds, and base year value corrections).  This table is supplied as a reference tool only.  It does not quote the sections listed, but rather provides a brief synopsis of each section for quick reference to the authoritative law on each subject.

| TABLE 9A |
| REVENUE AND TAXATION CODE SECTIONS APPLICABLE TO ROLL PROCEDURES |

| R&T Reference | Remarks |
|---|---|
| Section 463 | *Penalty for failure to file statement*.  A penalty, 10 percent of assessed value, is applied when a property statement is not filed in accordance with filing requirements and deadlines as identified in sections 441 and 463, respectively.  The penalty may be applied to the regular roll, or applied to additions made to the roll after originally completed and published.  It may only be abated by the county board of equalization or assessment appeals board. |
| Section 502 | *Concealment, etc., of tangible personal property*.  A penalty, 25 percent of the additional assessed value as provided in section 504, is applied if the taxpayer or agent willfully conceals information that results with a lower assessed value.  The penalty is applied to additions made to the roll after originally completed and published. |
| Section 503 | *Fraudulent act, collusion, causing escape of taxable tangible property*.  A penalty, 75 percent of the additional assessed value, is applied if through a fraudulent act or omission, or fraudulent collusion, the property is underassessed in whole or in part. The penalty is applied to additions made to the roll after originally completed and published. |
| Section 504 | *Penalty assessments; amounts*.  Indicates percentage of penalty added if required per section 502 (25 percent). |
| Section 506 | *Tax rate applicable, interest*.  The tax rate is the rate of the year of escape.  Apply interest for the number of months from delinquency date to roll entry date.  Interest is applied at the rate of three-fourths of 1 percent per month from the date the taxes would have become delinquent if filed timely. |
| Section 531 | *Escaped Property*.  Property is deemed to have escaped assessment under this section when its owner fails to file a property statement per section 441 resulting in no assessment or an underassessment.  No willful or fraudulent act is involved. |
| Section 531.1 | *Escaped property, incorrect exemption*.  If it is discovered that an exemption was incorrectly allowed, an escape assessment shall be made. |
| Section 531.3 | *Escaped personal property, failure to report cost accurately*.  Escape assessment due to inaccurate report of personal property cost when assessor required a cost report. |
| Section 531.4 | *Escaped business property, inaccurate statement or report*.  Escape assessment due to inaccurate business property statement or report. |
| Section 531.5 | *Escaped property, business inventory exemption*.  Escape assessment due to the application of an incorrect business inventory exemption. |

| TABLE 9A<br>REVENUE AND TAXATION CODE SECTIONS APPLICABLE TO ROLL PROCEDURES | |
|---|---|
| **R&T Reference** | **Remarks** |
| Section 531.8 | *Notice of Proposed Escape Assessment*.  Requires 10 day notice to taxpayer prior to enrollment of escape assessment. |
| Section 532 | *Statute of limitations*.  Eight year statute of limitations where 25 percent (sections 502 and 504) nondisclosure or fraud penalty applies.  Four year statute of limitations where no penalty involved. |
| Section 532.1 | *Extension of time for making escape assessment*.  Extends the time period specified in section 532 for making an escape assessment, correction, or claim for refund. (Extension only applies to corrections and refunds if specifically stated in the written agreement between the taxpayer and assessor.) |
| Section 533 | *Entry on roll*.  For assessments made pursuant to article 3 or 4 (commencing with sections 501 and 531 respectively), the entry on the roll is to state:  "Escaped assessment for year 19__ pursuant to Sections _____ of the Revenue and Taxation Code."<br><br>If the assessments are made as a result of an audit which discloses that property assessed to the party audited has been incorrectly assessed either for a past tax year for which taxes have been paid and a claim for refund is not barred by section 5097 or for any tax year for which the taxes are unpaid, the tax refunds resulting from the incorrect assessments shall be an offset against proposed tax liabilities, including accumulated penalties and interest, resulting from escaped assessments for any tax year covered by the audit. |
| Section 534 | *Procedure after assessment*.  Tax rate to be applied:  same rate as used for year of escape. (See also section 506.)  Notification to the assessee of an escape assessment shall be on a form prescribed by the State Board of Equalization. |
| Section 4831 | *Incorrect entries; transfers to unsecured roll*.  Any assessor error.  Result of an incorrect entry on the roll or clerical error. |
| Section 4831.5 | *Correction of errors caused by the assessee*.  Correction to the roll when information furnished to the assessor resulted with an overassessment of the property. |
| Sections 5096-5180 | *Refunds*.  Various code sections related to refunds. |
| Section 51.5 | *Errors and omissions in determination of base year value*.  Provides authority to correct base year values. |
| Sections 830, 862 – 866, 4876 – 4880 | *Failure to File Statement, Escape Assessments of State-Assessed Property; Errors on the Board Roll*.  Code sections governing roll changes for state-assessed property. |

# CHAPTER 10:  MORGAN PROPERTY TAXPAYERS' BILL OF RIGHTS

## LEGISLATIVE INTENT

The *Morgan Property Taxpayers' Bill of Rights*, sections 5900 through 5911, was designed and added to the Code to promote fair administration of property tax in regard to the rights and duties of taxpayers, and specifically in reference to taxpayer questions, appeals, and roll changes when errors have occurred.[306]  The Legislature specifically stated its intent in section 5911 by stating:

> It is the intent of the Legislature in enacting this part to ensure that:
>
> (a) Taxpayers are provided fair and understandable explanations of their rights and duties with respect to property taxation, prompt resolution of legitimate questions and appeals regarding their property taxes, and prompt corrections when errors have occurred in property tax assessments.
>
> (b) The board designate a taxpayer's advocate position independent of, but not duplicative of, the board's existing property tax programs, to be specifically responsible for reviewing property tax matters from the viewpoint of the taxpayer, and to review and report on, and to recommend to the board's executive officer any necessary changes with respect to, property tax matters as described in this part.

As described in subdivision (b) above, the Property Taxpayers' Rights Advocate is responsible for implementing the *Taxpayers' Bill of Rights*.  The advocate is appointed by the Board and serves to review the effectiveness of the Board's property tax programs, including those affecting local assessment, from the taxpayers' viewpoint, by (1) providing clearly-written informational materials to property taxpayers, (2) prompt and adequate resolution of inquiries, complaints, and other problems, and (3) identification of areas of recurring conflict between taxpayers and property tax assessment officials.

Related specifically to personal property (and fixtures) and roll procedures, the *Taxpayers' Bill of Rights* initiated legislation in three other important sections of the code: section 531.8, *Notice of Proposed Escape Assessment*, requiring additional taxpayer notice of escape assessments, section 469, *Audit of profession, trade, or business,* and section 408, *Assessor's records*, dealing with records available to the assessee.

---

[306] Effective January 1, 1994.

## NOTICE OF PROPOSED ESCAPE ASSESSMENT

As discussed earlier, section 531.8 was added January 1, 1994 with the *Taxpayers' Bill of Rights* to aid in the taxpayers' understanding of their rights and duties with respect to property taxation, and to promote fairness. This notice must be sent by the assessor prior to enrolling any escape assessment.

## RECORDS AVAILABLE TO THE ASSESSEE

The rights of taxpayers and the public to inspect public records of all types are prescribed by law, the majority of which is found in the Public Records Act (Government Code sections 6250-6260). In Government Code section 6254(i), the Public Records Act prohibits from public disclosure any taxpayer information which is received in confidence and the disclosure of which would result in unfair competitive disadvantage to the taxpayer.

However, the Legislature has adopted specific Revenue and Taxation Code provisions (sections 408-408.3) granting both the public at large and assessees rights to inspect specific types of information in the assessors' records. As to the public rights, the assessment roll and its index, owners' maps and assessors' maps, property characteristic information, claims for exemption (except homeowner's) and other forms must be disclosed. For the assessee or his/her representative, all information related to the appraisal and assessment of his/her own property, including audit and roll change information, must be disclosed. Under section 408(e):

> . . . the assessor shall, upon request of an assessee of property, or his or her designated representative, permit the assessee or representative to inspect or copy all information, documents, and records, including auditors' narrations and workpapers. . . relating to the appraisal and assessment of the assessee's property, and any penalties and interest. . . .[307]

As part of the amendments to the *Taxpayers' Bill of Rights,* section 408 was expanded, increasing the taxpayers' rights to inspect or copy various types of documents including "auditors' narrations and work papers, whether or not required to be kept or prepared by the assessor."

Pursuant to further amendments under the *Taxpayers' Bill of Rights*, section 469 was also modified to guarantee the taxpayer a copy of the assessor's findings upon the completion of an audit. Upon completion of an audit of the assessee's book and records, the assessee shall be given the assessor's findings in writing with respect to data that would alter any previously enrolled assessment. The assessor *must provide* information under section 469, whether or not the taxpayer requests the information as required under section 408. In addition, "if the audit discloses that any property was subject to an escape assessment, the assessor shall include that

---

[307] Section 408(e).

fact as a finding presented to the taxpayer as required by Rule 191."[308]  (See the discussion in Chapter 8 under the heading "Appeal after an Audit.")

## RIGHT TO APPEAL

The assessee has two means of protesting a property tax assessment.  The first is to contact the assessor (i.e., the appraiser or the auditor-appraiser) prior to enrollment of the assessment and explain why they believe the value is incorrect.  Once enrolled, the assessee's option is to file an application for assessment appeal.  An assessee may request this application and information regarding the appeals process from either the assessor or the clerk of the county board of supervisors.

An appeal may be filed on an assessment only within the applicable filing periods, according to statutory provisions related to the particular assessment in question.[309]  Whether the property be real or personal property, in general appeal applications for assessments on the *regular assessment roll*[310] must be filed with the county assessment appeals board as described in section 1603.  Assessments made outside the regular assessment period (usually based on an escape assessment due to audit or late filings of property statements) must be appealed according to statutory provisions found in sections 469 and 1605.  Pursuant to these sections, an appeal must be filed no later than 60 days after the date of mailing printed on the notice or the postmark date, whichever is later.[311]

When an application for assessment appeal is filed timely regarding an escape assessment resulting from an audit, *all* property owned for the year of escape by an assessee at the location is opened up for appeal.  This includes the real property on which the personal property is located, even if the original appeal deadline was missed (unless previously equalized).  The following provision in section 1605(e) states:

> If an audit of the books and records of any profession, trade, or business pursuant to Section 469 discloses property *subject to an escaped assessment* for any year, then the original assessment of all property of the assessee at the location of the profession, trade, or business for that year shall be subject to review, equalization and adjustment by the county board of equalization or assessment appeals board. . . .[312]  (Italics added.)

---

[308] Rule 305.3(b)(2).

[309] An appeal cannot be filed at the county level on a claim for exemption.  A county assessment appeals board does not have authority to grant or deny an exemption  (Rule 302).

[310] The *regular assessment roll* is that roll processed during the period from January 1 to and including July 1 of the calendar year in which the assessment should have been enrolled if it had been timely made (section 1605(f)).

[311] Section 1605.  See Rule 305.3 for more information on *Notice for Filing an Application*.

[312] Section 1605(e), in part.

The legislative intent of this provision is to afford the assessee a similar right to "open up" past assessments as the assessor has.[313]

For more information regarding assessment appeals and the statutory provisions governing the appeals process and procedures, refer to the *Assessment Appeals Manual* published by the Board of Equalization.

---

[313] Section 469.

# APPENDIX A:  IMPROVEMENTS AS STRUCTURE ITEMS VERSUS FIXTURES

The following list includes a variety of improvements and their typical classifications as structure items or fixtures.  As discussed in the text, an improvement will be classified as a *structure item* when its primary use or purpose is for housing or accommodation of personnel, personalty, or fixtures, or when the improvement has no direct application to the process or function of the trade, industry, or profession.  An improvement will be classified as a *fixture* if its use or purpose directly applies to or augments the process or function of a trade, industry, or profession.  Items which have a dual purpose will be classified according to their primary purpose.

It must be emphasized that the listing is illustrative as a guide only.  Proper classification as structure item or fixture is determined according to the actual use or purpose of the property and intent as "reasonably manifested by outward appearances."  Appraisal responsibility is determined by an assessor's internal procedures.

Appendix A

| STRUCTURE ITEMS | FIXTURES |
|---|---|
| Air conditioning—office and building cooling | Air conditioning—process cooling |
| Auxiliary power generation equipment—for building purposes | Air lines |
| Awnings | Auxiliary power generation equipment—for trade or production purposes |
| Batch plants—buildings, fences, paving, yard lights, and spur tracks | Back bars |
| Boilers—office and building heating | Batch plant—scales, silos, hoppers, bins, machinery |
| Building renovations | Boilers—for manufacturing process |
| Butane and propane installations—used for heating buildings | Bowling lanes |
| Car washes—all buildings, canopies, interior and exterior walls, fences, paving, and normal plumbing | Burglar alarm systems |
| Carpets and floor coverings affixed to floor—wall-to-wall carpeting and specially installed strip or area carpeting, tile, terrazzo coverings | Butane and propane installations—used for trade or production purposes |
| Central heating and cooling plants | Car washes—special plumbing, wiring, and car washing equipment |
| Chutes—built-in | Compressors—air |
| Coin-operated laundries—restroom, sanitary plumbing fixtures | Conveyors—for moving materials and products |
| Conveyors—for moving people | Cooling towers—used in a trade or production process |
| Cooling towers—other than used in a trade or production process | Counters |
| Crane ways | Cranes—traveling |
| Dock elevators | Environmental control devices—used in the production process |
| Elevators—including machinery and power wiring | Fans and ducts—used for processing |

Appendix A

| **STRUCTURE ITEMS** | **FIXTURES** |
|---|---|
| Environmental control devices—if an integral part of the structure | Fences and railings—inside of buildings |
| Escalators | Furnaces—process |
| External window coverings | Furnishings—built-in, i.e., wall-hung desks |
| Fans and ducts—which are part of an air circulation or exhaust system for the building | Heating—boilers—for the manufacturing process |
| Fences—outside of building | Hoists |
| Flagpoles | Incinerators—commercial and industrial |
| Heating—boilers—used in office or building heating | Ice dispensers—coin operated |
| Kiosk—permanently attached | Kilns—beehive, tunnel, or cylinder type, and equipment |
| Movie sets—which are a complete building | Kilns—lumber |
| Paint spray rooms—if an integral part of the building | Laundromat—plumbing, wiring, and concrete work for equipment |
| Parking lot gates | Lighting fixtures—lighting associated with a commercial or industrial process |
| Partitions—floor to ceiling | Machinery foundations and pits—not part of normal flooring or foundation |
| Pipelines and pipe supports—used to convey air, water, steam, oil, or gas to operate the facilities in a building | Miniature golf courses |
| Pits—not used in the trade or process | Movie sets—which are not a complete building |
| Pneumatic tube systems | Ovens |
| Radiators—steam | Paint spray booths |
| Railroad spurs<br>Refrigeration systems—that are an integral part of the building | Partitions—annexed—less than floor to ceiling<br>Pipelines and pipe supports—used to convey air, water, steam, oil, or gas to equipment used in the production process |

Appendix A

| **STRUCTURE ITEMS** | **FIXTURES** |
|---|---|
| Refrigerators—walk in—which are an integral part of the building—excluding operating equipment | Pits—used as wine and sugar clarifiers, skimming pits, grease pits, sump pits, and pits used to house machinery in the manufacturing |
| Restaurants—rough plumbing to fixtures | Plumbing—special purpose |
| Renovations to building structures | Power wiring, switch gear, and power panels—for manufacturing process |
| Security—Banks and Financial<br>　　Fire alarm systems<br>　　Safes-embedded<br>　　Night depository (if integral part of<br>　　　building)<br>　　Teller cages<br>　　Vault alarm system<br>　　Vaults | Refrigeration systems—that are not an integral part of the building |
| Service stations—canopies, paving, sign, pylons | Refrigerators—walk in—unitized—including operating equipment |
| Shelving—originally designed as integral part of the building | Restaurant equipment—plumbing fixtures, stainless steel or galvanized sinks in kitchens, bars, soda fountains, garbage disposals, dishwashers, hoods, etc. |
| Shielded or clean rooms—if an integral part of the building | Roller skating surface |
| Signs—include supporting structure that forms an integral part of the building, including sign blades, pylons, or marquee structures serving as canopies.  Exclude sign cabinet (face) and lettering | Scales—including platform and pit |
| Silos or tanks—whose primary function or intent is to store property for a time period, such as storage tank farms and grain and liquid petroleum storage facilities | Security—Banks and Financial<br>　　Cameras (surveillance) attached to walls or<br>　　　columns<br>　　Drive-up and walk-up windows<br>　　　unitized security type<br>　　Night depository (if not an integral part of<br>　　　the  building)<br>　　Man traps<br>　　Vault doors |
| Smog control devices—when attached to incinerator or building heating plant | Service stations—gasoline storage tanks, pumps, air and water wells, signs |

Appendix A

| **STRUCTURE ITEMS** | **FIXTURES** |
|---|---|
| Sprinkler systems—where primary function is the protection of a building or structure | Shelving—other than that which is an integral part of the building |
| Store fronts | Shielded or clean rooms—if not an integral part of the building |
| Television and radio antenna towers | Signs—sign cabinets and free standing signs, including supports |
| Trout ponds—concrete | Silos or tanks—whose primary function is as part of a process, including temporary process holding such as breweries or refineries |
| Theaters—drive-in—buildings, screen and structures, fencing, paving, lighting | Ski lifts, tows, trams |
| Water systems at golf courses | Sky slides |
| | Smog control devices—attached to process device |
| | Theaters—auditorium equipment—seating, screens, stage equipment, sound, lighting, and projection |
| | Theaters—drive in—heater and speaker uprights, wiring and units, projection equipment, signs |
| | Trash compactors and paper shredders |
| | Wash basins—special purpose water softeners for commercial or industrial purposes |

# APPENDIX B:  COORDINATION OF LANDLORD AND LEASEHOLD IMPROVEMENT APPRAISALS

## DEVELOP AN INTER-DEPARTMENTAL MEMORANDUM FOR COORDINATION

Transferring information between the real property and business property divisions within an assessor's office can help to avoid duplicate or escape assessment of landlord and leasehold improvements–both of which may include structure items and fixtures.  One method used to track and monitor this transfer of information in some assessors' offices is an inter-departmental memorandum.  This memorandum is sent between departments (i.e., between the real property division and business division) with a copy of the improvement source document (e.g., building permit, change in ownership statement, etc.).  As shown in the table below, the memorandum includes three copies: one copy kept by the originator to verify completion of the assessment, one copy for the real property file, and one copy for the business property file.

The intent of the memorandum is to provide a complete record of the appraisal, including classification, valuation, and assessee.  It summarizes all appraisal information for the business file and real property record.  The following table illustrates how an inter-departmental memorandum may be used in practice.

| EXAMPLE B.1<br>INTER-DEPARTMENTAL MEMORANDUM |
| --- |
| • The business property division receives a property statement reporting additions on Schedule B.  After reviewing the property statement, the auditor-appraiser initiates a memorandum to the real property division addressing these additions. |
| • The originator (auditor-appraiser) keeps the original memorandum (copy #1).  Next, the auditor-appraiser attaches copies #2 and #3 to a copy of Schedule B and forwards that information to the real property division.  The auditor-appraiser retains the original (copy #1) to track the appraisal of the improvements. |
| • Using the memorandum and its attachments, the real property appraiser determines any applicable value changes.  After valuing the property, the real property appraiser places copy #2 in the real property file. |
| • Using the final copy (#3), the real property appraiser notifies the business property division of the appraisal, along with any recommendations for the auditor-appraiser. |

## DESCRIPTION OF METHOD

The following steps describe one method of coordinating the appraisal of landlord and leasehold improvements as it is used by some assessors' offices.  Under this method, information regarding landlord or leasehold improvements is referred to and from the real property and personal property divisions for evaluation and appropriate action.

After proper classification, the real property appraiser values the property reported in Columns 1, 3, and 4 (i.e., *Structure Items Only*, *Land Improvements*, *Land and Land Development*), while the auditor-appraiser values the property reported in Column 2 (i.e., *Fixtures Only*).[314]   This method requires that the business division provides a copy of Schedule B (and the Supplemental Schedule) from the Business Property Statement to the real property appraiser each year, or whenever a change is reported from the prior year's schedule.

As discussed above, a memorandum should be attached to this documentation.  After a review of the statement and/or inspection of the property, the real property appraiser notifies the auditor-appraiser of the action taken (on copy #3 of the memorandum).   In the event that the assessee does not correctly classify the improvements, the real property appraiser's review should include consideration of both non-fixture real property items (Columns 1, 3, and 4) and fixtures (Column 2).   Based on a building permit received earlier in the year, for instance, the real property appraiser may add value to real property, believing those improvements to be structure items.   However, the assessee may report the same improvements on the property statement as fixtures.  If the real property appraiser does not receive a copy of Schedule B of this statement, and review the costs as they were reported, a duplicate assessment may occur.

This communication process works both directions.  Although the memorandum could originate from either division, it more often it originates from the business division.

### *Example*

Following is an example of an assessment of leasehold improvements using the suggested procedures outlined above.   The example demonstrates only one method to coordinate the assessment of leasehold improvements; it is not the only proper method.

| EXAMPLE B.2 |
|---|
| ASSESSMENT OF LEASEHOLD IMPROVEMENTS |
| • In August 2001, a tenant obtained a building permit valued at $60,000 to install restaurant improvements in a new strip mall.  During September 2001, the real property division received a copy of this building permit.  The real property appraiser copied the permit and forwarded it to the business division with an attached memorandum.  Since this was done in a timely manner, a copy of the permit was in the business file prior to receipt of the Business Property Statement. |
| • In April 2002, the business division received a property statement from the assessee (the tenant) reporting the actual cost of the improvements as $48,000.  The assessee classified and reported all leasehold improvements as fixtures on Schedule B, Column 2.  No items were reported in Columns 1, 3, and 4. |
| • The property statement included a supplemental schedule that broke down the total cost additions on Schedule B.  Following is the list of additions and their cost are shown below: |

---

[314] On Schedule B of the Business Property Statement.

| EXAMPLE B.2 (CONTINUED) SUPPLEMENTAL SCHEDULE (SCHEDULE B) | |
|---|---|
| **Description** | **Cost** |
| Electrical wiring to restaurant equipment | $  2,500 |
| Flooring | 5,000 |
| Rough plumbing to restaurant equipment | 5,000 |
| Walk-in refrigerator | 10,000 |
| Store front | 2,500 |
| Sign in front of restaurant | 500 |
| Interior wall paint | 1,000 |
| Light fixtures & ceiling fans | 3,500 |
| Stainless steel sink in kitchen | 1,000 |
| Booths | 10,000 |
| Counters | 3,000 |
| Dishwasher | 2,500 |
| Hood | 1,500 |
| Total | $ 48,000 |

## Step 1:  Verification of Costs

Since the amount on the building permit did not match the actual cost reported by the business owner, it was appropriate to verify actual costs.  It is important to note when the value indicated on a building permit varies from the total costs reported on a property statement.  In general, this variance may occur due to several reasons:  (1) the tenant may have overestimated the cost of improvements; (2) the landlord and tenant may have split the cost of the improvements; or (3) the business owner may have underreported the cost of the leasehold improvements.

In this case, the auditor-appraiser contacted the business owner prior to sending a copy of the property statement to the real property appraiser.  The auditor-appraiser found that the business owner overestimated the cost of improvements when applying for the permit.  Thus, the property statement represented actual cost.

## Step 2:  Transfer of information

The business property division forwarded a memorandum to the real property division with copies of Schedule B and the supplemental schedule.  On the memorandum, the auditor-appraiser referenced (1) the September 2001 memorandum received from the real property division and (2) the information received from the assessee in step 1.  Utilizing all information available aids in the proper classification of improvements.

### Step 3:  Classification

Depending upon the established policy of the assessor's office, either the auditor-appraiser or real property appraiser may classify the property.  For this example, the real property appraiser classified the leasehold improvements.  The real property appraiser classified the property as follows:

| EXAMPLE B.3<br>CLASSIFICATION BY REAL PROPERTY APPRAISER | | | |
|---|---|---|---|
| | Cost | Structure | Fixture |
| Electrical wiring to restaurant equipment | $ 2,500 | | $  2,500 |
| Flooring | 5,000 | $  5,000 | |
| Rough plumbing to restaurant equipment | 5,000 | | 5,000 |
| Walk-in refrigerator – not integral part of building | 10,000 | | $ 10,000 |
| Store front | 2,500 | 2,500 | |
| Sign in front of restaurant | 500 | | 500 |
| Interior wall paint | 1,000 | 1,000 | |
| Light fixtures and ceiling fans | 3,500 | 3,500 | |
| Stainless steel sink in kitchen | 1,000 | | 1,000 |
| Booths | 10,000 | | 10,000 |
| Counters | 3,000 | | 3,000 |
| Dishwasher | 2,500 | | 2,500 |
| Hood | 1,500 | | 1,500 |
| Total | $ 48,000 | $12,000 | $ 36,000 |

### Step 4:  Determination of Assessee

In this example, the assessee was determined to be the tenant.  As discussed earlier, improvements can be assessed to either the landlord or the tenant, on either the secured or unsecured roll.  Commonly, as in this example, they are assessed to the party that paid for the improvements.

### Step 5:  Valuation

### Valuation of Structure Items

After classification, the real property appraiser determined the value of the structure items listed above.  If land improvements, land, and land development were reported (Columns 3 and 4 of Schedule B), the real property appraiser would have valued these improvements as well.

### Valuation of Fixtures

After valuing the structure items, the real property appraiser forwarded a copy of Schedule B along with copy #3 of the memorandum—detailing the action taken—to the auditor-appraiser. Using that information, the auditor-appraiser must then value the fixtures.  As discussed earlier, fixtures are real property; they must be valued, at the lesser of (1) their full cash value or fair

market value or (2) their factored base year value.  The auditor-appraiser valued and enrolled the fixtures as shown below:

| | | | | | |
|---|---|---|---|---|---|
| **EXAMPLE B.4**<br>**VALUATION OF FIXTURES** | | | | | |
| | Cost | Index Factor | Percent Good Factor[315] | Fair Market Value | Indexed Value (2% Inflation) |
| Total 2001 Cost of Fixtures | $ 36,000 | 100 | .93 | **$ 33,480** | **$ 36,720** |
| **Enrolled Value** | | | | **$ 33,480** | |

## Step 6:  Enrollment of Value

In general, the assessed value can be enrolled to either the secured or unsecured roll account depending on how the assessor's office enrolls leasehold improvements (i.e., on the secured roll to the land and building owner or on the unsecured roll to the tenant who paid for improvements).  As discussed in step 4, the tenant was determined to be the assessee, both values (structure value and fixture value) were enrolled on an unsecured account with the business personal property.  Since the value of fixtures is used in the determination of a mandatory audit, separation of the structure and fixture values on the unsecured account is necessary.

## Step 7:  Clearly Identify the Leasehold Improvements on the Appraisal Records

The final step documents the assessment on appraisal records.  Notes regarding the leasehold improvements in both the real property appraisal records and in the business property files will assist in verification of the assessment(s) and can help to avoid efforts in future assessment years.  These notes summarize the information relied upon during the appraisal and identify the actions taken.  The memo(s) and attached copies of source documents are kept in the appraisal records as support.

---

[315] The appraiser in this example has determined an average 12-year service life for these types of fixtures.

# APPENDIX C:  DEFINITION OF SALES TAX BUSINESS CLASSIFICATION CODES

The following codes are duplicated from the Business Taxes Code Book (section 203.028, pages 2-5 and 2-6) and are provided here to aid the assessor in proper classification of new businesses.

| Retail Trade Group | | Retail Trade Group | |
|---|---|---|---|
| 01 | Women's Apparel | 30 | Home Furnishing Stores |
| 02 | Men's Apparel | 31 | Appliance |
| 03 | Family Apparel | 32 | Second-Hand Stores |
| 04 | Shoe Stores | 33 | Grocery Stores with Beer and Wine |
| 05 | Variety Stores | | Licenses "20" |
| 07 | Department Stores | 34 | Grocery Stores with General Liquor |
| 09 | General Stores | | Licenses "21" |
| 10 | News and Magazine Stands | 35 | Eating and Drinking Places with Beer and |
| 11 | Art, Gift and Novelty Stores | | Wine Licenses "40" or "41" |
| 12 | Sporting Goods and Bicycle Stores | 36 | Eating and Drinking Places with General |
| 13 | Florist Shops | | On-Sale Licenses |
| 14 | Camera Stores | 40 | Farm and Construction Equipment Stores |
| 15 | Music Stores | 41 | Garden Stores |
| 16 | Stationery and Book Stores | 46 | Fuel and Ice |
| 17 | Jewelry Stores | 50 | Building Material |
| 18 | Office, Store, and School Furniture | 51 | Hardwares |
| | and Equipment Stores | 52 | Plumbing and Electrical Supply Stores |
| 19 | Full-Time Specialty Stores | 53 | Paint, Glass and Wallpaper Stores |
| 20 | Grocery Stores without Alcoholic | 58 | Cigarette Vending Machine Operators |
| | Beverages | 60 | New Car Dealers |
| 21 | Specialty Food Stores | 61 | Automotive Supply Stores |
| 22 | Package Liquor Stores | 62 | Service Stations |
| 24 | Eating and Drinking Places without | 63 | Auto Trailer and Supply Stores |
| | Alcoholic Beverages | 64 | Used Car Dealers |
| 25 | Confectionery Stores | 66 | Boat and Motorcycle and Supply Stores |
| 26 | Cigar Stores and Stands | 67 | Aircraft and Supply Stores |
| 27 | Drug Stores | | |
| | | | |
| | **Non-Store Retailers** | | |
| 28 | Non-Store Retailers (Full-Time) | | |
| 29 | Part-Time Permittees | | |

Appendix C

| Service Groups | | Producers, Manufacturers and Wholesalers | |
|---|---|---|---|
| | | **Group** | |
| 70 | Hotels, Motels and Boarding | 90 | Farm, Tobacco, Alcoholic Beverages, Food |
| | Houses without On-Sale General | | and Food Processing Equipment |
| | Licenses | 91 | Textile Products with Household Goods |
| 71 | Automotive Repair | 92 | Drugs, Chemicals and Allied Products |
| 72 | Repair and Hand-Trade Shops | 93 | Motion Pictures, Equipment and Supplies |
| 73 | Portrait Studio | 94 | Automotive Vehicles, Trailers, Parts, |
| 75 | Hotel with On-Sale General | | Equipment and Supplies Other Than |
| | Licenses | | Petroleum |
| 76 | Clubs and Places of Amusement | 95 | Transportation Equipment Other Than |
| | With On-Sale General Licenses | | Automotive |
| 77 | Shoe Repair Shops | 96 | Petroleum, Petroleum Products, Oil Well |
| 78 | Undertaking Parlors and Cemeteries | | Refining and Service Station Equipment |
| 79 | Personal Service Shops, | 98 | Heavy Industrial Equipment and |
| | Amusement Places without On-Sale | | Miscellaneous Machinery |
| | General Licenses | 99 | Publishers, Light Industrial Equipment and |
| | | | All Other Permittees N.E.C. |
| **Construction Contractors Group** | | | |
| 82 | Construction Contractors and | | |
| | Manufacturers and Wholesalers of | | |
| | Building Materials | | |
| | | | |
| **Producers, Manufacturers and** | | | |
| **Wholesalers Group** | | | |
| 83 | Store and Office Equipment | | |
| 86 | Electronic and Electrical Equipment | | |
| | | | |
| **Service Groups** | | | |
| 84 | Health Services | | |
| 85 | Public Utilities, Transportation and | | |
| | Allied Services | | |
| 87 | Government, Business, and Social | | |
| 88 | Auctioneers | | |
| 89 | Business Service Concerns | | |

# APPENDIX D:  SAMPLE BUSINESS PROPERTY STATEMENT

BOE-571-L (S1F) REV. 7 (8-02)

**BUSINESS PROPERTY STATEMENT FOR 2003**
*(Declaration of costs and other related property information as of 12:01 A.M., January 1, 2003)*

RETURN THIS ORIGINAL FORM. COPIES WILL NOT BE ACCEPTED.

*(Make necessary corrections to the printed name and mailing address.)*

RETURN THIS COPY BY APRIL 1, 2003

LOCATION OF THE PROPERTY
STREET
CITY

*(File a separate statement for each location.)*

**PART I:   GENERAL INFORMATION**

COMPLETE (a) THRU (g)

a. Enter type of business: _____

b. Enter local telephone number ( )_____ FAX number ( )_____

   E-Mail Address *(optional)* _____

c. Do you own the land at this business location?  ☐ Yes  ☐ No

   If **yes**, is the name on your deed recorded

   as shown on this statement?  ☐ Yes  ☐ No

d. When did you start business at this location?  DATE: _____

   If your business name or location has changed from last year, enter the former name and/or location: _____

e. Enter location of general ledger and all related accounting records (include zip code): _____

f. Enter name and telephone number of authorized person to contact at location of accounting records: _____

g. During the period of January 1, 2002 through December 31, 2002:

   (1) Has all or part of this real property been subject to a change in ownership?  ☐ Yes  ☐ No

   (2) Are any related entities conducting business in the county?  ☐ Yes  ☐ No
       If **yes**, provide name, mailing  address, and locations: _____

   (3) If you leased this real property, has it been the subject of a lease agreement for a period of 35 years or more (including options)?  ☐ Yes  ☐ No

   (4) Did you acquire "control" through acquisition of stock or otherwise of a legal entity which owns real property in this county?  ☐ Yes  ☐ No

   (5) Did another person or entity acquire "control" through acquisition of stock or otherwise of this corporation or entity?  ☐ Yes  ☐ No

**PART II:   DECLARATION OF PROPERTY BELONGING TO YOU**
*(attach schedule for any adjustment to cost)*

| | | COST (omit cents) (see instructions) | ASSESSOR'S USE ONLY |
|---|---|---|---|
| 1. | Supplies | | |
| 2. | Equipment | *(From line 35)* | |
| 3. | Equipment out on lease or rent to others | *(Attach Schedule)* | |
| 4. | Bldgs., Bldg. Impr., and/or Leasehold Impr., Land Impr., Land | *(From line 71)* | |
| 5. | Construction In Progress | *(Attach Schedule)* | |
| 6. | Alternate Schedule A | *(See instructions)* | |
| 7. | | | |
| 8. | | | |

**PART III:   DECLARATION OF PROPERTY BELONGING TO OTHERS – IF NONE WRITE "NONE"**

(SPECIFY TYPE BY CODE NUMBER)

*Report conditional sales contracts on Schedule A*

1. Leased equipment
2. Lease-purchase option equipment
3. Capitalized leased equipment
4. Vending equipment
5. Other businesses
6. Government-owned property

Tax Obligation:    A. Lessor    B. Lessee

| | Year of Acq. | Year of Mfr. | Description and Lease or Identification Number | Cost to Purchase New | Annual Rent |
|---|---|---|---|---|---|
| 9. Lessor's name<br>Mailing address | | | | | |
| 10. Lessor's name<br>Mailing address | | | | | |

**OWNERSHIP TYPE (✔)**

Proprietorship ☐
Partnership ☐
Corporation ☐
Other _____ ☐

**DECLARATION BY ASSESSEE**

***Note:*** **The following declaration must be completed and signed. If you do not do so, it may result in penalties.**

*I declare under penalty of perjury under the laws of the State of California that I have examined this property statement, including accompanying schedules, statements or other attachments, and to the best of my knowledge and belief it is true, correct, and complete and includes all property required to be reported which is owned, claimed, possessed, controlled, or managed by the person named as the assessee in this statement at 12:01 a.m. on January 1, 2003.*

| | |
|---|---|
| SIGNATURE OF ASSESSEE OR AUTHORIZED AGENT* | DATE |
| NAME OF ASSESSEE OR AUTHORIZED AGENT* *(typed or printed)* | TITLE |
| NAME OF LEGAL ENTITY *(other than DBA)(typed or printed)* | FEDERAL EMPLOYER ID NUMBER |
| PREPARER'S NAME AND ADDRESS *(typed or printed)* | TELEPHONE NUMBER ( ) | TITLE |

**BUSINESS DESCRIPTION (✔)**

Retail ☐
Wholesale ☐
Manufacturer ☐
Service/Professional ☐

* Agent:  See page S4B for Declaration by Assessee for instructions.

Appendix D

BOE-571-L (S1B) REV. 7 (8-02)

**SCHEDULE A — COST DETAIL: EQUIPMENT**  *(Do not include property reported in Part III.)*

Include expensed equipment and fully depreciated items. Include sales or use tax, freight and installation costs.
Attach schedules as needed. Lines 18, 31, 33, and 42 "Prior"— Report detail by year(s) of acquisition on a separate schedule.

| LINE NO | Calendar Yr. of Acq. | 1. MACHINERY AND EQUIPMENT FOR INDUSTRY, PROFESSION, OR TRADE (do not include licensed vehicles) COST | ASSESSOR'S USE ONLY | 2. OFFICE FURNITURE AND EQUIPMENT COST | ASSESSOR'S USE ONLY | 3. OTHER EQUIPMENT (describe) COST | ASSESSOR'S USE ONLY | Calendar Yr. of Acq. | 4. TOOLS, MOLDS, DIES, JIGS COST | ASSESSOR'S USE ONLY |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 2002 | | | | | | | 2002 | | |
| 12 | 2001 | | | | | | | 2001 | | |
| 13 | 2000 | | | | | | | 2000 | | |
| 14 | 1999 | | | | | | | 1999 | | |
| 15 | 1998 | | | | | | | 1998 | | |
| 16 | 1997 | | | | | | | 1997 | | |
| 17 | 1996 | | | | | | | 1996 | | |
| 18 | 1995 | | | | | | | Prior | | |
| 19 | 1994 | | | | | | | Total | | |
| 20 | 1993 | | | | | | | Calendar Yr. of Acq. | 5a. COMPUTERS Component cost of $25,000.00 or less COST | ASSESSOR'S USE ONLY |
| 21 | 1992 | | | | | | | | | |
| 22 | 1991 | | | | | | | | | |
| 23 | 1990 | | | | | | | 2002 | | |
| 24 | 1989 | | | | | | | 2001 | | |
| 25 | 1988 | | | | | | | 2000 | | |
| 26 | 1987 | | | | | | | 1999 | | |
| 27 | 1986 | | | | | | | 1998 | | |
| 28 | 1985 | | | | | | | 1997 | | |
| 29 | 1984 | | | | | | | 1996 | | |
| 30 | 1983 | | | | | | | 1995 | | |
| 31 | 1982 | | | | | | | Prior | | |
| 32 | 1981 | | | | | | | Total | | |
| 33 | Prior | | | | | | | Calendar Yr. of Acq. | 5b. COMPUTERS—Component cost of $25,000.01 to $500,000.00 COST | ASSESSOR'S USE ONLY |
| 34 | Total | | | | | | | | | |
| 35 | Add TOTALS on lines 19, 32, 34, 43, 46 and any additional schedules. ENTER HERE AND ON PART II, LINE 2 | | | | | | | 2002 | | |
| | | | | | | | | 2001 | | |

| 36 | ASSESSOR'S USE ONLY | | | | | 2000 | | |
|---|---|---|---|---|---|---|---|---|
| 37 | CLASSIFICATION | COL. | FULL VALUE BASE | FULL VALUE | PERS. PROP. RCLND | PERS. PROP. ADJUSTMENT | PERS. PROP. FULL VALUE | 1999 |
| 38 | Machinery & equipment | 1 | | | | | | 1998 |
| 39 | Office furniture & equipment | 2 | | | | | | 1997 |
| 40 | Tools, molds, dies & jigs | 4 | | | | | | 1996 |
| 41 | Computers | 5a | | | | | | 1995 |
| 42 | | 5b | | | | | | Prior |
| 43 | | 5c | | | | | | Total |
| 44 | Other equipment | 3 | | | | | | 5c. COMPUTERS—Provide total cost of components costing $500,000.01 or more and attach detailed schedule by year of acquisition |
| 45 | Schedule B – Fixtures | – | | | | | | |
| 46 | TOTALS | | | | | | | TOTAL COST |

AH 504                                    209                                    October 2002

BOE-571-L (S2) REV. 7 (8-02)

**SCHEDULE B — COST DETAIL:    BUILDINGS, BUILDING IMPROVEMENTS, AND/OR LEASEHOLD IMPROVEMENTS, LAND IMPROVEMENTS, LAND AND LAND DEVELOPMENT**

Attach schedules as needed. Line 69 "Prior"— Report detail by year(s) of acquisition on a separate schedule.

| LINE NO | Calen-dar Yr. of Acq. | BUILDINGS, BUILDING IMPROVEMENTS, AND/OR LEASEHOLD IMPROVEMENTS | | | | 3. LAND IMPROVEMENTS (e.g., blacktop, curbs, fences) | | 4. LAND AND LAND DEVELOPMENT (e.g., fill, grading) | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1. STRUCTURE ITEMS ONLY (see instructions) | | 2. FIXTURES ONLY (see instructions) | | | | | |
| | | COST | ASSESSOR'S USE ONLY | COST | ASSESSOR'S USE ONLY | COST | ASSESSOR'S USE ONLY | COST | ASSESSOR'S USE ONLY |
| 47 | 2002 | | | | | | | | |
| 48 | 2001 | | | | | | | | |
| 49 | 2000 | | | | | | | | |
| 50 | 1999 | | | | | | | | |
| 51 | 1998 | | | | | | | | |
| 52 | 1997 | | | | | | | | |
| 53 | 1996 | | | | | | | | |
| 54 | 1995 | | | | | | | | |
| 55 | 1994 | | | | | | | | |
| 56 | 1993 | | | | | | | | |
| 57 | 1992 | | | | | | | | |
| 58 | 1991 | | | | | | | | |
| 59 | 1990 | | | | | | | | |
| 60 | 1989 | | | | | | | | |
| 61 | 1988 | | | | | | | | |
| 62 | 1987 | | | | | | | | |
| 63 | 1986 | | | | | | | | |
| 64 | 1985 | | | | | | | | |
| 65 | 1984 | | | | | | | | |
| 66 | 1983 | | | | | | | | |
| 67 | 1982 | | | | | | | | |
| 68 | 1981 | | | | | | | | |
| 69 | Prior | | | | | | | | |
| 70 | Total | | | | | | | | |

| 71 | Add TOTALS on line 70 and any additional schedules. ENTER HERE AND ON PART II, LINE 4 | |
|---|---|---|

| 72 | Have you received allowances for tenant improvements for the current reporting period that are not reported above? ☐ Yes ☐ No  If **yes** indicate amount $ _____ |

REMARKS:

_____

_____

_____

_____

_____

_____

_____

_____

# *APPENDIX E:  SAMPLE AUDIT CHECKLIST*

**AUDIT CHECKLIST**
**COUNTY ASSESSOR**
**AUDIT INTERVIEW AND CHECKLIST**

Name _____  Parcel No. _____

Situs Address _____

Auditor _____  Audit Date _____  Class # _____

Audit Contact:
Name _____  Title _____  Phone # _____

Location of Records _____

**RECORDS EXAMINED**

| | |
|---|---|
| [ ] Chart of Accounts | [ ] General Ledger |
| [ ] Location Listing/Coding Chart | [ ] Property Ledger |
| [ ] Federal/State Tax Returns | [ ] Financial Statements |
|    Change in ownership: | [ ] Journals (list) _____ |
|    [ ] Sch. E/FTB Form 100 (Corp.) | [ ] Purchase Invoices |
|    [ ] Sch. K-1/FTB Form 565 (Prtnr) | [ ] Depreciation Schedules |
| [ ] Business Property Statements (other counties) | [ ] Other |

**1.  GENERAL COMMENTS FROM ASSESSEE**

A  Date business started at this situs _____

B.  Number of locations in the County _____

C.  Fiscal year end _____

D.  Type of business _____

E.  Type of organization:  Sole Proprietorship [ ]  Partnership [ ]  Corporation [ ]
            Any change in real estate ownership or change in control or more that 50 percent
            of stock ownership in the last four years?  Yes [ ]  No [ ]

F.  Any changes in technology/process?  Yes [ ]  No [ ]
            Any effect on equipment?  Yes [ ]  No [ ]
            If yes, explain: _____

G.  Capitalization policy _____

H.  Any affiliates or subsidiaries located here or elsewhere within the
county?                                                                      Yes [ ]  No [ ]
If yes, please provide:
Name _____
Address _____

I.  Method of accounting:          Accrual [ ]      Cash [ ]        Hybrid [ ]

J.  Does assessee have improvements/fixtures on leased land?          Yes [ ]  No [ ]
If so, please refer to item 5.

K.  Is a suspense, clearing or capital account used?                      Yes [ ]  No [ ]
Comment on its use: _____
_____

## 2.  SUPPLIES

G.L. Acct. numbers _____

[ ] Office                [ ] Shop                [ ] Maintenance
[ ] Pallets/Bins          [ ] Medical/Dental      [ ] Printing
[ ] Photography           [ ] Janitorial          [ ] Samples

A.  Are supplies expensed as purchased? [ ]        As consumed? [ ]
If expensed when purchased, how many weeks/months are kept on hand? _____

B.  What is included in supplies? _____
_____

C.  Was a physical inventory of supplies taken:                          Yes [ ]  No [ ]
If yes, when? _____

D.  Have "supply type" items been classified as inventory?              Yes [ ]  No [ ]

E.  Have "supply type" items been classified as prepaid accounts?        Yes [ ]  No [ ]

F.  Does the company have chemical storage/holding tanks?                Yes [ ]  No [ ]
(Gasoline, propane, oil, etc.)
If yes, how are levels on hand determined for reporting purposes? _____

## 3.  OTHER ASSESSABLE ASSETS

G.L. Acct. Numbers _____

[ ] Containers                      [ ] Small Tools
[ ] Molds, Dies, Jigs               [ ] China, Glassware, Flatware
[ ] Art works, Antiques             [ ] Other
[ ] Library [ ] Updates, expensed _____
[ ] Operational Software
[ ] If application software (not assessed), describe _____
_____

Appendix E

**4.**   **EQUIPMENT**

|  |  | YES | NO |
|---|---|---|---|

A.   Is equipment primarily purchased new?
    [Verify that full costs have been capitalized:  cost, sales tax, freight
    and installation.  Sample invoices to verify both cost and cut-off.]   ____   ____

B.   Have any equipment acquisitions involved a trade-in of
    existing equipment?   ____   ____

C.   Is fully depreciated equipment still on the books?   ____   ____
    Is it reported?   ____   ____

D.   Are disposed/scrapped assets written off the books?   ____   ____

E.   Has previously leased equipment which is now purchased been
    capitalized at the full original invoice cost and acquisition date?   ____   ____

F.   Does the company manufacture and use their own equipment?   ____   ____
    **If yes**, are all costs capitalized?   ____   ____
    (Equipment depreciation or capitalized interest if project extends
    beyond one year, labor, overhead, sales tax on materials)
    **If yes**, verify/establish trade level.

G.   Is there a vehicle account which includes non-licensed vehicles
    [or vehicles not covered by an annual license fee ("se" license)]   ____   ____

H.   Do any officers, employees, or any related companies lease,
    an lease, or loan equipment to this company?   ____   ____
    If so, please refer to item 7.

I.   Does this company have idle equipment on its premises?   ____   ____
    If yes, how is it accounted for in the general ledger?
    _____

**5.**   **EQUIPMENT OUT ON LEASE OR RENT TO OTHERS**

A.   Does this company lease or rent equipment to others?   ____   ____
    If so:  Type of equipment? _____
    Standard lease/rental period? _____
    Reported at property trade level? _____
    Costs includes: [ ] Sales Tax      [ ] Freight      [ ] Installation

B.   Is the leased equipment reported to all California counties?   ____   ____

|  | | YES | NO |
|---|---|---|---|

C.    Do they lease equipment to "related" entities at a lower value than those unrelated?    ____    ____

D.    Do they lease equipment originally purchased from a parent or subsidiary company in which they receive a discounted purchase price?    ____    ____

E.    Were lease contract agreements reviewed?    ____    ____

**6.    BUILDING, LAND, AND LEASEHOLD IMPROVEMENTS**

A.    Was the appraisal record reviewed while on a situs review?    ____    ____

B.    Was a detailed schedule of these items obtained?    ____    ____

C.    Were trade fixtures identified?    ____    ____

D.    Was a determination made whether expensed items should have been capitalized as real property additions or trade fixtures?    ____    ____

E.    Was it noted whether capitalized items were repairs and/or new additions?    ____    ____

F.    Have items been posted to the real estate account since the last appraisal?    ____    ____

G.    Do leasehold improvement items left from the previous tenant affect the appraisal?    ____    ____

H.    Are any fixtures included in the real property appraisal?    ____    ____

I.    Have any leased trade fixtures been reflected on the books as purchased after the lease terminated?    ____    ____

J.    If the property is tenant-occupied, do there appear to be trade fixtures which should be reported by the real property owner?    ____    ____

**7.    CONSTRUCTION-IN-PROGRESS**

A.    Do the books reflect CIP on any of the lien dates?    ____    ____

B.    If there was CIP, are the payables accrued properly for the lien cut off?    ____    ____

C.    Are there periodic progress billings from the contractor?    ____    ____

D.    Were any invoice reviewed which were paid after lien date?    ____    ____

|  |  | **YES** | **NO** |
|---|---|---|---|

E.   Was the contract reviewed for the new addition(s)?   ____  ____
What does the CIP represent?   **[ ]** Real Property
                              **[ ]** Fixtures/Equipment

F.   Is CIP self-constructed?   ____  ____
If so, are all costs properly capitalized?   ____  ____
(Equipment depreciation or capitalized interest if project extends
beyond one year, labor, overhead, sales tax on material)

## 8.   PROPERTY BELONGING TO OTHERS

A.   Does the company have on its premises property belonging to
others?   ____  ____

B.   Did they indicate property belonging to others on their business
property statement?   ____  ____

C.   Has that property been assessed?   ____  ____
If so, complete the following:
          Assessee:_____
          Parcel # _____
If not assessed, please provide the following:
          Name: _____
          Mailing: _____
          Situs: _____

# *Appendix F:  Sample Statute of Limitations Waiver*

## WAIVER OF STATUTE OF LIMITATIONS

### AGREEMENT TO EXTEND STATUTE OF LIMITATIONS

### REVENUE & TAXATION CODE SECTIONS 532 AND 75.11(d)

The period of limitations for enrolling escape assessments on the regular roll (specified in section 532 of the California Revenue and Taxation Code) and the period of limitations for enrolling supplemental assessments on the supplemental roll (specified in section 75.11(d) of the California Revenue and Taxation Code) will expire for tax year **1999-2000** after **June 30, 2003**.

Pursuant to Revenue and Taxation Code sections 532.1 and 75.11(e), the assessor and the undersigned taxpayer agree to extend the period for making escape assessments, supplemental assessments, corrections, and claims for refund until **June 30, 2004**.

Legal Name of Business:  _____

Address:  _____
              _____

Signed:  _____    Date:  _____

Title:  _____

Assessor, County of _____

By _____    Date:  _____

# *Appendix G:  Sampling*

## General

When an assessor, assessee, or third party chooses to use some type of sampling methodology to develop their own factors for determining percent good or depreciation, it is important to be familiar with some of the basic concepts of statistical sampling in order to properly analyze the results.  *Sampling* is a statistical method which enables one to make observations regarding an entire group of items (population) based on a study of a smaller sub-set (sample) of this group.  It is a powerful tool in studying large populations.  The advantage of a statistical sample is that sound inferences can be drawn regarding a population at only a fraction of the cost of investigating each item in the population.  In some cases, a thorough investigation of a sample can actually produce more reliable results than a cursory enumeration of the entire population.

In the valuation of a group of items for assessment purposes, for example, sampling may be applied to:

- Derive valuation schedules by analyzing market values

- Derive replacement cost new (RCN) factors and indexes

- Derive physical deterioration, and functional and economic obsolescence indexes

- Estimate economic lifetime and survival characteristics of a population of assets

- Calculate appropriate trade level adjustments

Sampling design, potential pitfalls, and the reasonable expectations as to the confidence associated with various samples will vary greatly depending upon the population being sampled.  Therefore, few rigid rules apply in all situations.  Independent professional judgment is necessary in selecting testing techniques and/or selecting or developing a sampling plan.  However, certain principles are encountered and/or applied in nearly all sampling situations.  For example, in every case, the sample result must be objective and defensible.  The following discussion is an introductory summary of some of the more important aspects that should be considered in designing and conducting a sample.  For a more thorough understanding of the subject, it is advisable to consult a textbook on sampling and/or statistics, some of which are referenced at the conclusion of this text.

## REPRESENTATIVENESS

Accepted sampling theory requires that a sample be drawn randomly from a population in order to make true statistical inferences regarding that population.  In statistics, a *population* is a set of all objects or units to be measured or studied.  A *sample* is a subset of a given population.  A *random sample* is a sample selected in such a manner that every unit of the population has an equal chance of being included in the sample.

Ideally, the population that is sampled should coincide with the entire population under study. Sometimes, usually for practicality or convenience, they will not coincide. If so, any statistical inferences drawn from the sample apply to the sampled population only. The extent to which those inferences can be applied to a target population which is different from the sampled population will be a question of judgment.

In many cases it is not possible, or practical, to draw a random sample; the sample drawn will be non-random or "biased."[316] Deviating from the theoretical approach is not necessarily wrong, nor does it necessarily invalidate conclusions regarding a target population drawn from a sample, providing that if potential bias is identified, it is not large and/or there are no practical alternatives available. However, if bias does exist great care needs to be taken to avoid reaching invalid conclusions.

For example, the set of assets for which sales transactions have occurred is not at all a random selection, as it excludes items that no buyer would want (zero or even negative value) and also items an owner would be unlikely to sell. Such a "sample" might be representative of the inventory of certain used equipment dealers, but not representative of the totality of assets held by an industrial firm.

## SAMPLE SIZE

The sample size needed to obtain a certain degree of confidence in the results is largely independent of the size of the population. Sample sizes must be large enough to provide meaningful results, but not so large as to create wasteful effort. Needed sample sizes will vary greatly, depending upon the nature of the population being sampled. As the size of the population increases, the needed sample size expressed as a percentage of the population decreases. A sample consisting of far less than 1 percent of the population is often appropriate for large populations.

The most important factor in determining the appropriate sample size is the variability (or variance) within the population of the characteristic being sampled. The larger the variability, the larger the sample size needed. For example, a particular sample size could be satisfactory for the study of one population, but be quite inadequate for the study of a second population with a substantially larger variance than the first.

One aspect of applying sampling to the field of valuation that will tend to increase needed sample size is that many populations are effectively comprised of subpopulations, each of which requiring a separate finding. For example, in conducting a sample to establish a table of valuation factors to apply to a particular type of equipment, a sample size of $n$ might be sufficient to estimate the average value of all such equipment as a percent of its original cost. However, the resultant value estimate would have no usefulness since (1) it would be an average across all years of acquisition and (2) factors are needed for each year of acquisition. Establishing a reliable table would require for each year a sample size large enough to allow one to draw

---

[316] Inferences may be drawn from a biased sample, but it must be remembered that the conclusions will be based on the assumption of a random sample model and will not reflect the influence of the bias.

meaningful conclusions regarding that year.  The variance of each of the subpopulations of individual years would not be as large as the variance of the population of all years considered together.  Therefore, the needed sample size for each of the individual years would be something less than *n*.  However, the total needed sample size for all of the years would probably be much larger than the n that would be sufficient to estimate the population when considered as a whole.

Due to large variances within some subpopulations subject to sampling and the scarcity of sample item observations, results that are not completely consistent among subpopulations may occur.  Raw data indicating 60% depreciation after 3 years, 40% after 4 years, and 50% after 5 years, for example, would not be reasonable.  A 60% − 59% − 49% pattern, although not as inconsistent, would not be acceptable either.  When such inconsistencies occur, there will be a need to fit a nonlinear curve to the findings for the subpopulations by selecting the appropriate standard curve or set of curves or by constructing a best-fitting curve.

If the general form of the curve is known, or can be assumed, in advance, it may be reasonable to establish a table of factors by fitting a curve to a sample of individual data points rather than formally dividing the population into subpopulations.  However, in order for the curve to yield reliable estimates for each year, the sample would need to contain a sufficient number of items for each year.  The effect could be close to the same as dividing the population into subpopulations to begin with, although some reduction in sample size will result from being able to utilize the relationships among years as an indicator for any given year.

## STRATIFICATION

Stratification is the segregation of a population into smaller homogeneous groups, with the expressed purpose of improving sample efficiency and/or sample reliability.  For populations with a large variance among their elements, sampling efficiency and reliability may be increased by dividing the population into strata, sampling the strata separately, projecting the sample of each stratum to estimate the entire stratum, and combining the projections of the strata based on the weight each stratum contributes toward the total population.  This process can often be effective by ensuring that infrequently occurring items are represented in the sample in the same proportion as in the population.

It should be noted that although separating a population into subpopulations (discussed under Sample Size) and dividing it into strata appear to be similar, the two actions are quite different and are done for different reasons.  Subpopulations are formed when a separate estimate is needed for each of the subpopulations.  Taking this action increases the total number of sample items compared to what would be required if a single estimate for the population as a whole were needed.  Stratification is used in order to increase the efficiency and reliability of a sample that is being used to make a single estimate for the overall population.  It tends to reduce the standard error of the sample in contrast to the resultant errors that would occur without stratification.  Stratification also allows one to make an estimate for the population, using a smaller sample than would be required without stratification, but still achieves the same degree of confidence.

## MEASUREMENT

A random sample of adequate size with improperly measured observations would be of no more validity than a biased sample of inadequate size. It is quite possible that the observable value for the items in a sample will not be the value that is the true focus of the study. The true focus of many studies will be the market value of a certain type of equipment. The observable value may need to be adjusted for factors such as trade level or quantity discounts to estimate this market value. Although adjustments may be appropriate in some circumstances, care needs to be taken in making any such adjustments. For example, if retirements are not promptly reflected on an assessee's books, then those records may be a poor reflection of economic life. However, attempting to adjust those records for non-recorded retirements could reduce the study to a level little better than guesswork. Similarly, when studying the retirement pattern of equipment that is of a type so new that the length of time period studied is less than the total useful life of the equipment, substituting someone's opinion as to when a piece of equipment will be retired would be of questionable validity.

## OUTLIERS

One of the most difficult areas of judgment in the practical application of statistics is the handling of outliers. *Outliers* are sample items with extreme values that do not appear to be representative of the population from which they were drawn (or at least not in the same proportion as indicated by the sampling frequency). Various guidelines for the identification of outliers can be found in statistical texts. Sometimes those guidelines are expressed in terms of statistical parameters (e.g. more than three standard deviations from the sample mean). These guidelines give the appearance of a precise means of identifying outliers; however, this is somewhat illusory. Identifying outliers is always a question of judgment. Rejecting a sample item as an outlier means that the sample that will be projected is not random. A truly unrepresentative item that seriously distorts the projection of the sample needs to be rejected, but the number of such occurrences should be very small. If more than just a few observations have to pass the test of being representative in the eyes of the party conducting the sampling, the entire sampling process is reduced to a question of judgement.

## VALIDITY OF RESULTS

Whether the sampling is performed by an assessor, an assessee, or another party, it is important that all of the involved parties have confidence in the results. To this end it is desirable that there be a discussion among the parties before the sampling is started. Methodology should be discussed and, to the extent possible, agreed upon. A clear audit trail must be maintained in order that all parties can be satisfied that the sample was selected and projected properly.

The party conducting the sampling study should be prepared to make a confidence statement, which consists of both a *confidence level* and a *confidence interval*. The interval estimate of a parameter is called a *confidence interval*, and the lower and upper values of the interval are the *confidence limits*. The *confidence level* indicates the probability that the interval will contain the

true value of the parameter.  (If the sample is not random, these will not be true confidence intervals.  However, they will serve to indicate the relative variability within the sample.)

Because of large differences among populations it is difficult to recommend a particular degree of confidence that must be reached in order for the results to be considered meaningful.  A finding that a class of property had depreciated by 50% after five years with an 80% confidence level and an interval bounded by 0% and 100% would have little meaning.  On the other hand, a confidence interval bounded by 49.5% and 50.5% would be of almost remarkable precision.  Actual results will tend to fall between these two extremes.

The confidence interval is a measure of the variability of the units included in the sample.  In and of itself, it is not a measure of whether a sample is acceptable or unacceptable.  However, the smaller the interval the more reliable the results of the sample will be.  When a large interval is disclosed the assessor, assessee, and/or a third party must make a decision regarding the acceptability of the sample based upon the best information available.  Some of the options to be considered in making this decision include:

- Accept the sample
- Increase the sample size
- Stratification
- Do not accept the sample

## SUMMARY

This appendix is provided to afford the reader with a basic understanding of sampling and its possible application in the context of property tax.  For further information on sampling theory and application, it is recommended that an interested reader consult a textbook on statistics.  The following are among the books offering further information and additional examples:

Cochran, William G., *Sampling Techniques, 3rd Edition,* John Wiley & Sons, 1977.

Freund, Rudolf J. and Wilson, William J., *Statistical Methods Revised Edition*, Academic Press, 1997.

Arkin, Herbert, *Handbook of Sampling for Auditing and Accounting 2nd Edition,* McGraw-Hill Book Company, 1974.

Arens, Alvin A. and Loebbecke, James K., *Applications of Statistical Sampling to Auditing,* Prentice-Hall, Englewood Cliffs, New Jersey, 1981.

Neter, John and Loebbecke, James K., *Behavior of Major Statistical Estimators in Sampling Accounting Populations: An Empirical Study*, American Institute of Certified Public Accountants, New York, New York, 1975.

Also recommended, as an example, is the *Sales and Use Tax Audit Manual*, California State Board of Equalization, Department of Business Taxes, Chapter 13:  *Statistical Sampling*.

# APPENDIX H:  APPLICATION OF THE MARKET METHOD

As stated in Chapter 4, the market method is any method of calculating value factors (and/or developing depreciation tables) which relies on market data, with adjustments made for relevant property characteristics incorporated in the data.[317]  Using a variation of this methodology, an appraiser may gather market data for identical or similar property to compare the price of a used asset to the original price new of that same asset.  Market data (i.e., prices new and/or used) may come from actual invoices, other reliable records of sales of used equipment, or reliable price guides (blue books, etc.) in some cases, with adjustments as appropriate.  The price used and original price new of the asset is used by the appraiser to estimate the value factor (used price / new price = value factor)[318] at the age it was at the time of sale.  The estimates are reduced to a table of value factors (similar to a depreciation table and/or the percent good tables published by the Board) and arrayed on a scattergram.  A best-fit curve, passing through the entire mass of points, estimates average value factors at each age and the average decline in value per year.  (It is usually, but not always, set to 100% at age 0 in order to correspond with the assumption that a new asset is purchased at its market value when new.)

This appendix does not include all the possible opportunities and problems involved in developing valuation factors by any methodology.  Thus, the examples provided should not be deemed the only proper models.  The models do not represent methods that are appropriate, and necessarily complete for all circumstances.  A large group of representative assets or an explicit random sample of assets can be used to develop the depreciation factors.  Sound judgment and accepted statistical methods should be used in developing and applying the methodology in each individual situation where a market method is considered appropriate.

The following list is provided to illustrate the basic methodology.

- Obtain the sales prices of used assets that are similar to the assets to be valued (for example, assets of the same type, age and price range), on or close to the lien date.

- Obtain the average selling prices new for the same asset during each previous year (or quarter, if available).

- Adjust selling prices new and/or used as required to account for such factors as features, upgrades, trade level, volume discounts etc.

- Calculate the percent good of this used asset as a fraction of its price new for each of the ages represented.

- Perform these same steps for as many assets as possible to obtain a database of prices of used versus new assets.

- Reduce the database to a single schedule of value factors that relate age to value as a percent of price new.

---

[317] Sampling should be used when gathering market data, see Appendix G on sampling.
[318] Using the market method, a combined factor may be estimated similar to the result of multiplying the index factor and the percent good factor used from AH 581 tables discussed in this chapter.

# DEVELOPING COMBINED FACTORS

A *combined factor*, as used in this text, is (1) the product of multiplying the replacement cost index factor and the percent good factor, or (2) can be derived directly, without computing the replacement cost index and the percent good factors individually, using a market method. When such factors are derived directly, one arithmetic step is saved. A combined factor is a product of the replacement index factor and percent good factor. Examples of methods to compute combined factors directly from a market method are included below. These methods create several data points for each asset in the sample or group of assets to be studied. All data points combined for all assets should then be reduced to a single schedule.

## METHOD 1:  COMPUTE CHANGES BETWEEN CURRENT LIEN DATE AND PREVIOUS YEARS

The methodology illustrated in the example below is the most theoretically accurate method for developing combined factors; it is the method used to develop percent good factors for real property. It requires annual updating to be useful and reliable.

### Example

A rapidly depreciating item of equipment was selling used on January 1, 1998 for $1,000. The average selling prices new of comparable equipment were as follows in previous years, and the resulting factors derived from this data are shown:

| YEAR | SELLING PRICE NEW | FACTOR (%) | |
|------|-------------------|------------|--|
| 1998 |         | 100 | (1000/1000) |
| 1997 | $1,200  | 83  | (1000/1200) |
| 1996 | $1,500  | 67  | (1000/1500) |
| 1995 | $1,900  | 53  | (1000/1900) |
| 1994 | $2,300  | 43  | (1000/2300) |
| 1993 | $3,000  | 33  | (1000/3000) |

Note that for this item, selling prices new declined over time as technological improvements occurred.

## METHOD 2:  COMPUTE HISTORICAL CHANGES IN PRICE

Factors derived using the methodology illustrated in the example below are easily verifiable when prices can be determined at specific points in time and data are available. Care must taken when applying factors derived using this method in subsequent years. These markets are not static. Several problems that may occur when this method is used include the following:

1.  When value is measured over a long period, the earliest data points are several years old and possibly inaccurate.

2.  It may be difficult to locate data for one-year-old equipment.

3.  If the equipment is of the type that is subject to rapid technological changes, it is difficult to find old equipment that is functionally identical to new equipment.

## Example

An item is selling new for $1,000 on January 1, 1993.  Following are selling prices of comparable used equipment on the same date in subsequent years, and the resulting factors derived from this data:

| DATE | AGE (in years) | SELLING PRICE USED | FACTOR (%) | |
|------|----------------|---------------------|--------|--------------|
| 01/01/93 | 0 | $1000 (new) | 100 | (1000/1000) |
| 01/01/94 | 1 | $900 | 90 | (900/1000) |
| 01/01/95 | 2 | $790 | 79 | (790/1000) |
| 01/01/96 | 3 | $720 | 72 | (720/1000) |
| 01/01/97 | 4 | $670 | 67 | (670/1000) |
| 01/01/98 | 5 | $580 | 58 | (580/1000) |

### SUMMARY

The foregoing discussion does not include all the possible opportunities and problems involved in developing valuation tables for machinery and equipment for use in the cost approach to value.  This appendix is meant only to give a basic background on different methods that may be used to develop cost approach tables using current market data.

# APPENDIX I: LIFING STUDIES

As discussed generally in Chapter 4 and more specifically in Assessors' Handbook Section 582 (AH 582), *Explanation of the Derivation of Percent Good Factors,* an average service life estimate is necessary in order to effectively utilize equipment index and percent good tables. Mortality studies are statistical studies, typically based upon a sample of a population, which estimate a percentage of items that live at any given age and their life expectancy at any given age. A mortality study identifies a group of items, records the life term of each item in the group, and averages the life term or probable life expectancy of the items when new, by summing the life terms of all items in the group and dividing by the total number in the group. The probable total life expectancy of survivors of the group is similarly calculated by summing their total life expectancies and dividing by the number of survivors at that age. The result is a "forecast" of the total life expectancy as time passes.

Mortality studies may come in many forms. Actuarial tables compiled by insurance companies to predict the life expectancy of humans at all ages are probably the most common. Similar studies of personal property and various types of equipment are often referred to as *lifing studie*s.

The Iowa State University, Department of Engineering mortality (or lifing) studies, published in the form of a series of graphs and tables for various types of industrial machinery and equipment are useful for assessment purposes.[319] However, other studies and/or methods of conducting lifing studies may also be appropriate for assessment purposes, provided that they are timely, properly designed, appropriately conducted, and carefully evaluated. In such circumstances these studies may, in some cases, provide extremely accurate results.

The following is a general discussion of lifing study methodology. Although not intended to be directly applicable to any one fact situation, this information may be helpful in evaluating lifing studies submitted by assessees in various circumstances. In contrast to the Iowa State University study discussed in AH 582, the methodology explained here is modeled after a brief treatise set forth in *Engineering Valuation and Depreciation.*[320] In practice, those designing and conducting a lifing study using the concepts of this methodology may employ numerous variations of it, either expanding upon it, or interposing other methods deemed more appropriate for the particular property involved.

---

[319] A brief discussion of the Iowa State University study is included in AH 582.
[320] Marston, Winfrey, and Hemstead, McGraw-Hill, 1953, pages 154-155.

## DATA SOURCES

Every lifing study reflects the particular data sources inputted.  Generally, the most reliable sources of data for a lifing study are the retirement records of assessees, related to the specific category of property subject to study.  Generally, recorded retirements contain data that are more complete and verifiable than other data sources.  Accordingly, this type of data source should be given greater weight in the study than a less reliable source, such as, unrecorded retirements.  For example, if one business owner seldom conducts physical inventories and/or has significant unrecorded retirements, those data should be given little weight, except as an indication of an upper bound of lifetime, since it is incomplete and unverified.

When verifying the accuracy of retirement records or determining the existence of unrecorded retirements, it may be necessary to conduct a complete inventory or review of all records related to the property.  Relevant data to be reviewed and evaluated consists of the following information for each asset in the group studied:

- Original in-service date

- Original acquisition date

- Date of retirement, if any

- Proceeds at retirement, if any (if significant proceeds were realized at retirement, the appraiser should verify that a true retirement occurred).

While information obtained from Business Property Statements should be considered, it may be incomplete from the standpoint of the statistical data required here and may not always be reliable for use in a lifing study.  Furthermore, acquisitions and retirements of the property are not the only events that affect the reported totals on these statements.  All of the following may impact totals for a given category:

- Transfers in

- Transfers out

- Lease buy-outs

- Purchases of used equipment

- Reclassifications of assets

- Consolidations

- Differences in recording information

- Conversions of information systems

Only studies based on reliable and complete records specific to individual assets can give reliable estimates of lifetime.  Therefore, a review of the records specific to each asset is appropriate and generally necessary when such a specific study is conducted.

# GENERAL STEPS

Lifing studies consist of three general steps:

- Calculating the survivor curve of known assets

- Matching the survivor curve to known standard curves (by average lifetime and shape of curve)

- Applying the parameters of the matching curve to determine probable remaining economic lifetime at each age

## CALCULATING THE SURVIVOR CURVE

As discussed in AH 582, a "survivor curve" expresses the percentage or number of survivors of an original group of items for each year of existence in the group. From the mathematician's viewpoint, "Survivor curves and their derived curves expressing the service age in percent of average life are useful in classifying curves by their shapes, in using standard or type curves for extending and smoothing original data curves, and in predicting the probable service life of a particular unit by use of group experience."[321] The objective of this methodology is to find the curve and its parameters most accurately representing the actual observed survivor curve relative to the specific property studied.

To calculate the survivor curve, the analyst/appraiser conducting the study first computes the total dollar amount of the original cost of assets and the surviving costs after retirements for each year assets were put into service.[322] The costs are entered on a spreadsheet with the latest year to the left (see Exhibit 1).

In the second step, the analyst calculates the total amount of dollars for the surviving assets and the total amount of dollars for the assets actually exposed to retirement for each year (see Exhibit 2). The percentage of assets surviving for each year is the ratio of surviving costs to exposed costs. The exposed cost at each age is the total amount of assets for which the survivors are known. The surviving costs at each age are the total amount of assets for which the exposed costs are known after retirements for that year. (This calculation combines the totals for all in-service years.)

The plotted points on the survivor curve are determined by multiplying the value for each preceding point on the curve by the percentage surviving for the succeeding year (see Exhibit 3). The computed curve is usually not complete and is called a "stub survivor curve."

---

[321] Marston, Winfrey, and Hempstead, McGraw-Hill, *Engineering Valuation and Depreciation*, 1953, page 149.

[322] Item counts may be used in lieu of dollar costs in calculating a survivor curve in certain situations, consistent with *Engineering Valuation and Depreciation*, Marston, Winfrey, Hempstead, Ninth printing, 1982, page 154. For example, when similar objects with similar costs are studied use of item counts may provide accurate results.

## MATCHING TO KNOWN PATTERNS OF SURVIVAL

There are several well-known families of "standard curves" that are useful for lifing study analysis. As discussed above, the Iowa State University Engineering Department developed a series of 18 standard curves with a variety of different characteristics in conducting economic studies of utility properties. Most survivor curves fit one of the Iowa curves, and lifing studies traditionally attempt to match the calculated survivor curve to one of the set of the standard Iowa curves.[323]

By matching the known portion of a standard statistical curve with the survival characteristics of a certain group of assets, the analyst can estimate the remaining economic lifetime at any given age. This is because the standard curves are well understood and tabulated. This third step of the appraiser's study rests on the assumption that if survival characteristics of a group of assets match some standard curve for certain ages, then those characteristics will match the standard curve for the rest of the ages in question.

## APPLYING THE PARAMETERS OF THE MATCHING CURVE

Whatever family of curves is utilized, the final step in the analysis is to find the curve and parameters that best fit the actual real observed survivor curve. Two methods may be utilized. The traditional method is known as the "least squares fit method." In this method, various curves and combinations of parameters are tried and tested, and for each combination, the sum of the squares of the differences between the known data and the theoretical curve is calculated. The combination "curve and parameter set" which produces the lowest sum of squared differences is said to be the "best fit," i.e., the most reliable complement (see Exhibits 4 and 5). The example compares two Iowa curves (L-0 and S-0) to the calculated survival data, for different lifetimes. In practice, the remaining curves should also be examined for goodness of fit, and all curves should be tested to find the best fitting curves for each.

Another method for finding the curve and parameters that best fit the actual real observed survivor curve is the "maximum likelihood estimation." In this method, the arithmetic differences are not squared and summed, but the ratios of the real data and the fitted curve data (i.e., the "likelihoods") are squared and multiplied together. The combination curve and parameter set that produces the maximum combined "likelihood" is the best fit. Although the "least squares fitting method" is more easily understood, the "maximum likelihood estimation method" is more reliable.

---

[323] In cases where two or more Iowa curves provide almost equally good matches to observed data, the appraiser/analyst should use great care to assure a reasonable result, as use of different curves can give widely different valuation results.

Once the best-fitting standard, matching survivor curve is identified, its characteristics can easily be determined and employed in the methodology for finding the percent good for the particular type of property under study.   Therefore, the analyst's subsequent steps should follow the methods discussed in AH 582, *Explanation of the Derivation of Equipment Percent Good Factors*.

# EXHIBIT 1

**COMPANY NAME**
**TOTAL PRODUCTION EQUIPMENT**

| ACQ YEAR | REPORTING YEAR 1997 | 1996 | 1995 | 1994 | 1993 | 1992 | 1991 | 1990 | 1989 | 1988 | 1987 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 98,964,070 | | | | | | | | | | |
| 1996 | 153,448,288 | 169,990,761 | | | | | | | | | |
| 1995 | 182,580,048 | 208,876,140 | 231,759,101 | | | | | | | | |
| 1994 | 96,031,282 | 110,243,378 | 118,136,366 | 132,197,405 | | | | | | | |
| 1993 | 57,805,330 | 69,696,484 | 87,949,290 | 91,810,652 | 104,702,302 | | | | | | |
| 1992 | 56,079,852 | 70,599,183 | 82,243,750 | 85,447,803 | 92,756,127 | 95,649,687 | | | | | |
| 1991 | 51,106,528 | 63,819,036 | 69,034,721 | 78,924,765 | 83,566,290 | 84,899,167 | 87,264,411 | | | | |
| 1990 | 37,973,937 | 44,224,012 | 47,105,779 | 50,586,786 | 58,450,217 | 61,020,961 | 64,714,926 | 83,918,314 | | | |
| 1989 | 23,499,363 | 29,803,541 | 31,294,917 | 41,324,487 | 48,782,829 | 49,794,962 | 50,468,073 | 56,681,656 | 60,314,739 | | |
| 1988 | 8,462,511 | 9,211,305 | 10,302,978 | 11,942,492 | 12,119,445 | 16,957,580 | 17,829,925 | 21,614,975 | 27,712,608 | 29,596,847 | |
| 1987 | 4,399,738 | 5,968,139 | 9,788,393 | 10,127,846 | 11,486,846 | 13,435,764 | 13,980,642 | 16,797,158 | 18,445,041 | 20,382,424 | 20,552,152 |
| | | | | | | | | | | | |
| TOTALS | 770,350,947 | 782,431,979 | 687,615,295 | 502,362,236 | 411,864,056 | 321,758,121 | 234,257,977 | 179,012,103 | 106,472,388 | 49,979,271 | 20,552,152 |

## EXHIBIT 2

### COMPANY NAME
### TOTAL PRODUCTION EQUIPMENT

| AGE: | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ACQ YEAR** | | | | | | | | | | | |
| 1997 | 98,964,070 | | | | | | | | | | |
| 1996 | 169,990,761 | 153,448,288 | | | | | | | | | |
| 1995 | 231,759,101 | 208,876,140 | 182,580,048 | | | | | | | | |
| 1994 | 132,197,405 | 118,136,366 | 110,243,378 | 96,031,282 | | | | | | | |
| 1993 | 104,702,302 | 91,810,652 | 87,949,290 | 69,696,484 | 57,805,330 | | | | | | |
| 1992 | 95,649,687 | 92,756,127 | 85,447,803 | 82,243,750 | 70,599,183 | 56,079,852 | | | | | |
| 1991 | 87,264,411 | 84,899,167 | 83,566,290 | 78,924,765 | 69,034,721 | 63,819,036 | 51,106,528 | | | | |
| 1990 | 83,918,314 | 64,714,926 | 61,020,961 | 58,450,217 | 50,586,786 | 47,105,779 | 44,224,012 | 37,973,937 | | | |
| 1989 | 60,314,739 | 56,681,656 | 50,468,073 | 49,794,962 | 48,782,829 | 41,324,487 | 31,294,917 | 29,803,541 | 23,499,363 | | |
| 1988 | 29,596,847 | 27,712,608 | 21,614,975 | 17,829,925 | 16,957,580 | 12,119,445 | 11,942,492 | 10,302,978 | 9,211,305 | 8,462,511 | |
| 1987 | 20,552,152 | 20,382,424 | 18,445,041 | 16,797,158 | 13,980,642 | 13,435,764 | 11,486,846 | 10,127,846 | 9,788,393 | 5,968,139 | 4,399,738 |
| **$'s Surviving** | 1,114,909,789 | 919,418,354 | 701,335,859 | 469,768,543 | 327,747,071 | 233,884,363 | 150,054,795 | 88,208,302 | 42,499,061 | 14,430,650 | 4,399,738 |
| **$'s Exposed** | | 1,015,945,719 | 765,970,066 | 518,755,811 | 373,737,261 | 269,941,741 | 177,804,511 | 98,948,267 | 50,234,365 | 18,999,698 | 5,968,139 |

AH 504

## EXHIBIT 3

### COMPANY NAME
### PRODUCTION EQUIPMENT

| Exposed Costs | Age | Surviving Costs | Year % Surviving | Survivor Curve Curve |
|---|---|---|---|---|
| | 0 | 1,114,909,789 | 100.00% | 100.00% |
| 1,015,945,719 | 1 | 919,418,354 | 90.50% | 90.50% |
| 765,970,066 | 2 | 701,335,859 | 91.56% | 82.86% |
| 518,755,811 | 3 | 469,768,543 | 90.56% | 75.04% |
| 373,737,261 | 4 | 327,747,071 | 87.69% | 65.80% |
| 269,941,741 | 5 | 233,884,363 | 86.64% | 57.01% |
| 177,804,511 | 6 | 150,054,795 | 84.39% | 48.12% |
| 98,948,267 | 7 | 88,208,302 | 89.15% | 42.89% |
| 50,234,365 | 8 | 42,499,061 | 84.60% | 36.29% |
| 18,999,698 | 9 | 14,430,650 | 75.95% | 27.56% |
| 5,968,139 | 10 | 4,399,738 | 73.72% | 20.32% |

232

October 2002

Appendix I

**EXHIBIT 4**

**Company Name**
**Data Analysis Percent Surviving**

| | | Curve> | LO | LO | LO | LO | LO | LO |
|---|---|---|---|---|---|---|---|---|
| | | | | | Lifetime | | | |
| Year | Test Data | AGE | 1 | 2 | 3 | 4 | 5 | 6 |
| 1997 | 100.00% | 0 | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| 1996 | 90.5 | 1 | 44.81 | 74.74 | 85.17 | 89.78 | 92.45 | 93.98 |
| 1995 | 82.86 | 2 | 7.73 | 44.81 | 64.8 | 74.74 | 80.95 | 85.17 |
| 1994 | 75.04 | 3 | 0.24 | 21.53 | 44.81 | 59.3 | 68.51 | 74.74 |
| 1993 | 65.8 | 4 | 0 | 7.73 | 29.76 | 44.81 | 56.3 | 64.39 |
| 1992 | 57.01 | 5 | 0 | 1.85 | 15.78 | 32.05 | 44.81 | 54.31 |
| 1991 | 48.12 | 6 | 0 | 0.24 | 7.73 | 21.53 | 34.44 | 44.81 |
| 1990 | 42.89 | 7 | 0 | 0 | 3.18 | 13.46 | 25.45 | 36.08 |
| 1989 | 36.29 | 8 | 0 | 0 | 0.97 | 7.73 | 18.01 | 28.28 |
| 1988 | 27.56 | 9 | 0 | 0 | 0.24 | 4.02 | 12.13 | 21.53 |
| 1987 | 20.32 | 10 | 0 | 0 | 0 | 1.85 | 7.73 | 15.89 |
| 1986 | 0 | 11 | 0 | 0 | 0 | 0.73 | 4.02 | 11.31 |
| 1985 | 0 | 12 | 0 | 0 | 0 | 0.24 | 1.85 | 7.73 |
| 1984 | 0 | 13 | 0 | 0 | 0 | 0.06 | 0.73 | 5.07 |
| 1983 | 0 | 14 | 0 | 0 | 0 | 0 | 0.24 | 3.16 |
| 1982 | 0 | 15 | 0 | 0 | 0 | 0 | 0.06 | 1.85 |
| 1981 | 0 | 16 | 0 | 0 | 0 | | 0 | 1.02 |

**Data Fit Sum of Least Squares**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1997 | 100.00% | 0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 90.5 | 1 | 20.87 | 2.48 | 0.28 | 0.01 | 0.04 | 0.12 |
| 1995 | 82.86 | 2 | 56.44 | 14.47 | 3.26 | 0.66 | 0.04 | 0.05 |
| 1994 | 75.04 | 3 | 55.95 | 28.63 | 9.14 | 2.48 | 0.43 | 0 |
| 1993 | 65.8 | 4 | 43.3 | 33.72 | 12.99 | 4.4 | 0.9 | 0.02 |
| 1992 | 57.01 | 5 | 32.5 | 30.43 | 17 | 6.23 | 1.49 | 0.07 |
| 1991 | 48.12 | 6 | 23.15 | 22.92 | 16.31 | 7.07 | 1.87 | 0.11 |
| 1990 | 42.89 | 7 | 18.4 | 18.4 | 15.77 | 8.66 | 3.04 | 0.46 |
| 1989 | 36.29 | 8 | 13.17 | 13.17 | 12.47 | 8.15 | 3.34 | 0.64 |
| 1988 | 27.56 | 9 | 7.6 | 7.6 | 7.46 | 5.54 | 2.38 | 0.36 |
| 1987 | 20.32 | 10 | 4.13 | 4.13 | 4.13 | 3.41 | 1.58 | 0.2 |
| 1986 | 0 | 11 | 0 | 0 | 0 | 0 | 0.16 | 1.28 |
| 1985 | 0 | 12 | 0 | 0 | 0 | 0 | 0.03 | 0.6 |
| 1984 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0.26 |
| 1983 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0.1 |
| 1982 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0.03 |
| 1981 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0.01 |
| | Total | | 275.51% | 175.95% | 98.81% | 46.61% | 15.30% | 4.31% |
| | Avg. | | 16.21% | 10.35% | 5.81% | 2.74% | 0.90% | 0.25% |
| | Square Root | | 40.26% | 32.17% | 24.10% | 16.55% | 9.49% | 5.00% |

| | | **EXHIBIT 5** | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Company Name** | | | | | |
| | | **Data Analysis Percent Surviving** | | | | | |
| | **CURVE>** | S0 | S0 | S0 | S0 | S0 | S0 |
| | | **Lifetime** | | | | | |
| Year | Test Data | **AGE** | 1 | 2 | 3 | 4 | 5 | 6 |
| 1997 | 100.00% | 0 | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| 1996 | 90.5 | 1 | 50 | 82.54 | 90.98 | 94.44 | 96.18 | 97.17 |
| 1995 | 82.86 | 2 | 0 | 50 | 72.51 | 82.54 | 87.85 | 90.98 |
| 1994 | 75.04 | 3 | 0 | 17.45 | 50 | 67.1 | 76.68 | 82.54 |
| 1993 | 65.8 | 4 | 0 | 0 | 27.48 | 50 | 63.76 | 72.51 |
| 1992 | 57.01 | 5 | 0 | 0 | 9.01 | 32.83 | 50 | 61.49 |
| 1991 | 48.12 | 6 | 0 | 0 | 0 | 17.45 | 36.23 | 50 |
| 1990 | 42.89 | 7 | 0 | 0 | 0 | 5.55 | 23.31 | 38.43 |
| 1989 | 36.29 | 8 | 0 | 0 | 0 | 0 | 12.14 | 27.47 |
| 1988 | 27.56 | 9 | 0 | 0 | 0 | 0 | 3.81 | 17.45 |
| 1987 | 20.32 | 10 | 0 | 0 | 0 | 0 | 0 | 9.01 |
| 1986 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 2.8 |
| 1985 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1984 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1983 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1982 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | **Data Fit Sum of Least Squares** | | | | | |
| 1997 | 100.00 | 0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1996 | 90.5 | 1 | 16.4 | 0.63 | 0.002 | 0.15 | 0.32 | 0.44 |
| 1995 | 82.86 | 2 | 68.66 | 10.79 | 1.07 | 0 | 0.25 | 0.66 |
| 1994 | 75.04 | 3 | 56.31 | 33.17 | 6.27 | 0.63 | 0.03 | 0.56 |
| 1993 | 65.8 | 4 | 43.3 | 43.3 | 14.68 | 2.5 | 0.04 | 0.45 |
| 1992 | 57.01 | 5 | 32.5 | 32.5 | 23.04 | 5.85 | 0.49 | 0.2 |
| 1991 | 48.12 | 6 | 23.16 | 23.16 | 23.16 | 9.41 | 1.41 | 0.03 |
| 1990 | 42.89 | 7 | 18.4 | 18.4 | 18.4 | 13.94 | 3.83 | 0.2 |
| 1989 | 36.29 | 8 | 13.17 | 13.17 | 13.17 | 13.17 | 5.83 | 0.78 |
| 1988 | 27.56 | 9 | 7.6 | 7.6 | 7.6 | 7.6 | 5.64 | 1.02 |
| 1987 | 20.32 | 10 | 4.13 | 4.13 | 4.13 | 4.13 | 4.13 | 1.28 |
| 1986 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0.08 |
| 1985 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1984 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1983 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1982 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total | | 283.63% | 186.85% | 111.52% | 57.38% | 21.97% | 5.70% |
| | Avg. | | 17.73% | 11.68% | 6.97% | 3.59% | 61.37% | 0.36% |
| | Square Root | | 42.10% | 34.18% | 26.40% | 18.95% | 11.70% | 6.00% |

# APPENDIX J:  SUMMARY OF COURT CASES

*Allstate Insurance Co.* v. *County of Los Angeles* (1984) 161 Cal.App.3d 877.  The Court held that "standardized off-the-shelf, general purpose computers and computer components, placed in general purpose office buildings, and connected to a power source by means of standardized plugs, and to each other by means of standardized cables, are and remain personalty regardless of whether or not use of a computer is essential to efficient and competitive operation of the business in which they are employed.  The key factors determinative of whether a computer system is personalty are that the system can be removed from the realty without damage to itself or to the realty and without diminishing the value of the realty, and the objective reality is that ownership of the computer is unrelated to ownership of the land or a leasehold interest in it."

*Beckman Instruments, Inc.* v. *County of Orange* (1975) 53 Cal.App.3d 767.  Interdivisional transfers of manufactured goods with an accompanying markup in value, for purposes of delivery or to facilitate marketing, result in a trade level increase and corresponding increase in value in accord with Property Tax Rule 10.

*Bell* v. *Bank of Perris* (1942) 52 Cal.App.2d 66.  "The mere fact that pumps annexed to realty were removed on one occasion for the purpose of being overhauled and then put back in place does not show that their installation was not intended to be permanent.  In order to make an article a permanent accession to land its annexation need not be perpetual; it is sufficient if the article shall appear to be intended to remain where fastened until worn out or until it is superseded by another article more suitable for the purpose."

*Brock & Co.* v. *Board of Supervisors* (1937) 8 Cal.2d 286.  The term "situated" connotes a more or less permanent location or situs and the requirement of permanency must attach before tangible property which has been removed from the domicile of the owner will attain a situs elsewhere.  Thus, where personal property was removed from the state shortly prior to the first Monday in March lien date for the purpose of sale and of reducing the owner's personal property tax and returned shortly thereafter, it remained taxable at its permanent situs in the State.  The State's jurisdiction was not lost by virtue of the temporary excursion out of the State.

*Clunie* v. *Siebe* (1896) 112 Cal. 593.  The taxpayer is not required to affix a valuation to any part of his property.

*Coe* v. *Errol* (1885) 116 U.S. 517.  Delivery of California-grown rice to, and its storage in, the port district's elevators were no part of the process of exportation which begins when the goods cross the water's edge.  Delivery to a common carrier and subsequent handling of the rice at the port was no part of the export process.  *Coe* v. *Errol* makes it clear that it is only entry with a common carrier for transportation to the goods' ultimate destination, that will suffice.

*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881.  The California Supreme Court held that bank electronic data processing equipment not physically attached to the building by permanent connections, but merely by standardized "quick disconnect" plugs inserted into the power source, was not a fixture but personalty where: (1) neither the equipment nor the building was designed or modified for each other and factors showing a lack of annexation; and (2) adaptability were not outweighed by other objective manifestations of permanence (i.e., the interrelation between the purpose and structural form of the building and the capacity and physical characteristics of the equipment, and the equipment's weight and size.

*De Luz Homes Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546.  The absence of an actual market for a particular type of property does not mean that it has no value or that it may escape from the mandate of Constitution, article XIII, §1, that all property shall be taxed in proportion to its value, but only that the assessor must then use such pertinent factors as replacement costs and analyses for determining valuation.  In valuing a leasehold interest in exempt lands and improvements by the capitalization of income method it is improper, in computing the anticipated net income to be capitalized, to deduct from anticipated gross income the lessee's charges for rent, amortization of his investment, or payments of principal and interest on his mortgage debt.  The proper method of valuing a possessory interest in a housing project at a permanent military installation is to deduct from annual anticipated gross income the operating and maintenance expenses and the amount required by the leased to be deposited to a replacement reserve, and to capitalize the difference for the remaining years of the lease at a rate which will allow for risk, interest, and taxes.

*Dennis* v. *County of Santa Clara* (1989) 215 Cal.App.3d 1019.  Under section 110, an arm's length, open market sale for a price that is not influenced by an exigency of either buyer or seller permits the assessor to presume fair market value from the purchase price, but the presumption may nevertheless be rebutted by evidence that the fair market value of the property is otherwise.

*Flying Tiger Line Inc.* v. *County of Los Angeles* (1958) 51 Cal.2d 314.  Taxation of aircraft owned by a domiciliary airline and used in the Korean airlift was found to violate the federal constitution since taxable situs was not established.  The decision was rendered by the California Supreme Court without a majority opinion.

*General Dynamics Corp.* v. *County of Los Angeles* (1958) 51 Cal.2d 59.  A possessory interest in government-owned personal property is not a taxable possessory interest in the absence of legislative authority.

*GeoMetrics* v. *County of Santa Clara* (1982) 127 Cal.App.3d 940.  A county may not impose an unapportioned tax on aircraft located physically in foreign countries and engaged in foreign commerce for all or part of a tax year, as such a tax is barred by the Commerce Clause of the United States Constitution.  Taxation of the aircraft according to the number of days the aircraft was located in the county is permissible, however.

*GTE Sprint Communications Corp.* v. *Alameda County* (1994) 26 Cal.App.4th 992.   Unit taxation of public utilities and railroads is properly characterized as the taxation of property as a going concern, not as the taxation of real property or personal property, or even a combination of both.   Under the unit taxation method, the Board considers the earnings of the property as a whole, and does not consider, less still assess, the value of any single real or personal asset.

*Ice Capades Inc.* v. *County of Los Angeles* (1976) 56 Cal.App.3d 745.   Where the movable property of a domiciliary corporation engaged in interstate commerce has acquired an out of state tax situs, the county of domicile must apportion the tax by excluding such property values that are subject to potential out of state taxation.

*Japan Line, Ltd.* v. *County of Los Angeles* (1979) 441 U.S. 434.   "If a state tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state, no impermissible burden on interstate commerce will be found; however, a more elaborate inquiry is necessary when a state seeks to tax the instrumentalities of foreign rather than interstate, commerce."

*Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610.   The lessor's right under a lease to remove shipyard facilities does not fix their status as personalty for tax purposes and preclude the assessor from classifying the property as improvements to realty in accordance with the physical facts of their annexation to the land.

*Lyons* v. *Estes* (1969) 6 Cal.App.3d 979.   The county assessor is a tax official of the state within the meaning of section 19286 of this code and may inspect income tax returns to assist him in assessing taxpayer's property.

*Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco* (1982) 129 Cal.App.3d 876.   The court held that in light of the purpose and objective of former article XII, § 14-4/5, the "in lieu" tax exemption should not and did not apply to personal property owned by an insurance company but used in an unrelated business.

*Mayhew Tech Center Phase II* v. *County of Sacramento* (1992) 4 Cal.App.4th 497.   Land and improvements occupied by the Franchise Tax Board under a lease-purchase agreement were exempt under this Article since, despite the lease agreement, the state held the essential indicia of ownership.   The financing arrangement closely resembled the financing of a purchase through a loan secured by a deed of trust on the subject property, most of the property rights were vested in the state, and the lease provided for automatic vesting of title in the state at the expiration of the lease if all rental payments were made.   The state thus occupied the property as a beneficial owner and would eventually hold all incidents of ownership if it so chose.   State property is not to be taxed unless there is express authority for taxation.

*Minnesota* v. *Blasius* (1933) 290 U.S. 1.  Under the Commerce Clause of the U.S. Constitution, "property which has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates, is deemed to be part of the general mass of the property within the state and thus subject to its taxing power."

*Mobilease Corp.* v. *County of Orange* (1974) 42 Cal.App.3d 461.  Since 1935, the Legislature has expressly declared that there shall be no local ad valorem taxation on vehicles subject to registration under the Vehicle Code.  Section 10758, Revenue and Taxation Code, provides in pertinent part as follows:  "The license fee imposed under this part is in lieu of all taxes according to value levied for state or local purposes on vehicles of a type to registration under the Vehicle Code whether or not the vehicles are registered under Vehicles Code section 4000. . . "Local taxation of vehicles as personal property under the Revenue and Taxation Code is authorized by finding that they are special mobile equipment and, therefore, under Vehicle Code, section 4010, exempt from registration by the DMV.

*Morse Signal Devices* v. *County of Los Angeles* (1984) 161 Cal.App.3d 570.  In determining whether an article is a fixture, there are three tests under Rule 122.5: the manner of its annexation, its adaptability to the use and purpose for which the realty is used, and the intention of the party making the annexation.  The manner of annexation and the use to which the realty is put are relevant in determining the crucial element of intention to make the article a permanent part of the realty.  Great expense or difficulty in removal is indicative of intended permanence.

*Mutual Life Insurance of New York* v. *City of Los Angeles* (1990) 50 Cal.3d 402.  The Court ruled that by virtue of the "in lieu" provision of subdivision (f), section 28, article XIII of the California Constitution, the personal property owned by insurance companies is exempt from property taxation regardless of whether the property is used for insurance related business or not and that the controlling factor in determining whether the exemption applies is ownership of the personal property.

*M.P. Moller Inc.* v. *Wilson* (1936) 8 Cal.2d 31.  Whether an article has lost its character as personal property and becomes a fixture is a question of fact and whether the article is or was physically affixed to the building is only one of the criteria in determining whether there was an intention to make it a permanent accession to the real property; and annexation by weight and gravity is not always alone a sufficient indication of an intent to make the article a permanent fixture and part of the realty, but it must appear from the nature of the chattel that if used for the purpose for which it was designed it would naturally and necessarily be annexed to and become a permanent and integral part of some realty, in that it would become essential to the ordinary and convenient use of the property to which it was annexed."

*People* v. *Niles* (1868) 35 Cal. 282.  "To authorize the taxing of personal property in any other county than that in which the owner resides, it must appear that such property is kept or maintained in such county, and is not here casually, or in transit, or temporarily, in the ordinary course of business or commerce."

*Rinaldi* v. *Goller* (1957) 48 Cal.2d 276.  "A building need not be physically anchored to the land to be considered realty; it may be found to be a fixture though it is secured to the realty by force of gravity alone."

*Rosasco* v. *County of Tuolumne* (1904) 143 Cal. 430.  Permanent situs, as distinguished from place of temporary sojourn, is the controlling force in the assessment of property in transit, migrating herds, or rolling stock.  When cattle are brought permanently into one county, they are to be assessed there irrespective of the residence of the owner.

*San Diego County* v. *Assessment Appeals Bd. No. 2* (1983) 140 Cal.App.3d 52.  Under the trade level theory of assessment, if the owner of property at the consumer level is subject to application of a sales tax element in the valuation of the property, the lessor of the same kind of property at the consumer level is subject to the same sales tax element.

*San Diego County* v. *Lafayette Steel* (1985) 164 Cal.App.3d 690.  In determining whether an article is a fixture, there are three tests: the manner of its annexation, its adaptability to the use and purpose for which the realty is used, and the intention of the party making the annexation. The manner of annexation and the use to which the realty is put are relevant in determining the crucial element of intention to make the article a permanent part of the realty.  Great expense or difficulty in removal is indicative of intended permanence.

*San Diego Trust & Savings Bank* v. *San Diego County* (1940) 16 Cal.2d 142.  Bank vaults and vault doors, including those installed by lessees, have been held to constitute improvements.

*San Francisco* v. *Talbot* (1883) 63 Cal. 485.  "Plying" the waters in a particular location implies regularity, and is not the term used to express the character of the irregular and transient visitations of a ship to a port.

*Sea-Land Services, Inc.* v. *County of Alameda* (1974) 12 Cal.3d 772.  Cargo containers used exclusively for transportation of cargo for hire in interstate and foreign commerce are subject to an apportioned local tax.  The habitual presence of such containers creates a taxable situs, even though the identical containers are not within the county every day and even though none of the containers is continuously within the county.  Note:  all ocean-going cargo containers of 1,000 cubic feet or more are now exempt under section 232.  This exemption does not affect the principle of tax situs due to habitual or average presence.

*Seatrain Terminals of California, Inc.* v. *County of Alameda* (1978) 83 Cal.App.3d 69. Exclusive use of two 750 ton cargo cranes, mounted on rails specially installed on the wharf, constitutes a taxable possessory interest.  The cranes were properly classified as fixtures since they were intended to be a permanent part of the wharf.

*Security Pacific National Bank* v. *Los Angeles County* (1984) 161 Cal.App.3d 877.   In determining whether an article is a fixture, there are three tests under Rule 122.5: the manner of its annexation, its adaptability to the use and purpose for which the realty is used, and the intention of the party making the annexation.   The manner of annexation and the use to which the realty is put are relevant in determining the crucial element of intention to make the article a permanent part of the realty.   Great expense or difficulty in removal is indicative of intended permanence.

*Seegmiller* v. *County of Nevada* (1997) 53 Cal.App.4th 1397.   A taxpayer requested the apportionment of the property tax on his machine shop, which he had moved from Truckee (California) to Reno, Nevada, subsequent to July 1st on the new fiscal year.   The court held that the situs of this property (movable business personal property) on the lien date was controlling for the assessment of the entire year.   The taxpayer is not entitled to apportionment based on the actual amount of time the property was located in California because the lien date is the method adopted for determining that the taxpayer has enjoyed the benefit of governmental services during the year preceding the assessment.

*Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303.   In determining whether articles constitute fixtures, and therefore improvements, within the meaning of section 105, the determining factor is whether there was an intention to make a permanent accession to the real property as reasonably manifested by outward appearances.   Neither the status of the party by whom the articles have been installed, nor the length of the lease under which party is in possession of the property, is controlling.   The fact that the fixtures are removable pursuant to express or implied contract between the landlord and tenant does not necessarily negate the element of permanence, nor is the contract binding upon the taxing authority.

*Southern California Telephone Co.* v. *State Board of Equalization* (1938) 12 Cal.2d 127.   The central office equipment of a telephone company installed in a building owned by the company and especially designed for its use constitutes an improvement.   This includes such items as headsets, operators' stools, etc., which although readily detachable, are usable only with the attached items with which they constitute a single unit.

*Specialty Restaurants, Corp.* v. *County of Los Angeles* (1980) 111 Cal.App.3d 607 (Queen Mary case).   The use of a special wharf area, developed as a tourist attraction by the city, manifested the intent to make a vessel (the Queen Mary) a permanent addition to realty.

*Tele-Vue Systems, Inc* v. *County of Contra Costa* (1972) 25 Cal.App.3d 340.   A permanently affixed interior household connection to a cable television system installed by the system owner who neither owns nor controls the connection constitutes a fixture and is assessable to the owner of the realty rather than to the system owner.

*Trabue Pittman Corp.* v. *County of Los Angeles* (1946) 29 Cal.2d 385.  For purposes of taxation, the definitions of real property in the revenue and taxation laws of the state control irrespective of whether they conform to definitions used for other purposes.  In determining whether articles constitute fixtures, and therefore improvements, within the meaning of section 105, the determining factor is whether there was an intention to make a permanent accession to the real property as reasonably manifested by outward appearances.  Neither the status of the party by whom the articles have been installed, nor the length of the lease under which party is in possession of the property, is controlling.  The fact that the fixtures are removable pursuant to express or implied contract between the landlord and tenant does not necessarily negate the element of permanence, nor is the contract binding upon the taxing authority.  Bank vaults and vault doors, including those installed by lessees, were held to constitute improvements.  Similarly, tellers' cages, partitions, coupon booths and counters installed by a lessee bank have been held to be improvements taxable to the owner of the building in which they were installed.

*Travelers Indemnity Co.* v. *Colonial Ins. Co.* (1966) 242 Cal.App.2d 227.  "Not all motor vehicles are required to be registered and exemption of a motor vehicle from registration does not make it any less a motor vehicle or signify its removal from all other applicable sections of the Vehicle Code."

*TRW Space & Defense Sector* v. *County of Los Angeles* (1996) 50 Cal.App.4th 1703.  Federal government cost-reimbursement and fixed-price contracts which provided that title to property acquired in the performance of those contracts passed to the federal government did not establish federal government ownership of overhead personal property such as consumable supplies and low-value office and plant equipment, and this was not immune from state property taxation.  The title provision in the cost-reimbursement contracts applied only to property subject to controlling regulations, which did not include overhead personal property wherein the government acquired title solely because of partial, advance, or progress payments.  With regard to fixed-price contracts, the title provision applied only to enumerated types of property, which did not include overhead personal property.

*Valley Fair Fashions, Inc.* v. *Valley Fair* (1966) 245 Cal.2d 614.  An assessment of improvements to the lessee in possession and control was not erroneous even though the land was assessed to the landlord and he owned the improvements.

*Ventura, County of* v. *Channel Islands State Bank* (1967) 251 Cal.App.2d 240.  A sign and a night depository constituting trade fixtures, owned by a bank and installed on a leased premises were properly classified as improvements under section 105 and real property under section 104 even though assessed to the lessee and placed on the unsecured roll.  The lessee-bank (owning trade fixtures attached to landlord's realty) was the proper assessee.  Where a statement of separate ownership as provided in section 2188.2 is not filed, the assessor is not required to assess lessee-owned trade fixtures to the landlord.

*Weyse* v. *Crawford* (1890) 85 Cal. 196.   Property in a warehouse is not assessable to the warehouseman as the person in possession.  If the owner is not known, the property should be assessed to unknown owners and the tax collected by seizure and sale.

*Xerox Corporation* v. *County of Orange* (1977) 66 Cal.App.3d 746.   Under the market value concept, where price is the basis of value, the sales tax and freight charges are elements of value.

# GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| **Air Taxi** | Aircraft used by an air carrier which (1) does not utilize aircraft having a maximum passenger capacity of more than 30 seats, (2) does not have a maximum payload capacity of more than 7,500 pounds in air transportation, and (3) which does not hold a certificate of public convenience and necessity or other economic authority issued by the Civil Aeronautics Board of the United States, or its successor, or by the California Public Utilities Commission, or its successor. |
| **Aircraft** | Also referred to as general aircraft. Any contrivance used or designed for the navigation of or for flight in the air which has been flown at least once. It is not a parachute or similar emergency safety device, rockets or missiles, or certificated aircraft or scheduled air taxis. |
| **Annuity** | A periodic series of obligatory payments; an annuity can be level, increasing, decreasing, or a combination thereof. |
| **Apportionment** | Process used to allocate or eliminate, based on the time of presence, the assessments or the taxes for time spent out of state. |
| **Appraisal Unit** | The unit that (1) people in the market typically buy and sell or (2) that is normally valued separately. |
| **Assessed Value** | The taxable value of a property against which the tax rate is applied. |
| **Assessee** | Person who owns, claims, possesses, or controls the property on the lien date. |
| **Assessment Roll** | A listing of all taxable property within a county. It identifies, at a minimum: (1) the property (usually by assessor's parcel number), (2) the tax-rate area where the property is located, (3) the name (if known) and mailing address of the assessee, (4) the assessed value of the property, including separate assessed values for land, improvements, and personal property, (5) penalties (if any), and (6) the amount (if any) of specified exemptions (e.g., Homeowners', Church, Welfare, etc.). Distinct assessment rolls include the locally-assessed secured and unsecured regular assessment rolls, the locally-assessed supplemental assessment roll, and the state-assessed roll (which is added to the locally-assessed secured roll). |
| **Audit** | Means of collecting data relevant to the determination of taxability, situs, and value of property. |
| **Audit Program** | System used to select and conduct audits. |
| **Average Service Life** | The average life term of a group of items. |

| Term | Definition |
|------|-----------|
| **Base Year Value** | In accordance with section 110.1, a property's base year value is its fair market value as of either the 1975 lien date or the date the property was last purchased, newly constructed, or underwent a change in ownership after the 1975 lien date. |
| **Basic Operational Programs (Software)** | Programs that are fundamental and necessary to the functioning of a computer.  The part of the operating system including supervisors, monitors, executives and control or master programs which consist of the control program elements of that system. |
| **Board Roll** | Part of the secured roll, containing State assessed property. |
| **Book Value** | Capitalized cost less depreciation as estimated by the accountant. |
| **Building Improvements** | Improvements to a structure. |
| **Capitalization** | Any method of converting expected future benefits into an indicator of present value; the discounting of projected income to a present value. |
| **Capitalization Rate** | Any rate used to convert income into an indicator of value; a ratio that expresses a relationship between income and value. |
| **Capitalized Cost** | Recorded cost of asset in assessee's books and records. |
| **Capitalized Interest** | Cost associated with use of money during construction of an asset whether the source of funds is debt or equity and whether or not the interest is actually incurred. |
| **Certificated Aircraft** | Aircraft operated by an air carrier or foreign air carrier engaged in air transportation while there is in force a certificate or permit issued by the Civil Aeronautics Board of the United States, or its successor, or a certificate by the California Public Utilities Commission authorizing such air carrier to engage in such transportation. |
| **Change in Ownership** | A transfer of a present interest in property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest. |
| **Comparative Sales Approach** | An approach to value by reference to sale prices of the subject property or comparable properties. |
| **Compound Interest** | Interest on the sum of principal and the accrued interest, combined at regular intervals; interest on interest. |
| **Conditional Sale Contract** | Form of sales contract in which seller reserves title until buyer pays for goods or land, at which time, the condition having been fulfilled, title passes to buyer.  Such contract under Uniform Commercial Code is a purchase money security agreement.  UCC Section 9-105(h).  (See also *financing lease*.) |

| Term | Definition |
|------|------------|
| **Confidence Interval** | Describes the limits of accuracy of an inference. This precision interval is a statistical measure of the inability to predict the true population error because the test is based on a sample rather than a census. |
| **Confidence Level** | An inference from a sample that tells the proportion of times a statement about the population is likely to be true in the long run. |
| **Confidence Limits** | Confidence interval expressed as a range, the lower and upper bound on the confidence interval. |
| **Cost** | The expenditure required to develop and construct an improvement or acquire personal property. |
| **Cost Approach** | A value approach using the following procedures to derive a value indicator: (1) estimate the current cost to reproduce or replace an existing property without untimely delays, (2) deduct for all accrued depreciation, and (3) add an amount to compensate for entrepreneurial profit (if present). |
| **Data** | Factual information used as a basis for analysis. |
| **Depreciation** | A decrease in utility resulting in a loss in property value; the difference between estimated replacement or reproduction cost new as of a given date and market value as of the same date. There are three principal categories of depreciation: physical deterioration, functional obsolescence, and external obsolescence. |
| **Direct Billing** | System developed and implemented by an assessor to appraise selected accounts periodically, in lieu of annual property statements. |
| **Direct Capitalization** | A capitalization method used to convert a single year's income expectancy into an indicator of value, either by dividing the income estimate by an appropriate rate or by multiplying the income estimate by an appropriate factor. |
| **Direct Costs** | Expenditures required for the labor and materials necessary to develop and construct an improvement (or personal property); sometimes referred to as "hard costs." |
| **Documented Vessel** | Any vessel which is required to have and does have a valid marine document issued by the Bureau of Customs of the United States or any federal agency successor or DMV. |
| **Economic Life** | Useful or profitable life of property, which may be shorter than the physical life. |
| **Economic Obsolescence** | See *External Obsolescence.* |

| Term | Definition |
| --- | --- |
| **Economic Rent** | The amount of rental income that could be expected from a property if available for rent on the open market, as indicated by the prevailing rental rates for comparable properties under similar terms and conditions; economic rent is distinguished from contract rent, which is the actual rental income for the subject property as specified in a lease; economic rent is also referred to as market rent. |
| **Effective Age** | The age indicated by the condition and utility of the property. |
| **Effective Gross Income** | The estimated potential gross income less allowances for vacancy and collection losses. |
| **Equipment Index Factor** | Multiplier used to "trend" the historical cost of property to an estimated reproduction or replacement cost new. |
| **Escape Assessment** | Assessment made after the completion of the regular assessment roll. |
| **Exposed Costs** | Cost of property in service at the beginning of each age interval that are exposed to retirement. |
| **Extended Term Lease** | Lease with duration of more than six months.  (Commonly referred to as *long-term lease*.) |
| **External Obsolescence** | Form of depreciation.  Also referred to as *Economic Obsolescence*.  The loss in utility and value due to an incurable defect caused by external negative influences outside the property itself. |
| **Factor** | One of two or more numbers that when multiplied together produce a third number, a multiplier.  A capitalization factor is the reciprocal of a capitalization rate. |
| **Financial Corporation** | Banks and financial institutions exempt from property taxation by the California Constitution, article XIII, section 28 and section 23182. |
| **Financing Lease** | See *Conditional Sale Contract*. |
| **Fixed Machinery and Equipment** | A type of fixture.  Equipment which is physically or constructively annexed and intended to remain indefinitely with the realty. |
| **Fixture** | An item of tangible property, the nature of which was originally personal property, but which is classified as real property for assessment purposes because it is physically or constructively annexed to real property with the intent that it remain annexed indefinitely. |
| **Full Cash Value** | See *Market Value*. |
| **Full Economic Cost** | Cost for appraisal purposes.  Includes all market costs (direct and indirect) necessary to purchase or construct equipment and make it ready for its intended use. |

| Term | Definition |
|------|------------|
| **Functional Obsolescence** | Form of depreciation.  The loss in utility and value due to changes in the desirability of the property; attributable to changes in tastes and style or the result of a poor original design.  Functional obsolescence is curable if the cost to cure it is equal to or less than the value added by curing it. |
| **General Aircraft** | Also referred to as aircraft.  Any contrivance used or designed for the navigation of or for flight in the air which has been flown at least once.  It is not a parachute or similar emergency safety device, rockets or missiles, or certificated aircraft or scheduled air taxis. |
| **Historical Cost** | The total cost of a property when it was originally constructed or purchased. |
| **Improvements** | All buildings, structures, fixtures, and fences erected on or affixed to the land; all fruit, nut bearing, ornamental trees and vines, not of natural growth, and not exempt form taxation, except date palms under eight years of age. |
| **Income Approach** | Any method of converting an income stream or a series of future income payments into an indicator of present value. |
| **Indirect Costs** | The outlay for items, other than labor and materials, required to develop and construct an improvement or personal property; includes such costs as (1) legal fees, property taxes, construction financing, administrative expenses, appraisal fees, and lease-up expenses for real property and/or (2) freight, installation, interest on borrowed funds, and testing costs for personal property.  Sometimes referred to as "soft costs." |
| **Inference** | Act of passing from statistical sample data to generalizations (as of the value of population parameters) usually with calculated degrees of certainty. |
| **Interest Rate** | The rate of return on debt capital; the price paid for borrowing money. |
| **Inventory** | Exempt items of personalty that become part of the product or are themselves a product that is held for sale or lease in the ordinary course of business. |
| **Land** | Real estate, or real property, except improvements.  It includes: the possession of, claim to, ownership of, or right to possession of land, and all mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto. |
| **Landlord Improvements** | Improvements made by the real property owner. |
| **Leasehold/Tenant Improvements** | Improvements made by the lessee/tenant. |

| Term | Definition |
|---|---|
| **Lessee** | One who has the right to use (or occupy) property under a lease agreement.  (In terms of real property a tenant.) |
| **Lessor** | One who conveys the right to use (and/or occupy) property under a lease agreement.  (In terms of real property a landlord.) |
| **Lien Date** | All taxable property (both state and locally assessed) is assessed annually for property tax purposes as of 12:01 a.m. on January 1, which is called the lien date.  It is referred to as the lien date because on this date the taxes become a lien against all real property assessed on the secured roll. |
| | Note:  Taxes on the unsecured roll are not a lien on property; they are a personal obligation of the assessee. |
| **Lifing Studies** | See *Mortality Studies* |
| **Long-Term Lease** | See *Extended-Term Lease*. |
| **Mandatory Audit** | Audits required by law.  For taxpayers owning or possessing tangible business personal property and fixtures with a full cash value of $400,000 or more, section 469 requires an audit at lease once in each four-year period. |
| **Market Value** | Also referred to as full cash value or fair market value.  It means the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes. |
| **Mortality Studies** | Statistical studies, typically based upon a sample of a population, whose results estimate the percentage of things which live at any given age the life expectancy of those things at any given age (also known as *lifing studies*). |
| **Movable Property** | All property which is intended to be, and is, moved from time to time from one location to another. |
| **Net Income Before Recapture and Taxes (NIBR&T)** | The annual net income remaining after deducting all operating expenses but before deducting other charges such as recapture, debt service, and property taxes.  For property tax appraisal purposes, NIBR&T is capitalized into an indicator of value using various income capitalization techniques. |
| **New Construction** | Any addition to real property, whether land or improvements (including fixtures) since the last lien date; any alteration of land or improvements (including fixtures) since the last lien date that constitutes a major rehabilitation thereof or which converts the property to a different use. |

| Term | Definition |
|------|-----------|
| **Nondocumented Vessel** | Any vessel not required to be documented. |
| **Nonmandatory Audit** | Audits not required by law, but authorized by section 470 and Rule 192 (e). |
| **Operating Expenses** | The periodic expenditures necessary to maintain the real/personal property and continue production of the effective gross income, assuming prudent and competent management; sometimes referred to as "allowable expenses." |
| **Outliers** | Sample items with extreme values that do not appear to be representative of the population from which they were drawn (or not in the same proportion as indicated by the sampling frequency). |
| **Parameters** | Set of physical properties that describes a population such as the mean, number of transactions in the population, standard deviation, etc. |
| **Percent Good** | The complement of depreciation; if a property is 20 percent depreciated, its percent good is 80 percent.  Percent good refers to the portion of benefits remaining in an asset compared to the total benefits when new. |
| **Personal Property** | All property except real property (section 106). |
| **Physical Deterioration** | Form of depreciation.  The loss in utility and value due to some physical deterioration in the property; considered curable if the cost to cure it is equal to or less than the value added by curing it. |
| **Population** | A group of units with some characteristics in common.  The total units from which the sample is drawn. |
| **Potential Gross Income** | The total income of a property before deducting vacancy and collection losses or operating expenses. |
| **Processing Program** | Software used to develop and implement the specific applications which the computer is to perform.  Its operation is possible only through the facilities provided by the basic operational program (or control program).  It is not fundamental to the functioning of the computer. |
| **Property** | Property includes all matters and things—real, personal, and mixed—that are capable of private ownership. |
| **Random Sample** | Sample where every unit still remaining in the population has an equal chance of selection on each draw. |
| **Real Property** | The possession of, claim to, ownership of, or right to the possession of land, all mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto, and improvements; in California property tax law, the term is synonymous with "real estate." |

| Term | Definition |
|------|------------|
| **Recapture** | The return of invested capital; in real estate investments, capital may be returned gradually as part of the annual income; it may be recaptured all or in part through resale of the property, or through a combinations of both.  The variety of the methods of recapture require the various capitalization techniques. |
| **Regular Assessment Roll** | Roll covering period starting July 1 of the current calendar year to June 30 of the next year.  Assessment period for the regular roll must be completed on or before July 1. |
| **Replacement Cost** | The cost required to replace an existing property with a property that has equivalent utility. |
| **Reproduction Cost** | The cost required to reproduce an exact replica of an existing property. |
| **Reversion** | A lump-sum benefit in property that an investor receives or expects to receive at the termination of an investment. |
| **Sale Price** | The amount of money a buyer agrees to pay and a seller agrees to accept in an exchange of property rights; sale price is based on a particular transaction, not necessarily on what the typical buyer would pay or the typical seller would accept. |
| **Sales Tax** | A state or local-level tax on the retail sale of specified property or services.  It is a percentage of the cost of such.  Generally, the purchaser pays the tax, but the seller collects it, as an agent for the government.  Various taxing jurisdictions allow exemptions for purchases of specified items, including certain foods, services, and manufacturing equipment.  If the purchaser and seller are in different states, a use tax usually applies. |
| **Salvage Value** | The value of property at the end of its economic life in its present use. |
| **Sample** | Subset of a given population; any number of units drawn from a population. |
| **Sampling** | Statistical method which enables one to make observations regarding an entire group of items (population) based on a study of a smaller sub-set (sample) of this group. |
| **Scarcity** | The present or anticipated under-supply of an item relative to the demand for it. |
| **Secured Property** | Property on the secured roll. |
| **Secured Roll** | That part of the assessment roll containing state assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of taxes. |
| **Service Life** | Period of time (or service) extending from the date of installation to the date of retirement from service. |

| Term | Definition |
|------|-----------|
| **Short-Term Lease** | Lease of property on a daily, weekly, or other short-term basis (defined as a period of six months or less). |
| **Situs** | The place where property is legally situated, the more or less permanent location of the property. |
| **Statistical Sample** | Sample where the selection of the items to be included is independent of the sample and one that provides a means of establishing the sample size objectively and a means of objectively appraising the sample results. |
| **Statute of Limitations** | Time period during which an assessment can be made.  See section 532. |
| **Stratification** | Physical segregation of the population into homogeneous groups with the expressed purpose of improving sample efficiency and/or sample reliability. |
| **Structure** | An edifice or building, an improvement whose primary use or purpose is for housing or accommodation of personnel, personalty, or fixtures and has no direct application to the process or function of the industry, trade, or profession. |
| **Structure Items** | Integral parts of the structure.  Improvement that has a primary use or purpose for housing or accommodation of personnel, personalty, or fixtures and has no direct application to the process or function of the industry, trade, or profession. |
| **Stub Survivor Curve** | An incomplete survivor curve, that is, one which does not extend to zero percent surviving because of a lack of retirement data. |
| **Supplemental Assessment** | An assessment of the full cash value of property as of the date a change in ownership occurs or new construction is completed which establishes a new base year value for the property or for the new construction. |
| **Supplies** | Property used up in the normal operation of a business, but which are not intended for sale or lease. |
| **Survivor Curve** | Curve showing the property surviving in service at successive ages. The ordinates to the curve give, at any particular age, the percentage (or the actual number) surviving in service. |
| **Taxable Value** | For real property subject to article XIII A of the California Constitution, the base year full value adjusted for any given lien date as required by law or the full cash value for the same date, whichever is less, as set forth in section 51(a).  For personal property, the full cash value (market value) on the lien date each year. |
| **Tenant Improvements** | See *Leasehold Improvements.* |
| **Trade Fixture** | A type of fixture which is "trade-related." |

| Term | Definition |
|------|------------|
| **Trade Level** | Property normally increases in value as it progresses through production and distribution channels. |
| **Trade-in Allowance** | Property used for payment in whole or in part for acquisition of other property (usually older property used as partial payment for new property). |
| **True Lease** | Agreement under which an owner gives up possession and use of his/her property for valuable consideration and for a definite term and at the end of the term, the owner has the absolute right to retake, control, or convey the property. |
| **Undocumented Vessel** | Any vessel not required to be documented as defined in the context of property tax.  (See *Documented Vessel*.) |
| **Unsecured Property** | Property on the unsecured roll. |
| **Unsecured Roll** | See definition of *secured roll*.  Remainder of the roll is the unsecured roll.  The taxes are a personal liability of the owner. |
| **Use Tax** | A sales tax that is collectible by the seller where the purchaser is domiciled in a different state.  A tax on the use, consumption, or storage of tangible property, usually at the same rate as the sales tax, and levied for the purpose of preventing tax avoidance by the purchase of articles in a state or taxing jurisdiction which does not levy sales taxes or has a lower rate. |
| | A levy on privilege of using, within taxing state, property purchases outside the state, if the property would have been subject to the sales tax had it been purchased at home.  Such tax ordinarily serves to complement sales tax by eliminating incentive to make major purchases in states with lower sales taxes; it requires resident who shops out-of-state to pay use tax equal to sales tax savings. |
| **Utility** | The capacity of goods to evoke a desire for possession, wantedness, want-satisfying power. |
| **Value** | The power of one commodity to command other commodities in exchange, a ratio of exchange, present worth of future net benefits. |
| **Vehicle** | A device by which any person or property may be propelled, moved, or drawn upon a highway, excepting a device moved exclusively by human power or used exclusively upon stationary rails or tracks.  See text for discussion of assessable and exempt vehicles. |
| **Vessel** | Every description of watercraft used or capable of being used as a means of transportation on water. |
| **Yield** | The return on investment. |

| Term | Definition |
|------|-----------|
| **Yield Capitalization** | A capitalization method used to convert future benefits to present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that reflects the investment's income pattern, value change, and yield rate. |
| **Yield Rate** | A measure of investment return (usually annualized) that is applied to a series of incomes to obtain the present value of each; examples are the interest rate, the discount rate, the internal rate of return, and the equity yield rate. |

# BIBLIOGRAPHY

American Society of Appraisers. *Appraising Machinery and Equipment*: American Society of Appraisers, 1989.

Appraisal Institute. *The Dictionary of Real Estate Appraisal*. 3rd ed. Chicago: Appraisal Institute, 1993.

California State Board of Equalization, *Sales & Use Tax Manual*, September 1999.

Ehrman, Kenneth A., Esq. and Flavin, Sean, Esq. *Taxing California Property*. 3rd ed. 3 vols. New York: Clark Boardman Callaghan, 1989.

Marshall & Swift Publications, *Marshall Valuation Service*, October 2001.

Marston, Winfrey, and Hemstead, *Engineering Valuation and Depreciation*, McGraw-Hill, 1953.

Miller, Harry D and Starr, Marvin B., *Current Law of California Real Estate,* 2nd Ed., San Francisco: Bancroft-Whitney Co., 1989 and 1998 Supplement.

U.S. Department of Labor Statistics. *BSL Handbook of Methods.* Bulletin 2490, 1997.

U.S. Food and Drug Administration*, Glossary of Computerized System and Software Development Terminology* (www.fda.gov).

U.S. Food and Drug Administration. *Internationally Harmonised Guide for Active Pharmaceutical Ingredients (API), Good Manufacturing Practice, Draft,* U.S. Food and Drug Administration, September 1997.

U.S. Food and Drug Administration – Center for Devices and Radiological Health, *Code of Federal Regulations*, Title 21 – Food and Drugs, Revised as of April 1, 2001 (www.accessdata.fda.gov).