| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| Robert J. Feinstein | |
| Bradford J. Sandler | |
| Paul J. Labov | |
| Colin R. Robinson | |
| PACHULSKI STANG ZIEHL & JONES LLP | |
| 780 Third Avenue, 34th Floor | |
| New York, NY 10017 | |
| Telephone: (212) 561-7700 | |
| Facsimile: (212) 561-7777 | |
| rfeinstein@pszjlaw.com | |
| bsandler@pszjlaw.com | |
| plabov@pszjlaw.com | |
| crobinson@pszjlaw.com | |
| | |
| *Counsel to the Plan Administrator* | |
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*,[1] | Case No. 23-13359 (VFP) |
| Debtors. | (Jointly Administered) |

**Order Filed on October 24, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

**DATED: October 24, 2023**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtor's proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.

**ORDER APPROVING AGREEMENT OF SALE
WITH 550 MONTGOMERY INVESTMENTS LLC**

The relief set forth on the following pages, numbered three (3) through nine (9), is

**ORDERED**.

(Page | 3)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

Upon the *Notice of Filing of Agreement of Sale with 550 Montgomery Investments LLC* (the "Sale Notice"),[2] by Michael Goldberg, plan administrator ("Plan Administrator"), appointed pursuant to the *Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* [Docket No. 2160] (the "Plan") as of the Effective Date, for entry of an order (this "Order"), approving the Agreement of Sale (as defined below) by and between the Plan Administrator and 550 Montgomery Investments LLC ("Purchaser"), substantially in the form attached hereto as **Exhibit 1** (together with all schedules, exhibits, and ancillary documents related thereto, in each case, as may be amended, modified or supplemented from time to time in accordance with the terms thereof, collectively, the "Agreement of Sale") providing for the sale to Purchaser of the Property, which includes (i) Real Property, including certain real property located at 2436 Penny Road, Claremont, County of Catawba and State of North Carolina, and (ii) Personal Property; and granting related relief, all as more fully set forth in the Sale Notice and Agreement of Sale; and the Court having entered the *Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA, and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief* [Docket No. 92] (the "Bidding Procedures Order") in the chapter 11 cases of the above-captioned debtors and debtors in

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Sale Notice and the Agreement of Sale.

(Page | 4)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

possession (collectively, the "Debtors"); and the Plan Administrator, as the sole representative of the Wind-Down Debtors, having the authority pursuant to the Plan to liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets, including the Property, in accordance with the Bidding Procedures; and the Court having jurisdiction to consider the Sale Notice and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Sale Notice in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Sale Notice is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Sale Notice was appropriate pursuant to the Plan and under the circumstances and no other notice need be provided; and this Court having reviewed the Sale Notice and Agreement of Sale and having heard the statements in support of the relief requested therein at a hearing, if necessary, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Plan, and as further described in the Sale Notice, establish just cause for the relief granted herein; and upon all of the proceedings had before the Court, if any, and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT:**

A.    The Agreement of Sale was negotiated, proposed, and entered into by the Plan Administrator and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Plan Administrator nor the Purchaser has engaged in any conduct

(Page | 5)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

that would cause or permit the Agreement of Sale to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

B.    The Purchaser is consummating the sale of the Property in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is not an "insider" of any Debtor or the Wind-Down Debtors (as defined under section 101 (31) of the Bankruptcy Code). The Purchaser has proceeded in good faith in all respects in connection with the sale of the Property. The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

C.    The total consideration provided by the Purchaser, upon the terms and conditions set forth in the Agreement of Sale is the highest and best offer received by the Debtors and the Plan Administrator and constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Property for purposes of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the other laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

D.    The Wind-Down Debtors are the sole and lawful owners of the Property. The Property constitutes property of the Debtors' estates and title thereto is vested in the Wind-Down Debtors within the meaning of section 541(a) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Property to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Property, which transfer vests or will vest the Purchaser with all right, title, and interest of the Wind-Down Debtors to the Property free and clear of (a) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy

(Page | 6)

| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

Code) and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "Liens") and (b) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Purchaser's interests in the Property, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (b), the "Claims"), and (c) all other encumbrances or interests (collectively, as set forth in clauses (a) through (c), the "Claims, Encumbrances, and Interests") relating to, accruing or arising any time prior to entry of this Order, with the exception of any such Liens or Claims that are expressly assumed by the Purchaser or otherwise permitted under the Agreement of Sale (the "Permitted Encumbrances").

| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

E.      The Purchaser is not a continuation of, or successor to, the Debtors in any respect, and there is no continuity of enterprise between the Debtors and the Purchaser.

F.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of judgment as set forth herein.

**THE COURT HEREBY ORDERS THAT:**

1.      The Agreement of Sale and all other ancillary documents, and all of the terms and conditions thereof are hereby approved pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

2.      The transactions contemplated by the Agreement of Sale are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale, unless such authorization and the sale is duly stayed pending such appeal. The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

3.      Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Plan Administrator is authorized to transfer the Property to the Purchaser in accordance with the terms of the Agreement of Sale and such transfer shall constitute a legal, valid, binding, and effective

(Page | 8)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

sale and shall vest the Purchaser with title to the Property. Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, other than Permitted Encumbrances, the Property shall be sold free and clear of all Claims, Encumbrances and Interests of any kind or nature whatsoever, with all such Claims, Encumbrances and Interests (as applicable) to attach to the cash proceeds of the Purchase Price ultimately attributable to the property against or in which such Claims, Encumbrances and Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Claims, Encumbrances and Interests had prior to the sale, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

4.      The Plan Administrator is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Plan, the Sale Notice and the Agreement of Sale.

5.      Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order and any and all other documents and instruments necessary and appropriate to consummate the sale of the Property to the Purchaser.

6.      This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing officers, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Property.

(Page | 9)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER APPROVING AGREEMENT OF SALE WITH 550 MONTGOMERY INVESTMENTS LLC |

7.      This Order constitutes a final order within the meaning of 28 U.S.C. §158(a). Notwithstanding any provision in the Bankruptcy Rules or Local Rules to the contrary, for cause shown, pursuant to Bankruptcy Rule 6004(h), this Order shall not be stayed, shall be effective immediately upon entry, and the Plan Administrator and the Purchaser are authorized to close the sale immediately upon entry of this Order.

8.      The Sale Notice shall be deemed good and sufficient notice of the approval of the Agreement of Sale and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

9.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## Exhibit 1

**Agreement of Sale**

## AGREEMENT OF SALE

**THIS AGREEMENT OF SALE** (this "Agreement"), made as of the 2nd day of October, 2023, ("Effective Date") by and between **BED BATH & BEYOND INC.,** a New York corporation, having an office at 650 Liberty Avenue, Union, NY 07083 ("Seller") and **550 Montgomery Investments LLC,** a Delaware Limited Liability Company, having an address at 108 Lakeland Avenue, Dover, Kent County, Delaware 19901 ("Buyer"), sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

**WHEREAS**, Seller is the owner of the real property and improvements more particularly described in Exhibit A hereto and in Section 2 below (the "Property");

**WHEREAS**, Seller, along with its affiliated debtors and debtors in possession, has filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

**WHEREAS**, Seller has been granted power and authority by the Bankruptcy Court to sell the Property and Seller has engaged A&G Realty Partners and JLL ("Auction Consultants") to conduct a sale of the Property by public auction or otherwise, and Buyer is the successful bidder for the Property;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby covenant and agree as follows subject only to an order of the Bankruptcy Court approving this Agreement:

## W I T N E S S E T H :

**NOW, THEREFORE,** in consideration of the mutual promises herein made, it is agreed as follows:

1.    **RECITALS.**  The recitals set forth above are incorporated by reference as if fully set forth at length herein.

2.    **SALE.**  Seller agrees to sell, and Buyer agrees to purchase, for the Purchase Price (as defined in Section 3 hereof), subject to the terms and conditions of this Agreement, all of the right, title and interest of Seller in the Property, comprising:

(a)    Real Property.  That certain real property located at 2436 Penny Road, Claremont, County of Catawba and State of North Carolina (the "State"), as more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Land"), together with: (1) all improvements located thereon (the "Improvements"); (2) all rights, benefits, privileges, easements, tenements, hereditaments, rights-of-way and other appurtenances thereon or in any way appertaining thereto, including all mineral rights, development rights, air and water rights; and (3) any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land (collectively, the "Real Property"); and

(b)    Personal Property.  All of the equipment, machinery, fixtures, furniture, furnishings, supplies and other personal property, now or hereafter located on or affixed to the Real Property, and any replacements or substitutions therefor, including, but not limited to, the Inventory listed

on Exhibit "B" hereto and the Seller Deliverables listed on Exhibit "C" hereto (collectively, the "Personal Property").

**3.** **PURCHASE PRICE.** The Purchase Price of the Property shall be Four Million and 00/100 ($4,000,000) Dollars (herein referred to as the "Purchase Price") payable as follows:

(a) Upon execution and delivery of this Agreement, Buyer shall deposit in immediately available funds with the Stewart Title Guaranty Company, as "Escrow Agent," the sum of FOUR HUNDRED THOUSAND and 00/100 ($400,000.00) Dollars (together with all interest accrued thereon, the "Deposit"), which shall be maintained by Escrow Agent in an interest bearing account pursuant to the provisions of Section 16 hereof; and

(b) At Closing the balance of the Purchase Price shall be paid in immediately available funds by wire transferring such balance into an account designated by Seller, subject to the adjustments and pro-rations described in Section 13 hereof.

TIME IS OF THE ESSENCE for the delivery of the Deposit. Upon making the Deposit, the Deposit shall be non-refundable and Buyer shall have no further rights thereto, except as otherwise expressly set forth in this Agreement. Concurrently herewith, Buyer shall notify Escrow Agent of its Federal Tax Identification number.

**4.** **CLOSING DOCUMENTS.**

(a) At Closing, Seller shall execute and/or deliver to Buyer:

(i) a deed without covenants ("Deed") conveying the Real Property subject to no exceptions other than the Permitted Exceptions (as defined in Section 5(a) hereof) on the basis that as of Closing, the Title Company (as defined in Section 5(a) hereof), shall insure title as set forth in this Agreement;

(ii) an affidavit of title, the form and substance of which shall be subject to the reasonable approval of the Title Company (as defined in Section 5A hereof);

(iii) a bill of sale, if applicable, conveying all of Seller's right, title and interest in and to the Personal Property, free and clear of liens or encumbrances ("Bill of Sale");

(iv) a closing statement;

(v) an affidavit of Seller certifying that Seller is not a "foreign person", as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended;

(vi) such organizational and authorizing documents of Seller as reasonably shall be required by the Title Company to evidence Seller's authority to execute this Agreement and any documents to be executed by Seller at Closing and to consummate the transaction contemplated by this Agreement; and

(vii) such other instruments as reasonably may be required by the Title Company to effectuate the within transaction.

(b) At Closing, Buyer shall execute and/or deliver to Seller:

(i) the balance of the Purchase Price;

(ii)  a closing statement;

(iii)  such organizational and authorizing documents of Buyer as reasonably shall be required by the Title Company to evidence Buyer's authority to execute this Agreement and any documents to be executed by Buyer at Closing and to consummate the transaction contemplated by this Agreement;

(iv)  a certificate updating Buyer's representations and warranties set forth in this Agreement, as of the Closing Date; and

(v)  such other instruments as reasonably may be required by the Title Company to effectuate the within transaction.

5.    **TITLE**.

(a)    Buyer, at its expense, shall obtain a title insurance commitment ("Title Commitment") from Stewart Title Guaranty Company ("Title Company") doing business in the state in which the Real Property is located ("State") insuring marketable title (as hereinafter defined) to the Real Property.  For the purposes of this Agreement, "marketable title" shall be deemed to be such title as the Title Company shall insure at standard rates and subject only to the usual printed exceptions and such other exceptions as may be approved in writing by Buyer or not objected to by Buyer as hereinafter provided (collectively, the "Permitted Exceptions").  Buyer, within ten (10) days from the date hereof, shall forward to Seller a true copy of its Title Commitment and all underlying title documents and shall specify any alleged defects as set forth in said Title Commitment ("Title Defect(s)"), failing which Buyer shall be deemed to have waived all title objections, time being of the essence of Buyer's obligation to so notify Seller.  Subject to Section 5(c) hereof, Seller shall have the right, but shall not be obligated nor required, to commence litigation or to incur any expenditure of monies:  (i) to cause any such defect(s) to be removed as a Title Defect; or (ii) to cause a similarly recognized title insurance company to insure marketable title in accordance herewith without additional premium; and Buyer shall not have any claim, cause or right of action against Seller, at law or in equity, whether for damages, specific performance or otherwise, by reason of Seller's failure to clear any such Title Defects.  If Seller causes marketable title to be insured for the Real Property, Buyer shall be required to complete the purchase of the Real Property as herein provided.

(b)    If Seller shall be unwilling or unable to cause marketable title to be insured, Buyer shall have the right to accept such title as Seller shall be able to convey or to terminate this Agreement, by notice delivered to Seller within five (5) days following receipt of the written notice from Seller of Seller's response to Buyer's notice of the alleged Title Defects.  If Buyer shall fail to so notify Seller, then Buyer shall be deemed to have elected to accept title without any abatement or reduction in the Purchase Price or in any of the other terms and conditions herein set forth.  Seller agrees to convey such title as is described herein or as Buyer shall be willing or shall be deemed to accept in accordance with the provisions hereof. If Buyer elects to terminate this Agreement, the sole remaining obligations hereunder shall be upon Escrow Agent to return the Deposit pursuant to the provisions of Section 16 hereof, except for Surviving Obligations (as defined in Section 19 hereof).

(c)    If, at Closing there are liens or encumbrances against the Property that are removable by the payment of monies, Seller shall satisfy and remove said liens and encumbrances at Closing which Seller may do, at its option, by either (i) delivering to Title Company instruments acceptable to Title Company in recordable form sufficient to satisfy and remove such liens or encumbrances of record, together with the cost of recording or filing said instruments; or (ii) depositing or causing to be deposited with the Title Company sufficient monies reasonably acceptable to the Title Company to insure satisfying such liens or encumbrance and obtaining and recording of such satisfactions and the issuance of title

insurance to Buyer free of any such liens or encumbrances without additional premium.  In neither event shall such lien or encumbrance constitute a Title Defect permitting Buyer to terminate this Agreement.

      **6.**    **POSSESSION.**  Seller shall deliver to Buyer, and Buyer shall accept, possession of the Property from Seller at the time of Closing and thereafter, Buyer shall be entitled to take any rents, issues and profits of the Property to its own use.

      **7.**    **RISK OF LOSS AND CONDEMNATION**.

      (a)    If, prior to Closing, the Property or any part thereof is subject to an eminent domain or condemnation proceeding, Buyer shall have a period of five (5) business days after receipt of Seller's notice of such event within which to elect, by written notice to Seller and to Title Company, to terminate this Agreement.  Upon such termination, the Deposit shall be returned to Buyer, and this Agreement shall become null and void and neither party shall have any claim against the other by virtue of this Agreement, except for the Surviving Obligations (as defined in Section 19 below).  If no such election is timely made, Buyer shall be deemed to have waived its rights under this Paragraph 13(a), provided, however, that Buyer shall be entitled, upon Closing, to all of the proceeds of any condemnation award, and Seller shall execute and deliver all documents reasonably requested of Seller in order to effectuate same.

      (b)    If, prior to Closing, all or any portion of the Property shall be damaged or destroyed by fire, earthquake or other casualty and the cost of repairing such damage will exceed Fifty Thousand Dollars ($50,000), Buyer may elect to (1) terminate this Agreement by written notice to Seller and Title Company given within thirty (30) days of the date of the casualty, whereupon the Deposit shall be returned to Buyer and neither party shall have any further obligations hereunder except for the Surviving Obligations, or (2) close the sale, whereupon at Closing Buyer shall be entitled to all insurance proceeds payable with respect to the damage or destruction and the Purchase Price shall be reduced by any deductible amount under such insurance.  If the cost to repair the damaged portion of the Property is less than or equal to Fifty Thousand Dollars ($50,000), the purchase and sale contemplated hereby shall nonetheless close on the Closing, and the Purchase Price shall be reduced by the reasonable cost to repair such damage or destruction as reasonably determined by Seller and Buyer, and Seller shall be entitled to all insurance proceeds payable with respect to the damage or destruction.  If Buyer does not give notice to Seller and Title Company of the exercise of its right to terminate the Agreement within said thirty (30) day period, Buyer shall be deemed to have elected to close the transaction; provided, however, that Buyer shall be entitled, upon Closing, to all of the proceeds of any insurance award and the Purchase Price shall be reduced by any deductible amount under such insurance, and Seller shall execute and deliver all documents reasonably requested by Buyer in order to effectuate same.

      **8.**    **REPRESENTATIONS**.

      (a)    In order to induce Seller to enter into this Agreement, Buyer warrants and represents the following:

      (i) it has the full power and authority to perform all of its obligations under this Agreement, and has been duly organized, is validly existing and is in good standing under the laws of the State of Delaware, and, at Closing will be qualified to do business in the State of North Carolina;

      (ii) it has the right, power and authority, without the joinder of any other person or entity, to enter into, execute and deliver this Agreement and to perform all duties and obligations imposed on it under this Agreement;

(iii) this Agreement is a valid obligation of Buyer and is binding upon it in accordance with the terms hereof; the persons or parties executing this Agreement on its behalf have been duly authorized and empowered to bind it to this Agreement;

(iv) it has not: (a) made a general assignment for the benefit of creditors; (b) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition by its creditors; (c) suffered the appointment of a receiver to take possession of all, or substantially all, of its assets; (d) suffered the attachment or other judicial seizure of all, or substantially all, of its assets; (e) admitted in writing its inability to pay its debts as they come due; or (f) made an offer of settlement, extension or composition to its creditors generally;

(v) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions or provisions of any agreement to which it is a party or by which it is bound;

(vi) to its actual knowledge, there are no existing or pending litigation or insolvency actions or claims with respect to its ability to consummate the proposed transaction;

(vii) it has the financial capacity to pay the Purchase Price and all other costs and expenses in connection with the purchase of the Property; and

(viii) (A) Buyer presently is and at all times during the term hereof shall remain in compliance with all regulations and requirements of OFAC (as hereinafter defined), and any authorizing statute, law or executive order, including without limitation, the Executive Order (as hereinafter defined) relating to money laundering, anti-terrorism, trade embargos and/or economic sanctions; (b) Buyer and each person or entity owning an interest in Buyer is: (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"); and (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States; (c) none of the funds or other assets of Buyer constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined); (d) no Embargoed Person has any interest of any nature whatsoever in Buyer (whether directly or indirectly); (e) none of the funds of Buyer have been derived from any unlawful activity with the result that the investment in Buyer is prohibited by law or that this Agreement is in violation of law; and (f) Buyer has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all applicable times. The term "Embargoed Person" means any person, entity or government subject to trade restrictions pursuant to United States law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any executive orders or regulations promulgated thereunder, and all amendments thereto, with the result that the investment in Buyer is prohibited by law or that Buyer is in violation of law;

(B) Buyer covenants and agrees: (a) to comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect; (b) to immediately notify Seller if any of the representations, warranties or covenants set forth in this subparagraph (B) no longer is true or has been breached or if Buyer has a reasonable basis to believe that they no longer may be true or have been breached; (c) not to use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and

Prohibiting Transactions With Persons, Who Commit, Threaten to Commit, or Support Terrorism and all amendments thereto) (herein referred to as "Executive Order") to make any payment due to Seller under this Agreement; and (d) at the request of Seller, to provide such information as may be requested by Seller to determine such compliance by Buyer with the terms hereof; and

(C)    Buyer hereby acknowledges and agrees that its inclusion on the List at any time prior to Closing, shall be a default of this Agreement.  The representations of subparagraphs (A), and (B) shall survive Closing.

## 9.    <u>CONDITION OF PROPERTY</u>.

(a)    Buyer acknowledges and agrees that Seller has not made, does not make and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether expressed or implied, oral or written, past, present or future (other than as otherwise represented pursuant to and as limited by this Agreement or the documents delivered at Closing), of, as to, concerning or with respect to: (i) the value, nature, quality or condition of the Property, including, without limitation, the water, soil and geology; (ii) the income to be derived from the Property; (iii) the suitability of the Property for any and all activities and uses which Buyer or any tenant may conduct thereon; (iv) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body; (v) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property; (vi) the manner or quality of the construction or materials incorporated into the Property; (vii) the manner, quality, state of repair or lack of repair of the Property; (viii) compliance with any environmental protection, pollution, safety or land use laws, rules, regulations, orders or requirements, including the existence in or on the Property of Hazardous Materials (as hereinafter defined); (ix) any other matter with respect to the Property; or (x) merchantability or condition of operation of the Personal Property or its fitness for any particular purpose, the design or condition of the Personal Property; the quality or capacity of the Personal Property; workmanship or compliance of the Personal Property with the requirements of any law, rule, specification or contract pertaining thereto; patent infringement or latent defects.  Additionally, no person acting on behalf of Seller is authorized to make, and by execution hereof Buyer acknowledges that no person has made, except as set forth in this Agreement or in the documents to be delivered at Closing, any representation, agreement, statement, warranty, guaranty or promise regarding Seller and/or the Property or the transaction contemplated herein; and no such representation, warranty, agreement, guaranty, statement or promise if any, made by any person acting on behalf of Seller shall be valid or binding upon Seller unless expressly set forth herein or in the documents to be delivered at Closing.  Buyer further acknowledges and agrees that having been given the opportunity to inspect the Property, Buyer is relying and shall rely solely on its own investigation of the Property and not on any information provided or to be provided by Seller except as otherwise set forth herein, and agrees to accept the Property at Closing and waive all objections or claims against Seller arising from or related to the Property or to any Hazardous Materials on the Property.  Buyer further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information and makes no representations as to the accuracy, truthfulness or completeness of such information except with respect to a breach of any representation or warranty set forth herein.  Seller is not liable or bound in any manner by any verbal or written statement, representation or information pertaining to the Property, or the operation thereof, furnished by any real estate broker, contractor, agent, employee, servant or other person except with respect to a breach of any representation or warranty set forth herein.  Buyer further acknowledges and agrees that to the maximum extent permitted by law, it is purchasing the Property on an "AS IS", "WHERE IS" and "WITH ALL FAULTS' basis.  The provisions of this Section 9 shall survive Closing or any termination hereof.

(b)      "Hazardous Materials" shall mean any substance which is or contains: (i) any "hazardous substance" as now or hereafter defined in §101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) or any regulations promulgated thereunder, "CERCLA"; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act (42 U.S.C. §6901, et seq.) or regulations promulgated thereunder, "RCRA" or in any other applicable state or local law, ordinance, rule or regulation; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.) or in any other applicable state or local law, ordinance, rule or regulation; (iv) any gasoline, diesel fuel, or other petroleum hydrocarbons; (v) any asbestos and asbestos containing materials, in any form, whether friable or non friable; (vi) any polychlorinated biphenyls; (vii) any radon gas; or (viii) any additional substances or materials which now are or hereafter shall be classified or considered to be hazardous or toxic under Environmental Requirements (as defined in Section 9(c) hereof), or the common law, or any other applicable laws relating to the Property.  Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property: (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

(c)      "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

(d)      By proceeding with this transaction Buyer, on behalf of itself and all of its officers, directors, shareholders, employees, members, partners, representatives and affiliated entities (collectively, the "Releasors"), hereby expressly waives and relinquishes any and all rights and remedies Releasors now or hereafter may have against Seller, Seller's affiliates, Seller's investment advisors, the partners, trustees, beneficiaries, shareholders, members, managers, directors, officers, employees, agents and representatives of each of them, and their respective heirs, successors, personal representatives and assigns (the "Seller Parties"), whether known or unknown, which may arise from or be related to: (a) the physical condition, quality, quantity and state of repair of the Property and the prior management and operation of the Property; (b) any due diligence documents delivered by Seller, or its representatives, to Buyer (the "Property Documents"); (c) the Property's compliance or lack of compliance with any federal, state or local laws or regulations; and (d) any past, present or future presence or existence of Hazardous Materials on, under or about the Property or with respect to any past, present or future violation of any Environmental Requirements now or hereafter enacted, regulating or governing the use, handling, storage or disposal of Hazardous Materials, including, without limitation, (i) any and all rights and remedies Releasors now or hereafter may have pursuant to any Environmental Requirements and (ii) any and all claims, whether known or unknown, now or hereafter existing, with respect to the Property under any Environmental Requirements.

Buyer, on behalf of itself and the other Releasors, hereby assumes all risk and liability resulting or arising from, or relating to the ownership, use, condition, location, maintenance, repair, or operation of, the Property from and after Closing and Seller Parties shall not be liable for any special, direct or indirect, consequential, punitive or other damages resulting or arising from or relating to the ownership, use, condition, location, maintenance, repair or operation of the Property.

The foregoing waivers, releases and agreements by Buyer, on behalf of itself and Releasors, shall survive Closing and the recordation of the Deed and shall not be deemed merged into the Deed upon its recordation.

(e)    Seller shall not be responsible for curing any governmental violations, notice of which hereafter is received, either prior to or subsequent to Closing, nor shall Buyer be entitled to any abatement, reduction or other modification in the Purchase Price or in any of the other terms and conditions hereunder in the event of the occurrence and/or the receipt of notice of any such governmental violation, nor shall Seller prior to Closing, be responsible for performing any work or fulfilling any other obligation in connection with obtaining a Certificate of Occupancy or any other governmental approval in connection with the sale of the Property or resulting from the use or physical condition of the Property.  At its sole cost and expense, Buyer shall be responsible for performing any work or fulfilling any other obligation in connection with obtaining a Certificate of Occupancy or any other governmental approval in connection with the purchase of the Property, or resulting from the use or physical condition of the Property.

**10.** **CLOSING OF TITLE.**  The closing of title herein sometimes referred to as the "Closing") shall take place on October 31, 2023 (the "Closing Date"), TIME BEING OF THE ESSENCE.  The Closing shall be held in escrow through the Title Company by delivery of the closing documents to the Title Company on or prior to the Closing or such other place or manner as the parties hereto may mutually agree.

**11.** **ASSIGNMENT.**  This Agreement may not be assigned, pledged or otherwise transferred by Buyer without the prior consent of Seller, which consent may be withheld in Seller's sole discretion, except to an entity in which Buyer and/or its principals maintains at least a fifty-one (51%) percent interest in such entity, provided that concurrently with any such assignment, Buyer notifies Seller thereof and of the name and address of the assignee and sends to Seller a true copy of such executed assignment, together with a written agreement by the assignee to assume all of the terms, promises and conditions of this Agreement on the part of Buyer, and an agreement by Buyer (in form satisfactory to Seller) that it shall remain liable for all of the terms, promises and conditions of this Agreement on Buyer's part to be performed hereunder.

**12.** **BROKERAGE.**  Any commission or fee of any type due and payable to a broker on behalf of Buyer as a result of this Agreement or related to the sale of the Property shall be paid solely by Buyer. Seller shall have no obligation to fund or cause the funding of any commission or fee due to any broker acting on behalf of Buyer. This paragraph shall survive the Closing.

**13.** **COSTS AND PRORATIONS**.

(a)    Buyer will pay the following costs of Closing this transaction:

(i)  all Deed recordation fees and expenses and all mansion, realty transfer fee or similar taxes or any other fees or taxes due in connection with the transfer of the Property or recordation of the Deed and whether or not the same are not required by statute to be paid by Seller;

(ii)  all settlement fees and other charges of the Title Company due in connection with the closing of this transaction;

(iii)  the premiums, title search fees and all other costs relating to the issuance of the title policy, and any and all special endorsements issued in connection with this transaction, whether pursuant to the title commitment or otherwise;

(iv)  the cost of any survey obtained by Buyer;

**Error! Unknown document property name.**

(v) the fees and disbursements of Buyer's counsel and any other expenses(s) incurred by Buyer or its representative(s) in inspecting or evaluating the Property or closing of this transaction;

(vi) any and all charges, fees, costs and expenses in connection with Buyer obtaining or recording any financing for the purchase of the Property;

(vii) any fees or costs payable to any governmental entity in connection with this transaction including without limitation, obtaining a Certificate of Occupancy, a Certificate of Continued Occupancy, inspection fee or any other governmental approval; and

(viii) all other costs, expenses, fees, taxes and disbursements with respect to this transaction not payable by Seller as set forth in (b) below.

(b)      Seller will pay all fees and disbursements of Seller's counsel.

(c)      Seller shall be responsible for and shall promptly pay all utility charges and similar charges with respect to the Property attributable to the period up to and including the Closing Date.  All real property ad valorem taxes, special taxes, assessments, deposits and personal property taxes shall be prorated (employing a 365-day year) between Buyer and Seller as of the Closing Date based upon the most recently available property assessment.  If such assessment is not available for the year in question, taxes shall be re-prorated when the amount thereof can be ascertained.  All assessments levied against the Property shall be paid in full by Seller on or before Closing, even if said assessments are due in installments subsequent to Closing.  If increased taxes are, after Closing, determined to be due for the year in which Closing occurs, then each party shall be obligated for the payment of its pro rata share of such additional taxes.  If increased taxes are, after Closing, determined to be due for any year prior to the year in which Closing occurs, Seller shall be obligated for the payment of such additional taxes.  If the proration at Closing is based on tax assessments and bills covering a tax parcel that is larger than but includes the Property, then the portion of such tax bills pertaining to the Property shall be determined by allocation on a per-acre basis, with appropriate allocation of taxes attributable to improvements on the assessed parcel based upon the location of same on the parcel (so that Buyer pays no taxes attributable to improvements that are not located on the Property).  All prorations, if and to the extent known and agreed upon as of the Closing, shall be paid by Buyer to Seller (if the prorations result in a net credit to Seller) or by Seller to Buyer (if the prorations result in a net credit to Buyer) by increasing or reducing the cash to be paid by Buyer at the Closing.  Any such prorations not determined or not agreed upon as of the Closing shall be paid by Buyer to Seller, or by Seller to Buyer, as the case may be, in cash as soon as practicable following the Closing.

(d)      Seller has advised Buyer that Seller intends to cease its data operations at the Property on or around September 30, 2023.  Notwithstanding that Seller will be ceasing such operations on or around September 30, 2023, Buyer has requested that Seller continue to keep operational the data systems inventory listed on Exhibit "B" hereto and the deliverables listed on Exhibit "C" hereto (the "Data Operating Systems") from the date that Seller would otherwise cease operations until Closing (the "Reimbursement Period").  Seller's only obligation with respect to this request shall be to reasonably cooperate with Buyer (and to recommend to the Seller's Bankruptcy Plan Administrator, as successor to Seller, that the Plan Administrator reasonably cooperate with Buyer) in order to effectuate an orderly transfer of the Data Operating Systems.  If Seller agrees to keep the Data Operating Systems operational for the Reimbursement Period, then, at Closing, Buyer shall reimburse Seller for the costs incurred by Seller for employees retained for the Reimbursement Period to maintain and keep operational the Data Operating Systems for the Reimbursement Period, and all other ancillary costs thereto such as utilities and insurance premiums, as such costs are set forth on Exhibit "D" hereto.

(e)    If any errors or omissions are made regarding adjustments and prorations pursuant to this Section 13, the Parties shall make the appropriate corrections promptly upon the discovery thereof. If any estimates are made at the Closing regarding adjustments or prorations, the parties shall make the appropriate correction promptly when accurate information becomes available.  Any corrected adjustment or proration shall be paid in cash to the party entitled thereto.

14.    **NOTICES.**  All notices, requests, consents, approvals, responses, waivers or other communications ("notice(s)") required or permitted to be given hereunder shall be given in writing and shall be delivered by a commercial overnight courier that guarantees next business day delivery and provides a receipt or by electronic mail, and such notices shall be addressed as follows:

|  |  |
|---|---|
| To Seller: | Bed Bath & Beyond Inc.<br>650 Liberty Avenue<br>Union, NJ 07083<br>Attn: General Counsel<br>email: David Kastin@BedBath.com |
| with a copy to: | Cole Schotz P.C.<br>Court Plaza North<br>25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Warren Usatine<br>Email: WUsatine@coleschotz.com |
| To Buyer: | 550 Montgomery Investments, LLC<br>945 Heights Blvd.<br>Houston, Texas 77008,<br>Attention:    Dr. Ishnella Kaur Azad &<br>Mathew Wells (managing member)<br>Email: iazad@5Riverscre.com &<br>mwells@wellsholdingsinc.com |
| with a copy to: | Quadros Migl & Crosby, PLLC<br>509 Branard St.<br>Houston, Texas 77006,<br>Attention: Boyd S. Hoekel<br>Email: bhoekel@qmclaw.com |
| To Escrow Agent: | Stewart Title Guaranty Company<br>1360 Post Oak Blvd, 10th Floor, MC#10-1,<br>Houston, TX 77056<br>Attention: Amanda Cash<br>Email: amanda.cash@stewart.comL<br>Phone: 713-625-8699 |

Any notice sent by the attorney representing a Party, shall qualify as notice under this Agreement.

15.    **DEFAULT; REMEDIES**.

(a)    If Buyer shall default in any manner under this Agreement, then, at Seller's option, Buyer shall forfeit to Seller all of its right, title and interest in and to the Deposit paid hereunder; and Buyer

Error! Unknown document property name.

shall have no further liability to Seller (except for the Surviving Obligations). The Parties have agreed that the actual damages suffered by Seller would be extremely difficult or impracticable to ascertain. After negotiation, the Parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the Deposit is a reasonable estimate of the damages that Seller would incur in such an event and that the aforesaid payment of the Deposit is liquidated damages hereunder and not a penalty. The provisions of this Section 15(a) shall not limit or affect any of Buyer's indemnities as provided in Sections 12, 17 and 34 of this Agreement.

(b)      If Seller shall refuse or fail to convey the Property to Buyer in violation of Seller's obligations hereunder, for any reason other than a default by Buyer under this Agreement, or otherwise shall be in default of its obligations hereunder, Buyer, as its sole remedies hereunder, shall have the right to: (i) terminate this Agreement and receive a return of the Deposit; or (ii) seek specific performance; or (iii) waive such breach or default and proceed to Closing. In the event that Buyer elects to seek specific performance under (ii) above, Buyer shall bring such action within thirty (30) days after the scheduled Closing Date, or else such remedy shall be deemed waived; and unless otherwise expressly required pursuant to this Agreement, in no event shall Seller be obligated to undertake any of the following: (1) change the condition of the Property or restore the same after any fire or casualty; (2) expend money or post a bond to remove or insure over a Title Defect or encumbrance or to correct any matter shown on a survey of the Property; (3) secure any permit, approval, or consent with respect to the Property or Seller's conveyance thereof; or (4) expend any money to repair, improve, remediate or alter the Property or any portion thereof. If Buyer shall not institute an action for specific performance within thirty (30) days after the scheduled Closing Date, time being of the essence, and Buyer has not elected to waive such default by Seller, Buyer shall be deemed to have elected to terminate set forth in (i) above.

(c)      In no event shall either party be liable to the other for any punitive, speculative or consequential damages.

## 16.   **ESCROW AGENT**.

(a)      The Deposit shall be held in escrow by Escrow Agent in one or more interest-bearing, federally insured bank accounts selected by Escrow Agent on the terms hereinafter set forth.

(b)      When Closing has occurred, Escrow Agent shall deliver the Deposit to Seller.

(c)      If Escrow Agent receives a request for the Deposit signed by Seller stating that Buyer has defaulted in the performance of its obligations under this Agreement, Escrow Agent shall submit a copy of such request to Buyer. If Escrow Agent shall not have received notice of objection from Buyer within five (5) business days after Escrow Agent has forwarded such request, Escrow Agent shall deliver the Deposit to Seller. If Escrow Agent shall receive a timely notice of objection from Buyer as aforesaid, Escrow Agent promptly shall submit a copy thereof to Seller.

(d)      If Escrow Agent receives a request signed by Buyer stating that this Agreement has been canceled or terminated, or that Seller has defaulted in the performance of its obligations hereunder, and that Buyer is entitled to the Deposit, Escrow Agent shall submit a copy of such request to Seller. If Escrow Agent shall not have received notice of objection from Seller within five (5) business days after Escrow Agent has forwarded such request, Escrow Agent shall deliver the Deposit to Buyer. If Escrow Agent shall receive a timely notice of objection from Seller as aforesaid, Escrow Agent promptly shall submit a copy thereof to Buyer.

(e)      Any notice to Escrow Agent may be sent by email by a Party or their attorney.

(f)    If Escrow Agent receives notice signed by Seller instructing Escrow Agent to pay the Deposit to Buyer, or if Escrow Agent receives notice signed by Buyer instructing Escrow Agent to pay the Deposit to Seller, Escrow Agent shall deliver the Deposit in accordance with such instructions.

(g)    If Escrow Agent shall have received a notice of objection as provided for in Sections 16(c) or 16(d) hereof within the time therein prescribed, Escrow Agent shall not comply with any requests or demands it may have received and shall continue to hold the Deposit until Escrow Agent receives either: (i) a written notice signed by both Seller and Buyer stating who is entitled to the Deposit; or (ii) a final order of a court of competent jurisdiction directing disbursement of the Deposit in a specific manner; in either of which events, Escrow Agent then shall disburse the Deposit in accordance with such notice or order. Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such requests or demands until and unless it has received a direction of the nature described in (i) or (ii) above.

(h)    Notwithstanding the foregoing provisions of Section 16(g) above, if Escrow Agent shall have received a notice of objection as provided for in Sections 16(c) or 16(d) hereof within the time therein prescribed, or shall have received at any time before actual disbursement of the Deposit a notice from either Seller or Buyer advising that litigation between Seller and Buyer over entitlement to the Deposit has been commenced, or otherwise shall believe in good faith at any time that a disagreement or dispute has arisen between the Parties hereto over entitlement to the Deposit (whether or not litigation has been instituted), Escrow Agent shall have the right, upon notice to both Seller and Buyer, (i) to deposit the Deposit with the Clerk of the Court in which any litigation is pending, and/or (ii) to take such affirmative steps, at its option, as it may elect in order to terminate its duties as Escrow Agent, including, but not limited to, the depositing of the Deposit with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Buyer is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder except for any previous gross negligence or willful default.

(i)    Escrow Agent shall have no duty to invest all or any portion of the Deposit during any period of time Escrow Agent may hold the same prior to disbursement thereof except in one or more interest-bearing accounts as aforesaid, and any disbursements or deliveries of the Deposit required herein to be made by Escrow Agent shall be with such interest, if any, as shall have been earned thereon.

(j)    Escrow Agent shall be under no obligation to deliver any instrument or documents to a court or take any other legal action in connection with this Agreement or towards its enforcement, or to appear in, prosecute or defend any action or legal proceeding which, in Escrow Agent's opinion, would or might involve it in any cost, expense, loss or liability unless, as often as Escrow Agent may require, Escrow Agent shall be furnished with security and indemnity satisfactory to it against all such costs, expenses, losses or liability.

(k)    Escrow Agent shall not be liable for any error or judgment or for any act done or omitted by it in good faith, or for any mistake of fact or law, and is released and exculpated from all liability hereunder except for willful misconduct or gross negligence.

(l)    Escrow Agent's obligations hereunder shall be as a depositary only, and Escrow Agent shall not be responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any notice, written instructions or other instrument furnished to it or deposited with it, or for the form of execution thereof, or for the identity or authority of any person depositing or furnishing same.

(m)      Escrow Agent shall not have any duties or responsibilities except those set forth in this Agreement and shall not incur any liability in acting upon any signature, notice, request, waiver, consent, receipt or other paper or document believed by it to be genuine, and Escrow Agent may assume that any person purporting to give any notice or advice on behalf of any Party in accordance with the provisions hereof has been duly authorized to do so.  Seller and Buyer hereby jointly and severally agree to indemnify and to hold and save Escrow Agent harmless from and against any and all loss, damage, cost or expense Escrow Agent may suffer or incur as Escrow Agent hereunder unless caused by its gross negligence or willful misconduct.

(n)      The terms and provisions of this Section 16 shall create no right in any person, firm or corporation other than the Parties hereto and their respective successors and permitted assigns, and no third party shall have the right to enforce or benefit from the terms hereof.

(o)      The provisions of this Section 16 shall survive Closing or the termination of this Agreement for any reason.

**17.**      **ACCESS.**  Prior to any access to the Property, Buyer or Buyer's agents will obtain and maintain not less than One Million and 00/100 ($1,000,000.00) Dollars comprehensive general liability insurance with a contractual liability endorsement which insures Buyer's indemnity obligations hereunder and which names Seller as an additional insured thereunder (a copy of which policy and proof of premium payment shall be provided by Buyer to Seller prior to undertaking any inspections of the Property.  Buyer agrees to indemnify and hold and save Seller harmless from any claim, loss, injury, liability, actual damage or expense, including reasonable attorneys' fees and costs, arising out of: (i) a breach by Buyer and/or any of the Releasors (as defined in Section 9(d) hereof) of any applicable laws, rules, regulations or ordinances, or in connection with any inspections of the Property; (ii) any access to, entry upon or activity conducted by, or on behalf of, Buyer or any Releasors with respect to or on the Property in connection with any inspections of the Property, whether or not such access, entry or activity is permitted by, in compliance with or in violation of any applicable laws, rules, regulations or ordinances; (iii) any lien, claim or levy, including construction, mechanic's, materialmen's and judgment liens, filed or pending against any portion of the Property, or title thereto, by any contractor, sub-contractor or other party having a claim against or through Buyer or any Releasor in connection with any inspections of the Property without limiting the foregoing indemnity, Buyer hereby acknowledges and agrees that Buyer's failure to cause any such lien to be released or bonded to the reasonable satisfaction of Seller within ten (10) days after receipt of notice thereof shall constitute a default hereunder); and (iv) any claims, suits, actions or the assertion of any other rights by or on behalf of any tenant, invitee, guest or other party alleging personal injury, property damage, interruption of business, nuisance or any other allegation of negligence or wrong doing in connection with any Buyer inspection of the Property (collectively, the "Indemnity Obligations").  Notwithstanding anything to the contrary herein, Buyer's Indemnity Obligations shall not be applicable to claims arising from the mere discovery of the presence of an adverse environmental or property condition not caused or negligently exacerbated by Buyer or Buyer's Representatives.

**18.**      **NO CONTINGENCY ON FINANCING.**  Buyer's obligations under this Agreement are NOT CONTINGENT upon Buyer securing any financing in the purchase of the Property.

**19.**      **SURVIVING OBLIGATIONS**.  The term "Surviving Obligations" as used herein shall mean, collectively, the Indemnity Obligations, the Confidentiality Obligations and the indemnities set forth in Sections 12 and 17 hereof, together with other obligations of the Parties which expressly survive the termination of this Agreement for any reason.

**20.**      **ENTIRE AGREEMENT.**  This Agreement constitutes the final and entire agreement between the Parties and neither Party shall be bound by any terms, conditions, statements, warranties or

representations, oral or written, not contained herein.  All understandings and agreements heretofore made between the Parties are merged in this Agreement, which alone fully and completely expresses the agreement of the Parties and may not be changed, modified, varied or terminated except by a written instrument signed by the Parties or their respective counsel.  The Parties agree that, except as and to the extent expressly provided herein, the Parties agree that none of the terms and provisions of this Agreement shall survive the delivery of the Deed and all such terms and provisions of this Agreement shall be merged into the Deed.

21.    **BINDING EFFECT.**  This Agreement shall be binding upon and shall inure to the benefit of Seller and Buyer and their respective successors and assigns, except as otherwise provided herein.

22.    **CONSTRUCTION.**  The interpretation, construction and performance of this Agreement shall be governed by the laws of the State, without regard to principles of conflict of laws.

23.    **FURTHER ASSURANCES.**  Each Party, at any time and from time to time, shall execute, acknowledge when appropriate, and deliver such further instruments and documents and take such other action as reasonably may be requested by the other Party in order to carry out the intent and purpose of this Agreement; provided, however, that the requested modifications shall be ministerial in scope and, without limitation, shall not:  (i) modify or alter in any form or manner the monetary obligation of either Party hereto; or (ii) materially increase any non-monetary obligations or materially and adversely affect the rights (monetary or non-monetary) of either Party under this Agreement, as determined by the affected Party in its reasonable judgment.  Further, Seller:  (i) shall not be obligated to agree in any form or manner, to any additional indemnity agreements or any representations, warranties or guaranties which are not already expressly agreed upon in this Agreement; (ii) shall not be obligated to agree to any changes to the environmental agreements set forth herein or in any other document; and (iii) shall not allow others to act as attorney-in-fact for Seller.  The provisions of this Section 23 shall survive Closing or the termination of this Agreement for any reason.

24.    **CAPTIONS.**  The captions preceding the Sections of this Agreement are intended only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

25.    **WAIVER OF CONDITIONS**.

(a)    Buyer and Seller each shall have the right, in the sole and absolute exercise of its discretion, to waive any of the terms or conditions of this Agreement which are strictly for its respective benefits and to complete Closing in accordance with the terms and conditions of this Agreement which have not been so waived.  Unless otherwise specifically provided herein, any such waiver shall be effective and binding only if in writing and if made and delivered at or prior to Closing.

(b)    No waiver by either Party of any failure or refusal by the other Party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal by the other Party so to comply.

26.    **SEVERABILITY.**  The terms, conditions, covenants and provisions of this Agreement shall be deemed to be severable.  If any clause or provision herein contained shall be adjudged to be invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, the same shall be deemed to be severable and shall not affect the validity of any other clause or provision herein, but such other clauses or provisions shall remain in full force and effect, unless such provisions shall relate to the Purchase Price or other monies to be paid hereunder.  In such event, either Party, on not less than ten (10) days' notice to the other,  shall have the right to terminate this Agreement on the date specified in such

notice, whereupon the Deposit shall be released to Buyer and neither Party shall have any further obligation to the other, except for Surviving Obligations.

**27.** **GENDER.** As used in this Agreement, the masculine gender shall include the feminine or neuter genders and the neuter gender shall include the masculine or feminine genders, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

**28.** **NO PUBLIC DISCLOSURE.** Prior to Closing, all press releases or other dissemination of information to the media or responses to requests from the media for information relating to the transaction contemplated herein shall be subject to the prior consent of both Parties hereto. After Closing, this covenant shall terminate and no longer be binding on either Party.

**29.** **NO PARTNERSHIP.** Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest.

**30.** **BANKRUPTCY COURT APPROVAL AND SALE ORDER**. The parties' obligations set forth in this Agreement are expressly subject to approval by the Bankruptcy Court ("Bankruptcy Court Approval") pursuant to an Order (the "Sale Order") approving the sale to Buyer. The Sale Order shall include factual findings and ordering provisions that provide (i) title to the Property shall be transferred to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, with all such liens, claims and encumbrances to attach to the proceeds of the sale; (ii) Buyer is purchasing the Property in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections offered thereby; and (iii) that stay provided under Rule 6004(g) of the Federal Rules of Bankruptcy Procedure shall be waived to the extent necessary to permit a Closing to occur as soon as possible after entry of the Sale Order.

**31.** **RECORDATION.** Buyer and Seller agree not to record this Agreement or any memorandum hereof.

**32.** **PROPER EXECUTION.** The submission by Seller to Buyer of this Agreement in an unsigned form shall be deemed to be a submission solely for Buyer's consideration and not for acceptance and execution. Such submission shall have no binding force and effect, shall not constitute an option or an offer, and shall not confer any rights or obligations upon Buyer or impose any obligations upon Seller irrespective of any reliance thereon, change of position or partial performance. The submission by Seller to Buyer of this Agreement for execution by Buyer and the actual execution thereof and delivery to Seller by Buyer similarly shall have no binding force and effect on Seller or Buyer unless and until Seller shall have executed this Agreement and the Deposit shall have been received by Escrow Agent.

**33.** **BUSINESS DAYS.** If any date herein set forth for the performance of any obligations by Seller or Buyer or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (as hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term "Legal Holiday" shall mean any local or federal holiday on which post offices are closed in the jurisdiction in which the Property is located.

**34.** **LIKE-KIND EXCHANGE.** Seller, at the request of Buyer, agrees to cooperate reasonably with Buyer so that Buyer may acquire the Property as "replacement property" in a transaction intended to qualify in whole or in part as a tax-deferred exchange pursuant to Section 1031 of the Tax Code. In order to implement such exchange: (i) Buyer, upon notice to Seller, shall assign its rights, but not its obligations, under this Agreement to a third party designated by Buyer to act as a qualified intermediary; (ii) Seller shall, and hereby agrees to, acknowledge such assignment and to accept payment of all or a

portion of the Purchase Price from the intermediary; and (iii) at Closing, Seller shall convey the Property directly to Buyer; provided, however, that: (w) Seller's cooperation shall be limited to the actions specifically contemplated by the foregoing; (x) none of Seller's rights or obligations hereunder shall be affected or modified in any way, nor shall any time periods contained herein be affected in any way; (y) Seller shall have no responsibility or liability to Buyer or any other person for the qualification of Buyer's purported exchange transaction under Section 1031 of the Tax Code, other than solely as a result of Seller's failure to perform the actions specifically contemplated in this Section; and (z) Seller shall not be required to incur any additional expense (unless reimbursed by Buyer) or liability (other than to a *de minimis* extent) as a result of such cooperation, exchange or assignment. Buyer hereby agrees to and shall save, defend, indemnify and hold Seller harmless from and against any and all liability incurred by Seller as a result of any such cooperation, exchange or assignment. The provisions of this Section 34 shall survive Closing.

35. **LIMITED LIABILITY.** The obligations of Seller under this Agreement or any documents executed pursuant hereto or in connection herewith, including, without limitation, the Deed, and the Bill of Sale are intended to be binding only on the Property of Seller and shall not be personally binding upon, nor shall any resort be had to any other property of Seller or any properties of the Seller Parties. The provisions of this Section 35 shall survive Closing or termination of this Agreement, for any reason.

36. **NO THIRD PARTY BENEFICIARY.** The provisions of this Agreement are not intended to benefit any third parties.

37. **EQUITABLE OWNERSHIP.** Prior to the conveyance of the Property hereunder, Buyer shall not acquire, obtain or assume any equitable ownership of or title to the Property by reason of this Agreement.

38. **PREPARATION OF AGREEMENT.** This Agreement shall not be construed more strongly against either Party regardless of who is responsible for its preparation.

39. **JOINT OBLIGATIONS.** All obligations and liabilities of Seller and Buyer set forth herein shall be joint and several if more than one Seller or Buyer is named herein.

40. **COUNTERPARTS.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which will constitute the same agreement. The counterparts of this Agreement may be executed and delivered by facsimile or other electronic signature (including portable document format, email, and/or Docusign or similar methods) by either of the parties and the receiving party may rely on the receipt of such document so executed and delivered electronically or by facsimile as if the original had been received. Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form but having attached to it one or more additional signature pages.

41. **EXHIBITS.** All Exhibits referred to herein are a part of the Agreement.

42. **UTILITIES.** Seller shall transfer all utilities into Buyer's name on or before the Closing Date, and Seller shall ensure that the utility services, including electrical service to the Property, remain on at the Property through the end of the Closing Date.

**[no further text on this page; signature page follows]**

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed and delivered by duly authorized persons on the day and year first above written.

SELLER:

**BED BATH & BEYOND INC.**, a New York corporation now known as 20230930-DK-BUTTERFLY-1, INC.

By:_____
Name:  Michael Goldberg
Title:    Plan Administrator

BUYER:

550 Montgomery Investments, LLC

By:_____
Name:    Mathew Wells and Ishnella Azad
Title:    Managing Member & Member

## JOINDER AND CONSENT OF ESCROW AGENT

An original, fully executed copy of this Agreement, together with the Deposit, has been received by Escrow Agent this \_\_\_ day of _____, 2023, and by execution hereof Escrow Agent covenants and agrees to be bound by the terms of this Agreement.

Stewart Title Guaranty Company,

By:_____
Name:
Title:

## LIST OF EXHIBITS

EXHIBIT "A"        Legal Description

EXHIBIT "B"        Inventory List

EXHIBIT "C"        Seller Deliverables

EXHIBIT "D"        List of Reimbursement Period Costs

## EXHIBIT "A"

### Legal Description

Lying and being situate in Catawba County, North Carolina, and more particularly described as follows:

Beginning at a 5/8" rebar on the Eastern right of way of Penny Rd. said rebar being located N. 05°58'43" E. 600.14' from a railroad spike at the intersection of Penny Rd. and Kelly Boulevard. Also being the common corner of Lots 1 and 3 of Plat Book 71, Page 156. Thence from said beginning corner N. 02°20'16" E. 600.00' to a computed point on the Eastern right of way of Penny Rd. Thence with the arc of a circular curve to the left having a radius of 1977.38' a chord bearing and distance of N. 02°05'42" E. 16.75' to a 1/2" rebar the Southwest corner of Claremont NA Cable Systems, LLC Deed Book 2781, Page 594. Thence leaving the right of way of Penny Rd. and with Claremont NA Cable Systems, Inc. for the next 2 calls (1) S. 88°08'52" E. 292.71' to a 1/2" rebar. (2) S. 40°25'26" E. 372.08' to a 5/8" rebar Northwest corner of Lot 2 Plat Book 71, Page 156. Said rebar being located N. 40°25'26" W. 90.00' from a 5/8" rebar in the line of Claremont NA Cable Systems, LLC and with the Western line of Lot 2 Plat Book 71, Page 156 S. 02°20'16" W. 346.06' to a 5/8" rebar, Thence with the line of said Lot 2 again N. 87°39'44" W. 206.11' to a 5/8" rebar the common corner between Lots 2 and 3 of Plat Book 71, Page 156. Thence leaving Lot 2 and with the line of Lot 3 N. 87°39'44" W. 339.14' to the point and place of beginning containing 6.95 acres according to a survey by Honeycutt Land Surveying, PA entitled "ALTA/ACSM Land Title Survey for: Bed Bath and Beyond Inc." dated 6/26/2012, File No: B-2609.

Together with the rights and easements for the benefit of and running with the said parcel, all as set forth in a certain Reciprocal Easement and Operation Agreement between CP at CIBP, LLC and Bed Bath & Beyond, Inc., dated November 14 , 2012, and recorded on November 16 , 2012 in Deed Book 3158, Page 37, Catawba County Registry.

A-1

**EXHIBIT "B"**

**INVENTORY LIST**

65548/0002-46144178v3

**Error! Unknown document property name.**

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

DocuSign Envelope ID: 59FB54F1-F129-42D7-902D-4084A5FEC14D

**EXHIBIT "C"**

**SELLER DELIVERABLES**

1.      Active Building Management System ("BMS")

2.      Active Access Control Systems to include cameras

3.      Delivery of access controls, credentials, etc. to ensure seamless transfer of network infrastructure.

4.      License Transfers, passwords, login credentials to ensure a seamless transition.

5.      Uptime and security until Closing.

6.      Data wipe of all BBB proprietary information without negative impact to building or equipment function.

C-1

EXHIBIT "D"
List of Reimbursement Period Costs

- Sewer, water and garbage
- Power
- Staffing  (2 FTE)
- Circuits (2 internet only)
- Insurance

65548/0002-46144178v6