**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Robert J. Feinstein (admitted *pro hac vice*)
Bradford J. Sandler
Paul J. Labov
Colin R. Robinson
Judith Elkin (*pro hac vice* admission pending)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
rfeinstein@pszjlaw.com
bsandler@pszjlaw.com
plabov@pszjlaw.com
crobinson@pszjlaw.com
jelkin@pszjlaw.com

*Counsel to the Plan Administrator*

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*,[1] | Case No. 23-13359 (VFP) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE PLAN ADMINISTRATOR TO MOTION OF COMMON STOCK
EQUITY INTEREST HOLDERS FOR CERTIFICATION OF DIRECT APPEAL TO
THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

Michael Goldberg, as plan administrator (the "Plan Administrator"),[2] files this objection

(the "Objection") to the *Emergency Motion of Common Stock Equity Interest Holders For*

*Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit* [Docket

No. 2450 and 2450-1] (the "Certification Motion"), filed by Neely Das and Gabriel Rostom

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtor's proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.

[2] The Plan Administrator has been appointed pursuant to the Debtors' confirmed Plan, as defined herein.  The Plan Administrator is responsible for and has the authority to administer certain post-confirmation responsibilities under the Plan on behalf of the Wind-Down Debtors (as defined in the Plan).

("Movants").  In support of his Objection, the Plan Administrator submits the Declaration of

Michael Goldberg (the "Goldberg Declaration") and states as follows:

## I.    PRELIMINARY STATEMENT

1.    Movants are two common stockholders of Debtor Bed Bath & Beyond, Inc.

("BBB"), the pre-Plan effective date public company that owned or was affiliated with each of the

other Debtors.  Under the Debtors' confirmed Plan, which went effective on September 29, 2023,

all common stock (the "Stock") of BBB was cancelled.[3]  Movants' various objections to

confirmation of the Plan were overruled by this Court after they were provided with ample

opportunity to present their arguments.  Those arguments were rejected on the grounds Movants

cited no legal authority – nor could they as there is none – for their objections and the Court itself

could not find any.  Movants did not present any evidence at the confirmation hearing in support

of the factual allegations included in their plan objections or arguments, and instead relied, as they

do here, on a variety of internet searches, social media postings, rumors, and the like that do not

constitute admissible or reliable evidence.

2.    Movants are now appealing the Confirmation Order.  As part of that appeal,

Movants seek certification of their appeal directly to the Third Circuit.  The Certification Motion

should be denied because it is based on the same legally unsustainable arguments as their

objections to confirmation, none of which involve unsettled questions of law, issues of public

importance, or resolution of conflicting opinions and none of which will materially advance the

progress of these cases.

---

[3] *See* Goldberg Declaration confirming that all equity was cancelled on the Effective Date of the Plan and DTC has
administratively cancelled the CUSIP numbers associated with the common equity interests in BBB, including those
held by Movants.

3.      Movants' arguments are based on a fundamental misunderstanding of bankruptcy law, and flow from the flawed premise that shares of stock in a corporation are owned by the corporation such that the stock becomes "property of the estate" within the meaning of section 541 of the Bankruptcy Code (11 U.S.C. § 101, *et seq.*) upon the filing of a bankruptcy petition.  This premise is legally incorrect.  No authority exists under either applicable state law or the Bankruptcy Code for Movants' flawed premise that shares of a corporation's stock are owned by the corporation.  The applicable law here is anything but unsettled, and renders Movants' merits arguments utterly baseless.  Therefore, the Certification Motion should be denied.

## II.      **BACKGROUND FACTS**

### A.      **The Bankruptcy Case**

4.      On April 23, 2023, each of the above-captioned debtors, including BBB (the "Debtors") filed a voluntary petition under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of New Jersey (the "Court").  During these chapter 11 cases, the Debtors continued to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases were procedurally consolidated and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  No party requested the appointment of a trustee or examiner in these chapter 11 cases.

5.      On May 5, 2023, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee").  *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 218].

### B.    The Plan and Confirmation

6.      On July 21, 2023, the Debtors filed their *Motion For Entry of an Order (I) (A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Plan, (C) Approving the Forms of Ballots and Notices in Connection Therewith, (D) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing and Certain Dates and Deadlines With Respect Thereto, and (E) Granting Related Relief, and (II) (A) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (B) Granting Related Relief* [Docket No. 1438] (the "Conditional DS Motion") seeking conditional approval of the adequacy of the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates,* [Docket No. 1437] (as amended, the "Disclosure Statement"), in order to commence solicitation of votes on the Debtors' *Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* [Docket No. 1429] (as amended, the "Plan"), and to schedule a consolidated hearing to consider both the adequacy of the Disclosure Statement on a final basis and confirmation of the Plan.

7.      On August 2, 2023, the Court entered its Order approving the Conditional DS Motion [Docket No. 1716] (the "Conditional DS Order"), which among other things, conditionally approved the Disclosure Statement, established procedures for soliciting votes for or against the Plan, established deadlines for the filing of objections to both the Plan and the Disclosure Statement, and consolidated the hearing on final approval of the Disclosure Statement and confirmation of the Plan as permitted by section 105(d)(2)(B)(vi) of the Bankruptcy Code.  As set forth in the Conditional DS Order, the dates established for notice of the hearing on the Disclosure

Statement and Plan, solicitation of votes on the Plan, and filing objections to the Disclosure

Statement and Plan were consistent with the Bankruptcy Rules.

8.      On August 28, 2023, Movants moved to vacate [Docket No. 2068-1] (the "Motion

to Vacate")[4] parts of the Conditional DS Order on the grounds that, in pertinent part, (a) there was

a scrivener's error on the opt-out form for parties deemed to reject the Plan;[5] (b) the claims of

certain bondholders who were also holding borrowed shares of the Debtors' Stock were disallowed

because the Stock constituted property of the Debtors' estate which had not been returned, and

such claimants were therefore, ineligible to vote on the Plan; and (c) cancelling the Stock before

it was turned over to the Debtors was "not fair and equitable" in accordance with section 1129(b)

of the Bankruptcy Code. *See* Motion to Vacate.  These same arguments were repeated in Movants'

September 12, 2023 Objection to the Plan and Disclosure Statement [Docket No. 2192] (the

"DS/Plan Objection" and with the Motion to Vacate, the "Plan Objections").  The "evidence"

included in the Plan Objections were references to numerous SEC filings, charts, articles and

excerpts of social media postings showing that a certain bondholder had published articles on

hedging/short selling investment strategies and owned both bonds and Stock in the Debtors, and

publicly-available market data on short selling positions in BBB Stock.

9.      On September 11, 2023, the Debtors filed their *Second Amended Joint Chapter 11*

*Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* [Docket No. 2160],[6] and on September

---

[4] On August 8 and August 10, 2023, Movants filed manually and then electronically Docket No. 1878 which was an objection to the Conditional DS Motion (the "DS Objection").  By the time the DS Objection was filed on the docket, the Conditional DS Order had already been entered.  On August 31, 2023, in response to an objection filed by the Debtors indicating the DS Objection was late filed, Movants filed Docket No. 3125 (the "DS Objection Reply") indicating the efforts they had made, as *pro se* litigants, to obtain ECF privileges and file the DS Objection prior to the August 1, 2023 hearing on the Conditional DS Motion.  The inability of Movants to timely file their DS Objection prior to the hearing on the Conditional DS Motion and entry of the Conditional DS Order resulted in Movants filing the Motion to Vacate.

[5] The "scrivener's error" objection was resolved on September 7, 2023, when Debtors' counsel informed Movants that they would not be included in the Plan definition of "Releasing Parties."  *See* Transcript at 55:5-14.

[6] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

12, 2023, the Court held a hearing on the final approval of the Debtors' Disclosure Statement and

confirmation of the Plan (the "Confirmation Hearing").  *See* Transcript of Confirmation Hearing

[Docket No. 2175] (the "Transcript").  Movants' Motion to Vacate was treated as an objection to

both final approval of the Disclosure Statement and confirmation of the Plan.  Transcript at 15:6-

17.  That day, the Debtors also filed their *Proposed Findings of Fact, Conclusions of Law, and*

*Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Second*

*Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* [Docket No.

2162] in support of the Plan.

10.    During the Confirmation Hearing, the Court heard extensive argument on Movants'

Plan Objections that the Plan is not "fair and equitable" under section 1129(b)(2) on the grounds

that (a) the borrowed Stock held by certain claimants who were also bondholders was subject to

turnover under section 542, and (b) therefore, those claimants had disallowed claims and were not

eligible to vote on the Plan.[7]  *See* Transcript at 55:15-56-58:23.

11.    In support of their Plan Objections, Movants argued that the Stock is considered

"valuable property of the estate,"[8] and that under section 542 of the Bankruptcy Code, such Stock

is "returnable" to the Debtors.  Transcript at 57:1-4.   Therefore, Movants argued (the Plan

Administrator does not pretend to understand these contentions, but merely repeats them) that the

bondholder creditors holding such Stock are "ineligible to vote to accept or reject the plan," and

their claims are "disallowed." *Id.* at 57:5-10.  Movants maintained the Plan is thus not "fair and

---

[7] Notwithstanding Movants' repeated argument that certain bondholders who were also stockholders were not entitled
to vote because of their alleged bad acts, Movants never filed a motion to designate the votes of these claimants as
permitted under section 1126(e) of the Bankruptcy Code.
[8] In making this argument, Movants relied on the *Final Order (I) Approving Notification and Hearing Procedures for*
*Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 587] which
granted the related Stock Transfer Motion [Docket No. 23] (the "Trading Order") to restrict stock trading so as to
preserve the Debtors' net operating losses (NOL).  The Stock Transfer Motion indicated that the Debtors' NOL was a
valuable asset of the estate; ***not that the Stock itself was valuable***.  The Court reiterated this point at the Confirmation
Hearing.  Transcript at 58:10-17; 63:2-22.

equitable" because it allowed for "disallowed claims" to vote on it, "while it unfairly affects the shareholders who are not allowed to basically get the greatest possible value of their shares which would have occurred if all the borrowed shares were returned." Transcript at 57:15-24.  Movants did not present any evidence at the Confirmation Hearing in support of the factual allegations included in their Plan Objections as to how "borrowed Stock," even if returned to the Debtors rather than its owner, would have value to the Debtors such that the result would be a recovery to Movants.

12.    After hearing Movants' arguments, this Court stated that it "couldn't find any authority for the proposition that authorized stock of a debtor corporation is property of the estate and the debtor corporation as opposed to the party holding the stock." Transcript at 56:3-9.  The Court explained that there is no "determination that the underlying shares of stock are a valuable asset or property of the estate. The NOLs were valuable to the, or the potential NOLs were valuable to the bankruptcy estate[,] not the underlying shares of the debtor corporation."  The Court further found there is no "foundation for the turnover argument," and "no foundation for or legal authority supporting [the Plan Objections]."  *Id.* at 58:3-20.  Accordingly, the Court overruled Movants' Plan Objections.

13.    On September 14, 2023, the Court entered an Order confirming the Plan [Docket No. 2172] (the "Confirmation Order").  On September 29, 2023 (the "Effective Date"), the Debtors filed the *Notice of (I) Entry of the Order (A) Approving the Disclosure Statement on a Final Basis and (B) Confirming the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates and (II) Occurrence of Effective Date* [Docket No. 2311].

14.    Prior to confirmation, the Debtors had conducted a number of court-approved asset sales which generated certain sale proceeds. The Plan established the process for distributing those

sale proceeds as well as monetizing any remaining assets of the Debtors.  The Plan vests the Debtors' assets in the Wind-Down Debtors, who, at the direction of the Plan Administrator and with oversight from the Oversight Committee, will be responsible for monetizing and thereafter distributing such assets to Holders of Allowed Claims in accordance with the Waterfall provisions of the Plan.

15.    Pursuant to the Plan, on the Effective Date, the Plan Administrator became the sole representative of the Wind-Down Debtors and assumed responsibility for purposes of resolving certain claims, performing claims reconciliation, and objecting to claims in accordance with the terms of the Plan Administrator Agreement.  Pursuant to the Plan, all Interests in BBB (as defined in the Plan), including the Stockholders' Interests in the Debtors, were "cancelled, released, and extinguished."  *See* Plan, Art. III.B.9.

16.    Pursuant to Section IV.D of the Plan, the Stock was cancelled as of the Effective Date without need for any further action.  On October 18, 2023, DTC effectuated the administrative cancellation of the CUSIP numbers associated with the Stock, as well as the Debtors' other securities.  *See* Goldberg Declaration.

**C.    The Appeal and the Motion to Stay the Confirmation Order**

17.    On September 29, 2023, Movants filed their Notice of Appeal of the Confirmation Order [Docket No. 2305] (the "Appeal").  *See* Case No. 23-13359-VFP.  On Appeal, Movants allege the Plan is not "fair and equitable" under section 1129(b)(2) of the Bankruptcy Code for the same reasons argued in their Plan Objections; namely, that the Plan improperly allowed bondholders who also owned Stock to vote on the Plan because (a) the Stock is property of the Debtors' estates pursuant to section 541 of the Bankruptcy Code, and (b) therefore, the Stock is subject to turnover pursuant to section 542 of the Bankruptcy Code.  Certification Motion at ¶ 20.

On October 13, 2023, Movants filed their *Emergency Motion of Common Stock Equity Interest Holders for Stay and Associated Relief Pending Appeal Pursuant to Fed. R. Bankr. P. 8013(d) and 8007* [Docket Nos. 2455, 2471] (the "Stay Motion"), seeking a stay of the Confirmation Order pending their Appeal.[9]  Contemporaneously with the Stay Motion, Movants filed this Certification Motion.

## III.    ARGUMENT AND AUTHORITIES

### A.    Legal Standard

18.    The standard for granting a motion for the direct appeal of a bankruptcy court order to the court of appeals is set out in 28 U.S.C. § 158(d)(2) which permits a direct appeal if one of three criteria are met:

> (i)    the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii)    the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii)    an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

28 U.S.C. § 158(d)(2)(A); *see also In re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 708, Bankr. D. Del. 2016).  If the bankruptcy court determines any of these issues in the affirmative, it may certify a direct appeal, after which it is within the discretion of the circuit court to accept or reject the certification.  *Id.*  Certification of direct appeal is not merited in this case as none of the statutory criteria exist here.

19.    Movants pose their issues on appeal as follows:

> (1)    Whether authorized and outstanding stock of a debtor corporation is property of the estate after the commencement of a bankruptcy case pursuant to section 541 of the Bankruptcy Code?

---

[9] Contemporaneously herewith, the Plan Administrator has filed a separate objection to the Stay Motion.

(2)     *If* the answer to the first question is yes, whether authorized and outstanding stock of a debtor corporation **considered as property of the estate** is of consequential value or benefit to the estate, so that it is subject to turnover pursuant to section 542 of the Bankruptcy Code?

(3)     *If* the answer to (2) is yes, then does the Plan fail the fair and equitable test because, according to Movants, the Plan allows distributions to holders of claimants whose claims are disallowed because they hold stock in the debtor corporation that is subject to turnover?

Certification Motion at ¶ 20.  As posed by Movants, the issues raised are not independent issues, but must be reviewed in sequence, with an affirmative finding required before the next issue can be addressed.[10]

20.     All of Movants' Appeal arguments flow from the flawed premise that stock is owned by the corporation that issues it rather than the stockholder.  Because this premise is incorrect as a matter of settled law, none of the standards for a direct appeal can be met.  The stock of a public corporation is owned by the stockholder, not the corporation.  This is not an unsettled legal concept, but a recognized truism.  Movants have not cited **any** authority to support their assertion that stock is owned by the issuing entity as opposed to its holder, let alone conflicting or unresolved authority meriting immediate review by the Third Circuit.

---

[10] Many of Movants' arguments are difficult to understand or based on law that does not apply to this case.  For example, in numerous sections of the Certification Motion, Movants cite to the Debtors' alleged violation of certain provisions of the Bankruptcy Act (the bankruptcy law that existed prior to adoption of the current Bankruptcy Code in 1989).  As the Bankruptcy Act is clearly not applicable here, this Objection does not address arguments made under the Bankruptcy Act.  *See Notes to Enactment*, 11 U.S. C. § 101 (Nov. 6, 1978) (This statute applies to cases filed after October 1, 1979).

**B.** **The Confirmation Order Does Not Involve a Question of Law for which there is No Controlling Authority of the Third Circuit or the Supreme Court.**

(1)    Stock is Owned by the Stockholder, not the Corporation that Issues It.

21.    The ordinary definition of shareholder provides that a shareholder is: "the owner of one or more shares of stock in a corporation, commonly also called a 'stockholder.'" *Law.com Legal Dictionary*, available at https://dictionary.law.com/Default.aspx?selected=1948.   As this Court stated in overruling Movants' Plan Objections on exactly the same grounds asserted here: "I, frankly, couldn't find any authority for the proposition that authorized stock of a debtor corporation is property of the estate and the debtor corporation as opposed to the party holding the stock." Transcript at 56:3-6.  Movants do not cite any authority for their proposition here.

22.    The fact that stock is owned by the person who holds it is neither a controversial nor unresolved legal concept.  As stated by the Securities and Exchange Commission ("SEC"), the federal agency that regulates the public debt and equity markets:

> ***Shareholders, or stockholders, are the owners of a company's outstanding shares***, which represents a residual portion of the corporation's assets and earnings as well as a percentage of the company's voting power. Stockholders have a right to participate in the distribution of corporate assets in the form of dividends (if they are paid) and possibly through the sale of their holdings at a profit on the stock market. Individuals may become shareholders by buying common stock in corporations through brokers or directly from the company (if they offer a direct investment plan). ... ***If a company goes bankrupt, however, common shareholders are last in line to be repaid (behind creditors and preferred shareholders)***.

SEC Investor Publications, *Bankruptcy: What Happens When Public Companies Go Bankrupt* (Feb. 2, 2009) available at: https://www.sec.gov/reportspubs/investor-publications/investorpubsbankrupt (emphasis added).  The SEC actively participated in these cases and appeared at the Confirmation Hearing.  At the Confirmation Hearing, the SEC raised issues relating to the Plan's opt-out release and gatekeeper provisions, but ***never*** argued or

11

supported Movants' argument that the Stock of BBB was property of the estate which had to be turned over to the Debtors before it could be cancelled. *See* Transcript at 30-34. This is unsurprising insofar as settled law holds to the contrary.[11]

23.    Movants' reliance on case law indicating that section 541 of the Bankruptcy Code defines property of the estate broadly is not determinative as none of these cases specifically finds that a debtor's publicly held stock is property of the debtor. Section 541, which defines property of the estates as the "legal or equitable interests of the debtor in property as of the commencement of the case" does not create a property interest in something which was never owned by the debtor.

24.    The Supreme Court has weighed in on the scope of property of the estate. In *Butner v. U.S.*, the Supreme Court stated: "Property interests are created and defined by state law" and the analysis does not change because an entity is in bankruptcy. *Butner v. United States*, 440 U.S. 48, 55 (1979). BBB was a public company incorporated under the laws of the State of New York. New York recognizes that stock is property of the stockholder, not the corporation. *Zyskind v. FaceCake Mktg. Tech., Inc.*, 973 N.Y.S.2d 34, 36 (App. Div. 1st Dept. 2013). As stated by the Attorney General for the State of New York: "Common stock - also called common shares, capital shares, or capital stock - represents **units of ownership in a corporation**."[12]

---

[11] Underscoring the absurdity of Movants' position, if stock became property of the estate upon the filing of a petition, continued trading would be forbidden as a violation of the automatic stay of section 362, yet post-bankruptcy stock trading is common. FINRA: *What a Corporate Bankruptcy Means for Shareholders* (Nov. 16, 2021) available at https://www.finra.org/investors/insights/what-corporate-bankruptcy-means-shareholders ("[T]he securities of companies in bankruptcy can and often do keep trading, as there is no federal law that prohibits trading stocks in bankrupt companies."); SEC Investor Publications, *Bankruptcy: What Happens When Public Companies Go Bankrupt* ("A company's securities may continue to trade even after the company has filed for bankruptcy under Chapter 11."). It was for this reason that the Court entered the Trading Order – to prevent trading in the Stock that would impair the NOL.

[12] Office of the New York State Attorney General: *Understanding Common Investments – Investing in a Public Company*, available at: https://ag.ny.gov/resources/individuals/investing-finance/stocks#:~:text=Stock%20represents%20a%20share%20of,ownership%20privileges%20of%20a%20stockholder (emphasis added).

25.     The Third Circuit has a well-established body of case law analyzing section 541 and the parameters of property of the estate.  Given the number of public company bankruptcies filed in Delaware as well as other jurisdictions, one would surmise that if the issue of stock ownership by the debtor was as controversial and unsettled as Movants contend, it would have been raised long ago before other courts both within and outside of the Third Circuit.  Yet that is not the case.  While recognizing that property of the estate is construed broadly, the Third Circuit has indicated that the section ***does not create new property rights or value where there previously were none***.  *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 750-751 (3d Cir. 2013) (cites omitted).

26.      In *Majestic Star Casino*, an individual who was the shareholder of an entity that owned one of the debtors, had successfully petitioned the IRS to revoke the non-debtor entity's status as an "S" corporation, which effectively revoked the flow through tax status of the debtor.  The result was a tax liability of one of the debtors.  The debtors, through their creditors, successfully argued to the bankruptcy court that the S corporation status was property of the estate. The Third Circuit disagreed.

> But § 541 defines property only in terms of "legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  It goes without saying that the "right" of a debtor to place its tax liabilities on a non-debtor may turn out to have some value, but that does not mean that such a right, if it exists, is property. Capacious as the definition of "property" may be in the bankruptcy context, we are convinced that it does not extend so far as to override rights statutorily granted to shareholders to control the tax status of the entity they own.

*Id.* at 757.  Thus, the Third Circuit recognizes that the stock of a company is owned and controlled by the shareholder, and property of the estate does not extend to rights the debtor does not own or control.

DOCS_NY:48784.5 08728/003

26.     Movants' allegations regarding allegedly abusive short selling by certain claimants who were also bondholders do not change this analysis. While Movants' Certification Motion, like their Plan Objections, is replete with a hodgepodge of commentary from the internet on alleged short selling activities, the evils of short selling and the arguable impact this investment strategy might have on driving companies into bankruptcy, Movants cite no authority determining that the existence of short selling in a corporation's shares changes the ownership of borrowed stock from the holder to the corporate issuer. Short selling is a practice where an investor borrows the stock of a corporation through their brokerage company from another stock owner with a requirement that the stock eventually be returned.[13] The investor then sells the stock, retaining the cash proceeds. The short seller hopes that the price of the stock will fall over time, providing an opportunity to buy back the stock at a lower price than the original sale price. The short seller then replaces the borrowed stock with the cheaper newly-acquired stock, and any money left over is profit to the short seller.

27.     While this practice may be controversial[14] and is currently subject to new SEC regulations designed to curb alleged abuses,[15] the practice is not illegal and most importantly, for purposes of the issue presented here, it does not change the ownership of the Stock from the holders who are borrowing/lending or buying/selling the Stock to the issuing corporation, BBB. Movants cite no authority for their argument that short selling

---

[13] In Paragraph 26 of the Certification Motion, Movants reference, without citation to any authority, a requirement that the short sellers must turnover their borrowed shares to the Debtors. But the borrowed shares are owned by the person who loaned them, not BBB, so it is unclear why a short seller's borrowed shares should become property of the estate any more than any other shares of BBB Stock.

[14] *Why is Short Selling Legal? A Brief History*, available at https://www.investopedia.com/articles/investing/110614/why-short-selling-legal-brief-history.asp#:~:text=Short%20Selling%20Becomes%20Legitimate&text=This%20rule%20prevented%20short%20selling,check%20on%20upside%20price%20swings.

[15] https://www.sec.gov/news/press-release/2023-221.

changes the ownership of stock from the holder to the corporation that issued it as there is none. And while the issue of short selling securities and its impact on bankruptcy filings may be of public importance, establishing such policy is not within the purview of this Court or any appellate court in determining whether the Debtors' Plan met the standards for confirmation.

28.    Therefore, the Stock of BBB held by its public shareholders, which was cancelled as of the Effective Date of the Plan, was never property of the estate. Movants' first and gateway issue in its Appeal – that a company's stock becomes property of the estate upon the filing of a bankruptcy – is simply incorrect. No unresolved or conflicting question of law exists that would require certification of the Appeal for direct appeal to the Third Circuit.

29.    While it is unnecessary to address the remaining issues raised by Movants as they all require an initial determination that stock issued by a debtor company belongs to the debtor company, the remaining issues will be addressed below.

(2)    <u>The Debtors Were Not Required to Sue All their Shareholders to Get Back their Stock before Cancelling the Stock Pursuant to the Plan.</u>

31.    Movants' second argument on Appeal – that the Debtors were required to file a section 542 turnover proceeding to get back the Stock before cancelling it – is based on Movants' fundamental misunderstanding of the chapter 11 process. Chapter 11 provides a federal law statutory methodology for a corporate debtor to restructure or liquidate in an efficient manner. Within certain express parameters, as set out in sections 1121-1129 of the Bankruptcy Code, a corporate debtor can sell its assets, convert debt to equity, cancel existing equity, assume or reject contracts, and take such other actions necessary to either liquidate or restructure to enable it to pay its creditors and interest holders in accordance with the statutory absolute priority rule.

15

32.    The Debtors' Plan does not contain any features that are uncommon in corporate liquidating plans.  The Debtors' principal assets were sold pre-confirmation, and the proceeds of those sales as well as any residual assets (mostly litigation) will be liquidated by the Plan Administrator who will distribute the resulting cash to creditors in accordance with the Plan Waterfall, which conforms to the absolute priority rule and the settlement contained in the Plan. Transcript at 10:3-11.

33.    Section 542 is entitled "Turnover of property of the estate" and thus clearly only relates to property of the estate.  *See* 5 COLLIER ON BANKRUPTCY P 542.03 (16th Ed. 2023).  As discussed above, BBB's Stock was never property of the estate, so it would be illogical and circular for the Debtors to have to seek turnover of such Stock.

34.    As a preliminary matter, a section 542 turnover action is an adversary proceeding[16] where the plaintiff/debtor would have the burden of proof that (i) property being held by the third party (here, the stockholders) was the debtor's property, and if so, then (ii) that the property (the Stock) was property the debtor could use, sell, or lease.  The Debtors here could never meet this burden of proof.  Nor could the Debtors ever show the property (Stock) had any consequential value, as the Debtors' liabilities far exceeded the value of their assets, and the intent was to cancel the Stock as there was no residual value available for equity.

35.    In regard to the treatment of BBB Interest Holders, the Plan provides: "Each Allowed Interest in BBB shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in BBB shall be entitled to any recovery or distribution under the Plan on account of such Interests."  Plan at III.B.9.  Cancellation of stock held by out

---

[16] *In re Denby-Peterson*, 941 F.3d 115, 130-31 (3rd Cir. 2019) (Section 542 is not self-effectuating and trustee must file adversary proceeding to recover property of the estate which is only recoverable upon a judicial determination that turnover is appropriate); *see also* Fed. R. Bankr. P. 7001(1).

of the money equity is standard practice in many corporate bankruptcy cases[17] and is expressly permitted under section 1123(a)(5)(F) of the Bankruptcy Code. *See* SEC Investor Publications, *Bankruptcy: What Happens When Public Companies Go Bankrupt* ("***In most instances, the company's plan of reorganization will cancel the existing equity shares.*** This happens in bankruptcy cases because secured and unsecured creditors are paid from the company's assets before common stockholders.") (emphasis original).

36.     Movants do not elaborate which subsection of section 542 is applicable to its arguments but based on Movants' references to "consequential value or benefit to the estate",[18] the Plan Administrator surmises Movants are claiming section 542(a) applies.  Section 542(a) requires an entity "in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  The Debtors' debt far exceeded the value of its assets – a finding not appealed by Movants.  Therefore, even if for some reason, BBB's Stock could be considered property of the Debtors' estates, as such Stock was not property which the Debtors could "use, sell, or lease," and such Stock had no consequential value, no turnover action is necessary to treat Interest Holders under the Plan.

37.     Nothing in the Bankruptcy Code requires a debtor to jump through a series of procedural hoops to cancel its out of the money equity.  Despite the enumerable bankruptcy cases involving public companies that cancel their old equity as part of a plan, no court has ever so

---

[17] *See, e.g., In re Neiman Marcus Group*, Case No. 20-32519 (Bankr. S.D. Tex) [Docket No. 1795]; *In re Lucira Health, Inc.*, Case No. 23-10242 (Bankr. D. Del.) [Docket No. 562-1]; *In re Party City Holdco*, Case No. 23-90005 (Bankr. S.D. Tex.) [Docket No. 1701]; *In re Revlon, Inc.*, Case No. 22-10760 (Bankr. S.D.N.Y.) [Docket No. 1727]; *In re Southern Foods Group*, Case No. 19-36313 [Docket No. 3398].  In each of these cases, the public company debtor cancelled its equity through a confirmed plan and filed a corresponding Form 8-K with the SEC so indicating all equity was being cancelled upon the effective date of its plan.
[18] Certification Motion at ¶ 20.

determined, and Movants cite no legal authority for their proposition that a debtor must file a turnover action prior to cancellation of its stock pursuant to a plan. Nor has the SEC ever made this argument. Such a requirement would be circular, waste valuable estate resources and have the exact same end result – cancellation of out of the money equity. *Cf*, NY BCL § 515(a) and (b) (by implication, recognizing that stock is owned by the holder, by permitting a corporation to cancel any purchased, redeemed or otherwise reacquired shares). This issue does not meet any prong of the test for direct appeal.

(3)    The Plan Does Not Violate the Fair and Equitable Requirements of the Bankruptcy Code.

38.    Movants' third issue is that the Plan fails the fair and equitable test because, according to Movants, the Plan allowed voting by and distributions to certain bondholder claimants whose claims are disallowed because they hold Stock that is subject to turnover.[19] As with the prior issue, this issue is dependent upon **both** a finding that the Stock is property of the estate and that such Stock (which has been cancelled) is subject to turnover. Movants' argument is based on their presumption that the claims of these dual stock/bondholders are somehow automatically disallowed because they have not turned over their Stock.[20]

39.    As stated previously, there is no legal requirement that a debtor seek turnover of its own stock, regardless of how interests are treated under a plan. "In insolvent debtors, plans which cancel all equity interests and issue stock to senior creditors are theoretically sound and comply with the fair and equitable requirement." 7 COLLIER ON BANKRUPTCY P 1129.03 (16th

---

[19] This issue seems to be an attempt to invoke section 502(d) of the Bankruptcy Code which provides that a claim of a person from whom property is recoverable under section 542, can have its claim disallowed. This standard provision was included in Section IV.I.6 of the Disclosure Statement.

[20] Nothing in the Certification Motion (or the Plan Objections) elaborates on why the alleged turnover requirement applies only to the alleged short selling bondholders with borrowed shares as opposed to all shareholders (including Movants – who do not appear to have voluntarily turned over their own shares to the Debtors as allegedly required by section 542). Once again, the Plan Administrator is reciting these arguments, but in some instances they are virtually incoherent.

DOCS_NY:48784.5 08728/003

2023).  In this case, no new stock was issued; rather the Plan Administrator was appointed to

monetize any remaining assets and distribute those assets to creditors holding allowed claims[21] in

accordance with the Waterfall set out in the Plan.  As it was not anticipated unsecured creditors

(including bondholders) would be paid in full, the Plan provided no recovery for Holders of

Interests in BBB, as required by the absolute priority rule.  Thus, the Plan is fair and equitable as

required by section 1129(b)(2)(C) in that the classes senior to Movants are not being paid in full

and no class junior to Movants is receiving any recovery.

40.     Additionally, even if Movants' short selling allegations against certain bondholders

were correct, the Plan would still meet the test for fair and equitable as to the BBB equity holders

because to the extent the bondholders are also stockholders, they are only recovering as general

unsecured creditors on their bond claims, not their equity claims.  *Cf, Ahuja v. Lightsquared Inc*.,

644 Fed. Appx. 24, 29-30, (2d Cir. 2016) (in determining equal treatment under section 1123(a)(4),

finding that a plan that canceled the interests of all common equity holders in the debtor, including

those of a hedge fund that held both secured claims and equity, was permissible because the hedge

fund only received value in the reorganization for its secured claim and its contribution of certain

litigation rights, not for its common equity interests.)

41.     None of the three issues on Appeal discussed above meet the test for certification

for direct appeal.  None of the legal issues are unsettled or subject to conflicting rulings because

they involve standard, long settled principles of state and bankruptcy law as to what does and does

not constitute property of the estate which have never been contested.

---

[21] It should be noted that one of the Plan Administrator's duties is filing claim objections.  Therefore, other than the presumed allowance of a timely-filed proof of claim to which no objection has been filed, no claims of any unsecured creditors have yet to be either "allowed" or "disallowed," and given the likelihood that a recovery for unsecured creditors, if any, will be minimal, Movants' arguments are not only legally unsustainable, but factually speculative.

**C.**  **No Matter of Public Importance Is Implicated by the Confirmation Order.**

42.  Nor is the public interest implicated.  Certification Motion at ¶¶ 25-29.  Despite hyperbolic statements as to the impact of short selling on millions of public investors in bankrupt public companies, short selling is not illegal and regulating any perceived abuses are within the purview of the SEC and Congress,[22] not the courts.  Movants presented no evidence at the Confirmation Hearing as to any illegal acts by any short sellers and cite no statutory or case law indicating the alleged actions taken by certain bondholders, even if true, violate any securities laws.  Nor does the Confirmation Order make any determination as to whether the claim of any specific unsecured creditor or equity holder should be allowed or disallowed.  The only issue the Court had to decide was whether the Plan was fair and equitable to the equity holders, including Movants – which it was because the Plan complied with the absolute priority rule.  Nothing in the Confirmation Order is controversial or implicates the public interest.

43.  As detailed above, cancellation of stock held by out of the money equity is standard practice in many corporate bankruptcy cases.  If the practice was so controversial as to implicate the public interest, one must wonder why it is done without any objection by the SEC in enumerable public company chapter 11 cases or why the SEC expressly identifies cancellation of equity as a customary risk to equity holders in public company bankruptcies.  Additionally, if the allegations of securities fraud made by Movants against certain bondholders was as obvious as Movants contend, one would have expected the SEC to have supported Movants at the Confirmation Hearing.

---

[22] *Why is Short Selling Legal? A Brief History* (Sept. 29, 2022) available at
https://www.investopedia.com/articles/investing/110614/why-short-selling-legal-brief-history.asp.

44.     Movants' citations to cases addressing the public interest and direct appeal certification do nothing to advance their argument as to its applicability here.  For example, in *In re Nortel Networks Corp*., 2010 Bankr. LEXIS 812 (Bankr. D. Del. March 18, 2010), the Court denied the certification motion notwithstanding the case involved the automatic stay and international pension plans impacting many employees of the global debtors.  Certification was granted in *Jaffe v. Samsung Elecs. Co. (In re Qimonda AG),* 470 B.R. 374 (Bankr. E.D. Va. 2012), but that case involved the applicability of the intellectual property protections of section 365(n) to chapter 15 cases and the ability of a foreign debtor to cancel US intellectual property licenses in pervasive globally-used technology.  Similarly, in *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009), the court determined certification had been appropriate because of the impact of the restructuring on an ecologically important forest and on the residents of an entire town which was controlled by the debtors.  *Ransom v. MBNA Am. Bank, N.A. (In re Ransom)*, 380 B.R. 809 (BAP 9th Cir. 2007), involved the ability of a chapter 13 debtor to take certain deductions for car expenses even though he did not have a car.  There was an ambiguity in the applicable federal guidelines for deductions that had been interpreted differently by numerous lower courts around the country and the issue implicated every chapter 13 case filed.

45.     No such issue of public importance exists here.  No court has ever determined stock to be property of a debtor; no court has ever required an insolvent debtor to file a turnover action to cancel its stock, and the SEC, who regulates public stock, accepts cancellation of equity interests as a common result of chapter 11.  Furthermore, if the SEC and Congress wanted to eliminate short selling, they could make the practice illegal.  It is not for the courts to make such a determination about the alleged abuses of short selling based on this Confirmation Order when no evidence was

presented at the Confirmation Hearing and no determination has been made as to the allowance or

disallowance of any such claims. Nothing in this Confirmation Order impacts the rights of

shareholders of any corporation other than BBB.

**D.      No Conflicting Opinions Exist which Require Resolution through Direct Appeal.**

46.     In arguing that the Appeal will involve questions of law requiring resolution of

conflicting opinions, Movants make a number of comments throughout the Certification Motion

that the Debtors chose not to have their cases treated as a Subchapter V small business cases, and

this Court made such a finding in the Confirmation Order. *See* Certification Motion at ¶ 30. These

statements appear in reference to the fact that the Confirmation Hearing was combined with the

disclosure statement hearing. *See* ¶¶ 6-7, above.

47.     Movants contend the procedures established by this Court in the Conditional DS

Order conflict with one 1995 Pennsylvania bankruptcy court case which stated that the shortened

procedures and consolidated hearing provisions of sections 1121(e) and 1125(f) of the Bankruptcy

Code only apply in small business cases.[23]  Putting aside the issue of whether the "resolution of

conflicting opinions" standard for direct appeal was intended to resolve two allegedly conflicting

bankruptcy court opinions,[24] this presumption of a conflict is incorrect because this Court did not

take any action under either section 1121(e) or 1125(f).  As Movants correctly note, these sections

of the Bankruptcy Code only apply to small business cases and the Debtors neither qualified for

nor ever sought such status.

---

[23] *In re Haskell-Dawes, Inc.*, 188 B.R. 515, 519-520 (Bankr. E.D. Pa. 1995) (court found it was appropriate to forgo appointment of a creditors' committee because the debtor qualified as a small business; statement regarding sections 1121(e) and 1125(f) were *dicta*.)

[24] *See In re Ransom*, 380 B.R. at 812 (citing to no less than 50 bankruptcy court decisions ruling in various, sometimes conflicting, ways on the applicable issue).

48.     This Court correctly relied on section 105(d) for its entry of the Conditional DS Order and the relief set out therein.  As an initial matter, this Court did not shorten notice; however, it did combine the hearings on confirmation of the plan and adequacy of the disclosure statement. Section 105(d)(2)(B)(vi) of the Bankruptcy Code expressly provides that the Court may combine the hearing on the adequacy of the Disclosure Statement and the hearing to confirm the Plan. 11 U.S.C. § 105(d)(2)(B)(vi).  This combined disclosure statement/plan procedure has been utilized in numerous cases within the Third Circuit.[25]  No court has determined this statutorily permitted process to be improper.  Therefore, this Court's Conditional DS Order does not conflict with the ruling of the *Haskell-Dawes* court, which did not address section 105(d) at all, and this non-existent conflict cannot provide a basis for direct appeal.

### E.     Certification for Direct Appeal Will Not Materially Advance the Case.

49.     Movants also argue that certification for direct appeal will materially advance progress of the case.  Certification Motion at ¶ 32-35.  This is incorrect.  Movants' Stock was cancelled as of the Effective Date, and the administrative cancellation of the Stock CUSIP numbers has been effectuated.  The Stock cannot be un-cancelled.  It is unclear what relief Movants believe an appellate court can grant them – reinstatement of valueless cancelled stock in a company that no longer exists or forcing the Plan Administrator to file turnover actions against the old shareholders in order to recover the worthless already cancelled Stock so it can be re-cancelled. Movants' Appeal and the related Stay Motion and this Certification Motion are materially hampering the progress of these cases because the Plan Administrator must use valuable estate resources to respond to and defend against a specious and moot Appeal which Movants lack

---

[25] *See, e.g., In re Lucira Health, Inc.*, Case No. 23-10242 (Bankr. D. Del.) [Docket No. 519]; *In re L'Occitane, Inc.*, No. 21-10632 (Bankr. D.N.J.) [Docket No. 408]; *In re Modell's Sporting Goods, Inc.*, No. 20-14179 (Bankr. D.N.J.) [Docket No. 762]; *In re SLT Holdco, Inc.*, No. 20-18368 (Bankr. D.N.J.) [Docket No. 461].

standing to assert and for which no relief can be granted that would not put Movants in the exact same position they are now – holders of cancelled equity in an entity that no longer exists.

50.    Movants cite to several cases that limit the ability of a debtor to utilize section 1127(b) post-confirmation/pre-substantial consummation plan modification provisions to amend a confirmation order.  Certification Motion at ¶ 33.  As Movants fail to indicate who is seeking to modify the Confirmation Order and how they are seeking to modify it, the relevance or applicability of this argument to the Certification Motion cannot be discerned.

51.    Movants also cite several cases indicating that a debtor cannot use a "chapter 22" – a second chapter 11 – to modify the plan confirmed in its first chapter 11.  Certification Motion at ¶ 33.  Here again, as the Plan Administrator is not seeking any such relief, the relevance or applicability of this argument to the Certification Motion cannot be discerned.

52.    Nothing in the Appeal will materially advance these cases and Movants fail to prove otherwise.  The Certification Motion should be denied.

## IV.    CONCLUSION AND RELIEF REQUESTED

53.    The Certification Motion should be denied.  While the issues raised in Movants' Appeal, as set forth in paragraph 20 of the Certification Motion and as discussed above, are admittedly unique, they are based on Movants' misunderstanding of bankruptcy law without citation to any applicable, let alone conflicting or unresolved, case law.  This Appeal does not involve an unsettled question of law as to which there is no controlling decision of the Court of Appeals for the Third Circuit or of the Supreme Court, does not involve a matter of public importance, and does not require resolution of any conflicting decisions.  Nor will an immediate appeal from the Confirmation Order materially advance the progress of these cases.  The Certification Motion should be denied.

DOCS_NY:48784.5 08728/003

For the foregoing reasons, the Plan Administrator respectfully requests that the Court deny

the relief requested in the Certification Motion.

Dated:  October 27, 2023                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                            */s/ Bradford J. Sandler*
                                            Robert J. Feinstein (admitted *pro hac vice*)
                                            Bradford J. Sandler
                                            Paul J. Labov
                                            Colin R. Robinson
                                            Judith Elkin (*pro hac vice* admission pending)
                                            PACHULSKI STANG ZIEHL & JONES LLP
                                            780 Third Avenue, 34th Floor
                                            New York, NY 10017
                                            Telephone:  (212) 561-7700
                                            Facsimile:  (212) 561-7777
                                            Email: rfeinstein@pszjlaw.com
                                                     bsandler@pszjlaw.com
                                                     plabov@pszjlaw.com
                                                     crobinson@pszjlaw.com
                                                     jelkin@pszjlaw.com

                                            *Counsel to the Plan Administrator*