| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** |
| Robert J. Feinstein (admitted *pro hac vice*)<br>Bradford J. Sandler<br>Paul J. Labov<br>Colin R. Robinson<br>Hayley R. Winograd (admitted *pro hac vice*)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017<br>Telephone:  (212) 561-7700<br>Facsimile:  (212) 561-7777<br>rfeinstein@pszjlaw.com<br>bsandler@pszjlaw.com<br>plabov@pszjlaw.com<br>crobinson@pszjlaw.com<br>hwinograd@pszjlaw.com<br><br>*Counsel to the Plan Administrator* |

| | |
|---|---|
| In re:<br><br>BED BATH & BEYOND INC., *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Jointly Administered) |

## OPPOSITION OF THE PLAN ADMINISTRATOR TO EMERGENCY MOTION OF COMMON STOCK EQUITY INTEREST HOLDERS FOR STAY AND ASSOCIATED RELIEF PENDING APPEAL PURSUANT TO FED. R. BANKR. P. 8013(D) AND 8007

Michael Goldberg, as plan administrator (the "Plan Administrator"),[2] files this opposition

(the "Opposition") to the *Emergency Motion of Common Stock Equity Interest Holders For Stay*

*and Associated Relief Pending Appeal Pursuant to Fed. R. Bankr. P. 8013(d) and 8007* [Docket

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtor's proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.

[2] The Plan Administrator has been appointed pursuant to the Debtors' Plan, as defined herein.  The Plan Administrator is responsible for and has the authority to administer various post-confirmation responsibilities under the Plan on behalf of the Wind-Down Debtors (as defined in the Plan).

Nos. 2455, 2471] (the "Motion"), filed by Neely Das and Gabriel Rostom (the "Appellants").  In

support of its Opposition, the Plan Administrator states as follows:

## I.    PRELIMINARY STATEMENT[3]

1.    Appellants fail to demonstrate the extraordinary remedy of a stay pending their

appeal of the Plan is warranted.  On appeal, Appellants argue that their equity interests in BBB

should not be cancelled before they are turned over to the Debtors pursuant to sections 541 and

542 of the Bankruptcy Code.  From this fundamentally flawed premise, Appellants argue that the

Plan is not fair and equitable because it allows distributions to certain claimants whose claims are

disallowed because they hold common stock of BBB (the "Stock") that, according to Appellants,

is property of the Debtors.  Appellants also assert that a stay is necessary to prevent "irreparable

harm" to them if the Stock is cancelled before being returned to the Debtors under sections 541

and 542 because Appellants will be deprived of their rights to sell the Stock to securities traders

with open short positions.

2.    Appellants cannot carry their heavy burden of satisfying the four-part test required

for a stay pending their appeal.  First, Appellants cannot show likelihood of success on their appeal.

The entire appeal is premised on two faulty assertions: (i) that the outstanding Stock is property of

the Debtors' estate under section 541; and (ii) therefore, such Stock is subject to turnover under

section 542.  Appellants' first contention—that outstanding stock is property of the debtor—is, as

this Court correctly found in overruling the Objection to the Plan, utterly without any legal

foundation.   By definition and under applicable law, "stockholder" is the owner of the stock.

Thus, Issue Two—whether the Stock is subject to turnover—is equally without merit.  A section

---

[3]    Capitalized terms used but not defined herein shall have the meaning ascribed to them below.

542 turnover action requires a showing that the property is indeed property of the estate.

Appellants' contention that stock is property of the debtor is simply not the law.

3.      Similarly, Issue Three—that the plan is not fair and equitable—would likewise fail

on the merits because it is dependent upon Appellants' deficient arguments that the Stock was

subject to a section 542 turnover action.   The Plan complied with all applicable law, including the

absolute priority rule.   Appellants' arguments on appeal that the Debtors were required to file a

section 542 turnover proceeding to get back their shares before cancelling them is based on a

fundamental misunderstanding of applicable law and the chapter 11 process.

4.      Appellants fail to satisfy the remaining elements necessary to warrant a stay.  They

will not suffer "irreparable harm" absent a stay because there is no equity value left to preserve

and the Stock has already been cancelled pursuant to the Plan.   By contrast, the Debtors and other

parties in interest would suffer if the Plan were stayed, as creditors would not receive timely

distributions pursuant to the Plan.    Finally, and for all these reasons, a stay does not serve the

public interest, where the Plan is fair and equitable, complies with applicable law, and there is no

"harm" to Appellants.   The public interest would be disserved by the imposition of a stay at the

behest of shareholders who are woefully out of the money.   For the foregoing reasons, and the

reasons set forth below, a stay is not warranted and the Motion should be denied.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Bankruptcy Case

5.      On April 23, 2023, each of the above-captioned debtors, including Bed Bath &

Beyond, Inc. ("BBB," and collectively, the "Debtors") filed a voluntary petition under chapter 11

of the Bankruptcy Code (the "Bankruptcy Case") before the United States Bankruptcy Court for

the District of New Jersey (the "Court").   During the Bankruptcy Case, the Debtors continued to

operate their businesses and manage their properties as debtors and debtors in possession pursuant

3

to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases were procedurally consolidated and jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.   Prior to the Bankruptcy Case, Appellants held shares of common stock in BBB, which were publicly traded on the NASDAQ until it was delisted on May 3, 2023.[4]

6.      On May 5, 2023, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee"). *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 218].

## B.      The Plan and Confirmation

7.      On July 21, 2023, the Debtors filed their motion [Docket No. 1438] (the "Conditional DS Motion"), seeking conditional approval of the adequacy of the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates*, [Docket No. 1437] (as amended, the "Disclosure Statement"), in order to commence solicitation of votes on the Debtors' *Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates*, [Docket No. 1429] (as amended, the "Plan"), and to schedule a consolidated hearing to consider both the adequacy of the Disclosure Statement on a final basis and confirmation of the Plan.  On August 2, 2023, the Court entered its Order approving the Conditional DS Motion [Docket No. 1716] (the "Conditional DS Order"), which among other things, conditionally approved the Disclosure Statement, established procedures for soliciting votes for or against the

---

[4]      *Market Watch*, "Nasdaq kicks off Bed Bath & Beyond delisting process," available at https://www.marketwatch.com/story/bed-bath-and-beyond-stock-set-for-nasdaq-delisting-at-market-open-5b0e68e6

DOCS_NY:48794.3 08728/003

Plan, established deadlines for the filing of objections to both the Plan and the Disclosure Statement, and consolidated the hearing on final approval of the Disclosure Statement and confirmation of the Plan as permitted by section 105(d)(2)(B)(vi) of the Bankruptcy Code.  As set forth in the Conditional DS Order, the dates established for notice of the hearing on the Disclosure Statement and Plan, solicitation of votes on the Plan, and filing objections to the Disclosure Statement and Plan were consistent with the Bankruptcy Rules.

8.     On August 28, 2023, Appellants moved to vacate [Docket No. 2068-1] (the "Motion to Vacate")[5] parts of the Conditional DS Order on the grounds that, in pertinent part, (a) there was a scrivener's error on the opt-out form for deemed rejecting parties of the Plan;[6] (b) the claims of certain bondholders (the "Bondholders") who were holding borrowed shares of the Debtors' Stock were disallowed because the Stock constituted property of the Debtors' estate which had not been returned, and such claimants were therefore ineligible to vote on the Plan; and (c) cancelling the Stock before it was turned over to the Debtors was "not fair and equitable" in accordance with section 1129(b) of the Bankruptcy Code. *See* Motion to Vacate.  These same arguments were repeated in Appellants' September 12, 2023 Objection to the Plan and Disclosure Statement [Docket No. 2192] (the "DS/Plan Objection" and with the Motion to Vacate, the "Objection").  The "evidence" proffered by Appellants in their Objection included numerous SEC

---

[5]     On August 8 and August 10, 2023, Appellants filed manually and then electronically Docket No. 1878 which was an objection to the Conditional DS Motion (the "DS Objection"). By the time the DS Objection was filed on the docket, the Conditional DS Order had already been entered. On August 31, 2023, in response to an objection filed by the Debtors indicating the DS Objection was late filed, Appellants filed Docket No. 3125 (the "DS Objection Reply") indicating the efforts they had made, as pro se litigants, to obtain ECF privileges and file the DS Objection prior to the August 1, 2023 hearing on the Conditional DS Motion. The inability of Appellants to timely file their DS Objection prior to the hearing on the Conditional DS Motion and entry of the Conditional DS Order resulted in Appellants filing the Motion to Vacate.

[6]     This Objection was resolved on September 7, 2023, when Debtors' counsel informed Appellants that they would not be included in the Plan definition of "Releasing Parties."  *See* Transcript at 55:5-14.

5

filings, charts, articles and excerpts of social media postings showing that a certain bondholder

had published articles on hedging/short selling investment strategies and owned both bonds and

Stock in the Debtors, and publicly-available market data on short selling positions in BBB Stock.[7]

9.    On September 11, 2023, the Debtors filed their *Second Amended Joint Chapter 11*

*Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* [Docket No. 2160] (the "Plan"),[8] and

on September 12, 2023, the Court held a hearing on the final approval of the Debtors' Disclosure

Statement and confirmation of the Plan (the "Confirmation Hearing"). *See* Transcript of

Confirmation Hearing [Docket No. 2175] (the "Transcript").    Appellants' pending Motion to

Vacate, filed two weeks earlier, was treated as an objection to final approval of the Disclosure

Statement and confirmation of the Plan. Transcript at 15:6-17.

10.    During the Confirmation Hearing, the Court heard argument from Appellants with

respect to their contentions that the Plan is not "fair and equitable" under section 1129(b)(2) of the

Bankruptcy Code because (a) the borrowed Stock held by the Bondholders was subject to turnover

under section 542, and (b) therefore, those Bondholders had disallowed claims and were not

eligible to vote on the Plan.[9]    *See* Transcript at 55:15-56-58:23.    Appellants' arguments in this

regard were premised on the fundamentally flawed notion that shares of stock of a chapter 11

debtor is considered "property of the estate,"[10] and that under section 542 of the Bankruptcy Code,

---

[7]    *See, e.g.*, DS Objection ¶ 2 n. 3 (citing to Reddit post).

[8]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[9]    Notwithstanding Appellants' repeated argument that certain bondholders who were also stockholders were not entitled to vote because of their alleged bad acts, Appellants never filed a motion to designate the votes of these claimants as permitted under section 1126(e) of the Bankruptcy Code.

[10]    In making this argument, Appellants relied on the *Final Order (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (II) Granting Related Relief* [Docket No. 587] which granted the related Stock Transfer Motion [Docket No. 23] (the "Trading Order") to restrict stock trading so as to preserve the Debtors' net operating losses (NOL).  The Stock Transfer Motion indicated that the Debtors'

6

shares of the debtor's stock are subject to turnover to the Debtors. Transcript at 57:1-4.  As set forth below and stated by this Court, this proposition finds no support in the law.  Appellants maintained, without citation to any authority, that the Plan is thus not "fair and equitable" because it allowed for "disallowed claims" to vote on it, "while it unfairly affects the shareholders who are not allowed to basically get the greatest possible value of their shares which would have occurred if all the borrowed shares were returned." *Id.* at 57:5-24.  Appellants did not present any evidence at the Confirmation Hearing in support of the allegations in their Objection as to how "borrowed Stock," even if returned to the Debtors rather than its owner, would have value to the Debtors such that the result would be a recovery to Appellants.

11.      After hearing Appellants' arguments, this Court found that it "couldn't find any authority for the proposition that authorized stock of a debtor corporation is property of the estate and the debtor corporation as opposed to the party holding the stock." Transcript at 56:3-9.  The Court explained that there is no "determination that the underlying shares of stock are a valuable asset or property of the estate. The NOLs were valuable to the, or the potential NOLs were valuable to the bankruptcy estate[,] not the underlying shares of the debtor corporation."  The Court further found there is no "foundation for the turnover argument," and "no foundation for or legal authority supporting [the Plan Objections]." *Id.* at 58:3-20.  Accordingly, the Court overruled the Objection.

12.      On September 14, 2023, the Court entered an Order confirming the Plan [Docket No. 2172] (the "<u>Confirmation Order</u>").  On September 29, 2023 (the "<u>Effective Date</u>"), the Debtors filed the *Notice of (I) Entry of the Order (A) Approving the Disclosure Statement on a Final Basis*

---

NOL was a valuable asset of the estate; ***not that the Stock itself was valuable***.  The Court reiterated this point at the Confirmation Hearing.  *See* Transcript at 58:10-17; 63:2-22.

*and (B) Confirming the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates and (II) Occurrence of Effective Date* [Docket No. 2311].

13.     The Plan went effective on September 29, 2023. [Docket No. 2311]. On the Effective Date, the Plan Administrator became the sole representative of the Wind-Down Debtors and assumed responsibility for purposes of resolving certain claims, performing claims reconciliation, and objecting to claims in accordance with the terms of the Plan Administrator Agreement.   Class 6, consisting of General Unsecured Claims (including bondholders), were impaired, and it was not anticipated that they would be paid in full. *See* Plan, Art. III.B.6.

14.     Pursuant to the Plan, all Interests in BBB (as defined in the Plan), including the Appellants' Interests in the Debtors, were "cancelled, released, and extinguished." *See* Plan, Art. III.B.9. Pursuant to Section IV.D of the Plan, the Stock was cancelled as of the Effective Date without need for any further action.  On October 18, 2023, DTC effectuated the administrative cancellation of the CUSIP numbers associated with the Stock, as well as the Debtors' other securities. *See* Goldberg Declaration.[11]

## C.     The Appeal and Instant Motion to Stay the Confirmation Order

15.     On September 29, 2023, Appellants filed their notice of appeal of the Confirmation Order, [Docket No. 2305] (the "Appeal"). *See* Case No. 23-13359-VFP.  On Appeal, Appellants argue the Plan is not "fair and equitable" under section 1129(b)(2) of the Bankruptcy Code for the same reasons argued in support of their Objection; namely, that the Plan improperly allowed the

---

[11]   Refers to the *Declaration of Michael Goldberg as Plan Administrator in Support of Objections of Plan Administrator to (I) Emergency Motion of Common Stock Equity Interest Holders for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit and (II) Emergency Motion of Common Stock Equity Interest Holders for Stay and Associated Relief Pending Appeal Pursuant to Fed. R. Bank. P. 8013(d) and 8007,* filed concurrently herewith.

Bondholder who held the Stock to vote on the Plan because (a) the Stock is property of the Debtors pursuant to section 541 of the Bankruptcy Code, and (b) therefore, the Stock is subject to turnover pursuant to section 542 of the Bankruptcy Code. *See Motion re: of Common Stock Equity Interest Holders for Certification of Direct Appeal to the United States Court of Appeals for the Third Circuit* [Docket No. 2450] (the "Certification Motion") ¶ 20.  Appellants present their issues on appeal as follows:

> (1)    Whether authorized and outstanding stock of a debtor corporation is property of the estate after the commencement of a bankruptcy case pursuant to section 541 of the Bankruptcy Code? ("Issue One");
>
> (2)    *If* the answer to the first question is yes, whether authorized and outstanding stock of a debtor corporation ***considered as property of the estate*** is of consequential value or benefit to the estate, so that it is subject to turnover pursuant to section 542 of the Bankruptcy Code? ("Issue Two");
>
> (3)    *If* the answer to (2) is yes, then does the Plan fail the fair and equitable test because, according to Appellants, the Plan allows distributions to holders of claimants whose claims are disallowed because they hold stock in the debtor corporation that is subject to turnover ("Issue Three," and collectively with Issue One and Issue Two, the "Issues").

Certification Motion at ¶ 20.

16.    On October 13, 2023, Appellants filed the instant Motion, seeking a stay of the Confirmation Order pending their Appeal.  Contemporaneously with the Motion, Appellants filed their motion for direct appeal to the Third Circuit. *See id.*[12]

---

[12]    The Plan Administrator is filing an objection to the Certification Motion concurrently herewith.

### III.    ARGUMENT

#### A.    Legal Standard

17.    A stay pending appeal is an "extraordinary remedy." *El v. Marino*, 722 F. Appx.
262, 267 (3d Cir. 2018); *see also Conestoga Wood Specialties Corp. v Sec'y of U.S. Dept. of Health
and Human Services*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013) (stays pending
appeal are "rarely granted"); *Donald J. Trump for President, Inc. v Sec'y of Pennsylvania*, 830 F.
Appx. 377, 389 (3d Cir. 2020) (stays pending appeal are "extraordinary remed[ies] never awarded
as of right.")  Such relief is warranted only if the movant establishes each of the following four
elements: (1) a "strong showing" of likelihood of success on the merits of its appeal; (2) irreparable
injury if the stay is not granted; (3) the stay will not substantially harm other parties; and (4) the
stay would serve the public interest. *See Marino*, 722 F. Appx. at 267. The first factor—likelihood
of success on the merits of the appeal—has been considered "the more important piece of the stay
analysis." *S.S. Body Armor I., Inc. v Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir.
2019).  "In order to succeed on such a motion, the moving party must 'show satisfactory evidence
on all four criteria.'" *In re W.R. Grace & Co.*, 475 B.R. 34, 205-06 (D. Del 2012) (quoting *Turner
v. Citizens Nat'l Bank (In re Turner),* 207 B.R. 373, 375 (B.A.P. 2d Cir. 1997)).  Appellants have
failed to establish any of the four elements required to warrant the extraordinary remedy of a stay
pending appeal of the Confirmation Order.

#### B.    Appellants Fail to Show Likelihood of Success on the Merits

18.    Appellants fail to show a strong likelihood of success on the merits of their Appeal.
"[A] strong showing of the likelihood of success exists if there is 'a reasonable chance, or
probability, of winning.'" *S.S. Body*, 927 F.3d at 772 (quoting *Singer Mgmt. Consultants, Inc. v.
Milgram*, 650 F.3d 223, 229 (3d Cir. 2011)).  Appellants assert that they are likely to succeed on
the merits of their Appeal based on their arguments that (a) the Stock was property of the Debtors

10

pursuant to Section 541; (b) the Stock should have been turned over to the Debtors pursuant to

section 542 of the Bankruptcy Code prior to Appellants' equity interests being cancelled; and (c)

the Bondholders' claims were disallowed because they held the Stock that was subject to turnover,

and therefore, the Plan is not "fair and equitable" under Section 1129(b). *See* Motion ¶ 21 (referring

to Certification Motion).  The Appeal is without merit for multiple reasons.

### i.     <u>Issue One is Without Merit: Outstanding Stock is Not Property of the Debtor</u>

19.     Issue One fails on the merits.   As this Court correctly stated in overruling

Appellants' Objection, there is no foundation for the Appellants' notion that outstanding stock is

property of the debtor, "as opposed to the party holding the stock." Transcript at 56:3-6.

Appellants do not cite any authority in support of this same argument on appeal.

20.     By definition, "stockholder" means "an owner of corporate stock." Merriam

Webster, available at https://www.merriamwebster.com/dictionary/stockholder.[13]   The fact that

stock is owned by the person who holds it is neither a controversial nor unresolved legal concept.

As stated by the Securities and Exchange Commission ("<u>SEC</u>"), the federal agency that regulates

the public debt and equity markets:

> ***Shareholders, or stockholders, are the owners of a company's
> outstanding shares***, which represents a residual portion of the
> corporation's assets and earnings as well as a percentage of the company's
> voting power. Stockholders have a right to participate in the distribution of
> corporate assets in the form of dividends (if they are paid) and possibly
> through the sale of their holdings at a profit on the stock market. Individuals
> may become shareholders by buying common stock in corporations
> through brokers or directly from the company (if they offer a direct
> investment plan). ... ***If a company goes bankrupt, however, common***

---

[13]   *See also* Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/stockholder
(defining "stockholder" as "a person who owns shares in a company and therefore gets part of the company's
profits and the right to vote on how the company is controlled."); *Law.com Legal Dictionary*, available at
https://dictionary.law.com/Default.aspx?selected=1948 (same); SEC Investor Publications, *Bankruptcy: What
Happens When Public Companies Go Bankrupt* (Feb. 2, 2009) available at:
https://www.sec.gov/reportspubs/investor-publications/investorpubsbankrupt  (referring to "Stockholders" as
"owners of the company.")

> *shareholders are last in line to be repaid (behind creditors and preferred shareholders)*.

SEC Investor Publications, *Bankruptcy: What Happens When Public Companies Go Bankrupt* (Feb. 2, 2009) available at: https://www.sec.gov/reportspubs/investor-publications/investorpubsbankrupt (emphasis added).[14]

21.     As the Supreme Court held, "[p]roperty interests are created and defined by state law," and the analysis does not change because an entity is in bankruptcy. *Butner v. United States*, 440 U.S. 48, 55 (1979).  Here, BBB was a public company incorporated under the laws of the State of New York.  New York law holds for the unremarkable proposition that "a share is the property of the shareholder, not of the corporation." *Zyskind v. FaceCake Mktg. Tech., Inc.*, 973 N.Y.S.2d 34, 36 (App. Div. 1st Dept. 2013).  As stated by the Attorney General for the State of New York: "Common stock - also called common shares, capital shares, or capital stock - represents **units of ownership in a corporation**."[15]

22.     While recognizing that "property of the estate" is construed broadly, the Third Circuit has expressly indicated that section 541 of the Bankruptcy Code **does not create new property rights or value where there previously were none**.  *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 750-751 (3d Cir. 2013) (holding that "§ 541 defines property only in terms of 'legal or equitable interests of the debtor in property as of the commencement of the case.'" (quoting 11 U.S.C. § 541(a)(1)).  Thus, stock of a

---

14     At the Confirmation Hearing, the Securities and Exchange Commission ("SEC"), the federal agency that regulates the public debt and equity markets, raised issues relating to the Plan's opt-out release and gatekeeper provisions, but **never** argued, or supported Appellants' argument, that the stock of BBB was property of the estate which had to be turned over to the Debtors before it could be cancelled.  *See* Transcript at 30-34.

15     Office of the New York State Attorney General: *Understanding Common Investments – Investing in a Public Company*, available at: https://ag.ny.gov/resources/individuals/investing-finance/stocks#:~:text=Stock%20represents%20a%20share%20of,ownership%20privileges%20of%20a%20stockholder (emphasis added).

company is owned and controlled by the shareholder, and property of the estate does not extend to rights the debtor does not own or control.  The Stock of BBB held by its public shareholders, which was cancelled as of the Effective Date of the Plan, (*see* Goldberg Declaration), is not, and was never, property of the estate.  Appellants' advocacy arguments against short selling practices does not change this fact, and Appellants otherwise offer no support for their arguments that outstanding stock of the debtor is property of the estate.

23.    Appellants' reliance on case law generally holding that section 541 of the Bankruptcy Code defines property of the estate "broadly" is unavailing, as none of these cases support the proposition that a debtor's publicly held stock is property of the debtor.  *See* Certification Motion ¶ 22 n. 11.  Again, contrary to Appellants' unsupported assertions, section 541 does not create a property interest in something which was never owned by the debtor.  *See Majestic Star*, 716 F.3d at 759.[16]

24.    Accordingly, Issue One–that a company's stock becomes property of the estate upon the filing of a bankruptcy–is entirely without merit.  For this reason alone, Appellants fail to show likelihood of success on the merits.

## ii.    <u>Issue Two is Without Merit: the Stock Would Not be Subject to Turnover</u>

25.    For all these same reasons, Issue Two is equally without merit.  For instance, if the Stock does not constitute property of the Debtors, then any turnover action under section 541 to

---

[16]    If stock became property of the estate upon the filing of a petition, continued trading would be forbidden as a violation of the automatic stay of section 362, yet post-bankruptcy stock trading is common. *See* FINRA: *What a Corporate Bankruptcy Means for Shareholders* (Nov. 16, 2021) available at https://www.finra.org/investors/insights/what-corporate-bankruptcy-means-shareholders ("[T]he securities of companies in bankruptcy can and often do keep trading, as there is no federal law that prohibits trading stocks in bankrupt companies."); SEC Investor Publications, *Bankruptcy: What Happens When Public Companies Go Bankrupt* ("A company's securities may continue to trade even after the company has filed for bankruptcy under Chapter 11.").  It was for this reason that the Court entered the Trading Order—to prevent trading in the Stock that would impair the NOL.

return it to the Debtors would necessarily fail.  In order to establish a claim for turnover under

section 542, the debtor must establish, by a preponderance of the evidence, that (i) property being

held by the third party (here, the Bondholders) was the debtor's property, and if so, (ii) that the

property (the Stock) was property the debtor could "use, sell, or lease … unless such property is

of inconsequential value or benefit to the estate."  28 U.S.C. § 542(a); *see also In re Irish Bank*

*Resolution Corp. Ltd. (in Special Liquidation)*, 559 B.R. 627, 644 (Bankr. D. Del. 2016).  For the

reasons discussed *supra*, the Stock is not, and was never, property of BBB.  Therefore, the Debtors

could never establish the first prong sufficient to establish turnover, namely, that the property being

held by the third party was the debtor's property.[17]

26.     Appellants' contention that the Debtors were required to file a section 542 turnover

proceeding to get back their shares before cancelling them is based on a fundamental

misunderstanding of the chapter 11 process.   Chapter 11 provides a federal law statutory

methodology for a corporate debtor to restructure or liquidate in an efficient manner.   Within

certain express parameters, as set out in sections 1121-1129 of the Bankruptcy Code, a corporate

debtor can sell its assets, convert debt to equity, cancel existing equity, assume or reject contracts,

and take such other actions necessary to either liquidate or restructure to enable it to pay its

creditors and interest holders in accordance with the statutory absolute priority rule.  As discussed

above, the Debtors' Plan does not contain any features that are uncommon in corporate liquidating

plans.  The Debtors' principal assets were sold preconfirmation, and the proceeds of those sales as

---

[17]     Even assuming *arguendo* the Stock somehow constituted property of the Debtors, any turnover action would still
fail.  The Debtors could never establish that the purported property of the Debtors (the Stock) had any
consequential value that was subject to turnover.  There was no value left to preserve in the Debtors' estate, and
therefore, the Stock had no equity value.  This is why the Stock was cancelled pursuant to the Plan.  Thus, even
if BBB's Stock constituted property of the Debtors' estates, such Stock was not property which the Debtors could
"use, sell, or lease" and had no "consequential value."  For this additional reason, any turnover action would have
been futile.

well as any residual assets (mostly litigation) will be liquidated by the Plan Administrator who will distribute the resulting cash to creditors in accordance with the Plan waterfall, which conforms to the absolute priority rule and the settlement contained in the Plan. *See* Transcript at 10:3-11. Nothing in the Bankruptcy Code requires a debtor to jump through a series of procedural hoops to cancel its out of the money equity. Appellants cite no legal authority for their proposition that a debtor must file a turnover action prior to cancellation of its stock pursuant to a plan.

27.     Accordingly, Issue Two—that the Stock would be subject to turnover—is without merit. For this additional reason, Appellants fail to demonstrate any likelihood of success on the merits of their Appeal, and the Motion should be denied.

### iii.    Issue Three is Without Merit: The Plan is Fair and Equitable

28.     For all of these same reasons, Issue Three likewise fails on the merits. Appellants contend that the Plan is not "fair and equitable" under Section 1129(b) of the Bankruptcy Code because the Plan allowed voting by, and distributions to, the Bondholders whose claims are purportedly disallowed because they hold the Stock subject to turnover.[18] This argument is premised on Appellants' incorrect assumptions underlying Issue One and Issue Two, namely: (a) that the Stock is property of the Debtors, and (b) therefore, the Stock should have been turned over to the Debtors.[19] As discussed *supra*, there can be no question that the Stock is not property of the Debtors and any turnover action would fail. Therefore, Appellants fail to show that the Plan is not fair and equitable on this basis.

---

[18]    This issue seems to be an attempt to invoke section 502(d) of the Bankruptcy Code which provides that a claim of a person from whom property is recoverable under section 542, can have its claim disallowed. This standard provision was included in Section IV.I.6 of the Disclosure Statement.

[19]    Nothing in the Certification Motion (or the Plan Objections) elaborates on why the alleged turnover requirement applies only to the alleged short selling bondholders with borrowed shares as opposed to all shareholders (including Appellants – who do not appear to have voluntarily turned over their own shares to the Debtor as allegedly required by section 542).

29.     Notwithstanding the above, there can be no question that, as a general matter, the Plan complies with section 1129(b)(2)(C) of the Bankruptcy Code.  Section 1129(b)(2)(C) provides that, to be "fair and equitable" with respect to a class of interests, a plan must provide that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, and (iii) the value of such interests; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest. *See* 11 U.S.C. 1129(b)(2)(C).  As explained above, there is no legal requirement that a debtor seek turnover of its own stock, regardless of how interests are treated under a plan.  "In insolvent debtors, plans which cancel all equity interests and issue stock to senior creditors are theoretically sound and comply with the fair and equitable requirement."  7 COLLIER ON BANKRUPTCY P 1129.03 (16th 2023).   Indeed, stock held by out-of-the-money equity is routinely cancelled under a plan of reorganization for a bankrupt entity in a chapter 11 liquidation, and is expressly permitted under section 1123(a)(5)(F) of the Bankruptcy Code.  *See, e.g., In re Neiman Marcus Group*, Case No. 20-32519 (Bankr. S.D. Tex) [Docket No. 1795]; *In re Lucira Health, Inc.*, Case No. 23-10242 (Bankr. D. Del.) [Docket No. 652-1].[20]  In each of these cases, the public company debtor cancelled its equity through a plan, and filed a corresponding Form 8-K with the SEC indicating all equity was being cancelled upon the effective date of its plan.

38.     This is, of course, because in chapter 11 cases, equity holders always get paid last, and there is often no equity left to preserve. *See, e.g., In re Toy & Sports Warehouse, Inc.*, 37 B.R.

---

[20]     *See also In re Party City Holdco*, Case No. 23-90005 (Bankr. S.D. Tex.) [Docket No. 1701]; *In re Revlon, Inc.*, Case No. 22-10760 (Bankr. S.D.N.Y.) [Docket No. 1727]; *In re Southern Foods Group*, Case No. 19-36313 [Docket No. 3398].

16

141, 150 (Bankr. S.D.N.Y. 1984) ("The debtors' equity shareholders in Class V are impaired under the plan because they will be wiped out and all of the stock [] will be cancelled. This feature does not offend the best interests test in Code § 1129(a)(7) since the debtor is insolvent and there is no equity interest to preserve."); *In re Xtreme Iron, LLC*, No. 12-33832-HDH-11, 2013 Bankr. LEXIS 4918, at *34-35 (Bankr. N.D. Tex. Nov. 18, 2013) ("[O]n the Effective Date, all Equity Interests and other instruments evidencing any Claim against the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule."); SEC Investor Publications, *Bankruptcy: What Happens When Public Companies Go Bankrupt Bankruptcy: What Happens When Public Companies Go Bankrupt* (Feb. 24, 2009, available at: https://www.sec.gov/reportspubs/investorpublications/investorpubsbankr upt (***"The owners are last in line to be repaid if the company fails. Bankruptcy laws determine the order of payment," noting, "[i]n most instances, the company's plan of reorganization will cancel the existing equity shares.*** This happens in bankruptcy cases because secured and unsecured creditors are paid from the company's assets before common stockholders.") (emphasis original). As this Court is aware, this is known as the "absolute priority rule." *See* 11 U.S.C § 1129(b)(2) (requiring that creditors be paid in full before holders of equity receive any distribution); *In re PWS Holding Corp.*, 228 F.3d 224, 237 (3d Cir. 2000) (explaining that under "absolute priority rule," equity gets paid last in a chapter 11 bankruptcy).

39.    Here, no new stock was issued. Rather, the Plan Administrator was appointed to monetize any remaining assets and distribute those assets to creditors holding allowed claims[21] in

---

[21]    It should be noted that one of the Plan Administrator's duties is filing claim objections. Therefore, other than the presumed allowance of a proof of claim to which no objection has been filed, no claims of any unsecured creditors have yet to be either "allowed" or "disallowed," and given the likelihood that a recovery for unsecured creditors, if any, will be minimal, Appellants' arguments are not only legally unsustainable, but factually speculative.

17

accordance with the Waterfall set out in the Plan.  As it was not anticipated unsecured creditors (including bondholders) would be paid in full, the Plan provided no recovery for holders of Interests in BBB, as required by the absolute priority rule.

40.    Thus, the Plan is fair and equitable as required by section 1129(b)(2)(C) in that the classes senior to Appellants are not being paid in full and no class junior to Appellants is receiving any recovery.[22] *See In re Aleris Int'l, Inc.*, 09-10478 (BLS), 2010 WL 3492664, at *30 (Bankr. D. Del. May 13, 2010) (finding that plan that cancelled equity interests is fair and equitable under section 1129(b)(2)(C) because, in pertinent part, "the holder of such interests is not entitled to any fixed liquidation preference or fixed redemption price, and such interests have no value. In addition, no interest junior to the Cancelled U.S. Equity Interests exists, and, accordingly, no holder of any interest junior to the Cancelled U.S. Equity Interests will receive or retain any property under the plan on account of such junior interest").

41.    Even accepting as true Appellants' short selling allegations against the Bondholders, the Plan would still meet the test for fair and equitable as to the BBB equity holders. To the extent the Bondholders are also stockholders, they are only recovering as general unsecured creditors on their bond claims, not their equity claims.   *Cf, Ahuja v. Lightsquared Inc.*, 644 F. Appx. 24, 29-30 (2d Cir. 2016) (in determining equal treatment under section 1123(a)(4), finding that a plan that canceled the interests of all common equity holders in the debtor, including those of a hedge fund that held both secured claims and equity, was permissible because the hedge fund only received value in the reorganization for its secured claim and its contribution of certain

---

[22]    Indeed, although the unsecured creditors in Class 6 voted against the Plan and were themselves crammed down, the Court made express findings that the Plan was fair and equitable as to Class 6 because no junior class was receiving or retaining any property under the plan. *See* Confirmation Order ¶¶ 59, 65.

DOCS_NY:48794.3 08728/003

litigation rights, not for its common equity interests).  Issue Three—that the fair is not "fair and equitable" because the Bondholders held disallowed claims—is therefore without merit.

42.    Given the utter baselessness of their arguments, Appellants fail to meet their substantial burden of showing a reasonable likelihood of success on the merits of their Appeal. *See In re Color Spot Holdings, Inc.,* 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018) ("[T]he [e]mergency [m]otion rehashes the same arguments considered and rejected by the [b]ankruptcy [c]ourt based on the same evidence .... Merely repeating these rejected arguments does not meet the 'substantial' burden [a]ppellants have to show a likelihood of success on the merits of their appeal.")  The Motion should be denied for this reason alone.  *See S.S. Body*, 927 F.3d at 772 (affirming denial of motion for stay pending appeal, where appellant "falters at the very first stay factor…[W]e determine that [appellant] has a fatally low likelihood of succeeding in its [] Appeal. This compels us to affirm the District Court's underlying order, even without considering any of the remaining stay factors.")

## C.    Appellants Will Not Suffer Irreparable Harm Absent a Stay Pending Appeal

30.    Appellants have failed to demonstrate irreparable harm absent a stay pending appeal.  To do so, a movant must demonstrate an injury that is neither remote nor speculative, but "actual and imminent." *Revel AC*, 802 F.3d 558, 571 (3d Cir. 2015); *W.R. Grace*, 475 B.R. at 206. A purely economic injury generally does not meet the burden. *See Revel AC*, 802 F.3d at 572 ("A purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement" unless "the potential economic loss is so great as to threaten the existence of the movant's business.")

31.    Appellants argue they will be irreparably harmed if the Plan is not stayed on the grounds that: (a) if their Stock is cancelled before the Stock is turned over to the Debtors, Appellants will be "depriv[ed] of their rights to sell their shares at the considerably appreciated

share that will eventually result from short sellers"; and (b) if estate assets are distributed pursuant to the Plan prior to the determination of the Appeal, their Appeal could be challenged as equitably moot. *See* Motion ¶ 23. Each of these arguments lacks merit.

32.    First, Appellants' argument that they will be deprived of their rights to sell the Stock if it is cancelled pursuant to the Plan is premised on their incorrect belief that there is any Stock left to sell. As discussed above, the Stock has already been cancelled. *See* Goldberg Declaration. But even if it were not, the Debtors have no equity left to preserve, and Appellants' equity interests would still have gotten wiped out under the Plan and in accordance with the absolute priority rule, as discussed *supra*. Thus, whether the Stock was cancelled pursuant to the Plan, or was somehow first returned to the Debtors, the Appellants would be left in the same position: they have no equity interests in the Debtors.[23]

33.    In any event, Appellants' alleged harm is purely economic and does not constitute the type of "irreparable" harm sufficient to warrant the extraordinary relief of a stay. *See In re Boy Scouts of Am. and Delaware BSA, LLC*, 20-10343-LSS, 2023 WL 2891519, at *8 (D. Del. Apr. 11, 2023) (finding appellants fail to show they will suffer irreparable harm absent a stay of the confirmation order pending appeal where appellants' alleged harm is "purely economic," may be redressed by a legal or equitable remedy, and is likely illusory, as their claims will be paid in full and there is no 'additional' payment to which they are entitled."); *In re THG Holdings LLC*, 19-11689 (JTD), 2019 WL 6615341, at *6 (D. Del. Dec. 5, 2019) (no irreparable harm shown based on appeal of payment issue, noting "a purely economic injury, compensable in money, cannot

---

[23]    On this basis, Appellants arguably do not even have standing to appeal the Plan because they are not entitled to receive any recovery or distributions thereunder, and even if their requested relief were granted and the Stock were returned to the Debtors, they would be in the same position with their equity being wiped out.

DOCS_NY:48794.3 08728/003

satisfy the irreparable injury requirement" unless "the potential economic loss is so great as to threaten the existence of the movant's business.") (internal quotations omitted).

34.     Second, even if the consummation of the Plan were potentially to moot the Appeal, "the possibility that an appeal may become moot does not alone constitute irreparable harm for purposes of obtaining a stay." *In re Color Spot Holdings, Inc.*, 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018).  Appellants fail to show any irreparable injury absent a stay of the Plan.  For this additional reason, the Motion should be denied.

### D.     The Debtors and Others Will Be Harmed by a Stay Pending Appeal

35.     Appellants argue, without any support, that the Debtors and third parties will not suffer any harm if a stay is granted because a stay "would simply maintain the status quo with respect to [Appellants'] equity interests prior to the Plan Effective Date… while simply protecting [Appellants] from any potential dispossession and mootness arguments." Motion ¶ 26. Appellants, however, ignore the substantial harm the Debtors, its estate, and its creditors will suffer if the Plan is stayed.   A stay pending appeal will prevent creditors from receiving timely distributions under the Plan, at the behest of out-of-the-money shareholders trying to work some kind of stock trading angle to leverage short sellers.  Again, Appellants are not entitled to, and will not receive distributions under the Plan.  Appellants' meritless argument that their equity should not be cancelled as out-of-the-money interest holders should not be used to supplant the voice and rights of the Debtors' real creditors who are entitled to timely payments under a fair and equitable plan. *See In re Roth Am., Inc.*, 90 B.R. 94, 97 (Bankr. M.D. Pa. 1988) (denying stay where the debtor and other interested parties will suffer harm if stay were granted, noting "[i]f anyone is to suffer, it will be the estate, estate creditors and the good faith purchasers of this property.")  For this additional reason, a stay is not warranted.

DOCS_NY:48794.3 08728/003

E.    **A Stay Pending Appeal Is Contrary to the Public Interest**

36.    Finally, Appellants fail to satisfy the fourth prong required to warrant a stay. Appellants generally maintain that there is a "strong public policy in favor of correct application of the law," and that a stay "preserves the ability to redress harm through appellate review." Motion ¶ 28.[24]   These general assertions are meritless under the facts here.  For the reasons discussed above, the Plan does not violate the "fair and equitable" test of section 1129(b), and otherwise complies with all applicable law.  Appellants cannot show otherwise, and Appellants are not even directly aggrieved by the Plan.  They are out-of-the-money equity whose interests are cancelled because there is no value left in the Debtors' estate.  There is thus no "harm" to redress through appellate review here.

37.    By contrast, a stay of the Plan would be contrary to public policy.  There is "a strong public interest in the swift and efficient resolution of bankruptcy proceedings." *ACC Bondholder Group v. Adelphia Communications Corp. (*In re Adelphia Communications Corp.), 361 B.R. 337, 367–68 (S.D.N.Y. 2007).  As set forth above, the Appeal has no merit.  The public's interest is served by allowing creditors of the Debtors to receiving distributions under the Plan, which again, complies with all applicable law.  It would therefore be a waste of party, estate, and judicial resources to stay the Plan pending resolution of the Appeal.  A stay pending the Appeal would do nothing but delay the resolution of the Bankruptcy Case and distributions to creditors. *See Bohm v. Howard (In re Howard)*, 422 B.R. 593, 605 (Bankr. W.D. Pa. 2010), *aff'd,* 2:10CV962, 2011 WL 578777 (W.D. Pa. Feb. 9, 2011) (denying motion for stay pending appeal, finding "imposing a stay pending appeal and permitting the Defendant to continue to dissipate

---

[24]    Citing *Ams. United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990) and *AT&T Co. v. Winback & Conserve Program Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994).

DOCS_NY:48794.3 08728/003

assets of the estate does nothing but delay this bankruptcy case and foster further litigation, and noting "there is a strong public interest in the preservation of a debtor's assets for the purpose of paying creditors, rather than pursuing the litigation of claims."); *ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 272 (S.D.N.Y. 2004) ("[t]his Court finds that the public interest in the expeditious administration of bankruptcy cases as well as in the preservation of the bankrupt's assets for purposes of paying creditors, rather than litigation of claims lacking a substantial possibility of success, outweighs the public interest in resolving the issues presented here on appeal.").

38.      For the foregoing reasons, Appellants fail to demonstrate the extraordinary remedy of a stay is warranted.   The Motion should be denied.

## IV.      <u>CONCLUSION</u>

For the foregoing reasons, the Plan Administrator respectfully requests that the Court deny the Motion.

Dated:  October 27, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Bradford J. Sandler*

Robert J. Feinstein (admitted *pro hac vice*)
Bradford J. Sandler
Paul J. Labov
Colin R. Robinson
Hayley R. Winograd (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777
Email: rfeinstein@pszjlaw.com
          bsandler@pszjlaw.com
          plabov@pszjlaw.com
          crobinson@pszjlaw.com
          hwinograd@pszjlaw.com

*Counsel to the Plan Administrator*