| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>Robert J. Feinstein (admitted *pro hac vice*)<br>Bradford J. Sandler<br>Paul J. Labov<br>Colin R. Robinson<br>PACHULSKI STANG ZIEHL & JONES LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017<br>Telephone:  (212) 561-7700<br>Facsimile:  (212) 561-7777<br>rfeinstein@pszjlaw.com<br>bsandler@pszjlaw.com<br>plabov@pszjlaw.com<br>crobinson@pszjlaw.com<br><br>*Counsel to the Plan Administrator* |

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*,[1] | Case No. 23-13359 (VFP) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF THE PLAN ADMINISTRATOR TO MOTION BY CREDITOR F3 METALWORX, INC. FOR THE ALLOWANCE OR PAYMENT OF POST-PETITION STORAGE CHARGES OF $23,437 THROUGH OCTOBER 2023 AS AN ADMINISTRATIVE EXPENSE AND FOR PAYMENT OF $3,750 PER MONTH AS A CONTINUING ORDINARY COURSE ADMINISTRATIVE EXPENSE**

Michael Goldberg, as plan administrator (the "Plan Administrator"),[2] files this supplemental objection (this "Supplemental Objection") to the request for administrative claim of F3 Metalworx, Inc. (the "F3 Metalworx") set forth in the *Notice of Motion by Creditor F3 Metalworx, Inc. for the Allowance and Payment of Post-Petition Storage Charges of $23,437*

---

[1]  The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488.  A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtor's proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.

[2]  The Plan Administrator has been appointed pursuant to the Debtors' Plan, as defined herein. The Plan Administrator is responsible for and has the authority to administer certain post-confirmation responsibilities under the Plan on behalf of the Wind-Down Debtors.

*through October 2023 as an Administrative Expense and for Payment of $3,750 per Month as a Continuing Ordinary Course Administrative Expense* [Docket No. 2309] (the "Motion"), and respectfully states as follows:

**Preliminary Statement**

1. The Motion should be denied in its entirety because F3 Metalworx has failed to carry its burden that it has a valid administrative expense claim. To the contrary, the evidence demonstrates that F3 Metalworx may at most have a prepetition general unsecured claim for contract rejection damages. The requisite elements under section 503(b) are wholly absent. Chiefly, among other deficiencies:

- F3 Metalworx manufactured certain shelving components referred to as "valance bands" that F3 Metalworx claims to be storing for the Debtors *prepetition* pursuant to prepetition purchase orders (the "Stored Product");

- In late 2021 (also prepetition), the Debtors attempted to *return* the unused valance bands to F3 Metalworx because they were not needed in the Debtors' stores;

- The valance bands were in fact shipped back by the Debtors to a third-party warehouse vendor prepetition and remained unused by the Debtors; and

- While it appears that the Debtors paid F3 Metalworx for the Stored Product, the Debtors never actually used it postpetition nor shipped it back to F3 Metalworx for storage at its own warehouse.[3]

2. According to the emails filed by F3 Metalworx in support of the Motion, the parties made no agreement with respect to F3 Metalworx's handling or storage of the Stored

---

[3] F3 Metalworx contends that at some unspecified point "during 2022" the Stored Product was moved by F3 Metalworx from the third-party warehouse to F3 Metalworx's own warehouse It is unclear if F3 Metalworx asked for or was given the Debtors' permission to move the Stored Product. F3 Metalworx also claims that it had been paying the third-party warehouse for storage of the Stored Product prior to moving the product to its own warehouse. But F3 Metalworx failed to file any evidence of having made such third-party payments.

Product or how the long such an arrangement would last. Despite F3 Metalworx's failed attempt to characterize the arrangement as a contract for use of F3 Metalworx's property, the email correspondence establishing the terms consists only of F3 Metalworx's proposal that they be paid a monthly fee for storage and costs for labeling and pallet construction. The shipping documentation demonstrates only that there were shipments from the Debtors to a third party warehouse.

3.  If it was ever unclear that the excess Stored Product was use of F3 Metalworx's property for the benefit of the estates during the chapter 11 cases, the evidence filed by F3 Metalworx regarding the Debtors' postpetition conduct further establishes that compelling payment of an administrative expense claim would turn the bankruptcy priorities on their head. To begin, the record is devoid of evidence that the Debtors reached out to F3 Metalworx about the Stored Product at any point during the lease auction process to monitor its condition. The Debtors did not schedule any contract with F3 Metalworx for assumption in the bankruptcy case. In early August 2023, before F3 Metalworx filed the Motion, F3 Metalworx was directly notified in writing by the Debtors' bankruptcy counsel that the Debtors did not need the product and did not intend to accept shipment of it. To the extent of any executory contract that the Debtors had with F3 Metalworx, it was rejected by operation of the Debtors' Plan as of the Effective Date. Finally, as of October 31, 2023, the estates' interest in the valance bands has been abandoned pursuant to Bankruptcy Code section 554.[4]

4.  F3 Metalworx could have at any time moved for, or requested that the Debtors stipulate to, relief from the automatic stay to terminate the "storage agreement" due to nonpayment and to sell or scrap the product. F3 Metalworx attaches some invoices to its proof of

---

[4] *See* Dkt. No. 2645.

claim, but such invoices were only sporadically issued by F3 Metalworx and were never actually paid by the Debtors throughout the approximately 22 months straddling the Petition Date since the Stored Product was shipped back by the Debtors to a third-party warehouse in December 2021.[5] F3 Metalworx should not be permitted to recover fees as an administrative expense claim based on the existing evidentiary record which establishes, at best, that the Debtors had in better times over-sourced for new shelving prepetition, that such shelving was never subsequently used, and that disposing of the product was in fact burdensome not beneficial to the estates' reorganization efforts.

**Relevant Background**

5. The Plan Administrator incorporates herein by reference its statement of the relevant facts set forth in paragraphs 1 through 6 of the Preliminary Objection.

6. Pursuant to the Plan, on the Effective Date, the Plan Administrator became the sole representative of the Wind-Down Debtors and is authorized to (i) implement the Plan and any applicable orders of the Bankruptcy Court and (ii) sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without additional notice to or approval of the Bankruptcy Court. See Plan, Articles IV.F.4, VII.A. and VII.B.

7. On October 31, 2023, the Plan Administrator filed its *Notice of Abandonment of Certain De Minimis Assets (125 Pallets of Valance Bands)* [Dkt. No. 2645], providing *inter alia* that, "the Plan Administrator, to the extent it is determined the Stored Product not previously

---

[5] Notably, F3 Metalworx's first invoice was dated August 1, 2022 (more than eight months after the deal was purportedly struck), and seeks storage fees for the period of *November* 2021 – July 2022. However, the earliest email in which the Debtors communicated with F3 Metalworx about returning the valance bands is dated *December* 14, 2021. Moreover, the logistics documentation for shipment of the product to the third-party warehouse is dated December 21, 2021 and December 22, 2021. Accordingly, there should be no storage fee owing for November 2021 at all and only a *de minimis* amount for December 2021, if any.

abandoned, hereby provides notice of the abandonment of the Stored Product pursuant to the Plan. *See* Plan, Articles IV.F.4, VII.A. and VII.B."

**Supplemental Objection**

A. **Standard for Allowance of Administrative Claims**

8. Section 503(b) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate."[6]

9. Administrative expenses receive the highest priority in corporate bankruptcy proceedings.[7] Congress created administrative priority to incentivize entities to "do business with the debtor in possession" so as to rehabilitate the business for the benefit of all creditors,[8] as well as to "fulfill[] the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to them."[9] To qualify for administrative priority, the expense must represent "a concrete, discernible benefit" to the estate; a "speculative benefit or the mere potential for benefit is not enough[.]"[10] Thus, as the Third Circuit has summarized, "[f]or a claim in its entirety to be entitled to first priority under [§ 503(b)(1)(A)], the debt must arise from a transaction with the debtor-in-possession. . . . [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the

---

[6] 11 U.S.C. § 503(b).

[7] 11 U.S.C. § 507(a)(1).

[8] *See In re Economy Lodging Sys., Inc.*, 234 B.R. 691 (B.A.P. 6th Cir. 1999); *see also Toma Steel Supply Inc. v. Transamerican Natural Gas Corp. (In re Transamerican Natural Gas Corp.)*, 978 F.2d 1409, 1420 (5th Cir. 1992) (stating that "the purpose of the priority treatment afforded by § 503 is to encourage third parties to provide necessary goods and services to the debtor-in-possession so that it can continue to conduct its business, thus generating funds from which prepetition creditors can be paid").

[9] *Trustees of the Amalgamated Ins. Fund v McFarlin Inc.*, 789 F.2d 98, 101 (2d Cir. 1986).

[10] *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 490 (Bankr. S.D.N.Y. 1991) (quoting *In re United Trucking Serv., Inc.*, 851 F.2d 159, 162 (6th Cir. 1988)); *see Am. Anthracite & Bituminous Coal Comp. v. Leonardo Arrivabene, S. A.*, 280 F.2d 119, 126 (2d Cir. 1960).

operation of the business."[11] Additionally, "[a] party seeking payment of costs and fees as an administrative expense must . . . carry the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets."[12]

10. Because allowance of priority claims reduces the amount of the estate available to prepetition creditors, what constitutes administrative expense is narrowly construed; courts have allowed administrative claims only to those suppliers who were "induced" by debtor in possession to provide goods and services. *In re Massetti*, 95 B.R. 360 (Bankr. E.D. Pa. 1989); *In re Old Carco LLC*, 424 B.R. 633, 642 (Bankr. S.D.N.Y. 2010) ("The services performed by the claimant must have been 'induced' by the debtor-in-possession, not the pre-petition debtor. Considering inducement by the debtor-in-possession to be a crucial element comports with the policy reason for allowing the priority, which is to encourage third parties to supply the debtor-in-possession with goods and services with the goal of achieving a reorganization to benefit all creditors. Thus, benefit to the debtor-in-possession alone, without its having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority, as it would contradict this policy reason for allowing the priority."); *see also In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984); *In re Chateaugay Corp.*, 156 B.R. 391, 399 (S.D.N.Y.), *aff'd*, 10 F.3d 944 (2d Cir. 1993); *In re BH S & B Holdings LLC*, 426 B.R. 478, 486 (Banks. S.D.N.Y. 2010); *In re Globe Metallurgical, Inc.*, 312 B.R. 34, 41 (Bankr. S.D.N.Y. 2004).

11. In one analogous situation, a District Court determined that the bankruptcy court did not err when it found that creditor was not entitled to recover the cost of internet connection

---

[11] *Calpine Corp., v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999) (citation omitted).

[12] *Id.*

services it provided to an internet service provider ("ISP") after ISP declared chapter 11 bankruptcy. *Bertram Communs. LLC v. Netwurx, Inc.*, 433 B.R. 719 (E.D. Wis. 2010). The court reasoned that the creditor's claim was not an administrative claim under section 503(b) because conversations the creditor and the debtor had about postpetition services occurred prepetition and the debtor did not induce creditor to provide those services by making promises to pay for them. The record further supported bankruptcy court's determinations that the creditor was not entitled to payment for services under a theory of unjust enrichment or *quantum meruit* because the creditor continued to provide services after the ISP told the creditor it would not pay for them.

12. Similarly, in *Beneke Co. v. Economy Lodging Sys. (In re Economy Lodging Sys.)*, 234 B.R. 691 (6th Cir. 1999), a consultant did not have an administrative expense claim under a prepetition contract where the debtor did not seek to induce the consultant's continued performance under the contract postpetition and did not seek to assume the contract. The court was not persuaded by the fact that the consultant was unaware of the debtor's intent to reject the contract pursuant to Bankruptcy Code section 365.

**B.**     **F3 Metalworx Has Not Established Postpetition Inducement or Benefit, Any Executory Contract Has Been Deemed Rejected by the Plan, and as of October 31, 2023, the Estates' Interest in the Valance Bands Have Been Abandoned**

13. Here, there is no evidence that the Debtors induced F3 Metalworx to provide postpetition storage services. All of the relevant conduct related to the treatment of the valance bands occurred prepetition. The mere fact that F3 Metalworx presently has the valance bands at "its own warehouse" is insufficient to warrant an administrative expense claim. As noted above, the Debtors never shipped the valance bands to F3 Metalworx but rather to a third-party storage

facility.[13] Any underlying executory contract has been rejected. Finally, the estates' interest in the valance bands has been abandoned.

14. Therefore, there is no postpetition transaction or benefit to the estates and no legal or factual basis for compelling payment of F3 Metalworx's Claim as an administrative expense.

**WHEREFORE**, the Plan Administrator respectfully requests that the Court, (i) deny the Motion in its entirety, and (ii) grant such other and further relief as is just and proper.

Dated: November 7, 2023

*/s/ Colin R. Robinson*
Robert J. Feinstein (admitted *pro hac vice*)
Bradford J. Sandler
Paul J. Labov
Colin R. Robinson
**PACHULSKI STANG ZIEHL & JONES LLP**
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Email:    rfeinstein@pszjlaw.com
          bsandler@pszjlaw.com
          plabov@pszjlaw.com
          crobinson@pszjlaw.com

*Counsel to the Plan Administrator*

---

[13] The two cases cited by F3 Metalworx, *In re Patient Educ. Media, Inc.*, 221 B.R. 97 (Bankr. S.D.N.Y. 1998), and *In re Sturgis Iron & Metal Co., Inc.*, 420 B.R. 716 (Bankr. W.D. Mich. 2009), involve the debtor's postpetition use of the creditor's property pursuant to, respectively, a video production equipment storage contract and an equipment lease. Here, in contrast, as noted above, the Debtors shipped the valance bands to a third party where the Debtors understood that they would be stored. As noted above, F3 Metalworx cannot unilaterally move the valance bands from the third party warehouse in order to manufacture an administrative claim for the estate's use of its property.