J. Alexandra Rhim, Esq. (admitted *pro hac vice*)
**HEMAR, ROUSSO & HEALD, LLP**
15910 Ventura Boulevard, 12th Floor
Encino, California 91436
Telephone: (818) 501-3800
Facsimile: (818) 501-2985
E-mail: arhim@hrhlaw.com

**BERNSTEIN-BURKLEY, P.C.**
Keri P. Ebeck, Esquire
Bar No. 262092017
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
(412) 456-811

*Attorneys for Realty Income Corporation*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

-----------------------------------------------------------------------x
In re                                                  :        Chapter 11
                                                       :
BED BATH & BEYOND, INC., *et al.,*                     :        Case No. 23-13359 (VFP)
                                                       :
        Debtors                                        :        (Jointly Administered)
-----------------------------------------------------------------------x

**REALTY INCOME CORPORATION'S SUPPLEMENTAL OBJECTION
TO DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS
TO ASSUME AND ASSIGN UNEXPIRED NON-RESIDENTIAL
REAL PROPERTY LEASE FOR STORE NO. 1107**

Realty Income Corporation ("RIC" or "Landlord"), landlord to debtor Bed Bath & Beyond, Inc. (the "Debtor") with respect to the retail store located at 1050 McKinley Place Drive, San Marcos, Texas (the "Leased Premises"), submits this objection (this "Objection") to the proposed assumption and assignment of the lease pertaining to Store No. 1107 (the "Lease" or "Lease Agreement"), to Ollie's Bargain Outlet, Inc. ("Ollie's") pursuant to the Notice of Assumption of Certain Unexpired Leases [Docket No. 1157] (the "Assignment Notice"), and the Debtors' Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases [Docket No. 714] (the "Cure Notice"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Debtors seek to assume and assign the Lease to Ollie's in contravention of
Debtors' own Lease and the Landlord's leases with other non-debtors.  The Leased Premises is
located in a shopping center known as the Red Oak Village (the "Shopping Center") located at 1050
McKinley Place Drive, San Marcos, Texas 78666.  Therefore, the shopping center protections of
section 365(b)(3)(C) of the Bankruptcy Code prohibit an assignment to Ollie's because its proposed
use will breach: (a) the Lease itself, including its numerous use and exclusivity provisions; and (b)
exclusivity provisions in other tenant leases.  As explained below, most if not all of these restrictions
were *existing* requirements at the inception of the Lease that the Debtor had contracted to abide by.
Thus, Ollie's as assignee would have the same obligations, yet its store model and inventory mix
clearly violate these restrictions.

2.      Ollie's describes itself as an "***extreme value retailer***" selling consumer merchandise
in "***no-frills, semi-lovely***" stores.  The goods consist of closeout, liquidation overruns, repackaged,
irregular and refurbished items.  Even according to Ollie's, its inventory assortment is "***constantly
changing***" due to its opportunistic acquisition of inventory which necessarily produces an
unpredictable inventory mix.  Given the unknown and changing nature of Ollie's inventory, there is
inherent uncertainty and risk that Ollie's will prospectively sell items that would violate use
exclusives in a manner that is presently unknown.  Ollie's business model creates an ever-present
risk of breaches under the Lease that the Landlord should not have to bear.  This mode of business
fails to satisfy the "first-class" shopping center requirement under the Lease.

3.      Moreover, the proposed assignment violates section 365(b)(3)(D) of the Bankruptcy
Code.   The Lease (including its use and exclusivity provisions) and the tenant leases clearly
contemplate and require that the tenant mix and balance be preserved.  Despite their burden to do

so, the Debtors will be unable to offer evidence to prove that Ollie's proposed tenancy will not disrupt the Shopping Center's tenant mix and balance.

4.       If the Court approves the tenancy, the Landlord will be harmed in precisely the ways Congress sought to prevent in enacting section 365(b)(3). Among other things, at a minimum, the Landlord will incur damages due to rent abatements and other remedies potentially available to other tenants.  The Landlord will face additional losses due to lower patronage and sales.

5.       While the proposed assignment may yield $100,000 in gross consideration to the Debtors, it comes at an unjustifiably high cost to the Landlord.  The proposed assignment furthers Ollie's primary growth strategy which is to open new profitable stores and expand operations into new geographic regions.[1]  Ollie's is free to expand in other areas without imposing such a disproportionate risk upon the Landlord without safeguards.

6.       Fortunately, Congress enacted 365(b)(3) of the Bankruptcy Code to reflect the complexity of shopping centers and to prevent the harm that would ensue in this case from the proposed assignment. The proposed assignment must be denied under the facts of this case.

## FACTUAL BACKGROUND

### Ollie's Bargain Outlet

7.       As its name indicates and according to its 10-K Filing, Ollie's is an "extreme value retailer of brand name merchandise at drastically reduced prices" and is known for its assortment of products offered as "Good Stuff Cheap."[2]  According to Ollie's, 65% of the retail value of its merchandise is based on "brand name and closeout merchandise."[3]  "This merchandise includes overstocks, discontinued merchandise, package changes, cancelled orders, excess inventory and

---

[1]       See Form 10-K for fiscal year ending January 28, 2023 (the "10-K Filing") at p. 19.  A true copy of the 10-K Filing is attached as Exhibit 2 to the Declaration of J. Alexandra Rhim ("Rhim Declaration") filed separately and concurrently.
[2]       See 10-K Filing at Part 1, Item 1 at p.1.
[3]       See *id.*

buybacks from retailers, and major manufacturers."[4]   Ollie's explains that it "*principally* buys overproduced, overstocked, and closeout merchandise."[5]

      8.      Ollie's Form 8-K Filing references its website (www.ollies.us).  A true and correct copy of the Form 8-K Filing is attached as <u>Exhibit 1</u> to the Rhim Declaration.  Excerpts and images from Ollie's own website, including the excerpts below, are appended as <u>Exhibit 6</u> to the Rhim Declaration.

      9.      In Ollie's website (www.ollies.us), Ollie's describes its business model as follows:



Ollie's is America's largest retailer of closeout merchandise and excess inventory. Our 501 "semi-lovely" stores sell merchandise of all descriptions and some beyond description.

You'll find real brands at real bargain prices in every department, from housewares to sporting goods to flooring and to food. Ollie's buyers scour the world looking for closeouts, overstocks, package changes, manufacturer refurbished goods, and irregulars.

Much of the merchandise comes direct from the finest manufacturers in the country and abroad. For example, if a manufacturer makes too much of an item, or changes their packaging, Ollie's will buy the overstocked or old packaged items. So, you will always find famous brand name products at Ollie's, but a lot of them could be last year's colors, patterns, or packaging that traditional retailers won't sell.

Ollie's has also worked very closely with financial institutions. When companies are liquidated, the banks will often sell remaining inventories and turn them into cash. Ollie's will buy the goods back and pass the savings on to you, the customer.

Everything you buy at Ollie's is covered by our *30-day No Hard Time Guarantee*. If for any reason you are not completely satisfied with your purchase - return it within 30 days for a full refund (with sales receipt).



      10.      Ollie's website also provides a glossary of terms used in its website pertaining to, among other things, the types of merchandise it sells.  The glossary is excerpted in part as follows:

---

[4]    See *id.* at p.5.
[5]    See *id.* at p. 4 (emphasis added).

 

**Good Stuff Cheap** - good quality products at great prices

**Semi-lovely** – functional, but not particularly pretty and shiny like those other fancy stores

**Deal** – a bargain on good quality products at a great price

**Closeout** - items that will no longer be manufactured or sold by a fancy store. The last batch of goods

**Buyout** – all of the items a supplier or manufacturer had left over after selling to their usual buyers

**Excess Inventory/Overstock/Overrun** – the items left over after a manufacturer sold their contracted allotment of goods to their usual buyers

**Liquidated** - Products of companies (usually companies that have closed) that are sold in return for cash

**Discontinued** – goods that are no longer produced

11.    Ollie's further explains in its website and 10-K Filing that its stores are operated in a "no-frills, semi-lovely warehouse style."  According to Ollie's own glossary, this means that the stores are "functional, but not particularly pretty and shiny like those other fancy stores."  Yet, the Lease which, on its face, requires the Shopping Center to be operated and managed as a first-class shopping center.

12.    Ollie's inventory perpetually changes due to its opportunistic inventory acquisition. Ollie's explains in its website: "Our constantly changing merchandise assortment is procured by a highly experienced merchant team, who leverage deep, long-standing relationships with hundreds of major manufacturers, wholesalers, distributors, brokers and retailers. These relationships enable our merchant team to find and select only the best buys from a broad range of brand name and closeout product offerings and to pass drastically reduced prices along to our customers."

13.    Ollie's admittedly engages in the sale of "***closeout merchandise and excess inventory***" and advertises that it sells "manufacturer refurbished goods", irregulars" and other re-packaged goods.  "When companies are liquidated, the bank will often sell remaining inventories and turn them into cash[;] Ollie's will buy the goods back and pass the savings on to you, the customer."

14.     In its website, Ollie's advertises that it sells the following highly-varied categories of merchandise.  Ollie's "offers brand name merchandise at up to 70% off the fancy store prices." Ollie's 10-K filing (Part 1 at pps. 5 and 6) further reference the varied and unpredictable nature of its inventory.



15.     Ollie's also explains that it "compete[s] with a diverse group of retailers, including discount, closeout, mass merchant, department, grocery, drug, convenience, hardware, variety, online, and other specialty stores."  Ollie's 10-K filing (Part 1 at p.10).

**Subject Lease and Use Restrictions**

16.     Landlord and debtor Bed Bath & Beyond, Inc. ("Debtor" or "Tenant") are parties to that certain Lease Agreement dated September 29, 2005 (the "Lease," as amended) and such other related agreements.  A true and correct copy of the Lease is appended as Exhibit 2 to the concurrently filed Declaration of Demetri Lahanas (the "Lahanas Declaration").

17.     Debtor concurrently issued the Tenant Estoppel Certificate Dated September 29, 2005 (the "Estoppel Certificate") which referenced, among other things: a Letter Agreement dated July 18, 2005 between Marmaxx Operating Corp. ("Marshalls") and Debtor regarding exclusive use matters and a Letter Agreement dated October 25, 2005 between Ross Dress For Less, Inc. ("Ross")

6

and Debtor regarding exclusive use matters.  A true and correct copy of the Estoppel Certificate and the letter agreements are appended collectively as <u>Exhibit 3</u> to the Lahanas Declaration.

18.     Pursuant to letter agreements, Debtor twice exercised the option to extend the term of the Lease Agreement from February 1, 2017 through January 31, 2022 and thereafter from February 1, 2022 through January 31, 2027.  True and correct copies of the letter agreements are appended, collectively, as <u>Exhibit 4</u> to the Lahanas Declaration.

19.     The Premises is located in the Shopping Center.  The Landlord is the fee owner of Lots 1 and 2 in the Shopping Center.[6]  Below is an excerpt from the site map of the Shopping Center which shows that the Premises are flanked by and adjacent to the Ross and Marshalls stores.  The Premises is also in close proximity to Best Buy Stores, L.P. ("<u>Best Buy</u>") which is adjacent to Ross.  The Premises is across the parking lot from PETsMART.



---

[6]     See Exhibit 1 (Special Warranty Deed) appended to the Lahanas Declaration.  The Landlord is the successor to all of Cole MT San Marcos TX, LLC pursuant to a merger transaction with VEREIT, Inc.  See Lahanas Declaration at paras. 7-9.

20.    Marshalls, PETsMart, and Best Buy lease their respective space in the Shopping Center from the Landlord as explained below.

a.    Marshalls leases its space from the Landlord pursuant to a Lease Agreement dated as of July 21, 2005 between the Landlord and Marshalls (the "Marshalls Lease"). A Memorandum of Lease Agreement was further recorded on September 12, 2005 (the "Marshalls MOL"). The Marshalls Lease and Marshalls MOL sets forth an exclusive provision prohibiting the Landlord from leasing space to a retailer that sells or displays used merchandise or second-hand goods. On its website (www.ollies.us), Ollie's describes itself as "America's largest retailer of closeout merchandise and excess inventory." Ollies also advertises that it sells "manufacturer refurbished goods, and irregulars." By admittedly selling used or second-hand goods, Ollie's proposed use would violate the exclusive provision in the Marshalls Lease. A true copy of the Marshalls MOL is attached as Exhibit 5 to the Lahanas Declaration.

b.    PetsMart leases its space from the Landlord pursuant to a Lease Agreement dated as of August 4, 2005 between the Landlord and PetsMart (the "PetsMart Lease"). A Memorandum of Lease Agreement was also recorded on December 15, 2006 (the "PetsMart MOL"). The PetsMart Lease and PetsMart MOL both contains use provisions that prohibits the Landlord from leasing space to a thrift store or "liquidation outlet." As described above, Ollie's admittedly describes itself as the seller of overstock, "closeout merchandise and excess inventory." In fact, Ollie's states that: "*When companies are liquidated, the bank will often sell remaining inventories and turn them into cash[;] Ollie's will buy the goods back and pass the savings on to you, the customer.*" Accordingly, Ollie's admits that it assists with liquidation of inventory so that its business model would violate the exclusive provisions in the PetsMart Lease and PetsMart MOL. A true copy of the PetsMart MOL is attached as Exhibit 6 to the Lahanas Declaration.

c.       Best Buy leases its space from the Landlord pursuant to a Lease Agreement dated as of March 30, 2007 between the Landlord and Best Buy (the "Best Buy Lease"). A Memorandum of Lease Agreement was also recorded on July 18, 2007 (the "Best Buy MOL"). The Best Buy Lease contains an exclusive provision that prohibits the Landlord from leasing space to a retailer that is a "second hand" store, *schlock* store, or "surplus store." The Best Buy MOL further prohibits the sale of electronics, appliances, televisions, stereos, car radios, tape decks or phones, entertainment software, office equipment, cameras, supplies, furniture and substitutes for or items are technological evolutions of the above and related items. As described above, Ollie's describes itself as a retailer of "closeout merchandise and excess inventory" and advertises that it sells "manufacturer refurbished goods", irregulars" and other re-packaged goods as well as items described in the Best Buy MOL. Accordingly, Ollie's business model and inventory that it sells would violate the exclusive provision in the Best Buy Lease and the Best Buy MOL. A true copy of the Best Buy MOL is attached as Exhibit 7 to the Lahanas Declaration.

*Use Restrictions*

21.       **To summarize, the Lease expressly limits the Tenant's use to: (1) "lawful" retail use; (2) that is not prohibited by Section 13.1.1 of the Lease Agreement (Exhibit M (Prohibited Uses); Exhibit K-1 (Existing Exclusives)); and (3) in compliance with all rules and regulations, including Operating Easement Agreements.**

22.       Section 1.1.27 of the Lease Agreement provides that the "Permitted Use" of the premises must be for "lawful" retail use not prohibited by Section 13.1.1 and other provisions of the Lease Agreement.

23.       Section 13.1.1 of the Lease Agreement provides that the: "Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable." Exhibit M at

Section 3 provides that "Prohibited Uses" for the Premises would be for any "second hand" store or "surplus" store; and Section 27 prohibits any supermarket as except an upscale, boutique-type food store.

24.     Section 13.3.1 of the Lease Agreement further provides that the "Tenant shall honor certain exclusives and certain prohibited uses granted by landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which executed prior the Effective (hereinafter, "***Existing Exclusives***") [a true and complete listing and description of such Existing Exclusives being attached hereto as <u>Exhibit K-1</u>], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusives (except as may be specifically set forth on <u>Exhibit K-1</u>)."

25.     The Existing Exclusives identified in Exhibit K-1 of the Lease pertain to Marmaxx Operating Corp. ("<u>Marshalls</u>") and PETsMART, Inc. ("<u>PETsMART</u>") as described in greater detail below.

26.     As for PETsMART, Exhibit K-1(1) restricts use of the Premises to 1,000 sq. ft. of gross floor area or 5% of sales area for the pet food, accessories, products related to nature and the environment and educational products related to the foregoing and office and storage use incidental to the foregoing. Exhibit K-1(1)(b) states that "Prohibited Uses" are for "used clothing" or "thrift store" or "***liquidation outlet***." Further, Exhibit K-1(1)(b) states that "it is the intent of this Section that the Shopping Center shall be devoted to high quality retail uses." Yet, Ollie's advertises that it is the seller of overstock, "closeout merchandise and excess inventory." Ollie's states that: "*When companies are liquidated, the bank will often sell remaining inventories and turn them into cash[;] Ollie's will buy the goods back and pass the savings on to you, the customer*."

27.     As for Marshalls, Exhibit K-1(2) prohibits the Shopping Mall from, at any time, devoting more than 25,000 sq. feet to the sale or display of "off-price apparel and related accessories

. . . "  Exhibit K-1(2)(b) provides that the Premises "shall not be used for any establishment which sells or displays used merchandise or second hand goods."  On its website (www.ollies.us), Ollie's describes itself as "America's largest retailer of closeout merchandise and excess inventory." Ollies also advertises that it sells "manufacturer refurbished goods, and irregulars."  Dollar Tree is an existing tenant in the Shopping Center with a space that is 8,000 square feet.  When combined with the Premises which is 23,000 square feet, the 25,000 square feet limitation for sale of off-price apparel and related accessories would be exceeded.

*Operating Easement Agreements | Recorded Documents*

28.    Section 12.5.2 of the Lease requires that the "***Tenant shall comply with the terms and conditions of the OEAs*** to the extent same affects the Premises . . . " (emphasis added).  Section 5.2.7 of the Lease Agreement likewise requires that the "Tenant shall comply with the rules and regulations of the Shopping Center. . ."

29.    Section 12.5.1 of the Lease identifies the Operating Easement Agreements (OEAs) that the Tenant and Landlord are required to comply with:

a.    The Declaration of Covenants, Conditions and Restrictions, dated May 24, 1996 between Mary Ann Hood, Trustee and Lowe's Home Centers, Inc., recorded on May 28, 1996 (the "Lowe's OEA") as amended by the First Amendment, dated on or about June 20, 2005 and the Second Amendment, dated on or about June 13, 2006, which contain certain use limitations and exclusives.  Section 3.6 of the Lowe's OEA imposes use restrictions prohibiting the Premises to be used as a "retail and/or warehouse home improvement center, lumber yard, building materials supply center. . . "  Lowe's Home Centers, Inc. ("Lowes") is the fee owner of and presently operating the property that is the subject of the Lowe's OEA.  A true copy of the Lowe's OEA together with its amendments is attached as Exhibit 8 to the Lahanas Declaration.

b.    The Easements with Covenants and Restrictions Affecting Land in favor of

Sam's Real Estate Business Trust (the "Sam's OEA").  The Sam's OEA at Section 3 (Competing Business) sets out use restrictions prohibiting "discount department store or other discount store," "a variety, general or "dollar store, "a grocery store or supermarket", or a combination of the above. Sam's Club is the fee owner of and presently operates the property that is the subject of the Sam's OEA.  A true copy of the Sam's OEA is appended as Exhibit O to the Lease Agreement (attached as Exhibit 1 to the Lahanas Declaration).

30.     Section 13.1.2 of the Lease obligates Landlord to: "lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located."  The PETsMart MOL and Bestbuy MOL likewise provide for this requirement.  Exhibit K-1 relating to PetsMart specifically requires that the "Shopping Center shall be devoted to high quality retail uses."  Exhibit M of the Lease reiterates the "first-class" requirement for various retail uses as follows:  Section 14 prohibits books store other than "first-class" stores like Borders and Barnes & Noble; Section 28 requires retail office use to be "first-class"; Section 35 requires restaurants to be "first-class"; Section 5.1.1 of the Lease further obligations Landlord to maintain all common areas up to a "first-class" standard.

31.     The above permitted uses, and Existing Exclusives, provisions of other non-debtor leases and OEAs (collectively, the "Other Tenant Leases") provide for restrictions that account for co-tenant considerations and competitive concerns.  Thus, the Lease clearly contemplates and allows Landlord to control the tenant mix and balance at the Shopping Center.

## LEGAL ARGUMENT

## I.     THE PROPOSED ASSIGNMENT IS PROHIBITED BY SECTION 365(b)(3)(C)

### A.     Legal Standard Under the Bankruptcy Code

1.     It is a mandatory requirement that a debtor must provide adequate assurance of an assignee's future performance to assign an executory contract or unexpired lease to a third party in

bankruptcy. 11 U.S.C § 365(f)(2). When a lease is for real property in a shopping center, a debtor

bears the burden to prove adequate assurance exists, and that burden is high. *In re Joshua Slocum,*

*Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990). Specifically, a debtor must establish each of the following

four elements to meet its burden and assign a shopping center lease over a landlord's objection:

> (A) . . . that the financial condition and operating performance of the proposed
> assignee . . . shall be similar to the financial condition and ***operating***
> ***performance of the debtor*** . . . ***as of the time the debtor became the lessee***
> ***under the lease***;
> (B) that any percentage rent due under such lease will not decline substantially;
> (C) that . . . assignment of such lease is subject to all the provisions thereof,
> including (but not limited to) provisions such as a radius, ***location, use, or***
> ***exclusivity provision***, and will not breach any such provision contained ***in any***
> ***other lease***, financing agreement, or master agreement relating to such
> shopping center; and
> (D) that assumption or assignment of such lease will not disrupt any tenant mix
> or balance in such shopping center.

11 U.S.C. § 365(b)(3) (emphasis added). *See also MOAC Mall Holdings LLC v. Transform*

*Holdco LLC (In re Sears Holdings Corp.)* ("*Sears*"), 613 B.R. 51, 76–77 (S.D.N.Y. 2020), vacated

on other grounds, 143 S. Ct. 927 (2023) (recognizing a debtor must meet each requirement to

assign an unexpired shopping center lease).

2.      Courts must interpret statutes according to their plain meaning. *See In re Visteon*, 612

F.3d 210, 219 (3d Cir. 2010) (recognizing that "all cases of statutory construction . . . begin[] with

the statute's plain language"). "Courts must presume that a legislature says in a statute what it means

and means in a statute what it says there." *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir.

2010). If "the words of a statute are unambiguous, . . . judicial inquiry is complete." Id.

**B.      The Plain Meaning of Section 365(b)(3)(C)**

3.      Section 365(b)(3)(C) is clear: an assignment of a shopping center lease "is subject to

all the provisions thereof [i.e. all the provisions of the debtor's lease], including (but not limited to)

provisions such as a radius, location, use, or exclusivity provision, and will not breach any such

provision [i.e. a radius, location, use, or exclusivity provision] contained in any other lease, financing agreement, or master agreement relating to such shopping center[.]" 11 U.S.C. § 365(b)(3)(C) (emphasis added).

4.     Section 365(b)(3)(C) plainly requires that shopping center lease assignments respect the radius, use and exclusive provisions in *both* the debtor's lease and other, non-debtor leases at the shopping center. *See* 11 U.S.C. § 365(b)(3)(C); *see also* S. REP. NO. 97-527, at 1, 2, 5, 7, 9, 10, 13, 16–17, and 19 (all reflecting that section 365(b)(3)(C) was enacted to deal with concerns about a proposed assignment's effect on other non-debtor tenants in a shopping center).

**C.     The Proposed Assignment Unequivocally Violates Section 365(b)(3)(C) With Respect to the Debtor's Lease and its *Use and Exclusivity Provisions*.**

5.     The Lease would require that Ollie's, as assignee, abide by the Prohibited Uses and Existing Exclusive provisions and the OEA's under the Lease.  Given Ollie's business model, its operation would clearly be in violation of these restrictions.   Ollie's is admittedly a liquidation/bargain outlet that sells unpredictable and fluctuating merchandise.  Ollie's also acts as a liquidation arm for others.   These aspects are squarely in violation of the Lease and OEA restrictions as explained below.

6.     Exhibit M at Section 3 of the Lease provides that "Prohibited Uses" for the Premises would be for any "second hand" store or "surplus" store.  To reiterate, Ollie's admittedly serves as a bargain/liquidation outlet that sells overruns and surplus items.

7.     Exhibit K-1 of the Lease sets out "Existing Exclusives" in favor of PetsMart and Marshalls that prohibit the use of any portion of the Premises as a liquidation outlet or to sell off-price apparel (utilizing space that exceeds the 25,000 sq. ft. aggregate requirement).  It is abundantly clear that Ollie's serves as a liquidation outlet and sells off-price apparel in contravention of the Prohibited Use and Existing Exclusives.  When coupled with Dollar Tree, the 25,000 sq. ft.

limitation is exceeded.

8.      The Lease also obligates a tenant to abide by existing OEAs.  The Lowe's OEAs prohibit, among other things, the sale of retail home improvement building materials.  Yet, it is clear that Ollie's sells and advertises the sale of such materials.  The Sam's OEAs prohibits the use of the Premises as a discount department store, variety/general store, grocery store or combination of the above.  [See Exhibit O appended to Lease]  Again, Ollie's operates as this type of prohibited store model and sells the sale of such items.  [See Para. 13 above.]

9.      As explained above, the heavily discounted and highly varied type of merchandise sold by Ollie's (including other unknown categories) under a liquidation model violate the express use exclusives under the Lease.  In addition, the unpredictable nature of Ollie's inventory create an ongoing risk that Ollie's use, albeit unknown at this time, would violate the use and exclusive restrictions.

10.     Even under the most restrictive interpretation of Section 365(b)(3)(C), it is clear that a lease assignment cannot cause a breach under the underlying Lease being sought to be assigned. *In re Toys "R" Us*, 587 B.R. 304 (Bankr. E.D. Va. 2018) ("*Toys*").

**D.      The Proposed Assignment Unequivocally Violates Section 365(b)(3)(C) With Respect to the *Other Tenant Leases*.**

11.      Given the unambiguous and plain meaning of section 365(b)(3)(C), the Debtors cannot be allowed to assign the Lease to Ollie's.  Such assignment would not only violate the express provisions under the Lease (including the use and exclusivity requirements) but also terms of the Other Tenant Leases.

12.     The Best Buy Lease constitutes (i) an "other lease" that (ii) "relates to" the Shopping Center, and (iii) includes an exclusivity provision, (iv) that Ollie's proposed use will breach. Under these facts, the Debtor cannot meet its mandatory burden to satisfy section 365(b)(3)(C) with respect

to Ollie's. *See Sears*, 613 B.R. at 76–77 (debtor must establish all four elements of section 365(b)(3) to prove adequate assurance and thereby assign a shopping center lease). The proposed assignment must be denied.

**E.      Attempts to Evade the Plain Meaning of Section 365(b)(3)(C) With Respect to Other Tenant Leases Fail and Result in Statutory Surplusage**

13.     The Court should reject the Debtors' arguments for why Other Tenant Leases are irrelevant to the analysis.  As explained above, at the inception of the Lease, the Debtor was aware of these Other Tenant Leases.  And, upon twice seeking extensions of the lease term, the Debtor was cognizant of the Other Tenant Leases and any other OEAs which were in existence.  Yet, the Debtor determined it would exercise the extension options in view of these existing leases.

*i.      Toys "R" Us* **is Not Binding and Was Wrongly Decided**

14.     The Debtors encourage the Court to follow a decision from the Eastern District of Virginia, *In re Toys "R" Us*, 587 B.R. 304 (Bankr. E.D. Va. 2018) ("*Toys*"), to hold that section 365(b)(3)(C) only restricts a shopping center lease assignment that would breach a use or exclusivity provision in a lease to which the debtor is a party.  Here, the proposed assignment would very clearly breach the Lease itself including its use and exclusivity provisions.  In the event the Debtor argues that Toys would permit such use and exclusive provisions that flow from other tenant leases, the Court should not follow *Toys*, which is not binding on this Court and was wrongly decided.

15.     In *Toys*, a bankruptcy judge faced similar facts to those presented here: a contested shopping center lease assignment where the proposed assignee would violate an exclusive use provision in a separate, later non-debtor lease at the shopping center. The judge held the proposed assignment did not violate section 365(b)(3)(C) because the exclusive use restriction did not appear in the debtor's earlier lease being assigned. *See Toys*, 587 B.R. at 310.

### a.    *Toys* Is Not Binding

16.    The judge in *Toys* did not examine the plain meaning of section 365(b)(3)(C) to make his decision. Instead, he relied on a single sentence in the Fourth Circuit's 2004 opinion in *Trak Auto*, to describe the legislative purpose of section 365(b)(3)(C). *See Toys*, 587 B.R. at 309 (quoting *Trak Auto* to hold that the purpose of section 365(b)(3)(C) "is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out *in the lease with the debtor-tenant*") (emphasis in original).

17.    The judge's failure to follow the statute's plain meaning is reason alone for this Court to reject *Toys. See Phila. Newspapers*, 599 F.3d at 304 (stating, if "the words of a statute are unambiguous, . . . judicial inquiry is complete"). There is another reason to jettison *Toys*: *Trak Auto* actually got the legislative purpose of section 365(b)(3)(C) wrong.

18.    *Trak Auto* addresses one issue: whether section 365(b)(3)(C)'s specific limitations on assigning a shopping center lease controlled over then-section 365(f)(1)'s general invalidation of anti-assignment provisions in bankruptcy. *Trak Auto* held that section 365(b)(3)(C), the more specific provision, controlled. *See Trak Auto*, 367 F.3d at 243–44 (applying the basic principle of statutory construction that a specific provision controls over a more general provision of a statute). In fact, *Trak Auto* held nothing about the purpose of section 365(b)(3)(C), and the Fourth Circuit's one sentence commentary about the purpose of that section—on which the entire *Toys* decision is based—is dicta.

19.    Even as dicta, *Trak Auto's* statement about the purpose of section 365(b)(3)(C) is incorrect. The Fourth Circuit relied on *In re Ames Dep't Stores, Inc.* ("*Ames*"), 121 B.R. 160, 165 n.4 (Bankr. S.D.N.Y. 1990) to support its statement that, "Congress's purpose in § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out in the lease with the debtor-tenant." *Trak Auto*, 367 F.3d at 244. *Ames*, however,

is a case about tenant mix under section 365(b)(3)(D), not the requirement to honor use, exclusivity

and radius provisions in shopping center leases under section 365(b)(3)(C). *See Ames*, 121 B.R. at

165 (analyzing whether a proposed assignment satisfies section 365(b)(3)(D)). Although *Ames* refers

to section 365(b)(3)(C) in a footnote, it does so in passing to highlight a change Congress made to

sections 365(b)(3)(C) and 365(b)(3)(D) in 1984 to strengthen a landlord's ability to protect itself

against a harmful assignment in bankruptcy. *See id.* at 165 n.4.7 *Ames* does not address the

legislative purpose of the portion of section 365(b)(3)(C) in controversy here, *i.e.* that assignment of

a shopping center lease must not breach the use, exclusivity and radius restrictions in other leases at

the shopping center. Congress has addressed that purpose squarely, stating that section 365(b)(3)(C)

is intended to is to protect the interests of landlords and other non-debtor tenants in a shopping

center. *See, e.g.*, S. REP. NO. 97-527 at 1, 2, 5, 7, 9, 10, 13, 16–17, and 19.

### b.    The Court Should Follow *Sears*, Not *Toys*

20.    This Court should follow the Southern District of New York's recent guidance in

*Sears*, which reminds bankruptcy judges to follow section 365(b)(3)'s plain meaning when deciding

contested shopping center lease assignments. *See Sears*, 613 B.R. at 77–78.

21.    In *Sears*, a bankruptcy judge evaluated, *inter alia*, whether a debtor satisfied section

365(b)(3)(A) with respect to a proposed shopping center lease assignment. *See id.* at 61–63. Section

365(b)(3)(A) requires that, to assign a shopping center lease, a debtor prove the proposed assignee's

financial condition and operating performance are similar to the debtor when it entered the lease.

*See* 11 U.S.C. § 365(b)(3)(A). Sears did not prove that its proposed assignee met that standard, but

it did prove the assignee satisfied a minimum financial condition provision in the lease that would

have allowed Sears to assign the lease to the proposed assignee outside of bankruptcy. *See Sears*,

613 B.R. at 62–63. The bankruptcy judge held that compliance with the lease satisfied section

365(b)(3)(A) because some courts look only to lease terms to decide issues of tenant mix under

section 365(b)(3)(D).  *See id.* at 65–67.

22.     The district court vacated the bankruptcy court ruling, holding that the bankruptcy judge erred in failing to follow the plain meaning of section 365(b)(3)(A). Specifically, the district court found that section 365(b)(3)(A) is clear on its face and, unlike section 365(b)(3)(D), "does not use a phrase that requires resort to the lease to give it definition and context." *Id.* at 77. As a result, the bankruptcy judge improperly "read § 365(b)(3)(A) out of the statute, effectively rewriting it and overriding the express wishes of the legislature."

23.     The narrow view of *Toys* cannot be endorsed since it would result in statutory surplusage.  Under this approach to statutory construction, every word and every provision is to be given effect and none should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.

24.     The plain meaning of section 365(b)(3)(C) requires consideration of "any other lease."  Contrasting to section 365(b)(3)(A) which refers to a debtor's lease, section 365(b)(3)(C) necessarily refers to the landlord's other leases.  Moreover, section 365(b)(3)(C) does not qualify such other lease by way of timing, notice or knowledge.  Had Congress intended to include such additional qualifiers or conditions, it would have as it did in section 365(b)(3)(A) where a temporal qualification was included.

## III.    THE PROPOSED ASSIGNMENT WILL UPEND TENANT MIX AND BALANCE

25.     If approved, the proposed assignment will place Ollie's, an "extreme value retailer" adjacent to Marshalls, Ross and across the parking lot to Dollar Store.

26.     Adding Ollie's to the tenant mix at the Shopping Center will not increase patronage. *See Joshua Slocum*, 922 F.2d at 1086, 1089 (recognizing that section 365(b)(3)(D) seeks to protect tenant mix, which is critically important to driving patronage at a shopping center). Rather, Ollie's, Marshalls, Ross and Dollar Store will attract and compete for the same set of patrons (*i.e.* shoppers

of discounted goods) and cannibalize each other's business.  That such cannibalization will occur within 150 linear feet of each other makes matters even worse. *See Matter of Federated Dept. Stores, Inc.*, 135 B.R. 941, 943 (S.D. Ohio 1991) (recognizing that tenant balance is all about "[l]ocation, location, location").

27.     By any measure, an assignment to Ollie's will set the tenant mix and balance at the Shopping Center on their heads. While Ollie's may want to force its way into the Shopping Center for its own competitive reasons, section 365(b)(3)(D) prohibits Ollie's from disrupting the Power Center's carefully managed tenant mix and balance.

28.     It is true that certain stores within the Shopping Center sell similar items to Ollie's. Of import, however, none of those stores openly and predominantly operate as a liquidation arm, selling closeout merchandise and excess inventory.  If anything, the careful, express and limited authorization for those stores to sell discrete items that may overlap with existing tenants underscores the Landlord's efforts to preserve the tenant mix and balance within the Shopping Center.  Further, those other stores have obtained the requisite consent from co-tenants and others and also have superior retail presentation.

29.     To summarize, the Lease contains provisions that recognize the Landlord's interest in maintaining tenant mix and upholding the quality of the Shopping Center.  As noted above, the Lease contains a provision that requires the Landlord to uphold the "first-class" character of the Shopping Center.  It is unclear that Ollie's can comply with this mandate given that its stores are admittedly "no-frills, semi-lovely warehouse style."  According to Ollie's own glossary in its website, this means that the stores are merely functional and industrial in function and appearance.

30.     Further, the Lease contains a provision that enables the Landlord to prevent any assignment whose assignee's proposed use conflicts with the tenant mix and balance in effect at the Shopping Center when the Lease is assigned. This contractual bargained-for ability to control an

assignee's use of the Premises speaks directly to tenant mix and balance. *See e.g.*, S. REP. NO. 97-527, at 15 (recognizing that restrictive use clauses are necessary to define and protect the relationships between stores in shopping centers). Both the Lease and section 365(b)(3)(D) expressly protect tenant mix and balance at the Shopping Center against an improper assignment—in or outside bankruptcy.

31.     The proposed Ollie's tenancy will disrupt tenant mix and balance at the Shopping Center. The Debtors cannot meet their burden to assign the lease to Ollie's under section 365(b)(3)(D). The Debtors' request to assign the Lease to Ollie's must be denied.

## IV.     THE LANDLORD'S RISK OF HARM IS NOT ILLUSORY

32.     If the Lease is assigned to Ollie's in violation of section 365(b)(3), the Landlord will be harmed in ways section 365(b)(3) is intended to prevent.

33.     The Landlord faces the specter of suffering a rent abatement under the Other Tenant Leases while having to incur substantial legal fees to litigate the proposed assignment.

34.     If the Landlord were to suffer a reduction in percentage rent under the Lease, such result would be in violation of section 365(b)(3)(B).

35.     The Landlord will suffer an overall reduction in patronage at the Shopping Center due to the disruption in tenant mix and balance that having two specialty retailers located practically next door to each other will cause.

## V.     THE LANDLORD IS OBLIGATED TO OBJECT TO THE PROPOSED ASSIGNMENT

36.     As further evidence of the Landlord's interest and rights with respect to tenant mix, certain of the Other Tenant Leases obligate the Landlord to pursue an objection to any lease assignment that would violate such Other Tenant Leases or other requirements.

37.     The Landlord is entitled to a safe harbor that, if the proposed assignment is permitted, that it should not be deemed to be in breach under the Other Tenant Leases or such other requirements due to such assignment.

## RESERVATION OF RIGHTS

38.     The Landlord reserves the right to make such other and further objections as may be appropriate based upon any new information provided by the Debtors or Ollie's, including requests for adequate protection under section 363(e) of the Bankruptcy Code.   The responsive pleadings may address other issues the Court may be required to decide, depending on whether the Objection is sustained. Specifically, issues of cure amount, unbilled amounts and attorney fees under the Lease are unresolved, and the Landlord reserves all of its rights regarding any open issues that remain once the Objection is decided.

39.     The Landlord further reserves all rights including the ability to seek and enforce the indemnity under Section 12.4.7 of the Lease and such other rights and remedies under the Lease and applicable law.

**WHEREFORE**, the Landlord requests that the Court enter an order denying the proposed assignment of the Lease to Ollie's and granting such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 14, 2023

**BERNSTEIN-BERKLEY, P.C.**

By: */s/ Keri P. Ebeck*
Keri P., Ebeck, NJ ID No. 262092017
kebeck@bernsteinlaw.com
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
Telephone: 412-456-8112
Fax: 412- 456-8135

*Attorneys for Realty Income Corporation*

-and-

**HEMAR, ROUSSO & HEALD LLP**

By: _/s/ J. Alexandra Rhim_
15910 Ventura Blvd., 12th Floor
Encino, CA 91436
Telephone: 818-501-3800
Fax: 818-501-2985
J. Alexandra Rhim, Esq.
arhim@hrhlaw.com
*Admitted Pro Hac Vice*
*Attorneys for Realty Income Corporation*