J. Alexandra Rhim, Esq. (admitted *pro hac vice*)
**HEMAR, ROUSSO & HEALD, LLP**
15910 Ventura Boulevard, 12th Floor
Encino, California 91436
Telephone: (818) 501-3800
Facsimile: (818) 501-2985
E-mail: arhim@hrhlaw.com

**BERNSTEIN-BURKLEY, P.C.**
Keri P. Ebeck, Esquire
Bar No. 262092017
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
(412) 456-811

*Attorneys for Realty Income Corporation*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| BED BATH & BEYOND, INC., *et al.,* | : | Case No. 23-13359 (VFP) |
| | : | |
| Debtors | : | (Jointly Administered) |

------------------------------------------------------------------------x

**DECLARATION OF MATTHEW MACDONALD IN SUPPORT OF REALTY INCOME CORPORATION'S SUPPLEMENTAL OBJECTION TO DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO ASSUME AND ASSIGN <u>UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASE FOR STORE NO. 1107</u>**

I, Matthew MacDonald, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.  I am Senior Director of Asset Management for Realty Income Corporation ("<u>RIC</u>" or "<u>Landlord</u>").

2.  I have personal knowledge of the facts set forth below; am authorized to make this Declaration; and, if called to testify, would testify competently as to the facts set forth herein.

3.  RIC is the fee owner and landlord of the shopping center commonly known as Red Oak Village (the "<u>Shopping Center</u>") located at 1050 McKinley Place Drive, San Marcos, Texas 78666 including the premises located there known as Store No. 1107 (the "<u>Premises</u>"), which is the

subject of Debtor's (defined below) motion seeking to assume and assign the lease pertaining to the Premises.

4. Lincoln PO Red Oak Village, L.P. ("Lincoln Village") was the original fee owner and landlord in connection with the Premises and the Shopping Center. On or about December 22, 2010, pursuant to a Purchase Agreement, Cole MT San Marcos TX, LLC ("Cole MT") purchased the real property comprising Lots 1 and 2 in the Shopping Center (wherein the Premises is located). On December 18, 2010, pursuant to a Special Warranty Deed, Cole MT became the assignee and fee owner of Lots 1 and 2 of Lincoln Village in connection with the Premises and Shopping Center. A true and correct copy of the Special Warranty Deed is attached as Exhibit 1 to the Williams Declaration (as defined below).

5. Pursuant to a merger transaction that closed on or about August 12, 2021, RIC acquired all equity interests in VEREIT, Inc. ("VEREIT"). Cole MT was a wholly-owned subsidiary of VEREIT. Following the August 12 merger, through its acquisition of all interests in VEREIT, Cole MT became a subsidiary of RIC, which became the successor and holder of all of Cole MT's, respective, right, title and interest in the Property, Premises and the Lease Agreement (defined below). The merger with VEREIT and RIC's acquisition of interests in Cole MT are described in RIC's 10-K Filing and Exhibit 21.1 (subsidiaries).[1]

Background

6. I am also a custodian of record with respect to the leases and documents appended to the concurrently filed Declaration of Sara Williams (the "Williams Declaration"). Therefore, I reiterate paragraphs 3 through 6 in the Williams Declaration and can likewise attest to the authenticity of the documents and to the accuracy of the transactions relating thereto as described in

---

[1] True copies of the 10-K Filing and Exhibit 21.1 are attached as Exhibits 4 and 5 to the Declaration of J. Alexandra Rhim filed separately and concurrently herewith.

that declaration.

7. Prior to my employment at RIC, I was employed by a developer of shopping centers and was involved in the aspects of building, construction, leasing and shopping mall tenant issues pertaining to those centers. In my role at RIC, I am involved in locating potential tenants and all matters leading to consummation of a lease transaction with such tenants. In particular, my duties include reviewing permitted uses, use exclusives and operating easement agreements as part of determining appropriate tenants. I am involved in entering into new leases, renewing leases and renegotiating existing leases. I am also involved in obtaining consents from tenants in connection with prospective tenants in light of existing use restrictions. As such, I am experienced and knowledgeable in connection with the handling of use restrictions and tenant mix issues in a shopping center.

8. I have been personally involved in reviewing the tenant mix and potential leasing of the Premises at issue. I have personal knowledge and familiarity with the Shopping Center at issue.

## Subject Lease and Other Tenant Leases

9. Landlord and debtor Bed Bath & Beyond, Inc. ("Debtor" or "Tenant") are parties to that certain Lease Agreement dated September 29, 2005 (the "Lease Agreement," as amended) and such other related agreements that govern Debtor's lease and tenancy of the Premises. A true and correct copy of the Lease Agreement is appended as Exhibit 2 to the Williams Decl.

10. Debtor concurrently issued the Tenant Estoppel Certificate Dated September 29, 2005 (the "Estoppel Certificate") which referenced, among other things: a Letter Agreement dated July 18, 2005 between Marmaxx Operating Corp. ("Marshalls") and Debtor regarding exclusive use matters and a Letter Agreement dated October 25, 2005 between Ross Dress For Less, Inc. ("Ross") and Debtor regarding exclusive use matters. True and correct copies of the Estoppel Certificate and the letter agreements are appended collectively as Exhibit 3 to the Williams Decl.

11. Pursuant to letter agreements, Debtor twice exercised the option to extend the term of the Lease Agreement from February 1, 2017 through January 31, 2022 and thereafter from February 1, 2022 through January 31, 2027. True and correct copies of the letter agreements are appended, collectively, as <u>Exhibit 4</u> to the Williams Decl.

12. I have personal knowledge of the leasing operations conducted at the Shopping Center as well as its protocols for maintaining the business records pertaining to those operations. The Shopping Center is a stand-alone shopping center.

13. Attached below is an excerpt from the site map of the Shopping Center. The excerpt is an accurate depiction of the location of the Premises within the Shopping Center. Within the Shopping Center, the Premises are flanked by and adjacent to the Ross and Marshalls stores. Also adjacent to Marshalls is Sam's Club which is in close proximity to the Premises. The Premises is also in close proximity to Best Buy which is adjacent to Ross.



14. Marshalls, PetsMart, and Best Buy lease their respective space in the Shopping

Center from the Landlord as more particularly described as follows:

      a.    Marmaxx Operating Corp. ("Marshalls") leases its space from the Landlord pursuant to a Lease Agreement dated as of July 21, 2005 between the Landlord and Marshalls (the "Marshalls Lease"). A Memorandum of Lease Agreement was further recorded on September 12, 2005 (the "Marshalls MOL").  The Marshalls Lease and Marshalls MOL contain an exclusive provision that prohibits the Landlord from leasing space to a retailer that sells or displays used merchandise or second-hand goods utilizing over 25,000 square feet.[2]  On its website (www.ollies.us), Ollie's describes itself as "America's largest retailer of closeout merchandise and excess inventory." Ollies also advertises that it sells "manufacturer refurbished goods, and irregulars."  Accordingly, Ollie's admittedly sells used or second-hand goods, which would violate the exclusive provision in the Marshalls Lease.  A true and correct copy of the Marshalls Mol is attached as Exhibit 5 to the Williams Decl.

      b.    PetsMart leases its space from the Landlord pursuant to a Lease Agreement dated as of August 4, 2005 between the Landlord and PetsMart (the "PetsMart Lease").  A Memorandum of Lease Agreement was also recorded on December 15, 2006 (the "PetsMart MOL"). A true copy of the PetsMart MOL is attached as Exhibit 6 to the Williams Decl.  The PetsMart Lease and PetsMart MOL both contains use provisions that prohibits the Landlord from leasing space to a thrift store or "liquidation outlet."  As described above, Ollie's admittedly describes itself as the seller of overstock, "closeout merchandise and excess inventory."  In fact, Ollie's states that: "*When companies are liquidated, the bank will often sell remaining inventories and turn them into cash[;] Ollie's will buy the goods back and pass the savings on to you, the customer*."  Accordingly, Ollie's admits that it assists with liquidation of inventory so that its business model would violate the

---

[2] Dollar Tree is an existing tenant in the Shopping Center with a space that is 8,000 square feet.  When combined with the Premises which is 23,000 square feet, the 25,000 square feet limitation for sale of off-price apparel and related accessories would be exceeded.

exclusive provisions in the PetsMart Lease and PetsMart MOL.

    c. Best Buy Stores, L.P. ("Best Buy") leases its space from the Landlord pursuant to a Lease Agreement dated as of March 30, 2007 between the Landlord and Best Buy (the "Best Buy Lease"). A Memorandum of Lease Agreement was also recorded on July 18, 2007 (the "Best Buy MOL"). A true copy of the Best Buy MOL is attached as Exhibit 7 to the Williams Decl. The Best Buy Lease contains an exclusive provision that prohibits the Landlord from leasing space to a retailer that is a "second hand" store, *schlock* store, or "surplus store." The Best Buy MOL further prohibits the sale of electronics, appliances, televisions, stereos, car radios, tape decks or phones, entertainment software, office equipment, cameras, supplies, furniture and substitutes for or items are technological evolutions of the above and related items. As described above, Ollie's describes itself as a retailer of "closeout merchandise and excess inventory" and advertises that it sells "manufacturer refurbished goods", irregulars" and other re-packaged goods as well as items described in the Best Buy MOL. Accordingly, Ollie's business model and inventory that it sells would violate the exclusive provision in the Best Buy Lease and the Best Buy MOL.

Operating Easement Agreements

15. The Lease Agreement at Section 12.5.2 provides that the Lease Agreement is further *subject* to an operating easement agreement with Lowe's Home Centers, Inc. ("Lowes") as follows:

*The Declaration of Covenants, Conditions and Restrictions, dated May 24, 1996 between Mary Ann Hood, Trustee and Lowe's Home Centers, Inc., recorded on May 28, 1996* (the "Lowe's OEA") as amended by the First Amendment, dated on or about June 20, 2005 and the Second Amendment, dated on or about June 13, 2006, which contain certain use limitations and exclusives. Lowe's is the fee owner of and presently operating the property that is the subject of the Lowe's OEA. A true copy of the Lowe's OEA together with its amendments is attached as Exhibit 8 to the Williams Decl.

16. The Lease Agreement at Section 12.5.2 further provides that the Lease Agreement is

further *subject* to an operating easement agreement with Sam's Real Estate Business Trust ("Sam's Club") as follows: *The Easements with Covenants and Restrictions Affecting Land in favor of Sam's Real Estate Business Trust* (the "Sam's OEA"). Sam's Club is the fee owner of and presently operating the property that is the subject of the Sam's OEA. A true copy of the Sam's OEA is appended as *Exhibit O* to the Lease Agreement (attached as Exhibit 2 to the Williams Decl.).

17. The aforementioned documents appended hereto as Exhibits 1 through 8 are documents routinely and customarily maintained by employees and agents of RIC following the VEREIT acquisition and, thus, are deemed generated and maintained in the regular course of RIC's business operations. These documents are routinely maintained as part of RIC's legal records pertaining to its lease transactions as they were compiled and uploaded by RIC's legal department following the VEREIT merger. I can regularly access these records, as I did in retrieving these documents for purposes of this Declaration.

Shopping Center Restrictions

18. Section 13.1.2 of the Lease Agreement obligates Landlord to: "lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located." The Lease Agreement also provides for tenant mix considerations given the requirements of Section 12.5.2 which gives consideration to other tenants. Accordingly, as expressed by the Lease Agreement, Landlord has the expectation and intent to control the tenant mix and balance at the Shopping Center. Further, the tenant mix and balance of a shopping center is an issue I have dealt with regularly over the course of my career.

19. A property's 'tenant mix' is essentially the group of tenants who make up the property's occupancy. A "shopping center" brings together a group of retailers to attract a high volume of shopping traffic. As landlord of a shopping center, the landlord endeavors to have a mix

of compatible, complementary and not competing retailers. Generally, retailers do not like competition with other anchor tenants in the same center, as evidenced by the exclusive use provisions in the various leases.

20. If the Ollie's lease assignment is approved, such assignment will disrupt the tenant mix and balance of the Shopping Center by placing direct competitors too close to one another and overweighting the Shopping Center with retailers selling discounted goods. This will likely reduce sales to the stores at the Shopping Center who sell similar products.

21. A first-class shopping center is one that is of the best quality or highest grade in terms of shopping experience and store availability. The requirement under the Lease Agreement that the Shopping Center be first-class is imposed in order to draw shoppers of a similar demographic who will shop not only at one store but multiples stores located at the Shopping Center. Thus, the goal is to produce a strong and beneficial synergy among the tenants to create high foot traffic within the Shopping Center.

Nature of Ollie's Stores

22. Landlord has serious concerns that given Ollie's business model that Landlord will not able to fulfill its obligation to operate a first-class shopping center. Ollie's is in the business of selling close-out and irregular goods and serving as a liquidation arm to other institutions. Further, Ollie's website supplies its own **glossary** of terms such as "Good Stuff Cheap", "Semi-lovely", "Closeout", "Buyout", "Liquidated", "discontinued", "Refurbished", "IR (irregular)" is telling and indicates that its operations would not fall within a first-class shopping center.

23. Ollie's over-run inventory would also constitute "surplus" sales that are prohibited by certain lease provisions, including those contained in the Best Buy Lease. The term "surplus" used in leases refers to customer returns, overstock and closeouts. This is the commonly known usage in the liquidation industry.

24. I have personally visited Ollie's store locations. The stores have the appearance of liquidation outlets and are clearly intended for bargain shopping. Presumably due to cost considerations, the stores have a "bare bones" appearance with inventory placed on pallets. The floors are unfinished concrete. As Ollie's own description states, the stores provide for a "treasure hunt" experience as the inventory is laid out, in sort parts of the store, in haphazard fashion and the inventory mix is admittedly unpredictable.

25. Also problematic is that Ollie's inventory mix is admittedly always changing and that it may sell other unknown items that it refers to as "Other Stuff Too". Given the uncertainty of the inventory mix, an inherent risks exists that Ollie's could sell goods – currently unknown – that would run afoul of exclusive use provisions. Ollie's does not have core inventory as it sells whatever items it procures on an opportunistic basis.

26. Most of Ollie's shoppers would be bargain shoppers and categorized as a "destination tenant." In other words, the shoppers who shop at Ollie's are not likely to continue shopping at other stores. For the reasons above, if Ollie's had approached RIC to lease a store location, RIC would have summarily declined Ollie's as a tenant.

27. The Landlord will suffer damages due to potential rent abatement that could be sought by other tenants. The Landlord may also suffer additional damages due to a reduction in patronage and sales at the Shopping Center, including a reduction in percentage rent payable to the Landlord under certain leases at the Power Center.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 15, 2023

*/s/ Matthew McDonald*
Matthew MacDonald
Senior Director of Asset Management