# LEASE AGREEMENT

Between

**LINCOLN PO**
**RED OAK VILLAGE, L.P.**
**a Delaware limited partnership,**

Landlord

and

**BED BATH & BEYOND INC.,**
**a New York corporation,**

Tenant

**RED OAK VILLAGE**
**San Marcos, Texas**

Dated as of:  September ___, 2005

* * * * * *

TABLE OF CONTENTS

Page

ARTICLE 1    BASIC TERMS AND DEFINITIONS ...................................................... 1
    Section 1.1    Basic Terms and Definitions ................................................................ 1
ARTICLE 2    LEASE OF PREMISES, LEASE TERM; DELIVERY DATE ................................ 5
    Section 2.1    Lease of Premises ................................................................................ 5
    Section 2.2    Term .................................................................................................... 5
    Section 2.3    Delivery Date ...................................................................................... 5
    Section 2.4    Unseasonable Delivery: Slack Period .................................................. 7
    Section 2.5    Initial Co-Tenancy Condition .............................................................. 7
ARTICLE 3    IMPROVEMENTS ........................................................................... 9
    Section 3.1    Landlord's Work and Tenant's Work ................................................... 9
    Section 3.2    Plan Approvals .................................................................................... 9
    Section 3.3    Performance of Work ......................................................................... 11
    Section 3.4    Measurement; Adjustment of Rent .................................................... 12
ARTICLE 4    FIXED RENT AND TAXES: DETERMINATION AND PAYMENT ................. 13
    Section 4.1    Fixed Rent .......................................................................................... 13
    Section 4.2    Payment of Rent ................................................................................ 13
    Section 4.3    Real Estate and Other Taxes .............................................................. 13
    Section 4.4    Intentionally Omitted ........................................................................ 14
ARTICLE 5    COMMON AREAS, THEIR USE AND CHARGES ................................... 14
    Section 5.1    Common Areas: Maintenance ............................................................ 14
    Section 5.2    Common Areas: Restrictions .............................................................. 17
ARTICLE 6    UTILITIES ..................................................................................... 19
    Section 6.1    Utility Service .................................................................................... 19
    Section 6.2    Interruption ........................................................................................ 19
    Section 6.3    Intentionally Omitted ........................................................................ 19
ARTICLE 7    SIGNS .......................................................................................... 19
    Section 7.1    Tenant's Building Signage .................................................................. 19
    Section 7.2    Pylon/Monument Signage .................................................................. 20
    Section 7.3    Signage: Alteration/Removal/Allocation ............................................ 20
    Section 7.4    Cooperation ........................................................................................ 20
    Section 7.5    Signage and Building Restrictions and Criteria ................................. 21
ARTICLE 8    ALTERATIONS AND IMPROVEMENTS .............................................. 21
    Section 8.1    Alterations and Improvements ............................................................ 21
ARTICLE 9    REPAIRS ...................................................................................... 22
    Section 9.1    Tenant's Repairs ................................................................................. 22
    Section 9.2    Landlord's Repairs ............................................................................. 22
    Section 9.3    Legal Compliance Work ..................................................................... 23
ARTICLE 10    INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION ...... 23
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification ........ 23
    Section 10.2    Tenant's Insurance ........................................................................... 24
    Section 10.3    Landlord's Insurance ........................................................................ 24
    Section 10.4    General Insurance Requirements ...................................................... 25

Case 23-13359-VFP Doc 2697-2 Filed 11/15/23 Entered 11/15/23 14:12:59 Desc
Exhibit 2 Page 3 of 108
Table of Contents
(continued)

Page

ARTICLE 11     FIRE AND OTHER CASUALTY; EMINENT DOMAIN .................................... 25
     Section 11.1     Fire and Other Casualty ............................................................................. 25
     Section 11.2     Eminent Domain ........................................................................................ 27
     Section 11.3     Abatement of Rent Charges ....................................................................... 28
ARTICLE 12     COVENANTS, REPRESENTATIONS AND WARRANTIES ............................ 28
     Section 12.1     Quiet Enjoyment ....................................................................................... 28
     Section 12.2     Authority .................................................................................................... 28
     Section 12.3     Landlord's Covenants, Warranties and Representations ............................ 29
     Section 12.4     Environmental Matters .............................................................................. 30
     Section 12.5     OEA ........................................................................................................... 31
     Section 12.6     Intentionally Omitted ................................................................................ 33
ARTICLE 13     USE AND RESTRICTIONS ......................................................................... 33
     Section 13.1     Permitted and Prohibited Uses .................................................................. 33
     Section 13.2     Tenant's Exclusive in Center ..................................................................... 34
     Section 13.3     Exclusives Which Tenant Must Honor ...................................................... 35
ARTICLE 14     CONDUCT OF BUSINESS OPERATIONS ............................................... 35
ARTICLE 15     TENANT ASSIGNMENT AND SUBLETTING ...................................... 36
     Section 15.1     Assignment and Subletting ........................................................................ 36
     Section 15.2     Liability of Tenant ..................................................................................... 37
     Section 15.3     Collateral Assignment ............................................................................... 37
     Section 15.4     Cure Rights of Original Tenant ................................................................. 37
     Section 15.5     Recognition Agreement ............................................................................. 37
ARTICLE 16     DEFAULT AND DISPUTE RESOLUTION ............................................. 38
     Section 16.1     Tenant Default ........................................................................................... 38
     Section 16.2     Landlord Default ........................................................................................ 39
     Section 16.3     Arbitration ................................................................................................. 40
ARTICLE 17     RIGHT TO MORTGAGE AND NON DISTURBANCE, ESTOPPEL
                       CERTIFICATE ........................................................................................... 40
     Section 17.1     Right to Mortgage and Non-Disturbance ................................................... 40
     Section 17.2     Estoppel Certificate ................................................................................... 40
     Section 17.3     Existing Mortgages .................................................................................... 40
ARTICLE 18     NOTICE ....................................................................................................... 41
ARTICLE 19     TENANT'S PROPERTY .............................................................................. 41
ARTICLE 20     END OF TERM ............................................................................................ 41
     Section 20.1     Surrender of Premises ................................................................................ 41
     Section 20.2     Hold Over ................................................................................................... 42
ARTICLE 21     TENANT'S RIGHT OF FIRST OFFER .................................................... 42
ARTICLE 22     ONGOING CO-TENANCY .......................................................................... 42
ARTICLE 23     MISCELLANEOUS ...................................................................................... 43
     Section 23.1     Loading Facilities ...................................................................................... 43
     Section 23.2     Liens ........................................................................................................... 43
     Section 23.3     Broker's Commission ................................................................................ 43

Page

| | | |
|---|---|---|
| Section 23.4 | Force Majeure | 44 |
| Section 23.5 | Consents | 44 |
| Section 23.6 | Costs | 44 |
| Section 23.7 | Attorneys' Fees | 44 |
| Section 23.8 | Survival of Obligations | 44 |
| Section 23.9 | Non-Waiver | 44 |
| Section 23.10 | Rights Cumulative | 44 |
| Section 23.11 | Definition of Landlord | 44 |
| Section 23.12 | Successors and Assigns | 45 |
| Section 23.13 | Limitation of Landlord's Liability | 45 |
| Section 23.14 | Limitation of Tenant's Liability | 45 |
| Section 23.15 | Joint and Several Liability | 45 |
| Section 23.16 | Severability | 45 |
| Section 23.17 | Grammatical Usages and Construction | 45 |
| Section 23.18 | Table of Contents, Line Numbering and Paragraph Headings | 45 |
| Section 23.19 | Definition of Hereunder, Herein, etc. | 45 |
| Section 23.20 | Short Form Lease | 45 |
| Section 23.21 | Entire Agreement and Modification | 46 |
| Section 23.22 | No Joint Venture or Partnership Created by Lease | 46 |
| Section 23.23 | Tenant's Tradename | 46 |
| Section 23.24 | Counterparts | 46 |
| Section 23.25 | Waiver of Trial by Jury | 46 |
| Section 23.26 | Governing Law | 47 |
| INDEX OF EXHIBITS | | 48 |

1    **LEASE AGREEMENT**

2        THIS LEASE AGREEMENT ("*Lease*") is entered into as of September ___, 2005 by and

3    between LINCOLN PO RED OAK VILLAGE, L.P., a Delaware limited partnership, having an office

4    at 3300 Lincoln Plaza, 500 N. Akard Street, Dallas, TX 75201 ("*Landlord*"), and BED BATH &

5    BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey

6    07083 ("*Tenant*").

7                                   W I T N E S S E T H :

8                                        ARTICLE 1
9
10                              BASIC TERMS AND DEFINITIONS

11        Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set
12    forth in this Section 1.1 except as otherwise expressly provided herein.

13        1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord
14    under the terms and conditions of this Lease, other than Fixed Rent.

15        1.1.2    Affiliate:  A corporation, partnership, person or other entity which is controlling,
16    controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein,
17    "*control*" shall mean the possession, direct or indirect, of the power to direct or cause the direction of
18    the management and policies of a person or entity, whether through the ownership of voting securities
19    or rights, by contract, or otherwise.

20        1.1.3    Alternate Rent:  As defined in and payable in the manner set forth in Exhibit L
21    attached hereto.

22        1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time,
23    available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping
24    Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and
25    other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck
26    serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas,
27    retention or detention areas, and common utility lines.

28        1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

29        1.1.6    Delivery Date:  As defined in Section 2.3 hereof.

30        1.1.7    Effective Date:  The date hereof.

31        1.1.8    Event of Default:  As defined in Section 16.1 hereof.

32        1.1.9    Excused Periods:  Periods during which Tenant's failure to conduct the
33    operations of its business or any other business: (x) resulted from alterations or renovations being
34    performed in and to the Premises, (y) was caused by damage or destruction, eminent domain
35    proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its
36    employees, agents, or contractors.

37        1.1.10    Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease
38    have been agreed to by the parties and attached hereto, it being the intention of the parties that they
39    shall become a binding part of this Lease as if fully set forth herein.

40        1.1.11    Fixed Rent:  The following amounts for the periods indicated (subject to
41    adjustment pursuant to Sections 2.5 and 3.4 hereof).

42        (a)    For the period commencing on the Rent Commencement Date and
43    ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of One
44    Hundred Thirty-Eight Thousand and No/100 ($138,000.00) Dollars per year [based on Six and No/100
45    ($6.00) Dollars per square foot of Floor Area in the Premises];

          (b)      In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of One Hundred Forty-Nine Thousand Five Hundred and No/100 ($149,500.00) Dollars per year [based on Six and 50/100 ($6.50) Dollars per square foot of Floor Area in the Premises];

          (c)      In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of One Hundred Sixty-One Thousand and No/100 ($161,000.00) Dollars per year [based on Seven and No/100 ($7.00) Dollars per square foot of Floor Area in the Premises]; and

          (d)      In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of One Hundred Seventy-Two Thousand Five Hundred and No/100 ($172,500.00) Dollars per year [based on Seven and 50/100 ($7.50) Dollars per square foot of Floor Area in the Premises].

          1.1.12 Floor Area:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) or the Project and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than [exterior] loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center or the Project include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

          1.1.13 *Force Majeure*:  As defined in Section 23.4 hereof.

          1.1.14 Ground Lessor:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

          1.1.15 Intentionally Omitted.

          1.1.16 Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

          1.1.17 Inducement Tenant:  As defined in Subsection 2.3.1 hereof.

          1.1.18 Landlord:  As defined in the preamble and Section 23.11 hereof.

          1.1.19 Landlord's Mailing Address:  Lincoln PO Red Oak Village, L.P., 3300 Lincoln Plaza, 500 N. Akard Street, Dallas, TX 75201, Attn: Mr. Robert Dozier, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

          1.1.20 Landlord's Work:  As defined in Section 3.1 hereof.

          1.1.21 Lease Interest Rate:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

          1.1.22 Legal Requirements:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

          1.1.23 Mortgagee:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

          1.1.24 Intentionally Omitted.

          1.1.25 Intentionally Omitted.

          1.1.26 Intentionally Omitted.

1.1.27 Permitted Use: The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the "***Permitted Items***"); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 Premises: Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately: (i) Twenty-Three Thousand (23,000) square feet of Floor Area, and **(ii)** one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling space (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling or fire pump facility space be included in the determination of Tenant's Pro Rata Share.

1.1.28A Project: The Shopping Center and the area designated as the "Sam's Parcel" on Exhibit B attached hereto (hereafter referred to as the "***Sam's Parcel***"), collectively initially containing approximately three hundred thirty-two thousand (332,000) square feet of Floor Area, as more particularly described in Exhibit A-1 hereto.

1.1.29 Renewal Option: As defined in Section 2.2.2 hereof.

1.1.30 Renewal Period(s): Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 Rent: Fixed Rent and/or Additional Rent.

1.1.32 Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33 Intentionally Omitted.

1.1.34 Shopping Center: The shopping center commonly known as Red Oak Village Shopping Center, containing approximately One Hundred Ninety-Seven Thousand (197,000) square feet of Floor Area, on the property located at the southeast corner of Cottonwood Parkway and the Interstate Highway 35 frontage road, in San Marcos, Texas, and more particularly described in Exhibit A hereto. Anything contained in this Lease to the contrary notwithstanding, if Landlord or its Affiliate, at any time from and after the Delivery Date, holds title to or has control over, by deed, ground lease or otherwise, the Sam's Parcel (or any portion thereof), then the Sam's Parcel (or such portion thereof) shall be deemed to be included within the Shopping Center for all purposes and, subject to the applicable provisions of Section 13.2.4(b) below, Landlord shall comply with its obligations imposed against the Shopping Center by this Lease regarding the Sam's Parcel (or such applicable portion thereof) including, without limitation, Section 23.20 below. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35 Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 Taxes: As defined in Section 4.3.3 hereof.

1        1.1.37 <u>Tenant</u>: As defined in the preamble hereof.

2        1.1.37A <u>Tenant Delays</u>: Any net delays in the Substantial Completion of Landlord's
3    Work solely and directly and to the extent caused (despite Landlord's diligent efforts in performing
4    Landlord's Work) by Tenant's or its agents', employees', contractors' or subcontractors' failure or
5    refusal to act in accordance with the terms of this Lease, provided that Landlord shall have notified
6    <u>Tenant</u> of such Tenant Delays promptly after Landlord's discovery of its occurrence.

7        1.1.38 <u>Tenant's Mailing Address</u>: 650 Liberty Avenue, Union, New Jersey 07083,
8    Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant
9    may notify Landlord from time to time by notice given in accordance with the provisions of Article 18
10    hereof.

11        1.1.39 <u>Tenant's Permits</u>: As defined in Section 2.3.1(b) hereof.

12        1.1.40 <u>Tenant's Property</u>: All of Tenant's personal property, including, without
13    limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers
14    and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage
15    racks and signage and any and all other personal property of Tenant which is capable of being removed
16    from the Premises without material damage thereto, but which shall not include electrical systems,
17    heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet,
18    elevators, standard lighting and wiring installed within the walls of the Premises.

19        1.1.41 <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the Floor Area of the
20    Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined
21    any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no
22    event shall Tenant's Pro Rata Share be greater than twelve (12%) percent, unless increased to the
23    extent provided in Subsection 5.1.3(b) below. Notwithstanding the foregoing, if the Shopping Center
24    is comprised of more than one (1) tax parcel, then the denominator for determining Tenant's Pro Rata
25    Share of Taxes may, at Landlord's discretion, be the Floor Area of the tax parcel on which the
26    Premises are located provided that such tax parcel includes a proportionate amount of Common Areas,
27    in which event the term "Taxes" (notwithstanding the provisions of Subsection 4.3.3 below) for the
28    purposes of determining Tenant's Pro Rata Share of Taxes shall mean the Taxes levied or assessed on
29    such tax parcel (i.e., the tax parcel on which the Premises are located) only. Anything contained in this
30    Subsection 1.1.41 to the contrary notwithstanding, if Landlord or its Affiliate, at any time from and
31    after the Delivery Date, holds title to or has control over, by deed, ground lease or otherwise, the Sam's
32    Parcel (or any portion thereof) or if Landlord is regularly maintaining the Common Areas on any part
33    of the Sam's Parcel and including the costs of such maintenance (or certain components of such
34    maintenance) as part of Common Area Charges, then the Tenant's Pro Rata Share of Common Area
35    Charges (or the aspects of the Common Area Charges that include the cost of maintaining the Sam's
36    Parcel or any portion thereof) shall be adjusted to be no greater than a percentage determined by
37    dividing the amount of square feet of Floor Area in the Premises by the total amount of square feet of
38    Floor Area as shown on <u>Exhibit B</u> for (a) the Shopping Center and (b) the Sam's Parcel (or, if the
39    Sam's Parcel is subdivided and Landlord or its Affiliate only acquired title to, obtained control over, or
40    is maintaining a portion of the Sam's Parcel, then this clause (b) shall only include the Floor Area
41    located on such portion of the Sam's Parcel as shown on <u>Exhibit B</u>). Floor Area shall be deemed
42    added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor
43    Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as
44    the case may be, with respect to such Floor Area. Within thirty (30) days following written request
45    from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping
46    Center.

47        1.1.42 <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

48        1.1.43 <u>Term</u>: A period (the "***Initial Term***") of approximately Ten (10) years
49    beginning on the Rent Commencement Date and expiring at midnight on the last day of January
50    following the Tenth (10th) anniversary of the Rent Commencement Date, unless the Rent
51    Commencement Date is February 1, in which event the Expiration Date shall be the day before the
52    tenth (10th) anniversary of the Rent Commencement Date. As used herein: (i) "***Term***" shall refer to the
53    Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2
54    below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

ARTICLE 2

LEASE OF PREMISES, LEASE TERM;
DELIVERY DATE

Section 2.1    Lease of Premises. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Project, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Project.

Section 2.2    Term.

2.2.1    Initial Term. Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the "***Rent Commencement Date***"). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options. Tenant shall have the right and option (hereinafter a "***Renewal Option***") to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a "***Renewal Period***", and collectively, the "***Renewal Periods***") upon the same terms and conditions as are herein set forth. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s). In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options, whichever shall occur earlier. If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof. If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1    Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "***Delivery Date***") following the day on which all of the following conditions (the "***Delivery Date Conditions***") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant.

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, "***Tenant's Permits***")), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the

1  occurrence of the Delivery Date, and  (3) Landlord shall obtain the permanent certificate of occupancy
2  promptly following the correction or completion of Tenant's Work.

3          (c)      The Common Areas, and all of the improvements thereto shown on
4  Exhibit B hereto shall have been Substantially Completed and operational, and all off-site
5  improvements (including, without limitation, street, storm drainage, and traffic signalization
6  improvements) required for the Shopping Center to open for business and for Tenant to receive a
7  permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost
8  and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and
9  approvals required from applicable governmental authorities to enable the Common Areas to be
10  developed, operated, and used for the purposes herein contemplated, which permits and approvals shall
11  include, without limitation, zoning, building code, environmental requirements, curb cut and site plan
12  approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon),
13  construction, and development and use permits.

14          (d)      The representations and warranties of Landlord set forth in
15  subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect.

16          (e)      A Lease or other occupancy agreement shall have been entered into with
17  the tenant or occupant set forth below (the "***Inducement Tenant***") on the following terms, for
18  occupancy of the premises designated for it on Exhibit B; such lease shall not be cancelable by the
19  Inducement Tenant, except for failure of Landlord to complete the Shopping Center, for injury to or
20  loss of the premises thereby demised because of fire or other casualty, or for a taking or for other
21  reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Marshalls | 28,000 | 10 Years |

22
23      Notwithstanding the foregoing, TJ Maxx may be substituted for Marshalls as the Inducement
24  Tenant (it being understood and agreed that a store operated under any other trade name, no matter
25  how similar to the trade name "TJ Maxx", shall not be a permitted substitute Inducement Tenant),
26  provided that such substitute satisfies the requirements set forth above for the Inducement Tenant.

27          (f)      Landlord shall have delivered to Tenant, in recordable form: (i) a
28  subordination, non-disturbance and attornment agreement substantially in the form attached hereto as
29  Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the
30  Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is
31  not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required
32  pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content
33  described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

34          (g)      The Sam's OEA (hereinafter defined in Section 12.5) are (x) fully
35  executed and delivered and recorded in Clerk's Office of Hays County, State of Texas, and (y) superior
36  to all mortgages, deeds of trust and other liens affecting the Shopping Center and the Sam's Parcel; any
37  third-party approvals required under the Sam's OEA for the performance of Landlord's Work
38  (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F
39  hereto) and Tenant's Work shall have been obtained. In the event that Landlord owns the Sam's Parcel
40  on the date that all of the Delivery Date Conditions, except for this Subsection 2.3.1(g), are satisfied,
41  the satisfaction of this Subsection 2.3.1(g) shall not be deemed to be a Delivery Date Condition.

42          (h)      In the event that Landlord owns the Sam's Parcel (or any portion thereof)
43  on the date that all of the Delivery Date Conditions, except for this Subsection 2.3.1(h), are satisfied,
44  then Landlord shall record a memorandum or short form of this Lease against the Sam's Parcel (or
45  such applicable portion thereof) in form and substance as either party shall reasonably request.

46      2.3.2  Delivery Date.

47          (a)      Landlord shall give Tenant at least one hundred twenty (120) days prior
48  notice of the Delivery Date (the "***Delivery Date Notice***"), using the form of Delivery Date Notice
49  attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition
50  precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the

1   contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established
2   in the Delivery Date Notice.

3           (b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery
4   Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain
5   substantial, additional costs and expenses, including, without limitation, storage costs for fixtures,
6   equipment, and inventory, employee costs during the waiting period, and additional advertising and
7   promotional costs, the exact amount of which would be impracticable or extremely difficult to
8   ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date
9   Notice (subject to extensions of the Delivery Date established in the Delivery Date Notice by *Force*
10  *Majeure*, not to exceed thirty [30] days in the aggregate, occurring after the Delivery Date Notice is
11  given provided that Landlord shall have notified Tenant of such events of *Force Majeure* promptly
12  after its occurrence, and subject to the extent of any Tenant Delays occurring after the Delivery Date
13  Notice is given), then, in addition to any other remedies available to Tenant under this Lease, Tenant
14  shall be entitled to offset from the initial installment(s) of Rent hereunder, as liquidated reimbursement
15  to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: (i)⬛
16  ⬛⬛⬛⬛⬛⬛ Dollars ($⬛⬛⬛⬛), plus (ii) ⬛⬛⬛⬛⬛ Dollars (⬛⬛⬛) for each day
17  that the Delivery Date established in the Delivery Date Notice is delayed for reasons other than delays
18  caused by *Force Majeure* and/or Tenant Delays to the extent permitted above. The foregoing
19  liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount
20  which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact
21  ascertainment.

22          2.3.3   Delivery Date Certification. Upon the satisfaction of all of the Delivery Date
23  Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached
24  hereto as Exhibit J.

25          2.3.4   No Waiver. Neither Tenant's acceptance of physical possession of the Premises
26  nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be
27  deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any
28  obligation under this Lease, unless such condition or obligation is expressly waived in writing by
29  Tenant.

30      Section 2.4   Unseasonable Delivery; Slack Period. If, for any reason (including, without
31  limitation, Force Majeure), the Delivery Date occurs during the period commencing on September 1
32  and ending on the March 31 next following (the "*Slack Period*"), then Tenant shall have, in addition to
33  any other remedies, the right to:

34          (a)    accept delivery of physical possession of the Premises; or

35          (b)    defer its acceptance of delivery of physical possession of the Premises to
36  a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on
37  the date that Tenant actually accepts physical possession of the Premises (subject to the other
38  provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

39  in either event, if the Rent Commencement Date occurs before the April 1 next following the Slack
40  Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing
41  on the Rent Commencement Date and ending on the March 31 next following; any benefit which
42  Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening
43  expenses incurred by Tenant in connection with this Lease. In the event Tenant defers the acceptance
44  of physical possession of the Premises as set forth in this Section 2.4, the per diem liquidated damages
45  of ⬛⬛⬛⬛⬛ payable by Landlord to Tenant under Section 2.3.2(b) shall cease to accrue as of the date
46  the Delivery Date would have occurred had Tenant not elected to defer acceptance, but shall
47  recommence on the date later in the Slack Period which Tenant designates for delivery of the Premises
48  if Landlord fails to deliver the Premises with all Delivery Date Conditions satisfied on such date.
49
50  Notwithstanding the foregoing provisions of this Section 2.4, if the Delivery Date occurs during the
51  first fifteen (15) days of the Slack Period (i.e., between September 1 and September 15) solely as a
52  result of a specific Tenant Delay exceeding fifteen (15) days in duration, then the Delivery Date shall
53  be determined as if such Tenant Delay had not occurred.
54

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the *"Initial Co-Tenancy Condition"* shall mean that the Inducement Tenant shall have accepted possession of its entire premises, such premises shall have been substantially completed, and the Inducement Tenant shall, be open for business.

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least One Hundred Twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed ████████ Dollars (█████) in the aggregate as to all such expenses.

2.5.4    Provided that the Inducement Tenant is then open for business, if a lease is entered into with one (1) of the four (4) tenants set forth below (individually and collectively referred to as the *"Additional Inducement Tenants"*):

| Additional Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Pier 1 | 7,900 | 10 Years |
| Ross | 30,000 | 10 Years |
| Best Buy | 30,000 | 10 Years |
| Barnes & Noble | 24,500 | 10 Years |

and such Additional Inducement Tenant is open for business to the public (the satisfaction of the foregoing condition is hereinafter referred to as *"Stage-2 Co-Tenancy Condition"*), then the Fixed Rent shall be increased by One and No/100 ($1.00) Dollar per square foot of Floor Area in the Premises per year for the remainder of the Term. Additionally, if the foregoing condition is met with respect to a second (2nd) Additional Inducement Tenant (the satisfaction of the foregoing condition is hereinafter referred to as *"Stage-3 Co-Tenancy Condition"*), then the Fixed Rent shall be increased by an additional ████████ Dollar per square foot of Floor Area in the Premises per year. Under no circumstances will the Fixed Rent set forth in Section 1.1.11 above be increased by more than Two and No/100 ($2.00) Dollars per square foot of Floor Area in the Premises per year in the aggregate.

Notwithstanding the foregoing, Books a Million or Borders may be substituted for Barnes & Noble as an Additional Inducement Tenant and Circuit City may be substituted for Best Buy as an

1    Additional Inducement Tenant, provided that each such substitute satisfies the requirements set forth
2    above for the Additional Inducement Tenant that it is replacing.

3                                              ARTICLE 3
4
5                                            IMPROVEMENTS

6        Section 3.1    Landlord's Work and Tenant's Work. Landlord shall, at its sole cost and
7    expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto,
8    and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, "*Landlord's
9    Work*"), and shall deliver possession of the Premises to Tenant in the condition described therein.
10   Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work
11   (hereinafter referred to as "*Tenant's Work*") which Tenant desires to adapt the Premises to Tenant's
12   use.

13       Section 3.2    Plan Approvals.

14           3.2.1   Preparation of Plans and Specifications.

15                   (a)    Within thirty (30) days after the Effective Date, Landlord shall deliver to
16   Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the
17   Premises (the "*Preliminary LOD*") [Limits of Demised], which shall be subject to any reasonable
18   modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially
19   consistent with Exhibits B, D, and D-1 hereto.

20                   (b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD,
21   Tenant shall deliver to Landlord its revisions thereto (the "*Revised LOD*"), showing the location of the
22   interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the
23   location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and
24   any reasonable revisions to the interior clear dimensions.

25                   (c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD,
26   Landlord shall deliver to Tenant a final LOD (the "*Certified LOD*"), certified by Landlord, which shall
27   incorporate all of the elements of the Revised LOD.  Within fifteen (15) days after its receipt of the
28   Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such
29   approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice,
30   make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's
31   approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written
32   approval (which may be withheld in its sole discretion), provided that, as to changes required to
33   conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of
34   said Legal Requirements. After Tenant approves the Certified LOD, Landlord shall be responsible for
35   any and all reasonable costs incurred and delays experienced by Tenant in connection with any further
36   changes to the Certified LOD required by Landlord.

37                   (d)    Within thirty (30) days after Tenant's receipt of the Certified LOD,
38   Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2);
39   Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4)  (collectively,
40   "*Tenant's Plans*"), all of which shall be substantially consistent with the Certified LOD (as same may
41   be reasonably modified by Tenant, as noted above).

42                   (e)    Within thirty (30) days after receipt of Tenant's Plans, Landlord shall
43   prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications
44   (the "*Preliminary Plans*") for Landlord's Work (which shall include, without limitation, mechanical,
45   electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans
46   [including, without limitation, a site lighting plan with photometrics]), and each of the plans which
47   collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's reasonable
48   judgment.  The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified
49   LOD, and Exhibits B, D, D-1, and F hereto.

50                   (f)    Within thirty (30) days after its receipt of the Preliminary Plans, Tenant
51   shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's
52   reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D,
53   D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters
54   and obtain Tenant's approval.

1                (g)     Within thirty (30) days after the date on which Landlord receives notice
2 of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single
3 submission, final plans and specifications (the "*Final Plans and Specifications*"), which shall be
4 substantially consistent with the Preliminary Plans, as approved by Tenant.

5                (h)     Within fifteen (15) days after its receipt of the Final Plans and
6 Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such
7 approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice,
8 make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's
9 approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's
10 prior written approval. Unless specifically noted on a separate summary sheet attached to the Final
11 Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's
12 Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the
13 Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D,
14 Exhibit D-1, and Exhibit F shall govern and prevail.

15              (i)     All submissions by the parties of the Preliminary LOD, the Revised
16 LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the Final Plans and
17 Specifications shall be made (or accompanied) by the computer files thereof formatted in any version
18 of "Autocad" up to "Autocad 2002".

19      3.2.2  Plan Changes.

20            (a)     Tenant shall have the right to make changes from the standards and
21 specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project
22 Manual", referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to
23 either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in
24 accordance therewith (the "*Changes*"), provided that any Changes of a material nature that Tenant
25 desires to make to the exterior of the Premises after Tenant has approved the elevations and color
26 board in respect of the Premises shall employ the same color scheme and use the same materials as in
27 the balance of the Shopping Center unless Landlord approves otherwise. Within ten (10) business days
28 after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or
29 savings, and any delay that may be occasioned by such Change. If Tenant fails to authorize such
30 Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have
31 disapproved such Change.

32            (b)     Tenant shall pay to Landlord the net reasonable additional third-party
33 costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any
34 charges for overhead and profit, other than sums not exceeding 7% subcontractor profit and 7%
35 general contractor profit thereon), taking into consideration any and all actual costs and savings
36 resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved
37 by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole
38 option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's
39 receipt of backup information reasonably supporting all such costs, including, without limitation,
40 invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the
41 Delivery Date.

42            (c)     Tenant shall be entitled to offset against Rent the net reasonable cost
43 savings resulting from the aggregate Changes, not to exceed Fifty Thousand Dollars ($50,000.00),
44 taking into consideration all reasonable additional third-party costs of Landlord's Work directly and
45 solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums
46 not exceeding 7% subcontractor profit and 7% general contractor profit thereon). At Tenant's request,
47 Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs,
48 including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen.
49 Such payment shall be due and payable within thirty (30) days after the Delivery Date.

50            (d)     If the Changes occur during the preparation of any of the plans described
51 in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared
52 shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent
53 efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of
54 Landlord's Work (taking into consideration any time reductions resulting from such changes), then:
55 (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the
56 commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2
57 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes

1 requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under
2 Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net
3 delay.

4          Section 3.3    Performance of Work.

5          3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and
6 workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-
7 class materials, and in accordance with all insurance company requirements.  Landlord shall perform
8 Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall
9 pay all impact fees and related governmental charges in connection with Landlord's Work and all other
10 work performed by or on behalf of Landlord in connection with the Shopping Center.  If Tenant's
11 Permits cannot be obtained because Landlord's Work has not been completed or has been performed
12 improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy
13 the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed
14 delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

15          3.3.2   If: (a) Landlord's Work has not been commenced (i.e., if Landlord has not yet
16 poured foundation footings for the Premises) by January 31, 2006, or (b) the Delivery Date shall not
17 have occurred by October 1, 2006 (subject to *Force Majeure*, not to exceed thirty (30) days in the
18 aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure*
19 promptly after its occurrence and subject to the extent of any Tenant Delays occurring after the date the
20 Delivery Date Notice is given), Tenant may thereafter, during such time as Landlord's Work has not
21 been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in
22 default hereunder and, at Tenant's option in its sole discretion, elect to:

23                    (i)    terminate this Lease, if Landlord shall fail to fully cure such
24 default within thirty (30) days after receiving Tenant's notice thereof, in which event neither
25 party shall have any further liability hereunder, except: (i) for those obligations which survive
26 the expiration or other termination of this Lease pursuant to the express terms of this Lease, and
27 (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary
28 remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in
29 connection with this Lease (including, without limitation, costs associated with the preparation
30 and review of plans and specifications, attorney's fees, and the performance of Tenant's Work),
31 not to exceed: ▊▊▊▊▊▊▊▊▊▊▊▊▊▊ in the aggregate as to all such costs and
32 expenses; and/or

33                    (ii)   avail itself of the remedies set forth in Section 16.2 below
34 (provided, however, that the cure period set forth therein shall not be applicable); and/or

35                    (iii)   extend one or more times the dates set forth in clauses (a) and/or
36 (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to
37 Landlord.

38 The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent
39 election of any alternative remedy provided in this Section, this Lease, at law, or in equity.
40

41          3.3.3   Landlord's Work Performed After Delivery of Possession.  On or before the
42 Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the
43 Premises to compile a punch list of the "Punch List Items" (hereinafter defined).  Tenant shall deliver
44 to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall
45 complete any Punch List Items within fifteen (15) days after it receives a copy of said punch list.  If
46 Landlord fails to complete any item on said punch list within said 15-day period, Tenant shall have the
47 right to complete such item(s) using its own contractors and receive reimbursement from Landlord for
48 the reasonable costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion
49 of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall
50 occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and
51 servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable
52 costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's
53 Work.  As used herein, the term "*Punch List Items*" shall mean such minor items of a cosmetic nature
54 which, when considered as a whole, do not adversely affect either the performance of Tenant's Work
55 or Tenant's ability to conduct its normal business operations in the Premises.

1                  3.3.4   Tenant's Right of Entry. Prior to the Delivery Date, following reasonable prior
2 notice to Landlord (which may be telephone notice provided that Landlord has notified Tenant of the
3 appropriate parties and their respective phone numbers for such purpose) and during normal business
4 hours, Tenant may enter upon the Premises for the purposes of inspecting the work, taking
5 measurements, making plans, erecting temporary or permanent signs and doing such other work as
6 may be appropriate or desirable without being deemed thereby to have taken possession or obligated
7 itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially
8 interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless
9 from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to
10 the extent caused by Landlord, its agents, employees, or contractors.

11                  3.3.5   Intentionally Omitted.

12                  3.3.6   Work Requirements After Delivery Date. Following the Delivery Date, any
13 construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of
14 the Shopping Center shall be subject to the following terms and conditions:

15                         (a)       staging and storage of materials and parking of construction vehicles
16 shall occur only within the portions of the Shopping Center designated as "Staging" on Exhibit B
17 hereto or with respect to construction on an Outparcel (as defined in Section 5.2.3 below), only within
18 such Outparcel;

19                         (b)       Landlord shall diligently ensure that, from and after Tenant's opening for
20 business to the public, no ingress, egress or passage of any construction, delivery and related vehicles
21 engaged in the performance of such work or other construction activities shall take place except
22 through the entrance/exit drive designated as the "Construction Drive" on Exhibit B hereto; and

23                         (c)       Landlord shall maintain the Shopping Center in a clean, safe, and sightly
24 condition, and shall use reasonable efforts to ensure that such construction shall not materially
25 adversely interfere with the normal conduct of any business operations in the Premises.

26                  3.3.7   Tenant's Trailer. Landlord shall install a trailer for Tenant's exclusive use in
27 conducting employee interviews and recruiting, in accordance with Exhibit D hereto, in the location
28 shown on Exhibit B hereto. Said trailer shall be installed and operational at least forty-five (45) days
29 prior to the Delivery Date, and shall be removed within twenty (20) days (but not sooner than ten days)
30 after the Delivery Date.

31                  3.3.8   Intentionally Omitted.

32                  3.3.9   Intentionally Omitted.

33          Section 3.4     Measurement; Adjustment of Rent.

34                  3.4.1   Measurement of Premises and Shopping Center. Within five (5) days after the
35 completion of the first course of masonry for the exterior walls of the Premises and demising walls of
36 the Premises (and at least sixty (60) days prior to the Delivery Date), Landlord shall deliver to Tenant a
37 certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear
38 dimensions and the Floor Area of the Premises, and Floor Area of the Shopping Center, the
39 measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or
40 engineer. If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to
41 have any of such measurements made and certified to Landlord by Tenant's licensed architect,
42 surveyor or engineer. If the Floor Area of the Premises varies from that shown on the Certified LOD
43 (as may be modified by any applicable Changes) by two hundred fifty (250) square feet or more and/or
44 if the width of the Premises is less than the interior clear dimensions shown on the Certified LOD (as
45 may be modified by any applicable Changes), then Landlord shall correct such work to conform to the
46 Certified LOD (as may be modified by any applicable Changes).

47                  3.4.2   Measurement of Storage Area/Mezzanine. Within five (5) days after the
48 substantial completion of the floor system for the office mezzanine and the installation of the floor
49 tracks for the walls enclosing it, Landlord shall deliver to Tenant a certification to Tenant by
50 Landlord's licensed architect, surveyor or engineer of the Floor Area of each of said non-selling
51 space(s), the measurements of which shall be subject to confirmation by Tenant's licensed architect,
52 surveyor or engineer. If the square footage of the non-selling space on the office mezzanine varies by

1   greater than one percent (1%) from that shown on the Final Plans and Specifications, then, at Tenant's
2   request, Landlord shall correct such work to conform to the Final Plans and Specifications.

3            3.4.3  Adjustment of Fixed Rent and Tenant's Pro Rata Share. Subject to the
4   foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area
5   less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any
6   other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall
7   be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of
8   any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual
9   Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof
10  (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's
11  Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute
12  and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata
13  Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute
14  between the parties with respect to the Floor Area of the Premises, the square footage of said non-
15  selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance
16  with the provisions of Section 16.3 below.

17                                  ARTICLE 4
18
19                      FIXED RENT AND TAXES:
20              DETERMINATION AND PAYMENT

21        Section 4.1    Fixed Rent. Commencing on the Rent Commencement Date and continuing
22  throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly
23  installments, in advance, on the first day of each and every calendar month throughout the Term,
24  except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based
25  on a 365-day year.  Fixed Rent shall be paid without demand, deduction or set-off, except to the extent
26  otherwise expressly provided herein.

27        Section 4.2    Payment of Rent. All Rent shall be mailed or otherwise delivered to Landlord's
28  Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address
29  as Landlord may from time to time designate.  Landlord acknowledges and agrees that for
30  administrative purposes, Tenant has designated BBBY Management Corporation, a New York
31  corporation (the "*Paying Agent*"),  to make all Rent payments due to Landlord under this Lease. Said
32  designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute,
33  an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain
34  primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord
35  from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by
36  Tenant directly to Landlord.

37        Section 4.3    Real Estate and Other Taxes.

38            4.3.1  Landlord shall pay on or before the delinquency dates thereof all "Taxes"
39  (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.
40  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax
41  parcels and lots that exclude any property not a part of the Shopping Center.

42            4.3.2  (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes
43  which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate
44  fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord
45  and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the
46  Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata
47  Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments
48  (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such
49  option so as to maximize the number of installments, and Landlord shall pay the same before any fine,
50  penalty, interest or cost may be added thereto for nonpayment thereof.

51                (b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the
52  applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the
53  payment of Taxes for the previous payment period, as well as copies of all notices concerning
54  assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this
55  Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the
56  fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3   As used herein, "***Taxes***" shall mean all general, ad valorem real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Landlord and Tenant agree that, if Landlord receives, and/or the Shopping Center is the beneficiary of, any deferral, abatement or other tax-lowering adjustment or benefit including, without limitation, any tax increment financing (individually or collectively, "***Tax Reduction Program***"), then the Taxes otherwise payable but for such Tax Reduction Program shall be reduced by one-half of the benefits of such Tax Reduction Program each applicable tax year and Tenant's Pro Rata Share of Taxes shall be reduced accordingly. However, if any other tenant or occupant of the Shopping Center shall be entitled to greater benefit than Tenant in respect of any Tax Reduction Program, then Tenant shall be entitled to such greater benefit, and Tenant's Pro Rata Share of Taxes shall be adjusted accordingly. Landlord covenants that in no event shall Tenant's obligations under this Lease be increased or the benefits to Tenant under this Lease decreased by reason of any such Tax Reduction Program and the sales taxes imposed on the Shopping Center in connection with such program shall not exceed the sales taxes which otherwise would have been imposed on the Shopping Center if such Tax Reduction Program had not been entered into. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year after the Shopping Center has been completed and fully assessed will be approximately $1.75 per square foot of Floor Area in the Premises.

4.3.4   At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all reasonable documents which are necessary and proper therefor and required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding the foregoing, if Landlord reasonably and in good faith believes that there is insufficient basis to contest the amount or validity of any assessed valuation of Taxes, and Tenant requests that Landlord contest the amount or validity of such assessed valuation or Taxes, such contest shall be at Tenant's cost and expense, which costs and expenses are subject to recoupment by Tenant from any rebate or refund as provided above.

Section 4.4   Intentionally Omitted.

ARTICLE 5

COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to minimize interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting of at least 2.5 foot candles average maintained illumination, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    Common Areas: Maintenance. During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the "**Common Areas Charges**") incurred by Landlord to operate, maintain, insure and repair the Common Areas, including, for each calendar year, an administrative fee ("***Administrative Fee***") equal to seven percent (7%) of the Common Areas Charges for the calendar year in question [but excluding from the Common Areas Charges used for the computation of such Administrative Fee (i) the cost, or amortized portion of such cost, of any replacement or improvement of a capital nature (if such capital item, or the amortized portion of the cost of such capital item, is a permitted Common Areas Charge hereunder), (ii) the cost of electricity and other utilities, and (iii) insurance premiums]. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)    Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared substantially in accordance with generally accepted accounting principles consistently applied (the "***CAC Reconciliation Statement***"). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges (including insurance premiums) with respect to the first full calendar year of the Term exceed $1.75 per square foot of Floor Area, and with respect to any other calendar year thereafter (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year).

5.1.3    Exclusions from Common Areas Charges.

(a)    Common Areas Charges shall not include: **(1)** the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; **(2)** the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year

1   of the Term, or (B) more than once during each five (5) full calendar years of the Term; **(3)** the cost of
2   investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or
3   any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt service
4   (including principal and interest) or payments of any judgments or other liens against Landlord; **(5)** the
5   cost of maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes or other
6   taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of compliance with
7   applicable Legal Requirements (including, without limitation, the cost of curing violations or
8   contesting such Legal Requirements), except that Common Areas Charges shall include the cost of
9   compliance with laws affecting only the Common Areas provided that same shall (A) apply only to
10  laws enacted after the Rent Commencement Date, (B) not be necessitated by the acts or omissions of
11  Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or
12  employees, (C) not be necessitated by the particular nature of any other tenant's business (for purposes
13  of example only and not of limitation, laws mandating the installation of special water or grease traps
14  for restaurants or gas stations), (D) be amortized on a straight-line basis over the useful life thereof
15  under generally accepted accounting practices, and (E) be similarly imposed on all other tenants of the
16  Shopping Center; **(8)** any costs resulting from insurance deductibles or any payments made under any
17  self-insurance policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid
18  for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof
19  and the amount of any judgment or other charge entered or costs assessed against Landlord in excess
20  of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(10)** those
21  portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in
22  the Shopping Center other than through the payment of such tenant's proportionate share of insurance
23  premiums otherwise includable as part of Common Areas Charges; **(11)** sums paid or owed by
24  Landlord to any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation
25  of leases with, or construction of improvements for, any tenant in the Shopping Center (including,
26  without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with
27  lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or
28  defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent;
29  **(16)** depreciation [except as expressly permitted pursuant to item 23 below]; **(17)** costs
30  disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center
31  (including, without limitation, all costs relating to the operation of any food court in the Shopping
32  Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter
33  defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising,
34  entertainment and promotional costs for the Shopping Center (including, without limitation, holiday
35  decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and
36  other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to
37  Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and
38  expenses for materials and services by unrelated persons or entities of similar skill and experience;
39  **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within
40  one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the
41  maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as
42  determined in accordance with generally accepted accounting principles); **(24)** reserves for anticipated
43  future expenses; **(25)** any cost or expense, other than the Administrative Fee, relating to the
44  administration and management of the Common Areas (whether on-site or off-site) including, but not
45  limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues
46  and subscriptions, office utility charges, telephone charges and automobile expenses; **(26)** costs
47  incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems;
48  **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility
49  service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market
50  rates; or **(28)** any and all costs relating to (including, without limitation, costs to operate, manage,
51  maintain, insure or repair) those Common Areas located on the Sam's Parcel.

52                  (b)    In addition, if any tenant or other occupant of the Shopping Center
53  (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services
54  the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly
55  for costs which would otherwise be included in the Common Areas Charges, then the costs associated
56  with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the
57  denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be
58  reduced by the Floor Area occupied by such tenant or other occupant.

59                  (c)    Common Areas Charges for any period during the Term which
60  constitutes less than a full calendar year shall be equitably prorated.

5.1.4 <u>Tenant's Right to Audit</u>. Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. In the event of an error in Tenant's favor, Tenant shall pay the net shortfall (after deducting Tenant's expenses for the audit) to Landlord within thirty (30) days after Tenant's discovery thereof. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5 In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    <u>Common Areas: Restrictions</u>.

5.2.1 <u>Continuous Access</u>. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2 <u>No Alterations</u>. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the area designated as "Critical Area" on Exhibit B hereto (the **"Critical Area"**), from that shown on Exhibit B hereto; (ii) construct or permit to be constructed any structures in the Critical Area of the Shopping Center (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on Exhibit B hereto; (iii) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas, or the number, location or layout of parking spaces located within the Critical Area from those shown on Exhibit B hereto. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises (other than emergency repairs to utilities and Common Areas and as otherwise permitted by Section 5.2.6 below) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3 <u>Outparcels</u>. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outparcels (collectively, the **"Outparcels"** and individually, an **"Outparcel"**) designated on Exhibit B hereto as "Lot 3," "Lot 4," "Lot 5," "Lot 6," "Lot 7," and "Lot 8": (a) no more than one building shall be constructed on any Outparcel; (b) no building shall exceed one story in height; (c) no building shall exceed a maximum height of twenty-six feet (26') as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or architectural treatments or embellishments

#939089 v5                    17

thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae); (d) the Floor Area of any building constructed on an Outparcel shall not exceed the Floor Area established therefor on Exhibit B hereto; and (e) all Legal Requirements relative to parking requirements for each Outparcel operation shall be complied with by providing the requisite number of parking spaces solely within the boundaries of such Outparcel, without reduction in such number by virtue of the granting of a variance or special exception. For purposes of this Subsection 5.2.3, the Floor Area of any building constructed on an Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).

5.2.4    Parking Area. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) five (5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with at least ninety percent (90%) of such spaces being at least nine (9) feet in width and eighteen (18) feet in length and no more than ten percent (10%) of such spaces being compact spaces, with such compact spaces to be proportionately located throughout the parking field of the entire Shopping Center. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Except as designated as "Reserved Parking" on Exhibit B hereto, Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center.

5.2.5    Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6    Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)    not be performed during the months of August, November, or December of any year from and after the opening of Tenant's store for business to the public, except (i) in the event of an emergency, (ii) as may be otherwise required by applicable Legal Requirements, or (iii) for construction occurring within the interior of any building provided that such interior construction shall not require an exterior staging area and shall not otherwise have any adverse impact on the Common Areas or the ongoing operations at the Premises or the balance of the Shopping Center;

(b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8  Miscellaneous.

(a)  No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.  Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant)  shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)  Trash Compactor & Containers.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)  Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)  Cellular Towers.  No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

## ARTICLE 6

## UTILITIES

Section 6.1  Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2  Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within thirty-six (36) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.  Except as provided in this Section 6.2, Landlord shall have no liability to Tenant for a disruption of the utilities serving the Premises; provided, however, Landlord shall use commercially reasonable efforts to restore (or cause to be restored) the disrupted utilities.

Section 6.3  Intentionally Omitted.

ARTICLE 7

SIGNS

Section 7.1    Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Subject to compliance with applicable Legal Requirements, and provided that all such exterior signs erected by Tenant are either Tenant's prototypical signs or are reasonably aesthetically compatible with the exterior signage in the Shopping Center or have otherwise been approved by Landlord pursuant to Section 7.3 below, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Pylon/Monument Signage. Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The dimensions of Tenant's pylon sign panel(s) shall be at least as large as those of other occupants of the Shopping Center occupying less than fifty thousand (50,000) square feet of Floor Area, and shall be located above the signs of all other tenants of the Shopping Center occupying less than fifty thousand (50,000) square feet of Floor Area. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas or on the Sam's Parcel (and with respect to the Sam's Parcel subject to the rights of the owner of the Sam's Parcel under the Sam's OEA), such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be higher than and at least as large as the largest sign made available to all other tenants of the Shopping Center occupying less than fifty thousand (50,000) square feet of Floor Area. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments] and the costs of any electricity used to illuminate them (such maintenance and electricity costs are collectively referred to as "*Pylon Costs*") shall be includable in Common Areas Charges; provided, however, for the purposes of determining Tenant's Pro Rata Share of the Common Areas Charges, the Pylon Costs includable in Common Areas Charges shall be reduced by an amount determined by multiplying the total amount of Pylon Costs by a fraction, the numerator of which is the aggregate area of the identification panels for tenants or occupants of the Project that are not also tenants or occupants of the Shopping Center and the denominator of which is the total area of all identification panels (including any Shopping Center identification panel) on such pylon or monument sign(s). If the top position on the pylon sign, as shown on Exhibit F, is occupied by another tenant's sign panel, then upon the expiration or earlier termination of such other tenant's lease, Tenant shall have the right to relocate its pylon sign panel to the top position on the pylon sign, at Tenant's sole expense; provided however, the foregoing shall not apply to the top panel if such panel is to be occupied by a tenant or occupant of the Shopping Center which occupies at least fifty thousand (50,000) square feet of Floor Area.

Section 7.3    Signage; Alteration/Removal/Allocation. Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that (a) the area of the new sign is no larger than the area of the sign which it replaces, (b) that the method of construction and attachment is substantially the same, and (c) such signs are either Tenant's prototypical signs or are aesthetically compatible with those of the balance of the Shopping Center, not including the Outparcels. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or

1   between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by
2   Landlord and Tenant hereunder shall comply with applicable Legal Requirements. Any exterior
3   building façade signs that are not Tenant's (or any subtenant's) prototypical signs and not reasonably
4   aesthetically compatible with those of the balance of the Shopping Center (not including the
5   Outparcels) shall be subject to Landlord's approval.

6       Section 7.4   Cooperation. Landlord, upon request, shall execute any consents or applications
7   which may be reasonably required by applicable Legal Requirements to permit the placement,
8   installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or
9   monument, to which Tenant may be entitled under this Lease.

10      Section 7.5   Signage and Building Restrictions and Criteria.

11      7.5.1   During the Term, no exterior identification signs attached to any building of the
12  Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs
13  employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers,
14  provided that Tenant shall have the right to employ any methods necessary for the installation of
15  internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than
16  professionally prepared interior window signs advertising special sales within the subject premises,
17  temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing
18  shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals
19  which indicate hours of business, emergency telephone numbers, credit cards accepted, and other
20  similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words
21  of like import. No billboard signs shall be permitted within the Shopping Center.

22      7.5.2   Landlord shall not permit any obstructions (including, without limitation, any
23  trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront,
24  storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.
25  Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(j)), no
26  premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall
27  have: (i) building signage possessing more total square footage than the total square footage available
28  for use by Tenant, or a maximum height greater than the maximum height of Tenant's building
29  signage, as measured from the finished floor level to the highest point on such signage, or (ii) a
30  building and entrance design element higher or wider than the height or width of the building and
31  entrance design element of the Premises.

32                          ARTICLE 8
33
34              ALTERATIONS AND IMPROVEMENTS

35      Section 8.1   Alterations and Improvements.

36      8.1.1   Tenant shall not perform any structural alterations or structural improvements to
37  the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of
38  Landlord, provided, however, that Tenant's alterations or improvements to the exterior of the Premises
39  to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent
40  provided that such alterations or improvements are architecturally harmonious, in terms of color and
41  materials, with the balance of the Shopping Center. All other structural alterations or structural
42  improvements shall require Landlord's consent. All work performed by Tenant in connection with
43  structural and non-structural alterations or improvements shall be done at Tenant's sole cost and
44  expense, in a good and workmanlike manner and in compliance with all applicable Legal
45  Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which
46  shall be governed by the applicable provisions of Article 7 above.

47      8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior
48  approval of Landlord, make non-structural alterations and non-structural improvements to the Premises
49  as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating,
50  ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment,
51  painting, and wall and floor coverings. Any non-structural exterior alterations and non-structural
52  exterior improvements shall be subject to the provisions of Subsection 8.1.1(a) above relating to
53  structural exterior alterations and improvements.

8.1.3   Tenant shall have the right to subdivide the Premises into two (2) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4   Tenant shall have the right to erect and maintain, at Tenant's sole cost and expense, an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly use diligent efforts to cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

## ARTICLE 9

## REPAIRS

Section 9.1   Tenant's Repairs. Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) all non-structural, interior elements of the Premises (including plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and the painting or other treatment of interior walls, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed lien free in a good and workmanlike manner and in accordance with all applicable Legal Requirements.

Section 9.2   Landlord's Repairs. Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)   the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)   the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

1              (c)       the roof, gutters, flashings, downspouts and scuppers;

2              (d)       the electric, gas, water, sanitary sewer, and other public utility lines
3    serving the Premises, to the point of connection to the Premises;

4              (e)       all electric, gas, water, sanitary sewer, and other public utility lines and
5    ducts in or passing through the Premises which do not exclusively serve the Premises; and

6              (f)       the non-structural elements of the Premises (including, without
7    limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing,
8    mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st)
9    anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-
10   structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties
11   or guarantees; and

12             (g)       any damage to the Premises or the Shopping Center which is occasioned
13   by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by
14   Landlord of any provision of this Lease.

15             All repairs and replacements on Landlord's part to be performed hereunder shall be at
16   Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good
17   and workmanlike manner in accordance with all applicable Legal Requirements, and without material
18   interference with or disruption to the normal conduct of any business operations in the Premises.
19   Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or
20   which would otherwise affect the normal conduct of any business operations in, the Premises (except
21   in the case of an emergency posing imminent risk of material harm to persons or property, in which
22   event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If,
23   in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the
24   normal conduct of any business operations in the Premises, Landlord shall perform such repairs only
25   after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion
26   thereof), and Landlord shall reimburse Tenant for the reasonable out-of-pocket costs and expenses
27   incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities
28   charges and security expenses.  In the event Landlord does not reimburse Tenant for any amounts
29   payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the
30   right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in
31   equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate
32   from the date of outlay until reimbursement or full satisfaction by credit.

33             Section 9.3    Legal Compliance Work.  Except as expressly provided in Section 5.1 above
34   and this Section 9.3 below, Landlord shall be responsible, at its sole cost and expense (and not
35   includable in Common Areas Charges), for performing all "*Legal Compliance Work*" (hereinafter
36   defined).  Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for
37   the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises
38   which are neither structural nor comprise the major building systems serving the Premises; or
39   (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of
40   general applicability to tenants and occupants of the Shopping Center); provided, however, that the
41   foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance
42   with all Legal Requirements, and (y) the repairs required in this Lease.  As used herein, "Legal
43   Compliance Work" shall mean any obligation, addition, alteration, improvement, or rebuilding,
44   structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable,
45   which may be required by reason of any Legal Requirement.

46                                          ARTICLE 10
47
48                            INDEMNIFICATION, INSURANCE AND
49                            WAIVER OF SUBROGATION

50             Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

51             10.1.1  Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on
52   behalf of anyone claiming under or through either one by way of subrogation, hereby release and
53   waive all rights of recovery and causes of action against each other from any and all liability for any
54   loss or damage to property or resulting from damage to such property (and, in either case, any resulting
55   loss of business or rental income), whether caused by the negligence or fault of the other party, which

1    is normally insured under Special Form property insurance (formerly known as "All-Risk") and time
2    element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a
3    self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring
4    party or the party maintaining the deductible hereby releases the other party from any liability arising
5    from any event which would have been covered had the required insurance been obtained and/or the
6    deductible not been maintained.

7         10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property
8    insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping
9    Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise
10   against the other party hereto in connection with any loss or damage which is covered by such policy
11   or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

12         10.1.3 Mutual Indemnification.

13         (a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above,
14   Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any
15   and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in
16   connection with loss of life, personal injury and/or damage to property arising from or out of any
17   occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act
18   or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent
19   such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord,
20   its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said
21   parties may be statutorily liable.

22         (b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above,
23   Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any
24   and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in
25   connection with loss of life, personal injury and/or damage to property arising from or out of any
26   occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y)
27   occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees,
28   servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions,
29   damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors,
30   licensees or employees, or for which any of said parties may be statutorily liable.

31         Section 10.2   Tenant's Insurance.

32         10.2.1 Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full
33   force and effect from and after the Delivery Date and throughout the Term: (i) commercial general
34   liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for
35   claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by
36   Tenant under this Lease, and having a combined single limit of liability of not less than ███████████
37   ████████████████ for bodily injury, death and property damage liability; and (ii) Special Form
38   (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount
39   adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry
40   any of its insurance under "blanket policies" covering the Premises and other locations it or any
41   Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall
42   be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all
43   other respects, any such policy or policies shall comply with the applicable provisions of this Article
44   10.

45         10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2
46   may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies
47   which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-
48   insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains,
49   during the period of such self-insurance, a tangible net worth of at least ███████████████████
50   ████████████); or (iv) a combination of any of the foregoing insurance programs. To the extent any
51   deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance
52   with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an
53   informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two
54   Hundred Thousand Dollars ($200,000) unless Tenant complies with the requirements regarding self-
55   insurance pursuant to clause (iii) above.

1    Section 10.3    Landlord's Insurance.

2        10.3.1 Liability Insurance. Landlord shall maintain in full force and effect on and after
3    the Effective Date and throughout the Term commercial general liability insurance with regard to the
4    Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and
5    having a combined single limit of liability of not less than T̶w̶o̶ ̶M̶i̶l̶l̶i̶o̶n̶ ̶D̶o̶l̶l̶a̶r̶s̶ ̶(̶$̶1̶0̶,̶0̶0̶0̶,̶0̶0̶0̶)̶ for
6    bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance
7    under "blanket policies" covering the Shopping Center and other properties provided that: (i) the
8    amount of the total insurance available shall be at least the protection equivalent to separate policies in
9    the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with
10   the applicable provisions of this Article 10.

11       10.3.2 Special Form Property Insurance. Landlord shall procure and maintain in full
12   force and effect on and after the Effective Date and throughout the Term, Special Form (formerly
13   known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1)
14   year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes],
15   demolition, increased cost of construction and contingent operation of building laws coverages,  on a
16   replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of
17   the buildings (including the Premises) and other insurable improvements in the Shopping Center;
18   provided, however, in no event shall such insurance cover Tenant's Property. All policies required to
19   be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof
20   shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in
21   trust by such party and disbursed only in accordance with the provisions of, and for the purposes set
22   forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant
23   to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000)
24   without Tenant's prior consent.

25       10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse
26   Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies
27   required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges.
28   If the rates for any insurance Landlord is required to carry hereunder are increased above the rates that
29   would be charged for general retail use as a result of the specific use or other activity of any other
30   occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas
31   Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium
32   which had previously been included in Common Areas Charges, Landlord shall promptly refund
33   Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share
34   of any insurance premium for any period during the Term which constitutes less than a full calendar
35   year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration
36   or earlier termination of this Lease.

37    Section 10.4    General Insurance Requirements.

38       10.4.1 All insurance required to be maintained by the parties under this Lease shall be
39   maintained with insurance companies qualified to do business in the state in which the Shopping
40   Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its
41   equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its
42   insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice
43   to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall
44   provide to the other duly executed certificates evidencing the insurance coverage described in Sections
45   10.2.1 and 10.3 above.

46       10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be
47   reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in
48   consultation with their respective insurance advisors) the minimum limits of such insurance to limits
49   which shall be reasonable and customary for similar facilities of like size and operation in accordance
50   with generally accepted insurance industry standards.  The replacement value of the buildings and
51   other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time
52   at the request of either Landlord or Tenant.

ARTICLE 11

FIRE AND OTHER CASUALTY;
EMINENT DOMAIN

Section 11.1    Fire and Other Casualty.

11.1.1 (a)    Except as otherwise provided in this Section 11.1, if all or a portion of
the Premises, the Common Areas (including all improvements thereto) or other buildings in the
Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and
restore the Premises and the Common Areas to the condition existing immediately prior to such fire or
other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements
performed by Tenant, and shall not include any of Tenant's Property, and (y) rebuild and restore at
least eighty percent (80%) of additional Floor Area (exclusive of the Premises) within the Shopping
Center to substantially the condition in which same existed immediately prior to such fire or other
casualty so that same shall be occupied or ready for occupancy following reconstruction. With respect
to buildings or improvements within the Shopping Center which are damaged by fire or other casualty
but which are not required to be restored by Landlord, Landlord shall promptly either (a) rebuild and
restore all or portions of the same to substantially the condition in which they existed immediately
prior to such fire or other casualty, or (b) raze the remaining portions of such buildings or
improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or
landscape such areas in a sightly manner. The proceeds of the policies required to be obtained and
maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for
the performance of such rebuilding and restoration work. In the event such insurance proceeds are
insufficient to complete such work, Landlord shall provide the balance of the amount necessary to
rebuild or restore the Shopping Center in the manner provided in this Section 11.1. If an uninsured
casualty (i.e., a casualty not covered by the either the insurance required to be maintained, or the
insurance actually maintained, by Landlord pursuant to Section 10.3 above) occurs and Landlord was
not required to carry insurance covering such a casualty under the terms of this Lease, and provided
that (I) more than fifty percent (50%) of the Shopping Center shall have been damaged in such
casualty, and (II) more than fifty percent (50%) of the Premises are damaged or destroyed, Landlord
shall have the option of not rebuilding the Shopping Center provided Landlord terminates the leases of
all similarly situated tenants, in which case Landlord shall promptly notify Tenant thereof, and this
Lease shall terminate not less than thirty (30) days after Tenant's receipt of said Landlord's notice.
Notwithstanding the foregoing, if within thirty (30) days following Tenant's receipt of Landlord's non-
rebuild and termination notice Tenant notifies Landlord that it wants Landlord to rebuild the Premises,
then Landlord shall rebuild or restore (as applicable) all of the Premises, and not less than Fifty
Thousand (50,000) square feet of leasable Floor Area of the Casualty Rebuild Area (as shown on
Exhibit B hereto) in addition to the Premises, to substantially the same condition that existed
immediately prior to the casualty. With respect to the costs of the restoration or rebuilding as provided
in the preceding sentence, Landlord shall be responsible to pay for the initial ██████████████
████████████████████████ of such costs and Tenant shall provide the funds, in
excess of said $250,000.00, for such restoration or rebuilding.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so
damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises
in the course of, and as part of, such rebuilding or restoration work. The principles set forth
Subsections 8.1.1 and 8.1.2 shall control as to which changes Landlord shall have the right to consent,
and which changes shall not require Landlord's consent. If the net cost and expense of such rebuilding
or restoration work is increased solely as a result of such changes (taking into consideration any and all
actual reduced and additional costs resulting from such changes and/or other cost savings arising
therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase,
which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant
backup information evidencing such increase (including, without limitation, receipted invoices) as may
be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which
possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's
substantial completion of such rebuilding or restoration work is delayed solely as a result of such
changes (taking into consideration any and all reasonable time savings to Landlord resulting from such
changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately
adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable business judgment (exercised in good faith),
any damage to the Premises renders all or any portion of the Premises unusable for the conduct of

1    Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the
2    normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or
3    totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's
4    reasonable judgment, be utilized for its normal conduct of business.

5            11.1.2 In the event that:

6                    (a)    Landlord does not commence the repair and restoration work to the
7    Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this
8    Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently
9    pursue the completion of such repair and restoration work (subject to such period as may be reasonably
10   necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

11                   (b)    the required repairs and restorations to the Premises, the Common Areas,
12   or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance
13   with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period
14   may be extended by reason of an event of Force Majeure, not to exceed ninety (90) days in the
15   aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its
16   occurrence),

17   then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:
18
19                   (i)    after giving thirty (30) days' prior notice to Landlord (and
20   Landlord's continued failure to commence and diligently pursue such repairs and restoration
21   work to completion), perform or complete, as the case may be, said work (or any portion
22   thereof) on Landlord's behalf and at the sole cost of Landlord, which reasonable cost Landlord
23   shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's
24   delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall
25   have the right to offset the amount thereof, together with interest at the Lease Interest Rate,
26   against the Rent next accruing hereunder (it being agreed, without limiting the foregoing
27   provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or
28   payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid
29   (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as
30   same is being performed); or

31                   (ii)    seek to obtain specific performance of Landlord's repair and
32   restoration obligations pursuant to the laws of the state in which the Shopping Center is
33   located; or

34                   (iii)    terminate this Lease by thirty (30) days' notice to Landlord. In
35   addition to the foregoing, if, in the opinion of an independent licensed architect designated by
36   Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the
37   Premises, the Common Areas or other buildings in the Shopping Center cannot be completed
38   by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the
39   date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate
40   this Lease by giving Landlord at least thirty (30) days' notice thereof.

41           If the Premises are substantially destroyed by fire or other casualty during the last two (2) years
42   of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant
43   shall each have the right to terminate this Lease as of the date of such damage or destruction by giving
44   notice within thirty (30) days following such damage or destruction, but Tenant may negate any
45   termination by Landlord by agreeing to extend the Term for an additional five (5) year period by
46   exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt
47   of the termination notice from Landlord.

48           Section 11.2    Eminent Domain.

49           11.2.1  As used in this Section 11.2, "*Taking*" or "*Taken*" shall mean a taking for any
50   public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or
51   eminent domain or by agreement between Landlord and those having the authority to exercise such
52   right.

53           11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of
54   vesting of title or transfer of possession, whichever is earlier, without further liability on the part of

1 either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant
2 hereunder.

3       11.2.3  In the event that:

4            (a)    any portion of the Premises shall be Taken so that it is commercially
5 unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the
6 Premises;

7            (b)    as a consequence of any Taking: (i) portions of the Shopping Center
8 shall be divided or separated in any manner that it materially interferes with parking, visibility, or
9 access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no
10 longer has at least two (2) entrances from Leah Avenue, at least one (1) entrance from Cottonwood
11 Parkway, an entrance from the IH-35 frontage road between the premises designated as "Discount Tire
12 Co." and the premises designated as "Lot 5" on Exhibit B, and an entrance at the intersection of the
13 IH-35 frontage road and McKinley Place Drive, and as a result, it is not commercially reasonable or
14 feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

15            (c)    there occurs, in Tenant's reasonable judgment, a denial of adequate
16 access to the Critical Area at the grade of any street adjoining the Shopping Center or to any easement
17 granted under this Lease, whether or not a Taking shall have occurred;

18            (d)    any portion of the Shopping Center shall be Taken which materially
19 interferes with parking, visibility or access to the Premises, and as a result of such taking it is
20 commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal
21 business in the Premises;

22            (e)    more than twenty-five (25%) percent of the total Floor Area of all of the
23 buildings in the Shopping Center (other than the Premises) are Taken; or

24            (f)    so many of the parking spaces in the Shopping Center are Taken such
25 that there are fewer than (i) five (5.0) parking spaces for every one thousand (1,000) square feet of
26 Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal
27 Requirements;

28 then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty
29 (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease
30 shall terminate without any further liability on the part of either Landlord or Tenant, except for an
31 adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant
32 for its share of the award for the taking pursuant to Subsection 11.2.5 below.  Upon any partial Taking
33 of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which
34 the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal
35 conduct of business.
36
37       11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole
38 cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area
39 not so Taken to tenantable condition, similar in physical appearance to the condition of the area
40 immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which
41 repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold
42 improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair
43 or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be
44 made available to and used by Landlord for any rebuilding or restoration which it is required to
45 perform hereunder.  During the period of such repairs and restoration, all Rent shall abate to the extent
46 that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct
47 of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.

48       11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be
49 entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and
50 removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which
51 reduces the award payable to Landlord for its fee interest in the Premises.

52       11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be
53 resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12

COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord. Nothing in this Section 12.1 shall be deemed to in any way modify or limit Landlord's remedies upon an Event of Default by Tenant.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)  As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and indefeasible fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like except for the encumbrances described on Exhibit E hereto;

(b)  In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)  Except for the approval of Lowe's which is required under Section 3.1 of the Lowe's OEA and which has already been obtained, no third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)  Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)  The Shopping Center now has, and, on the Delivery Date, shall have, access to and from the IH-35 frontage road, Cottonwood Parkway, and Leah Avenue, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)  This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)  From and after the Delivery Date, there shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)  As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from

1  having the signage (including, without limitation, the square foot area and size of letters) as depicted
2  on Exhibit D-1 and Exhibit F hereof.

3          (i)      As of the Effective Date there is no Related Land in existence and as of
4  the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in
5  existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable
6  instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining
7  to or otherwise affecting Related Land);

8          (j)      Attached hereto as Exhibit K-2 is a complete list of all fully executed
9  and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "*Existing*
10 *Leases*"); and

11         (k)      Landlord shall promptly forward to Tenant any notice or other
12 communication received by Landlord from any owner of property adjoining or adjacent to the
13 Shopping Center or from any municipal or other governmental authority, in connection with any
14 hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or
15 related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted,
16 could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business
17 therein, or Tenant's rights and benefits under this Lease.  Landlord, at its sole cost and expense, shall
18 appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to appear and
19 contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice
20 as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be
21 obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which
22 event Landlord shall fully cooperate with Tenant, provide such information, and execute any
23 reasonable documents or other instruments as Tenant may reasonably request in connection with any
24 such proceeding.

25     Section 12.4   Environmental Matters.

26         12.4.1 Definitions.

27         (a)      As used herein, the term "*Environmental Laws*" shall mean any and all
28 Legal Requirements concerning the protection of the environment, human health or safety.

29         (b)      As used herein, the term "*Hazardous Substances*" shall mean each and
30 every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste,
31 hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any
32 of the Environmental Laws or the presence of which may cause liability at common law, including,
33 without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

34         (c)      As used herein, the term "*Environmental Notice*" shall mean a
35 summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading,
36 letter or other communication, written or oral, actual or threatened, from the United States
37 Environmental Protection Agency or other federal, state or local governmental agency or authority, or
38 any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or
39 emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or
40 potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous
41 property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

42         (d)      As used herein, the term "*Releasing*" or "*Release*" shall mean releasing,
43 spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the
44 environment or into any building or other improvements in violation of Environmental Laws.

45         (e)      As used herein, the term "*Compliance Costs*" shall mean any and all
46 costs incurred by a party in complying with applicable Environmental Laws, including, without
47 limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees;
48 application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate,
49 surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs
50 of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the
51 Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

52         (f)      As used herein, the term "*Tenant Related Parties*" shall mean Tenant's
53 agents, servants, employees, contractors or licensees\

12.4.2  Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon or from "Tenant Releases" (as defined in Subsection 12.4.3 below).

12.4.3  Responsibility for Releases of Hazardous Substances.

(a)  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter "*Tenant Releases*"), including, without limitation, any Compliance Costs required to address Tenant Releases. As between Landlord and Tenant, Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. No third party shall be a third party beneficiary with respect to the immediately preceding sentence.  Landlord shall not be liable with respect to Hazardous Substances which are introduced to the Shopping Center or the Premises after the Delivery Date by any party other than Landlord or an Affiliate of Landlord, or any contractor, employee, agent or representative of Landlord, provided that: (i) Landlord shall otherwise comply with its duties and obligations under this Section 12.4 (including, without limitation, with respect to the Compliance Costs referenced above) and, as between Landlord and Tenant, shall be liable with respect to Hazardous Substances as otherwise provided in this Section 12.4.3(a), (ii) upon request by Tenant, Landlord shall, at its sole expense, commence appropriate actions or proceedings against the party who introduced (or was legally responsible for the introduction of) such Hazardous Substances  to the Shopping Center or the Premises and thereafter diligently pursue same, and (iii) without limiting Tenant's other rights and remedies under this Lease, should the introduction of Hazardous Substances as aforesaid interfere, in more than a *de minimis* manner, with the normal conduct of Tenant's business at the Premises, its use and enjoyment of the Common Areas, or Tenant's other rights and benefits under this Lease, then Tenant shall be entitled to an equitable abatement of Rent.  In the event such interference continues for a period of one hundred twenty (120) days after discovery of such Hazardous Materials and Landlord is unable to remediate (or cause the remediation of) such Hazardous Substances as required by law within such one hundred twenty (120) days, Tenant shall be entitled to terminate this Lease at any time prior to the completion of such remediation upon thirty (30) days prior notice to Landlord.

(b)  Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner, using commercially reasonable efforts, so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4  Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5  Landlord's Representations and Warranties.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any current uncured violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge, except as set forth in that certain Phase I Environmental Site Assessment, dated February 2, 2005, conducted by Integrated Testing and Engineering Company of San Antonio, L.P., Project No. 053101.esa: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.  The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

1               12.4.6  Documents.  Each party shall immediately notify the other party of the notifying
2  party's receipt of an Environmental Notice.

3               12.4.7  Indemnity.  Each party to this Lease shall indemnify, defend and hold the other
4  party, and its agents, servants, shareholders, directors, officers, partners, members and employees
5  harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative
6  proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including,
7  without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other
8  purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its
9  representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous
10  Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of
11  Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12              12.4.8  Survival.  The obligations of the parties under this Section 12.4 shall survive the
13  renewal, expiration, breach or earlier termination of this Lease.

14              12.4.9  Conflict.  In the event of any conflict between the provisions of this Section 12.4
15  and any other provision of this Lease, the provisions of this Section 12.4 shall control.

16       Section 12.5   OEA.

17              12.5.1  As used in this Lease, the term "*OEAs*" shall mean: (i)  that certain Declaration
18  of Covenants, Conditions and Restrictions by and between Mary Ann Hood, Trustee and Lowe's
19  Home Centers, Inc., a North Carolina corporation, dated as of May 24, 1996 and recorded on May 28,
20  1996 in the Official Public Records of Hays County, State of Texas (the "*Clerk's Office*") in Volume
21  1229 at Page 830, as amended pursuant to that certain: (a) First Amendment to Declaration of
22  Covenants, Conditions and Restrictions, dated as of June 20, 2005, by and between Mary Ann Hood,
23  Trustee and Lowe's Home Centers, Inc., recorded in the Clerk's Office in Volume 2716, Page 758,
24  (b) Acknowledgement Relating to Declaration of Covenants, Conditions and Restrictions (Jack in the
25  Box), dated June 28, 2005, by Engineer Business Center, LLC, recorded in the Clerk's Office in
26  Volume 2716, Page 733, (c) Acknowledgement Relating to Declaration of Covenants, Conditions and
27  Restrictions (Shell), dated June 27, 2005, by CNL APF Partners, L.P., recorded in the Clerk's Office in
28  Volume 2716, Page 712, (d) Acknowledgement Relating to Declaration of Covenants, Conditions and
29  Restrictions (Discount Tire), dated June 9, 2005, by Halle Properties, L.L.C., recorded in the Clerk's
30  Office in Volume 2716, Page 725, and (e) Acknowledgement Relating to Declaration of Covenants,
31  Conditions and Restrictions (Centurytel), dated June 10, 2005, by Centurytel of San Marcos, Inc.,
32  recorded in the Clerk's Office in Volume 2716, Page 752 (collectively, the "*Lowe's OEA*"); (ii)  that
33  certain Reciprocal Easement Agreement by and between Mary Ann Hood, Trustee and PBA
34  Development, Inc., a Texas corporation, dated as of June 19, 1998 and recorded on June 22, 1998 in
35  the Clerk's Office in Volume 1426 at Page 1, as amended and/or acknowledged pursuant to that
36  certain: (1) First Amendment to Reciprocal Easement Agreement, dated July 1, 2005, by and between
37  Lincoln PO Red Oak Village, L.P. and Texas Cinema Corporation, recorded in the Clerk's Office in
38  Volume 2750, Page 712, (2) Acknowledgement Relating to Reciprocal Easement Agreement (Jack in
39  the Box), dated June 28, 2005, by Engineer Business Center, LLC, recorded in the Clerk's Office in
40  Volume 2716, Page 795, (3) Acknowledgement Relating to Reciprocal Easement Agreement (Shell),
41  dated June 27, 2005, by CNL APF Partners, LP, recorded in the Clerk's Office in Volume 2716, Page
42  774, (4) Acknowledgement Relating to Reciprocal Easement Agreement (Discount Tire), dated June 9,
43  2005, by Halle Properties, L.L.C., recorded in the Clerk's Office in Volume 2716, Page 787, and
44  (5) Acknowledgement Relating to Reciprocal Easement Agreement (Centurytel), dated June 10, 2005,
45  by Centurytel of San Marcos, Inc., recorded in the Clerk's Office in Volume 2716, Page 805
46  (collectively, the "*PBA OEA*"); and (iii) if Sam's shall acquire the Sam's Parcel, that certain
47  Easements with Covenants and Restrictions Affecting Land, a form of which is attached hereto as
48  Exhibit O (the "*Sam's OEA*").  Any changes to the Sam's OEA from that which is attached hereto as
49  Exhibit O that could diminish the rights or increase the obligations of Tenant thereunder or under this
50  Lease, or could adversely affect Tenant's use or occupancy of the Premises (including, without
51  limitation, access thereto [inclusive of the access to and from Cottonwood Parkway as shown on
52  Exhibit B hereto]) or the conduct of Tenant's business therein, shall be subject to Tenant's prior
53  written consent, which consent may be withheld in its sole and absolute discretion.  Without limiting
54  the foregoing (and subject to the provisions of Section 23.20 below), if Sam's shall not acquire the
55  Sam's Parcel as of the Delivery Date, and if Landlord shall, from and after the Delivery Date, convey
56  the Sam's Parcel (or any portion thereof) to any third party (including, without limitation, any Affiliate
57  of Landlord), then, Landlord shall be permitted to enter into a reciprocal easement agreement with
58  such third-party provided that in no event shall such agreement diminish the rights or increase the

1    obligations of Tenant thereunder or under this Lease, adversely affect Tenant's use or occupancy of the
2    Premises (including, without limitation, access thereto [inclusive of the access to and from
3    Cottonwood Parkway as shown on Exhibit B hereto]) or the conduct of Tenant's business therein.

4              12.5.2  Landlord covenants, represents and warrants to Tenant that: (i) the OEAs have
5    not been modified, amended or terminated; (ii) except for the Sam's OEA, the OEAs are currently in
6    full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the any of
7    OEAs exists thereunder beyond any applicable notice and cure period; and (iv) the OEAs are, and shall
8    remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other
9    land which is encumbered by the OEAs.  Landlord and Tenant each acknowledge that this Lease is
10   made and shall continue to be subject and subordinate to the OEAs, subject to the provisions of this
11   Section 12.5.  Tenant shall comply with the terms and conditions of the OEAs to the extent same
12   affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in
13   connection with such compliance unless there is an independent, specific and express obligation of
14   Tenant under this Lease that requires the expenditure of funds in order to satisfy such independent,
15   specific and express Lease obligation).

16             12.5.3  Landlord shall, during the Term: (i) perform and observe all of the terms,
17   covenants, provisions and conditions of the OEAs on Landlord's part to be performed and observed;
18   (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes
19   of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the
20   enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the
21   OEAs; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of
22   the OEAs.

23             12.5.4  Whenever, pursuant to the OEAs, the consent or approval of Landlord shall be
24   required by or requested, and to the extent Landlord has the legal right to withhold its consent or
25   approval, and such consent or approval could diminish the rights or increase the obligations of Tenant
26   thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or
27   the conduct of Tenant's business therein, such consent or approval shall not be granted without the
28   prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

29             12.5.5  Landlord shall, immediately upon receipt, forward to Tenant and Tenant's
30   leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under
31   or pursuant to any of the OEAs, which relate to, or could adversely affect, Tenant's use or occupancy
32   of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

33             12.5.6  Landlord shall not amend, or modify any of the OEAs if such amendment or
34   modification could diminish the rights or increase the obligations of Tenant thereunder or under this
35   Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's
36   business therein, nor shall Landlord terminate any of the OEAs.

37             12.5.7  In the event Landlord defaults in the performance of any of its obligations under
38   any of the OEAs or fails to enforce the obligations of any other obligee under any of the OEAs, and
39   such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease,
40   Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein,
41   Tenant may, but shall not be obligated to, after thirty (30) days prior written notice to Landlord (except
42   in the event of emergency, in which case only such notice as is reasonable under the circumstances
43   shall be required) and Landlord's failure to cure the default within that period (or, if thirty (30) days
44   shall be insufficient to effect the cure, if Landlord shall have failed to commence to cure the default
45   within the thirty (30) day period, and/or thereafter fail to diligently pursue same to completion), cure
46   any default by Landlord under the OEAs and/or enforce, in its own name, at Landlord's expense, the
47   obligations of any other obligee under the OEAs.  Landlord shall, upon demand, reimburse Tenant for
48   the reasonable costs incurred by Tenant in performing any of Landlord's obligations under the OEAs
49   or enforcing the obligations of any obligee under the OEAs, together with interest thereon at the Lease
50   Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and
51   remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior
52   notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due
53   hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until
54   reimbursement or full satisfaction by credit.

55             12.5.8  As between Landlord and Tenant, in the event of any conflict between the OEAs
56   and this Lease, this Lease shall in all respects control.

1    12.5.9  Landlord shall obtain any third-party approvals required under any of the OEAs
2    for the performance of Landlord's Work (including, without limitation, Tenant's elevations and
3    signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's
4    business in the Premises.

5        Section 12.6   Intentionally Omitted.

6                                    ARTICLE 13
7
8                            USE AND RESTRICTIONS

9        Section 13.1   Permitted and Prohibited Uses.

10        13.1.1  Tenant's Permitted Use.  The Premises may be used and occupied for the
11   Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the
12   "Prohibited Uses" (defined in Exhibit M hereto annexed) or the "Existing Exclusives" (hereinafter
13   defined in Subsection 13.3.1), to the extent then applicable.

14        13.1.2  Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage
15   the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in
16   the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit
17   any portion of the Shopping Center to be occupied for any of the "Prohibited Uses" (defined in
18   Exhibit M hereto annexed).  Landlord shall not lease, rent or occupy or permit any portion of any land
19   (the "*Related Land*") contiguous or adjacent to the Shopping Center  (including, without limitation,
20   any land that would be contiguous or adjacent to the Shopping Center but for any intervening road,
21   street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s), to be
22   occupied for  the following Prohibited Uses listed on Exhibit M hereto: Items 1, 2, 4, 5, 14, 15, 21, 22
23   and 25.  Notwithstanding the foregoing, the provisions of this Subsection 13.1.2 shall not apply to any
24   business existing on any Related Land owned or controlled by a person or entity which: (i) was
25   previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder,
26   already owned or controlled such Related Land (excluding, however, the Landlord originally named
27   herein and its Affiliates).  Without limiting the generality of the foregoing, in no event shall the Sam's
28   Parcel be deemed to be Related Land if and when the Sam's Parcel is transferred from Landlord to
29   Sam's and for so long as the Sam's Parcel is owned by Sam's.

30        Section 13.2   Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and
31   subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as
32   follows:

33        13.2.1  Landlord shall not lease, rent or occupy (or permit any other premises in the
34   Shopping Center or on any Related Land to be occupied), whether by a tenant, sublessee, assignee,
35   licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either
36   singly or in any combination, of items contained in any of the following respective categories of
37   merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware);
38   (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art
39   (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet,
40   shelving and storage items (which items, either singly or in any combination, are hereinafter referred to
41   as the "*Exclusive Items*").  Notwithstanding the foregoing, any tenant or subtenant in the Shopping
42   Center or the Related Land shall have the right to utilize its respective premises for the sale, rental
43   and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable
44   portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser
45   of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two
46   thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example
47   only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area
48   could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its
49   entire demised premises in which any and all Exclusive Items are sold shall not exceed five hundred
50   (500) square feet.]

51        13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line
52   national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target], (ii) discount
53   club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center
54   [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in
55   which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within
56   the Shopping Center, as such stores are currently operated (as of the Effective Date).  In addition,

1     provided that Landlord enters into a lease with Michael's and/or Ross for space in the Shopping Center
2     within one (1) year after the Effective Date, then, Tenant shall enter into a so-called "side letter"
3     agreement with Michael's and/or Ross, as applicable, in the form commonly used by Tenant as of the
4     Effective Date with respect to Michael's and/or Ross, as applicable, provided that Michael's and/or
5     Ross, as applicable, agrees to enter into same, in which event the terms and provisions of such side
6     letter agreement shall modify the applicability of the provisions of Subsection 13.2.1 above to
7     Michael's and/or Ross, as applicable. Further, attached as Exhibit N hereto is a copy of an executed
8     "side letter" agreement, between Tenant and Marmaxx Operating Corp., that, as more particularly
9     provided therein, modifies the applicability of the restrictions set forth in Subsection 13.2.1 above with
10     respect to Marshalls.

11           13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the
12     benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent
13     (50%) of the Floor Area of the Premises.

14           13.2.4  (a)  Upon breach of the aforesaid covenant and agreement by Landlord,
15     contained in this Section 13.2, (which breach shall not include a situation in which the lease between
16     Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein
17     from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition,
18     such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions
19     of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so
20     long as such violation shall continue, and Tenant shall have all remedies given to it at law (other than
21     consequential or punitive damages) and in equity, including, without limitation, the right to obtain
22     injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against
23     Landlord or any other violator for damages (however, Tenant shall not in any such action against
24     Landlord, seek consequential or punitive damages). Notwithstanding the foregoing, Tenant shall not
25     terminate this Lease unless Tenant shall have followed the procedures for a default by Landlord set
26     forth in Section 16.2 hereof; provided, however, in no event shall Landlord's cure period for a default
27     under this Section 13.2 be longer than thirty (30) days.

28           (b)  If any person or entity other than Landlord shall violate any of the
29     exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate
30     any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and
31     vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly
32     commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant
33     shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation,
34     an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set
35     forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and
36     prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall
37     cooperate with Tenant with respect to such prosecution (including, without limitation, by executing
38     any reasonable documentation or authorization which is reasonably required by Tenant in connection
39     with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

40         Section 13.3    Exclusives Which Tenant Must Honor.

41           13.3.1  Tenant shall honor certain exclusives and certain prohibited uses granted by
42     Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have
43     been executed prior to the Effective Date (hereinafter, "*Existing Exclusives*") [a true and complete
44     listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not
45     sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises
46     to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set
47     forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than
48     those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to
49     indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense
50     (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement
51     by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant
52     shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit
53     the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with
54     regard to the Premises.

55         13.3.2  Intentionally Omitted.

56           13.3.3  Except as expressly set forth in this Section 13.3, Tenant shall not be obligated
57     to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14

CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 & 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred twentieth (120th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "*Recapture Date*") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15

TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, for any lawful retail use subject to all of the terms and conditions of this Lease.

15.1.2  Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the "*Assignment/Subletting Notice*") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice to Tenant (the "*Termination Notice*") thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "*Termination Date*") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly

1 reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.
2 Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving
3 notice to Landlord (the "*Rescission Notice*"), within ten (10) days after receiving the Termination
4 Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination
5 Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the
6 Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination
7 Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its
8 termination rights hereunder with respect to such proposed assignment or subletting transaction, and
9 Tenant may assign this Lease or sublet the entire Premises in accordance with its
10 Assignment/Subletting Notice. If Landlord terminates the Lease hereunder, then, for a period of two
11 (2) years after the Termination Date, Landlord shall not lease, rent or occupy or permit the Premises or
12 any portion thereof to be occupied as a store which operates primarily as a home furnishings, linens
13 and/or domestics store; the foregoing shall survive the termination of this Lease.
14
15           15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this
16 Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, and
17 without triggering Landlord's termination rights under Section 15.1.2 above, to assign Tenant's
18 interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of
19 Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its
20 Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or
21 operated by Tenant or its Affiliate(s) in the State of Texas; (d) in conjunction with any merger,
22 acquisition, consolidation or public offering of stock or other interests involving Tenant or its
23 Affiliate(s); and/or (e) as may be required by any Legal Requirement.

24           Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no
25 assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect
26 the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant
27 originally named herein or its Affiliate (collectively, the "*Original Tenant*") of its interest in this Lease
28 to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major
29 Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective
30 date of such assignment, shall terminate.  For purposes of this Section 15.2, the term "*Major Assignee*"
31 or "*Major Guarantor*", as the case may be, shall mean a person or entity which has, as of the effective
32 date of such assignment, a tangible net worth of at least ███████████████ ████████████ Dollars.

33           Section 15.3   Collateral Assignment.  In addition to Tenant's other rights set forth in this
34 Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more
35 "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant
36 or its Affiliates shall be permitted and Landlord shall execute all reasonable documentation reasonably
37 requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the
38 right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's
39 business operations at the Premises, without such Affiliate having assumed any liability for the
40 performance of Tenant's obligations under this Lease.  As used herein, "*Lender*" shall mean a state or
41 federally regulated: bank, savings and loan association, insurance company, pension fund, credit union,
42 real estate investment trust, or other institutional lender.

43           Section 15.4   Cure Rights of Original Tenant.

44           If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said
45 assignee or any future assignee in respect of any default, shall also give a copy of such notice to the
46 Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original
47 Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as
48 is given to Tenant therefor under this Lease.

49           15.4.1 If this Lease is terminated because of: (a) an Event of Default of such assignee,
50 or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee
51 pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United
52 States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give
53 to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given
54 to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into
55 a new lease of the Premises with Landlord ("*New Lease*"), provided that the Original Tenant shall
56 have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not
57 reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be
58 obligated to cure such Events of Default as a condition to the exercise of its rights under this

1   Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as
2   aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee
3   (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New
4   Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the
5   Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and
6   conditions as those set forth herein, except for requirements which are no longer applicable or have
7   already been performed. It is the intention of the parties hereto that such New Lease shall have the
8   same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of
9   this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and
10  effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent
11  contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall
12  serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original
13  Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances
14  thereto, as contemplated in this Lease.

15      Section 15.5   Recognition Agreement. In the event Tenant subleases at least fifty percent
16  (50%) of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions
17  of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among
18  Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

19                          ARTICLE 16
20
21                  DEFAULT AND DISPUTE RESOLUTION

22      Section 16.1   Tenant Default.

23          16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its
24  receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or
25  (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or
26  observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature
27  of such default (or, if such default shall be of a nature that same cannot reasonably be cured within
28  thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th)
29  day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an
30  "*Event of Default*". If Tenant fails to pay the Fixed Rent within ten (10) days after Tenant's receipt of
31  notice from Landlord as aforesaid more than three (3) times in any twelve (12) consecutive month
32  period, then thereafter, during the twelve (12) consecutive months immediately following said third
33  default, if Tenant shall default in the payment of Fixed Rent and Tenant shall fail to cure such default
34  within ten (10) days after notice from Landlord, Tenant shall pay to Landlord, as additional rent
35  together with the next due payment of Fixed Rent, a late charge ("*Late Charge*") equal to ▄▄▄▄▄▄▄
36  ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ The parties agree that such Late Charge represents a fair and reasonable
37  estimate of the costs Landlord will incur by reason of the late payment of Fixed Rent by Tenant.

38          16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or
39  in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the
40  Rent other than as expressly permitted under Subsection 16.1.2(c) hereof, and any right of distraint,
41  which may be granted to it by law), including the following:

42          (a)     to bring suit for the collection of such unpaid Rent or for the
43  performance of such other covenant of this Lease on Tenant's part to be performed; and/or

44          (b)     without waiving any non-monetary default, may (but shall not be
45  obligated to) perform any covenant which is capable of being remedied by the performance of
46  affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should
47  Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall
48  comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to
49  Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest
50  thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

51          (c)     upon at least five (5) days' notice to Tenant, to terminate this Lease,
52  whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall
53  have accrued up to the date of termination and any damages to Landlord by reason of any such breach,
54  and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the
55  right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

If Landlord shall elect to terminate this Lease as provided in this Section 16.1.2(c) above, then Landlord shall be entitled to recover from Tenant, in addition to amounts then due and unpaid, as and for liquidated damages (and not as a penalty), an amount equal to the amount (if any) by which (i) the Rent reserved hereunder for the period which otherwise would have constituted the balance of the Term (exclusive of unexercised Renewal Options) from the latest of the date of termination of this Lease, the date of reentry or the date through which monthly deficiencies shall have been paid in full (conclusively presuming the Additional Rent component of Rent to be the same as payable for the year immediately preceding such termination or reentry or the date through which monthly deficiencies shall have been paid in full), exceeds (ii) the fair market rental value of the Premises at the time of such election for such period (conclusively presuming the Additional Rent component of Rent to be the same as payable for the year immediately preceding such termination or reentry or the date through which monthly deficiencies shall have been paid in full), both discounted to present value at the rate of ten percent (10%) per annum; and/or

16.1.3  Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4  Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5  Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential or punitive damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant, Tenant's agents or employees, or Tenant's contractors.

Section 16.2    Landlord Default. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay (provided that Tenant gave Landlord notice of such

1  amount within 30 days following the outlay; otherwise, from the date upon which Tenant demands
2  such amount from Landlord) until paid; and/or

3  (d)  terminate this Lease, without waiving its rights to damages for
4  Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal
5  conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of
6  being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom
7  Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall
8  not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default
9  cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and
10 diligently prosecute said cure to completion).

11  Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing
12 imminent risk of liability or material harm to persons or property or material disruption to the normal
13 conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without
14 prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no
15 event shall Landlord be liable to Tenant for any consequential or punitive damages suffered by Tenant
16 as a result of a default by, or any other act of, Landlord, Landlord's agents or employees, or Landlord's
17 contractors.

18  Section 16.3  Arbitration.  In any case where this Lease expressly provides for submission of a
19 dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Austin,
20 Texas, before one arbitrator in accordance with the procedural rules then obtaining of the American
21 Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final,
22 conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to
23 the determination of factual issues, and the arbitrator shall have no power to reform, supplement or
24 modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable
25 dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.
26 Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall
27 separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties
28 did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in
29 which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

30  ARTICLE 17

32  RIGHT TO MORTGAGE AND NON
33  DISTURBANCE, ESTOPPEL CERTIFICATE

34  Section 17.1  Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject
35 and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit
36 of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well
37 as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping
38 Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a
39 subordination, non-disturbance and attornment agreement in substantially the form attached as
40 Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the
41 written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or
42 affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner
43 recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following
44 provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may
45 arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of
46 the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease
47 as long as Tenant is not then in default under the Lease after Tenant's receipt of notice of such default
48 and the expiration of all applicable cure periods; (ii) in the event of the termination of the ground or
49 underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor
50 shall Tenant be evicted or removed of its possession or its right of possession of the Premises (except
51 to the extent that such joinder is necessary and required by Legal Requirements to enforce the
52 mortgagee's rights under the mortgage, and then only for such purpose and not for the purpose of
53 terminating the Lease), and this Lease shall continue in full force and effect as a direct lease between
54 the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as
55 contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall
56 have the right to execute any amendment to this Lease which is specifically required hereunder and the
57 Ground Lessor shall recognize and be bound thereto.

1        Section 17.2   Estoppel Certificate.  Upon written request of Landlord or Tenant, the other
2  party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and
3  only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser,
4  assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this
5  Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if
6  such is the case, and has not been modified, assigned, supplemented or amended, except by such
7  writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been
8  paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is
9  in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and
10  (6) stating which options to extend the Lease Term have been exercised, if any. Each request for a
11  written statement pursuant to this Section 17.2 made within twelve (12) months of two (2) earlier
12  requests for such a written statement shall be accompanied by a payment, from the requesting party to
13  the other party, in the amount of One Thousand Dollars ($1000) (increased by Two Hundred Dollars
14  ($200) on each date that the Fixed Rent increases pursuant to Section 1.1.11 hereof).

15        Section 17.3   Existing Mortgages.  If a mortgage, deed of trust, or other security instrument,
16  or any ground or underlying lease, encumbers the Shopping Center or any part thereof on the Effective
17  Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in
18  recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the
19  form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any
20  mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any
21  portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause
22  (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be
23  required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).
24  Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the
25  right by notice given to Landlord at any time prior to the date on which such instrument(s) are
26  delivered, to terminate this Lease, in which event, neither party shall have any further liability
27  hereunder, except: (i) for those obligations which survive the expiration or other termination of this
28  Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly
29  reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this
30  Lease, including, without limitation, the preparation and review of plans and specifications, and the
31  performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not
32  exceed the aggregate sum of Fifty Thousand Dollars ($50,000).

33                                    ARTICLE 18
34
35                                    NOTICE

36        Subject to the further provisions of this Article 18, whenever it is provided herein that any
37  notice, demand, request, consent, approval or other communication (***"Notice"***) shall or may be given to
38  either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary
39  notwithstanding, shall not be effective for any purpose unless same shall be given by registered or
40  certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier,
41  with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address , with copies of
42  notices to Landlord also given to Jenkens & Gilchrist, a Professional Corporation, 1445 Ross Avenue,
43  Suite 3200, Dallas, Texas 75202, Att: William L. Sladek, Esq., or to Tenant at Tenant's Mailing
44  Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath &
45  Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Sills Cummis Epstein & Gross
46  P.C., One Riverfront Plaza, Newark, New Jersey 07102, Attention: Jeffrey H. Newman, Esq., or to
47  such other person or other address as may, from time to time, be specified by either party in a written
48  notice to the other party, in accordance with the provisions of this Article 18. All notices given in
49  accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at
50  the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following
51  items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices
52  (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as
53  described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of
54  default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common
55  Areas Charges as described in Section 5.1 of this Lease.

# ARTICLE 19

## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise (but excluding herefrom any judgment liens obtained by Landlord from a court of competent jurisdiction pertaining to an Event of Default), Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to both Tenant and Landlord reasonably evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

# ARTICLE 20

## END OF TERM

Section 20.1   Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2   Hold Over. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

# ARTICLE 21

## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease but subsequent to the initial "lease-up" of the Shopping Center. At such time that Landlord has knowledge that such space ("*Offered Space*") is or will become available, Landlord will give Tenant notice (the "*Offering Notice*") of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer. In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), provided however that if there are fewer than seven (7) years remaining on the then current Term, the then current Term shall be extended pursuant to such amendment to, and the Expiration Date shall be deemed to be, midnight on the last day of January following the seventh (7th) anniversary of the date of the Offering Notice (which extension of the then current Term may be accomplished, if less than seven (7) years remain on the then current Term, by Tenant's exercise of any unexercised Renewal Option only for such portion of the applicable Renewal Period that shall end on such seventh (7th) anniversary; with Tenant hereby reserving the right to exercise any Renewal Option for the remainder of the applicable Renewal Period, provided Tenant shall give Landlord notice of same at least one hundred eighty (180) days prior to such seventh (7th) anniversary), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the

1   Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space
2   (including, without limitation, the Offered Space) which may in the future become vacant and
3   available), and Landlord may lease the Offered Space to any other party upon substantially the same
4   terms and conditions as that offered to Tenant, provided that such lease is executed within six (6)
5   months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to
6   the Offered Space. As used herein, the phrase "*substantially the same terms and conditions as that*
7   *offered to Tenant*" shall mean terms not materially different and/or a rent of not more than five (5%)
8   percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect
9   to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment
10  described in this Article 21) shall be resolved by arbitration in accordance with the provisions of
11  Section 16.3 above.

12                                  ARTICLE 22
13
14                              ONGOING CO-TENANCY

15          As used herein, the term "*Excess Vacancy*" shall mean:

16          (1)     if the Stage-2 Co-Tenancy Condition has not been satisfied, that the Inducement Tenant
17  (or an Inducement Replacement Tenant as defined below) has ceased to operate for business to the
18  public (for reasons other than casualty, retro-fitting of a store or a store concept change provided such
19  tenant is proceeding with due diligence to re-open its store);

20          (2)     if the Stage-2 Co-Tenancy Condition has been satisfied, that either (i) the Inducement
21  Tenant (or Inducement Replacement Tenant) has ceased to operate for business to the public (for
22  reasons other than casualty, retro-fitting of a store or a store concept change provided such tenant is
23  proceeding with due diligence to re-open its store) , or (ii) there is not at least one (1) Additional
24  Inducement Tenant (or Inducement Replacement Tenant) open for business to the public in all of its
25  premises; and

26          (3)     if the Stage-3 Co-Tenancy Condition has been satisfied, that either (i) the Inducement
27  Tenant (or Inducement Replacement Tenant)  has ceased to operate for business to the public (for
28  reasons other than casualty, retro-fitting of a store or a store concept change provided such tenant is
29  proceeding with due diligence to re-open its store) , or (ii) there are not at least two (2) Additional
30  Inducement Tenants (or Inducement Replacement Tenants) open for business to the public in all of
31  their respective premises.

32          In the event of an Excess Vacancy, Tenant shall have the right to: (i) pay Alternate Rent in lieu
33  of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues
34  for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease,
35  exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-
36  day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date
37  set forth in Tenant's notice of termination without further liability on the part of either Landlord or
38  Tenant, except: (A) for those obligations which survive the expiration or other termination of this
39  Lease pursuant to the express terms of this Lease, and (B) Landlord, promptly after receiving a
40  statement from Tenant showing the costs and expenses of any alterations made by Tenant, shall
41  reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired
42  portion of the Term. If Tenant does not terminate this Lease pursuant to this Article 22, then
43  commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent,
44  provided, however, that Tenant shall retain all of its original rights under this Article 22 with respect to
45  any future condition(s) of Excess Vacancy. For purposes of this Article 22, an "*Inducement
46  Replacement Tenant*" shall mean a tenant that (a) occupies at least ninety-five percent (95%) of the
47  Floor Area in the Inducement Tenant's or the applicable Additional Inducement Tenant's premises, as
48  shown on Exhibit B and (b) such tenant(s) is a "National Tenant" (as defined below) or "Regional
49  Tenant" (as defined below) which offers goods and services that are compatible with the then current
50  uses of the Shopping Center and Tenant, and attracts a similar customer to the Shopping Center as was
51  attracted by the Inducement Tenant or Additional Inducement Tenant that is being replaced. As used
52  in this Lease, the term "*National Tenant*" shall mean a tenant operating, as of the applicable date, at
53  least seventy-five (75) retail stores in the continental United States under a single trade name in first-
54  class shopping centers. As used in this Lease, a "*Regional Tenant*" shall mean a tenant operating, as of
55  the applicable date, at least thirty-five (35) retail stores in first-class shopping centers in any of the
56  following states under a single trade name: Texas, Oklahoma, Louisiana and Arkansas.



ARTICLE 23

MISCELLANEOUS

Section 23.1  Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2  Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, if Landlord has furnished Tenant with a nondisturbance agreement from Landlord's construction lender as mandated by this Lease, then except for the lien securing the construction loan and with which construction lender Tenant has an executed nondisturbance agreement as set forth herein, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any other lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3  Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Retail Connection (the "**Broker**"). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4  *Force Majeure*. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, a moratorium on construction imposed by Legal Requirements provided that the application of same is not as a result of the acts or omissions of Landlord or Landlord's employees, agents, or contractors, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto.  A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of Force Majeure and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5  Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for

1  the reasonable costs and expenses in such action or proceeding against the non-violating party,
2  including reasonable attorneys' fees, costs and expenses.

3      Section 23.8  Survival of Obligations.  The obligation to pay any sums due to either party
4  from the other that by the terms herein would not be payable, or are incapable of calculation, until after
5  the expiration or sooner termination of this Lease shall survive and remain a continuing obligation
6  until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier
7  termination of this Lease.

8      Section 23.9  Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict
9  performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a
10  waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or
11  condition on the occasion of any subsequent breach or default; nor shall the failure of either party to
12  exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a
13  waiver of the right to exercise that same kind of option upon any subsequent occasion.

14      Section 23.10  Rights Cumulative.  Unless expressly provided to the contrary in this Lease,
15  each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and
16  shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal
17  Requirements.

18      Section 23.11  Definition of Landlord.  The term *"**Landlord**"* shall mean only the person or
19  entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by
20  such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims
21  made by Tenant against Landlord which arose prior to the effective date of the transfer of such
22  ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the
23  effective date of the transfer of such ownership interest) thereupon be released and discharged from all
24  covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be
25  binding during the Term upon each new owner for the duration of such owner's ownership.

26      Section 23.12  Successors and Assigns.  The provisions of this Lease shall be binding upon and
27  shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators,
28  successors and assigns.

29      Section 23.13  Limitation of Landlord's Liability.  Except with respect to insurance proceeds or
30  condemnation awards received by Landlord which are required by the terms of this Lease to be applied
31  to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the
32  Delivery Date, look only to Landlord's estate and property in the Shopping Center subsequent to the
33  date upon which Tenant has given Landlord written notice of a default under this Lease (or the
34  proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center
35  for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process)
36  requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its
37  officers, directors, stockholders, members or partners shall be subject to levy, execution or other
38  enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.
39  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this
40  Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this
41  Lease or which may be available at law or in equity.

42      Section 23.14  Limitation of Tenant's Liability.

43      Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its
44  successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not
45  seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant
46  or any of its Affiliates.

47      Section 23.15  Joint and Several Liability.  If either party consists of more than one person,
48  then the persons constituting such party shall be jointly and severally liable hereunder.

49      Section 23.16  Severability.  If any term, covenant, condition or provision of this Lease is held
50  by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the
51  provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or
52  invalidated thereby.

1          Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or
2  neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall
3  be substituted for singular and singular for plural in any place in which the context so requires. This
4  Lease shall be construed without regard to: (i) the identity of the party who drafted the various
5  provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease.
6  Moreover, each and every provision of this Lease shall be construed as though all parties hereto
7  participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a
8  document is to be construed against the drafting party shall not be applicable hereto.

9          Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of
10  contents and line numbering, if any, and section headings are inserted only for convenience and in no
11  way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

12          Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the
13  contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to
14  this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection,
15  or paragraph hereof.

16          Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and
17  delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for
18  recording, which shall be in form and substance as either party shall reasonably request. If, at any time
19  following the Delivery Date, Landlord or its Affiliate shall hold title to or have control over, by deed,
20  ground lease or otherwise, the Sam's Parcel (or any portion thereof), then Landlord shall record a
21  memorandum or short form of this Lease against the Sam's Parcel (or such applicable portion thereof)
22  in form and substance as either party shall reasonably request. In no event shall the amount of Fixed
23  Rent reserved hereunder be included in any such short form lease or memorandum.

24          Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement
25  of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged
26  herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease
27  cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the
28  party against whom enforcement of the change, modification or discharge is sought.

29          Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein
30  shall be deemed or construed as creating the relationship of principal and agent or of partnership or of
31  joint venture between the parties hereto.

32          Section 23.23 <u>Tenant's Tradename</u>. Landlord shall not make use of Tenant's tradename [i.e.,
33  "*Bed Bath & Beyond*"®] in any advertising or marketing material, including, without limitation, on
34  any internet website, without obtaining Tenant's prior written approval, which may be withheld in
35  Tenant's sole and absolute discretion.

36          Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of
37  which shall be deemed an original. The signatures to this instrument may be executed and notarized
38  on separate pages, and when attached to this instrument, shall constitute one complete document.

39          Section 23.25 <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and
40  all rights which either may have to request a jury trial in any proceeding between them at law or in
41  equity.

42                          [Signature page follows]

Section 23.26 <u>Governing Law</u>. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

LINCOLN PO RED OAK VILLAGE, L.P.,
a Delaware limited partnership

By: LINCOLN GP RED OAK VILLAGE, INC., a
Texas corporation, its general partner

[SEAL]

By: _____
Name:  Robert Dozier
Title:  Executive Vice President

**TENANT:**

ATTEST:

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name:  Warren Eisenberg
Title:  Co-Chairman

Name:  Alan M. Freeman
Title:  (Assistant) Secretary

[SEAL]

1
2                                    **INDEX OF EXHIBITS**

3    Exhibit A       Legal Description of Shopping Center

4    Exhibit A-1     Legal Description of Project

5    Exhibit B       Site Plan

6    Exhibit C       Form of Rent Commencement and Expiration Date Agreement

7    Exhibit D       Specifications for Landlord's Work

8    Exhibit D-1     Exterior Elevations of the Premises, and Sidewalk Plan

9    Exhibit D-2     Exterior Elevations of the Shopping Center

10   Exhibit E       Permitted Encumbrances

11   Exhibit F       Tenant's Signage

12   Exhibit G       Form of Subordination, Non-Disturbance and Attornment Agreement

13   Exhibit H       Form of Subtenant Recognition Agreement

14   Exhibit I       Form of Delivery Date Notice

15   Exhibit J       Form of Delivery Date Certification

16   Exhibit K-1     Existing Exclusives

17   Exhibit K-2     Existing Leases

18   Exhibit L       Alternate Rent

19   Exhibit M       Prohibited Uses

20   Exhibit N       Marshall's Agreement

21   Exhibit O       Sam's OEA

1    <u>Exhibit A</u>

2    <u>Legal Description of Shopping Center</u>

3    <u>TRACT 1</u>: Lot 5, Section 1 (Mckinley Place) and Lot 6, Section 1 (Mckinley Place), each a
4    subdivision in Hays County, Texas, according to the map or plat thereof, recorded in Volume 9, Page
5    186 of the Plat Records of Hays County, Texas. (Lot 5, Section 1 containing approximately 1.150
6    acres of land and Lot 6, Section 1 containing approximately 1.140 acres of land per recorded plat —
7    total acreage 2.290 acres); and

8
9    <u>TRACT 2</u>: Lot 7, Section 1 (Mckinley Place), a subdivision in Hays County, Texas, according to the
10   map or plat thereof, recorded in Volume 10, Page 79 of the Plat Records of Hays County, Texas.
11   (Containing approximately 1.661 acres of land per recorded plat); and

12
13   <u>TRACT 3</u>: A 17.037 acre tract of land, more or less, out of the J.M. Veramendi Survey No. 1 in Hays
14   County, Texas and being more particularly described by metes and bounds below.

15
16            **BEING** a 17.037 acre tract or parcel of land out of and being a part of the J.M. Veramendi
17   Survey No. 1 in the City of San Marcos, Hays County, Texas, and being a part of that certain 116.94
18   acre tract described in a deed from H.L. Schulle, Trustee, to Mary Anne Hood, Trustee, recorded in
19   Volume 263, Page 522, Hays County Deed Records. Herein described tract or parcel of land being
20   more particularly described by metes and bounds as follows:

21            **BEGINNING** at a½ inch iron rod with survey cap found in the southwest line of the said
22   116.94 acre tract at the south corner of Lot No. 4, Section 1, McKinley Place, a subdivision in said
23   county as recorded in Volume 9, Page 186, Hays County Plat Records, for the west corner of this tract.
24   Said point being in the northeast line of Lot A, Municipal Airport Subdivision, as recorded in Volume
25   163, Page 161, Hays County Deed Records.
26            **THENCE** with the southeast line of Lots No. 4, 5 and 6 of Section 1, McKinley Place
27   Subdivision, N 44 deg. 51 min. 07 sec. E, 185.22 feet to a ½ inch iron rod with survey cap found; N 44
28   deg. 47 min. 37 sec. E, 200.42 feet to a ½ inch iron rod with survey cap found; N 44 deg. 48 min. 05
29   sec. E, 199.02 feet to a ½ inch iron rod with survey cap found in the southwest line of McKinley Place
30   Drive, a 60 foot roadway as shown on plat of said subdivision, the east corner of Lot No.6, for the
31   north corner of this tract.
32            **THENCE** with the southwest line of McKinley Place Drive, along a curve to the left whose
33   radius is 330.00 feet; whose long chord bears S 52 deg. 11 min. 43 sec E, 82.77 feet; 82.99 feet along
34   the arc to a 5/8 inch iron rod set at the end of said curve.
35            **THENCE** continuing with the southwest line of McKinley Place Drive, S 59 deg. 32 min. 34
36   sec. E, 100.00 feet to a 5/8 inch iron rod set at the beginning of a curve to the right.
37            **THENCE** with said curve to the right whose radius is 270.00 feet; whose long chord bears S
38   52 deg. 07 min. 59 sec. E, 69.90 feet; 70.10 feet to a 5/8 inch iron rod set at the end of said curve and
39   termination of said curve, for an interior corner of this tract.
40            **THENCE** with the terminus of McKinley Place Drive, N 45 deg. 15 min. 44 sec. E, 60.00 feet
41   to a ½ inch iron rod with survey cap found in the southwest line of Lot No. 1, Section 1, McKinley
42   Place, as recorded in Volume 7, Page 156, Hays County Plat Records, the east corner of said McKinley
43   Place Drive, for an angle corner of this tract.
44            **THENCE** with the southwest line of Lot No. 1, Section 1, McKinley Place Subdivision, S 44
45   deg. 43 min. 02 sec. E, 587.49 feet to a ½ inch iron rod with survey cap found at the north corner of
46   that certain 0.059 acre tract described in a deed from Mary Anne Hood, Trustee, to Century Telephone
47   of San Marcos, Inc., recorded in Volume 1289, Page 21, Hays County Deed Records, for an east
48   corner of this tract.
49            **THENCE** with the northwest line of the Century Telephone S 45 deg. 25 min. 30 sec. W,
50   49.94 feet to the west corner of same, a ½ inch iron rod with survey cap found for an interior corner of
51   this tract.
52            **THENCE** with the southwest line of the Century Telephone tract S 44 deg. 41 min. 44 sec. E,
53   54.41 feet to the south corner of same, a 5/8 inch iron rod set in the curving northwest line of Leah
54   Avenue, a 60 foot roadway as shown on the Plat of Lot 3, Block 1, Section 2, McKinley Place, a
55   subdivision as recorded in Volume 8, Page 204, Hays County Plat Records, for the east corner of this
56   tract.
57            **THENCE** with the northwest line of Leah Avenue, along a curve to the left whose radius is
58   330.00 feet; whose long chord bears S 10 deg. 26 min. 26 sec. W, 283.68 feet; 293.22 feet along the
59   arc to a 5/8 inch iron rod set to replace a 60d nail found at the end of said curve.
60            **THENCE** continuing with the northwest line of Leah Avenue, S 15 deg. 07 min. 36 sec. E,
61   99.99 feet to a 5/8 inch iron rod set to place a 60d nail at the beginning of a curve to the right.

Exhibit A-1

#939089 v5

1      **THENCE** with said curve to the right whose radius is 270.00 feet whose long chord bears S
2 14 deg. 54 min. 21 sec. W, 270,92 feet; 293.81 feet along the arc to a 5/8 inch iron rod set at the end of
3 said curve.
4      **THENCE** continuing with the northwest line of Leah Avenue, S 45 deg. 09 min. 50 sec. W,
5 126.26 feet to a ½ inch iron rod with survey cap found where same intersects the southwest line of the
6 before mentioned 116.94 acre tract, the east corner of that certain 1.056 acre tract described in a deed
7 from SLC6a Joint Ventures to W.C. Carson, recorded in Volume 2074, Page 401, Hays County Deed
8 Records, for the south corner of this tact.
9      **THENCE** with the southwest line of the 116.94 acre tract, the northeast line of the Carson
10 1.056 acre tract and northwest line of that certain 15.92 acre tract described in a deed from W.C.
11 Carson, Trustee, to W.C. Carson, recorded in Volume 845, Page 806, Hays County Deed Records and
12 northeast line of that certain 0.629 ace tract described in a deed from the City of San Marcos to W.C.
13 Carson recorded in Volume 1642, Page 141, Hays County Deed Records, N 44 deg. 36 min. 46 sec. W,
14 at 49.84 feet pass a 1 inch iron pipe found at the north corner of the 1.056 ace tract and east corner of
15 the Carson 15.92 acre tract at 1021.89 feet pass the north corner of the Carson 15.92 ace tract and east
16 corner of the 0.629 acre tract, in all, 1071.80 feet to a ½ inch iron rod with survey cap found at the
17 north corner of the Carson 0.629 acre tract, for an angle corner of this tract.
18      **THENCE** continuing with the southwest line of the 116.94 acre tract and northeast line of the
19 Municipal Airport Subdivision, N 44 deg. 40 min. 01 sec. W, 199.44 feet to the POINT OF
20 BEGINNING, containing 17.037 acres of land; and
21
22 TRACT 4: Lot A (Municipal Airport Subdivision), a subdivision in Hays County, Texas, according to
23 the map or plat thereof, recorded in Volume 8, Page 285 of the Plat Records of Hays County, Texas.
24 (Containing approximately 5.67 acres of land per recorded plat); and
25
26 TRACT 5: An 18.252 acres tract of land, more or less, out of the J.M. Veramendi Survey No. 1 in
27 Hays County, Texas, and being more particularly described by metes and bounds attached hereto.
28
29      **BEING** an 18.252 acre tract or parcel of land out of and being a part of the J.M. Veramendi
30 Survey No. 1 in the City of San Marcos, Hays County, Texas, and being a part of that certain 15.92
31 acre tract described in a deed from W.C. Carson Trustees, to W.C. Carson, recorded in Volume 845,
32 Page 806, Hays County Deed Records, and being all of that certain 0.258 acre tract described in a deed
33 from Brian F. McCoy, et ux, to W.C. Carson, recorded in Volume 1642, Page 117, Hays County Deed
34 Records, and being all of that certain 0.629 acre tract described in a deed from the City of San Marcos
35 to W.C. Carson, recorded in Volume 1642, Page 141, Hays County Deed Records, and being all of that
36 certain 1.056 acre tract described in a deed from the City of San Marcos to W.C. Carson, recorded in
37 Volume 1642, Page 147, Hays County Deed Records and being all of that certain 1.056 acre tract
38 described in a deed from SLC61 Joint Venture to W.C. Carson, recorded in Volume 2074, Page 401,
39 Hays County Deed Records. Herein described tract or parcel of land being more particularly described
40 by metes and bounds as follows:
41      **BEGINNING** at a ½ inch iron rod with survey cap found at the intersection of the southwest
42 line of that certain 116.94 acre tract described in a deed from H.L. Schulle Trustee, to Mary Anne
43 Hood, Trustee, recorded in Volume 263, Page 522, Hays County Deed Records, with the northwest
44 line of Leah Avenue, a 60 foot roadway as shown on the Plat of Lot 1, Block A, Cottonwood Crossing,
45 a subdivision as recorded in Volume 10 Page 151, Hays County Deed Records, the east corner of the
46 before mentioned 1.056 acre tract recorded in Volume 2074, Page 401, Hays County Deed Records,
47 for the east corner of this tract.
48      **THENCE** with the northwest line of Leah Avenue and southeast line of the last mentioned
49 1.056 acre tract, S 45 deg. 18 min. 31 sec. W, 924.10 feet to a 5/8 inch iron rod set at the beginning of
50 a curve to the right.
51      **THENCE** with said curve to the right whose radius is 15.00 feet; whose long chord bears S 75
52 deg. 33 min. 01 sec. W, 14.70 feet, 15.36 feet along the arc to a 5/8 inch iron rod set at the end of said
53 curve in the northeast line of Cottonwood Parkway, a future 70 foot roadway, the south corner of this
54 1.056 acre tract, for the south corner of this tract.
55      **THENCE** with the south line of the 1.056 acre tract, N 02 deg. 28 min. 47 sec. W, 57.49 feet
56 to the west or southwest corner of same, a 5/8 inch iron rod set in the southeast line of the before
57 mentioned 15.92 acre tract for an interior corner of this tract.
58      **THENCE** with the southeast line of the 15.92 acre tract, S 45 deg. 19 min. 03 sec. W, 40.66
59 feet to a ½ inch iron rod found where same intersects the northeast line of Cottonwood Parkway, the
60 future 70 foot roadway for an angle corner of this tract.
61      **THENCE** with the northeast line of Cottonwood Parkway, N 44 deg. 42 min. 42 sec. W, 99.99
62 feet to a ½ inch iron rod found at the beginning of a curve to the right.

Exhibit A-2

1         **THENCE** with said curve to the right whose radius is 406.21 feet; whose long chord bears N
2  23 deg. 35 min. 27 sec. W, 292.22 feet; 298.92 feet along the arc to a 5/8 inch iron rod set at the end of
3  said curve.
4         **THENCE** continuing with the east or northeast line of Cottonwood Parkway, N 02 deg. 30
5  min. 34 sec. W, 157.64 feet to a 5/8 inch iron rod set at the beginning of a curve to the left.
6         **THENCE** with said curve to the left whose radius is 703.87 feet whose long chord bears N 23
7  deg. 49 min. 35 sec. W, 511.06 feet; 523.01 feet to a ½ inch iron rod with survey cap found at the end
8  of said curve, the west corner of the before mentioned 0.258 acre tract and south corner of the before
9  mentioned 0.629 ace tract.
10         **THENCE** continuing with the northeast line of Cottonwood Parkway and southwest line of
11  the 0.629 acre tract, N 45 deg. 09 min. 49 sec. W, 50.10 feet to a ½ inch iron rod with survey cap
12  found at the west corner of the 0.629 ace tact, for the west corner of this tract.
13         **THENCE** with the northwest line of the 0.629 acre tract, N 44 deg. 48 min. 48 sec. E, 547.70
14  feet to the north corner of same, a ½ inch iron rod with survey cap found in the southwest line of the
15  before mentioned Hood 116.94 acre tract, for the north corner of this tract.
16         **THENCE** with the southwest line of the Hood 116.94 acre tract, the northeast line of the 0.629
17  acre, 15.92 acre and 1.056 acre tract, S 44 deg. 36 min. 46 sec. E, at 49.91 feet pass the east corner of
18  the 0.629 acre and north corner of the Carson 15.92 acre tract, at 1021.96 feet pass a 1 inch iron pipe
19  found at the east corner of the 15.92 acre and north corner of the 1.056 acre tract. In all, 1071.80 feet to
20  the POINT OF BEGINNING, containing 18.252 acres of land.
21
22  SAVE AND EXCEPT THEREFROM (unless Landlord or its Affiliate, at any time from and after the
23  Delivery Date, shall hold title to or have control over, by deed, ground lease or otherwise, the
24  following):  the "Sam's Parcel" as shown on Exhibit B hereto.
25

#939089 v5

1

Exhibit A-1

2

Legal Description of Project

3    TRACT 1: Lot 5, Section 1 (Mckinley Place) and Lot 6, Section 1 (Mckinley Place), each a
4   subdivision in Hays County, Texas, according to the map or plat thereof, recorded in Volume 9, Page
5   186 of the Plat Records of Hays County, Texas. (Lot 5, Section 1 containing approximately 1.150
6   acres of land and Lot 6, Section 1 containing approximately 1.140 acres of land per recorded plat —
7   total acreage 2.290 acres); and
8    TRACT 2: Lot 7, Section 1 (Mckinley Place), a subdivision in Hays County, Texas, according
9   to the map or plat thereof, recorded in Volume 10, Page 79 of the Plat Records of Hays County, Texas.
10   (Containing approximately 1.661 acres of land per recorded plat); and
11    TRACT 3: A 17.037 acre tract of land, more or less, out of the J.M. Veramendi Survey No. 1
12   in Hays County, Texas and being more particularly described by metes and bounds below.

13

14    BEING a 17.037 acre tract or parcel of land out of and being a part of the J.M. Veramendi
15   Survey No. 1 in the City of San Marcos, Hays County, Texas, and being a part of that certain 116.94
16   acre tract described in a deed from H.L. Schulle, Trustee, to Mary Anne Hood, Trustee, recorded in
17   Volume 263, Page 522, Hays County Deed Records. Herein described tract or parcel of land being
18   more particularly described by metes and bounds as follows:

19    BEGINNING at a½ inch iron rod with survey cap found in the southwest line of the said
20   116.94 acre tract at the south corner of Lot No. 4, Section 1, McKinley Place, a subdivision in said
21   county as recorded in Volume 9, Page 186, Hays County Plat Records, for the west corner of this tract.
22   Said point being in the northeast line of Lot A, Municipal Airport Subdivision, as recorded in Volume
23   163, Page 161, Hays County Deed Records.
24    THENCE with the southeast line of Lots No. 4, 5 and 6 of Section 1, McKinley Place
25   Subdivision, N 44 deg. 51 min. 07 sec. E, 185.22 feet to a ½ inch iron rod with survey cap found; N 44
26   deg. 47 min. 37 sec. E, 200.42 feet to a ½ inch iron rod with survey cap found; N 44 deg. 48 min. 05
27   sec. E, 199.02 feet to a ½ inch iron rod with survey cap found in the southwest line of McKinley Place
28   Drive, a 60 foot roadway as shown on plat of said subdivision, the east corner of Lot No.6, for the
29   north corner of this tract.
30    THENCE with the southwest line of McKinley Place Drive, along a curve to the left whose
31   radius is 330.00 feet; whose long chord bears S 52 deg. 11 min. 43 sec E, 82.77 feet;  82.99 feet along
32   the arc to a 5/8 inch iron rod set at the end of said curve.
33    THENCE continuing with the southwest line of McKinley Place Drive, S 59 deg. 32 min. 34
34   sec. E, 100.00 feet to a 5/8 inch iron rod set at the beginning of a curve to the right.
35    THENCE with said curve to the right whose radius is 270.00 feet; whose long chord bears S
36   52 deg. 07 min. 59 sec. E, 69.90 feet; 70.10 feet to a 5/8 inch iron rod set at the end of said curve and
37   termination of said curve, for an interior corner of this tract.
38    THENCE with the terminus of McKinley Place Drive, N 45 deg. 15 min. 44 sec. E, 60.00 feet
39   to a ½ inch iron rod with survey cap found in the southwest line of Lot No. 1, Section 1, McKinley
40   Place, as recorded in Volume 7, Page 156, Hays County Plat Records, the east corner of said McKinley
41   Place Drive, for an angle corner of this tract.
42    THENCE with the southwest line of Lot No. 1, Section 1, McKinley Place Subdivision, S 44
43   deg. 43 min. 02 sec. E, 587.49 feet to a ½ inch iron rod with survey cap found at the north corner of
44   that certain 0.059 acre tract described in a deed from Mary Anne Hood, Trustee, to Century Telephone
45   of San Marcos, Inc., recorded in Volume 1289, Page 21, Hays County Deed Records, for an east
46   corner of this tract.
47    THENCE with the northwest line of the Century Telephone S 45 deg. 25 min. 30 sec. W,
48   49.94 feet to the west corner of same, a ½ inch iron rod with survey cap found for an interior corner of
49   this tract.
50    THENCE with the southwest line of the Century Telephone tract S 44 deg. 41 min. 44 sec. E,
51   54.41 feet to the south corner of same, a 5/8 inch iron rod set in the curving northwest line of Leah
52   Avenue, a 60 foot roadway as shown on the Plat of Lot 3, Block 1, Section 2, McKinley Place, a
53   subdivision as recorded in Volume 8, Page 204, Hays County Plat Records, for the east corner of this
54   tract.
55    THENCE with the northwest line of Leah Avenue, along a curve to the left whose radius is
56   330.00 feet; whose long chord bears S 10 deg. 26 min. 26 sec. W, 283.68 feet; 293.22 feet along the
57   arc to a 5/8 inch iron rod set to replace a 60d nail found at the end of said curve.
58    THENCE continuing with the northwest line of Leah Avenue, S 15 deg. 07 min. 36 sec. E,
59   99.99 feet to a 5/8 inch iron rod set to place a 60d nail at the beginning of a curve to the right.
60    THENCE with said curve to the right whose radius is 270.00 feet whose long chord bears S
61   14 deg. 54 min. 21 sec. W, 270,92 feet; 293.81 feet along the arc to a 5/8 inch iron rod set at the end of
62   said curve.

#939089 v5                                A-1-1

1    **THENCE** continuing with the northwest line of Leah Avenue, S 45 deg. 09 min. 50 sec. W,
2    126.26 feet to a ½ inch iron rod with survey cap found where same intersects the southwest line of the
3    before mentioned 116.94 acre tract, the east corner of that certain 1.056 acre tract described in a deed
4    from SLC6a Joint Ventures to W.C. Carson, recorded in Volume 2074, Page 401, Hays County Deed
5    Records, for the south corner of this tact.
6    **THENCE** with the southwest line of the 116.94 acre tract, the northeast line of the Carson
7    1.056 acre tract and northwest line of that certain 15.92 acre tract described in a deed from W.C.
8    Carson, Trustee, to W.C. Carson, recorded in Volume 845, Page 806, Hays County Deed Records and
9    northeast line of that certain 0.629 ace tract described in a deed from the City of San Marcos to W.C.
10   Carson recorded in Volume 1642, Page 141, Hays County Deed Records, N 44 deg. 36 min. 46 sec. W,
11   at 49.84 feet pass a 1 inch iron pipe found at the north corner of the 1.056 ace tract and east corner of
12   the Carson 15.92 acre tract at 1021.89 feet pass the north corner of the Carson 15.92 ace tract and east
13   corner of the 0.629 acre tract, in all, 1071.80 feet to a ½ inch iron rod with survey cap found at the
14   north corner of the Carson 0.629 acre tract, for an angle corner of this tract.
15   **THENCE** continuing with the southwest line of the 116.94 acre tract and northeast line of the
16   Municipal Airport Subdivision, N 44 deg. 40 min. 01 sec. W, 199.44 feet to the POINT OF
17   BEGINNING, containing 17.037 acres of land; and
18
19   TRACT 4: Lot A (Municipal Airport Subdivision), a subdivision in Hays County, Texas, according to
20   the map or plat thereof, recorded in Volume 8, Page 285 of the Plat Records of Hays County, Texas.
21   (Containing approximately 5.67 acres of land per recorded plat); and
22   TRACT 5: An 18.252 acres tract of land, more or less, out of the J.M. Veramendi Survey No. 1 in
23   Hays County, Texas, and being more particularly described by metes and bounds attached hereto.
24
25   **BEING** an 18.252 acre tract or parcel of land out of and being a part of the J.M. Veramendi
26   Survey No. 1 in the City of San Marcos, Hays County, Texas, and being a part of that certain 15.92
27   acre tract described in a deed from W.C. Carson Trustees, to W.C. Carson, recorded in Volume 845,
28   Page 806, Hays County Deed Records, and being all of that certain 0.258 acre tract described in a deed
29   from Brian F. McCoy, et ux, to W.C. Carson, recorded in Volume 1642, Page 117, Hays County Deed
30   Records, and being all of that certain 0.629 acre tract described in a deed from the City of San Marcos
31   to W.C. Carson, recorded in Volume 1642, Page 141, Hays County Deed Records, and being all of that
32   certain 1.056 acre tract described in a deed from the City of San Marcos to W.C. Carson, recorded in
33   Volume 1642, Page 147, Hays County Deed Records and being all of that certain 1.056 acre tract
34   described in a deed from SLC61 Joint Venture to W.C. Carson, recorded in Volume 2074, Page 401,
35   Hays County Deed Records. Herein described tract or parcel of land being more particularly described
36   by metes and bounds as follows:
37
38   **BEGINNING** at a ½ inch iron rod with survey cap found at the intersection of the southwest
39   line of that certain 116.94 acre tract described in a deed from H.L. Schulle Trustee, to Mary Anne
40   Hood, Trustee, recorded in Volume 263, Page 522, Hays County Deed Records, with the northwest
41   line of Leah Avenue, a 60 foot roadway as shown on the Plat of Lot 1, Block A, Cottonwood Crossing,
42   a subdivision as recorded in Volume 10 Page 151, Hays County Deed Records, the east corner of the
43   before mentioned 1.056 acre tract recorded in Volume 2074, Page 401, Hays County Deed Records,
44   for the east corner of this tract.
45   **THENCE** with the northwest line of Leah Avenue and southeast line of the last mentioned
46   1.056 acre tract, S 45 deg. 18 min. 31 sec. W, 924.10 feet to a 5/8 inch iron rod set at the beginning of
47   a curve to the right.
48   **THENCE** with said curve to the right whose radius is 15.00 feet; whose long chord bears S 75
49   deg. 33 min. 01 sec. W, 14.70 feet, 15.36 feet along the arc to a 5/8 inch iron rod set at the end of said
50   curve in the northeast line of Cottonwood Parkway, a future 70 foot roadway, the south corner of the
51   1.056 acre tract, for the south corner of this tract.
52   **THENCE** with the south line of the 1.056 acre tract, N 02 deg. 28 min. 47 sec. W, 57.49 feet
53   to the west or southwest corner of same, a 5/8 inch iron rod set in the southeast line of the before
54   mentioned 15.92 acre tract for an interior corner of this tract.
55   **THENCE** with the southeast line of the 15.92 acre tract, S 45 deg. 19 min. 03 sec. W, 40.66
56   feet to a ½ inch iron rod found where same intersects the northeast line of Cottonwood Parkway, the
57   future 70 foot roadway for an angle corner of this tract.
58   **THENCE** with the northeast line of Cottonwood Parkway, N 44 deg. 42 min. 42 sec. W, 99.99
59   feet to a ½ inch iron rod found at the beginning of a curve to the right.
60   **THENCE** with said curve to the right whose radius is 406.21 feet; whose long chord bears N
61   23 deg. 35 min. 27 sec. W, 292.22 feet; 298.92 feet along the arc to a 5/8 inch iron rod set at the end of
62   said curve.
63   **THENCE** continuing with the east or northeast line of Cottonwood Parkway, N 02 deg. 30
64   min. 34 sec. W, 157.64 feet to a 5/8 inch iron rod set at the beginning of a curve to the left.

1        **THENCE** with said curve to the left whose radius is 703.87 feet whose long chord bears N 23

2   deg. 49 min. 35 sec. W, 511.06 feet; 523.01 feet to a ½ inch iron rod with survey cap found at the end

3   of said curve, the west corner of the before mentioned 0.258 acre tract and south corner of the before

4   mentioned 0.629 ace tract.

5        **THENCE** continuing with the northeast line of Cottonwood Parkway and southwest line of

6   the 0.629 acre tract, N 45 deg. 09 min. 49 sec. W, 50.10 feet to a ½ inch iron rod with survey cap

7   found at the west corner of the 0.629 ace tact, for the west corner of this tract.

8        **THENCE** with the northwest line of the 0.629 acre tract, N 44 deg. 48 min. 48 sec. E, 547.70

9   feet to the north corner of same, a ½ inch iron rod with survey cap found in the southwest line of the

10   before mentioned Hood 116.94 acre tract, for the north corner of this tract.

11        **THENCE** with the southwest line of the Hood 116.94 acre tract, the northeast line of the 0.629

12   acre, 15.92 acre and 1.056 acre tract, S 44 deg. 36 min. 46 sec. E, at 49.91 feet pass the east corner of

13   the 0.629 acre and north corner of the Carson 15.92 acre tract, at 1021.96 feet pass a 1 inch iron pipe

14   found at the east corner of the 15.92 acre and north corner of the 1.056 acre tract. In all, 1071.80 feet to

15   the POINT OF BEGINNING, containing 18.252 acres of land.

1                                              Exhibit B

2                                              Site Plan

1    Exhibit C

2    Rent Commencement and Expiration Date Agreement

3    THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the
4    ____ day of _____, 200___, by and between LINCOLN PO RED OAK VILLAGE, L.P.
5    ("*Landlord*") and BED BATH & BEYOND INC. ("*Tenant*").

6    **WITNESSETH:**

7    WHEREAS, Landlord is the owner of a certain shopping center known as
8    _____ (the "*Shopping Center*"), situated in _____, _____;

9    WHEREAS, by that certain Lease Agreement dated as of _____ __, 200__ (the "*Lease*"),
10    Landlord leased a portion (the "*Premises*") of the Shopping Center to Tenant;

11    WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has
12    commenced; and

13    WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an
14    agreement setting forth certain information in respect of the Premises and the Lease.

15    NOW, THEREFORE, Landlord and Tenant agree as follows:

16    1.    The Rent Commencement Date occurred on _____, 200___.

17    2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant
18    exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided
19    in the Lease.

20    3.    The date of commencement of the **first Renewal Period** shall be February 1, 20___, if
21    Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease
22    shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the
23    Lease or unless the Lease terminates earlier as provided in the Lease.

24    4.    The date of commencement of the **second Renewal Period** shall be February 1, 20___,
25    if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the
26    Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term
27    of the Lease or unless the Lease terminates earlier as provided in the Lease.

28    5.    The date of commencement of the **third Renewal Period** shall be February 1, 20___, if
29    Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease
30    shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

31    6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them
32    in the Lease.

1       IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and
2  Expiration Date Agreement to be executed the date and year first above written.

3

**LANDLORD:**

LINCOLN PO RED OAK VILLAGE, L.P.,
a Delaware limited partnership

By:_____
Name:_____
Title:_____

    By its general partner, LINCOLN MFIL RED
    OAK, LTD., a Texas limited partnership

      By:_____
      Name: _____
      Title:

    By its general partner, LINCOLN GP RED
    OAK, INC., a Texas corporation

      By:_____
      Name: _____
      Title:

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By:_____
Name:  Warren Eisenberg
Title:  Co-Chairman

4

#939089 v5

1

<u>Exhibit D</u>

2

<u>Specifications for Landlord's Work</u>

#939089 v5

### *San Marcos, TX*

### Exhibit D - Standard Landlord's Work

#### 08/23/05

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the <u>Exhibit D</u>, to the extent not inconsistent with the terms of this <u>Exhibit D</u>. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

#### Landlord's Final Plans and Specifications

Landlord shall provide one (1) complete full size set, one (1) complete ½ size set and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.   Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5).  Tenant's Plans are project-specific design-development documents.  In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail.  Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.   <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2005, dated 03-01-05 developed by Casco Architects, comprise the following drawings and specifications:

All site specific plans and specifications developed by Landlord and submitted to Tenant for review and approval must be in the same Format as Tenant's Prototypical Plans and Specifications as outlined within Item C. below of this Exhibit unless otherwise authorized in writing by Tenant.

Tenant shall not be obligated to review nor approve improperly formatted Landlord's Plans and/or specifications, nor shall said submission be deemed to be in compliance with Section 3.2 "Plan Approvals" of the Lease, unless said Format is complied with.

Tenant reserves the right to immediately disapprove and return improperly formatted plans to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the plans and/or specifications to Tenant for re-review and approval.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---------|---------------|---------------|--------------|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2005 | 03/01/05 |
| A1.1 | Site Details | Prototype Version 1.2005 | 03/01/05 |
| A1.2 | Demolition Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.2 | Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.3 | Floor Finish Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2005 | 03/01/05 |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | Prototype Version 1.2005 | 03/01/05 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2005 | 03/01/05 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2005 | 03/01/05 |
| A4.1 | Exterior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2005 | 03/01/05 |
| A6.1 | Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2005 | 03/01/05 |
| A7.1 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2a | *Alternate* Large Scale Plans & Partition Types (38k SF Building) | Prototype Version 1.2005 | 03/01/05 |

1

| A8.1 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.2 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.3 | Customer Service Desk | Prototype Version 1.2005 | 03/01/05 |
| A8.4 | Register Bays | Prototype Version 1.2005 | 03/01/05 |
| A8.5 | Remote Service Desks | Prototype Version 1.2005 | 03/01/05 |
| A9.1 | Interior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A9.1a | *Alternate* Interior Elevations (38K SF Building) | Prototype Version 1.2005 | 03/01/05 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A9.4a | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A9.4b | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| A9.5 | FTG Plans, Wall Sections & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.5a | *Alternate* FTG Plans, Wall Sections & Details (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A.9.6 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.7 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.8 | *Alternate* Wall Sections at Awning | Prototype Version 1.2005 | 03/01/05 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2005 | 03/01/05 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2005 | 03/01/05 |
| S2.1 | Foundation Plan | Prototype Version 1.2005 | 03/01/05 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2005 | 03/01/05 |
| S3.1 | Foundation Details | Prototype Version 1.2005 | 03/01/05 |
| S3.2 | Roof Framing Details | Prototype Version 1.2005 | 03/01/05 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2005 | 03/01/05 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.0a | Base System Fire Alarm Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.1a | Base System Misc. Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2a | Base System Fire Alarm Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0b | *Alternate* Fire Alarm Plans w/Occupant Notification Alarm | Prototype Version 1.2005 | 03/01/05 |
| FA1.1b | *Alternate* Fire Plans w/Occupant Notification Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2b | *Alternate* Fire Alarm Plans w/Occupant Notification Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0c | *Alternate* Fire Alarm Plans w/Smoke Detection | Prototype Version 1.2005 | 03/01/05 |
| FA1.1c | *Alternate* Fire Alarm Plans w/Smoke Detection Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2c | *Alternate* Fire Alarm Plans w/Smoke Detection Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| M1.1 | Mechanical General Information | Prototype Version 1.2005 | 03/01/05 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2005 | 03/01/05 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2005 | 03/01/05 |
| E2.1 | Power Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2005 | 03/01/05 |
| E3.3 | Electrical Details | Prototype Version 1.2005 | 03/01/05 |
| E4.1 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E4.3 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2005 | 03/01/05 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2005 | 03/01/05 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |

| E5.1 | FTG Power, Lighting & Specialty Lighting | Prototype Version 1.2005 | 03/01/05 |
|------|------------------------------------------|--------------------------|----------|
| E5.1a | *Alternate* FTG Power, Lighting Specialty Lighting (Corner) | Prototype Version 1.2005 | 03/01/05 |
| E5.1b | *Alternate* FTG Power, Lighting, Specialty Lighting (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| E6.1 | *Bid Alternate:* Modular Wiring (Data Only) Plans & Details | Prototype Version 1.2005 | 03/01/05 |

Project Manual for Bed Bath & Beyond, dated March 01, 2005.

D.      Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.      All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

2.      All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

3.      Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and storm water design reports, if requested by Tenant.

### Site Specifications

A.      All parking areas and traffic drives in the Shopping Center shall consist of a minimum 8" lime subgrade (95% compacted), 10" flexible base, 2" of asphalt. Grading of these areas shall not exceed a slope of 2%. Utilization of any portion of the parking field for above ground storm water retention/detention is not acceptable to Tenant.

B.      All truck access drives in the Shopping Center shall consist of heavy duty asphalt, (8" lime, 2" asphalt over 12" crushed limestone). Grading of these areas are not to exceed a slope of 3%.

C.      All truck ramps and dumpster pads shall consist of heavy duty concrete (6" crushed lime, #3 re-bars @18" and 7" reinforced concrete). All truck ramps shall consist of #4 re-bars, 18" o/c. each direction. Recessed truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.      The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

### Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.      Clear Height - Building systems (plumbing & electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Mechanical shall be designed at a minimum of 17'-6" a.f.f. to bottom of duct. Maximum bottom of supply and return duct height shall not exceed 19'-0" a.f.f. Fire protection sprinkler piping (main and branch lines) shall be located at least 16'-6" a.f.f., sprinkler heads shall be located within 1" minimum and 6" maximum from the roof/floor deck. Bottom of all structural elements shall be located at least 18'-4" a.f.f.

B.      Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to 90 days after the Delivery Date.

        LL shall issue complete fire alarm system submittal consisting of site specific drawings and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping. If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

        Mr. Will Smith
        Code Consultants, INC.

3

Work:        (314) 991-2633
Fax:         (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

C.    1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

D.    Sprinkler System – The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

E.    Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises. Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.    LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping. If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

Mr. Will Smith
Code Consultants, INC.
Work:        (314) 991-2633
Fax:         (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

G.    If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

H.    If applicable, Landlord shall complete and make operational all vertical transportation equipment (passenger and freight elevators, escalators, cart conveyors, etc.) a minimum of (2) two weeks in advance of Delivery. Landlord shall continuously operate such equipment in accordance with manufacturers recommendations during this (2) week period in order to allow equipment to properly "Burn-In". "Burn-In" required in order to identify and repair any potential mechanical deficiencies that may exist with the equipment prior to Delivery.

## Construction Coordination Requirements

A.    Landlord shall provide Tenant with a critical path schedule within (2) weeks of commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B.    Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at **BBB.2000photos@bedbath.com**

## Building and Site Signs

A.    Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

B.    Remote Building Signs -- NA

4

C.   Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

D.   Temporary Signs -- commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the **[future]** main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed. Landlord shall secure banners through the following vendor:

Corporate Identification Solutions
3521 North Elston Avenue
Chicago, IL 60618
Attn: Sarah Glenn
P: 773.604.4800
F: 773.604.4848
sarah@corporateidsolutions.com
www.corporateidsolutions.com

E.   Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

## Permits and Approvals

A.   Landlord to secure all permits required to allow Tenant to fixture, merchandise (including without limitation permits for it's for prepackaged foods), and open for business to the public in the Premises.

If Seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than (12) weeks prior to delivery. Seizmic Inc. shall provide the necessary services to assist Landlord in securing the fixture permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of permit. Actual submission of the required documents to the AHJ shall be made only by Seizmic, Inc., or other vendor selected at Tenant's discretion.

Seizmic Inc.
Contact: Sal Fateen or Genie Fateen
161 Atlantic Street, Pomona, CA 91768
Ph. # 909 869 0989

Landlord shall be obligated to take possession of Fixture permit and transfer permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to delivery date.

B.   Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.   Landlord shall be obligated to forward (1) hard copy of all required documents outlined with Section 01700 – Contract Closeouts, of Tenant's Prototype Specifications / Project Manual to **Digital Reliance Incorporated (DRI), 386 Charmel Place, Columbus, OH 43235, (614) 430-5950, jg@digital-reliance.com,** for purpose of scanning to disk for Tenant's future use. All documents shall be delivered to DRI within thirty (30) days after the "Substantial Completion Date. The cost associated with this service is $500.00. All costs associated with this service shall be Landlord's responsibility.

Prior to scanning, DRI will confirm submittal from Landlord meets base minimum requirements and shall inform Landlord directly if certain documents are missing. DRI will not review items for content. The content will be reviewed once electronic file has been recieved by Tenant's Construction Project Manager. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord from Tenant's Construction Project Manager. Landlord to resubmit amended document to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

Once Electronic file has been completed, It shall be forwarded directly to Tenant's Construction Project Manager with transmittal copy to Landlord within sixty (60) days after the "Substantial Completion Date".

B.   Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.    If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents")
described in the immediately preceding paragraph A within the prescribed thirty (60) day period, then Tenant
may provide Landlord with notice of such failure.  If Landlord has not remedied such failure within fifteen (15)
days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the
amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-
out Documents.

D.    Final cost - Landlord shall provide Tenant with "final cost" within thirty (30) days after the Substantial
Completion Date.

E.    Landlord shall be obligated to provide to Tenant within 30 days of Tenants request copies of manufactures
invoice(s), manufactures cut sheets, Subcontractor invoices, etc. for any item or items described within
Exhibit D - Standard Landlord's Work.

6

1

<u>Exhibit D-2</u>

2

<u>Exterior Elevations of the Shopping Center</u>

#939089 v5

1                                                    Exhibit E

2                                              Permitted Encumbrances

3    1.       Easement Deed dated February 23, 1976 between Mary Ann Hood, Trustee and the City of San
4    Marcos and recorded in Volume 282, Page 84 and as shown on the Plat(s) recorded in Volume 9 Pages
5    186 and Volume 10, page 79 of the Plat Records, all of Hays County, Texas.  (TRACTS 1 AND 2)

6    2.       Public utility and drainage easement in favor of the City of San Marcos, recorded in Volume
7    1340, Page 417 of the Public Records of Hays County. (TRACT 5)

8    3.       Water/wastewater Easement recorded under Clerk's File No. 9924116 of the Official Public
9    Records of Hays County, Texas and reflected on Plats recorded in Volume 9, Page 186, Volume 10,
10   Page 79 of the Plat Records. (TRACTS 1 AND 2)

11   4.       Access easement reflected on Plat recorded in Volume 7, Page 156 of the Plat Records of Hays
12   County, Texas. (TRACTS 1 AND 2)

13   5.       Access easements, public utility easements and a temporary truck turnaround all as reflected on
14   Plat recorded in Volume 9, Page 186 AND Volume 10, Page 79 of the Plat Records of Hays County,
15   Texas. (TRACTS 1 AND 2)

16   6.       Temporary turnaround easement, public utility easements, waterline easements, drainage
17   easements and right-of-way all as reflected by the plat recorded in Volume 10, Page 151 of the Plat
18   Records of Hays County, Texas. (TRACT 5)

19   7.       Public utility easement 20' wide along the Northwest property line and 15' wide along the
20   Northeast property line of the subject property; as reflected by the plat recorded in Volume 8, Page 285
21   of the Plat Records of Hays County, Texas. (TRACT 4)

22   8.       Declaration of Covenants, Conditions and Restrictions as recorded in Volume 1229, Page 830
23   of the Official Public Records of Hays County. (TRACT 1, 2 and 3)

24   9.       Reciprocal Easement Agreement dated June 19, 1998, executed by and between Mary Anne
25   Hood, Trustee and PBA Development, Inc, a Texas corporation recorded in Volume 1426, page 1 of
26   the Official Public Records of Hays County, Texas. (TRACTS 1, 2 and 3).

27   10.      Waste water lift station on the subject property as reserved in Declaration recorded in Volume
28   1913, Page 326 of the Public Records of Hays County, Texas. (TRACT 5)

29   11.      Temporary turnaround easement off of McKinley Place Drive into the subject property as
30   shown on the Plat recorded in Volume 9, Page 186 of the Plat Records of Hays County, Texas.
31   (TRACT 3)

32   12.      Temporary turnaround easement located in the Southwest corner of TRACT III as reflected by
33   the plat recorded in Volume 8, Page 204, Volume 10, Page 110, of the Plat Records of Hays County,
34   Texas.

35   13.      Subject to the provisions of Sections 2.3.1(f) and 17.3 of this Lease, that certain Construction
36   Deed of Trust, Assignment, Security Agreement and Financing Statement, dated as of June 30, 2005,
37   by Landlord in favor of JPMorgan Chase Bank, N.A., recorded as Document Number 05018588 of the
38   Plat Records of Hays County, Texas.

39            **Landlord represents and warrants that (i) none of the foregoing will interfere with or**
40   **prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii)**
41   **conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s)**
42   **in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way**
43   **(a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the**
44   **Premises.**

#939089 v5

1

<u>Exhibit F</u>

2

<u>Tenant's Signage</u>

3

#939089 v5

<u>Exhibit G</u>

<u>Form of Subordination, Non-Disturbance and Attornment Agreement</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200__, by and between _____, a _____ **[corporation] [limited] [general] [partnership] [national banking association]**, having an office at _____ (the "*Mortgagee*") and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the "*Tenant*").

WITNESSETH:

WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a parcel of land owned by _____, a _____ **[corporation], [limited] [general] [partnership]** (the "*Landlord*") together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "*Shopping Center*" and being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord and Tenant dated as of _____ (the "*Lease*"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "*Premises*"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby, provided, however, if applicable law requires that Tenant be named in such suit, action or proceeding, Tenant may be named provided that: (i) there be no adverse affect on Tenant, and (ii) such suit, action or proceeding does not interfere with Tenant's rights under the Lease or otherwise cause a termination of the Lease;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise

G-1

#939089 v5

affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

#939089 v5

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Sills Cummis Epstein & Gross P.C., One Riverfront Plaza, Newark, New Jersey  07102, Attention:  Jeffrey H. Newman, Esq., or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if our memorandum of lease has been recorded prior to the subject mortgage]**
NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

Signature page to follow

G-3

1

2         IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-
3    Disturbance and Attornment Agreement as of the day and year first above written.

4

                                                                       **MORTGAGEE:**

ATTEST:                                                _____

By:_____            By:_____
Name:_____            Name:_____
Title:  (Assistant) Secretary                   Title:  (Vice) President

[SEAL]

                                                                       **TENANT:**

ATTEST:                                                BED BATH & BEYOND INC., a New York
                                                                       corporation

By:_____            By:_____
Name:_____            Name:  Warren Eisenberg
Title:  (Assistant) Secretary                   Title:  Co-Chairman

[SEAL]

#939089 v5

1                 **[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

2

3

4                        _____

5                     **[JURAT FOR PARENT:]**

6

7 STATE OF NEW JERSEY     )
8                            ) : ss.
9 COUNTY OF UNION        )

10

11       On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me
12 known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath &
13 Beyond Inc., the corporation described in and which executed the above instrument and that he signed
14 his name thereto by order of the Board of Directors of said corporation.

15

16                          Notary Public

17 My Commission Expires:

18

19

20 _____

21

22

#939089 v5

1       Exhibit H

2       Form of Recognition Agreement

3       THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__, by
4 and between Lincoln PO Red Oak Village, L.P., a Delaware limited partnership, having an address at
5 _____ ("*Landlord*"); Bed Bath & Beyond Inc., a New York
6 corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and
7 _____, a [_____] [corporation] [limited] [general]
8 [partnership], having an address at _____ ("*Subtenant*").

9       R E C I T A L S:

10     A.    Landlord and Tenant have entered into a certain Lease Agreement (the "*Lease*") dated
11 as of _____ __, 200__, a short form of which has been recorded in _____,
12 which demises certain premises (the "*Premises*") located in the _____ Shopping Center,
13 [City], [State], which Shopping Center is more particularly described on Exhibit A annexed hereto and
14 made a part hereof.

15     B.    Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of
16 the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and
17 deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form
18 attached to the Lease, in recordable form.

19     C.    Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has
20 subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

21     D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with
22 respect to the Sublease and the Subleased Premises.

23     NOW, THEREFORE, in consideration of the mutual covenants and agreements herein
24 contained, the parties hereto, intending to be legally bound hereby, agree as follows:

25     1.    Landlord warrants and represents as follows:

26     (a)    that it is the fee owner of the Premises,

27     (b)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B
28 annexed hereto, if any) and is in full force and effect,

29     (c)    that the term of the Lease expires on _____, but is subject to [three]
30 renewal periods of [five] years each and

31     (d)    that Tenant is not in default under the Lease nor has any event occurred which
32 would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

33     2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the
34 Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by
35 Subtenant of any of its rights, remedies and options contained therein shall not constitute a default
36 under the Lease.

37     3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its
38 consent or approval is required for any action of Tenant under the Lease, then, to the extent such
39 obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation
40 thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and,
41 subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such
42 consent or approval.

43     4.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of
44 the Lease or of any instrument modifying or amending the same or entered into in substitution or
45 replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant
46 in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege
47 granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in
48 default under the Sublease beyond the expiration of any applicable notice and cure period.

#939089 v5

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Sills Cummis Epstein & Gross P.C., One Riverfront Plaza, Newark, New Jersey  07102, Attention:  Jeffrey H. Newman, Esq., or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

1

2      9.     This Agreement shall be binding on and shall inure to the benefit of the parties hereto
3  and their respective heirs, legal representatives, successors, assigns and sublessees.

4          IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed
5  under seal the date first above written.

6

**LANDLORD:**

LINCOLN PO RED OAK VILLAGE, L.P.,
a Delaware limited partnership

By:_____
Name:_____
Title:_____

    By its general partner, LINCOLN/MFIL
    RED OAK, LTD., a Texas limited
    partnership

    By:_____
    Name:_____
    Title:_____

    By its general partner, LINCOLN GP RED
    OAK, INC., a Texas corporation

    By:_____
    Name:_____
    Title:

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:_____
Name:  Warren Eisenberg
Title:  Co-Chairman

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

1    **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2

3    _____

4                              **[JURAT FOR PARENT:]**

5    STATE OF NEW JERSEY        )
6                               ) : ss.
7    COUNTY OF UNION            )

8
9         On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me
10   known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath &
11   Beyond Inc., the corporation described in and which executed the above instrument and that he signed
12   his name thereto by order of the Board of Directors of said corporation.

13                              _____
14                                        Notary Public
15   My Commission Expires:
16
17
18   _____
19

20                    _____

21

Exhibit I

Form of Delivery Date Notice

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond [of _____] Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement dated as of _____, 200__ (the "*Lease*"), between Lincoln PO Red Oak
Village, L.P., as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant ("*Tenant*"),
with respect to certain retail premises (the "*Premises*") located in the Red Oak Village
Shopping Center, San Marcos, Texas

Gentlemen:

    In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____, 200__.
This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of the Lease.

                              LINCOLN PO RED OAK VILLAGE, L.P.


By:_____
_____, (Vice) President


cc:    [Jeffrey H. Newman, Esq.]
      [Allan N. Rauch, Esq.]

I-1

#939089 v5

Exhibit J

Form of Delivery Date Certification

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Lease Agreement dated as of _____, 200__ (the "*Lease*"), between Lincoln PO Red Oak
      Village, L.P., as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant ("*Tenant*"),
      with respect to certain retail premises (the "*Premises*") located in the Red Oak Village
      Shopping Center, San Marcos, Texas

Gentlemen:

      In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby certifies to
Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as defined in the
Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is defined in the
Lease) will be deemed to be _____, 200__. This notice shall constitute the Delivery Date
Certification referred to in Subsection 2.3.3 of the Lease.

                                    LINCOLN PO RED OAK VILLAGE, L.P.


                              By:_____
                                    _____, (Vice) President

cc:   [Jeffrey H. Newman, Esq.]
      [Allan N. Rauch, Esq.]

#939089 v5

1

Exhibit K-1

2

Existing Exclusives

3      1.    PETsMART:

4              (a)    Tenant's Exclusive Rights. As used in the Lease, the term "***Tenant's Primary***
5    ***Business***" shall mean the retail sale of (i) pets (including, but not limited to, fish, birds, reptiles, dogs,
6    cats and other small animals), (ii) food, accessories and other products relating to pets and animals,
7    including equestrian products and apparel related thereto, (iii) services related to pets and animals,
8    such as grooming, boarding, animal training and obedience classes, pet adoption and veterinary
9    services, (iv) products relating to nature and the environment, and (v) educational products and
10   services relating to any of the foregoing, and office and storage uses incidental to the foregoing. From
11   and after the date hereof and continuing throughout the Term of the Lease, to the extent permitted
12   under applicable law, Tenant shall have the exclusive right in the Shopping Center to conduct any
13   portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2. Subject to
14   the limitation set forth below, all other tenants or other occupants of any portion of the Shopping
15   Center shall be prohibited from engaging in any portion of such Primary Business described in clauses
16   (i), (ii) and (iii) of this Section 2, except on a basis which is incidental to an otherwise permitted use.
17   For purposes of this Section 2, the term "incidental" shall mean that the use occupies the lesser of (a)
18   one thousand (1,000) square feet of Gross Floor area, or (b) five percent (5%) of the sales area in the
19   subject premises.

20             (b)    Prohibited Uses. The following uses (collectively referred to as "Prohibited
21   Uses" and individually as a "Prohibited Use") are prohibited during the Term of the Lease in any
22   portion of the Shopping Center: nuisance; any use causing loud noises or offensive odors (including
23   any business using exterior loud speakers); manufacturing facility; dry cleaner (except facilities for
24   drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of
25   automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop
26   or service station or any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing
27   or thrift store or liquidation outlet; massage parlor; adult book shop or adult movie house; mortuary or
28   funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages,
29   whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club;
30   cinema or theater; place of recreation including, but not limited to, bowling alley, skating rink,
31   carnival, game arcade or health spa (except that either a yoga studio or a salon, such as an Elizabeth
32   Arden's Red Door Spa, shall be allowed, so long as there is only one of the two, and it is limited in size
33   to not more than five thousand (5,000) square feet); health club, unless located in excess of 500 feet
34   from Tenant's front door; church; or any other use inconsistent with the operation of a high quality
35   retail shopping center. Not more than ten thousand (10,000) square feet of space in the Shopping
36   Center in the aggregate shall be used for retail service offices, medical or professional offices, or other
37   office purposes except office use incidental to retail uses. In addition, the following uses must first be
38   approved in writing by Tenant: drive-throughs; children's recreational, educational or day-care facility;
39   restaurants occupying more than two thousand five hundred (2,500) square feet of Gross Floor Area;
40   provided, however, the following restaurants are permitted, (i) restaurants without limit as to size on
41   outparcels so long as they are self-parked on their respective outparcel, (ii) small restaurants and coffee
42   shops incidental to a retailer's permitted use, and (iii) restaurants within 300 feet from Tenant's
43   Premises; provided there may be only two such restaurants, each of which does not exceed 2000
44   square feet and provided, further, no restaurant shall be permitted in the 2,800 square foot building
45   adjacent to the Premises; offices and professional uses if the aggregate Gross Floor Area exceeds
46   10,000 square feet and more than 3,000 square feet are located within 300 feet of the Premises; schools
47   of any nature except in conjunction with animal training or obedience training classes associated with
48   Tenant's Primary Business. As used herein, "school" includes, but is not limited to, a beauty school,
49   barber college, reading room, place of instruction or any other operation serving primarily students or
50   trainees rather than retail customers. It is the intent of this Section that the Shopping Center shall be
51   devoted to high quality retail uses and that the parking and the other common facilities shall not be
52   burdened by either excessive or protracted use.

53      2.    Marshalls:

54             (a)    Landlord agrees that, from the date hereof until expiration of the term of this
55   lease, no other premises in the Shopping Center shall at any time contain more than twenty five
56   thousand (25,000) square feet of floor area therein used or occupied for, or devoted to, the sale or
57   display of off-price apparel and related accessories (the merchandise referred to above is herein
58   referred to as the "Protected Merchandise"). The computation of such floor area shall include on half

1  (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks,
2  gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or
3  display of the Protected Merchandise.  The foregoing uses described in this Paragraph 4(B) are
4  hereinafter collectively referred to as a "Competing Use." ·

5          (b)      Landlord agrees that Landlord's Parcel shall not be used (a) for any non-retail
6  purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not
7  being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink,
8  cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor,
9  sporting event, sports or game facility, off-track betting club (c) or for any establishment which sells or
10  displays pornographic materials or (d) for any establishment which sells or displays used merchandise
11  or second hand goods. No restaurants or establishments selling food prepared on premises for
12  consumption on or off premises shall be located in Landlord's Parcel within 200 linear feet of the
13  closest demising wall of the Demised Premises. Anything in this paragraph 4(A) to the contrary
14  notwithstanding, Landlord and Tenant hereby agree as follows: professional offices which offer
15  services to the general public and which are normally found in first class shopping centers such as
16  dentists, accountants, lawyers, doctors, real estate and stock brokerage offices ("Professional Offices")
17  and service oriented office uses which are normally found in first class shopping centers such as travel
18  agencies, insurance agencies, weight loss clinics and financial institutions ("Service Oriented Uses")
19  shall be permitted within the buildings labeled as Retail 1 and Retail 2 on the Lease Plan, provided that
20  such Professional Offices and Service Oriented Uses shall not exceed 10,000 square feet in the
21  aggregate. (Collectively the uses described herein are referred to as the "Prohibited Uses").

1

<u>Exhibit K-2</u>

2

<u>Existing Leases</u>

3

4  1.    Lease, dated August 5, 2005, between Landlord, as landlord, and PETsMART, Inc., as tenant;

5  and

6  2.    Lease, dated July 21, 2005, between Landlord, as landlord, and Marmaxx Operating Corp., as

7  tenant.

#939089 v5

Exhibit L

Alternate Rent

1.      During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as "**Alternate Rent**" an amount equal to three (3%) percent of all "Gross Sales" (hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the "**Cap**").

2.      As used herein, the term "**Gross Sales**" shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Paragraph 2 only, collectively, "**Tenant**"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased). Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term "Gross Sales" shall exclude: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(8)** fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates or gift cards, and **(15)** forfeited deposits.

3.      Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains. If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.      Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.

5.      Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month.

6.      Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law, or to its

1    accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or
2    Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that
3    each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon
4    Landlord).

#939089 v5

1          Exhibit M

2          Prohibited Uses

3     As used in this Lease, the term "***Prohibited Uses***" shall mean any of the following uses:

4          1.    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or
5     vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to
6     intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in
7     whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

8          2.    Any operation primarily used as a storage facility and any assembling, manufacturing,
9     distilling, refining, smelting, agricultural, or mining operation;

10         3.    Any "second hand" store, "surplus" store;

11         4.    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that
12    this provision shall not prohibit the temporary use of construction trailers during periods of
13    construction, reconstruction, or maintenance);

14         5.    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash
15    compactors or trash containers located near the rear of any building);

16         6.    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house
17    operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

18         7.    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that
19    performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site
20    premises are located more than 150 feet away from the Premises);

21         8.    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or
22    body shop repair operation;

23         9.    Any bowling alley or skating rink;

24         10.   Any live performance theater, auditorium, meeting hall, sporting event, or other
25    entertainment use (except that either [but not both] a Dave and Busters or a Studio Grill shall be
26    permitted as long as same are operated in a manner substantially similar to the manner in which same
27    are operated as of the Effective Date [the "***Permitted Entertainment Facility***"] and provided that such
28    Permitted Entertainment Facility is not located in the in-line space that is located from the premises
29    designated as "Best Buy" on Exhibit B hereto through the premises designated as "Marshalls" on
30    Exhibit B hereto, inclusive (the "***Restricted Area***");

31         11.   Any living quarters, sleeping apartments, or lodging rooms;

32         12.   Any veterinary hospital or animal raising or boarding facilities, except than an animal
33    boarding facility shall be permitted provided that such facility is incidental to a full-line pet and pet
34    supply store operating in at least 15,000 square feet of Floor Area and located at least 200 feet away
35    from the Premises (except that a full-line pet and pet supply store shall be permitted to be located
36    within the Premises subject to any Existing Exclusives); such occupant shall use reasonable efforts to
37    prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will
38    promptly remove any "dog dirt" from the Common Areas;

39         13.   Any mortuary or funeral home;

40         14.   Any "Pornographic Use", which shall include, without limitation: (x) a store displaying
41    for sale or exhibition books, magazines or other publications containing any combination of
42    photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational
43    [provided, however, that the sale of books, magazines and other publications by a national bookstore of
44    the type normally located in first-class shopping centers in the State in which the Shopping Center is
45    located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not
46    be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video
47    cassettes or other medium capable of projecting, transmitting or reproducing, independently or in
48    conjunction with another device, machine or equipment, an image or series of images, the content of
49    which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating
50    Association, or any successor thereto [provided, however, that the sale or rental of such videos by a

M-1

national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

15.     Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

16.     Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption , except that the sale of alcoholic beverages for on-premises consumption shall be permitted as an incidental part of an otherwise permitted restaurant or in the Permitted Entertainment Facility provided that, on an annual basis, not more than fifty percent (50%) of the gross sales of such restaurant or Permitted Entertainment Facility are derived from the sale of alcoholic beverages, and provided further that (x) the lease or other occupancy agreement with such restaurant or Permitted Entertainment Facility obligates such tenant or occupant to provide Landlord with an annual certification as to the percentage of total gross sales of such tenant or occupant that are derived from the sale of alcoholic beverages, (y) such lease permits Landlord to forward to Tenant copies of such annual certifications, and (z) Landlord in fact sends such certification to Tenant each year and each such certification provides that not more than fifty percent (50%) of such tenant's or occupant's sales are derived from the sale of alcoholic beverages;

17.     Any catering or banquet hall;

18.     Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall (except that a Permitted Entertainment Facility shall be permitted);

19.     Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

20.     Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities (including the incidental sale of lottery tickets in an otherwise permitted store), or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

21.     Any unlawful use;

22.     Any pawn shop, gun shop, or tattoo parlor;

23.     Any church or other place of religious worship;

24.     Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

25.     Any carnival, amusement park or circus;

26.     Any medical clinics or medical offices, except that one (1) eyecare center, such as Lenscrafters or Pearle Vision, which contains an optometrist office as an incidental part of such retail store, shall be permitted provided that the Floor Area of such eyecare center does not exceed ten thousand (10,000) square feet;

27.     Any supermarket (except that an upscale, boutique-type food store shall be permitted to be located within the Premises);

28.     Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the San Marcos, Texas metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 200 feet away from the Premises, and not more than seven thousand five hundred

M-2

(7,500) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

    29.    hotel/motel;

    30.    daycare center;

    31.    veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 200 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises subject to any Existing Exclusives); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;

    32.    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

    33.    karate center;

    34.    movie theater;

    35.    restaurant serving meals for on- or off-premises consumption, except that restaurants shall be permitted if they are of the type typically found in similar first-class shopping centers in the San Marcos, Texas metropolitan area, and provided such use is not located in the Restricted Area;

    36.    beauty parlor or nail salon, except that same shall be permitted provided such use is located at least 150 feet away from the Premises;

    37.    health spa, day spa, health club, exercise facility or similar type business, except that one (1) day spa occupying not more than 5,000 square feet of Floor Area shall be permitted provided such use is not located in the Restricted Area.

1

2

                                        Exhibit N

                                   Marshall's Agreement


Beyond any store of its kind.®

**Corporate Office**
650 Liberty Avenue                              July 18, 2005
Union, NJ 07083
908/688-0888

          Marmaxx Operating Corp.
          770 Cochituate Road
          Framingham, MA 07101

          RE:     Red Oak Village Shopping Center –
                  San Marcos, TX (the "Shopping Center")

          Ladies and Gentlemen:

                  Reference is made to the Shopping Center, for which Marmaxx Operating Corp.
          ("MARMAXX"), and Bed Bath & Beyond Inc. ("BBB") are each either negotiating or
          have executed a lease for their respective retail premises.  Notwithstanding the "exclusive
          use" provisions contained or to be contained in the respective leases of premises to BBB
          (the "BBB Lease") or MARMAXX (the "MARMAXX Lease"), BBB and MARMAXX
          hereby agree that only the following restrictions shall apply with respect to their
          respective premises so long as both the BBB Lease and the MARMAXX Lease remain in
          effect:

                  1.  Neither MARMAXX, nor any assignee(s) of the MARMAXX Lease, nor
          any sublessee(s) of all or any portion of the premises demised to MARMAXX pursuant to
          the MARMAXX Lease (the "MARMAXX Premises") shall use the MARMAXX
          Premises primarily as either (1) a home furnishings/linens/domestics store of the type
          currently operated by Bed Bath & Beyond, Linens 'N Things, HomePlace, J.C. Penney
          Home Store, HomeGoods or Strouds, or (2) a full-line linens/domestics store (e.g., selling
          sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats,
          tablecloths, dish towels, etc.).  For illustration purposes only, the restriction described
          above in this paragraph would not prevent the operation of the  respective stores known
          as Pier One, Mikasa, Williams Sonoma, Container Store or Hold Everything, as same
          currently operate.

                  2.  Neither BBB, nor any assignees(s) of the BBB Lease, nor any
          sublessee(s) of all or any portion of the premises demised to BBB under the BBB Lease
          (the "BBB Premises") shall use, occupy, or devote more than 25,000 square feet of floor
          area in the BBB Premises for the sale or display of off-price apparel and related
          accessories (the merchandise referred to above is herein referred to as the *"Protected*
          *Merchandise"*).  The computation of such floor area shall include on half (1/2) of all floor
          area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas,

#939089 v5

Marmaxx Operating Corp.
July 18, 2005
Page 2

shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise.

    3. (a) Notwithstanding anything contained herein, the provisions of this agreement for the benefit of BBB shall be of no further force or effect (and the respective "exclusive use" provisions contained (or to be contained) in the BBB Lease shall no longer apply) from and after the cessation of use of the BBB Premises as a store operating primarily as either a home furnishings/linens/domestics store or a full-line linens/domestics store, for a period of nine (9) consecutive months (which cessation is not attributable to such periods of time which (1) result from alterations or renovations being performed in and to the BBB Premises, or (2) are caused by damage or destruction, eminent domain proceedings or actions, or events of force majeure).

    (b) Notwithstanding anything contained herein, the provisions of this agreement for the benefit of MARMAXX shall be of no further force or effect (and the respective "exclusive use" provisions contained (or to be contained) in the MARMAXX Lease shall no longer apply) from and after the cessation of use of the MARMAXX Premises as a store operating primarily as an apparel store, for a period of nine (9) consecutive months (which cessation is not attributable to such periods of time which (1) result from alterations or renovations being performed in and to the MARMAXX Premises, or (2) are caused by damage or destruction, eminent domain proceedings or actions, or events of force majeure).

    4. For purposes of this agreement, the term "primarily" shall mean more than forty percent (40%) of the gross building square footage of the applicable premises, as such premises may be relocated, expanded or decreased in size within the Shopping Center from time to time after the premises is initially opened at the size indicated Paragraph 5 below.

    5.(a) Notwithstanding anything contained herein, the MARMAXX Premises, as of the date the tenant in the MARMAXX Premises initially opens for business, shall not exceed 31,000 square feet.

    (b) Notwithstanding anything contained herein, the BBB Premises, as of the date the tenant in the BBB Premises initially opens for business, shall not exceed 25,300 square feet.

    Please sign both of the enclosed counterparts of this agreement and return to the undersigned one fully-executed counterpart of this agreement to confirm your acceptance of and agreement to the foregoing. It shall be a condition precedent to the agreements herein set forth that BBB and MARMAXX each shall have entered into a lease or occupancy agreement for its premises in the Shopping Center within one year after the date hereof.

J:\FORMS\EXCLUSVE\TJ Maxx\San Marcos, TX (2c).doc

Marmaxx Operating Corp.
July 18, 2005
Page 3

Thank you for your time and cooperation.

Very truly yours,

BED BATH & BEYOND INC.

By:

Steven H. Temares
President – Chief Executive Officer

Confirmed and agreed:
MARMAXX OPERATING CORP.

By:

Ann McCauley
Secretary/Clerk

By:

Mary B. Reynolds
Vice President/Treasurer

J:\FORMS\EXCLUSVE\TJ Maxx\San Marcos, TX (2c).doc

1

2

3

**Exhibit O**

**Sam's OEA**

#939089 v5

EXHIBIT Q TO PURCHASE AGREEMENT

When recorded return to:
Mayer Brown Rowe & Maw LLP
700 Louisiana, Suite 3600
Houston, Texas 77002
Attention: Robert L. Morgan

TEXAS – San Marcos
Store #95714 (Sam's Club)

## EASEMENTS WITH COVENANTS AND
## RESTRICTIONS AFFECTING LAND ("ECR")

THIS AGREEMENT is made as of the _____ day of _____, 200_, between
SAM'S REAL ESTATE BUSINESS TRUST, a Delaware statutory trust ("Sam's Club"), and
TEXAS REALTY RETAIL PARTNERS, INC., a Texas corporation ("Developer").

### WITNESSETH:

WHEREAS, Sam's Club is the owner of the Sam's Club Tract as shown on the site plan
attached hereto as Exhibit A-1 hereof, said Tract being more particularly described in Exhibit B
attached hereto;

WHEREAS, Developer is the owner of the Developer Tract and the Outparcels shown
on the site plan attached hereto as Exhibit A-1 hereof, the same being more particularly
described in Exhibit C hereof; and

WHEREAS, Sam's Club and Developer desire that the Sam's Club Tract, the Developer
Tract and the Outparcels be developed in conjunction with each other pursuant to a general plan
of improvement to form a commercial Shopping Center (sometimes hereinafter referred to as the
"Shopping Center"), and further desire that the Shopping Center be subject to the easements and
the covenants, conditions and restrictions hereinafter set forth;

NOW, THEREFORE, for and in consideration of the premises, easements, covenants,
conditions, restrictions, and encumbrances contained herein, the sufficiency of which is hereby
acknowledged, Sam's Club and Developer do hereby agree as follows:

1.     Building/Common Areas.

1.1     "Building Areas" as used herein shall mean those portions of the Shopping Center
       shown on Exhibit A-2 as "Building Area" (and "Future Building Area" and
       "Future Expansion Area"). Canopies may encroach from the Building Areas over
       the Common Areas provided the canopies do not interfere with the use of the
       Common Areas.

1.2     "Common Areas" shall be all of the Shopping Center except the Building Areas.

24533969.7 04-Jan-05 16:22 04298777          C-1

1.3    "Tracts" as used herein shall mean the Sam's Club Tract and the Developer Tract but not the Outparcels. Reference to a "Tract" refers to the Sam's Club Tract or the Developer Tract but not the Outparcels.

1.4    Conversion to Common Areas: Those portions of the Building Areas which are not from time to time used or cannot, under the terms of this Agreement, be used for buildings shall become part of the Common Area for the uses permitted hereunder for so long as such areas are not or cannot be used, under the terms of this Agreement, for buildings, and shall be improved, kept and maintained as provided herein.

2.    Use. Buildings in the Shopping Center shall be used for commercial purposes of the type normally found in a retail shopping center including, without limitation, financial institutions, service shops, offices, and retail stores. No cafeteria, theatre, bowling alley, billiard parlor, night club or other place of recreation or amusement, or any business serving alcoholic beverages (other than on-premises consumption in connection with the operation of a restaurant, which shall be permitted so long as the total annual sales from alcoholic beverages for any such restaurant do not exceed 50% of the total annual sales of such restaurant) shall occupy space within the Shopping Center without the prior written consent of Sam's Club. No restaurant shall occupy space on any portion of the Developer Tract or the Outparcels situated within three hundred (300) feet of the front wall of the building on the Sam's Club Tract without the prior written consent of Sam's Club. Developer recognizes that said businesses may inconvenience Sam's Club's customers and adversely affect Sam's Club's business. Notwithstanding anything to the contrary contained herein it is expressly agreed that nothing contained in this Agreement shall be construed to contain a covenant, either express or implied, to either commence the operation of a business or thereafter continuously operate a business by Sam's Club on the Sam's Club Tract. Developer recognizes and agrees that Sam's Club may, at Sam's Club's sole discretion and at any time during the term of this Agreement, cease the operation of its business on the Sam's Club Tract; and Developer hereby waives any legal action for damages or for equitable relief which might be available to Developer because of such cessation of business activity by Sam's Club.

3.    Competing Business. Developer covenants that as long as Sam's Club, or any affiliate of Sam's Club, is the user of the Sam's Club Tract, either as owner or lessee, no space in or portion of the Developer Tract or the Outparcels, and no space in or portion of any other real property adjacent to the Shopping Center which may subsequently be acquired by Developer, shall be leased or occupied by or conveyed to any other party for use as (i) a facility dispensing gasoline or other fuels from pumps, and/or a facility engaged in the business of quick lube/oil changes, (ii) a membership warehouse club, (iii) a pharmacy, (iv) a discount department store or other discount store, as such terms are defined below, (v) a variety, general or "dollar" store, (vi) a grocery store or supermarket as such terms are defined below, or (vii) as any combination of the foregoing uses. In the event of a breach of this covenant, Sam's Club shall have the right to terminate this Agreement and to seek any and all remedies afforded by either law or equity, including, without limitation, the rights to injunctive relief. "Grocery store" and "supermarket", as those terms are used herein, shall mean a food store or a food department containing more than 10,000 square feet of building space used for the purpose of selling food for off premises consumption, which shall include but not be limited to the sale of dry, refrigerated or frozen

24533969.7 04-Jan-05 16:22 04296777                    C-2

groceries, meat, seafood, poultry, produce, delicatessen or bakery products, refrigerated or frozen dairy products, or any grocery products normally sold in such stores or departments. "Discount department store" and/or "discount store", as those terms are used herein, shall mean a discount department store or discount store containing more than 35,000 square feet of building space used for the purpose of selling a full line of hard goods and soft goods (e.g. clothing, cards, gifts, electronics, garden supplies, furniture, lawnmowers, toys, health and beauty aids, hardware items, bath accessories and auto accessories) at a discount in a retail operation similar to that of a Wal-Mart store or a Wal-Mart SuperCenter store (but the following stores as currently operated shall not be considered "discount department stores": Belk, Dillard's, Mervyn's, Kohl's, J.C. Penney and Sears).

4.    Buildings.

4.1    Design and Construction. The Buildings constructed on the Shopping Center shall be designed so that the exterior elevation of each shall be architecturally and aesthetically compatible and so that building wall footings shall not encroach from one Tract or Outparcel onto another Tract or Outparcel except as provided for in Subsection 4.4. below. The design and construction shall be of high quality. No improvements shall be constructed, erected or expanded or altered on the Outparcels until the plans for the same (including site layout, exterior building materials and colors and parking) have been approved in writing by Developer. No building constructed on the Sam's Club Tract or the Developer Tract shall exceed 42' (including all mechanical improvements and architectural embellishments) in height above finished grade. No building constructed on the Outparcels shall exceed 24' (including all mechanical improvements and architectural embellishments) in height, as measured from the mean finished elevation of the parking area of the Shopping Center; provided, however, that architectural embellishments to a building, not extending for more than ten percent (10%) of the length of the front of such building, may extend up to a height of 28', as measured from the mean finished elevation of the parking area of the Shopping Center. No building shall have a metal exterior.

4.2    Location/Size. No building shall be constructed on the Shopping Center (as either immediate development or future expansion) except within the Building Areas. Any rooftop equipment constructed on the buildings located on the Outparcels shall be screened in a manner satisfactory to the Developer.

4.3    Fire Protection. Any building constructed in the Shopping Center shall be constructed and operated in such a manner which will preserve the sprinklered rate on the other buildings in the Shopping Center.

4.4    Easements. In the event building wall footings encroach from one Tract onto the other Tract, despite efforts to avoid that occurrence, the party onto whose Tract the footings encroach shall cooperate in granting an encroachment permit or easement to the party whose building wall footings encroach.

24533969.7 04-Jan-05 16:22 04298777          C-3

5.    Common Areas.

5.1    Grant of Easements. Each party, as grantor, hereby grants to the other party, as grantee, and to the agents, customers, invitees, licensees, tenants and employees of grantee, a nonexclusive easement over, through and around the Sam's Club Tract and the Developer Tract for roadways, walkways, ingress and egress, parking of motor vehicles, loading and unloading of commercial and other vehicles, and the use of facilities installed for the comfort and convenience of customers, invitees, licensees, tenants and employees of all businesses and occupants of the buildings constructed on the Building Areas located on the Sam's Club Tract and the Developer Tract. Sam's Club and Developer hereby grant for the benefit of the Outparcels, nonexclusive easements for vehicular and pedestrian access, ingress, and egress over and across the Sam's Club Tract and the Developer Tract; provided, however, in no event shall the owner, occupant, licensee or invitee of any of the Outparcels(s) be permitted to use the Sam's Club Tract or the Developer Tract for vehicular parking or for any other purpose other than as described above. Developer hereby grants to Sam's Club for the benefit of the Sam's Club Tract, nonexclusive easements for vehicular and pedestrian access, ingress, and egress over and across the Outparcels; provided however, in no event shall the owner, occupancy, licensee or invitee of the Sam's Club Tract be permitted to use the Outparcels for vehicular parking or for any other purpose other than as permitted pursuant to the terms of this Agreement.

5.2    Limitations on Use.

(1)    Customers.    Each party shall use reasonable efforts to ensure that customers and invitees shall not be permitted to park on the Common Areas except while shopping or transacting business in the Shopping Center.

(2)    Employees.    Each party shall use reasonable efforts to ensure that employees park on the Common Areas of said party's Tract or Outparcel.

(3)    General.    Any activity within the Common Areas other than its primary purpose of the Common Areas, which is to provide for parking for the customers, invitees and employees of those businesses conducted with the Building Areas and for the servicing and supplying of such businesses, shall be permitted so long as such activity shall not unreasonably interfere with such primary purpose. The use by Sam's Club of the Common Areas on the Sam's Club Tract for the display, sale and storage of merchandise and for the use of seasonal sales structures is expressly permitted. The use by Developer of that portion of the Common Areas of the Developer Tract labelled on Exhibit A-2 to this Agreement as "Developer's Outdoor Sales Area" for the display, sale and storage of merchandise and for the use of seasonal sale structures is expressly permitted.    Persons using the Common Areas in accordance with this Agreement shall not be charged any fee for such use.

5.3    Utility and Service Easements. Each party, as grantor, hereby establishes and grants a nonexclusive easement for the benefit of the owner of each Tract or Outparcel, on, across and under the Common Areas, to install, use, maintain and repair public utility services and distribution systems (including storm drains, sewers, utilities and other proper services necessary for the orderly development and operation of the Shopping Center, now upon or hereafter installed on, across or under the Common Areas, to the extent necessary to service such Tract or Outparcel. Both parties shall use their commercially reasonable efforts to cause the installation of such utility and service lines prior to paving of the Common Areas. No such lines, sewers, utilities or services of one party shall be installed within the Building Areas on the other party's parcel. The location of any utilities hereafter installed shall be determined by the owner of the Tract or Outparcel (the location of utilities on the Sam's Club Tract shall be determined by Sam's Club as long as it is the owner of the Sam's Club Tract) upon which such utilities are to be installed. Any such installed utility services may be relocated by the owner of a Tract or Outparcel on such owner's Tract or Outparcel, subject to compliance with applicable laws, at the expense of the owner of that Tract or Outparcel, provided that such relocation shall not interfere with, increase the cost of, or diminish utility services to any other Tract or Outparcel and, further provided, that no utilities shall be relocated on the Sam's Club Tract without the prior written consent of Sam's Club as long as it is the owner of or lessee of the Sam's Club Tract.

5.4    Water Flow. Each party, as grantor, hereby establishes and grants a nonexclusive easement for the benefit of the owner of each Tract or Outparcel to use, maintain and repair any storm water drainage system (the "Storm Drainage System") now or hereafter located on either Tract or any Outparcel, together with the right to discharge surface water runoff across portions of either Tract or any Outparcel in accordance with the design of the Storm Drainage System. Any alteration in the natural water flow which may occur as a natural consequence of normal construction activities and the existence of the party's improvements substantially as shown on Exhibit A-2 (including without limitation building and building expansion, curbs, drives and paving) shall be permitted.

6.    Development, Parking Ratios, Maintenance, and Taxes.

6.1    Development. The arrangement of the Common Areas shall not be changed in a manner inconsistent with the provisions of this Agreement.

6.2    Sam's Club Tract and Developer Tract "Parking Ratio". Developer hereby agrees that at all times there shall be independently maintained on the Developer Tract parking area sufficient to accommodate not fewer than 5.0 car spaces for each 1,000 square feet of building or buildings on such Tract. Sam's Club hereby agrees that at all times there shall be independently maintained on the Sam's Club Tract parking area sufficient to accommodate not fewer than 4.5 car spaces for each 1,000 square feet of building or buildings on such Tract.

6.3     Outparcel "Parking Ratio".  Developer agrees that at all times there shall be
independently maintained on each Outparcel parking area sufficient to
accommodate not fewer than: (i) 15 spaces for every 1,000 square feet of building
space for any restaurant or entertainment use in excess of 5,000 square feet, (the
same ratio shall be provided for a McDonald's Restaurant, notwithstanding a
building footprint of less than 5,000 square feet); or (ii) 10 spaces for every 1,000
square feet of building space for any restaurant or entertainment use less than
5,000 square feet (subject to the exception above); or (iii) 5.5 spaces per 1,000
square feet of building space for any other use.

6.4     Maintenance.

(1)     Standards.  The Outparcels shall be kept neat, orderly, planted in grass and
trimmed until improved and constructed.  Following completion of the
improvements on the Common Areas, the parties hereto shall maintain the
Common Areas in good condition and repair.  The maintenance is to
include, without limitation, the following:

(a)     Maintaining the surfaces in a level, smooth and evenly-covered
condition with the type of surfacing material originally installed or
such substitute as shall in all respects be equal in quality, use, and
durability;

(b)     Removing all papers, ice and snow, mud and sand, debris, filth and
refuse and thoroughly sweeping the area to the extent reasonably
necessary to keep the area in a clean and orderly condition;

(c)     Placing, keeping in repair and replacing any necessary appropriate
directional signs, markers and lines;

(d)     Operating, keeping in repair and replacing, where necessary, such
artificial lighting facilities as shall be reasonably required;

(e)     Maintaining all perimeter and exterior building walls including but
not limited to all retaining walls in a good condition and state of
repair;

(f)     Maintaining, mowing, weeding, trimming and watering all
landscaped areas and making such replacements of shrubs and
other landscaping as is necessary; and

(g)     Maintaining elements of the Storm Drainage System.

(2)     Expenses.  The respective owners shall pay the maintenance expense of
their Tracts or Outparcels.

(3)     By Agent.  Subject to the mutual agreement of the parties hereto, a third
party may be appointed as an agent of the parties to maintain the Common

24533969.7 04-Jan-05 16:22 0429877?                    C-6

Areas in the manner as above outlined. Said third party may receive for such agency a fee that is mutually acceptable to all parties to cover supervision, management, accounting and similar fees, which sums are to be included in the general maintenance expense paid by the respective owners of the Common Areas.

6.5     Taxes. Each of the parties hereto agrees to pay or cause to be paid, prior to delinquency, directly to the appropriate taxing authorities all real property taxes and assessments which are levied against that part of the Common Areas owned by it.

7.     Signs. No rooftop sign shall be erected on the building constructed on the Outparcels. No freestanding identification sign may be erected on the Outparcels without approval of the Developer, and in no event shall such freestanding identification sign exceed the height of the shopping center pylon sign or block the visibility of the Sam's Club Store. Notwithstanding the foregoing, there may be erected entrance-exit signs to facilitate the free flow of traffic, which entrance-exit signs shall be of a monument type, not to exceed 3'3" in height, the type and location of such signs to be approved by Developer. No sign shall be located on the Common Areas on the Sam's Club Tract and the Developer Tract except signs advertising businesses conducted thereon, of which, there shall be no more than 2 free-standing identification signs on the Common Areas on the Sam's Club Tract and 3 free-standing identification signs on the Common Areas on the Developer Tract (which free-standing identification signs may be multi-tenant pylon or monument signs). The owner of the Sam's Club Tract shall have the right to maintain sign panels in the top panel position on each side of each of the pylon or monument signs maintained by Developer on the Developer Tract (only the name of the shopping center may be above the Sam's Club panel position), which sign panels for the owner of the Sam's Club Tract shall be at least twice as large (in total square footage) as any of the other sign panels available to any other sign panel owner or user on each such pylon or monument sign on the Developer Tract (determined separately with respect to each such pylon or monument sign). No signs shall obstruct the ingress and egress shown on Exhibit A-2. **[NOTE: IF SAM'S CLUB IS ALLOWED AN "OFF PREMISES" SIGN BY THE CITY, IT WILL BE ALLOWED TO HAVE A SINGLE USER PYLON SIGN ON THE DEVELOPER TRACT ALONG THE I-35 FRONTAGE AND THIS SECTION WILL BE REVISED.]**

8.     Indemnification/Insurance.

8.1     Indemnification. Each party hereby indemnifies and saves the other party harmless from any and all liability, damage, expense, causes of action, suits, claims, or judgments arising from personal injury, death, or property damage and occurring on or from its own Tract or Outparcel, except if caused by the act or negligence of the other party hereto.

8.2     Insurance.

(1)     Each owner of any portion of the Shopping Center shall procure and maintain in full force and effect throughout the term of this Agreement general public liability insurance and property damage insurance against

the Sam's Club Tract or Developer so long as it or any affiliate has an interest as owner or lessee of the Developer Tract, shall be entitled to institute proceedings for full and adequate relief from the consequences of said breach or threatened breach. Notwithstanding the foregoing, all of the record owners of an Outparcel shall be entitled to take any action permitted by this Agreement with respect to the breach of Sections 5.1, ~~8.1(1)(b)~~ 8.1, 8.2(4) and 9.

13.    Rights of Successors.    The easements, restrictions, benefits and obligations hereunder shall create mutual benefits and servitudes running with the land. This Agreement shall bind and inure to the benefit of the parties hereto, their respective heirs, representatives, lessees, successors and assigns. The singular number includes the plural and the masculine gender includes the feminine and neuter.

14.    Document Execution, Modification and Cancellation.    It is understood and agreed that until this document is fully executed by both Developer and Sam's Club there is not and shall not be an agreement of any kind between the parties hereto upon which any commitment, undertaking or obligation can be founded. This Agreement (including exhibits) may be modified or canceled only by the mutual agreement of (a) Sam's Club as long as it or its affiliate has any interest as either owner or Lessee of the Sam's Club Tract, or its successors in interest, and (b) Developer, as long as it or its affiliate has any interest as either owner or Lessor of the Developer Tract, or its successors in interest.

15.    Non-Merger.    So long as Sam's Club or its affiliate is owner or lessee of the Sam's Club Tract, this Agreement shall not be subject to the doctrine of merger.

16.    Duration.    Unless otherwise canceled or terminated, all of the easements granted in this Agreement shall continue in perpetuity and all other rights and obligations hereof shall automatically terminate and be of no further force and effect after ninety-nine (99) years from the date hereof.

17.    Headings.    The headings herein are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this document nor in any way affect the terms and provisions hereof.

18.    Entire Agreement.    This Agreement constitutes the entire agreement between the parties hereto. The parties do not rely upon any statement, promise or representation not herein expressed, and this Agreement once executed and delivered shall not be modified or altered in any respect except by a writing executed and delivered in the same manner as required by this document.

19.    Transfer of Interests; Notices.

19.1    Transfer of Interests.    In the event that any person or entity (the "Acquiring Party") shall acquire a fee or mortgage interest in any tract subject to this Agreement, or any portion thereof, the Acquiring Party shall execute and file in the land records of Hays County, Texas, a statement setting forth the name of the Acquiring Party, the address of the Acquiring Party to which all notices for the purposes of this Agreement may be sent, the nature of the interest held by the Acquiring Party, and the date that such interest was acquired (the "Notice

Statement"). Contemporaneously with such filing, the Acquiring Party shall also send by certified mail, return receipt requested, a copy of such Notice Statement to all other persons or entities then holding fee or mortgage interests in any tract subject to this Agreement, or any portion thereof, as reflected by the Notice Statements then of record in the land records of Hays County, Texas (the "Existing Interest Holders"). Until such time as an Acquiring Party files and mails such Notice Statement in accordance with the terms of this Section 19.1, it shall not be entitled to receive any notice required or permitted to be given under this Agreement, and the Existing Interest Holders shall have no obligation to give any such notice to the Acquiring Party. Any change of address shall require the filing and mailing of a new Notice Statement. It is understood and agreed that the provisions of this Section 19.1 regarding the recordation of the Notice Statement are satisfied with respect to Developer and Sam's Club.

19.2    Notices. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be mailed by certified or registered mail, postage prepaid, or by Federal Express, Airborne Express, or similar overnight delivery service, addressed as follows:

Sam's      Sam's Real Estate Business Trust
Club:      2001 S.E. 10th Street
           Bentonville, AR 72716-0550
           Attention: President (Sam's Club Store No. 95714)

           With a copy to:
           Sam's Real Estate Business Trust
           Attention: Property Management, State of Texas
           2001 S.E. 10th Street
           Bentonville, AR 72716-0550

Developer: Texas Realty Retail Partners, Inc.
           2110 A Boca Raton Drive
           Austin, TX 78747
           Attention: Robert W. McDonald III

           With a copy to:
           Lincoln Property Company Commercial, Inc.
           3300 Lincoln Plaza, 500 N. Akard
           Dallas, TX 75201
           Attention: Mr. Robert Dozier

           With a copy to:
           Lincoln Property Company Commercial, Inc.
           100 Congress Avenue, Suite 450
           Austin, Texas 78701
           Attention: Wes Babb

With a copy to:
Jenkens & Gilchrist, P.C.
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202
Attention: William L. Sladek, Esq.

Notices shall be effective upon receipt or refusal. In the event that any person acquires a fee interest in the Shopping Center said person shall be entitled to provide a request for notice to the addressees listed above, which request, in order to be effective, must also be recorded in the county recorder's office in the county in which the Shopping Center is located. Any party shall be entitled to change its address for notice by providing notice of such change and recording a copy of the notice of such change in the county recorder's office in the county recorder's office in the county in which the Shopping Center located. Until such time as the notice of change is effective pursuant to the terms of this Section 19 and until such time as it is recorded as required above, the last address of said party shall be deemed to be the proper address of said party.

20.    Consent. The owner of the Sam's Club Tract agrees that for so long as a lease of all or a portion of the Sam's Club Tract is in effect, whenever the consent of the owner of the Sam's Club Tract is required under the Agreement, the owner of the Sam's Club Tract will give such consent only after obtaining Sam's Club's consent.

21.    Obligations of the Owner of the Sam's Club Tract. Sam's Club hereby agrees that so long as a lease of all or a portion of the Sam's Club Tract is in effect, it will satisfy the obligations of the owner of the Sam's Club Tract hereunder, and will hold harmless and indemnify the owner of the Sam's Club Tract from any and all loss, damage, expense, fees, claims, costs, and liabilities, including, but not limited to, attorneys' fees and costs of litigation, arising out of this Agreement, except for those arising out of the acts or omissions of the owner of the Sam's Club Tract or it's employees, agents, contractors or invitees.

22.    Counterparts. This Agreement may be executed in one or more counterparts each of which in the aggregate shall constitute one and the same instrument.

24533969.7 04-Jan-05 16:22 04298777          C-12

**IN WITNESS WHEREOF**, the parties have executed this Agreement the day and year first written above.

**SAM'S REAL ESTATE BUSINESS TRUST,**
a Delaware statutory trust

By:_____

Name:_____

Title:  Assistant Vice President

"Sam's Club"

**TEXAS REALTY RETAIL PARTNERS, INC.,** a Texas corporation

By:_____

Name:_____

Title:_____

"Developer"

List of Exhibits:

Exhibit A-1 – Site Plan Showing Sam's Club Tract, Developer Tract and Outparcels (current drawing attached; to be updated prior to Closing as required)

Exhibit A-2 – Site Plan Marked to Show Various Development Details (current drawing attached; to be updated prior to Closing as required)

Exhibit B  – Sam's Club Tract Legal Description (to be attached prior to Closing)

Exhibit C  – Developer Tract and Outparcels Legal Description (to be attached prior to Closing)

STATE OF ARKANSAS     §
                         §
COUNTY OF BENTON    §

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by _____, an Assistant Vice President of SAM'S REAL ESTATE BUSINESS TRUST, a Delaware statutory trust, on behalf of the statutory trust.

(Seal and Expiration Date)

_____
Notary Public

STATE OF TEXAS       §
                    §
COUNTY OF DALLAS    §

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by _____, the _____ of TEXAS REALTY RETAIL PARTNERS, INC., a Texas corporation, on behalf of the corporation.

(Seal and Expiration Date)

_____
Notary Public

24533969.7 04-Jan-05 16:22 04298777           C-14

## EXHIBIT A-1 TO ECR



**EXHIBIT A-2 TO ECR**



24533969.7  04-Jan-05 16:22  04298777

C-16