**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Jessica D. Mikhailevich
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Email:    jessica.mikhailevich@troutman.com

-and-

Kenneth A. Listwak (*pro hac vice* application pending)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 777-6500
Email:    ken.listwak@troutman.com

*Counsel for Ollie's Bargain Outlet, Inc.*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BED BATH & BEYOND INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 1157, 1360, 2695, 2696, 2697, 2698, 2704, and 2706** |

## REPLY OF OLLIE'S BARGAIN OUTLET, INC. IN SUPPORT OF THE ASSUMPTION AND ASSIGNMENT OF A CERTAIN UNEXPIRED LEASE

Ollie's Bargain Outlet, Inc. ("Ollie's") hereby submits this reply in response to the

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

*Objection of Landlord Realty Income Corporation to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Real Property Lease for Store No. 1107* [Docket No. 1360] (the "Initial Objection Objection"), *Realty Income Corporation's Supplemental Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Lease for Store No. 1107* [Docket No. 2695] (the "Objection"), the *Declaration of Matthew Macdonald in Support of Realty Income Corporation's Supplemental Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Lease for Store No. 1107* [Docket No. 2696] (the "MacDonald Declaration"), the *Declaration of Demetri Lahanas in Support of Realty Income Corporation's Supplemental Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Lease for Store No. 1107* [Docket No. 2697] (with the exhibits thereto as resubmitted at Docket No. 2704, the "Lahanas Declaration"), and the *Declaration of J. Alexandra Rhim in Support of Realty Income Corporation's Supplemental Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Lease for Store No. 1107* [Docket No. 2698] (with the exhibits thereto as resubmitted at Docket No. 2706 the "Rhim Declaration" and, together with the MacDonald Declaration and the Lahanas Declaration, the "Declarations"),[2] and in support of the assumption and assignment of the Lease to Store No. 1107 to Ollie's, as set forth in the Assignment Notice.  In support of its reply, Ollie's submits the *Declaration of Robert Helm in Support of the Assumption and Assignment of*

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Initial Objection, the Objection, and the Lease, as applicable.  Unless otherwise specified, the documents cited to herein are attached as Exhibits to the Lahanas Declaration as resubmitted at Docket No. 2704, or the Rhim Declaration, as resubmitted at Docket No. 2706, and are referred to in the same manner as in the Objection.

*a Certain Unexpired Lease* (the "<u>Helm Declaration</u>") filed concurrently herewith and respectfully states as follows:

### <u>PRELIMINARY STATEMENT</u>[3]

Landlord's Objection is premised on an inaccurate mischaracterizations of Ollie's business model, a cavalier misreading of the Lease and other key documents, and a blatant misapplication of the Bankruptcy Code.  Throughout the Objection, Landlord cherry picks quotes from Ollie's 10-K Filing and website to give the Court the incorrect impression that Ollie's operates a liquidation store, a surplus store, or a second-hand thrift store, in violation of the Lease and various applicable use restrictions from co-tenant leases or OEAs.  This is not so.  Ollie's sells closeout merchandise, overstocked inventory, and remanufactured or refurbished goods.  In the retail industry, these terms of art are fully distinct from "liquidation", "surplus", "second-hand", "used", and "thrift", yet Landlord insists on ignoring these critical distinctions in an effort to shoehorn Ollie's business model into inapplicable use restrictions.

Landlord also glosses over the finer details of the Lease and other governing documents, because even a cursory reading of many of the provisions Landlord claims an assignment to Ollie's would violate are plainly inapplicable by their own terms.  Landlord ignores incidental use thresholds, language that specifies when a side letter governs over a default lease provision, limitations on applying later-negotiated use restrictions on previously-existing leases, and key defined terms.  These details matter.  When one takes a careful look at the terms of the Lease,

---

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to them elsewhere in this reply.

MOLs and OEAs, it becomes clear that many of Landlord's alleged violations simply do not comport with plain language of these documents.

Finally, Landlord misapplies section 365(b)(3) of the Bankruptcy Code in an effort to block assumption of the Lease to Ollie's and, in doing so, fully ignores the previous holdings of **this Court, in this chapter 11 case, on the same issues presented in this Objection**. As is described in detail below, Landlord seeks to leverage section 365(b)(3)(C) to retroactively impose later-negotiated use restrictions onto the previously-existing Lease. This Court has flatly rejected this approach. Landlord fails to meet its burden to show that Ollie's would violate any intended tenant mix imposed by the Lease—instead Landlord throws around unsubstantiated claims of diminished patronage and cannibalization among tenants. This Court has made clear that the subject lease is the focus of establishing tenant mix. Finally, Landlord uses a tortured reading of section 365(b)(3)(B) to argue that a decline in "any percentage rent due under such lease" to be assigned somehow means a decrease in rent income to the Landlord across co-tenant leases. No plausible reading of the statute can lead to this result. Even if it could—and even if harm to the Landlord was a factor in the analysis, which it is not—Landlord's claims of harm are fully speculative and based on documents Landlord has not shared with Ollie's or this Court.

Ollie's is ready, willing, and able to perform under the Lease and has provided adequate assurance that it will do so. When one views this assignment in light of Ollie's actual business model, the actual terms of the Lease and governing documents, and the actual analysis required under section 365(b)(3), it is evident that assignment to Ollie's is proper and that the Objection should be overruled.

4

## **BACKGROUND**

1.      On June 22, 2023, pursuant to the *Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 422] (the "Lease Sale Procedures Order"), Ollie's submitted a Qualified Bid (as defined in the Lease Sale Procedures Order) for the Lease to Store No. 1107.   In accordance with the Lease Sale Procedures Order, Ollie's submitted along with its bid, information concerning adequate assurance, which included a copy of Form 10-Q of Ollie's Bargain Outlet Holdings, Inc. (the "Public Company"), Ollie's publicly traded parent company, a hyperlink to the Public Company's From 10-K for the fiscal year ending January 28, 2023, and information regarding Ollie's retail operations.

2.      On June 27, 2023, the Debtors filed the *Notice of Successful and Backup Bidder with Respect to the Phase 1 Auction of Certain of the Debtors' Lease Assets and Assumption and Assignment of Certain Unexpired Lease* [Docket No. 1114] (the "Notice of Successful Bidder"). The Notice of Successful Bidder identified Ollie's as the successful bidder for the Lease to Store No. 1107 and stated that the deadline to object to the assumption and assignment of the Lease to Ollie's was July 11, 2023 at 5:00 p.m. (ET).

3.      On July 14, 2023, the Landlord filed the Initial Objection.

4.      On July 18, 2023, the Court held a hearing and adjourned the Initial Objection to a later date to be determined, to afford the parties time to work to consensually resolve the Initial Objection.  Despite Ollie's best efforts, the parties were unable to fully resolve Landlord's Initial Objection and the parties agreed to continue the hearing with respect to the proposed assignment of the Lease to November 29, 2023.

5

5.      On November 15, 2023, the Landlord filed the Objection and Declarations in support thereof.

6.      Upon information and belief, the issues raised in the Landlord's Initial Objection with respect to adequate assurance and cure have been resolved and the only issues that remain are those asserted in the Objection.

## OLLIE'S BUSINESS MODEL

7.      Ollie's prides itself on providing its customers incredible deals and steep discounts—it does so by offering mainly closeout merchandise and some overstock inventory, which are both terms of art in the retail industry.  Helm Declaration at ¶ 11.  Closeout merchandise consists of goods that are no longer made by the manufacturer or no longer sold by their intended retailers; overstock inventory consist of those goods that a manufacturer still has on hand after their intended buyers have purchased their contractually required allotments.  *Id.*  Viewed out of appropriate context, this may make Ollie's appear similar to  a "surplus" or "liquidation" store, when viewing these terms of art with the appropriate nuance and in the context of the industry, it becomes clear that these are very distinct concepts.  *Id.*  Surplus stores, in the retail world, are stores that sell government, industrial, and/or military surplus—not consumer goods.  *Id.*  Ollie's does not sell this type of merchandise.  Liquidation outlets are establishments such as auction houses, brokering the sale of merchandise that is being liquidated.  *Id.*  Ollie's does not liquidate retailer or manufacturer products—other entities, such as brokers or financial institutions undertake this work and Ollie's, from time to time, purchases certain of that inventory from those liquidators.  *Id.*  These goods are then sold alongside closeout, private label, and other products, often on the same shelf and without distinction.  *Id*.  Ollie's customers do not partake in an auction or liquidation process, like customers of an auction house or brokerage do.  Further, Ollie's does

6

not conduct any "going out of business" sales, fire sales, or anything similar in its 510 stores in 30 states. *Id.* In short, to the extent that any of Ollie's inventory could be considered "liquidated", any actual liquidation occurred further up in the supply chain and far removed from Ollie's locations and customers. *Id.*

8.      Ollie's also offers remanufactured and refurbished goods. *Id.* at ¶ 12. These too are terms of art in the retail industry. *Id.* While it may be tempting to conflate these goods for "second hand" or "used" goods that are sold in a thrift store, nothing could be further from the truth. Remanufactured goods come directly from a manufacturer and are sold in first class, unused condition—the merchandise has simply been returned to the manufacturer for recertification, repair if necessary, testing, and repackaging before selling to the end consumer. *Id.* This is starkly different from used or second-hand goods, which had been previously owed by an end consumer, used by an end consumer, and then resold to a thrift retailer. *Id.* Ollie's does not sell these types of goods, as opposed to, for example, Goodwill, the Salvation Army, Savers, or Plato's Closet. *Id.*

9.      Notably, the word "surplus" does not appear once in the entire 10-K Filing and there are absolutely no references therein to Ollie's business model in connection with liquidation sales, second-hand goods, used goods, or operation of a thrift store. *Id.* at ¶13. If Ollie's operated its business—even at a *de minimis* level—in any of these arenas, certainly at least a single reference would have to be made to such operations in its 10-K filing with the SEC. *Id.* Yet none appear, and it is no mystery as to why—Ollie's is **not** a liquidation, surplus, or second-hand retailer.

10.      Due to its business model, Ollie's product mix on a SKU level varies more than a typical retailer. *Id.* at ¶ 14. However, from a broader product category perspective, Ollie's stock is consistent. *Id.* Ollie's does not specialize in any of the niches that the co-tenants in the Shopping Center are known for and no fluctuation in Ollie's stock would conceivably push Ollie's into any

of those niche categories. *Id.* For example, Ollie's sells a *de minimis* amount of tools—whether the same electric drills were available week-to-week may change, but no variation in Ollie's typical stock would ever dramatically change the floor space dedicated to tools so as to make Ollie's a hardware or home improvement store. *Id.* As discussed below, Ollie's never comes close to exceeding the incidental use thresholds in applicable co-tenant exclusives. *Id.* This is unsurprising, as Ollie's is currently a co-tenant with the other retailers in various locations across the U.S.[4] *Id.* If anything, given that home goods was the leading product category in net sales for Ollie's past three fiscal years, Ollie's is a natural replacement for Bed Bath & Beyond within the shopping center. *Id.*; 10-K Filing at 5. Attached to the Helm Declaration as Exhibits A and B are diagrams setting out the layout of Ollie's stores located in Denton, TX, and Dodge City, KS, respectively (the "Store Layout Diagrams"). These Store Layout Diagrams show, among other items, the way Ollie's lays out its prototypical stores and are a reasonable approximation of how Ollie's would lay out Store No. 1107. *Id.* The Store Layout Diagrams show the percentage of floor space dedicated to each category of merchandise sold—none of these crosses any of the incidental use threshold appliable to the Lease and these boundaries within the stores do not change. *Id.*

11.    Finally, while Ollie's does have "semi-lovely" and functional stores, its stores are not dirty, low class, chaotic, or unsafe. Helm Declaration at ¶ 15. Indeed, while Ollie's may not have especially elegant décor in its stores—not unlike Bed Bath & Beyond, the prior tenant of Store No. 1107—Ollie's business model is predicated on drawing consumers through a welcoming and safe environment. *Id.* Indeed, Ollie's offers its customers a "unique, fun and engaging treasure hunt shopping experience" (*see* 10-K filing at p. 1), not unlike Bed Bath & Beyond's shopping

---

[4] Ollie's is a co-tenant of Marshalls in 11 locations, Lowe's in 9 locations, PETsMART in 8 locations, Best Buy in 5 locations, and Sam's Club in 4 locations. *Id.*

experience that drew in customers "ever searching for that perfect 'treasure'" (*see* First Day Declaration (defined below), at ¶ 14). Helm Declaration at ¶ 15. Ollie's products are consistent with a first class shopping center, as Ollie's offers well-regarded, recognizable brand name merchandise—the quality of its offerings is crucially important to Ollie's business model. *Id.* Ollie's prides itself on being a model tenant and resides in many "first class" shopping centers across the country. *Id.*

## **REPLY**

### I.    **Ollie's Proposed Use of Store No. 1107 Does Not Violate the Lease**

12.    The permitted uses under the Lease are extremely broad and Ollie's proposed use of Store No. 1107 fits well within this wide ambit. Section 1.1.27 of the Lease permits Store No. 1107 to be used for, among other things, "any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1…" Lease at § 1.1.27. Ollie's proposed use—the operation of a typical Ollie's store—is certainly lawful and no portion of Ollie's proposed use violates Section 13.1.1. Helm Declaration at ¶ 20. In the Objection, Landlord badly mischaracterizes Ollie's business model, quoting from Ollie's website and SEC filings without regard for the actual industry-appropriate definition of key words (*e.g.*, wrongly equating "closeout" for "liquidation" and "refurbished" for "second hand"). Yet as is made clear in the Helm Declaration and as argued below, Ollie's proposed use of Store No. 1107—when viewed through the lens of its ***actual*** business model—in no way violates the use restrictions or exclusives set out in the Lease, nor the use restrictions contained in other documents and made applicable to Store No. 1107 through the Lease. Accordingly, the Objection should be overruled, and the Court should approve assumption and assignment of the Lease to Ollie's.

9

### A. Ollie's Does Not Violate Any Use Restrictions Set Forth in the Lease

13.      Landlord wrongly alleges that Ollie's would violate a number of the Lease's use restrictions. Yet Ollie's proposed use of Store No. 1107 is fully compliant with the Lease. There simply are no violations.

14.      Article 13 of the Lease governs use restrictions and exclusives. Specifically, Section 13.1.1 provides that "Tenant shall not use the Premises for any of the 'Prohibited Uses' (defined in Exhibit M hereto annexed) or the 'Existing Exclusives' (hereinafter defined in Subsection 13.3.1), to the extent then applicable." Lease at § 13.1.1. Turning to Exhibit M of the Lease, Ollie's proposed use of Store No. 1107 does not involve any of the uses listed therein. *See* Helm Declaration at ¶ 20.

15.      Landlord has claimed that Ollie's would violate the Lease's use restriction because it operates a "second hand" store or "surplus" store. *See* Lease at Ex. M, Item 3. Ollie's does not operate either type of store. Ollie's is in the business of operating retail stores with an emphasis on closeout merchandise. *See* Helm Declaration at ¶ 21. Closeout merchandise includes products that are no longer manufactured or sold by the retailer for whom the merchandise was originally produced. *Id.* This is distinct from a surplus store, which is a term of art in retail referring to stores such as a government, army, or navy surplus store that sources all of its stock in this manner. *Id.* Even if some portion of Ollie's merchandise could be deemed "surplus" (which Ollie's contends is not the case), carry some small portion of "surplus" goods would not make Ollie's a "surplus store" any more than the Ollie's *de minimis* candy sales make it a candy store—Ollie's primary focus is on closeout goods.

16.      Likewise, Ollie's does not sell "second hand" merchandise, *i.e.* goods that have been sold to a retailer by a consumer for future sale to another consumer. *Id.* Ollie's does sell

10

some *refurbished* or *remanufactured* goods, which are distinct in the retail industry from "second hand" goods. *Id.* Indeed, refurbished or remanufactured goods come directly from a manufacturer and are sold in first class condition—the merchandise has simply been returned to the manufacturer for recertification, repair if necessary, testing, and repackaging, before selling to the end consumer. *Id.* This is in stark contrast to "second hand" goods, like those available at stores such as Goodwill, the Salvation Army, Savers, or Plato's Closet, which have been purchased directly from the consumer and placed on a shelf for resale. *Id.*

17.     Landlord also implies (though never directly states) that Ollie's violates the Lease's use restriction by operating a supermarket. *See* Objection at Factual Background ¶ 23; Lease at Ex. M, Item 27. The Lease does not define the term "supermarket." However, by any industry-standard or common sense definition of the term, Ollie's is far from a supermarket—a store that offers a wide selection of foods, beverages, and ingredients as its primary product offerings. *See* Helm Declaration at ¶ 22. While Ollie's does sell some food items, in Ollie's 2022 fiscal year "Consumables"—which includes health and beauty aids, candy, and pet food, in addition to packaged food—made up less than 25% of the company's net sales. *See* 10-K Filing at p. 4. Likewise, Ollie's only sells shelf stable, non-perishable food items, has no fresh, refrigerated, or frozen food offerings, and devotes ***at most***, 2,000 square feet (a low percentage of typical store size) of its stores to selling these limited food offerings. Helm Declaration at ¶ 22. No supermarket could possibly operate successfully under such practices, with less than 25% of its net sales attributable to food. Accordingly, Ollie's proposed use does not violate any use restrictions set forth in Exhibit M to the Lease.

160103801v6

i.  Landlord's Obligations to Its Tenant to Maintain a "First-Class" Shopping Center under the Lease Do Not Impose an Obligation on Ollie's Nor Is Ollie's Proposed Use Inconsistent with a "First-Class" Shopping Center

18.    The Landlord argues that Ollie's proposed use would violate the provision of Section 13.1.2 that states: "Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located." Lease at § 13.1.2; Objection at Factual Background ¶¶ 2, 11, and 30. However, Landlord's argument misses the mark—in the context of the Lease, this is an obligation *of the Landlord to the Tenant*, and *not* an obligation of the Tenant (or Ollie's as assignee) to the Landlord. Thus, Ollie's cannot violate this provision as it imposes no obligations on Ollie's.[5]

19.    Further, even under Landlord's backwards interpretation of this provision, Ollie's proposed use is entirely consistent with the current co-tenants in the "first-class" Shopping Center maintained by Landlord. Landlord argues that the nature of Ollie's stores are inconsistent with a "first-class" shopping center. Ollie's openly markets itself as a retailer that offers customers low prices in its "semi-lovely" stores—nothing about Ollie's business model would render its operations "low-class" or out of place in the Shopping Center. *See* Helm Declaration at ¶ 23. Ollie's stores are clean, safe, and reasonably aesthetically pleasing. *Id*. Further, Ollie's stores

---

[5] Landlord tries to confuse the issue by citing to various irrelevant use restrictions from Lease Exhibit M—Item 14 (prohibiting "Pornographic Use" and limiting bookstores to those in "first-class" shopping centers; Ollie's would never run afoul of this restriction, nor is it a bookstore), Item 28 (prohibiting certain office space, except for that ancillary to a retail operation or that typical of a "first-class" shopping center; Ollie's does not operate office space apart from that incidental to its retail operations), and Section 35 (prohibiting restaurants except for those found in "first-class" shopping centers; Ollie's is not a restaurant). *See* Objection at Factual Background ¶ 30. If anything, this litany of non-applicable use restrictions demonstrates that Landlord's obligation to the Tenant to maintain a "first-class" shopping center is affected through its enforcement of the use restrictions in Exhibit M to the Lease, which Ollie's proposed use does not violate.

offer first class, name brand products.  Ollie's is located in "first-class" shopping centers across

the country.  *Id.*

20.    Further, given that the Lease has no definition of "first-class", a look at Landlord's

other tenants and prior tenant Bed Bath and Beyond, whose operations are presumably consistent

with a "first-class" shopping center, is illuminating.  The current tenant mix of the Shopping Center

includes Ross, Marshalls, and Dollar Tree—all retailers with marketing practices predicated on

low price offerings or discounts.  *Id.*  Thus, Ollie's bargain-focused business model would hardly

be out of place among its would-be co-tenants.  Indeed, Ollie's store layout and marketing practices

are no more "low-class" than the tenant it seeks to replace—Bed Bath & Beyond:

> Bed Bath & Beyond became well known for its then-unique store philosophy of
> **"pile it high, let it fly," with product stocked floor to ceiling throughout its
> stores**; consumers flocked to its stores, **never knowing what they may come
> across during their expedition through the store's isles, ever-searching for that
> perfect "treasure."** Bed Bath & Beyond's philosophy focused on getting
> customers physically into their stores to drive sales and revenue, even creating what
> has been heralded as **one of the greatest retail coupons of all time**. This strategy
> led to financial success and propelled Bed Bath & Beyond to become one of the
> first superstores in the United States.

*Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath*

*& Beyond Inc., in Support the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No.

10] (the "<u>First Day Declaration</u>"), at ¶ 14 (describing Bed Bath & Beyond's brick-and-mortar retail

business model) (emphasis added).  Accordingly, even if section 13.1.2 of the Lease imposed an

obligation on Ollie's as a would-be tenant (it does not), Ollie's propose use is not in violation of

the Lease.

13

**B. Ollie's Does Not Violate Any Exclusives Set Forth in the Lease**

21.    Just as Ollie's proposed use of Store No. 1107 is fully compliant with any use restrictions set out in the Lease, such use also does not run afoul of any exclusives made applicable to Store No. 1107 through the Lease.  Section 13.3.1 of the Lease provides:

> Tenant shall honor certain exclusives and certain prohibited uses granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date . . . and shall not sublease, occupy or use any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusives.

Lease at § 13.3.1.

22.    The "Existing Exclusives" are set forth in Exhibit K-1 to the Lease and, importantly, the Lease specifically provides that "Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto" and further provides that "[e]xcept as expressly set forth in this Section 13.3, **Tenant shall not be obliged to honor any exclusive granted by Landlord to any tenant in the Shopping Center**."  *See id*., at §§ 13.3.1 and 13.3.3 (emphasis added).    Exhibit K-1, in turn, lists Existing Exclusives in favor of PETsMART and Marshalls—the only exclusives applicable to Store No. 1107 under the terms of the Lease.  *See id.*, at Ex. K-1.  Ollie's proposed use of Store No. 1107 is fully compliant with both Existing Exclusives.

a.    Ollie's Does Not Violate the PETsMART Exclusive or Related MOL

23.    Landlord incorrectly claims that Ollie's proposed use would violate section (b) of the PETsMART exclusive provision because it lists as "Prohibited Uses" the operation of a "used clothing or thrift store or liquidation outlet."  *See id*. at Sec. 1(b); PETsMART MOL.[6]  Ollie's

---

[6] Landlord separately claims that Ollie's proposed used violates the PetsMart Lease.  Landlord has provided no evidence whatsoever as to the terms of the PetsMart Lease independent of what is contained in Exhibit K-1 to the Lease to Store No. 1107 or the PetsMart MOL.  As a Tenant under the Lease would have had no notice of provisions in the PetsMart Lease apart from through in Exhibit K-1 to the Lease to Store No. 1107 or the PetsMart MOL, to the

operates a ***closeout*** retail business, which is wholly different from any of the prohibited uses in the PETsMART exclusive.  *See* Helm Declaration, at ¶ 25.  As discussed above, Ollie's does not sell "second hand"—or, as stated in the PETsMART exclusive, "used" or "thrift"—goods.  *Id*.  Ollie's operations consist of the sale of new merchandise, with a focus on closeout goods.  Any refurbished or remanufactured goods are not "used" or "thrift" goods for the reasons explained herein and represent a *de minimis* portion of products offered in Ollie's stores.  *Id*.  Likewise, Ollie's does not operate a "liquidation" store, as its business model is not like that of an auction house or broker, liquidating a retailer or manufacturer's inventory.  *Id.*  As noted above, Ollie's does not conduct any "going out of business" sales or fire sales.  To the extent any of Ollie's merchandise is involved in a liquidation process in any sense, any such liquidation was conducted by *other* actors further up the supply chain, well removed from Ollie's stores and customers.  *Id*.

24.     Further, Ollie's proposed use of Store No. 1107 does not encroach on the "Tenant's Primary Business" (as defined in the PETsMART exclusive)—while Ollie's does sell some pet food and accessories, it falls well under the "incidental" use threshold, as Ollie's devotes far less than 1,000 square feet or 5% of the sales area of its stores to such goods.  *See* Lease at Ex. K-1, Sec. 1(a); Helm Declaration at ¶ 26.  Ollie's does not sell pets, provide animal services of any kind, or otherwise engage in any other portions of the "Tenant's Primary Use."  *Id*.  For these reasons, Ollie's does not violate the PETsMART exclusive.

b.  <u>Ollie's Does Not Violate the Marshalls Exclusive, the Marshalls Letter Agreement, or the Marshalls MOL</u>

25.     Ollie's proposed use does not violate any portion of the Marshalls exclusive, made applicable through the Lease, the July 18, 2005 letter agreement between Bed Bath & Beyond and

---

extent there are any differences in the use restriction language in the PetsMart Lease, Ollie's should not be bound by such differing language.

160103801v6

Marshalls, attached to the Estoppel Certificate and as Exhibit N to the Lease (the "Marshalls Letter Agreement"), or the Marshalls MOL, despite the Landlord's claims to the contrary.

    a. *It is Physically Impossible for Ollie's to Violate the 25,000 Square Foot Cap on Protected Merchandise.*

26.    Landlord wrongly alleges that Ollie's would violate the provisions of the Marshalls exclusive contained in the Lease, the Marshalls MOL, and the Marshalls Letter Agreement that prohibit a tenant from using 25,000 square feet or more of Store No. 1107 for the purposes of selling or displaying off-price apparel and accessories.  The Marshalls Letter Agreement provides, in relevant part, that neither **Bed Bath & Beyond**, nor any **assignee of the Lease**, "shall use, occupy or devote more than 25,000 square feet of floor area in the BBB Premises for the sale or display of off-price apparel and related products."  Marshalls Letter Agreement at ¶ 2.  Meanwhile, section (a) of the Marshalls exclusive and section 6(B) of the Marshalls MOL contain the same restriction and each provide that "no **other premises** in Landlord's Parcel shall at any time contain more than twenty five thousand (25,000) square feet of floor area . . . used or occupied for, or devoted to, the sale or display of off-price apparel and related accessories."  Lease at Ex. K-1, Sec. 2(a); Marshalls MOL at ¶ 6(a)(emphasis added).[7]

27.    It is ***physically impossible*** for Ollie's proposed use of Store No. 1107 to violate this provision—Store No. 1107 has only 23,000 square feet in total floor area, so even if 100% of the store were dedicated to selling off-price apparel and related accessories ("Protected Merchandise"), Ollie's use would be compliant.  *See* Helm Declaration at ¶ 28; Lease at § 1.1.28.

---

[7] Landlord separately claims that Ollie's proposed used violates the Marshalls Lease.  Landlord has provided no evidence whatsoever as to the terms of the Marshalls Lease independent of what is contained in Exhibit K-1 to the Lease to Store No. 1107 or the Marshalls MOL.  As a Tenant under the Lease would have had no notice of provisions in the Marshalls Lease apart from through in Exhibit K-1 to the Lease to Store No. 1107 or the Marshalls MOL, to the extent there are any differences in the use restriction language in the Marshalls Lease, Ollie's should not be bound by such differing language.

However, far from utilizing a full 23,000 square feet for the sale of off-price apparel and accessories, apparel and accessories account, at most, for a *de minimis* portion of Ollie's stores at approximately under 2% of square footage.  Helm Declaration at ¶ 28.

28.      In an attempt to evade the bright-line cutoff for this use restriction and shoehorn Ollie's proposed use of Store No. 1107 into its scope, Landlord misreads the 25,000 square foot per premises threshold as an aggregate Shopping Center-wide limit.  *See* Objection at Factual Background ¶ 27 (implying an aggregate limit by stating Store No. 1107's 23,000 square feet must be considered in conjunction with Dollar Tree's 8,000 square foot premises).  This is wholly at odds with the plain language of the Marshalls Letter Agreement, which specifically applies the 25,000 square foot limit to "the BBB Premises", which is defined as "all or any portion of the premises demised to BBB under the BBB Lease [*i.e.*, the Lease]."  Marshalls Letter Agreement at ¶ 2.  The Marshalls Letter Agreement makes crystal clear that the 25,000 square foot limitation applies to Store No. 1107, not to the entire Shopping Center.

29.      Even if the Marshalls exclusive and the Marshalls MOL provided for an aggregate Shopping Center-wide cap (which they do not), the Marshalls Letter Agreement governs over both the Marshalls exclusive in the Lease and the Marshalls MOL.  Section 13.3.1 of the Lease, which makes the Existing Exclusives (including the Marshalls exclusive) applicable to Tenant, specifically provides that "Tenant shall be entitled to enter into a separate agreement with tenant or other occupant for whose benefit the Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises" and Section 13.2.1 explicitly acknowledges the Marshalls Letter Agreement as an exhibit to and part of the Lease.  Lease at §§ 13.2.1 and 13.3.1.  In the Marshalls Letter Agreement, Marshalls and Bed Bath & Beyond agreed that "[n]otwithstanding the 'exclusive use' provisions contained or to be contained in the

respective leases of premises to BBB . . . order [Marshalls]" the only use restriction were those set out in the letter. Thus, Marshalls—the party for whose benefit the Marshalls exclusive and use restrictions exists—plainly views the 25,000 square foot limit as applicable to the confines of Store No. 1107, in diametric opposition to Landlord's tortured reading of the limit as an aggregate cap. Under the plain language of the Lease, this version of the use restriction governs.

30.     Even ignoring the Marshalls Letter Agreement, the Marshalls exclusive and the Marshalls MOL do not provide for an aggregate cap. The language in both the Marshalls MOL and the Marshalls exclusive clearly do not provide for a 25,000 square foot Shopping Center-wide limit. Both documents specifically state that "no other premises in Landlord's Parcel shall at any time contain" more than 25,000 square feet of floors space for the sale or display of Protected Merchandise. Lease at Ex. K-1, Sec. 2(b); Marshalls MOL at ¶ 6(b). The language is clear that the 25,000 square foot limit applies to any individual premises (*i.e.*, store) within Landlord's Parcel (*i.e.*, the Shopping Center). Indeed, the subject of the verb "contain" is "**other premises**"—had the limit meant to be Shopping Center-wide, it would be drafted such that the **Landlord's Parcel** could not "contain" more than 25,000 square feet of floor space devoted to Protected Merchandise. Comparing this language with the 10,000 square foot aggregate limit on certain office space across the Shopping Center—"…Professional Offices and Serviced Oriented Uses shall not exceed 10,000 square feet **in the aggregate**"—it is clear that Landlord and Marshalls knew how to draft an aggregate square footage limit and did not intend to make the 25,000 square foot use restriction limit an aggregate cap. Lease at Ex. K-1, Sec. 2(a); Marshalls MOL at ¶ 6(a).

31.     Even if the Court is inclined to accept the Landlord's misreading, Landlord does not and cannot show that Ollie's proposed use of Store No. 1107 would violate an aggregate cap of 25,000 square feet dedicated to Protected Merchandise. Landlord has provided absolutely no

evidence as to the allocation of Dollar Tree's floor space with respect to Protected Merchandise. Yet even making the heroic (and almost certainly incorrect) assumption that **all 8,000 square feet** of Dollar Tree's floor space is dedicated to off price apparel and related accessories, Ollie's would still have 17,000 square feet to use for Protected Merchandise. Yet Ollie's allocates, at most, around 2% of its stores' floor space—here, at most, 2,300 square feet—for off price apparel and related accessories. Accordingly, even Landlord's perversion of the language in the Marshalls exclusive and Marshalls MOL does not lead to a use violation by Ollie's.

   b. *Ollie's Does Not Sell Used or Second Hand Goods*

32.    The Landlord also mistakenly claims that Ollie's would violate the Marshalls exclusive and the Marshalls MOL because it prohibits the sale of "used" or "second hand" goods. *See* Lease at Ex. K-1, Sec. 2(b); Marshalls MOL at ¶ 6(a). It bears repeating—Ollie's does **not** sell used or second hand goods, but rather, exclusively sells new merchandise with a focus on closeout inventory. Helm Declaration at ¶ 29. Refurbished or remanufactured goods are sold directly from the manufacture in first-class condition and are not used. *Id.* For these reasons, more fully articulated above, Ollie's does not violate this portion of the Marshalls exclusive or the Marshalls MOL.

## C. Ollie's Does Not Violate Any of the OEA's Made Applicable through the Lease

33.    Section 12.5.2 of the Lease requires the Tenant to adhere to certain operation and easement agreements—Ollie's proposed use of Store No. 1107 is compliant with all of them. Nonetheless, Landlord wrongly asserts that Ollie's would violate the terms of the Sam's OEA and the Lowe's OEA.

i.    Ollie's Does Not Violate the Sam's OEA

34.    Landlord asserts that Ollie's proposed use of Store No. 1107 would violate section 3 of the Sam's OEA, which prohibits operation of, among other things, "a discount department store or other discount store", a "variety, general or 'dollar' store", and a "grocery store or supermarket." *See* Sam's OEA, Sec. 3.  Landlord wrongly contends that "Ollie's operates as this type of prohibited store model and sells the sale of such items [sic]" and thus violates the Sam's OEA.  Objection at Legal Argument ¶ 8.  Yet a cursory reading of the definitions of the relevant terms in section 3 of the Sam's OEA and an understanding of Ollie's actual business model leads to the opposite conclusion.  Ollie's proposed use of Store No. 1107 is fully compliant.

35.    While Ollie's business model is predicated on providing discounted goods to its customers, section 3 of the Sam's OEA defines "discount department store" and "discount store", in relevant part, as "a discount department store or discount store containing more than 35,000 square feet of building space used for the purpose of selling a full line of hard goods and soft goods . . . at a discount retail operation similar to that of a Wal-Mart store or a Wal-Mart SuperCenter store." *Id*.  Given that Store No. 1107 has only 23,000 square feet of floor space (and 1,000 square feet of office space), it is **physically impossible** for Ollie's to violate this provision of the Sam's OEA.  *See* Helm Declaration at ¶ 32; Lease at § 1.1.28.

36.    Although the Sam's OEA does not define "variety, general or 'dollar'" store, based on accepted definitions of those terms in the retail industry, Ollie's does not operate such stores. Helm Declaration at ¶ 33.  Indeed, all three stores are single price point or low price point stores, typified by offerings that do not exceed a certain low-dollar threshold.  *Id*.  In contrast, the product offerings at Ollie's, while discounted from their original MSRP, can exceed several hundred dollars, and the average price point at an Ollie's store is high single digits.  *Id*. Accordingly, Ollie's

is not a variety, general, or dollar store and its proposed use of Store No. 1107 does not violate this provision of the Sam's OEA.  *Id*.

37.    Landlord incorrectly concludes that because Ollie's sells any amount of food items, it is therefore a grocery store or a supermarket.  The Sam's OEA defines "grocery store" and "supermarket" to mean "a food store or a food department containing more than 10,000 square feet of building space used for the purpose of selling food for off premises consumption, which shall include but not be limited to the sale of dry, refrigerated or frozen groceries, meat, seafood, poultry, produce, delicatessen or bakery products, refrigerated or frozen dairy products, or any grocery products normally sold in such stores or departments."  Sam's OEA, Sec. 3.  As noted above, Ollie's devotes ***at most*** 2,000 square feet of its stores to food sales and does not sell any fresh, refrigerated, or frozen foods; and less than 25% of Ollie's revenue in fiscal year 2022 derived from its consumables business (which includes much more than just food items).  Simply put, Ollie's is not a grocery store or supermarket and does not violate the Sam's OEA.

ii.    Ollie's Does Not Violate the Lowe's OEA

38.    As with the Sam's OEA, the Landlord eschews a careful reading of the Lowe's OEA to arrive at a conclusion that Ollie's proposed use of Store No. 1107 would violate the Lowe's OEA.  Yet this is not so.  The Landlord contends that the Lowe's OEA prohibits "the sale of retail home improvement building materials."  Objection at Legal Argument ¶ 8.  The ***actual*** language specifying what uses Lowe's OEA prohibits is below:

a)    A hardware store containing more than 9,000 square feet of leasable floor area.

b)    An appliance and/or home electronics store containing more than 5,000 square feet of leasable floor area, except that this restriction shall not apply to a "Best Buy" or "Circuit City" or other merchandiser of similar size and reputation as the same are operated and typically stocked as of the date hereof;

21

    c)   A lawn and garden store containing more than 3,000 square feet of leasable floor area;

    d)   A paint and/or décor center containing more than 5,000 square feet of leasable floor area; or

    e)   A retail and/or warehouse home improvement center, lumber yard, building materials supply center, substantially similar to that now operated by Lowe's, Home Depot, Home Owner's Warehouse, Home Quarters, Hechinger's, Builders Square, 84 Lumber, Wickes, Hughes Lumber, McCoys, Sutherlands and Payless Cashways.

*See* Loew's OEA at 3.6 (a)-(e)

39.     Yet again, Landlord jumps to the conclusion that because Ollie's sells the type of merchandise listed in a use restriction **in any quantity**, Ollie's has run afoul of such restriction. Ollie's does not violate Section 3.6(a) as it is, in no way, a hardware store—Ollie's sells some tools, but dedicates under 100 square feet to such sales in its stores.  Helm Declaration at ¶ 36.  For sections 3.6(b)-(d), Ollie's is well under the threshold to be in violation of these use restrictions With respect to section 3.6(b), while Ollie's sells some small appliances and home electronics, it dedicates well under 5,000 square feet of its stores to selling such items and cannot reasonably be considered an appliance store or home electronics store, any more than it could be considered a candy store because it sells an incidental amount of candy.  *Id*.  Along the same lines as to section 3.6(c), Ollie's sells some items found in a home and garden store, but uses far fewer than 3,000 square feet in its stores for such sales and is not a home and garden store.  *Id*.  Likewise with respect to section 3.6(d), Ollie's sells some paint and some limited home décor, such as wall hangings, but again, the floor space used in Ollie's store for these items is far below 5,000 square feet.  *Id.*  Simply because Ollie's sells some limited paint and home décor products, it is not, by nature, a paint or décor center.  *Id*.  Finally, with respect to section 3.6(e), as noted above Landlord incorrectly argues that this provision "prohibits the sale of retail home improvement building

materials" (Objection at Legal Argument ¶ 8)—yet the plain language of this provision prohibits operation of "a retail and/or warehouse home improvement center, lumber yard, building materials supply center, substantially similar to that now operated by Lowe's" and certain of Lowe's competitors.    While Ollie's sells some limited home improvement items, it is not a home improvement center, lumber yard, or building materials supply center (again, no more than it is a candy store for selling incidental amounts of candy) and its business is not akin to Lowe's or the competitors named in the OEA.    *Id.*    For all of these reasons, Ollie's proposed use of Store No. 1107 does not violate the Lowe's OEA.

### D. The Use Restrictions in the Best Buy Lease and Related MOL are Inapplicable to the Lease by Its Own Terms and under Applicable Law

40.    Landlord argues that the Lease cannot be assigned to Ollie's because its proposed use of Store No. 1107 would violate the Best Buy Lease and Best Buy MOL, both of which were executed in 2007, approximately two years after the Lease.    However, the plain language of the Lease and the Best Buy MOL makes clear that any use restrictions in the Best Buy Lease and MOL are inapplicable to the Tenant under the Lease and this Court, among others, has held that section 365(b)(3)(C) cannot be used to force subsequently-negotiated use restrictions onto previously-existing leases that a debtor wishes to assign.    Accordingly, the use restrictions in the Best Buy Lease and MOLs cannot block the assignment of the Lease to Ollie's.

i.    The Plain Language of the Lease and the Best Buy MOL Prohibits the Application of the Use Restrictions of the Best Buy Lease and MOL

41.    Both the Lease and the Best Buy MOL prohibit the applicable of the use restrictions in the Best Buy Lease and MOL from applying to Ollie's.    The plain language of Section 13.3.3 of the Lease provides that the "Existing Exclusives" in Exhibit K-1 to the Lease are the **only** exclusive provisions applicable to the Tenant under the Lease.    Thus, by virtue of not being

included in Exhibit K-1, the use restrictions and exclusives in Best Buy MOL are inapplicable to the use of Store No. 1107.  Landlord cannot block the assignment of the Lease through the application of exclusivity provisions that are explicitly carved out through Section 13.3.3.

42.     The Best Buy MOL recognizes this limitation and the wisdom of not improperly seeking to retroactively apply use restrictions on co-tenants not party to Best Buy's lease. Specifically, Best Buy MOL provides that all exclusivity and use restrictions on other co-tenant are "subject to the rights of tenants of the Shopping Center under leases in existence as of the effective date of the [Best Buy] Lease."  Best Buy MOL at ¶ 4.  Thus, if a particular use was permitted under a previously existing lease, such as the Lease to Store No. 1107, it could not be prohibited through the exclusives or use restrictions in the Best Buy MOL, as such exclusives and use restrictions are subject to the rights granted to tenant under the such previously-existing leases.

43.     Looking to the alleged violations of the Best Buy Lease and MOL that Landlord points out, Ollie's does not operate a "'second hand' store, *schlock* store, or 'surplus store'" for the reasons discussed above.[8]  Moreover, the various restrictions on merchandise in the Best Buy MOL simply are not applicable as such uses are fully permissible under the Lease's broad permitted use provisions and the restrictions in the Best Buy MOL are subject to Tenant's rights to operate under such permitted use under the Lease which was "in existence as of the effective date of the [Best Buy] Lease."  *See* Lease at § 1.1.27 (permitting "any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1…"); Best Buy MOL at ¶ 4 (providing

---

[8] Landlord claims these restrictions are contained in the Best Buy Lease.  Landlord has provided no evidence whatsoever as to the terms of the Best Buy Lease independent of what is contained in the Best Buy MOL.  As a tenant would have had no notice of provisions in the Best Buy Lease apart from the Best Buy MOL, thus Ollie's should not be bound by any additional use restrictions contained in the Best Buy Lease for this reason, in addition to those argued below with respect to section 365(b)(3)(C) of the Bankruptcy Code.

all use restrictions and exclusivity provisions are subject to rights granted tenants under previously

existing leases).

ii. <u>The Best Buy Lease and MOL Cannot be Retroactively Imposed on the Lease Pursuant to This Court's Prior Ruling in This Case on Section 365(b)(3)(C) of the Bankruptcy Code</u>

44.     The Landlord seeks to leverage section 365(b)(3)(C) of the Bankruptcy Code to

retroactively impose the use restrictions in the 2007 Best Buy Lease and MOL onto the September

2005 Lease to Store 1107 and block assignment of the Lease to Ollie's.  Well-reasoned caselaw—

including this Court's Assignment Ruling in this case—provides that the Landlord cannot do so.

*See generally In re Bed Bath & Beyond Inc.*, Case No. 23-13359 (VFP) (Bankr. D. N.J.) Aug. 30,

2023 Hrg. Tr. (the "<u>Assignment Ruling</u>").  While section 365(b)(3)(C) requires adequate assurance

that assumption and assignment of the Lease will not breach any use or exclusivity provisions

"contained in any other lease", this Court, among others, has held that such language "must be

understood to mean breach of agreements with other tenants **that were in existence at the time**

**the debtor entered into the lease** and would either be incorporated into the lease or part of an

agreement or part of a master agreement, **not subsequently entered into leases** that the debtor

had no knowledge of or agreed to." *Id*. at 120:1-6 (emphasis added); *accord In re Toys "R" Us,*

*Inc.,* 587 B.R. 304, 309-10 (Bankr. E.D. Va. 2018) (coming to the same conclusion and noting that

the intent of section 365(b)(3)(C) "is not to bestow upon landlords new contractual rights but rather

to preserve contract provisions at risk of being stricken as *de facto* anti-assignment clauses under

the provisions of 11 U.S.C § 365(f)").

45.     The Court arrived at this result under similar facts, *i.e.*, landlords objecting under

section 365(b)(3)(C) to the assignment of certain of the Debtors' leases on the basis that such

assignment would violate subsequently negotiated leases between the landlords and other co-

tenants.  After a thorough analysis of section 365(b)(3)(C) of the Bankruptcy Code, its legislative

25

history, and applicable case law, including the rulings in *In re Toys "R" Us, Inc.,* 587 B.R. 304 (Bankr. E.D. Va. 2018) and *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)* 613 B.R. 51 (S.D.N.Y. 2020), the Court ruled against the landlords and rejected their interpretation of section 365(b)(3)(C) that would retroactively apply later negotiated use restrictions onto the Debtors' previously existing leases. *Id.* at 116:1-129:4.

46.    The Court held that the landlords' reading "would expand the rights of a shopping center landlord outside of bankruptcy [,a] result which has been virtually . . . universally rejected in the case law." *Id.*, at 120:7-10.  Likewise, the Court noted that this reading would impermissibly expand the rights of co-tenants.  *See id*, at 122:20-23 (observing that "[o]utside of bankruptcy, [a co-tenant] such as Hobby Lobby could not have expected that the existing provisions of [its] lease would supersede provisions in existing tenants lease [*i.e.*, the Debtors' lease] that was entered into 14 years before").  Further, the Court took issue with the fact that the landlords' reading of section 365(b)(C)(3) would have rendered certain of the Debtors' bargained-for rights under the leases toothless.  Notably, one of the Debtors' leases at issue provided that, except as explicitly provided for in a certain section of the lease, the Debtor (and thus would-be assignee) was not subject to other exclusives granted by the landlord.  *Id.* at 121:11-16.  Yet the landlord's reading of section 365(b)(C)(3), which would have subjected the lease to use restrictions from future-negotiated leases that did not exist at the time the Debtor entered into its lease, would "write that 'bargain[ed] for' provision [out] of the BBB lease and that, as noted, is not what was intended according to the legislative history" and "would also give the landlord extra unbargained for rights." *Id.* at 121:17-21.

47.    Here, similar to the landlords in the Assignment Ruling, Landlord is attempting to use section 365(b)(3)(C) to impose Best Buy's exclusivity provisions, arising from a lease and

MOL from 2007, onto the Lease, which was entered into nearly two years before such provisions ever existed. Further, like the Debtors' lease in the Assignment Ruling, the Lease to Store No. 1107 contains a nearly identical provision limiting exclusives **solely to what is provided for in the Lease**, which **does not (and temporally could not)** include the exclusives in the Best Buy Lease and MOL. *See* Lease at § 13.3.3 ("Except as expressly set forth in this Section 13.3, Tenant shall not be obliged to honor any exclusive granted by Landlord to any tenant in the Shopping Center."). The Court should rule consistently with its well-reasoned Assignment Ruling issued earlier in this case. Here, as there, Landlord is seeking to expand its rights by retroactively importing use restrictions into the Lease, while in the same stroke, writing out the Debtors' bargained-for limitation on exclusives. Landlord should not be able to leverage section 365(b)(3)(C) this way to block assumption and assignment of the Lease.

48.    Throughout the Objection, Landlord asks this Court to redo its analysis from the Assignment Ruling, under highly similar facts, and come to the opposite conclusion.[9] Landlord asks this Court to reject the *Toys* ruling for precisely the same reasons that the landlords in the Assignment Ruling asserted, after this Court has explicitly agreed with the *Toys* Court's analysis. *See id.* at 123: 9 – 124: 7 (analyzing the "factually nearly identical" *Toys* case declining to reject the *Toys* ruling "because this Court's own examination of the plain meaning of [section 365(b)(C)(3)] led it to the same conclusion [as the *Toys* Court].) Landlord argues that this Court should interpret the *Sears* ruling to support Landlord's improper reading of section 365(b)(3)(C),

---

[9] Ollie's contends that the Court's interpretation of section 365(b)(3) as set forth in the Assignment Ruling is law of the case. While Ollie's acknowledges that the law of the case doctrine does not limit the Court's ability to revisit its own rulings, "[u]nder the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *ACLU v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 2177, 100 L. Ed. 2d 811 (1988)); *accord In re Budd*, No. 20-21419-ABA, 2022 Bankr. LEXIS 592, at *15 -17(Bankr. D.N.J. Mar. 4, 2022).

when this Court has already found that *Sears* cuts against this reading and supports the temporal

limitations of section 365(b)(3)(C). *See id.* at 124:19-22 ("the rationale behind [the *Sears* ruling]

and particularly that 365(b) should be read in harmony with 365(f) actually cuts in favor of this

Court's ruling…"). The Court should reject Landlord's invitation to go against its own analysis

and rule inconsistently with its previous, well-reasoned Assignment Ruling. Thus, for the reasons

articulated above and in the Assignment Ruling, the use restrictions in the 2007 Best Buy Lease

and MOL cannot block the assignment of the 2005 Lease to Store No. 1107.[10]

## II. Landlord Has Failed to Carry Its Burden to Prove That Ollie's Will Run Afoul of Any Tenant Mix

49.     Landlord's arguments on tenant mix also miss the mark and ignore the holding of

this Court in its Assignment Ruling. There, this Court held that it is a landlord's burden to establish

the existence of an intended tenant mix. *See* Assignment Ruling 129:18-130:14 (citing *Lasalle v.

Trak Auto*, 288 B.R. 114, 125 (E.D. Va. 2003), *Toy "R" Us Property Co. I*, 2019 WL *6 (E.D. Va.

Feb. 11, 2019) and *In re Toys "R" Us*, 598 B.R. at 242). In explaining how a landlord must

establish the existence of a tenant mix, this Court agreed with the *Sears* Court and others in holding

that:

> given the lack of any statutory definition for the words "tenant mix," and the several
> possibilities for what it might mean, it makes perfect sense to interpret the phrase
> "tenant mix" for purposes of § 365(b)(3)(D) in light of the lease whose performance
> is being assured — because the tenancy governed by that lease is part of the "tenant
> mix" at the shopping center.

Assignment Ruling at 130:21-131:2 (quoting *In re Sears*, 613 B.R. at 68 and later explicitly

adopting the reasoning of the *Sears* Court); *accord In re Toys "R" Us*, 587 B.R. at 310 (Section

---

[10] The fact that the Debtors exercised the option to extend the lease twice does not change this result. The extensions merely extended the term of the Lease pursuant to its own terms, negotiated in 2005 and which limit the Existing Exclusives to those listed on Exhibit K-1. At no point prior to either extension did Landlord seek to renegotiate the terms of the Lease to include the use restrictions in the Best Buy Lease or MOL. The Bankruptcy Code cannot now be leveraged by Landlord to retroactively alter the terms of the Lease.

160103801v6

"365(b)(3)(D) 'must be interpreted to refer to contractual protections and not undefined notions of tenant mix'") (quoting *In re Ames Department Stores, Inc.*, 121 B.R. 160 (Bankr. S.D.N.Y. 1990)).

50.    Thus, in the Assignment Ruling, the Court turned to the Bed Bath & Beyond lease at issue to see if the use restrictions therein established an intended tenant mix—the Court found, instead, that the would-be assignee's proposed use would be fully permissible under the broad permitted use provisions of the lease and that there were no provisions specifically requiring that a tenant adhere to a tenant mix. *See* Assignment Ruling at 132:8-133:7; *see also In re Toys "R" Us,* 587 B.R. at 310 (permitting assignment of a lease over landlord's objection because, among other things, landlord "has pointed to no provisions in the Lease or any applicable master agreement relating to tenant mix and balance that would prohibit the assignment of the Lease to Burlington."). Thus, in absence of any specific provisions in the lease at issue prohibiting the would-be assignee's proposed use, the Court found that the assignee's operations in the leased premises would not disrupt tenant mix and, in fact, leveraging section 365(b)(3)(D) to impose tenant mix requirements not bargained for in the lease would improperly expand the landlord's rights. *Id.*, at 133:8.

51.    Here, like the landlord in the Assignment Ruling, Landlord has failed to carry its burden to establish an intended tenant mix. Landlord throws around unsubstantiated claims that Ollie's tenancy in the Shopping center will "not increase patronage" or that Ollie's, along with already existing co-tenants Marshalls, Ross, and Dollar Tree, will cannibalize each other's business simply because each of these retailers offer discounted goods.[11] But such unevidenced

---

[11] Landlord fails to explain why the addition of a fourth retailer offering discounted goods would lead to this cannibalization, but three would not. Nor does landlord explain how Bed Bath & Beyond—a retailer famous for its never-expiring 20% off coupons (*see* First Day Declaration at ¶ 14)—was not already cannibalizing the business of Marshalls, Ross, and Dollar Tree, or why different retailers with distinct product offerings would cannibalize each other's business solely based on the fact that they offer discounts to their customers. Landlord offers no evidence to support any of these assertions and while each of these propositions would certainly buckle under any degree of

assertions are irrelevant under the standard established by the Court in its Assignment Ruling—to allow the Landlord leverage the Bankruptcy Code to impose new restrictions regarding a required increase in Shopping Center patronage or a lack of cannibalization is improper. Further, while Landlord claims that it has established an intended tenant mix through the "care, express and limited authorization for those stores [*i.e.* the current co-tenants] to sell discrete items that may overlap with existing tenants" (Objection at Legal Argument ¶ 28), the Landlord has provided Ollie's and the Court with none of the co-tenant leases it cites to in the Objection (or even the relevant use clauses therein) and it is not for the Court to "find an intended tenant mix by piecing together portions of various permitted, exclusive and restricted use provisions [contained in co-tenant leases] . . . . The Court should not be called upon to complete this jigsaw puzzle, particularly when some of the pieces are missing . . ." *See In re Toys "R" Us Prop. Co.*, No. 18-31429-KLP, 2019 Bankr. LEXIS 440, at *13-14 (Bankr. E.D. Va. Feb. 11, 2019) (assigning a lease over landlord's objection because, among other things, it failed to meet its burden to prove the existence of a tenant mix). Simply put, the proper focus is solely on the Lease.[12] Thus, the Landlord must point to provisions in the Lease establishing a tenant mix that Ollie's would violate. Landlord does not and cannot.

52.    The Lease has an incredibly broad ambit for permitted use, allowing a tenant to use Store No. 1107 for "any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1..." Lease at § 1.1.27. As discussed above, Ollie's use falls squarely within the permitted uses under the Lease and does not violate any use restrictions or exclusives in the Lease

---

economic scrutiny, the fact is that they are irrelevant—this Court has made clear that the provisions of the Lease evidence the existence of an intended tenant mix.

[12] For the same reason, the subjective impressions of what retailers generally do or do not like in a shopping center and the abject speculation as to the impact Ollie's would have on the Shopping Center, as set out in the MacDonald Declaration, have no place in this analysis.

or other documents applicable by the Lease's terms.[13] Further, while Landlord claims that the Lease "contains a provision that enables the Landlord to prevent any assignment whose assignee's proposed use conflict with the tenant mix and balance in effect the Shopping Center", no such provision exists.[14] To the contrary, the Lease provides that "Tenant shall have the right from time to time, **<u>without the consent of Landlord</u>**, to assign Tenant's interest in this Lease . . . for any lawful retail use subject to all of the terms and conditions of the Lease." *Id*. § 15.1.1 (emphasis added). Far from strictly prohibiting assignment subject to the preservation of a specific tenant mix, the Lease may be assigned without the Landlord's consent so long as the assignee's proposed use of the premises is lawful and in compliance with the Lease, as Ollie's proposed use is. Because Ollie's proposed use of Store No. 1107 is consistent with the use restrictions in the Lease, assignment of the Lease to Ollie's does not run afoul of section 365(b)(3)(D). *See In re Sears*, 613 B.R. at 74 ("[W]here there are few or no use restrictions on a demised premises, and the assignee agrees to be bound by whatever restrictions do exist . . . a court may deem the adequate assurances under § 365(b)(3)(D) to have been given.").

## III. <u>Landlord Misapplies Section 365(b)(3)(B) of the Bankruptcy Code</u>

53.     Section 365(b)(3)(B) of the Bankruptcy Code provides that, as a pre-requisite to the assignment of a shopping center lease, the debtor or assignee provide adequate assurance that "any percentage rent due under **<u>such lease</u>** will not decline substantially." 11 U.S.C. § 365(b)(3)(B) (emphasis added). The plain language of the statue makes clear "that the percentage rent referred to is rent due under the lease to be assigned" and not the rent in other co-tenant leases. *In re Rickel*

---

[13] In the light of Landlord's apparent fear that Ollie's business model would wreak havoc on the other co-tenants, it is worth emphasizing that in every instance where a co-tenant has protections for the sale of its signature goods—*e.g.* pet goods for PETsMART, home improvement and hardware for Lowe's, off-price apparel and accessories for Marshalls—Ollie's either does not sell such products or its proposed use of Store No. 1107 falls **<u>well below</u>** the incidental use thresholds in the applicable exclusive.

[14] It is therefore unsurprising that Landlord fails to cite to any provision of the Lease when making this claim.

*Home Ctrs.*, 240 B.R. 826, 835 (D. Del. 1998); *see also, e.g., In re Patriot Place, Ltd.*, 486 B.R.

773, 805 (Bankr. W.D. Tex. 2013) ("3LM's assumption of the Shopping Center Lease does not

implicate [section 365(b)(3)(B)] because there is no percentage rent due [under the assigned

lease]"); *In re Carter Hawley Hale Stores*, Case No. LA 91-64140 JD Chapter 11, 1991 Bankr.

LEXIS 2186, at *16 (Bankr. C.D. Cal. July 30, 1991) ("There is no provision in either the prime

lease or the sublease for percentage rent. Thus, § 365(b)(3)(B) does not apply to the case at bar.");

*In re Lafayette Radio Elecs. Corp.*, 12 B.R. 302, 310 (Bankr. E.D.N.Y. 1981) ("Because there is

no percentage rent provision in the Lease . . . Bankruptcy Code section 365(b)(3)(B) is

inapplicable.").   However, Landlord wrongly argues that the potential (and wholly

unsubstantiated) rent abatement Landlord would suffer under "Other Tenant Leases" would lead

to a reduction a reduction in percentage rent for the purposes of section 365(b)(3)(B).   *See*

Objection at Legal Argument ¶¶ 33-34.  This is simply not so.  Landlord has not presented an

ounce of evidence that Ollie's tenancy would lead to a reducing in percentage rent due under the

Lease and, what is more, Landlord has not provided evidence that the payment of percentage rent

is even applicable under the Lease.

54.     Tenant has no obligation to pay percentage rent under the Lease.  Rather, a reduced

rent based on percentage rent is a **remedy for the Tenant** if certain conditions required of

Landlord are not met.  Specifically, the only mechanism in the Lease for paying percentage-based

rent is "Alternate Rent", which is described in detail in Exhibit L to the Lease.  *See* Lease at §

1.1.3; Ex. L.  Alternate Rent only is applicable when the conditions set out in Sections 2.4, 2.5, or

22 of the Lease are in effect.  *See id.* at Ex. L.  Section 2.4 describes delivery of the premises

during a "Slack Period" that ended March 31, 2006, Section 2.5 describes conditions where

Marshalls did not become a tenant (which did not occur), and Section 22 describes "Excess

32

Vacancy" conditions where there is a lapse in certain co-tenancies—in each set of circumstances, Tenant has the right, but not the obligation, to pay percentage-based Alternate Rent, rather than Fixed Rent.  *See* Lease at §§ 2.4, 2.5, and 22.  Landlord has not proven: (i) that any of these conditions have come to pass or are currently in effect (those in Sections 2.4 and 2.5 cannot be); (ii) that Bed Bath & Beyond had ever elected to pay Alternate Rent; or  (iii) that Ollie's would somehow pay **substantially** less Alternative Rent than Bed Bath & Beyond.  Further, given that Ollie's, as Tenant, would have the option in all instances to pay Fixed Rent, rather than percentage-based Alternative Rent, the lease could be assigned to Ollie's with Ollie's opting to pay Fixed Rent and rendering section 365(b)(3)(B) inapplicable.

55.    Further, Landlord wrongly interprets section 365(b)(3)(B)—and indeed, all of section 365(b)(3)—to include an analysis of harm.  While it is true that section 365(b)(3) is intended to provide shopping center landlords with certain protections, it does so by requiring that a debtor or assignee of a lease provide adequate assurance that the conditions under subsections (A) through (D) will be met.  Section 365(b)(3), or any other provision of section 365 for that matter, does not require the Court to find that no harm will befall Landlord as a result of the assignment of the Lease.  Such harm is prevented through the protections given under the Bankruptcy Code.

56.    However, even if harm was a factor in this analysis, Landlord has provided absolutely no evidence to support its claim that it will be damaged.  Rather, Landlord concludes without support that it will suffer a reduction in patronage at the Shopping Center and "faces the specter of suffering a rent abatement under Other Tenant Leases while having to incur substantial legal fees to litigate the proposed assignment."  Objection at Legal Argument ¶ 21.  Much like a specter, Landlord's claims require belief in that which cannot be seen and are ultimately fictious.

33

Landlord argues that the other tenants in the Shopping Center could seek rent abatement due to assignment of the Lease to Ollie's but has not cited a single lease provision nor offered a single lease as an exhibit, asking the Court to take this conclusion fully on faith.  Further, Landlord yet again ignores this Court's Assignment Ruling, where the Court noted that "the assumption and assignment of [a] lease is a judicial action that may render the landlord unable to comply with the restriction contained in another lease and the law would excuse performance that has been rendered legally impossible." Assignment Ruling at 125:21-25.  Thus, under this Court's ruling, it's entirely likely that co-tenants would not have grounds to seek recourse from Landlord if the assignment to Ollie's is approved and, perhaps the Other Tenant Leases have provisions, like the lease in the Assignment Ruling, curtailing the right to rent abatement if Landlord objects as it has here.  Of course, it is impossible to fully apply the law to lease documents that Landlord has not provided, but this only underscores Landlord's evidentiary shortcomings in pressing this aspect of its Objection.  Thus, even if harm were relevant to this analysis (and it is not), the assignment of the Lease to Ollie's should be permitted.

## IV.   Ollie's Provided Adequate Assurance of Future Performance

57.    Upon information and belief, the Initial Objection is resolved with respect to adequate assurance.  However, to the extent the Landlord still objects to assignment on the basis of adequate assurance, such objection is unfounded.  The Debtors and Ollie's have provided the Landlord with more than adequate assurance of Ollie's ability to perform under the Lease.  Indeed, as a part of its Qualified Bid, Ollie's provided a copy of the Public Company's 10-Q and reference to the 10-K Filing, showing that Ollie's has the financial wherewithal to perform under the Lease.  Further, Ollie's explained, as of the time of the Qualified Bid, that it had been in operation for over

34

40 years and had 480 retail locations across 29 states.[15] The overwhelming majority of Ollie's stores are located in shopping centers.  Ollie's provided the Debtors and Landlord with the contact information of its chief financial officer, should either require further information regarding Ollie's ability to perform under the Lease—no such requests were ever received.  The information provided by Ollie's far surpasses a "bald statement" recognizing the need to meet the obligations under the Lease.  *See* Initial Objection, at ¶6.  Rather, the information provided by Ollie's shows that it has the financial ability and the industry experience to successfully run a retail store on the Leased Premises and, thus, perform under the terms of the Lease.

**V.    The Cure Objection Has Been Resolved**

58.    Upon information and belief, the Debtors and Landlord have resolved the Landlord's objection as to cure, with the agreed-upon cure amount of $159.91.  Ollie's does not oppose this cure amount.  However, to the extent that the Landlord asserts any higher cure amount, the Initial Objection provides no evidence whatsoever to support such cure and Ollie's reserves the right to oppose any such higher amount.

## CONCLUSION

59.    For the reasons stated herein, Ollie's respectfully requests that the Court overrule the Initial Objection and the Objection and enter an order approving assumption of the Lease by the Debtors and the Assignment thereof to Ollie's.

*[Signature Page Follows]*

---

[15] As of November 15, 2023, Ollie's has been in operation for over 41 years and has 510 stores open in 30 states.  *See* Helm Declaration at  5, n.2.

35

Dated:  November 22, 2023

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

*/s/ Jessica D. Mikhailevich*

Jessica D. Mikhailevich
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Email:    jessica.mikhailevich@troutman.com

-and-

Kenneth A. Listwak (*pro hac vice* application pending)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 777-6500
Email:    ken.listwak@troutman.com

*Counsel for Ollie's Bargain Outlet, Inc.*

160103801v6