| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br><br>Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**PANSINI & PIZZICA**<br>1525 Locust Street, 15th Floor<br>Philadelphia, PA 19102<br>DAVID B. PIZZICA, ESQ.<br>J. FRED LORUSSO, ESQ.<br>Telephone: 215-732-5555<br>dpizzica@pansinilaw.com<br>florusso@pansinilaw.com<br><br>**The Law Offices of Richard J. Corbi PLLC**<br>1501 Broadway, 12th Floor<br>New York, NY 10036<br>(646) 571-2033<br>Richard J. Corbi (pro hac vice)<br>rcorbi@corbilaw.com<br><br>Attorneys for Penelope Duczkowski and Joseph Duczkowski | Case No.:     23-13359-VFP<br><br>Hearing Date: May 29, 2024<br><br>Judge:         Vincent F. Papalia<br><br>Chapter:       11 |
| In Re:<br><br>BED BATH & BEYOND INC., et al.<br><br>      Debtors. | |

## REPLY BRIEF IN SUPPORT OF MOTION FOR RELIEF

Penelope Duczkowksi and Joseph Duczkowski (collectively, the "Movants") submit this reply in support of Movants relief from the automatic stay. The Movants respectfully submit:

**I.       INTRODUCTION**

Given the substantial value of the Penelope Duczkowski's claim – based upon past results and publicly reported results of cases involving Complex Regional Pain Syndrome - coupled with the ability of Debtor's carrier to assume full control of defense and indemnity payments, and the Bankruptcy Court's role in ensuring that all parties receive equitable treatment, it is crucial that

Movants are afforded the opportunity to fully litigation this matter in state court. The bankruptcy process relies on finality and predictability in service of the core purposes of the Bankruptcy Code. At its core, the bankruptcy proceeding is equitable in nature and the Court's role is to determine solutions that are grounded in the principles of fairness and justice. See In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3d Cir. 2006) ("[I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done…") (quoting Pepper v. Litton, 308 U.S. 295, 304, 60 S. Ct. 238, 84 L. Ed. 281 (1939)). Allowing personal injury claimants, such as Movants, to access available insurance proceeds is consistent with this goal, as it ensures that they are not unfairly burdened by the Debtor's bankruptcy. Where practicable, as here, the Debtor's insurance proceeds under its policy with Safety National Casualty Corporation ("Safety National") should be used for their intended purpose of compensating injured parties, rather than being shielded from liability through bankruptcy proceedings. See e.g., In re LTL Mgmt., LLC, 64 F. 4th 84, 2023 U.S. App. LEXIS 2323 (3d Cir. 2023).

The Plan Administrator would have this Court accept that the Debtor's Self-Insured Retention obligation under its liability policy with Safety National, coupled with the anticipated defense cost outlay by the Debtor, would frustrate the administration of the Plan and deplete the assets of the estate. As discussed more fully below, the express language of the applicable policy charts a clear path forward to allow Movants to recover against the policy proceeds without interfering or interrupting the orderly administration of the Plan, and without depleting the assets of the estate.

Indeed, the policy explicitly outlines the coverage and conditions under which claims can be made and administered, and specifically contemplates a scenario in which Safety National can

2

assume the control of the defense of any claim against Debtor, without implicating any liability against the Debtor for the defense costs associated with same. The pertinent provision of the Self-Insured Retention Endorsement to the policy specifically states:

> "[Safety National] shall have the right but not the duty to associate ourselves in or assume control of the defense of any claim or "suit" which in our sole judgment is likely to exceed [$1 million]. **If we do avail ourselves of that right, [Debtor] must cooperate with us. In the event we incur any 'defense costs' in the exercise of our right to defend any claim or 'suit,' [Debtor] shall not be liable to reimburse us for those 'defense costs'**."

(See the SIR Endorsement § II(D)(2), at 2, which is attached hereto as Exhibit "A") (emphasis added). Notwithstanding the Plan Administrator's instant pleas regarding the hypothetical depletion of the estate's assets via defense costs, there exists a path for Safety National, itself, to undertake all aspects of the defense of Movants' claim without implicating any liability for costs against the Debtor – the sole caveat being that the Debtor will "cooperate" with Safety National in the defense. It is inconceivable that the burden imposed upon the Plan Administrator in securing the Debtor's "cooperation" with Safety National's defense of the claim will ever outweigh the need to ensure that the dictates of fairness and justice are upheld, and that injured parties, such as Movants, receive adequate compensation for their injuries.

## II.    ARGUMENT

### A.    UNDER THE EXPRESS TERMS OF THE POLICY'S SELF-INSURED RETENTION ENDORSEMENT, SAFETY NATIONAL CAN ASSUME THE DEFENSE OF THE DEBTOR WITHOUT THE DEBTOR BEING LIABLE TO REIMBURSE SAFETY NATIONAL FOR THE DEFENSE COSTS

Contrary to the hyperbolic assertions of the Plan Administrator, the cost to defend Movants' suit will not "drain" the "administratively precarious" estate. This Court has the ability to monitor fees in connection with defense costs so that an estate is not "drained" of its assets. Bankruptcy Courts in other jurisdictions have instituted "soft caps" or 20% holdbacks in instances where estate

insurance proceeds are utilized for defense costs.[1] Accordingly, this Court can impose similar caps and hold backs to avoid the risk of professional of fees dwarfing the actual claims of the claimants. Rather, as briefly noted above, a viable scenario exists where Movants' claim can proceed without the Debtor's estate being responsible for one nickel of defense costs. Under the Safety National policy, Safety National can assume the defense of Movants' claim without the Debtor being held liable for the reimbursement of any defense costs incurred by Safety National. (See Exhibit A, SIR Endorsement § II(D)(2), at 2). The Plan Administrator's suggestion that "*the cost to defend this suit and other like it (should the Court grant relief) will drain these administratively precarious estates in hundred cent dollars to the detriment of the estates' other creditors*" is belied by the express terms of the policy.

Tellingly, the Plan Administrator acknowledges the relevant provision that equips Safety National with assuming the full costs associated with the defense in a buried footnote within the Supplemental Opposition brief. (See the Plan Administrator's Supplemental Opposition at FN 19). In acknowledging this, the Plan Administrator conveniently characterizes same as a "*seemingly contrary provision*" to other provisions within the policy that suggest the Debtor will be responsible for the reimbursement of defense costs. The specific provision in question offers far more than a "seemingly contrary provision" and is of paramount importance to the issue currently before the Court as it provides the framework for reconciling how Movants can continue with the state court action without impacting or prejudicing the Plan or the estates. Granting Movants' requested relief will not automatically implicate Debtor's responsibility or liability for defense

---

[1] *See, e.g.*, *In re P8H, Inc., d/b/a Paddle 8*, Case No. 20-10809 [Doc. No. 150] (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2020); *In re Personal Communications Devices, LLC*, Case No. 13-74303 [Doc Nos. 633 & 748] (Bankr. E.D.N.Y. May 20, 2015 & Feb. 4, 2016]; *Devices Liquidation Trust v. Christopher*, Adv. Pro. No. 13-8173 [Adv. Pro. Doc. No. 154] (Bankr. E.D.N.Y Nov. 30, 2015); *Devices Liquidation Trust*, Adv. Pro. No. 13-8174 [Adv. Pro. Doc. No. 230] (Bankr. E.D.N.Y. Nov. 30, 2015). Copies of these orders are attached hereto collectively as **Exhibit B**.

4

costs. The SIR endorsement specifically suggests that Safety National can assume full responsibility for defense costs. To the extent this particular provision may be "contrary" to other provisions within the policy, any ambiguity will be reconciled in favor of the insured Debtor.[2]

In Buntin v. Cont'l Ins. Co.,[3] the Third Circuit considered the effect of an endorsement to an insurance contract. Initially, the Third Circuit noted that the endorsement should be given effect over the general provisions of the policy. The Third Circuit then found that both the plaintiff and the insurance company set forth logical interpretations as to the effect of the endorsement and that the endorsement could be fairly interpreted in either the manner asserted by the plaintiff or the insurance company. Most significantly, the Third Circuit explained that in such a situation the insurance policy must be interpreted in favor of providing coverage:

> It is settled that any ambiguity or contradiction in an insurance policy must be construed against the insurer, and in a manner which is more favorable to coverage. If there is more than one reasonable reading of a policy provision, as is the case here, that provision must be construed against the insurance company which has drafted it. Since the language of the endorsement in this case is ambiguous, and the effect of endorsement unclear, the endorsement must be interpreted to include the omnibus clause of the basic policy (that is to say, in a manner favorable to coverage).

583 F.2d at 1206-7 (citations omitted); see also, Papalia, 2017 U.S. Dist. LEXIS 121520, at *44-*45 (confronted with conflicting language regarding the limit of liability provision, the court was

---

[2] The principles governing the interpretation of an insurance contract are well defined. Significantly, a court must interpret all ambiguities in a policy in favor of an insured – here, the Debtor. Thus, most importantly, if the policy will support two possible interpretations, one which provides for coverage and one which does not provide for coverage, the court must interpret the policy in favor of coverage. In addition, a court is required to read an insurance policy as a whole. When there is a conflict between the general coverage provisions in an insurance policy and an endorsement, the terms of the enforcement control. See, e.g., Empire Fire Marine Ins. Co. v. Intek Auto Leasing, Inc., No. 17-4525 (JMV) (MF), 2019 U.S. Dist. LEXIS 223782 (D.N.J. Dec. 18, 2019); Lane v. Tishman Constr. Corp., No. A-4258-05T5, 2007 N.J. Super. Unpub. LEXIS 2783, 2007 WL 106182 (N.J. Sup. Ct. App. Div., Apr. 11, 2007); Buntin v. Cont'l Ins. Co., 583 F.2d 1201 (3d Cir. 1978); Papalia v. Arch Ins. Co., No. 15-cv-02856, 2017 U.S. Dist. LEXIS 121520, 2017 WL 328113 (D.N.J. Aug. 1, 2017); Danchisko v. Harleysville Ins. Co., 2009 N.J. Super. Unpub. LEXIS 342, 2009 WL 395440 (N.J. Sup. Ct. App. Div., Feb. 19, 2009).

[3] 583 F.2d 1201 (3d Cir. 1978).

required to "construe the provision against the insurance company"). In the instant matter, it cannot be disputed that the language of the endorsement to the Safety National policy permits a solution to the problem before the court: *Safety National can step in, "associate" itself in Movants' claim, "assume control" of the defense, without the Debtor being liable for any defense costs.* (See Exhibit "A," the SIR Endorsement § II(D)(2), at 2).

> B. **UNDER THE EXPRESS TERMS OF THE POLICY'S SELF-INSURED RETENTION ENDORSEMENT, SAFETY NATIONAL CAN SETTLE ANY CLAIM REGARDLESS OF WHETHER THE VALUE OF SAME IS WITHIN OR IN EXCESS OF THE SELF-INSURED RETENTION**

Moreover, pursuant to the express language of the Endorsement to the policy, Safety National is vested with the authority to settle any claim regardless of whether the value of the claim is within or in excess of the SIR:

> **We may investigate and settle any claim or "suit" as we consider appropriate both within and in excess of the applicable Self-Insured Retention but we shall obtain your consent prior to entering into any settlement of a claim or "suit" that is equal to or less than the Self-Insured Retention amount.** If, however, you do not consent to any settlement within the Self-Insured Retention amount that is recommended by us and instead elect to contest the claim or continue with any legal proceedings involving the claim, our liability for the claim shall not exceed the amount determined by subtracting the Self-Insured Retention amount from the amount for which we recommended settlement, including "defense costs" incurred with our consent, to the date of such refusal. Further we shall have no liability with respect to such claim if the result of the above calculation is zero or negative. We will not continue to defend or settle any claim or "suit" after the Limit of Insurance of the applicable coverage has been exhausted by payments of judgments or settlements.

(See Exhibit "A," the SIR Endorsement § II(D)(2), at 3 (emphasis added)).

Under the language of the endorsement, the value of the claim relevant to the SIR amount is of no moment with respect to Safety National's ability to defend and settle Movants' claim. As set forth in the Endorsement, Safety National can settle *any* claim it considers appropriate. When

6

an "endorsement modifies, qualifies or restricts the terms of the original policy, the . . . endorsement controls." Gabriele v. Lyndhurst Residential Cmty., L.L.C., 426 N.J. Super. 96, 43 A.3d 1169, 1174 (N.J. Super. Ct. App. Div. 2012) (internal quotation marks omitted) (quoting 2 G. Couch, Couch on Insurance 2d, § 21.22 (2010); see also 4 Eric Mills Holmes, Appleman on Insurance 2d, § 20.1 (1998) ("If any irreconcilable conflict exists between provisions of the policy and provisions of an endorsement, then the latter must control.").

The Plan Administrator would have the Court accept that he "*will have to spend time and incur expenses to respond to and defend against the State Court Action as he and his small staff are trying to wind-down the Debtors and make distributions to creditors*." Based upon the language of the Endorsement, the Debtor must merely "cooperate" with Safety National should Safety National assume the defense of the claim. The expense associated with the cooperation does not present such a hardship to the Plan Administrator such as to outweigh the Movants' right to be made whole. Further, as set forth in the Endorsement, Safety National is vested with the discretion to resolve any claim within or in excess of the SIR amount, with the sole implication to the Debtor being the requirement that the Debtor consents to such a settlement. Accordingly, no hardship would bestow upon the Debtor under such scenario.

    C.    **THE VALUE OF MOVANTS' CLAIM FAR EXCEEDS THE SELF-INSURED RETENTION ($1M) SUCH THAT SAFETY NATIONAL CAN ASSOCIATE ITSELF IN AND ASSUME CONTROL OF THE DEFENSE OF THE CLAIM AGAINST THE DEBTOR**

As noted above, the SIR Endorsement to the Safety National policy expressly contemplates the instant scenario wherein Safety National can assume the defense of the claim that is likely to exceed the SIR amount ($1M). Without providing this Court with any knowledge of the facts of Movants' claim, the Plan Administrator falsely asserts that Movants' State Court Action amounts to nothing more than: "*Movants' gamble*" and "*Movants' longshot attempt to 'hit the jackpot' with*

7

*a claim that exceeds $1 million.*" To the contrary, Movants' claim is neither a gamble, nor a "longshot attempt to 'hit the jackpot.'" Rather, the sole objective of Movants' claim is to restore them to the position they were in before Mrs. Duczkowski suffered life-altering physical and emotional injuries because of Debtor's negligence.

On or about November 12, 2020, Penelope Duczkowski, then 61 years old, was shopping at the Debtor's Deptford, New Jersey location when a large 5-piece wok set fell off a display hook and struck the top of her right foot. Mrs. Duczkowski sought immediate emergency medical attention and underwent surgical intervention to address issues with her right metatarsal phalangeal joint. Following the surgical intervention, Mrs. Duczkowski's right foot pain increased and was marked by a burning sensation with noted pruritus (itchy skin). Ultimately, as Movants previously informed this Court, Mrs. Duczkowski was diagnosed as suffering from Complex Regional Pain Syndrome (CRPS).

CRPS is a chronic and debilitating condition that has had a profound, life-altering impact on Mrs. Duczkowski and her family. Characterized by severe, persistent pain, Mrs. Duczkowski's CRPS has significantly impaired her ability to perform daily activities and maintain a normal lifestyle. The pain associated with her CRPS is accompanied by other symptoms such as swelling, changes in skin color and temperature, and muscle weakness. These symptoms have led to physical and emotional distress, affecting Mrs. Duczkowski's quality of life, mental health, and overall well-being.

The chronic nature of CRPS requires long-term medical treatment and pain management and has prevented Mrs. Duczkowski from working and participating in social and recreational activities. She has not returned to her job as a rubber trimmer at the East Rubber Company in Westville, New Jersey since the underlying incident. The value of Movants' claims will far exceed

8

the SIR amount and will be well supported by expert medical opinions, current and anticipated future medical expenses, loss of earnings, and other relevant factors, all of which will be presented by detailed documentation and expert testimony.

Contrary to the unfounded suggestion that Mrs. Duczkowski's quest to be made whole is nothing more than a "gamble," reported settlement and verdict data for other similar cases involving CRPS claims suggests that the value of Mrs. Duczkowski's claim will easily exceed the SIR amount.  Indeed, the average plaintiff's verdict based upon reported New Jersey jury verdict results from 2010 to the present for cases involving claims of CRPS exceeds $3.4 million.[4]  Further, Movants counsel has handled prior claims of injured parties suffering from CRPS, each of which yielded jury verdicts or settlement amounts far in excess of the SIR amount at issue in the instant case.[5]  Accordingly, Safety National must provide the coverage.

### D. SAFETY NATIONAL MUST PROVIDE COVERAGE FOR MOVANTS' CLAIM REGARDLESS OF WHETHER THE DEBTOR CAN SATISFY THE SELF-INSURED RETENTION AMOUNT

As set forth above, the language of the policy and the SIR Endorsement allows for Safety National to assume the defense of Movants' claim and settle same regardless of whether the value is within or in excess of the SIR amount.  The sole burdens imposed upon the Debtor under such a scenario require the Debtor to cooperate with the defense and bless any settlement agreement.  Notwithstanding the foregoing, the Plan Administrator supports the opposition to the instant motion for relief on the premise that the Debtor's inability to satisfy the SIR dictates that there will

---

[4] Reported New Jersey Verdicts (chronologically): (1) Titus v. Levin, BUR-L-1710-05 (2010 - **$645K**); (2) Oppedisano v. Utz, MID-L-2317-07 (2010 - **$3M**); (3) Birchfield v. Vanguard Anesthesia, GLO-L-981-04 (2011 - **$7.5M**); (4) McCaffrey v. Pinnacle Federal Credit Union, SOM-L-1633-08 (2013 - **$500K**); (5) Mazzone v. Czyzewski, CAM-L-5524-09 (2014 - **$9.68M**); (6) Russel v. Food Circus Super Markets, MON-L-4727-12 (2015 - **$2.5M**); (7) Migut v. State of NJ, et al., MER-L-934-14 (2018 - **$2.495M**); and (8) Cathey v. Jersey Shore Convalescence, et al., MON-L-3085-17 (2019 - **$950K**).

[5] See e.g., Stanley v. Lowe's Home Centers, LLC, CCP, Phila. Co., July Term, 2019, No. 2433 (Jury Verdict: **$4.2M**); Gray v. Bittenbender, et al., CCP, Phila. Co., April Term, 2019, No. 4028 (Settlement: **$7.35M**).

be no coverage under its policy with Safety National. Such a position is unsupported by the majority view.

The Bankruptcy Code requires Safety National to honor its obligations under the policy. "§ 365 of the Bankruptcy Code makes it clear that…the failure of a bankrupt insured to fund a self-insured retention does not relieve the insurer of the obligation to pay claims under the policy." In re Vanderveer Estates Holding, LLC, 328 B.R. 18, 25 (Bankr. E.D.N.Y. 2005) aff'd sub nom. Am. Safety Indem. Co. v. Official Comm. of Unsecured Creditors, No. 05 CV 5877 ARR, 2006 U.S. Dist. LEXIS 101425, at *16 (E.D.N.Y. Oct. 3, 2006). "Failure of the debtor to perform these continuing obligations does not excuse the insurer from performance under the contract, but gives rise to an unsecured claim by the insurer for any damages incurred by reason of the debtor's breach of the policy." Id. See also Home Ins. Co. of Illinois v. Hooper, 691 N.E.2d 65 (Ill. App. 1998); In re Ames Dep't Stores, Inc., No. 93-4014, 1995 WL 311764 (S.D.N.Y. 1995)). See also Albany Ins. Co. v. Bengal Marine, Inc., 857 F.2d 250 (5th Cir. 1988); Columbia Casualty Co. v. Federal Press Co., 104 B.R. 56 (Bankr. N.D. Ind. 1989). See generally Patricia A. Bronte, 'Pay First' Provisions and the Insolvent Policyholder, The Insurance Coverage Law Bulletin, Vol. 3, No. 5 (2004); Patricia A Bronte et al., Coverage Issues for the Insolvent Policyholder, Coverage (ABA Section of Litigation), Vol. 14, No. 2 (2004).

Under the majority view, an insurer must provide coverage above the SIR up to policy limits even if the policyholder cannot pay the initial amount. In Home Insurance Co. of Illinois v. Hooper,[6] the Illinois appellate court held that the insurer was obligated to indemnify the insured for that portion of the judgment or settlement exceeding the SIR. Here, the inability of the insured – the Debtor - to pay the SIR is irrelevant since the SIR can be deemed "satisfied" without actual

---

[6] 294 Ill. App. 3d 626, 691 N.E.2d 65 (1st. Dist. 1998).

payment. The filing of bankruptcy by the insured is intended to provide relief to the insured; it does not relieve the obligation of the Insurer under the policy. Keck, Mahin & Cate, 241 B.R. 583 (N.D. Ill. 1999). "[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge." Matter of Edgeworth, 993 F.2d 51, 54 (5th Cir. 1993). The protection from liability afforded to the debtor under the Bankruptcy Code does not affect the liability to provide coverage. First Fidelity Bank v. McTeer, 985 F.2d 114 (3rd Cir. 1993); Vanderveer Estates, 328 B.R. at *25. Although the debtor may receive a discharge for the total amount of any claim, the insurer will remain obligated to the extent required by the insurance policy. In re W.G. Wade Shows, Inc., 234 B.R. 185 (Bankr. M.D. Fla.1999); Maertin v. Armstrong World Industries, Inc., 241 F.Supp.2d 434 (D.N.J. 2002).

The Bankruptcy Code is fundamentally about fairness, aiming to balance the interests of debtors and creditors in an equitable manner. The dictates of equity would be frustrated if Safety National was relieved of its obligations to pay a compensable claim to a tort victim under its general liability policy with the Debtor simply because the Debtor allegedly failed to meet the SIR due to its insolvency. Public policy does not provide windfalls for insurers in the event of its insured's bankruptcy while leaving injured tort victims without just recompense.

### E.  SAFETY NATIONAL IS WELL-EQUIPPED TO ASSUME AN UNSECURED CLAIM AGAINST THE DEBTOR FOR THE AMOUNT OF THE SIR

When an insurer is not affected by the bankruptcy of its insured, but receives immunity from liability simply because of it, something is awry. As stated *supra*, through the language of the policy's SIR Endorsement, Safety National maintained the ability to control the defense and settle the Movants' claim regardless of the value of the SIR. (See Exhibit "A," the SIR Endorsement § II(D)(2), at 2). Despite Debtor's inability to satisfy the SIR, there exist multiple scenarios to allow Movants to proceed with their state court action.

In practice, the SIR is paid to Safety National and that is then paid to claims along with any amounts over the SIR and up to the limits of the policy. Here, Safety National could simply assume an unsecured claim against the Debtor for the amount of the SIR, or the Movants could be paid their settlement amount less the SIR, with Movants assuming an unsecured claim against the Debtor for the SIR, thus leaving Safety National in no different position than if the Debtor had not filed for bankruptcy.

It follows that of the proposed scenarios, Safety National's assumption of an unsecured claim against the Debtor is far preferable and equitable to Movants' assumption of an unsecured claim. Safety National is better equipped to handle an unsecured claim against the Debtor for the SIR due to its financial strength, expertise, legal support, efficiency, negotiating power, and ability to mitigate the personal financial impact on Movants. Safety National possesses financial resources and liquidity that enables it to absorb losses and manage claims far more effectively than Movants. Safety National's specialized knowledge and expertise in risk management, claims processing and negotiating settlements allow it to navigate the complexities of the bankruptcy proceeding more effectively, and to maximize the potential recovery from the Debtor's estate. For Movants, pursuing an unsecured claim in bankruptcy will be time-consuming, stressful and financially burdensome. By allowing Safety National to assume the claim, Movants can focus on recovery and personal well-being, rather than being entangled in prolonged legal and financial processes.

**F. THE DEBTOR MAINTAINS THAT DEFENDING THE CLAIM WILL DEPLETE RESOURCES; YET, SIMULTANEOUSLY EXPENDS THESE RESOURCES IN ITS OWN EFFORTS TO PURSUE AFFIRMATIVE CLAIMS AGAINST OTHERS**

On the one hand, the Plan Administrator would assert the burden of cooperation with the Debtor's defense will expend valuable resources, while the other hand actively allocates said

resources in pursuit of affirmative claims by the bankruptcy estate. Indeed, there has been ample media coverage concerning the Debtor's efforts to pursue claims against, among others, shipping companies related to alleged damages the Debtor realized secondary to the global shipping crisis. (See e.g., "*Bankrupt Bed Bath & Beyond files $316M mega-claim against MSC*" https://finance.yahoo.com/news/bankrupt-bed-bath-beyond-files-200021107.html). The Court should not countenance the Debtor's effort to suggest that it would be fair and equitable to allow it to expend resources and manpower to seek its own recovery while it simultaneously covers itself with the shield of the plan injunction against Movants' efforts to be made whole following their life injuries at the Debtor's hands.

### G. A STATUS CONFERENCE WITHIN FORTY-FIVE (45) DAYS TO ADDRESS ANTICIPATED ASPECTS OF THE STATE COURT ACTION WOULD BE BENEFICIAL TO ALL INTERESTED PARTIES

Movants believe that a status conference with this Court to discuss the critical matters pertinent to the litigation of the state court action would assist in clarifying issues raised by the Plan Administrator regarding anticipated burdens of defending same. Specifically, a conference with the Court concerning the state court action would help ensure that the parties and the Court have a clear understanding of the financial implications of the litigation with respect to budgeting. A conference would also afford an opportunity to discuss the comprehensive case management plan for the state court action. This plan will encompass key milestones, deadlines, and procedural steps, including discovery schedules, motions, and trial dates. Establishing a plan that encompassed key milestones, deadlines, and procedural steps, including discovery schedules, motions, and trial dates would facilitate the smooth progression of the case and assist in preventing any unnecessary delays.

Movants maintain that addressing these matters in a status conference would promote judicial efficiency and fairness for all interested parties involved. Movants are prepared to provide any necessary documentation and proposed schedules in advance of the conference to assist the Court.

### III.  CONCLUSION

Allowing Movants to proceed with their personal injury claim in state court is essential to preserving their rights. Denying relief would effectively deprive them of the ability to seek redress for the injuries they suffered, which would contravene the fundamental principles of fairness and justice. Granting the instant relief to allow Movants to proceed against the Safety National insurance proceeds is consistent with the intent of bankruptcy laws, promotes fairness and justice, and ensures that injured parties receive adequate compensation for their injuries. The Debtor's insurance proceeds should be used for their intended purpose of compensating injured parties such as Movants, rather than being shielded from liability through bankruptcy proceedings. Movants are not adequately protected by the bankruptcy process. The state court personal injury claim represents their only opportunity to recover damages for the injuries they sustained.

For the reasons stated above, it is respectfully requested that the Court grant relief from the automatic stay/plan injunction to allow Movants to pursue their personal injury claim against the proceeds of the Safety National policy.

**Respectfully submitted,**

**PANSINI & PIZZICA**

**BY:   /s/ DAVID B. PIZZICA**
           **DAVID B. PIZZICA, ESQUIRE**
           **J. FRED LORUSSO, ESQUIRE**
           **Attorney for Movants**
           **Penelope Duczkowski and**
           **Joseph Duczkowksi**

**The Law Offices of Richard J. Corbi PLLC**

**By:**     **/s/ Richard J. Corbi**
       **RICHARD J. CORBI**
       **Co-Counsel to Movants**
       **Penelope Duczkowski and**
       **Joseph Duczkowksi**

**DATE: May 24, 2024**