Jeffrey M. Kurzon, Esq.*
P.O. Box 454
Peterborough, NH 03458
Jeff@Kurzon.com | 212-203-8918

The Honorable Vincent F. Papalia
United States Bankruptcy Judge for the District of New Jersey
50 Walnut Street, Courtroom 3B
Newark, NJ 07102

July 30, 2024

**VIA US PRIORITY MAIL AND EMAIL TO:** chambers_of_vfp@njb.uscourts.gov

Re: In re: Bed Bath & Beyond Inc., Case No. 23-13359-VFP (Pro Se Shareholder Motion to Compel Plan Administrator to Release or Procure and Release Evidence; Opposition to Sanctions and Letter in Support of ML1's Motion for an Equity Committee; Motion Seeking Third-Party Release Clarification)

Dear Judge Papalia,

This Honorable Court should support shareholder rights and shareholder participation rather than sanction it. This Honorable Court must stand for the interests of fairness, transparency and justice. And this Honorable Court, presiding over such a complicated bankruptcy, must support judicial economy as resources are limited. I am a *pro se* shareholder in the above-referenced bankruptcy case and I respectfully submit this letter to:

1. Move the Honorable Court to compel the Plan Administrator Goldberg to deliver to my law office and this Honorable Court via a public filing the directly registered balance of common stock at the transfer agent AST as of September 29, 2023, the date of the Plan confirmation as a check on fraud and a potentially enormously valuable asset to the estate to help prosecute "Securities Claims" that have, as of yet, seemingly not been prosecuted by Goldberg.

2. Oppose the motion for sanctions against the shareholder ("ML1") who courageously moved for the formation of an equity committee and support ML1's motion for the formation of an equity committee to help resolve important discrepancies such as contained herein in the interest of justice and judicial economy.

3. Motion for Clarity from this Honorable Court on (a) Whether the Third-Party Release Applies to Myself and others Similarly Situated (b) Whether I am entitled to corroborate with other shareholders who may have opted out of the Third-Party Release (c) what, specifically, is the consideration offered to those who did "sign" the Third-Party Release (by doing nothing) other than losing their right to pursue claims and (d) a determination whether the Plan should be further amended to address these potential discriminatory errors.

Although I am an attorney, my practice mostly involves deal making rather than the litigation side of the law. Other than In Re Express (Delaware Bankruptcy Court, Case 24-10831-KBO) where I recently tried and failed to move the Wilmington Court for a Shareholder's

---

*Admitted solely to practice in New York and Massachusetts.

Committee (under different, albeit similar facts and circumstances), I have no experience in bankruptcy law. I have consulted with three bankruptcy attorneys and I cannot afford their services, particularly as I am currently self-employed. I do not want to prejudice any party or waste limited judicial resources. I hope that my letter here (including the two motions contained herein) will benefit the Debtor and its estate, as well as fellow Interest holders, and even members of the classes above Class 9 so that they all may have a full and satisfactory recovery under this bankruptcy.

## I. Motion to Compel Discovery of Evidence to Expose Potential Fraud on Interest Holders, Fraud on the Bankruptcy Court and Fraud in the U.S. Capital Markets

Jeffrey M. Kurzon, an attorney and shareholder of Bed Bath & Beyond Inc. ("Debtor"), respectfully moves this Honorable Court to compel the production of evidence by the Plan Administrator by way of the American Stock Transfer & Trust Company, LLC (the Debtor's transfer agent) ("AST"), pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9016, and in support thereof states as follows:

**A. Jurisdiction and Venue**: This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**B. Background:**

On April 23, 2023 (the "Petitition Date"), Bed Bath & Beyond Inc. filed for relief under Chapter 11 of the Bankruptcy Code. On multiple and no less than three occasions, commencing October 28, 2023 and as recently as July 26, 2024 I wrote to Pachulski Stang Ziehl & Jones LLP ("Pachulski") as counsel to the Plan Administrator seeking information and clarity on these proceedings. After offering to sign an NDA, I was told, in summary, to seek counsel and read the docket to find my answers.

As of the Petition Date, I owned 503 shares directly registered with AST. As of the Plan's confirmation date on September 29, 2023, I owned 58,008 shares directly registered with AST. I owned several thousand more shares in various broker accounts, including retirement accounts.

On October 28, 2023 I wrote to Mr. Feinstein and Mr. Sandler at Pachulski concerning suspected illegal naked short selling. I wrote (on a privileged and confidential for settlement purposes only basis):

> Is the plan administrator aware that in BBBYQ Bankruptcy Court Docket 215 that the debtor stated Cede & Co. owned approximately 776 million common shares, which was more than total outstanding shares issued by the company?[1]

I wrote additionally:

---

[1] Dkt No. 101 (Declaration of Intent to Accumulate/Transfer Common Stock or Preferred Stock; Declaration of Status as a Substantial Shareholder) said that as of the Petition Date (April 23, 2023) the total outstanding was 739,056,836 shares, an approximate difference of 37 million shares!

2

> I would be happy to sign a basic NDA if that would permit you to speak more freely.
>
> Furthermore, I would like to know why the NVW [Null, void and worthless] letter attached to Dkt 2632 [sic: it is attached as Exhibit A to Dkt No. 2631] states "Other" but then the "if other, please advise" box is blank. Was this an oversight?

On October 30, 2023, Mr. Feinstein did not answer my question re the NVW letter and told me to raise whatever issues I wanted to with the court, and that I should carefully review the Liquidation plan's release, exculpation, injunction and gatekeeper provisions. I expressed my gratitude for Mr. Feinstein's curt (and incomplete) reply hopeful that some additional research or the passage of time might yield answers.

On March 12, 2024, I informed Mr. Feinstein that my law office is still investigating securities fraud, including "I would also like [you] to know that I have a pending dispute with SoFi Securities of California. I held 1,000 [shares of] bbbyq with them, which they custodied [with] the Apex Securities [Corporation] of Texas. I suspect fraud by then [them] because they "sold" the securities for a penny and I contend that something that does not exist cannot be sold. They told me to pound sand. I reported the matter to the NH Department of Securities Regulation as I currently live in NH. If they did this to me, they likely did it to all customers."[2]

On March 12, I also wrote Mr. Feinstein at Pachulski:

> My [law] office is still investigating. As custodian now of the debtor's records, are you (Mr. Goldberg) able to provide me the shareholder list as of September 29, 2023, the date of the plan effectiveness? The debtor provided this list in Dkt 219 (May 5). I have reasons to suspect fraud and therefore I have a reasonable and valid reason as an attorney and shareholder to inspect this list.
>
> Also, I would like to know from you whether interests of the (former?) 2700 shareholders are aligned or adverisarial [sic] with Mr. Goldberg. Would, for example, Mr. Goldberg ask the court to amend the plan if he discovered fraud and wanted to seek recovery for the shareholders?

Mr. Feinstein responded that I should retain experienced counsel to explain the plan to me and represent my interests. He also did not want to respond to my queries concerning fraud.

Again, on March 12, 2024 I wrote Mr. Feinstein expressing my concerns. On March 13, Mr. Feinstein wrote back stating that since the shares have been cancelled, my request is moot. He then stated that if this does not put an end to my accusatory emails, then I should go ahead and file my motion and the court can address my inquiry.

---

[2] I have since been involuntarily deplatformed from Sofi Securities. This dispute with Sofi and Apex is still pending and I reserve all rights and waive none. I believe it is highly relevant too to the motions contained in this letter, despite Mr. Goldberg's or his attorneys seeming lack of interest in my loss.

3

I am not sure what was accusatory except that it appears that the law firm seems threatened by my queries and unwilling to further communicate with me. I believe this is relevant to their response with a Rule 9011 sanctions motion against ML1. I believe it also now makes sense in hindsight in that Pachulski represented the Creditors Committee before it represented Mr. Goldberg, which at least gives the appearance of a conflict.

As recently as July 26, I have requested from the plan administrator via his attorneys the directly registered balance of common stock at the transfer agent AST as of September 29, 2023. These requests have been ignored and unanswered. As a shareholder, I am entitled to this information to understand my position and rights in the bankruptcy proceedings. The text of my July 26 e-mails to Mssrs. Feinstein and Sandler is below verbatim:

THIRD ATTEMPT:

ATTENTION MR. GOLDBERG, PLAN ADMINISTRATOR (via his attorneys)

Can you answer my very simple and basic questions, or do I need to move the court to compel?

1. How many common shares were issued and outstanding as 9/29/23 (date of plan confirmation)?

2. How many common shares were registered with AST, the transfer agent, as of 9/29/23?

Please help me understand since I'm obviously not as experienced as you or privy to as much information.

Thank you for your consideration to save judicial resources.

Additionally, I believe you should remove your sanctions motion against ML; to me your motion appears frivolous (thou doth protest too much).

Jeff
NY/MA Attorney / Pro Se Shareholder
Phone: 212-203-8918

This last e-mail, as well as my similar queries from March 24, and July 24, have gone unanswered by Pachulski. It seems that the law firm has been busy with their motion against ML1 for unbeknownst reasons. Cooperating with me could yield enormous benefit to the estate (e.g. via a securities fraud lawsuit), and "Securities Claims" are specifically "Non-Released Claims" under the Plan.

Mr. Goldberg as plan administrator is custodian of the books and records of the Debtor. The Debtor has or should have the information in possession of the transfer agent, namely who owned how much stock as of the date of the Plan's confirmation (September 29, 2023), particularly including Cede & Co., the legal owner of "Street" shares. Since Mr. Goldberg is

4

represented by counsel, I have communicated solely with his counsel, as is custom and practice where I practice law. But Mr. Goldberg and his attorneys do not seem to want to communicate with me despite the fact that I was and still am attempting to resolve a very serious dispute.

The reason I wish to know the balance of shares at the transfer agent is the following:

A. Dkt No. 219 (filed May 5, 2023) shows Cede & Co., the nominee of the clearing house Depositary Trust Clearing Corporation, which is a private company, partially owned by the banks connected to this action (including at least JP Morgan), as having a balance of 776,404,408. The issue here is that Debtor represented only having 739,056,836 shares outstanding, of which only "approximately 428,120,000 shares of voting common shares were outstanding."[3] Cede & Co.'s "street shares," those held on behalf pensioners, retirement accounts and investors "on the street," are generally voting shares, unless restricted for various reasons, but simply held by intermediaries such as brokers for the benefit of the "holders."
B. Given the foregoing, I thought it would be helpful to start a dialogue with the Plan Administrator about my concerns of illegal naked short selling, which may have played a part in bankrupting (perhaps deliberately as ML1's submissions seem to imply) this storied company known as Bed Bath & Beyond. This over-issuance of shares is a dilution on the Debtor's value, when more shares are in the market than are supposed to exist, the value of each share is reduced. The legal and regulatory issues created here cast doubt on the integrity of our capital markets.[4] Further, deliberately causing the price of stock to fail ruined the Debtor's ability to refinance and avoid bankruptcy altogether.
C. The accuracy and integrity of records are at play here as well. Because of this action, I now have doubts about whether the U.S. capital markets are free and fair, or simply a giant "self-regulated" crime cartel. If the latter, I want to do my part in holding wrongdoers accountable.
D. Because of the Plan's amended nature, I am not even sure whether I am party to the Third-Party Release (see Part III herein below).

The implications for Class 9 Interest holders in this action and this and other bankruptcy proceedings in general are the following:

A. Voting rights and distributions could be impaired and impacted, potentially leading to disputes.
B. The credibility of the Plan is called into play if the share count is inaccurate and fraud is discovered, as I strongly suspect.

---

[3] See Dkt No. 25, pp. 29, "E. Common Stock: As of the Petition Date, approximately 428,120,000 shares of voting common shares were outstanding."
[4] To date, the undersigned is unaware of any action Gary Gensler's SEC concerning the Debtors' stock. This is true for Merrick Garland's Department of Justice. Each of these facts are surprising, although not so surprising as I suspect them each to be "captured regulators" meaning their interests politically lie with supporting their bank donor-clients than strictly upholding the law.

5

C. Ensuring that all shareholders – whether "Street" shareholders or "Registered" shareholders – are treated equally is paramount. A misaligned share count could be that "Street" holders are severely disadvantaged since their "shares" are merely entitlements and not property like properly registered shares.[5]

Accurately accounting for the total number of shares is crucial for the fairness and legality of the bankruptcy proceedings. Addressing the discrepancy before the final decree is issued is essential to protect shareholder rights and ensure an equitable outcome for all shareholders. The public interest and potential fraud concerns strengthen these motions. If the banks and others can seemingly intentionally bankrupt Bed Bath & Beyond, they can do it to any company and the investing public deserves to know that as bright line risk factor, aka "the markets are rigged." American capitalism should not be Politburo- or Kabuki-capitalism.

In a futile attempt to get the information for myself by directly asking AST on March 27, 2023, I was denied on April 3 and told to contact the Debtor (which means contact Mr. Goldberg).

Since I requested politely numerous times and was ignored, I believe the Plan Administrator and his attorneys unwillingness to cooperate with me should create a negative inference and further support this motion. A more prudent approach of the Plan Administrator would have been to have a call with me to address my serious concerns.

To summarize:

As of May 2023, the shareholder list indicated Cede & Co owned approximately 786 million shares, despite only 739 million shares being outstanding and only 428 million of these being voting shares (see footnote 3, supra).

On September 29, 2023, the reorganization plan was approved, cancelling all common stock. Subsequently, a "null and worthless" letter filed by the Plan Administrator in October 2023 (see Dkt. No. 2631 – Exhibit A) claimed Cede & Co held approximately 701 million shares.

The Plan Administrator and his attorneys Pachulski do not seem to want to engage in settlement discussions with me for what reasons I am not sure. They do not seem interested in pursuing multi-billion Securities Claims as they seemingly supposed to do on behalf of the estate.

3. **Need for Evidence:**

There is a significant discrepancy in share counts that affects the rights and interests of all shareholders. Movant requested an accounting of the total shares outstanding (TSO) as of September 29, 2023, and the balance of non-Cede & Co shares at AST on the same date. Both requests have been ignored.

---

[5] That "Street" shares are not property and merely entitlements is beyond the scope of this letter, but it is believed that these "Street Shares" are merely contractual rights held via intermediaries. Only shares registered at the transfer agent are property. Property rights and contractual rights are legally different at their core.

6

**4. Legal Basis:**

Federal Rule of Bankruptcy Procedure 2004 authorizes examination of any entity regarding the financial affairs of the Debtor.

Federal Rule of Bankruptcy Procedure 9016 incorporates Federal Rule of Civil Procedure 45, allowing subpoenas for the production of documents and evidence.

**5. Request for Relief:**

Movant respectfully requests this Honorable Court to compel the Plan Administrator and AST to produce:
- The total shares outstanding (TSO) as of September 29, 2023.
- The balance of non-Cede & Co shares at AST as of September 29, 2023.

WHEREFORE, Movant prays for an order compelling the production of the aforementioned evidence and for such other and further relief as the Court deems just and proper.

## II. Opposition to Sanctions and Support for Formation of An Equity Committee

I oppose the motion for sanctions against ML1 who moved for the formation of an equity committee. The request for an equity committee is a legitimate and important action to ensure that the interests of shareholders are adequately represented, especially in complex bankruptcy proceedings such as this one. Sanctioning a shareholder for seeking such representation sets a troubling precedent and discourages active participation in the bankruptcy process.

I support the motion for the formation of an equity committee. The plan administrator's aggressive stance and refusal to provide basic stock information underscores the necessity of having an independent committee to represent shareholders' interests. An equity committee would ensure that shareholders have a voice and that their rights are protected, fostering greater confidence in the fairness of the proceedings.

I submit that ML's submissions serve as a valuable impact statement. I can personally attest that beyond the money I have so far lost investing in the Debtor is of little concern when compared to the impact on my health and the time lost trying to understand the status of my investment. The idea that we live in the United States with captured regulators and a fraudulent market is deeply psychologically distressing to me, and I believe to other shareholders as well. I also believe it is chilling on all public companies – and whether international investors should enter our capital markets – to think that the banks that can sell shares that do no exist and that regulators do nothing about it, as seems to be the case in this action where more shares existed on the Street (786 million) than were issued (739 million). What these numbers were as of September 29, 2023 are still unknown, and an equity committee could more successfully argue for the benefit of shareholders and make these proceedings more fair and equitable.

7

I have spoken with ML1 via phone and text, and advised him verbally and in writing that I am not his attorney, which I believe he understands. In my estimation, it is nice to have another shareholder (other than my 94-year-old father, who held 1,000 shares in his retirement account) with whom to commiserate.

In my review of ML1's submissions, and based on my interactions with ML1, I can personally attest that his actions do not in any way reach the level warranting sanctions, which would require bad faith, or acting vexatiously, wantonly, or for oppressive reason (see Chambers v. NASCO, Inc., 501 U.S. 32 (1991). Chambers establishes that sanctions should be reserved for only for instances of bad faith or clear abuse of the judicial process. ML1 actions have not come anywhere near this standard. Roadway Express, Inc. v. Piper, 447 U.S. 752 (1980) further reinforces that courts must exercise restraint in imposing sanctions and should do so only when absolutely necessary. Additionally, Thomas v. Tenneco Packaging Co., Inc., 293 F.3d 1306 (11th Cir. 2002) highlights that sanctions should be considered only in extreme circumstances where there is clear evidence of bad faith or abuse, which is not the case of ML1.

In ML1's latest *in camera* (under seal) submission to this Honorable Court (filed by email to chambers on July 24, 2024), he provided evidence of his and his wife's shareholdings at AST shareholder central – two accounts of directly registered shares with the exact number of shares. He further attested to holding a much larger amount in various brokerage accounts (see page 8 of ML1's submission of July 24), which lends credibility to his concern over these proceedings and explains his financial interest. Most importantly, Pachulski's motion for sanctions against ML1 are unwarranted since, if Goldberg has the Debtor's books and records, including AST records, which he should, he would be able to ascertain the identity of ML1.

Given the foregoing, it is surprising to me that Pachulski would move for sanctions against ML1 based on ML1's not providing his identity. If Pachulski had the information they should have (AST Records called for production in my numerous email attempts and the first part of this letter motion), they could easily confirm ML1's identity by looking at the names next to the AST share counts of ML1 and his wife. Further, Pachulski refused my invitation sent to the cc: parties on this email (removing Chambers for judicial economy) that stated, in part, as follows:

> Since each of ML1 and myself seem to suspect fraud (which could invalidate the Second Amended Plan), I challenge the Plan Administrator or their counsel or Kirkland, or the U.S. Trustee if they have the right as I suspect they do, to state the total shares outstanding of BBBYQ as of September 29, 2023 and to show each of ML1 and myself a copy of the AST share ledger as of close of business on September 29, 2023. The reason for requesting this is that I believe it is highly possible that this document would indeed show securities fraud and therefore require that the 2nd Amended Plan needs to be renegotiated into the 3rd amended plan; such plan granting a negotiated relief to shareholders.

Furthermore, all parties seemingly have ignored my request of July 10 – only leading to further escalation:

8

In addition to supporting an extension for ML, I also propose that an "approach the bench"-style off the record settlement teleconference with all parties could help since often words in emails lose meaning. A teleconference may help judicial economy and to focus ML's difficult task and allow for/foster collaboration among all parties.

Sanctions against *pro se* litigants should be imposed only in the most extreme cases. The standard for imposing sanctions is high and should be reserved for instances of bad faith, vexatious litigation, or clear abuse of the judicial process. See Chambers (supra).

The discrepancies in the share counts as detailed herein are substantial and have not been adequately addressed by the Plan (at least to the undersigned's satisfaction) or the Plan Administrator. ML1's motion for a committee is a legitimate attempt to seek transparency and accountability, not an act of bad faith.

Imposing sanctions on ML1 in this context would deter shareholders from exercising their rights and seeking necessary information, undermining the principles of transparency and justice in bankruptcy proceedings.

The actions of the Plan Administrator in seeking sanctions appear to be an attempt to silence legitimate concerns, which is contrary to the interests of fairness and due process.

The motion for sanctions is unwarranted and should be denied. The Court should instead focus on ensuring that the legitimate concerns regarding share discrepancies as well as ML1's legitimate concerns are properly addressed and appoint a shareholder committee to help it do so in order than this bankruptcy is justly resolved.

**III. Motion for Clarity from this Court on Whether the Third-Party Release Applies to Movant and Whether Movant is entitled to corroborate with other shareholders who opted-out of Signing the Third-Party Release (if Movant Opted-Out, which is not clear).**

Jeffrey M. Kurzon, pro se shareholder, respectfully moves this Honorable Court for an order clarifying the meaning of the consideration under the Third-Party Release and details regarding the reorganization of the 74 debtor entities, so that shareholders can give informed consent when "signing" the required releases. In support thereof, Movant states as follows:

**1. Jurisdiction and Venue:** This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**2. Background:**

On April 23, 2023, Bed Bath & Beyond Inc. filed for relief under Chapter 11 of the Bankruptcy Code. According to Judge Kaplan's "FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON A FINAL BASIS AND (II) CONFIRMING THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF BED BATH & BEYOND INC. AND ITS DEBTOR AFFILIATES," filed on September 14, 2023 (the "Kaplan Order"):

9

- The Debtor filed, on August 1, 2023, the Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates [Docket No. 1712].
- The Debtor filed, on September 11, 2023, the Notice of Filing of Amended Plan Supplement [Docket No. 2161] (as amended, the "Plan Supplement").
- The Debtor filed, on September 11, 2023, the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates [Docket No. 2160] (as amended, the "Plan").

On August 14, 2023, Bed Bath & Beyond Opt-Out Confirmation Number was provided to me by Kroll as follows: 3335-2-MNLBA-897852759 –.

Because my opt-out of the Third-Party Release was after the Amended August 1 plan, but before the Plan (as amended and restated) filed on September 11, 2023, I am not sure whether I am party to the Release. The same applies to my father who held 1,000 shares in his brokerage retirement account and may have opted out of the Third Party Release on or around the same time as Movant. And if I am a party to the Third-Party Release, which was found to be "fair and equitable," I do not know what benefit I have received other than losing my right to sue the Released Parties. Certainly, it seems that the Plan Administrator does not welcome my participation with respect to "Securities Claims" under the Plan, which are "Non-Released Claims," that have yet to be prosecuted and could be worth billions and billions of dollars to the estate.

As a matter, I request that this Honorable Court determine whether I am party to the Third-Party Release or not since my request to opt-out of the Third-Party Release was made prior to the Plan's finalization. It is not clear whether my opt-out was vitiated by the Plan's amendment. As an additional matter, I request that the Honorable Court provide clarity on what is the specific consideration offered to those shareholders who entered into the release (by doing nothing and not affirmatively opting out of granting the release).

As a further matter, I request that the Honorable Court determine how any equity in a reorganized Debtor Affiliate – if any – could be distributed, if at all, when the share count is in dispute (see Motion to Compel above).

On April 18, 2024, Kroll's Calvin Liu informed me he could not share with me who opted out of the release (thus making collective action difficult or impossible, which strains judicial resources).

The Plan approved on September 29, 2023, included provisions for some of the reorganization of 74 debtor entities and required shareholders to sign releases. However, the specifics of the consideration offered to shareholders and the details of the reorganization plan remain unclear to this day.

In paragraph 110 of the Kaplan Order, absence further evidence that I believe is my right to view and inspect for detection of fraud (Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release, which includes by reference each of the related provisions and definitions contained in the Plan,

10

and, further, shall constitute the Bankruptcy Court's finding that the third-party release is: (a) consensual . . . (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Asset Sale Transaction and implementing the Plan), I do not (a) find the release consensual since the consideration is not clearly defined and I, an attorney with twenty years of practice, do not even know whether I or others similarly situated am a party and (c) do not understand both the consideration or it could be deemed without discrimination. The Plan states that Class 9 will receive nothing on account of their Interests. If Third-Party Release signatories (who opted-in by doing nothing) are to receive "good and valuable consideration" then what is this consideration and how is to be reconciled when the share count as of the Plan effective date (September 29, 2023) is unknown and potentially subject to fraud.

Many shareholders, including the Movant, have expressed concerns about the lack of transparency and the ability to give informed consent without clear information. X.com (fka Twitter), Reddit.com and Youtube.com are full of conflicting information (as further evidence by ML1's latest July 24 e-mail submission), but the fact is that shareholders are likely victims of illegal naked short selling of their stock, and it is not clear how this Honorable Court can fairly treat shareholders without discrimination between those shareholders holding shares "on the Street" vs. those who directly registered their shares with AST.

### 3. Need for Clarification:

Shareholders that "signed" the Third-Party Release as part of the Plan could not have made informed decisions without understanding the specific consideration they are receiving and which of the 74 debtor entities will be reorganized.

The definition of "Asset Sale Transaction" according to the Plan (Dkt. 2160) means "the sale or sales, either as a going-concern or in a liquidation, of some or all of the Debtors' assets under this Plan or as otherwise authorized by order of the Bankruptcy Court or the Bankruptcy Code."

The ambiguity regarding the amounts and nature of the consideration offered, and the specific entities involved, hindered shareholders' ability to make an informed decision and may result in uninformed consent, contrary to principles of fairness and due process.

As a shareholder, I have the right to know whether I am a party to a release or not. If I am not party to the release, then I would like to know others in my situation who opted-out of the release so that we may pursue collective action.

Whether adjudicated as party to the Third-Party release or not, I request that this Honorable Court give more clarity as to what is the benefit to those who entered the release (as

11

this benefit could potentially be deprived to those who "chose"[6] to opt-out of the Third-Party Release).

Finally, because the Plan was amended after the release was initially solicited, it is ambiguous who, including myself, is party to the Third-Party Release, and what effect, if any, this may have on recovery for shareholders under the Plan.

I can and am willing to testify to my belief that the Third-Party release was not consensual and is potentially highly discriminatory.

### 4. Legal Basis:

Federal Rule of Bankruptcy Procedure 3016(c) requires that a plan filed with the court must be sufficiently clear so that a reasonable investor can understand the nature of the consideration being offered and the transactions proposed. Given my background as an attorney and investor for over twenty years, I am still perplexed by the Third-Party Release and why one might opt-in or opt-out, and even *whether* I did opt-in or opt-out.

Federal Rule of Bankruptcy Procedure 9019 requires court approval for any settlement or compromise, ensuring that all parties have a clear understanding of the terms and implications. I do not have a clear understanding, and believe that hundreds if not thousands of other shareholders do not have a clear idea understanding of the terms and implications of the Third-Party Release. I am willing to testify to these matters under oath. I believe the contents of this letter are true and correct to the best of my abilities.

### 5. Request for Relief:

Movant respectfully requests this Honorable Court to issue an order directing the Plan Administrator to provide:

A determination as to whether Movant is party to the Third-Party Release. In the event that Movant has opted out of the Third-Party Release, the Plan Administrator should be ordered to provide Movant a list of other shareholders with contact information who have also opted out so in the pursuit of judicial economy, collective action may be taken by those shareholders who opted out of the Third-Party Release, in addition to:

> A detailed explanation of the consideration being offered to shareholders under the Third-Party Release and specifying whether there is a difference between directly registered shares with AST and those held in "Street" form;

> A clear outline of the reorganization plan for each of the 74 debtor entities, and which are subject to the "Asset Sale Transaction" referenced in the Third-Party Release;

---

[6] Chose here is in quotes because Movant believes the Third-Party Release is sufficiently vague and cryptic as to not be consensual in any way. In every release I have ever negotiated as an attorney, the consideration to the releasing party needs to be clearly defined, which in this instance, was not.

12

And, Movant respectfully further requests this Honorable Court to, if determined that Movant, or any Shareholder has been discriminated against, or that the Third-Party Release was not consensual as found in the Kaplan Order, that:

> the Debtor enter into a Third Amended Plan to remove such discriminatory effect on Shareholders (i.e. treating directly registered shareholders differently than those shareholders holding shares at AST) and work to make the Third-Party Release consensual by clearly specifying the consideration.

WHEREFORE, Movant prays for an order clarifying identities of the Releasing Parties vis-à-vis the shareholders, the meaning of the consideration under the Third-Party Release and the specific amounts and details regarding the reorganization of the 74 debtor entities, and for such other and further relief as the Honorable Court deems just and proper.

Thank you for your attention to these matters.

Respectfully submitted,

Jeffrey M. Kurzon

*Pro Se* Common Stock Interest Holder

Cc. VIA Email Only ML1: 147aurora741@gmail.com, Brad Sandler, Pachulski Stang Ziehl & Jones: bsandler@pszjlaw.com, Fran B. Steele, U.S. Trustee: fran.b.steele_usdoj.gov, Emily Geier, Kirkland & Ellis LLP, Kirkland & Ellis International LLP: emily.geier@kirkland.com

13