| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** **Donald F. Campbell, Jr., Esq. (DC8924)** Giordano, Halleran & Ciesla, P.C. 125 Half Mile Road, Suite 300 Red Bank, New Jersey 07701 Tel: (732) 741 3900 Fax: (732) 224 6599 dcampbell@ghclaw.com Attorneys for Creditor, Beverly Parrish | |
| In Re: Bed Bath & Beyond, Inc. Debtor. | Case No: 23-13359(VFP) Chapter:  11 (Jointly Administered) The Honorable Vincent F. Papalia, U.S.B.J. Hearing Date: October 16, 2024 at 10:00 a.m. |

## MOTION TO ALLOW LATE FILED CLAIM TO BE TREATED AS TIMELY FILED

Beverly Parrish, by and through her undersigned counsel, Giordano, Halleran & Ciesla, P.C., hereby moves the Court by Motion to deem late filed proof of claim as timely filed. In support of said motion Beverly Parrish (hereinafter "*Parrish*") states as follows:

### BACKGROUND

1.     On August 1, 2021, Parrish was shopping in BED BATH & BEYOND at its Cary, North Carolina location. While walking in the shopping isle of BED BATH & BEYOND Parrish's walker abruptly caught on the uneven and frayed transition strip between the ceramic tiles and carpeting, causing Parrish to topple over the walker, catapult forward, and land forcefully on her left hip and leg (the "*incident*"). Parrish sustained substantial and severe injuries requiring surgery.

2.      Parrish notified BED BATH & BEYOND of the incident on the same day of the accident, August 1, 2021. The EMS needed to transport Parrish from the store to the emergency medical facility after the incident.

3.      On August 9, 2021, local counsel for Parrish, Taylor Hastings of Taylor S. Hastings Attorney at Law, ("*Local Counsel*") notified BED BATH & BEYOND of the injury claim.

4.      On August 16, 2021, Local Counsel received an acknowledgement of assigned carrier letter from BED BATH & BEYOND. The August 16, 2021 correspondence is attached hereto as **Exhibit A**.

5.      On August 19, 2022, Local Counsel sent a demand brochure, stating requested damages in the amount of $472,000.00. The demand brochure is attached hereto as **Exhibit B**.

6.      On October 16, 2022, Local Counsel received a denial letter from BED BATH & BEYOND. The October 16, 2022 correspondence is attached hereto as **Exhibit C.**

7.      On June 10, 2024, Parrish filed a Complaint for personal injury against BED BATH & BEYOND in the State of North Carolina, County of Wake, General Court of Justice, Superior Court Division. A copy of the State Court Complaint is attached hereto as **Exhibit D.**

8.      On June 18, 2024, Parrish received a filing in the State Court action advising of the bankruptcy and the September 14, 2023 Injunction. A copy of BED BATH AND BEYOND 'S Suggestion of Bankruptcy and Notice of Injunction is attached hereto as **Exhibit E.**

## BASIS FOR RELIEF REQUESTED

### A.  THE COURT SHOULD ALLOW PARRISH'S LATE FILED CLAIM TO BE TREATED AS TIMELY FILED AS SHE WAS NOT PROVIDED NOTICE

9.      On April 23, 2023, the Debtor, BED BATH & BEYOND (the "*Debtor*") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

10.     The Court set July 7, 2023, as the deadline for filing Proofs of Claims.

11.     The Debtor did not list Parrish as a creditor on the Debtor's petition or schedules, nor did the Debtor provide notice of its bankruptcy to Parrish. See Affidavit of Service list filed on April 24, 2023 **[Docket No. 62].**

12.     Parrish was never provided notice of the Debtor's bankruptcy, and only became aware of the Debtor's bankruptcy filing when the Debtor filed a Suggestion of Bankruptcy in the State Court Action. By the time the Debtor provided said notice, the deadline to file a proof of claim had passed.

13.     On September 14, 2023, the Debtor's plan was confirmed.

14.     Fed. R. Bankr. P. 2002(a) requires that all creditors receive 21 days' notice by mail of, among other things, the meeting of the creditors and the time fixed by this Court for filing proofs of claim pursuant to Rule 3003(c).

15.     "Fair or adequate notice has two basic elements: content and delivery." Fogel v. Zell, 221 F.3d 955, 962 (7th Cir. 2000). "If notice is unclear, the fact that it was received will not make it adequate," Id.; if the notice is not received, it is "inadequate unless the means chosen to deliver it was reasonable." Id. at 963.

16.     Under Federal Rule of Bankruptcy Procedures 3003(c)(3), "the court shall fix and for cause shown may extend the time within which proofs of claims or interest may be filed."

17.     In order for the court to allow a tardily filed claim, the petitioner must show

excusable neglect for failure to timely file a proof of claim. Neglect is excusable where the debtor failed to "properly alert and notify" the creditor. See In re Spring Ford Indus., Inc., No. 02-15015DWS, 2003 WL 21785960, at *2 (Bankr. E.D. Pa. July 25, 2003). The Court In re Spring Ford Indus., Inc. further stated, "even creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred." Id. at *3.

18.     As stated, Parrish as well as Local Counsel provided notice of the incident to BED BATH AND BEYOND in August of 2021, prior to the bankruptcy filing. Thus, the Debtor had sufficient knowledge of Parrish as a potential creditor. Parrish did not receive formal notice of the Debtor's bankruptcy proceedings, nor did she receive informal notice, or otherwise have any actual knowledge of the Debtor's bankruptcy proceedings. As a result, the Debtor failed to provide fair and adequate notice to Parrish prior to the bar date.

19.     Parrish filed a proof of claim on September 4, 2024. **See** **Exhibit F**. While the Debtor failed to property alert and notify Parrish of the proceedings and bar date, Parrish has since acted in good faith by retaining Giordano, Halleran & Ciesla, P.C. as counsel for this case. Accordingly, the undersigned seeks an Order from the Court Allowing Parrish's Late Filed Claim to be Treated as Timely Filed.

**WHEREFORE**, Parrish hereby requests that this Court grant an order (i) allowing the late filed proof of claim to be treated as timely filed and (ii) for whatever other relief this court deems just and proper.

Respectfully submitted,

*/s/ Donald F. Campbell, Jr.*

Dated: September 24, 2024                DONALD F. CAMPBELL, JR.

# EXHIBIT A

CorVel

August 16, 2021

Taylor S. Hastings Attorney At Law
1340 Environ Way
Chapel Hill, NC 27517
         Email:   taylor@hastingsnclaw.com

Re:
Claim: 0981-GL-22-0300047-001
Your Client: Parrish, Morgan
DOL: 8/01/2021
My Client: Bed Bath & Beyond
Carrier/ Underwriting: Safety National

Dear Taylor Hastings:

CorVel is the Third-Party Administrator investigating your claim. Please be advised that this claim has been
assigned to me for handling. I am in receipt of your letter of representation dated 8/09/2021.
Under Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (MMSEA), we are legally required
to report claims filed by a Medicare Beneficiary to Medicare. The sole purpose of this form is to determine if
your client is a Medicare Beneficiary, so that we may satisfy our reporting duty to Medicare.  Please return this
completed form to our office.  Thank you for your cooperation.  Please direct all correspondence to my
attention. To assist in our investigation into this matter, please provide the following regarding your Client:
Morgan Parrish.

1. Date of Birth
2. Social Security Number
3. Marital Status (if Married, name of spouse)
4. Occupation
5. Employer
6. Description of incident
7. Proof of Purchase/ receipt
8. Description of injuries
9. Theory of liability
10. Submit any/all medical records and specials
11. Identify any/all witnesses to incident

Thank you,
Sandra Hazelton

*CorVel Corporation is the authorized Third Party Claims Administrator for Safety National assigned to review and
adjust claims on behalf of their insured Bed Bath & Beyond*

Sandra Hazelton | Liability Claims Specialist
CorVel Corporation | Charlotte, NC
PO BOX 78059 | Charlotte, NC  28271
DD 704.941.2870 | TF 800.365.5998 Ext. 12870 | F 866-434-2480

Sandra_Hazelton@CorVel.com | www.CorVel.com

---

The Centers for Medicare & Medicaid Services (CMS) is the federal agency that oversees the Medicare program. Many Medicare beneficiaries have other insurance in addition to their Medicare benefits. Sometimes, Medicare is supposed to pay after the other insurance. However, if certain other insurance delays payment, Medicare may make a "conditional payment" so as to not inconvenience the beneficiary, and then recover after the other insurance pays.

Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (MMSEA), a federal law that became effective January 1, 2009, requires that liability insurers (including self-insurers), no-fault insurers, and workers' compensation plans report specific information about Medicare beneficiaries who have other insurance coverage. This reporting is to assist CMS and other insurance plans to properly coordinate payment of benefits among plans so that your claims are paid promptly and correctly.

We are asking you to answer the questions below so that we may comply with this law.

---

**Please review this picture of the
Medicare card to determine if you have, or
have ever had, a similar Medicare card.**



## Section I

| Are you presently, or have you ever been, enrolled in Medicare Part A or Part B? | □ Yes | □ No |
|---|---|---|
| If yes, please complete the following. If no, proceed to Section II. | | |
| **Full Name:** (Please print the name exactly as it appears on your SSN or Medicare card if available.) | | |
| | | |

| **Medicare Number:** | | **Date of Birth** (Mo/Day/Year) | / | / | |
|---|---|---|---|---|---|
| **\*\*Social Security Number:** (If Medicare Number is Unavailable) | - - | **Sex** □ Female | | □ Male | |

\*\* Note: If you are uncomfortable with providing your full Social Security Number (SSN), you have the option to provide the last 5 digits of your SSN in the section above.

Page **2** of **2**

## Section II

I understand that the information requested is to assist the requesting insurance arrangement to accurately coordinate benefits with Medicare and to meet its mandatory reporting obligations under Medicare law.

_____                 _____
**Claimant Name (Please Print)**                             **Medicare Number**

_____
**Name of Person Completing This Form If Claimant is Unable (Please Print)**


_____         _____
**Signature of Person Completing This Form**           **Date**

*If you have completed Sections I and II above, stop here. If you are refusing to provide the information requested in Sections I and II, proceed to Section III.*

## Section III

_____                 _____
**Claimant Name (Please Print)**                             **Medicare Number**

For the reason(s) listed below, I have not provided the information requested. I understand that if I am a Medicare beneficiary and I do not provide the requested information, I may be violating obligations as a beneficiary to assist Medicare in coordinating benefits to pay my claims correctly and promptly.

**<u>Reason(s) for Refusal to Provide Requested Information:</u>**


_____
_____
_____
_____


_____         _____
**Signature of Person Completing This Form**           **Date**

04/30/2018

# EXHIBIT B

Prepared by:

**Taylor S. Hastings, Attorney at Law**

August 19, 2022

# DEMAND BROCHURE FOR BEVERLY PARRISH

Taylor S. Hastings
*Attorney at Law*

**August 19, 2022**

<u>SENT VIA ELECTRONIC MAIL ONLY</u>

Sandra Hazelton
Liability Claims Specialist
CorVel Corporation
P.O. Box 6966
Portland, OR 97228
E: Sandra_Hazelton@corvel.com

|     |                |                                   |
|-----|----------------|-----------------------------------|
| RE: | Your Client:   | Bed Bath & Beyond │ Safety National |
|     | Firm's Client: | Beverly Parrish                   |
|     | Your Claim No. | 0981-GL-22-0300047-001            |
|     | Date of Loss:  | August 1, 2021                    |

Dear Sandra:

Please accept this correspondence on behalf of Beverly Parrish ("Ms. Parrish") and the claim identified in the reference line of this letter. To briefly reintroduce myself, my name is Taylor Hastings, and I represent Ms. Parrish in her premises liability action against Bed Bath & Beyond. On August 1, 2021, Ms. Parrish slipped and fell at the CrossRoads Cary store location as she walked through the store with her son. She suffered significant injuries as a result, including a left femur fracture that required surgical intervention and intensive rehabilitation. This letter demands compensation from your client in an amount sufficient to place her in the same position she would have been in if the fall did not happen. Please review as follows in support of our demand.

I look forward to hearing back from you soon, as well as to the opportunity to resolve this matter amicably. This offer will expire on September 19, 2022.

Sincerely,

TAYLOR S. HASTINGS
Attorney at Law

*This letter is for settlement purposes only and is without prejudice pursuant to Rule 408*

# THE SLIP AND FALL

### The Slip and Fall at Bed Bath & Beyond On August 1, 2021 at 405 Crossroads Blvd, Cary, NC 27518 at Approximately 2:00 p.m.

The negligent actions and omissions of Bed Bath & Beyond directly and proximately caused Ms. Parrish to slip and fall on August 1, 2021 at the store location addressed at 405 Crossroads Boulevard, Cary, North Carolina 27518.

Ms. Parrish, then 80-years-old, was shopping at the Cary Crossroads Bed Bath & Beyond on that date with her son, Gene Parrish ("Gene"), at approximately 2:00 p.m. Ms. Parrish needed to use a rollator walker to help her navigate the store. As they moved through the store, the rolling walker got caught on a rubber object on the floor that delineated a carpeted area and non-carpeted display area, causing Ms. Parrish to lurch forward over the walker and fall to the ground. She instinctively braced her impact with her left hip and leg. Her son observed the fall and its aftermath, as he watched Ms. Parrish writhe in pain on the hard floor of the store.

Gene called 9-1-1, and an ambulance came shortly after that to transport Ms. Parrish to the hospital. Emergency medical providers removed Ms. Parrish from the store by stretcher, as Ms. Parrish could not place any weight on her legs to move. Her left hip, thigh, and leg experienced sharp and piercing pain. Doctors at WakeMed would later observe that her leg was shortened and externally rotated. Witnesses available to corroborate the account of Ms. Parrish include Gene and the emergency services personnel who responded to the scene to assist Ms. Parrish and contemporaneously interviewed her and Gene.

Bed Bath & Beyond failed Ms. Parrish by not using reasonable care in the maintenance of the premises, as the care and cation expected of a reasonable, prudent person would have removed obstructions in the walkway and/or would have warned guests of the potential for obstructions as they scanned the store to purchase products. In general, "property owners have 'the duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors." *Goynias v. Spa Health Clubs, Inc.*, 148 N.C. App. 554, 555, 558 S.E.2d 880, 881, *aff'd per curiam*, 356 N.C. 290, 569 S.E.2d 648 (2002). The duty to exercise reasonable care requires that the landowner keep the premises in a reasonably safe condition and warn lawful visitors of hidden dangers or unsafe conditions that can be ascertained by reasonable inspection and supervision. *Roumillat v. Simplistic Enterp., Inc.*, 331 N.C. 57, 64, 414 S.E.2d 339, 342 (1992). It is well-established that evidence presented by a plaintiff tending to show that the condition causing a slip and fall existed for some time period prior to the fall may raise an inference of constructive notice. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 543 S.E.2d 166, *rev. denied,* 353 N.C. 450, 548 S.E.2d 525 (2001). The question is not whether a reasonably prudent person would have seen the [object] had he or she looked but whether a person using ordinary care for his or her own safety under similar circumstances would have looked down at the floor. *Norwood v. Sherwin-Williams Co.*, 303 N.C. 462, 468, 279 S.E.2d 559, 563 (1981).

Trip and fall injuries are commonly caused by the presence of various types of obstructions that exist on owners' and occupiers' premises. Most typically, these obstructions usually occur in entranceways, aisles and walkways, stairways and steps, parking areas, and other high traffic areas on a wide variety of different types of premises. Floor mats and other obstructions "subject to periodic folding, bunching, rolling, and shifting" can constitute hazards for which landowners may

be liable. *Jet Food Stores v. Kicklighter*, 226 Ga. App. 552 (487 S.E.2d 120) (1997). See *Best v. Dublin Eye Assoc., P.C.*, 188 Ga. App. 225 (372 S.E.2d 495) (1988) (landlord liable for placement and maintenance of defective mat); *Schuley v. Consol. Stores Corp.*, CASE NO. 98 C.A. 138, 2000 Ohio App. LEXIS 1216, at *1 (Ct. App. Mar. 24, 2000) (opining that while trying to pass through a Big Lots store, the plaintiff immediately tripped on a rug that had become wedged under the door, and the court held it was an open and obvious condition because the plaintiff did not have a duty to constantly monitor the floor for safety).

Consistent therewith, Bed Bath & Beyond owed patrons at the store a duty to exercise care to maintain the premises in a reasonably safe condition for the protection of all lawful visitors, including Ms. Parrish, who used the premises in a reasonable and ordinary manner when she patroned and moved through the store carefully and slowly with the help of her son and a walker; and Bed Bath & Beyond had a duty to display adequate warning to lawful visitors of any dangerous or unsafe condition on the premises that could not be ascertained by reasonable inspection and supervision of employees of the store. Bed Bath & Beyond breached the standard of care expected of the store in the following non-exhaustive ways that failed to comport with the care and caution of a reasonable, prudent person:

    a.  The store failed to keep and maintain the walkways in the store free from obstructions;

    b.  The store failed to warn persons, including Ms. Parrish, of unsafe conditions on the premises.

    c.  The store failed to make a reasonable inspection of the premises and to correct unsafe conditions which such inspection would have revealed; and

    d.  The store was negligent in such other respects as discovery will reveal.

As a direct and proximate cause of that negligence, Ms. Parrish slipped and fell at the store location on August 1, 2021. She suffered a nasty fracture of her left femur that required her to undergo intensive emergency surgery. She lost her independence and ability to perform the most basic of daily activities without maximum support. It is the obligation of Bed Bath & Beyond to compensate Ms. Parrish for those losses. The following sections will detail the medical treatment she received, her expenses, her pain, and her suffering. It will then conclude with a demand that incorporates the severity of her fall, medical bills, and a comparison to jury verdicts and settlements for individuals who sustained substantially similar injuries under like conditions at stores in North Carolina.

# PERSONAL INJURY AND MEDICAL TREATMENT

## PERSONAL INJURY AND MEDICAL TREATMENT AS DIRECT AND PROXIMATE RESULT OF FALL

MS. PARRISH INITIALLY presented for care at WakeMed Cary Hospital. She had immediate pain and could not ambulate. Any rotation of her hip caused Ms. Parrish to suffer intense pain. X-ray images helped treatment providers diagnose the specific nature of the fracture. As will be discussed in greater detail herein, the severity of her fracture warranted an operative plan designed to help her regain mobility. A summary of her medical chart is as follows.

### WAKEMED CARY HOSPITAL EMERGENCY DEPARTMENT

| DATE OF VISIT | NOTES | DIAGNOSIS (ICD-10-CM) |
|---|---|---|
| August 1, 2021<br><br>Date of initial injury | Emergency Department visit<br><br>Reason for Visit- Deformity at the left lower extremity with shortening, and appears externally rotated. Pain with any range of motion of the left hip.<br><br>Slip and fall incident at Bed Bath & Beyond. She was using a walker and it got caught on something on the floor. Given fentanyl.<br><br>Doctor's impression is that she has an angulated comminuted intertrochanteric LEFT proximal femur fracture.<br><br>Small areas of ecchymosis.<br><br>Pain in left hip is 8/10 with any movement of her hip.<br><br>Received hip, chest, and femur x-rays. Vascular congestion and interstitial opacities suggesting edema, along with possible change in configuration of the right-sided pacer lead noted in XR Chest 1 View.  Sent for further evaluation at orthopedics. | - S72.142A **[Principal]**<br>*Displaced intertrochanteric fracture of left femur, initial encounter for closed fracture*<br><br>- S72.142A (CMS/HCC)<br>*Closed displaced intertrochanteric fracture of left femur, initial encounter*<br><br>- Z20.822<br>*Contact with and (suspected) exposure to covid-19*<br><br>- B36.9<br>*Superficial mycosis, unspecified*<br><br>- W01.0XXA<br>*Fall on same level from slipping, tripping, and stumbling without subsequent striking against object, initial encounter*<br><br>- W19. XXXA<br>*Fall from standing, initial encounter* |

## WAKEMED CARY HOSPITAL SURGICAL SERVICES

| DATE OF VISIT | NOTES | ICD (ICD-10-PCS) |
|---|---|---|
| August 2, 2021<br><br>Transfer from Emergency Room to Surgical Services | Fall resulting in left hip pain. Patient has left introchanteric femur fracture. Echo ordered for uncharacterized systolic murmur.<br><br>Procedure: left proximal femur open reduction and internal fixation. | - 0QS734Z<br>*Reposition left upper femur with int. fix, perc approach* |

| DATE OF VISIT | NOTES | DIAGNOSIS (ICD-10-CM) |
|---|---|---|
| August 2, 2021<br><br>Post-op, transferred due to need for continued medical care. | Discharged to skilled nursing facility for further rehabilitation. Continuing physical therapy and occupational therapy.<br><br>Post-operatively the patient developed anemia. She has been transfused with a total of 2 units of packed red blood cells. | - D64.9<br>*Anemia, unspecified*<br><br>- 30233N1<br>*Transfuse nonaut red blood cells in periph vein, perc* |
| Discharged: August 6, 2021 | Physical therapy evaluation and treatment at WakeMed.<br><br>Reason for visit- initial evaluation and treatment by inpatient physical therapy services to assess for change in functional abilities from baseline and to determine appropriate level of assist needed for maximum independence and safety at discharge. Diagnosed with muscle weakness, difficulty walking, history of fall.<br><br>Patient limited by left lower extremity pain and weakness as well as kyphotic posture and decreased range of motion in right knee and ankle. Required max a to sit edge of bed. Unable to place right foot flat on floor and often lifting both feet off floor with attempts to stand. Require max a for lateral scoot to drop arm chair. | - S72.142A **[Principal]**<br>*Displaced intertrochanteric fracture of left femur, initial encounter for closed fracture*<br><br>- S72.142A (CMS/HCC)<br>*Closed displaced intertrochanteric fracture of left femur, initial encounter*<br><br>- F01.50<br>*Vascular dementia without behavioral disturbance*<br><br>- Z20.822 |

| | |
|---|---|
| Patient experiencing pain that interferes with therapy. | *Contact with and (suspected) exposure to covid-19* |
| Patient is below her baseline of mod I amb w/RW and will benefit from continued physical therapy. Recommending rehab less than 3 hours a day to recover to mod I level. | - B36.9 *Superficial mycosis, unspecified* |
| Patient will be seen at least two times a week for 10 visits. | |

| **DATE OF VISIT** | **NOTES** | **DIAGNOSIS (ICD-10-CM)** |
|---|---|---|
| August 4, 2021 | Hospital stay and services<br><br>WakeMed Physical Therapy Treatment<br><br>Patient reports decreased left lower extremity pain, but has weakness as well as kyphotic posture, and decreased range of motion in right knee and ankle. Patient with mod A for supine to sit and max A for stand pivot to right from edge of bed to recliner. Patient continues to be unable to place R foot flat on floor. Patient is below her baseline of mod I with ambulation with RW. Recommended skilled nursing facility at discharge to recover to mod I level of functional mobility. | - W01.0XXA<br>*Fall on same level from slipping, tripping, and stumbling without subsequent striking against object, initial encounter*<br><br>- W19. XXXA<br>*Fall from standing, initial encounter* |

| **DATE OF VISIT** | **NOTES** | **DIAGNOSIS (ICD-10-CM)** |
|---|---|---|
| August 5, 2021 | WakeMed Acute Occupational Therapy<br><br>Continues to demonstrate decreased overall functional strength/endurance/balance and pain in left lower extremity impacting ability to perform ADL's. Recommended continued OT services and skilled rehab at discharge. | |

### REHABILITATION AT SWIFT CREEK

ON AUGUST 6, 2021, Ms. Parrish started residential rehabilitation at Swift Creek Medical Center ("Swift Creek") after WakeMed discharged her from the hospital. She received in-patient treatment at Swift Creek until her release on August 27, 2021 to the care and custody of her son, Gene Parrish.

Her record explains that Ms. Parrish underwent surgery due to a left femur fracture on August 2, 2021. Postoperatively, Ms. Parrish developed anemia and that condition required her to receive a transfusion of 2 units of packed red blood cells. Otherwise, her body did not have enough red blood cells to deliver enough oxygen around her body. While at Swift Creek, wounds she suffered during the fall and subsequent surgery struggled to heal. This caused her discomfort and necessitated frequent medical intervention to treat.

Upon admission, Ms. Parrish complained of intense physical pain in her left hip and thigh due to the surgery on August 2, 2021. Treatment providers noted that her skin revealed bruises and abrasions from the fall, rashes from confinement to hospital beds, and wounds from the surgery. Her left hip had 10 staples with a 6.5cm incision, her left lateral thigh had 4 staples with a 3cm incision, and another incision of 3cm with 5 staples was also on her left lateral thigh. Her left arm, hand, and breast were all bruised due to the severity of the fall. Her condition left her incontinent and that required total care from her medical team at Swift Creek.

On August 9, 2021, skilled care providers recorded that Ms. Parrish required maximum assistance to safely wash and dry her lower body. It was necessary for her to receive verbal and tactile cues and to use grab bars while performing the task.

On August 10, 2021, Ms. Parrish suffered another fall when she attempted to move from her bed to her walker while at the rehabilitation center. While in rehabilitation, Swift Creek providers diagnosed her with Debility, R53.81, a diagnosis to describe the state of being weak, feeble, or infirm. It was therefore necessary for Swift Creek to provide Ms. Parrish with skilled level of care during her stay at the rehabilitation center.

On August 27, 2021, Swift Creek treatment providers removed the staples from her surgery and released her to the care of her son. Upon discharge, Ms. Parrish still required moderate to maximum assistance to wash her lower body. Her self-care functional skills assessment scored the lowest possible value, zero out of twelve, for performance and mobility. This was the new life for Ms. Parrish and her son, Gene Parrish, a reality that stood in stark contrast to the relative independence of her life and mobility before the fall at Bed Bath & Beyond. Discharge instructions required her to be in the care of her son while she continued to recover, and it was necessary for him to administer a litany of prescriptions to monitor her pain, healing, and diminished sense of self-worth.

# SUMMARY OF MEDICAL BILLS

### MEDICAL BILLS FOR TREATMENT MS. PARRISH RECEIVED

| PROVIDER | DATES OF SERVICE | AMOUNT PAID |
|---|---|---|
| WakeMed | 08/01/2021 TO 08/06/2021 | $10,130.00 |
| WakeMed | 08/01/2021 TO 08/06/2021 | $74,245.88 |
| Swift Creek Medical Center | 08/06/2021 TO 08/28/2021 | $13,674.22 |
| Swift Creek Medical Center | 08/06/2021 TO 08/28/2021 | $3,564.00 |

**TOTAL MEDICAL BILLS PAID:**    **$101,614.10**

# PAIN AND SUFFERING

<u>PAIN AND SUFFERING</u>

BEFORE THE FALL AT BED BATH & BEYOND, Ms. Parrish enjoyed the freedom of movement without assistance. She independently completed activities of daily living. That all changed when she suffered the fractured as described in her medical chart. The fall deprived Ms. Parrish of the dignity to move about of her free will and the privacy of self-care.

The severity of the fracture exacted intense pain from the start. The x-ray images of her leg and hip resulted in impressions of one of the most painful types of fractures: an angulated comminuted intertrochanteric left proximal femur fracture. Ms. Parrish could not walk or move her hip without suffering extraordinary pain. Several aspects to the nature of her fracture contributed to intense pain and immobility. Intertrochanteric fractures involve that part of the proximal femur from the base of the femoral neck to just below the lesser trochanter. These fractures are usually low-energy injuries caused by a fall. The patient experiences pain and an inability to walk. The pain is worsened with any attempt to flex or rotate the hip. Fractures can be further described by angulation, which refers to the angle formed by the distal femur relative to the proximal fragments of fractured bone. Surgical intervention was necessary to treat the severity of her injury.

The surgical procedure for Ms. Parrish involved interval intramedullary rod and screw fixation of the left intertrochanteric fracture. In this procedure, the intramedullary nail is inserted into the medullary canal of the femur after the fracture has been surgically exposed. This method basically consists of introducing a nail (or rod) into the medullary canal (the tunnel-like, marrow-filled cavity that runs through the center of the length of the femur. There are several potential risks to surgery and recovery, chief among them is the danger of excess blood loss.

**Indeed, a day after surgery, Ms. Parrish developed anemia and required a blood transfusion.**

The postoperative care for a patient treated for a femoral shaft fracture will vary according to a number of factors, including the type of treatment method used, the age of the patient, and comorbidities. In elderly patients, the outcome is especially problematic and particularly for the type of fracture Ms. Parrish suffered. Decreased bone density is common, particularly in older women. Concomitant fractures of the ipsilateral femoral neck also complicate management and are associated with a higher mortality rate.

Pressure sores on the back or heels, particularly the heel of the injured leg are a problem in 30 percent of patients following hip fracture. These lesions occur most common in elderly women, usually developing within about a week after surgery. These lesions not only increase the length of hospital stay, but they also are associated with a higher mortality. Most pressure sores can be prevented by turning the bedridden patient every few hours and supporting the legs so the heels do not touch the bed.

Overall, an intertrochanteric fracture is a severely disabling injury. Not only is there significant pain, but the patient is unable to walk or transfer from a bed to a chair. If the patient is confined to bed, there is a subsequent risk of pneumonia, pressure sores, venous thrombosis,

gastrointestinal disturbances, urinary infection and dementia. The fracture can result in a varus (turning inward) deformity, with limb shortening and external rotation of the leg below the fracture.

All these factors help medical professionals rate the level of her impairment. Her medical chart indicates high levels of impairment and maximum levels of dependency on others for activities of daily living. Before the fall, Ms. Parrish enjoyed the satisfaction of being able to perform activities of daily living independently. She could move around the house and go outside with independence. The injury and recovery from surgery created the need for Ms. Parrish to relearn how to perform core activities of daily living. Ms. Parrish required total assistance putting on and taking off lower body clothing. She needed total assistance for bathing, including washing, rinsing, and drying her body. The same was true for all toileting activities.

WakeMed discharged Ms. Parrish to intensive rehabilitation at an in-patient facility justified under the diagnosis of Debility. On August 27, 2021, Laura Jenks, a skilled provider with Swift Creek, opined that the mobility limitation from which Ms. Parrish suffered significantly impaired her ability to participate in MRADL's. Unlike before the accident, an appropriately fitted cane or walker would not be able to sufficiently resolve her inability to ambulate. It would instead be necessary to confine Ms. Parrish to a wheelchair or bed. This is a diagnosis that treatment providers do not believe will improve.

Deep vein thrombosis and pulmonary embolism are serious and feared complications of treatment for hip fracture. Deep vein thrombosis is not uncommon in hip fracture. Deep venous thrombosis (DVT) (clot formation) is a life-threatening complication. The lethal nature of venous and pulmonary emboli often requires the use of prophylactic low-dose anticoagulation, e.g. low-dose warfarin or low molecular-weight heparin compounds, following hip trauma and surgery. Meanwhile, mechanical compression, such as the use of a sequential intermittent pneumatic compression "boot", is an important adjuvant in the prevention of deep venous thrombosis (DVT) and pulmonary embolism The likelihood of thromboembolism occurring can also be decreased by early mobilization, such as having the patient up in a chair as early as possible after surgery.

Elderly patients often do not regain their ability to walk or they will need assistance, which greatly influences their ability to live independently. Only 50 to 65 percent of hip fracture patients regain their pre-fracture ambulatory status. After recovery from a hip fracture, an older patient, who prior to injury was living and walking within the community, may be limited to walking only in the house. Many of these patients will need to use a cane or crutches to walk efficiently or with confidence. Following hip fracture, 40 percent of geriatric patients will require help in daily living; 12 percent will walk only within their household; and 8 percent will not walk at all. The overall mortality for hip fractures is 15 to 20 percent. However, mortality it is much higher in the elderly population, among whom up to 36 percent will die within the first year following surgery.

**The risk factors identified in the preceding paragraphs compelled treatment providers to establish a plan as follows: anticoagulation medicine and prescription; pain control, constant monitoring of dressing/stints; daily care for fungal rash; intensive physical therapy; rehabilitation; education; relearning how to perform activities of daily living; and**

teaching her to embrace the reality that she may never have the independence she had before the slip and fall.

Many of the complications identified as risks are ones Ms. Parrish experienced after the fracture. She suffered from a decreased range of motion in her right knee and ankle. She could not place her right foot on the floor. Her knee flex was limited to 90 degrees and she experienced forefoot adduction. She manifested a posterior pelvic tilt.

These risks necessitated treatment providers to monitor her skin integrity and reposition dressings every 2 hours. It was necessary to limit the time in her chair to 2-hour intervals. Even with those precautions, Ms. Parrish suffered from Candida under a skin fold on the left side of her abdomen. This caused her to feel greater pain and decreased her overall strength. The increase in her mortality rate also engendered heightened anxiety, as did the constant medical attention required to monitor her skin integrity.

Her medical chart identified Ms. Parrish was very fearful in her physical therapy exercises. She had to practice bed mobility as a result, including scooting, sitting balance in chair, transfer training, bed training, and more. The condition presented by her physical limitations caused Ms. Parrish to experience immense anxiety.

She remained in denial of her limitations, as her goal for recovery exceeded her prognosis. This placed her at a Morse Total Score of 110, a severely high fall risk. Another fall like the one she experienced at Bed Bath & Beyond could ultimately lead to her death. At Swift Creek, Ms. Parrish did fall again. This will continue to be a difficult part of her recovery plan.

Her stay at the hospital and Swift Creek was one characterized by pain and discomfort. She needed to wedge a pillow between her legs, under her calves, and more to support her back when repositioning. It was necessary for Ms. Parrish to use sequential compression devices to prevent blood clots from forming in her legs. It was necessary for Ms. Parrish to perform foot exercises 10 times an hour to prevent the formation of a blood clot. A chief complaint of Ms. Parrish while at Swift Creek was muscle weakness.

As a byproduct of the surgery, rehabilitation, and lack of any independence caused by her injuries, Ms. Parrish started to suffer from deep depression during the days at nights at Swift Creek. Ms. Parrish expressed that it was very important to her to choose the way she bathed herself. She could no longer do that. Ms. Parrish relayed that it was very important to interact in groups in her daily life. She could no longer do that. It was very important to Ms. Parrish to engage in her favorite activities and go outside for a breath of fresh air. After the fall, Ms. Parrish could no longer do those activities without maximum levels of care. In short, the slip and fall at Bed Bath & Beyond confined Ms. Parrish to a life in a chair or her bed without being able to benefit from regular and routine interactions with other humans, a benefit that is integral to the mental health of all and tied inextricably to personal dignity.

It usually takes six months to a year for an adult to fully recover from the type of surgery performed on Ms. Parrish. Elderly people may never be able to move as well as they once did. That is likely going to be the case for Ms. Parrish.

All of these are complications she can expect to experience for the remainder of her life. She now lives with the unenviable anxiety that her slightest push for independence may prove fatal.

# ILLUSTRATIVE CASE COMPARISONS

**JURY VERDICTS AND SETTLEMENTS FOR SUBSTANTIALLY SIMILAR LOSSES**

> CASE: Anonymous v. Anonymous, No. 1567-75 (New York Co., N.Y. 2001), as reported in 2001 Jury Verdict Review Publications, Inc., New York Jury Verdict Review & Analysis, Vol. 18, Issue 7.

**RESULT: $762,000 ($435,000 and $262,00 for past and future pain and suffering; $67,000 for future medical expenses)**

PLAINTIFF PROFILE: 79-year-old retired female.

FACTS: Plaintiff slipped and fell on urine and feces in vestibule in his apartment.

INJURY: Comminuted right tibial plateau fracture, requiring insertion of two cannulated screws and immobilizing knee brace. Traumatic arthritis. Possible future total knee replacement. Significant residual pain, 5–10% valgus deformity, restriction on previously active lifestyle.

---

> CASE: Healy v. Clark Retail Enters., No. 00-025170-NI (Oakland Co., Mich., Circ. Ct. 2002), as reported in 2002 JAS Publications, THE MICHIGAN TRIAL REPORTER, Vol. 15, No. 4.

**RESULT: Jury award: $400,000**

PLAINTIFF PROFILE: 62-year-old female account representative (divorced).

FACTS: Plaintiff slipped and fell on frozen water puddle under convex overhang.

INJURY: Comminuted fracture of lower leg.

---

> CASE: Anonymous v. Anonymous (Middlesex Co., Mass. 2002), as reported in 2002 JAS Publications, THE MASSACHUSETTS, CONNECTICUT, RHODE ISLAND VERDICT REPORTER, Vol. 14, No. 2.

**RESULT: Settlement: $137,500.**

PLAINTIFF PROFILE: 68-year-old female.

FACTS: Plaintiff slipped and fell on crushed grapes in produce section of defendant's grocery store.

INJURY: Fractured hip, requiring hip replacement.

---

CASE: Conrad v. Hall, No. L-474-97 (Ocean Co., N.J. 1998), as reported in 1998 Jury Verdict Review Publications, Inc., New Jersey Jury Verdict Review & Analysis, Vol. 19, Issue 4.

**RESULT: $650,000**

PLAINTIFF PROFILE: Female in her late 30s.

FACTS: Plaintiff slipped and fell on worn mat as she was leaving. Plaintiff contended that defendant failed to either change mat or warn of dangerous condition.

INJURY: Fractured left (dominant) elbow; flattening of ulnar nerve; severe pain and weakness; clawing of two fingers, resulting in severe restriction in use of hand.

CASE: Crawford v. Wells Fargo Bank N.A., No. YC018521 (Los Angeles Co., Torrance, Cal., Super. Ct. 1998), as reported in Trials Digest, July 20, 1998, at 23.

**RESULT: Jury award: $457,000.**

PLAINTIFF PROFILE: 59-year-old unemployed female.

FACTS: Plaintiff slipped and fell in water at building operated by defendant. Plaintiff contended that security guard had been notified of presence of water four hours before incident.

INJURY: Ruptured disc at L1-L2; disc bulge at L3-L4, requiring surgery; injury to right knee, requiring arthroscopic surgery.

CASE: Sorensen v. Oscar Taylor's Inc., No. BACV2000-00171 (Barnstable Co., Mass. 2002), as reported in 2002 Jury Verdict Review Publications, Inc., National Jury Verdict Review & Analysis, Vol. 17, Issue 9.

**RESULT: Jury award: $400,000 (plus $88,000 interest).**

PLAINTIFF PROFILE: 58-year-old female.

FACTS: Plaintiff slipped and fell on ice outside of restaurant located on defendant's premises. Plaintiff contended that leaking gutter on defendant's building resulted in unnatural accumulation of ice.

INJURY: Fractured left leg, requiring 2 surgeries involving placement of titanium plates and 18 screws.

CASE: Geeslin vs. K-Mart Corp., No. 98-3027-F (Hillsborough Co., Fla. 1999), as reported in 1999 Jury Verdict Review Publications, Inc., Florida Jury Verdict Review & Analysis, Vol. 9, Issue 4.

**RESULT: $374,925 ($24,925 for past medical expenses, $50,000 for past noneconomic damages; $300,000 for future noneconomic damages)**

PLAINTIFF PROFILE: 72-year-old female.

FACTS: Plaintiff slipped and fell on flat piece of metal in aisle of defendant's store.

INJURY: Torn rotator cuff, requiring open surgery; continuing pain and limitation of motion.

---

CASE: Anonymous v. Anonymous, No. SC066408 (Los Angeles Co., Santa Monica, Cal., Super. Ct. 2002), as reported in 2002 Jury Verdicts Weekly, Vol. 1, No. 32.

**RESULT: Settlement: $260,000.**

PLAINTIFF PROFILE: 88-year-old retired female.

FACTS: Plaintiff tripped and fell on wet met at entrance to bank. Plaintiff contended that warnings on mat recommended against placing it in areas that are constantly wet, and that mat was improperly stored, causing wrinkles and lifted corners.

INJURY: Fractured left hip with displacement, requiring surgery with internal fixation.

---

CASE: Kirkham v. Wal-Mart Stores, Inc., No. INC008820 (Riverside Co., Indio, Cal., Super. Ct. 2002), as reported in 2002 Jury Verdicts Weekly (California), Vol. 1, No. 37.

**RESULT: Jury award: $600,000 ($100,000 economic damages; $500,000 noneconomic damages).**

PLAINTIFF PROFILE: Plaintiff tripped over plastic tote container that was around corner of checkout aisle in defendant's store.

INJURY: Soft tissue injuries to ankle, exacerbating pre-existing arthritic condition.

PLAINTIFF'S CASE: Negligence. Plaintiff contended that employees should have removed container.

---

CASE: Fun Sau Wa v. Chinese Daily News, Inc., No. GC018598 (Los Angeles Co., Pasadena, Cal., Super. Ct. 1998), as reported in Verdicts & Settlements, April 3, 1998, at 11.

**RESULT: $339,348.**

PLAINTIFF PROFILE: 61-year-old retired female.

FACTS: After leaving checkout stand, plaintiff tripped and fell over box of books that had been left on floor on defendant's premises.

INJURY: Displaced transcervical fracture of left hip, requiring implantation of Austin-Moore prosthesis.

# SETTLEMENT OFFER

**SETTLEMENT OFFER:**

**BASED ON THE FOREGOING DEMAND INFORMATION, MS. PARRISH AUTHORIZED US TO SETTLE THIS MATTER FOR PAYMENT AMOUNTING TO $472,000.00.**

**THIS OFFER EXPIRES ON SEPTEMBER 19, 2022.**

# EXHIBIT C

CoRVEL

October 12, 2022

Taylor Hastings
1340 Environ Way
Chapel Hill, NC 27517

| | |
|---|---|
| Claimant: | Parrish, Beverly |
| My Client: | Bed Bath & Beyond |
| Date of loss: | 8/1/2021 |
| Claim Number: | 0981-GL-22-0300047-001 |
| Carrier/Underwriting Co.: | Safety National |

Dear Taylor Hastings:

CorVel Corporation is the authorized Third Party Claims Administrator for Safety National assigned to review and adjust claims on behalf of their insured Bed Bath & Beyond.  We are obligated to investigate and pay only those claims in which Bed Bath & Beyond is legally liable. Our investigation revealed no liability on the part of Bed Bath & Beyond. Additionally, please be aware that there is no available premises Medical Payments coverage.

We are sorry that we cannot advise you more favorably in this matter.

Thank you,
Sandra Hazelton
CorVel Liability Claims Specialist
Sandra_Hazelton@corvel.com

**CorVel Corporation**                          PO BOX 6966
www.corvel.com                                Portland, OR 97228

# EXHIBIT D

| | |
|---|---|
| STATE OF NORTH CAROLINA<br>COUNTY OF WAKE | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |

BEVERLY PARRISH,                )
                                     )
         Plaintiff,         )
                                     )
        v.              )          **COMPLAINT**
                                     )
20230930-DK-BUTTERFLY-1, INC.,-1,  )
formerly known as BED BATH & BEYOND,  )
INC.,                      )
                                     )
        Defendant.     )
                                     )

NOW COMES the Plaintiff, Beverly Parrish, by and through undersigned counsel, Taylor S. Hastings, complaining as follows against the Defendant.

PARTIES

1.      The Plaintiff in this action is Beverly Parrish ("Ms. Parrish"), a citizen and resident of Wake County, North Carolina.

2.      On August 1, 2021, she fell at the Bed Bath & Beyond store in Cary, North Carolina, suffering personal injury.

3.      The Defendant in this action is 20230930-DK-Butterfly-1, Inc., formerly known as Bed Bath & Beyond, Inc.

4.      At the time of incident giving rise to this action, on August 1, 2021, the Defendant operated a retail store located at 405 Crossroads Boulevard, Cary, North Carolina.

5.      The current iteration of the business exists under the laws of the State of New York, with a principal office located in New Jersey at 650 Liberty Avenue, Union, N.J. 07083. The CT Corporation System is the registered agent for service of process on the Defendant in North Carolina at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina 27615.

Page **1**

6.      On September 28, 2023, the Defendant amended its certificate of authority to conduct business in North Carolina, changing its legal name from Bed Bath & Beyond to its present name.

7.      This cause of action arises from the actions and omissions of employees, managers, and representatives of the Bed Bath & Beyond in Cary, North Carolina. In the operation of its business activities in the state, the store engaged in advertising and business transactions with North Carolinians.

8.      The injury occurred while Ms. Parrish was shopping in the Cary store—as such, her claims arise out of or relate to the activities of the Defendant within the state.

9.      North Carolina has a strong interest in protecting its residents and providing a forum for redress, and Bath & Beyond, by operating in the state, has availed itself of the benefits and protections of North Carolina law, infrastructure, and commerce, making it reasonable to expect to defend a lawsuit within the jurisdiction. Therefore, the exercise of personal jurisdiction over the Defendant substantially comports with fairness and justice.

10.     Any reference to the Defendant encompasses the imputed actions and omissions of its employees, managers, and representatives, who invariably acted under the direction and control of the store, executing duties within the ambit of their employment in the sequence of events and transactions that precipitated this dispute.

11.     As the employer, the Defendant bears responsibility for the conduct of its employees, representatives, and managers whose actions and omissions, while performing their job responsibilities, contributed to the injuries at issue in this lawsuit.

<u>VENUE AND JURISDICTION</u>

12.     Pursuant to N.C.G.S. § 1-75.4, personal jurisdiction is proper over the nonresident

Defendant, as the entity has established minimum contacts with North Carolina such that

maintenance of this lawsuit does not offend traditional notions of fair play and substantial

justice.

13.     Pursuant to N.C.G.S. § 1-82, Wake County, North Carolina is the appropriate

venue for this action—that is where the Plaintiff resides and where the incident giving rise to this

action occurred.

14.     Pursuant to N.C.G.S. § 7A-240, subject matter jurisdiction is proper in this

Honorable Court. Moreover, superior court is the proper trial division since the amount in

controversy exceeds $25,000.

<u>STATEMENT OF FACTS</u>

15.     On August 1, 2021, at around 2:00 p.m., Ms. Parrish ventured into Bed Bath &

Beyond with her son, Gene Parrish.

16.     Ms. Parrish, an octogenarian, enjoyed independence in her activities of daily life

before the incident.

17.     To help her walk for extended periods, Ms. Parrish relied on the assistance of a

walker.

18.     On the date in question, Ms. Parrish was using a walker with reasonable care for

her surroundings.

19.     Her use of the walker exhibited the precaution expected of an ordinarily prudent

person in her same situation.

20.     The device had large, smooth wheels made of rubber to prevent the device from snagging on maintained walkways. It also had a stable and balanced design, enabling the walker to lift or tilt slightly when necessary to navigate transitional sections of aisles without comprising her stability.

21.     As Ms. Parrish moved through the store with her son, she encountered a section of the walkway that subtly transitioned from ceramic tiles to carpeting.

22.     At that juncture of the aisle, the store had placed a transition strip to ostensibly bridge the disparate sections of the floor design.

23.     The transitional stripping, made of rubber and vinyl, was frayed and uneven, having been warped and degraded without replacement or routine maintenance.

24.     The frayed, warped, and uneven condition of the transitional space constituted a hidden danger to patrons. However, no signs or warnings alerted customers to the dangerous condition of the walkway.

25.     Employees and managers of the store had constructive knowledge of the dangerous condition of the floor. Several factors contributed to this knowledge, including, without limitation, as follows:

- The carpet was thin and easily susceptible to wear and tear, requiring the store to be on alert for potential dangers created by uneven flooring, compounding the fact that the transition strip itself was made of rubber and vinyl, making it more susceptible to wearing out faster.

- The walkway served as a major artery for patrons shopping for the store merchandise. Therefore, the well-travelled pathway rendered the deteriorating condition of the matting and strips even more likely to occur.

- The injury happened on a summer afternoon in North Carolina—the moisture and heat from the preceding summer months had exposed the stripping to an increased danger of warping and degradation.

- The unsafe condition of the transition strip did not occur overnight—rather, it devolved into that condition over an extended period, offering the store ample opportunity to diagnose and rectify the danger through reasonable inspection and maintenance of the walkways in the premises.

26.    But Ms. Parrish had no reason to know of the dangerous condition of the transitional space between the carpet and cement tiles.

27.    As she moved toward merchandise in the carpeted section of the aisle, she trained her focus on the items showcased for customer engagement.

28.    Just before she made it to the carpeted walkway, her walker abruptly caught on the uneven and frayed transition strip, suddenly halting her progress without any forewarning of the peril.

29.    This sudden cessation of movement thrust her momentum forward, causing Ms. Parrish to topple over the walker, catapult forward, and land forcefully on her left hip and leg.

30.    Panic and pain swelled inside Ms. Parrish once she landed, causing her to instinctively call for help.

31.    Upon impact with the floor, Ms. Parrish felt the sensation of the bones in her left hip and femur shatter like glass under tremendous pressure, each fragment piercing through the delicate fabric of her body.

32.    The sharp and relentless shockwaves of pain fiercely radiated from head to toe, akin to an unrelenting storm ravaging a serene landscape.

33.    Her son, a witness to the distressing scene, swiftly summoned emergency medical services.

34.    Paramedics, upon their arrival, had no choice but to evacuate Ms. Parrish on a stretcher, as she lacked the ability to support any weight on her legs.

35.    Any minor shift in her position or a mere attempt to stand amplified her pain.

36.    The medics transported her to the hospital for emergency medical attention.

37.    Treatment providers at the hospital confirmed a fractured left hip that extended all the way to her femur—a condition that not only necessitated immediate surgical intervention but also heralded the onset of a prolonged and debilitating recovery process.

38.    The x-ray images revealed a brutal tableau reminiscent of a shattered vase—an angulated comminuted intertrochanteric left proximal femur fracture.

39.    This was no ordinary break; it was the kind that made you wince just looking at the films.

40.    Consistent with the severity of the fracture, Ms. Parrish found herself in a cruel ballet where every attempt to walk or even shift her hip choreographed a crescendo of excruciating pain.

41.    The nature of her fracture only added layers to this painful complexity. While the intertrochanteric fracture transformed simple movements into feats of endurance, the angle of the fracture was like a twisted sculpture, each misalignment a testament to the disruptive force of the fall.

42.    While in the emergency room, each pulse of pain radiated with an unrelenting, visceral intensity, enveloping her body in a tide of raw, merciless agony that offered no moment of respite.

43.     This constant pain commanded her undivided attention, as she waited to undergo her operation scheduled for the following day.

44.     After a painful night in the trauma room, on August 2, 2021, WakeMed transferred Ms. Parrish to the surgical services department for the operation, where surgeons performed an open reduction and internal fixation of her left proximal femur in the operating room.

45.     The intensive surgery attempted to painstakingly fit back together each fragmented piece of the shattered glass.

46.     The initial aftermath of the operation gave genesis to more intense pain. Every movement sent quakes of pain that rippled through her newly constructed left hip and femur bones.

47.     Following the surgery, Ms. Parrish moved to the surgery ward for postoperative care, where she underwent evaluations and treatments by the physical and occupational therapy teams to address her muscle weakness, difficulty walking, and pain.

48.     By August 5, 2021, despite marginal improvements, she continued to exhibit substantial mobility limitations and required extensive physical therapy to enhance her strength, balance, and overall functional mobility. Resultantly, WakeMed recommended her transfer to a skilled nursing facility to continue her rehabilitation, as opposed to approving her release to a home environment.

49.     On August 6, 2021, Beverly relocated to the Swift Creek Health Center at the Templeton of Cary ("Swift Creek"), where she continued her rehabilitation with ongoing physical and occupational therapy.

50.     Her rehabilitation at Swift Creek was arduous and prolonged, marked by intense pain, dependency, and a significant reduction in mobility.

51.     As she recovered, persistent post-surgical wounds resisted prompt healing, thereby prolonging her physical discomfort.

52.     As her body began to heal, the intense pain morphed into a constant, gnawing presence, as the echo of surgery and its precipitating fracture lingered ever-present in the background of her daily life, providing Ms. Parrish with a stark reminder of her injury and traumatic experience.

53.     The fracture resulted in an inward deformity that permanently shortened her limb.

54.     As a result, Ms. Parrish experienced a profound decline in her functional mobility, rendering her dependent on intensive care for routine daily activities—a stark regression from her prior independence.

55.     The prognosis was grim—unlike before the accident, an appropriately fitted cane or walker would not be able to sufficiently resolve her inability to ambulate. It would instead be necessary to confine Ms. Parrish to a wheelchair or bed for the rest of her life.

56.     As Ms. Parrish grappled with her newfound dependence at Swift Creek, a deep depression began to envelop her.

57.     This was not just a temporary sadness—it was as if someone had painted her days and nights in monochrome, stripping away the colors of autonomy that she cherished. Previously, Ms. Parrish had savored the simple ritual of bathing herself, a personal ceremony now cruelly wrested from her grasp, and her inability to perform this intimate act draped a heavy, wet towel over her spirit.

58.     Moreover, group interactions, once a vibrant thread in the fabric of her daily life, had become an elusive tapestry that hung just out of reach—indeed, her favorite pastimes and the refreshing embrace of the outdoors had morphed into distant memories, now only accessible with an exhausting array of assistance.

59.     Ultimately, the mishap at Bed Bath & Beyond did not just rob Ms. Parrish of her mobility. It sentenced her to an existence confined largely to a chair or her bed, severing the vital connections that stitch us to the world and to each other.

60.     In this enforced isolation, the loss of routine human interactions—a lifeline for mental wellness and a cornerstone of dignity—cast a long shadow over her life, dimming the very essence of her being.

61.     This enforced dependency, coupled with the relentless physical pain and the psychological burden of her diminished autonomy, underscored the transformative and deleterious impact of the fall on her enjoyment of life.

62.     The episode laid bare a blatant disregard for safety protocols designed to shield individuals from concealed hazards on store premises, culminating in acute physical pain and mental suffering.

63.     She incurred substantial medical expenses for the extensive treatment her injuries demanded and endured considerable pain throughout her recovery journey—a path that will never see her regain the strength and independence she enjoyed before the fall.

64.     Ms. Parrish now grapples with a prognosis of diminished mobility for her remaining years.

65.     Therefore, this complaint seeks not only to obtain compensation for the immediate injuries she suffered in the fall but also endeavors to redress the lasting impact of

those injuries on her capacity to enjoy the twilight years of her life, a dignity that the Defendant stripped away from her by neglecting the elemental duties of floor safety in the operation of its retail establishment.

## FIRST CAUSE OF ACTION: Negligence

66.     Ms. Parrish incorporates herein by reference all the preceding paragraphs of this complaint as if she fully alleged them below in their entirety.

67.     To sustain an action for negligence, the Plaintiff must establish the following elements: (1) duty; (2) breach; (3) proximate causation; and (4) damages.

68.     Property owners have the duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors. The duty to exercise reasonable care required the store to keep the premises in a reasonably safe condition and warn lawful visitors of hidden dangers or unsafe conditions that could have been ascertained by reasonable inspection, supervision, and maintenance.

69.     At all pertinent times, the Defendant needed to exercise a degree of vigilance and prudence commensurate with the level of care that an ordinarily prudent owner would have exercised under the same conditions.

70.     As it pertained to the safety of the walkways and aisles in the store, Bed Bath & Beyond needed to do as follows to meet the standard of an ordinarily prudent store owner under the same conditions:

   a.   Discover and keep the premises safe from hidden dangers or defects not observable to customers in the exercise of ordinary prudence.

   b.   Exercise ordinary care in the inspection of the hazardous condition of the walkways throughout the store.

c.   Straighten and monitor the floor mats and transition strips to ensure they did not

protrude in such a fashion as to ensnare a roller on which a person with disabilities

relied.

d.   Exercise ordinary care in monitoring the condition of transitional spaces

susceptible to folding, bunching, rolling, warping, and shifting.

e.   Exercise ordinary care in warning customers of the danger created by the placement

of the transitional strips in the store walkways and aisles.

f.   Conduct periodic walkthroughs of the store, including an inspection of the floors

for any potential slip or trip hazards.

g.   Remove any obstacles from the walkways discovered through regular and routine

inspections of the condition of the store.

h.   Ensure that all pathways were at least 36 inches wide and were free from

obstructions.

i.   Ensure that the mats were laid flat against the floor without curled edges to avoid

trip hazards.

j.   Regularly inspect the floor mats for wear and tear, being sure to replace any mats

that were frayed or no longer were flat against the floor.

k.   Replace any mat or transition strip that showed signs of wear or damage

immediately to prevent compromised functionality.

l.   Keep the underside of mats and stripping clean to prevent slippage, folding,

bunching, and shifting.

m.  Utilize commercial-grade, non-slip mats that feature beveled edges to prevent tripping and which are heavy enough to resist curling or bunching in the aisles of the store.

n.  Monitor and maintain safety at floor transitions by identifying all areas where flooring transitions presented tripping hazards if not properly maintained.

o.  Check and ensure that the edge of the carpet in a transition zone was securely fastened and laid flat against the floor, being sure to observe any sign of wear or fraying that could ensnare a shopping cart, wheelchair, or walker.

p.  Ensure that every transition area was even and was free of sharp and abrupt edges that can lead to a fall.

q.  Use transition strips or thresholds designed to smoothly bridge differing flooring types in the store, being sure to firmly affix any such transition strip to the floor.

r.  Regularly and routinely inspect transition strips, being sure to replace worn strips and repair damage to the flooring immediately.

s.  Place warning signs in clear view when identifying a hazard, such as the uneven condition of the floor, until the store can remedy the dangerous condition.

t.  Deploy warning signs or floor decals to alert customers and staff to the change in flooring, especially in areas of the retail establishment where the transition was not immediately obvious to customers.

u.  Train and supervise all staff on the need to maintain safe transitions between flooring types.

v.  Train and supervise employees on the need to look for cracks, wet spots, or uneven surfaces that could trip customers or staff.

w.  Record any incident or hazard in a store safety log, detailing the time, location, and
nature of the dangerous condition as well as the remedial action the store took to
resolve it.

x.  And any such other duty introduced at trial that flowed from the series of events
and transactions that gave genesis to this lawsuit.

71.  Employees and managers of the store failed to conform their actions to each of
those duties, abrogating their core duty to maintain the premises in a safe condition for customers
shopping the merchandise.

72.  On that date, and the times consequential to her injury, Bed Bath & Beyond
neglected the elemental precautions of floor safety—specifically, the upkeep of mats, transition
strips, and walkways— and that neglect was a dereliction of its duty to render these areas safe for
patrons.

73.  To compound its failure to maintain floor mats, transition areas, and walkways in
a safe condition, the retailer neither conducted regular surveys of the aisles for latent perils nor
provided adequate warning of such dangers to those exercising ordinary vigilance on the store
premises.

74.  Where a reasonable, prudent retailer would have ensured a smooth walking space
for its patrons, the Defendant did not, failing to act in conformity with the standard of ordinary
care in the upkeep of the premises.

75.  The store knew, or should have known, of the dangerous condition of the frayed
and uneven transitional space connecting the tiled and carpeted section—it was a heavily
travelled area, the material was susceptible to deterioration, the humidity augmented the

likelihood of danger, and its condition evolved over extended periods, meaning the store had ample opportunity to identify and abate the risk of harm but elected not to instead.

76.     Despite the elevated risk of danger created by those factors, the store still neglected to regularly inspect its condition, warn of its danger, or otherwise take reasonable steps to abate the risk of a customer tripping in the walkway.

77.     Safety standards applicable to the maintenance of aisles and walkways in a retail store expressly intend to shield patrons from the perils of tripping hazards. They are the sole sentinels against the dangers unknown to customers who enter the store, watchers on the wall guarding against the calamity of customer injury.

78.     To flout these duties is to court disaster just as surely as night follows day—and court disaster the retailer did, when, on the fateful afternoon of August 1, 2021, the Defendant neglected to maintain the transitional space in a reasonably safe condition, allowing its frayed, uneven, and warped state to create a latently dangerous floor condition.

79.     Ms. Parrish, dependent upon her walker for mobility, fell victim to this very neglect and experienced the precise harm that foreseeably results from the failure to exercise ordinary care in the upkeep and maintenance of the walkways and aisles in the store location. As a direct and proximate cause of its failure to keep the transitional space in a safe condition, the walker became ensnared in the floor mat and transition strip.

80.     Where a smooth and even transition would have prevented that occurrence, her walker became wedged in the uneven flooring beneath her, causing Ms. Parrish to topple forward with sudden and irreversible force.

81.     The fall fractured her left hip all the way to her femur, causing Ms. Parrish to suffer intense physical pain and mental suffering.

82.    As a direct and proximate cause of the store neglecting to keep the property reasonably safe for its patrons, Ms. Parrish endured grievous personal injury, pecuniary loss from incurring medical expense, pain, and suffering, all of which could have been avoided if the store exercised the level of care and caution for her wellbeing commensurate with the concern of an ordinarily prudent person in the same situation.

83.    As the Defendant employed all those responsible for the maintenance and upkeep of the premises, vicarious liability imputes their negligent actions and omissions to the Defendant, giving genesis to its derivative liability for the harm Ms. Parrish suffered as alleged in this complaint.

84.    Consistent therewith, Ms. Parrish demands compensation for the deleterious impact on her life that the incident caused her to suffer, amounting to compensatory damages that exceed $25,000.

PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff respectfully prays this Honorable Court to:

1.      Enter judgment against the Defendant, awarding compensation exceeding $25,000

to the Plaintiff in an amount specifically determined at trial.

2.      Tax the costs of this action against the Defendant.

3.      Award pre-judgment and post-judgment interest to the fullest extent allowed by

law.

4.      Award any such other relief the Court deems just and proper in this case.


Respectfully Requested, on this the 10th day of June 2024.


                                        THE HASTINGS LAW FIRM


                                        _____
                                        Taylor S. Hastings
                                        NC Bar: 47048
                                        *Attorney for the Plaintiff*
                                        The Hastings Law Firm
                                        1340 Environ Way
                                        Chapel Hill, N.C. 27517
                                        T: 919-913-4701
                                        F: 919-869-1394
                                        E: taylor@hastingsnclaw.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on June 10, 2024, he served a copy of the

summons and complaint in this action on the Defendant by certified mail, return receipt

requested, directed to the registered agent for service of process on the Defendant in North

Carolina at the following address:

**20230930-DK-Butterfly-1, Inc., c/o CT Corporation System, 160 Mine Lake Court, Suite 200, Raleigh, N.C. 27615**

Certified on this the 10th day of June 2024.

THE HASTINGS LAW FIRM

Taylor S. Hastings
NC Bar: 47048
*Attorney for the Plaintiff*
The Hastings Law Firm
1340 Environ Way
Chapel Hill, N.C. 27517
T: 919-913-4701
F: 919-869-1394
E: taylor@hastingsnclaw.com

# EXHIBIT E

STATE OF NORTH CAROLINA

COUNTY OF WAKE

BEVERLY PARRISH,

     Plaintiff,

v.

20230930-DK-BUTTERFLY-1, INC.,
formerly known as BED BATH & BEYOND,
INC.,

     Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV017729-910

## SUGGESTION OF BANKRUPTCY AND NOTICE OF INJUNCTION

     COMES NOW 20230930-DK-BUTTERFLY-1, INC., formerly known as BED BATH & BEYOND, INC., and files its Suggestion of Bankruptcy and Notice of Injunction, and would respectfully show the Court as follows:

     **PLEASE TAKE NOTICE** that on April 23, 2023, Bed Bath & Beyond Inc., and certain of its affiliates (collectively, the "Debtors")[1] filed voluntary petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Court"), currently pending as Case 23-13359-VFP (the "Bankruptcy").

     **PLEASE TAKE NOTICE** that on September 14, 2023, the Court entered an order confirming the Debtors' Second Amended Joint Chapter 11 Plan (the "Plan"), pursuant to which the Court enjoined all Claims (as defined in the Plan) against the Debtors, including the claim that forms the basis of the above-captioned lawsuit. *See* Confirmation Order [Bankruptcy Doc. 2172, pgs. 56, 131]. Accordingly, the above-captioned lawsuit is enjoined from further action.

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby

Dated:  June 18, 2024

Respectfully submitted,

/s/ *Amy L. Errichiello*
Amy L. Errichiello
N.C. State Bar # 61190
AKERMAN LLP
100 N. Main Street, Suite 2425
Winston-Salem, NC 27101
Telephone: (336) 296-7100
Facsimile: (336) 296-7010
amy.errichiello@akerman.com

/s/ *Michael I. Goldberg*
Michael I. Goldberg
Plan Administrator for the Debtors
201 East Las Olas Blvd.
Suite 1800
Fort Lauderdale, FL 33301
Phone: (954) 463-2700
Email:  Michael.Goldberg@akerman.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 18, 2024, a true and correct copy of the foregoing document was served, in accordance with the North Carolina Rules of Civil Procedure, *via* the Court's Electronic Case Management Filing System on all counsel of record.

/s/ *Amy L. Errichiello*
Amy L. Errichiello
N.C. State Bar # 61190
AKERMAN LLP
100 N. Main Street, Suite 2425
Winston-Salem, NC 27101
Telephone: (336) 296-7100
Facsimile: (336) 296-7010
amy.errichiello@akerman.com

/s/ *Michael I. Goldberg*
Michael I. Goldberg
Plan Administrator for the Debtors
201 East Las Olas Blvd.
Suite 1800
Fort Lauderdale, FL 33301
Phone: (954) 463-2700
Email:  Michael.Goldberg@akerman.com

3

# EXHIBIT F

## United States Bankruptcy Court, District of New Jersey (Newark)

**Fill in this information to identify the case (Select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☑ Bed Bath & Beyond Inc. (Case No. 23-13359) | ☐ Alamo Bed Bath & Beyond Inc. (Case No. 23-13360) | ☐ BBB Canada LP Inc. (Case No. 23-13361) | ☐ BBB Value Services Inc. (Case No. 23-13362) |
| ☐ BBBY Management Corporation (Case No. 23-13363) | ☐ BBBYCF LLC (Case No. 23-13364) | ☐ BBBYTF LLC (Case No. 23-13365) | ☐ bed 'n bath Stores Inc. (Case No. 23-13396) |
| ☐ Bed Bath & Beyond of Annapolis, Inc. (Case No. 23-13366) | ☐ Bed Bath & Beyond of Arundel Inc. (Case No. 23-13367) | ☐ Bed Bath & Beyond of Baton Rouge Inc. (Case No. 23-13368) | ☐ Bed Bath & Beyond of Birmingham Inc. (Case No. 23-13369) |
| ☐ Bed Bath & Beyond of Bridgewater Inc. (Case No. 23-13370) | ☐ Bed Bath & Beyond of California Limited Liability Company (Case No. 23-13371) | ☐ Bed Bath & Beyond of Davenport Inc. (Case No. 23-13372) | ☐ Bed Bath & Beyond of East Hanover Inc. (Case No. 23-13373) |
| ☐ Bed Bath & Beyond of Edgewater Inc. (Case No. 23-13374) | ☐ Bed Bath & Beyond of Falls Church, Inc. (Case No. 23-13375) | ☐ Bed Bath & Beyond of Fashion Center, Inc. (Case No. 23-13376) | ☐ Bed Bath & Beyond of Frederick, Inc. (Case No. 23-13377) |
| ☐ Bed Bath & Beyond of Gaithersburg Inc. (Case No. 23-13378) | ☐ Bed Bath & Beyond of Gallery Place L.L.C. (Case No. 23-13379) | ☐ Bed Bath & Beyond of Knoxville Inc. (Case No. 23-13380) | ☐ Bed Bath & Beyond of Lexington Inc. (Case No. 23-13381) |
| ☐ Bed Bath & Beyond of Lincoln Park Inc. (Case No. 23-13382) | ☐ Bed Bath & Beyond of Louisville Inc. (Case No. 23-13383) | ☐ Bed Bath & Beyond of Mandeville Inc. (Case No. 23-13384) | ☐ Bed, Bath & Beyond of Manhattan, Inc. (Case No. 23-13397) |
| ☐ Bed Bath & Beyond of Opry Inc. (Case No. 23-13385) | ☐ Bed Bath & Beyond of Overland Park Inc. (Case No. 23-13386) | ☐ Bed Bath & Beyond of Palm Desert Inc. (Case No. 23-13387) | ☐ Bed Bath & Beyond of Paradise Valley Inc. (Case No. 23-13388) |
| ☐ Bed Bath & Beyond of Pittsford Inc. (Case No. 23-13389) | ☐ Bed Bath & Beyond of Portland Inc. (Case No. 23-13390) | ☐ Bed Bath & Beyond of Rockford Inc. (Case No. 23-13391) | ☐ Bed Bath & Beyond of Towson Inc. (Case No. 23-13392) |
| ☐ Bed Bath & Beyond of Virginia Beach Inc. (Case No. 23-13393) | ☐ Bed Bath & Beyond of Waldorf Inc. (Case No. 23-13394) | ☐ Bed Bath & Beyond of Woodbridge Inc. (Case No. 23-13395) | ☐ Buy Buy Baby of Rockville, Inc. (Case No. 23-13398) |
| ☐ Buy Buy Baby of Totowa, Inc. (Case No. 23-13399) | ☐ Buy Buy Baby, Inc. (Case No. 23-13400) | ☐ BWAO LLC (Case No. 23-13401) | ☐ Chef C Holdings LLC (Case No. 23-13402) |
| ☐ Decorist, LLC (Case No. 23-13403) | ☐ Deerbrook Bed Bath & Beyond Inc. (Case No. 23-13404) | ☐ Harmon of Brentwood, Inc. (Case No. 23-13405) | ☐ Harmon of Caldwell, Inc. (Case No. 23-13406) |
| ☐ Harmon of Carlstadt, Inc. (Case No. 23-13407) | ☐ Harmon of Franklin, Inc. (Case No. 23-13408) | ☐ Harmon of Greenbrook II, Inc. (Case No. 23-13409) | ☐ Harmon of Hackensack, Inc. (Case No. 23-13410) |
| ☐ Harmon of Hanover, Inc. (Case No. 23-13411) | ☐ Harmon of Hartsdale, Inc. (Case No. 23-13412) | ☐ Harmon of Manalapan, Inc. (Case No. 23-13413) | ☐ Harmon of Massapequa, Inc. (Case No. 23-13414) |
| ☐ Harmon of Melville, Inc. (Case No. 23-13415) | ☐ Harmon of New Rochelle, Inc. (Case No. 23-13416) | ☐ Harmon of Newton, Inc. (Case No. 23-13417) | ☐ Harmon of Old Bridge, Inc. (Case No. 23-13418) |
| ☐ Harmon of Plainview, Inc. (Case No. 23-13419) | ☐ Harmon of Raritan, Inc. (Case No. 23-13420) | ☐ Harmon of Rockaway, Inc. (Case No. 23-13421) | ☐ Harmon of Shrewsbury, Inc. (Case No. 23-13422) |
| ☐ Harmon of Totowa, Inc. (Case No. 23-13423) | ☐ Harmon of Wayne, Inc. (Case No. 23-13424) | ☐ Harmon of Westfield, Inc. (Case No. 23-13425) | ☐ Harmon of Yonkers, Inc. (Case No. 23-13426) |
| ☐ Harmon Stores, Inc. (Case No. 23-13427) | ☐ Liberty Procurement Co. Inc. (Case No. 23-13428) | ☐ Of a Kind, Inc. (Case No. 23-13429) | ☐ One Kings Lane LLC (Case No. 23-13430) |
| ☐ San Antonio Bed Bath & Beyond Inc. (Case No. 23-13431) | ☐ Springfield Buy Buy Baby, Inc. (Case No. 23-13432) | | |

Modified Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Beverly Parrish
_____
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

The Hastings Law Firm
1340 Environ Way
Chapel Hill, NC 27517

Contact phone  919-913-4701
Contact email  taylor@hastingsnclaw.com

Where should payments to the creditor be sent? (if different)

Contact phone _____
Contact email _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known)_____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$_____472,000. Does this amount include interest or other charges?

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Personal injury (unliquidated) _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**          $_____

**Amount of the claim that is secured:**          $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**          $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition:**          $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).          $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).          $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).          $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).          $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).          $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(    ) that applies.          $_____

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No<br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | $ _____ |
|---|---|---|
| 14. **Is all or part of the claim being asserted as an administrative expense claim?** | ☐ No<br>☐ Yes. Indicate the amount of your claim for costs and expenses of administration of the estates pursuant to 503(b), other than section 503(b)(9), or 507(a)(2). Attach documentation supporting such claim.  If yes, please indicate when this claim was incurred: | |
| | ☐ On or prior to June 27, 2023: | $ _____ |
| | ☐ After June 27, 2023: | $ _____ |
| | Total Administrative Expense Claim Amount: | $ _____ |

THIS SECTION SHOULD ONLY BE USED BY CLAIMANTS ASSERTING AN ADMINISTRATIVE EXPENSE CLAIM ARISING AGAINST ONE OF THE ABOVE DEBTORS FOR POSTPETITION ADMINISTRATIVE CLAIMS. THIS SECTION SHOULD NOT BE USED FOR ANY CLAIMS THAT ARE NOT OF A KIND ENTITLED TO PRIORITY IN ACCORDANCE WITH 11 U.S.C. §§ 503(B) AND 507(A)(2); PROVIDED, HOWEVER; THIS SECTION SHOULD NOT BE USED FOR CLAIMS PURSUANT TO SECTION 503(B)(9) OF THE BANKRUPTCY CODE.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.
☒ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    08/29/2024
                    MM / DD / YYYY

_____
Signature

Name of the person who is completing and signing this claim:

| Name | Taylor Hastings | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | _____ | | |
| Company | The Hastings Law Firm | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1340 Environ Way | | |
| | Number        Street | | |
| | Chapel Hill | NC | 27517 |
| | City | State | ZIP Code |
| Contact phone | 919-913-4701 | Email | taylor@hastingsnclaw.com |

Modified Official Form 410

# Instructions for Proof of Claim

United States Bankruptcy Court                                                                                    12/15

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the case was filed.**

- **Fill in the caption at the top of the form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**
  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because attachments may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at https://restructuring.ra.kroll.com/BBBY.

## Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. §503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. §101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. §507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. §506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

If by first class mail:

Bed Bath & Beyond Inc. Claims Processing Center
c/o Kroll Restructuring Administration LLC
Grand Central Station, PO Box 4850
New York, NY 10163

If by overnight courier or hand delivery:

Bed Bath & Beyond Inc. Claims Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

You may also file your claim electronically at
https://restructuring.ra.kroll.com/BBBY/EPOC-Index.

## Do not file these instructions with your form