# **Exhibit A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
                              .   Case No. 23-13359-VFP
IN RE:                        .
                              .   (Jointly Administered)
                              .
BED BATH & BEYOND, INC.,      .   Martin Luther King Building &
et al.,                       .   U.S. Courthouse
                              .   50 Walnut Street
                              .   Newark, NJ 07102
            Debtors.          .
                              .   August 8, 2024
. . . . . . . . . . . . .     .   2:44 p.m.
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE VINCENT P. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor and        Pachulski Stang Ziehl & Jones
the Plan Administrator     By:  BRADFORD SANDLER, ESQ.
Michael Goldberg:          919 North Market Street, 17th Floor
                           Wilmington, DE  19801

                           Pachulski Stang Ziehl & Jones
                           By:  BETH E. LEVINE, ESQ.
                           780 Third Avenue, 34th Floor
                           New York, NY 10017

For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  FRAN STEELE, ESQ.
                           One Newark Center, Suite 2100
                           Newark, NJ  07102

Audio Operator:            Mariela Primo

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (CONTINUED):

For ML:                     No identifying information was given

For Mr. Kurzon:             The Law Office of Jeffrey Mead Kurzon
                            By:  JEFFREY MEAD KURZON, ESQ.
                            305 Broadway, 14th Floor
                            New York, NY  10007

                        - - -

1         (Proceedings commenced at 2:44 p.m.)

2          THE COURT:  Good afternoon.  It is Thursday, August

3 8th, 2024.  This is the United States Bankruptcy Court for the

4 District of New Jersey, and we are here in the case of Bed Bath

5 & Beyond, Inc., et al., 23-13359, a jointly administered case.

6 And we are here today on the motion of a former shareholder who

7 we will refer to as ML or ML1 to redact personally identifiable

8 information and for protective order and to appoint an Equity

9 Holders Committee with some additional related relief

10 requested.

11         May I get appearances, please?

12         MR. SANDLER:  Good afternoon, Your Honor.

13         Brad Sandler and Beth Levine for the Plan

14 Administrator, Michael Goldberg.

15         THE COURT:  Good afternoon.

16         MS. STEELE:  Good afternoon, Your Honor.

17         Fran Steele on behalf of the U.S. Trustee.

18         THE COURT:  Good afternoon.

19         MR. ML1:  Good afternoon, Your Honor.

20         ML1 entering as pro se shareholder.

21         THE COURT:  Good afternoon.

22         MR. KURZON:  Good afternoon, Your Honor.

23         This is Jeffrey Mead Kurzon.  I'm an attorney.

24 However, in front of you today, I wish to appear pro se not

25 representing any other party.

4

1          THE COURT:  Okay.  Good afternoon.

2          And I wanted to address two kind of procedural

3  matters first.  One is I thought it made sense and was

4  procedurally better to proceed by first dealing with the motion

5  to redact personally identifiable information because of the

6  many concerns that have been raised about ML's identity and

7  including his request today for me to close the courtroom.

8          And in that connection, I just want to say and I want

9  to disclose to ML and everyone here who else is on this line.

10  And I think you can see it on your own dashboard.  It's G.

11  Streich is my law clerk.  Juan Filgueiras is my courtroom

12  deputy.  Christy McDonald is also my law clerk.  There's also

13  T. Harrison from Debtwire Press, so it sounds like the press.

14  And then there's an A. Puba (phonetic), an E. Carranza

15  (phonetic), and an L. DeBaise (phonetic) who are on

16  listen-only.  And that is the extent of the appearances, okay.

17          And Mr. -- I'm a little formal when I say Mr. ML, but

18  -- so, Mr. ML, you have repeatedly indicated that you are

19  fearful that disclosure of your identity will potentially cause

20  harm to you or your family.  And I want to note that I have

21  tried to be very cautious and fair in that regard, and that's

22  evidenced by my order of June 12th, 2024, which had various

23  requirements in it but allowed you to redact your personal

24  information, but also required you to file it under seal, file

25  your papers under seal without your personally identifiable

1  information redacted and also provide copies to the other

2  litigants, the U.S. Trustee and the Plan Administrator.

3          And while you have provided redacted copies to

4  everyone, including the Court, I haven't seen any unredacted

5  copies on the docket at all, which was required by Paragraph 1

6  of my order.  And I don't know what the reason for that is, but

7  I'm going to ask.  But in any event, I made sure to say in

8  Paragraph 3 that the unredacted copy would be filed under seal

9  so that it wouldn't be available generally to the public and,

10 in Paragraph 4:

11          "Counsel for the Plan Administrator, the former

12          debtors, and the Office of the United States Trustee

13          shall maintain as confidential and not disclose to

14          any third parties the personally identifying

15          information of the shareholder who identified himself

16          as ML1 at the June 10th conference subject to further

17          orders of the Court.  It is the intention of this

18          Court that all the confidentiality provisions of this

19          order be considered provisional and subject to

20          modification in whole or in part and further

21          proceedings before this Court as described in this

22          order."

23          So the first thing is that your personally

24 identifiable information has not become publicly available as a

25 result of this case.  It may be available in other forum or

6

fora, but it wasn't because of this case.  And, frankly, I
don't understand why you didn't comply with the order, but
we'll get to that, as well.

          And so then relatedly, your last minute, really last-
minute after 11:00 a.m. today request for what is
unquestionably extraordinary relief, which is to close the
courtroom, which is a public forum, was inappropriate.  It
requires a motion.  It was untimely, I mean a couple of hours
before.  And, I guess, unless there are other parties who are
somehow participating without being disclosed on the dashboard
here, there's really not that many people here.  It's a pretty
limited proceeding.

          And then, I just want to cite to you, Mr. ML the case
of <u>Publicker Industries vs. David Cohen</u>, which involved a
Philadelphia newspapers and it's Third Circuit case, 733 F.2d
1059 (1984).  And there, the Third Circuit, which is the
governing law in this district and in this circuit, says that
the -- on Page 1071 that,

          "The public and the press possess a First Amendment
          and common-law right to access civil proceedings.
          Indeed, there is a presumption that these proceedings
          will be open.  The trial court may limit this right,
          however, when an important countervailing interest is
          shown.  A trial court must satisfy certain procedural
          and substantive requirements before it can deny

1    access to the civil proceedings."

2    So procedurally, the kind of extraordinary relief is

3    just not appropriate on two hours' notice.  But, also, the

4    Court is required, "in closing a proceeding, must articulate

5    the countervailing interest it seeks to protect and make

6    findings specific enough that a reviewing court can determine

7    whether the closure order was properly entered," citing cases.

8    "And substantively the record before the trial court

9    must demonstrate an overriding interest based on findings that

10   closure is essential to preserve higher values and is narrowly

11   tailored to serve that interest."  And I'll emphasize those

12   last few words, "narrowly tailored to serve that interest."

13   And there, the Third Circuit cites Press-Enterprise Co. v.

14   Superior Court of California, Riverside County, 104 S.Ct. at

15   824.

16   So in trying to address your confidentiality concerns

17   both in terms of the protective order and then the late request

18   to close these proceedings, which I denied, there's a couple of

19   things that I note.  One is, although I know the request was

20   opposed by the Plan Administrator and really not addressed

21   directly by the U.S. Trustee, I just want to tell the parties

22   that I am inclined to leave my order right where it was and by

23   requiring that unredacted copies of the motion papers be

24   provided to the U.S. Trustee and the Plan Administrator and

25   also that redacted copies by filed on the docket and, finally,

1  emphasize that the Plan Administrator, the former debtors, and

2  the Office of the United States Trustee, whoever this is

3  disclosed to, must maintain it as confidential and not disclose

4  it to any third parties.

5          So, and then on top of that, there's really very

6  limited public participation here.  And as I emphasized

7  earlier, no one knows your personally identifying information

8  as a result of these bankruptcy proceedings.  So I'm basically

9  deciding that aspect of the motion as well as addressing your

10 late request to close the courtroom by saying I'm going to keep

11 that July 12th, 2024 order in place and I feel that that

12 addresses your confidentiality concerns that your fear of

13 injury to your person or to your family, which I take very

14 seriously.

15         I don't know whether or not they're real, and I do

16 have to say in reading the papers I saw that a lot of that was

17 directed at Mr. Sandler and he's an officer of this Court.

18 He's a longstanding attorney that has been before me many, many

19 times.  He is one of the last people I would think would cause

20 personal harm to anyone, not just you, just anyone at all.  And

21 so, if that's the fundamental basis of the concern, I don't

22 think you need to be concerned about that.

23         If the amorphous community is the concern, then you

24 might have to worry about that.  But they've got your -- they

25 know whatever they know about you completely independently of

1 here. So if anyone wants to try to convince me that I'm going

2 down the path on that and that I shouldn't essentially continue

3 the June 12th order, please let me know. Otherwise, that's

4 going to be my ruling on that aspect of the motion.

5         MR. SANDLER: Your Honor?

6         THE COURT: Yes.

7         MR. SANDLER: Brad Sandler for the Plan

8 Administrator. If I may be heard just for a moment.

9         And I certainly appreciate everything you just said,

10 Your Honor. And I have no issue with it. My only question for

11 Your Honor is if you should put a date by which Mr. ML wanted

12 to comply with your order.

13         THE COURT: And we're going to make that part of --

14 we'll make part of the order that resolves these two motions.

15 How about that? But I don't think --

16         MR. SANDLER: Very good.

17         THE COURT: Yeah, I don't think it needs to be any

18 long period of time, because the papers already exist. And

19 from what I saw, there's very limited, if any, personally

20 identifying information in them anyway. So I'm not sure.

21         But Mr. ML?

22         MR. ML: Thank you, Your Honor. I will try to speak

23 to some of the concerns that you raised. I think the crux of

24 my issue is, is that I don't feel like I can effectively speak

25 to any of them simply from the standpoint of not being a

1 lawyer.

2      From the standpoint of I don't know what issues there

3 are. For example, the closed-door meeting, I did request via

4 email on June 21st, as well as June 25th, the correspondence

5 with everybody here. Additionally, with respect to the not

6 having -- I apologize, first and foremost, I definitely didn't

7 mean to obstruct your instructions or not follow them. On June

8 -- I'm sorry, on July 10th, I replied, specifically stating

9 that on the morning of June 14th, I felt like I notified and

10 served everybody and asked for confirmation of, is this all I

11 need to do procedurally and please advise what the disconnect

12 is, and I'd be happy to remedy it. And I didn't hear back, but

13 that's not the point.

14      The point is, I feel very disadvantaged, simply from

15 the standpoint of I don't mean to do the things that obviously

16 were procedurally out of bounds. I just am simply trying to

17 emphasize that I feel like that's very surprising to me. It

18 wasn't the intent and my -- maybe the question that I have

19 specifically on the order that I did not follow was, I'm

20 confused by the redacted versus unredacted, simply from the

21 standpoint of, it was my understanding from the scheduling

22 hearing that we were talking about, you know, setting up a lock

23 box or using the legal Zoom simply so that I may be served

24 documents, which I immediately did the next day.

25      I set one up. I modified the documents, the motion

1  that I was submitting, and I resubmitted those electronically

2  per the email from Ms. McDonald.  But my whole point is, I'm

3  not trying to obstruct anything, and I'm certainly not trying

4  to follow Judge's orders, and I apologize for not doing so.

5            THE COURT:  Well --

6            MR. ML:  I --

7            THE COURT:  Mr. ML --

8            MR. ML:  Yeah, go ahead.

9            THE COURT:  -- I know you're not a lawyer, but you

10  seem to me to be an intelligent person, and I directed you to

11  this.  I prepared the order.  You were here when I gave the

12  order verbally.  And Paragraph 1 of the order says, "The

13  shareholder within two business days of entry of this order

14  shall file with the Court a copy of the motions with his

15  personally identifying information redacted and replaced with

16  the information contained in Paragraph 2 of this order," which

17  Paragraph 2 allows you to, you know, use a different name and

18  address that would be acceptable for service; and two, to serve

19  copies of the motion.  So that didn't happen, and I think -- I

20  may not be the best writer in the world, but I think that's

21  pretty quick, pretty clear.

22            Then number two is serve copies of the motions

23  without any redactions on counsel for the Plan Administrator,

24  counsel for the former debtors, and counsel for the United

25  States Trustee by electronic mail.  From my understanding is

1  that you served redacted copies on those parties but not

2  unredacted copies.  So that did, that was not compliance.

3          And then I think --

4          MR. ML:  Your Honor?

5          THE COURT:  -- you did comply -- just let me finish.

6          MR. ML:  Yes.

7          THE COURT:  And then you did comply with number

8  three, I understand, by serving a redacted copy on Mr. Kurzon.

9  But like I say, I don't think that's that convoluted or

10 complicated, and I think you can comply with it fairly easily.

11         So again, I'll just ask --

12         MR. ML:  I'm sorry.  I --

13         THE COURT:  -- if there's something that -- you have

14 something, some issue with what I indicated was going to be my

15 ruling.

16         MR. ML:  Just my ineptitude of, I thought I did that,

17 because when I submitted them, you know --

18         THE COURT:  You didn't --

19         MR. ML:  -- there was no redacted -- there was no --

20 go ahead.

21         THE COURT:  You didn't -- I don't know, you didn't do

22 it because that -- they don't have your name.  So you didn't do

23 it.

24         MR. ML:  But in the legal --

25         THE COURT:  And you didn't file them.  And you didn't

1  file them with the Court.  You didn't file the unredacted

2  version, and you didn't file the redacted versions.

3       MR. ML:  I think that's where I get stuck is because

4  I don't know, I mean, I have a receipt from FedEx saying that

5  it was delivered, and I guess, I don't under -- I just want to

6  emphasize, I don't know what the disconnect is, and I apologize

7  for not following the order.  I didn't have any redacted

8  information in there, so I simply swapped out the name with the

9  legal Zoom name, which was Bed Bath & Beyond Shareholder.

10      And I think in my own negligence, I thought that was

11  sufficient, and I'm hearing that it's not, and I -- the

12  disconnect is completely on my own, unknowing of all of these

13  different legal terms and how to follow procedure

14  appropriately.  I apologize.

15      THE COURT:  Okay.  But just much more than

16  apologizing, I'd just rather you comply.  And what it says is

17  file with the Court a copy of the motions with his personal

18  identifying information redacted and replaced with the

19  information contained in Paragraph 2.

20      So, in other words, where you had your name and where

21  you had your other contact information, that's an unredacted

22  copy.  That's without the change that I allowed by Paragraph 2,

23  so you wouldn't be identified in the public filing.  Okay?

24      MR. ML:  Yes, Your Honor.  Okay.

25      THE COURT:  Okay.  So, do you need more than a couple

14

1 of weeks to do that? I think you could do it in a day, to be

2 honest with you.

3 MR. ML: Yes, I think I can -- yes, I think I can do

4 it in a day.

5 THE COURT: Yeah. All right, I'll give you --

6 MR. ML: I apologize. I'm still not -- I'm trying to

7 understand and digest and understand what you -- I'm really

8 struggling with just understanding the difference of what I did

9 versus what I'm being told I need to do. But re-analyze after

10 the call today, and I will mail it tomorrow, first thing.

11 THE COURT: So, just to try to make it as clear as I

12 possibly can, for example --

13 MR. ML: Please, thank you.

14 THE COURT: -- although I'm not looking at it as

15 right at this moment, the copy of the original motion that you

16 provided to the Court did not have your -- I'm sorry, did have

17 your personal identifying information that I saw. I saw your

18 name. I know what your name is, but I haven't disclosed it to

19 anyone except people that I work with in chambers. And that

20 was the version that was the unredacted version, okay?

21 And then, you know, I allowed you in Paragraph 2 to

22 address your concerns to -- on the public filing, say, you

23 know, put your other address that doesn't identify you

24 personally. But I also required in Paragraph 1 (ii) that you

25 serve the same unredacted set that you originally provided to

 1 the Court on Mr. Sandler and Ms. Steele, et cetera.  So, that

 2 you originally provided, not the one that says Bed Bath &

 3 Beyond shareholder.

 4          MR. ML:  Okay.  Understood.

 5          THE COURT:  Okay.  I mean, I don't know.  I don't

 6 know what else to say.

 7          MR. ML:  No, I do.  I understand now.  I didn't

 8 clarify the differentiation, but thank you --

 9          THE COURT:  Okay.

10          MR. ML:  -- for (indiscernible).

11          THE COURT:  All right.  Any other comments on that,

12 because that's what I -- I think that my ruling, there's a

13 general presumption that everything that happens before this

14 Court is public and is available and is open to the public.

15 And that's in 107 of the Bankruptcy Code and in the common law,

16 as I said it and in the Constitution.

17          So, that's an important, important interest that I

18 have to protect, as well as trying to be as narrow as possible

19 if there are real issues of concern.  And I'm saying to

20 eliminate those issues, Mr. ML has to provide his personal

21 information to the parties indicated in the order only, and

22 they have to keep it confidential.  Okay, that's my ruling.

23          MR. ML:  Thank you, Your Honor.

24          Can I speak quickly to the comments made about the

25 personally identifiable information and my concern there?

1        THE COURT:  Okay.

2        MR. ML:  I think simply just to state that I feel

3   very -- multiple things.  I mean, I'm very appreciative and I

4   can't understate that enough, the leniency that you and the

5   Court provided and continue to, especially as I'm obviously

6   very procedurally unable and inept to be able to have these

7   conversations.

8        But I think what I'm trying to emphasize with the

9   redaction of my personally identifiable information is I feel

10  like the content and information that I feel like I would like

11  to share with the estate, the U.S. Trustee, and the Court is of

12  such extreme importance and is unique from the perspective of

13  it not being available anywhere else, that I feel like the

14  dangers associated with those aspects, not Mr. Sandler

15  individually, of course.  I was more speaking to the more broad

16  implications of the -- I highlighted quite a few of them in the

17  objection responses, although very lengthy and untimely.

18       I'm very much trying to portray an emphasis that I

19  simply want to bring forth information that I feel like will

20  benefit the estate greatly, and I feel like I'm unable to do so

21  by myself.  And the fact that I'm extremely hindered

22  financially and unable to afford counsel allows me -- or I

23  can't, from a language perspective, ensure that when I'm

24  talking here, I'm worried that I'm going to say something that

25  I shouldn't and will result in either another sanction against

 1 me or will put myself in danger because of my inability to say

 2 things in a way that won't have implications from bad actors.

 3          And I think that's kind of like the point of emphasis

 4 that I wanted to have around the order of protection was simply

 5 wanting to share information as productively as possible and

 6 really just kind of give as much as possible, but to do it

 7 safely.  And I think that's all I really wanted to say.

 8 Thanks.

 9          THE COURT:  Yeah.  I mean, I guess I was going by

10 what you said you wanted, which was the redaction of personally

11 identifiable information.  What you just talked about goes far

12 beyond personally identifiable information.  And, again, if you

13 think that something that you want to provide to someone is

14 confidential in the course of a litigation, there's ways to do

15 that.  There's motion practice and that happens.  But I just

16 can't deal with -- I didn't consider -- I mean, you submitted a

17 lot of information, sir, so I'm not sure what you didn't

18 submit.

19          But there's plenty of information that was submitted

20 here in between your motion and the reply.  So I can only

21 respond by saying I'm only dealing with your request to react

22 personally identifiable information.  And if you have something

23 else you want to disclose and keep confidential, there's ways

24 to do that.  Parties can agree to keep it confidential.  You

25 don't even need the Court, but that's a whole nother thing and

18

1  we don't need to get into that now.

2          MR. ML:  Understood, thank you.

3          THE COURT:  Thank you. All right.

4          So now I want to just get to the substance of the

5  motion.  I think the real driver here is that you're seeking

6  the appointment of an Equity Holders Committee and then,

7  relatedly, a change in membership of the Committee.  And also

8  in certain places, you said you want all the proceedings to

9  stop.  You understand, again, that's quite extraordinary

10 relief.

11         MR. ML:  Yes, Your Honor.

12         THE COURT:  And the basis, as I understand it,

13 several of the bases are like alleged conflict of interest

14 among parties.  And although there are a lot of pages there, I

15 know you said that there were conflicts of interest, but what

16 are they?  And can you please point me to where you describe

17 them?

18         MR. ML:  I think my ability to do so realtime on the

19 call is going to be extremely hindered simply from the

20 standpoint of I don't feel like I can effectively communicate

21 with the Court to that capacity.  I think -- I'm happy to list

22 off many, but I'm happy to do so right after.

23         I think what I'm trying to underscore is when I

24 originally tried to reach out to the Court, I really wanted to

25 emphasize that I know for sure I cannot bring this forward

1 productively, efficiently on my own.  I have no ill intent.

2 I want to be an ally of the Court and the estate and the U.S.

3 Trustee.  And I think all of the correspondence thus far has

4 kind of been with that in mind.

5 So to your question on various conflicts of interest,

6 I think the fact that FTI Consulting, M3 Partners, Lazard,

7 Sixth Street, etc., were engaging with the debtors' estate far

8 advance of bankruptcy, far in advance, as early as January of

9 2023 for sure, per the 90 days pre-bankruptcy, but far before

10 that as well, that there's very substantial conflicts of

11 interest between the official bondholder list and who the

12 priority liens are.

13 I'll simply state one random example that I haven't

14 submitted anywhere because of my inability to understand how to

15 submit this information is --

16 THE COURT:  Well, I don't want to know.

17 MR. ML:  -- the, you know, company that was supposed

18 to be --

19 THE COURT:  You know what?  I'm going to stop you.

20 I'm sorry.

21 MR. ML:  Yeah.

22 THE COURT:  I can only consider what's before me.  I

23 can't consider things that are not before me.  And you telling

24 me on oral argument that there's other things you didn't tell

25 me is not something I can base a decision on because, again,

1  for the same reasons, it's not fair.  It's not fair to me, and

2  it's not fair to the other parties.  So I don't want you to

3  tell me what is not in your papers.

4         In fact, I specifically asked you to tell me in your

5  papers where it is, what the conflict of interest is, among

6  whom.

7         MR. KURZON:  Your Honor, this is Jeffrey Kurzon.

8  Sorry, ML.  I'm just going to say one thing.  In the record,

9  there is the fact that Pachulski represented the Creditors

10  Committee.  Now Pachulski is representing the Plan

11  Administrator.  And I can attest personally to the trouble I've

12  had communicating with the Plan Administrator via his attorney,

13  Pachulski, particularly related to the share count.

14         And I'm not sure if Your Honor wants to take judicial

15  notice of the letter I sent July 30th, twice actually.  But --

16         THE COURT:  Yeah.  No, but you know what --

17         MR. KURZON:  -- the third-party release --

18         THE COURT:  Mr. Kurzon?

19         MR. KURZON:  -- specifically --

20         THE COURT:  Go ahead.

21         MR. KURZON:  Yes.  Oh, the third-party release,

22  specifically releases of the released party, the Creditors

23  Committee.  So we don't know if Mr. Sandler and his firm's

24  loyalty is to his current client or his former client.  So

25  that's just one conflict of interest that maybe ML could

 1 describe further.

 2          But I mentioned it here is that that may be a

 3 conflict of interest.  Maybe it was waived.  But when we get to

 4 the meat and potatoes, so to speak, of whether there should be

 5 an Equity Committee, and I would submit that the Court should

 6 look at, in the alternative, Section 1104(c), appointment of an

 7 examiner in lieu of an Equity Committee --

 8          THE COURT:  Yeah, you see --

 9          MR. KURZON:  -- because of that conflict and other

10 issues.

11          THE COURT:  There's two responses to that,

12 Mr. Kurzon, immediately, and you're a lawyer so I think there

13 should be no problem appreciating this.  Number one, there is

14 no conflict in representing the Creditors Committee

15 pre-confirmation and then the Plan Administrator

16 post-confirmation.  In fact, the interests are very much

17 aligned because what they're trying to do in both cases is

18 maximize the estate for recovery to stakeholders.  So that's

19 just not a conflict, number one.

20          But number two is that if there were such a conflict,

21 it could have been raised and raised before.  It shouldn't be

22 raised now, nine months after confirmation.  And what was it --

23 and then secondly, just like your July 30th letter, you raising

24 1104 today is inappropriate.  I just said it to Mr. ML.  I just

25 said to him, it's not appropriate and it's not fair to raise

1  something in oral argument at the very last minute that isn't

2  in anybody's papers because no one has a chance to respond.

3  And you have to proceed by motion.  You can't just ask for that

4  at oral argument with no basis provided and no papers provided.

5            MR. KURZON:  Yes, Your Honor.

6            THE COURT:  And I think you should know that the same

7  is true, the same is true, I don't know what kind of law you

8  practice, but if you were a litigator, you know you have to

9  file a motion and give the other parties notice of what you're

10  trying to do.

11            And your July 30th letter gave me and the other

12  parties no fair notice and also does not comply with any rules

13  at all.  You don't just move to compel something until after

14  you have a subpoena or a discovery request that's not complied

15  with.  I didn't see anything like that, and you need to do it

16  by motion.  The same thing is for clarity on what the releases

17  say.

18            Number one, it sounds like you're asking for either a

19  declaratory judgment or an advisory opinion, and there's

20  problems with both of those.  There's real problems with both

21  of those, substantively.  And procedurally, if you want either

22  of those things, you have to bring it by a complaint under Rule

23  7001.  So we might as well deal with that preliminary matter

24  now.

25            It's the same thing the way Mr. ML started this with

1  the letter to the Court.  His letter to the Court was not the

2  way to seek relief.  It says it.  You have to file a motion or

3  a complaint.  The same thing applies to you, sir.  You have to

4  file a motion or a complaint and then people get a chance to

5  respond.

6  So I am not considering your July 30th letter today,

7  nor am I considering 1104.  Okay?

8  MR. KURZON:  Understood, Your Honor.

9  With respect to what you said earlier, that

10  bankruptcy is public and that's in the Code and the common law,

11  that makes sense.  However, the reason I did not send the

12  letter to the docket clerk to be filed on the docket is because

13  I believe the matters at stake are so serious as to impact our

14  national security.

15  So therefore, I believe that -- you know, I didn't

16  explicitly state this in the letter, but that it should remain

17  private.  And I will consider your words, Your Honor, in

18  respect to a potential future motion.  But I would just like to

19  let the Court know that I do not wish to be in the courtroom.

20  The reason I am in the courtroom is because I have a documented

21  nine-month trail of communication with the attorneys for the

22  Plan Administrator and the U.S. Trustee and the authors of the

23  plan, Kirkland & Ellis.  And the modus operandi of all three

24  seems to be to ignore me, which is highly frustrating because,

25  by ignoring me, they're ignoring all shareholders.

1        So I can only assume that there was fraud in the

2 factum or fraud in the inducement, and that when the plan talks

3 about, you know, the third-party release instrumental in

4 maximizing value for all stakeholders in several places, all

5 that I get is responses of no response or that this is a

6 liquidation. But if it were a liquidation, then I don't

7 understand why this is a Chapter 11 as opposed to a Chapter 7,

8 which would be a liquidation.

9        THE COURT: Right. Well, the bankruptcy -- one

10 reason is that the Bankruptcy Code specifically provides that a

11 reorganization plan may provide for the liquidation of the

12 debtor and its assets. That's one reason. And then many times

13 you start out hoping that it's a reorganization, and it doesn't

14 end up that way.

15        But just to go to what I thought was your main point

16 about national security, I read your letter. I don't see any

17 national security issues in there. But, you know, again, it's

18 the same thing I said to Mr. ML is if you have those kinds of

19 issues and you're not getting the kind of response that you

20 think you're entitled to, you're an attorney. You know where

21 the courthouse is. You can do whatever you think is

22 appropriate if you're not getting the responses or information

23 that you believe you are entitled to, you know, so.

24        MR. ML: Your Honor, if I may hop in there quick. I

25 think I just wanted to echo what Mr. Kurzon was trying to

1  portray as well, and to answer your point about can I have an

2  example of a conflict of interest.  So on Page 15 of my

3  objection responses is really where I start that entire concern

4  around whether it's a matter of national security or integrity

5  of our public markets or impacts to my person or my family.

6       The counsels associated with this entire bankruptcy

7  have a storied history together, and I hit on it on that Page

8  15.  They all represent large complex bankruptcies such as FDX,

9  Enron, Lehman Brothers with literal trillions in notational

10 derivatives that need to be unwound.  And the largest conflict

11 of interest and concern there is the absolute priority rule is

12 insufficient from that perspective.  If they are the trust --

13 if they are in charge of the trust for Lehman Brothers, and

14 they are needing to unwind an obscene amount of derivatives,

15 and they are representing creditors that have extreme exposure

16 to those derivatives still 15 years later, they are

17 incentivized with their parties.

18       Furthermore, what I tried to document was several

19 dozen examples of creditor concessions that, yes, these

20 concerns should have been raised earlier.  I'm simply just

21 trying to play a card as they get dealt to me.  But I'm trying

22 to emphasize that all of these law firms together have had

23 quite a storied history, especially when it comes to whether or

24 not equity committees were granted, whether they were fought

25 for, and several occurrences of where the UCC committees and

the debtor counsels associated with those bankruptcies all said the same thing. We are hopelessly out of the money. There's no chance for recovery and, in some cases, the equity committee request was denied and, in other cases, it was accepted.

And what you'll see is substantial run-ups in terms of the reorganized or the reissued, which I can say General Motors, American Airlines, Hertz. I literally have an entire list that I'm trying to compile as quickly as possible, but the law firms associated with this bankruptcy are not here by accident. In my opinion, they're all in the same bankruptcies together all the time. They just play different roles. Who's representing the UCC this time? Who's the financial advisor that time?

And what really concerns me there is I'm still unable to -- I have not because I'm trying to bring forward as much information as possible, which is obviously overwhelming, and it's not structured well and it's not argued well. It's not cited -- it's all poor. I'm trying to give the overwhelming abundance of information from the standpoint that there absolutely, in my opinion, is something here. And with respect to the market data, that shows the intent behind the need of entering bankruptcy and getting the stock off the market as quickly as possible.

Anyway, so I really just kind of wanted to hop in there, but thank you for allowing me to elaborate more.

1           THE COURT:  You don't have to thank me for that.  But

2   I think the bottom line is, though, that you said, and I

3   actually tagged Page 16 myself as saying, well, conflicts of

4   interest, valuation disputes, and creative restructuring

5   tactics, and it talks about it in general terms.  And then you

6   put a little bit of gloss on it now by saying that the same

7   firms are involved in big cases, but that's not prohibited by

8   any law at all.

9           It doesn't -- it's just something that whoever the

10  private clients choose to retain as debtors' counsel and

11  creditors' committee counsel and whatever counsel is -- that's

12  up to them, subject to review by parties in interest.  And

13  if parties in interest think that there's a conflict of

14  interest, that's why they file applications for retention at

15  the very beginning of the case.

16          MR. ML:  Understood.

17          THE COURT:  And nobody objected.  And no one objected

18  to that.

19          MR. ML:  Totally understood.  Totally understood.

20  Thank you.

21          I think to the point of my objection responses was

22  attempting to be as comprehensive as possible.  You're totally

23  right.  Each of those concerns that I have in a silo, it does

24  not warrant it, and I really am trying -- I tried to, all of

25  them in concert are important to digest and understand and

1  appropriately articulate, which I very much am not able to do.

2  And that's really kind of the crux of why I was trying to

3  present it in the way that I was, is I think it's all very

4  relevant information to look at holistically.  And I'll pause

5  there.  Thanks.

6          THE COURT:  No, no apologies necessary.  But, again,

7  I'm just trying to understand what the conflicts of interest

8  are.  And I heard about a conflict because the same firms are

9  involved in a lot of the same cases.  And unless there is a

10 conflict, that's not a problem, and it's vetted through the

11 application process that is required in every one of those

12 cases.

13         So, I don't know, and then there's another thing

14 about the -- that there's a conflict of interest that I read.

15 This is what I read, there's a conflict of interest because the

16 Creditors Committee is representing the creditors and doing

17 what it can to benefit their client, and that's their job.

18 That's what they do.

19         So, I don't see that as a conflict of interest.  It

20 would be a conflict of interest if they didn't do their job

21 that way.  If, for example, they suggested that the absolute

22 priority rule should be violated and the creditors should get

23 less than a hundred percent and equity should get something,

24 even though creditors are getting less than 100 percent, then

25 you'd wonder to yourself, well, why on earth are they doing

1 that?

2      That violates the absolute priority rule, which I

3 don't think has been fully understood because that's what the

4 absolute priority rule says, is that equity can't get anything

5 if the unsecureds are not getting paid.

6      MR. ML:  My -- so in my opinion, I believe, I can't

7 pull up the page, but it's in the objection responses,

8 specifically the reason why I believe that the unsecureds are

9 guaranteed such a low number is because of the massive -- and I

10 can't underscore that enough, massive rehypothecation

11 associated with the corporate debt instrument, the bonds

12 specifically, and the risk it poses to the FICC.

13      This is specifically why Lazard was brought in in

14 August of '22, likely far ahead of time.  But specifically,

15 they ran the bond exchanges that specifically went around the

16 Depository Trust Corporation and utilized an alternative

17 depository trust to negotiate what they reported, 70 NDAs with

18 various creditors.

19      And then ultimately in January, when the events of

20 default occurred, they just couldn't effectuate a deal,

21 unfortunately, despite knowing that there is a

22 $400-million offer from Ryan Cohen for part of the business, as

23 well as the implication that I tried to outline in my objection

24 responses relating to the -- I don't want to say abuse, because

25 that's not the right word, but the registration statements on

 1 | share offerings. And specifically, the regulations around them
 2 | enable flexibility to utilize alternative settlement methods,
 3 | such as crypto. And that's what I specifically tried to
 4 | highlight with one of the bondholder groups, per the Lazard
 5 | declaration, which is Cable Car, that's their specialty, is
 6 | fixing short issues associated with kind of settlement issues,
 7 | if you will, and Lazard was the one that was brokering those
 8 | deals, who was also the financial advisor to the company.
 9 | So I'm trying to portray, again, an overwhelming
10 | amount of circumstances, and they're endless. And I think my
11 | inability to constructively do that in a digestible format for
12 | the Court is really kind of my crux around, I don't feel like
13 | -- you could give me a year, I don't think that I would be able
14 | to, because I'm not a lawyer and everything, I would not be
15 | able to do that on my own. And I'm really trying to be, you
16 | know, an advocate for the truth and, you know, the law here.
17 | And I feel like I simply cannot do that myself.
18 | And I'm not trying to, from a nefarious standpoint,
19 | and I'm certainly not trying to get in anybody's way or slow
20 | things down, but there's, without a doubt, endless that needs
21 | to be documented.
22 | THE COURT: Yeah, but, sir, that's part of the
23 | problem. If I were to allow you to, or an Equity Holders
24 | Committee to engage in the broad, open-ended, far-ranging,
25 | really kind of almost undefined investigation that you are

1 apparently advocating, it would cost millions of dollars.

2          MR. ML:  I understand.

3          THE COURT:  It would take years to implement.  It

4 would bring this case to a complete grinding halt, and

5 ironically, ironically, would push you and shareholders further

6 out of the money because the administrative expenses come ahead

7 of you.  It just doesn't make any sense.  I'm sorry.

8          MR. ML:  Your Honor, the associated fraud and

9 recoveries that would come from any of the number of concerns

10 that I'm trying to raise are in far excess of millions of

11 dollars.  And I believe it's in the interest of the estate to

12 pursue all of them, simply from a standpoint of the breach of

13 from the board, that it is very difficult for me to emphasize

14 how impressively horrific the entire fiscal year results were.

15 And having a $3-billion reduction in earnings year over year is

16 not something that naturally happens.

17          And the fact that -- I understand the grave, or I

18 understand the massive implications associated with it and,

19 yes, I believe that absolutely needs to happen, simply from the

20 standpoint of the recoveries of the estate will be in tens, if

21 not hundreds of millions of dollars.  And I'm not trying to

22 sound preposterous when I say that stuff, but that is the

23 reality of the situation and is a really large underscore for

24 my order of protection of my personal info, simply because I

25 feel like it is not outlandish to say that these pursuits will

32

1  very likely, if pursued, will very likely lead to substantial

2  losses to very powerful financial institutions.  And I think

3  it's well worth it for the estate.

4        THE COURT:  But isn't there -- didn't the Plan

5  Administrator start a lawsuit?  Mr. Sandler, don't you have a

6  lawsuit against at least some officers and directors?

7        MR. SANDLER:  Yes, Your Honor.  There is D&O

8  litigation that is pending.  There's also litigation against

9  Hudson Bay.  There's, as you know from earlier today, there's a

10  large amount of preference actions that are pending.  So

11  there's a variety of claims that the Plan Administrator, of

12  course, is, as contemplated under the plan, is pursuing, you

13  know, all avenues of recovery.

14        MR. ML:  And, Your Honor, if I may hop in, I just, so

15  when I hear about the former members of the board and that they

16  are represented by Skadden, and that's extremely important

17  because, again, all of these law firms, in and of itself, of

18  course, all of these law firms are the biggest and the best in

19  the country.  They're undoubtedly going to cross paths.

20        But when Skadden is representing Bed Bath

21  historically, or Proskauer Rose is representing Bed Bath's

22  interest historically, and then now are representing adversary

23  cases against who the estate is bringing causes against, the

24  same is true for the shipping damage and demerge 13 causes of

25  action to where we're utilizing a law firm that is quite close

1 with the people who are implicated on the other side.  And what

2 I'm trying to emphasize with the creditor confessions, and

3 seems true for the recoveries from this morning, to where, you

4 know, we're moving for actually, quote/unquote, streamlined

5 processes.

6        However, it also underscores in that motion that

7 basically that it's going to be completely separate,

8 confidential, and it's going to be -- they're doing so in a way

9 so that they can basically avoid transparency.  Specifically to

10 the clawbacks themselves, like there's only been 207 total that

11 have been filed for a total demand of 110 million, yet the

12 90-day payments prior to bankruptcy are in excess of $530

13 million.  And there are -- I say dozens, there are literally

14 hundreds of clawbacks that have not even been filed.  And as

15 everybody is aware, we are 10 months post plan confirmation.

16        So I think my biggest concern with are we trying to

17 maximize is every single -- as far as I'm aware, because I do

18 not have the money and access to PACER to be able to afford to

19 be able to keep up with these tallies as much as possible.  But

20 the 35 adversary cases that have been voluntarily dismissed for

21 zero recovery had a total demand of $16.5 million.  There's 172

22 that have the remaining demand of $93 million that are now

23 being, quote/unquote, streamlined in a process that will not

24 have transparency, we'll just know what the result is at the

25 end of the day.

34

1   We are understanding that they are going to maximize

2   results. However, it's for maximize results of all

3   stakeholders, and as we all very clearly defined, or that's the

4   argument coming into today, is that equity holders are not even

5   persons of interest, despite there not being a final decree, as

6   well as the equity community as a whole definitely holds a

7   material amount of the corporate debt instrument and the bonds

8   because they were trading for pennies on the dollar.

9   So all the equity holders also own a massive amount

10  of the bonds. However, not institutional, which is important

11  because they are not going to be viewed as bondholders. They

12  are going to be beneficial holders according to brokers,

13  despite the large quantity of the corporate debt instrument

14  that we hold.

15  So when we're trying to maximize results into the

16  estate, I'm looking at it saying, okay, where are the 400

17  million other clawbacks? Why haven't they been started? Why

18  are there 36 voluntary dismissals? Why are identified the top

19  20 associated with the 200? Specifically, there's a

20  substantial difference between the amount being demanded by Ask

21  LLP, which is the firm being outsourced by the Plan

22  Administrator, and I'll happily talk about that for a moment as

23  well. But there's a $17 million gap in those 20 alone, meaning

24  the payments and transfers leading up to bankruptcy were $31

25  million, and the total demand on those 20 creditors was $14

1  million.  And four of them had already been voluntarily

2  dismissed for nothing.

3       So I'm trying to portray a track record of I don't

4  feel like the maximizing results is happening.  I don't feel

5  like the -- I'm trying to take my feelings out of it.  I'm

6  trying to specifically speak to the actions and the facts that

7  I see them in, is that I'm not encouraged by the fact that

8  there's a board of director complaints out there, and that

9  there's third-party adversary -- sorry, third-party adversary

10  causes of action against the shipping companies, because I feel

11  like there are going to be concessions that are extended to

12  those parties, specifically because of the history and the

13  parties involved, and the track record that I'm trying to lay

14  out there.

15       THE COURT:  All right.  I guess I've been doing this

16  a long time, and I know that preference actions and those kinds

17  of actions, sometimes they get filed, and then they're not as

18  good as they seem.  But I don't want to speculate.

19       But I guess I'll turn to Mr. Sandler, or Mr. Sandler,

20  if you want to respond briefly.  I think it would not be in

21  anyone's interest not to try to get the most out of those

22  actions, especially given the declaration of Mr. Goldberg that

23  was filed in connection with the extension.

24       It looks like the case is administratively insolvent.

25  Forget about unsecured creditors.  It looks like previously

1  secured and even administrative claims are not going to get

2  paid in full.  Anyway.

3           MR. SANDLER:  Your Honor, do you want me to just

4  comment on the preference issue --

5           THE COURT:  Yeah.

6           MR. SANDLER:  -- or do you want me to take the bigger

7  picture issue of the appropriateness of an Equity Committee?

8           THE COURT:  Just do the first, preferences.

9           MR. SANDLER:  So, in terms of the preferences, and as

10 your Honor knows, we are not actually handling the preference

11 actions, but not every 90-day payment is recoverable.  Payments

12 to, for example, insurance companies or payments made on

13 account of rent, things like that just aren't recoverable

14 because there are defenses.

15          And while it's easy to look at the gross number of

16 payments that were made in the 90 days, all of the defenses in

17 547 get to be applied to them, whether it's an ordinary course

18 payment or it's the new value payment or whatever it may be,

19 and so that gross number often is substantially reduced.

20          THE COURT:  Yeah.

21          MR. ML:  I think my main point there is similar to

22 the bankruptcy section of the statement of financial affairs.

23 I literally just posted about this today because of the

24 concerns that it was raising.  But the bankruptcy section

25 specifically is around $93 million, I believe, but you have all

1 of those same creditors within the 90-day payments that are not

2 included in the bankruptcy section.  M3, FTI, Sixth Street,

3 Davis Polk, Greenberg Traurig, AlixPartners, Duane Morris, et

4 cetera, all of the firms that should be included in this

5 bankruptcy section are not.

6         Similarly, just with respect to the recoverability of

7 them, there's extensive payments that are made to, I'll use,

8 for example, all four, big four accounting law firms are being

9 used.  All four, Deloitte & Touche, Ernst & Young, KPMG, and I

10 forget who the last one is but, all four of them are being used

11 by the debtor prior to -- and there's more intent there than

12 simply saying the realty companies can't be clawed back,

13 especially when you are having an unwinding of the estate and

14 you're having asset sales in -- sorry, before the bankruptcy,

15 ever since January, and it's been very well documented that

16 they started to wind down locations in August.

17         It's worth underscoring that when you are overdue on

18 past A/P, as Ms. Gove was when she came into her position as

19 CEO, and you need to clean up a substantial amount of

20 historical A/P, and then you're also going to close locations,

21 and then you just happen to not have the cash flow available to

22 them, also we need to voluntarily apply for Chapter 11 relief

23 to then go through an auction process with those locations.

24 But a substantial amount of locations have already been dealt

25 with and have already had their A/P balances completely cleared

and paid for, but no disclosures and no transparency other than
who took care of those locations.

Well, it was none other than Alvarez & Marsal who
helped with the pre-petition closure of those stores.  We don't
know who those stores went to, but what I do know is during
bankruptcy, who those locations went to is extremely
concerning, specifically whether it was the Canadian operations
and the implications of who got those locations and at what
cost to the estate.  Those are also concessions that were made.
It's basically like they were giving over locations to their
friends.

And it underscores the destructive pattern of this
Board of Directors -- I'm sorry, just pretty much the business
as a whole that I'm really trying to emphasize there.  So, the
realty companies' 90-day payments that I'm really concerned
about is the ones that stopped.  The ones that, you know, the
leases, whether they were terminated or whether they were sold
off to other retailers or whatnot, well, we paid for them
leading into bankruptcy, and who knows what associated
liability on the balance sheet, as well as whether or not those
went to preferential parties that are associated with kind of
this re-emerging entity that in Canada is a perfect example how
it went to Rooms + Spaces and it went to the Putnam Group.  And
those are direct competitors, and they're getting them for
zero-dollar cure costs, and they're getting them ahead of a

 1  bankruptcy process by people and brokered, you know, Alvarez &

 2  Marsal.  Ms. Gove was a managing director there, and it just

 3  happened to also use them.  And they are also the financial

 4  advisors to the UCC, to which we were not even included in.

 5       I did message Mr. Greenberg on LinkedIn specifically

 6  asking, like, what was the purpose?  Like, how come you didn't

 7  think that equity would need to be included?  And I did not get

 8  a reply back.  But it just kind of emphasizes the difficulty

 9  that I have had as a shareholder and other shareholders have

10  had as I'm trying to bring forth these concerns.

11       Perhaps the 500 million that I quoted before, you're

12  right, some of those preferential probably cannot be clawed

13  back for very valid reasons.  And what I'm trying to emphasize

14  is it's the culmination of all of them together that paints a

15  very damning picture.  And I feel like myself trying to, you

16  know, regurgitate that for the Court in my objection responses

17  and all of the transpondence [sic] thus far is I'm trying to

18  emphasize that to the point that it would take millions of

19  dollars and years' worth of preparation, I'm the guy.

20       I'm the one that can help expedite that process

21  substantially given my professional background in corporate

22  accounting and finance, given my literal thousands of hours

23  that I've spent tracking Bed Bath & Beyond, not only the

24  corporate filing, but obviously dug into and extensively

25  examined the data, something that I feel like I am exemplary

1 at.  I'm a data guy.  I can literally, you know, from an

2 auditor standpoint, I know what questions to ask and I know

3 what data to dig for.  I feel like that's what I am trying to

4 portray.  And I'll pause there.

5           THE COURT:  Okay.  Then, I see Mr. Kurzon has his

6 hand up.  Yes, sir.

7           MR. KURZON:  Thank you, Your Honor.

8           I would just mention with respect to the need for an

9 Equity Committee, I don't know if I'm a party to the

10 third-party release and that's because the plan was submitted

11 to the Court.  I signed the release, and then the plan was

12 amended.  When I signed the opt-out of the release to say that,

13 you know, I don't understand this, I don't want to sign it, I

14 don't want to release anyone, what jumped out at me is that in

15 the 20 years I've practiced law and used releases to settle

16 disputes, parties are agreeing not to sue each other.  But as

17 part of every release I've helped negotiate and draft, the

18 consideration is clearly specified.

19           So here, shareholders by doing nothing were made

20 party to the release.  And I would submit that that's not in

21 the interest of justice because the shareholders are releasing

22 parties who wanted to be released because they put it in this

23 plan.  But the consideration that they're given is ostensibly

24 zero because Class 9 is given nothing.  And your colleague,

25 Judge Kaplan, declared it in the findings of fact a good and

 1  valuable consideration.  Well, if it's good and valuable

 2  consideration, then perhaps Mr. Sandler or it's too bad

 3  Kirkland & Ellis is not in the courtroom today, they could

 4  specify what that is.

 5        And then what I'm confused about as an investor, if I

 6  invest in a stock and the stock goes bankrupt and then the

 7  stock continues trading, should I going forward make sure that

 8  I have an additional -- in addition to whatever I invest in the

 9  stock, should I make sure that I have an additional 50,000 or

10  so that I can hire an appropriate bankruptcy counsel to

11  represent my interest to interpret basic things like this

12  release?

13        So, you know, admittedly this motion for Equity

14  Committee is filed after the plan confirmation, but I think

15  it's timely, especially given my experience communicating with

16  Pachulski, not so much Mr. Sandler here, but his partner,

17  Mr. Feinstein.  Mr. Feinstein told me to read the docket.

18  Well, I read part of the docket, at least it's going on 4,000

19  entries, and it's incomprehensible to an attorney without

20  bankruptcy experience.

21        So therefore, I submit that it's incomprehensible to

22  an investor and, if it's incomprehensible to an investor, then

23  how can the release be so integral to the plan if nobody

24  understands it?  Is this a Chapter 7 in the name of Chapter 11,

25  or is this a Chapter 11 where shareholders are right to be

1  patient and can expect an equity distribution?  And if there is

2  going to be an equity distribution of one of the 73 debtor

3  affiliates, how would that be possible if there were illegal

4  naked short selling, because at Docket 219 filed May 5th shows

5  that Cedenco (phonetic) has a balance of slightly more than 776

6  million shares.  But I was under the impression that there were

7  only 739 million shares at the time.  So Cedenco would not be

8  released under the third-party release.

9        But it seems to me like if the Plan Administrator

10  were trying to maximize value of the estate, they would go

11  after the large banks who potentially illegally naked shorted

12  this stock.  And what ML1 seems to be saying with his

13  submission is that this company was deliberately bankrupted

14  because it would be impossible to close those shorts, you know,

15  because more stock was sold than existed.  So you can't put a

16  square peg in a triangular hole, for example.

17        And when I bring these questions to Pachulski, they

18  ignore me.  So is my only recourse to find $50,000 to come back

19  to Your Honor with a bankruptcy attorney, because as an

20  attorney myself, and as a -- you know, I'd say I'm an average

21  investor.  You know, I know a few things about balance sheets

22  and cash flow.  This company was making $4 billion a year in

23  revenue.  Something seems very rotten in Denmark, and when

24  that's the case -- and, furthermore, the U.S. Trustee,

25  Ms. Steele, is on the call, she knows very well that I emailed

1  her with some valid concerns, and her posture was to ignore me,

2  maybe she didn't get the email, because she gets too many

3  emails and can't read them all.  I don't know.

4          But, you know, when you're systemically ignored by

5  the plan author, Kirkland, the Plan Administrator's attorney,

6  Pachulski, and the United States Trustee, and you have serious

7  questions about illegal naked short selling that are

8  unanswered, and there's a community that ML1 has attested to

9  that talks about this at least three times a week on YouTube,

10  you know, it's very confusing to an attorney, average investor.

11         And this, I submit, are all reasons why there should

12  be an Equity Committee because if the Equity Committee consists

13  of just one lawyer who's qualified as a bankruptcy attorney

14  that wants to poke at Pachulski and the U.S. Trustee and ask

15  these questions, that would be an enormous benefit to the

16  estate, because there could be billions and billions of dollars

17  at stake if this company was deliberately thrown into the ditch

18  by Wall Street firms, and that's what I suspect, and that's

19  what I submit.  Thank you, Your Honor.

20         THE COURT:  Well, you're welcome.  But that's the

21  problem, is that it seems like you and Mr. ML want a complete

22  redo of the bankruptcy case, and you're asking for it months

23  after plan confirmation and after all kinds of things have

24  happened, and you can't unring the bell.  Naked short sales and

25  the entire financial markets, that's not what we're dealing

1  with here.  We're dealing with one case, the Bed Bath & Beyond

2  case.  Naked short-selling sounds to me like it deals between

3  shareholders and people in the market rather than the debtor,

4  so this is going way beyond what was in the record.

5          But also, it's just, as you said, Mr. Kurzon,

6  speculation.  It's all speculation that this company was

7  somehow intentionally bankrupted to benefit I'm not even sure

8  who, naked short sellers is just, you know, I would say that's

9  a difficult thing to prove, so I --

10          MR. ML:  Your Honor? if I may hop in?

11          THE COURT:  And then, Mr. Kurzon, I just want to say

12 it sounded like you were starting to argue your motion again,

13 and as I told you before, you're not -- I'm not considering the

14 motion to compel or the motion for clarity.  You're an

15 attorney.  You can bring it.  Were you a litigator?

16          MR. KURZON:  No, Your Honor.  I'm principally on the

17 corporate side drafting contracts and --

18          THE COURT:  Okay.

19          MR. KURZON:  -- you know, the startup representation.

20          THE COURT:  All right.  Well, you're a lawyer, so we

21 have motion papers here.  You can figure it out, but you're

22 licensed to practice, so I don't know.  I see --

23          MR. ML:  Your Honor, ML.

24          THE COURT:  Yes.

25          MR. ML:  Can I hop in?

 1          THE COURT:  Yeah.

 2          MR. ML:  Specifically to your point about unringing

 3  the bell or unbaking the cake, I don't necessarily think that

 4  those are -- what I'm trying to emphasize here is the

 5  overabundance of concerning pieces of information and my

 6  ability, inability, to constructively bring forth my concerns,

 7  just simply because I no longer have the finances to do so.

 8          And so I'm trying to emphasize that with the Court

 9  that there absolutely is something there.  But I also feel like

10  there are numerous remedies that could be made, and I just want

11  to say, for example, a plan amendment itself to whether it's an

12  appointment of an examiner or -- I can't pretend to even

13  hypothesize.  But nobody is saying the entire bankruptcy needs

14  to be completely unwound and everything needs to start over.

15  I'm not trying to give that impression.

16          All I'm trying to do is protect my investment and

17  emphasize that I feel like that there is concern that Ask LLP

18  may not be suited for the job that they were tasked with, and

19  that --

20          THE COURT:  That's what they do.

21          MR. ML:  Oh, sorry.  And that --

22          THE COURT:  Mr. ML, Ask specializes in bringing

23  preference actions.

24          MR. ML:  And so I'm trying to document, and I feel

25  like I have done so, but I tried to document specifically with

1  the cases of the voluntary dismissals and the inaction after 10

2  months post-plan confirm to where there should be hundreds of

3  additional clawbacks that are being filed and haven't been.

4        So whether there's a more constructive way that the

5  Plan Administrator would like me to submit a list of questions

6  specifically, like, hey, can you please just outline which ones

7  were omitted from being pursued and for what reason?  I'm open

8  to any type of compromise or in the interest of transparency,

9  trying to get an understanding of -- I liken this to a snowball

10  down a hill of all of this information that I'm trying to bring

11  forward in my objection, literally, it's an impossibility to

12  even pretend to be able to do something like that during the

13  bankruptcy process -- a bankruptcy process, which as everybody

14  is aware, the debtors made every attempt to remove the stays

15  and expedite as quickly as possible, to which, I believe, is an

16  intent there as well.  But I'm not going to allude to what that

17  intent is.

18        What I'm trying to say is the more and more and more

19  I look and look and look, the more and more I find.  And these

20  aren't -- again, it's more looking at it from the perspective

21  of where there's smoke, there's fire, and we're literally in

22  the middle of it.

23        I think the last point that I wanted to make is

24  specifically trying to highlight -- I literally just tried to

25  pull it up realtime, so I apologize in advance if this is

1  incorrect in nature, but I believe this stuff to be true is

2  when we look at a Ascena Retail Group, Tailored Brands, and the

3  third one is Hertz, Kirkland & Ellis and Pachulski and several

4  of the other debtors were involved in those bankruptcies.

5       Specifically, I'll speak to a Ascena Retail Group

6  because that was in 2020.  The debtors filed -- sorry, a group

7  of Ascena shareholders filed a motion and the debtors and the

8  UCC objected, saying that the likelihood of recovery was

9  impossible because the company was insolvent, literally, word

10  for word, what we are hearing now.  And ultimately, one of them

11  was approved, Ascena Retail Group.  And the Tailored Brands

12  one, I believe, was also.  And each time, they come through

13  extremely favorably in hindsight.  And I think what I'm just,

14  again, trying to emphasize is the culmination of all these

15  things together.

16       The last thing that I wanted to just raise there,

17  because I touched on Ask LLP, the fact that they are also

18  responsible for, let's just say, I have it in front of me, but

19  they're also actively pursuing recoveries from everyday

20  Americans in the Celsius bankruptcy, which is -- or I think

21  they just reemerged.

22       But M3 and the Plan Administrator, who was before the

23  post-plan confirmation, the Plan Administrator was Josh

24  Sussberg.  The post-plan admin is Mohsin Mehdi from M3, who is

25  also very associated with our case here, and who was the

48

 1  restructuring expert of Celsius Network.  Well, that was

 2  Alvarez & Marsal.

 3          So, the fact that Ask LLP is voluntarily dismissing

 4  millions in clawbacks and yet to submit what I am stating is

 5  hundreds of clawbacks worth tens of millions of dollars, if not

 6  more, and also in other bankruptcies, to what I'm likening as

 7  the same estate, meaning Kirkland, the same group.  And this is

 8  what I mean by multiple bankruptcies.  I know Mr. Kurzon's

 9  water was deep in the weeds with Express.

10          What I'm trying to emphasize is something that large

11  and that concerning to national security, to the markets, to

12  the courts, all of that stuff.  And I'm really just trying to

13  do it -- there is a plethora of extremely damning situations,

14  excuse my language, but, specifically, yeah, I don't think Ask

15  LLP is best suited.  Or maybe they are from the perspective of

16  holistically, who are their customers when they say customer?

17  Is it institutions or who and what are they prioritizing

18  specifically when they are giving concessions or when they are

19  trying to, quote/unquote, streamline processes for the benefit

20  of who?

21          And I think I just get back to the mandate of trying

22  to maximize recovery and the substantial holdings in the bonds

23  that retail investor -- I say retail, former equity holders

24  have.  If we need to substantiate a quorum of creditors from

25  household investors, what percentage do you guys need?  Do you

49

1   guys want 4-1/2 percent, because I feel like that is something

2   that we could very easily coordinate as a community so that we

3   could bring forth questions, concerns, et cetera?

4          I'm really, again, just to the back to the original

5   request of the motion committee in and of itself was simply my

6   trying to procedurally do things correctly.  I didn't see

7   anything in 1102 that specifically stated pre- or post-plan

8   confirmation.  All I saw was final decree and I know that that

9   has not happened.  And so, to me, I was like do I make a fool

10  of myself and attack the plan itself or do I request an Equity

11  Committee so that whether it's a one-on-one basis or whether

12  there is a Committee, the substantial amount of information

13  that I have not brought forward to everybody on the call, it's

14  more than what I have submitted.

15         And while that might sound, wow, you have even more,

16  yes, there is that much here, specifically to where I'm really

17  just kind of asking from the grace of God.  I don't take

18  pleasure -- and I'll hit it on if there's a closing statement,

19  but I can't emphasize enough how destructive this has been to

20  me, my family.  I do not want the spotlight.  I do not want to

21  push for this.  I want to be ridden of this burden, but I feel

22  like there is nobody else in my seat with my plethora of

23  knowledge, the amount of information I've accumulated that I

24  feel like I'm trying to put it together.

25         And again, like I want to send an examiner or

1  investigator. I'll share whatever and everything. There is

2  absolutely something here. And I'm just trying to give the

3  best perspective of the scope and severity of the issue that I

4  can. And that's just me trying to do that. This is me trying

5  to do that, excuse me.

6       THE COURT: All right. Well, Mr. ML, on that point,

7  on the standard for the appointing of an Equity Holders

8  Committee, you cited a number of cases that the Plan

9  Administrator distinguished on pretty significant grounds like

10 Pilgrim's Pride and Oneida. The equity committee was

11 appointed before confirmation of the plan.

12      And then you talked about the Energy Futures case,

13 575 B.R. 616. That case had to do with, I read it -- I've read

14 it before. It had to do with the reversal of an order

15 approving a termination fee of $275 million. And so I don't

16 know what that has to do with equity holders.

17      MR. ML: Likely nothing. And I sincerely apologize

18 for wasting everybody's time with that. I honestly, again,

19 from my own negligence, I understand also that I am bound by

20 bankruptcy law. And although I do not know what that means or

21 what the implications are, I am bound as pro se. And I know

22 that me providing an exception before that entire section of my

23 objection responses is not adequate enough for my protection.

24      I am simply trying to emphasize that there was no ill

25 intent there from the standpoint of, you know, I'm simply using

 1  the tools I have at -- and I wrote this, I wrote this in the

 2  response.  But I simply am using the tools that I have at my

 3  disposal.  I cannot afford and do not have the understanding or

 4  know-how to effectively research and/or even cite the cases.

 5  So I am bound by the tools that I have at my disposal.

 6          And I just wanted to make that distinction regardless

 7  of whether or not that frees me from any liability.  I'm

 8  hearing that it does not.  And I just wanted to apologize again

 9  that, you know, I thought it was -- you know, it's ludicrous to

10  even expect me -- or, sorry, not expect, I'm not trying to give

11  that perception.  It is extremely preposterous that I even

12  attempt as a non-lawyer to address legal responses and

13  objections from the best law firms in the world.  And

14  especially with my inability to research, cite, list, argue,

15  it's hilarious that I made a fool of myself clearly.

16          And I apologize for wasting everybody's time with

17  precedent that had nothing to do with what I was requesting.

18  I'm simply trying to use the internet to the best of my ability

19  to try to structure things appropriately.  And, you know, that

20  was really kind of the reason of why I really didn't even want

21  to submit that section of my objection responses because the

22  other sections of my objection responses are the more important

23  parts anyways.

24          THE COURT:  Well, the law --

25          MR. ML:  But I apologize again for wasting people's

1   time.

2           THE COURT:  The law is important and you cited cases

3   here with cites, and it looks like you researched it and had

4   access to Westlaw.  So, that's what I see here.  And then the

5   most concerning --

6           MR. ML:  I don't have access to Westlaw.

7           THE COURT:  Well, you cited Westlaw cases, but one of

8   them --

9           MR. ML:  I would have to thank Google for that.

10          THE COURT:  But then there's the <u>Finova Group</u> case,

11  which you cite.  It doesn't really -- according to the Plan

12  Administrator, it doesn't exist, but we did a little research

13  ourselves and there was a <u>Finova</u> case filing.

14          MR. ML:  Unpublished.

15          THE COURT:  Yeah.  And in that case, there was -- the

16  Equity Holders Committee was appointed, like the case was filed

17  in March 7th and the Equity Holders Committee was appointed in

18  April 27th of the same year.  So those cases are all different,

19  if that's the case you were referring to.  I don't really know.

20          MR. ML:  I hope that's -- I think I should have just

21  exercised caution and completely not replied to any of it.  So

22  I apologize for the negligence.  And I just want to emphasize

23  that I -- you know, I sincerely apologize.  I don't have access

24  to the tools and I don't even know the implications and I

25  assume they're bad.  That's why it's being brought up.

1          And I just -- you know, I'm at your mercy.  And I am

2   trying to portray that I don't have -- this is not a "full

3   heart empty head" response.  And I'm trying to give the

4   portrayal of sincerity, and I'm really trying to fight for

5   truth and justice.

6          And I understand the importance of law, but I cannot

7   pretend to understand its nuances or appreciate the

8   implications of law without the reason for my original request

9   in the first place, which was, please help me get someone to

10  help me do this the right way.  And that is absolutely

11  something -- it's very clearly demonstrated I am not capable of

12  doing, but I am really hoping that through all these

13  conversations and, like I said, the amount of information that

14  I have not been able to even share, communicate, construct,

15  that is absolutely an impossibility because there's no way that

16  I could potentially do that against -- I won't say against, I

17  say in concert with the interests of the estate of, we're

18  literally talking hundreds of millions of dollars that the

19  estate could pursue with the culmination of what all of these

20  implications together would garner as well as much smaller

21  ones.

22         Like, there are several concerns that could be

23  shared.  I shared one recently in the email follow-up to

24  Mr. Kurzon's letter of support to where there were two share

25  repurchases that were impossible, as reported by the board of

54

1  directors, meaning the market price for the stock never hit the

2  prices at which the company bought back stock by a wide margin,

3  meaning we were overpaying for the repurchase of stock when the

4  market never hit those prices.

5  And so there's either -- and what I'm trying to

6  demonstrate here is whether it's accountability to Ask LLP, you

7  know, just -- or getting clarification on the categorization of

8  what is recoverable or what is not, or, you know, any of the,

9  like I said, dozens, if not hundreds of concerns that I would

10  like to share, it is just something that I think is impossible

11  for me to do simply from the standpoint of I'm not a lawyer.

12  And I really don't want to, from the standpoint of, I can't

13  emphasize enough how destroyed my family is because of this

14  entire process.

15  I want to get this over to the proper authorities.

16  And I -- whether that's something that you feel the U.S.

17  Trustee or you would be so kind to help me with, or to work in

18  concert with the Plan Administrator, I'm happy to do that -- or

19  get a quorum of creditors.  And there's a number of solutions

20  far, far prior to the unringing of the bell, the unbaking of

21  the cake, such as a slight amendment to a plan that has not

22  gone through a final decree, that I just feel like there's so

23  many other solutions that could ensure creditors and the estate

24  are maximizing the results and are pursuing things that are or

25  are not valid.

55

1          And I don't think that that's something that I can do

2    simply because my family has no money and there's no avenue for

3    me to get representation in any way.  And you know, to the

4    extent that there's no doubt going to be, I don't even know the

5    ballpark of what we're talking about, but we're talking about

6    me literally needing to sell my house to do whatever needs to

7    be done.  I have not worked professionally.

8          When I lost my job in January of '24, I had the

9    decision to make of nobody else seems to want to be doing

10   anything, to which I would be glad to have additional

11   conversations about.  But I do not feel comfortable having

12   here.

13          THE COURT:  Yeah.  This is not --

14          MR. ML:  Yeah. To the extent that I had to make the

15   decision of, do I need to do this insanely impossible task and

16   try to -- hence, the massive amounts of information that I've

17   tried to accumulate in the time and do it as quickly as

18   possible, that there's a better way to do all of this.  No

19   doubt.

20          THE COURT:  Well, you know what, I just have to say

21   here, and I know we've been going for a long time and I have to

22   get to --

23          MR. ML:  All right.

24          THE COURT:  -- Mr. Sandler and Ms. Steele.  But I

25   have to say here that it seems as though that you and Mr.

1  Kurzon think that the Court has some kind of prosecutorial role

2  or investigative role.  And I don't, that's not what we do.

3  The Court, issues are brought to the Court and are decided.

4  And I can't bring a criminal prosecution.  I can't do an

5  investigation.  It would be inappropriate.

6         So, these things are just --  I can't do them.  And

7  it sounds like though, what you are asking for in some ways is

8  a criminal investigation.  And if you have a criminal

9  complaint, then you go approach the appropriate authorities and

10  they'll deal with it.  I'm just trying to deal with this

11  bankruptcy case.  And I want to get to -- I see Mr. Kurzon has

12  his hand up but, please, I need to get to the other parties, as

13  well.

14         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

15         MR. ML:  Just one last -- Your Honor, I apologize.

16  Just to the very last point, I feel like that those aren't the

17  solutions that -- I'm not trying to bring forward a criminal

18  prosecution.  I'm simply trying to get representation, and I

19  feel ridiculous even quoting 1102.  I simply just am

20  financially unable to do so.  And I feel like there is a

21  substantial amount of information that could garner additional

22  recoveries into the estate.

23         And I feel like from a representation standpoint,

24  equity holders were non-existent in terms of representation or

25  view of the Court.  And I'm happy to talk about the two equity

 1  holders, and that has nothing to do with the rest of equity

 2  holders and their agenda and whatever they were trying to

 3  recover.  It does not align with the greater community of

 4  household investors.  And I can say that definitively because

 5  they both work for financial institutions and family offices

 6  themselves.

 7          But what I'm trying to say is that I don't think I'm

 8  asking for the bankruptcy to be undone.  I'm not asking for a

 9  criminal investigation.  I simply am looking for something

10  within your guys' power to do, whether it's a equity

11  representation, an examiner, or the very small amount of

12  somebody that can -- that wants this information that can help

13  them bring it forth in the correct way.  And thanks.

14          I apologize, Mr. Sandler, for interrupting you.

15          THE COURT:  No apology necessary.

16          Oh, Mr. Kurzon's hand is down.

17          MR. KURZON:  Yes, thank you, Your Honor.  Just as a

18  point of information, it's been alluded to before that this is

19  an extraordinary bankruptcy.  So then, therefore, it would

20  follow that the extraordinary relief that ML is asking for

21  could be granted if the Court finds it prudent not to step into

22  the role of a prosecutor or an investigator or any sort of

23  criminal investigative authority.

24          But as a point of information, since I have not been

25  party to every single hearing, has the Court taken judicial

1  notice of the alleged death by suicide of the late, alleged

2  late CFO Gustavo Arnal?  Because if not, I would like that

3  acknowledged in the bucket of why this is an extraordinary

4  bankruptcy and in favor of an Equity Committee, because when

5  equity is destroyed for whatever reason, it inhibits the

6  ability of the company, the debtor, to refinance.  So when

7  you've hit the end of your credit line, it's not a big deal if

8  you can find another lender.  But if lenders are not willing to

9  refinance, then that's the death of the company.  It means

10 shareholders get wiped out.

11        But I ask about the late CFO because I believe that

12 that is the material fact of which the Court should take

13 judicial notice when deciding whether or not there should be an

14 Equity Committee, because it implies that there is something

15 extra extraordinary when, you know, a CFO of a

16 multibillion-dollar company purportedly dies by suicide by

17 jumping off their Manhattan balcony.

18        THE COURT:  I'm aware of that, but --

19        MR. ML:  And to Mr. Kurzon's point --

20        THE COURT:  I'm aware of that, but --

21        MR. ML:  To Mr. Kurzon's point --

22        THE COURT:  -- I don't understand what that has to do

23 with this motion, but I'm aware of it.

24        MR. ML:  So the point that Mr. Arnal allegedly

25 committed suicide is nobody can prove, nobody can prove that he

1 is even dead.  And the FOIA requests that have been submitted

2 that do not get acknowledged for so much as a death certificate

3 or a police report, like these are all things that are included

4 in my objection responses.

5          But to the point that it's -- I don't think it can be

6 factually stated that he is not alive anymore.  That

7 underscores the exceptional nature as well as the massive

8 amounts of other very grandiose assertions that are being made.

9          THE COURT:  I'm not aware of the death or purported

10 death of a CFO being a factor to consider in the appointment of

11 an Equity Committee.  But Mr. Sandler or Ms. Steele, do you

12 have anything?

13          MR. SANDLER:  Your Honor, Brad Sandler for the Plan

14 Administrator.  I'm going to be extremely brief.  I know we've

15 been going for a while and I intend to essentially rely on our

16 papers and the fulsome evidentiary record that has already been

17 built in these proceedings for the last 14 months.

18          We're not hearing anything new here, Your Honor.

19 There's certainly no evidence.  And I think what we are hearing

20 is a fundamental misunderstanding of law and finance, frankly,

21 a misunderstanding of bankruptcy law, corporate law, tax law

22 from the papers, investment analysis, et cetera.  We hear a lot

23 of innuendo and speculation.

24          And I would suggest to the Court that it is not

25 appropriate for the Court to rely on an "I think" or "I

1 believe" or "I feel." We need to focus on facts, on the

2 reality. We need to focus on evidence. And there is just no

3 evidence to support the motion.

4 And if you look at the case, you had an iconic,

5 highly publicized public company filed for bankruptcy with

6 top-notch restructuring professionals. We already heard

7 Kirkland, Alix, Lazard, Deloitte, et cetera. There was a very

8 active Ad Hoc Committee of Bondholders who, they were so

9 active, they attended the first-day hearings, as Your Honor

10 knows. They were active in the case. They represented about

11 $130 million of unsecured debt.

12 There was an Official Committee of Unsecured

13 Creditors with sophisticated parties on that Committee, Ryder,

14 the Bank of New York, among others. The Committee alone, just

15 the seven Committee members, collectively had about $1.5

16 billion of unsecured debt. And that doesn't count the many,

17 many, many other unsecured creditors who were not on the

18 Committee, vendors, landlords, employees, et cetera. And let's

19 not forget that there was a secured creditor that was owed well

20 over half a billion dollars.

21 Many, many parties were active and actively involved

22 in these highly publicized bankruptcy cases. Secured

23 creditors, unsecured creditors, landlords, vendors, statutory

24 committee, taxing authorities, the SEC, Your Honor, as you may

25 recall, a securities class action plaintiff, and even some

61

1  stockholders, individual stockholders, just not Mr. ML1 or Mr.

2  Kurzon.

3          The plan, after a fulsome evidentiary record, Your

4  Honor, it was approved by Judge Kaplan.  The plan provided for

5  the cancellation of all interest, all equity.  That was done.

6  It's clear in the plan.  There's no dispute about that.  Mr.

7  ML1 agrees with that. In fact, he even acknowledges it in Page

8  40 of his reply.  You know, they are seeking to unring the bell

9  here.

10          And for all the reasons we've stated in our papers,

11  Your Honor, there's just no ability to do that.  There's no

12  evidence to do that.  It would create absolute havoc in the

13  bankruptcy system, in the financial markets itself.  It would

14  create unpredictability and, certainly, it would fly in the

15  face of public policy supporting the finality of bankruptcy

16  judgments, including the plan, which we know is, at this point,

17  confirmation order is final.

18          You know, the other thing I heard, Your Honor, is

19  speculation about whether the Plan Administrator is seeking to

20  maximize value for the estate.  And the Plan Administrator is a

21  fiduciary.  His compensation structure, which is laid out in

22  the plan supplement, is in part based on contingency.  The more

23  money he recovers for the estate, the more money he makes.  He

24  is incentivized to maximize the recovery and maximize

25  distributions.

62

1          Here we have some former shareholders, Your Honor.

2     They have no interest in these proceedings.  Their stock has

3     been canceled.  Recently, the Southern District of New York

4     made the statement that they have no standing.  They have no

5     economic interest in these cases.  The motion that was filed to

6     form an Equity Committee has been extremely expensive to these

7     estates.  It's coming out of the pocket of creditors, all types

8     of creditors, administrative creditors, priority creditors,

9     unsecured creditors.  And we've seen no evidence.  It's not

10    appropriate.

11         The law is absolutely in favor of finality, and it's

12    absolutely clear that this is untimely and an inappropriate

13    time to form an Equity Committee.  The burden is on Mr. ML1.

14    And Your Honor, you have been extremely gracious, as Mr. ML1

15    noted, and given him plenty of opportunities to present

16    evidence.  There is none, Your Honor.  There's conspiratorial

17    theories and innuendo.  There are beliefs and thoughts, but

18    there is no evidence to support the relief that they're

19    seeking, and the motion, Your Honor, it must be denied.  And

20    with that, we'll stand on our papers.

21         THE COURT:  Mr. Sandler, can I just ask you one

22    question?  And I know this is a very specific question.

23         In Paragraph 12 of Mr. Goldberg's declaration that

24    you cite, it says, at the end, it says, "There's currently zero

25    dollars in the shared proceeds pool.  While we have made

1 distributions totaling $33.15 million on account of allowed DIP

2 claims and allowed FILO claims, respectively, there is still

3 $381.77 million in principal outstanding plus interest on the

4 DIP and allowed FILO claims before" --

5       MR. SANDLER:  That's correct, Your Honor.

6       THE COURT:  -- "there will be any distributable

7 proceeds to distribute to allowed administrative claims."

8       MR. SANDLER:  That's correct, Your Honor.

9       If you recall, first of all, there's in excess of

10 $300 million as stated in the declaration that's still owed to

11 Sixth Street.  And going back to the final DIP order, Sixth

12 Street has a lien on all of the assets.  Under the plan, there

13 were certain reserves set aside, and there's essentially a

14 reserve of $10 million to pay the administrative claims, and

15 the administrative claims are well more than $10 million.

16       Now, that bucket gets filled up once Sixth Street

17 hits a certain dollar amount.  Again, this is all laid out in

18 the plan and the final DIP order.  And with those dollars, the

19 shared reserve will be filled up with money, and that'll pay

20 for the admins.  At the end of the day, Your Honor, I think it

21 is highly unlikely that the unsecured creditors will recover 2-

22 1/2 cents, which was the high side in the estimate.  I mean, we

23 hope that that happens.

24       The Plan Administrator, as I mentioned earlier, has

25 already filed suit against the D's and O's.  He has 16(b)

1 litigation pending, which is shareholder litigation.  There's a

2 variety of other litigation that's pending, including

3 preferences and other litigation.  In the aggregate, Your

4 Honor, it's not going to pay off several billion dollars of

5 debt.

6             THE COURT:  Okay.

7             MR. SANDLER:  And lest we forget, Your Honor, that

8 before any money potentially could even fall to equity, of

9 course there is no equity, but if there was equity, before any

10 money could fall to them, Your Honor, all of the unsecured

11 creditors have to be paid not only in full, as you correctly

12 noted, but also with interest.  So the number is even higher

13 than what is the face value.

14             So with that, Your Honor, our view, and I think it's

15 consistent with the Southern District of New York, is that the

16 former shareholders have no standing in these cases because

17 they have no economic interest and their stock has been

18 canceled.

19             THE COURT:  Okay, thank you.  Ms. Steele?

20             MR. ML:  Your Honor --

21             MS. STEELE:  Yes.  Thank you, Your Honor.

22             Fran Steele, on behalf of the U.S. Trustee.

23             Your Honor, unless you have --

24             MR. ML:  Your Honor, I object to the --

25             MS. STEELE:  -- additional questions -- I'm sorry.

1          THE COURT:  Let Ms. Steele talk, please.

2          MS. STEELE:  Thank you.

3          Your Honor, unless the Court has any specific

4   questions, the U.S. Trustee relies on the argument that was

5   just set forth by Mr. Sandler on behalf of the Plan

6   Administrator and relies on its objection that was filed on

7   June 24th, Docket Number 3331.

8          THE COURT:  Thank you, Ms. Steele.

9          MS. STEELE:  Thank you.

10          THE COURT:  All right.

11          MR. ML:  Your Honor, I would just like to object and

12   I'd like to speak to some of the assertions that were made.  So

13   specifically to the no economic interest, I would purport that

14   we, as a community, absolutely have economic interest in

15   maximizing results as the community owns a substantial amount

16   of bonds.  I think I'm looking for direction on, sure, how do

17   we bring forward a quorum.

18          Specifically to the 1.8 to 2.5 billion of unsecured

19   claims, what I, again, just trying to echo is there are dozens

20   of fraudulent claims that I myself, and I am not a professional

21   at, I can see when people have fraudulent claims that are, like

22   there's a $500,000 claim out there from somebody who has also

23   PPE loan, but it's just a random residential address, and maybe

24   those are already all taken into consideration.  Of course, I

25   hope so.

1              But the 1.8 to 2.5, when you try to recreate the

2    claims as of the date of the plan and disclosure agreement, I

3    believe it's either July 30th or August 1st of '23, it's an

4    impossibility, meaning the numbers don't split.  So from a

5    perspective of, again, just trying to echo transparency of,

6    okay, which creditors and the amounts make up that 1.8 to 2.5

7    billion.

8              It's an impossibility when there are -- I'm just

9    looking at one random, you know, you have seven of the exact

10   same claims for the exact same amounts by a Miss Carol

11   Anderson, and there are seven of them.  For the different

12   debtor entities, okay, great.  Maybe that's an oversight that

13   they are all submitted for $80 million a piece by this person.

14   But we just, again, need an avenue to be able to question and

15   seek for answers.

16             Specifically to the maximizing result for the estate

17   and a fiduciary, I totally understand and appreciate as I was

18   one myself in the corporate capacity that I was in.  The fact

19   that Mr. Goldberg is also the Plan Administrator for FTX, who

20   just had an examiner appointed, I believe as early as January

21   or February of 2024.  And the fact that he is also mandated on

22   FTX and specifically how that directly conflicts with the

23   maximizing effort of this estate is extremely relevant.  And I

24   understand that they can be reported as conspiratorial.

25             And I just want to reemphasize the, you know, there's

1   a difference between a conspiracy theory and a conspiracy.   And

2   I absolutely agree that these are conspiratorial.   And I would

3   like to categorically disagree that there is a conspiracy

4   theory here.   There absolutely is a conspiracy.

5        What I did want to mention about the senior secured

6   lenders that everybody is so worried about.   And nobody seems

7   to want to acknowledge the exact same -- sorry, I don't say

8   that they don't want to acknowledge.   I don't believe that it's

9   even been brought forth as a concern.   But the exact same week

10  as the amended credit agreement to where Sixth Street paid down

11  the ABL by $565 million, you know, on behalf of the estate,

12  that same week, they set up a line of credit with JPMorgan for

13  600 million with the same lenders that are on the lead.   That's

14  the Royal Bank of Canada, State Street, Truist Financial, Wells

15  Fargo.

16       They are all on that seemingly under the table

17  agreement for the same amount, approximately, on the same week.

18  And so when we're trying to give the impression of, again, I'm

19  not trying to unring the bell or unbake the cake.   I am

20  literally trying to get the smallest margin of opening.   And I

21  appreciate the leniency of the Court; I do.   That's not what I

22  was referring to.

23       What I meant was, there is so much conspiracy theory

24  that if a small percentage of them lead to anything, they will

25  be extremely material recoveries for the estate and the owners

1  of that estate.  And I understand that, you know, there are

2  sort of 1.8 to 2.5 billion of unsecured claims that was, you

3  know, an estimate as of a year ago, before the Brandon Meadows

4  claim came in for the $10 billion as well as the one point --

5  there was the $1 billion and then the $10 billion that he had

6  filed.

7         We just want an avenue so that the owners of the

8  corporate debt and the bonds that we all hold as a community,

9  whether it's through Fidelity or, you know, any other, if we

10 need to get a quorum so that we can ask these questions in the

11 right way, I just would very much appreciate nobody wanting a

12 court to go above and beyond or make some kind of criminal

13 assertion or any type of groundbreaking ruling.  I am simply

14 looking for an avenue to which I can appropriately bring forth

15 an exceedingly number and growing, literally growing number of

16 concerns that just seem to continue to come.

17        THE COURT:  Are you a bond holder, also?  A

18 noteholder?

19        MR. ML:  Not officially.  I hold mine in IBKR and I

20 believe I have a little bit in Fidelity, but yeah.  And the

21 point is -- behind that is, like, after -- when starting all of

22 this process, the first thing I did was start a shareholder --

23 the first thing I started in February was a survey with the

24 community of this is the third iteration of the community

25 survey that had been done by other people.

1          And one of the pieces of information that I wanted to

2   pull in was specifically the bonds for this purpose,

3   specifically if the community of, whether you need a response

4   of 100 people or whether you need a certain percentage dollar

5   amount of the total amount due on the bonds.  Whichever one,

6   yes, the community owns a large portion of the bonds, but not

7   officially because of the dynamic of the DTC and who, per the

8   David Kurtz declaration as well as the Greenberg declaration,

9   that is the official bond list.  And that is why I'm so

10  concerned because those are the official, quote/unquote,

11  official bond holders.

12          We are simply in brokerage name that rolls into

13  there.  And then that's where, again, our rights are not

14  transparent, and we are simply everyday American retail

15  shareholders that are trying to get a voice, whether it is

16  through the Equity Committee on the equity side or whether it

17  is a post-plan confirmation on the creditor side.  We're

18  literally looking for a voice to be able to bring forward

19  nearly all the things that we're discussing here, to maximize

20  the effort to and to recover as much as possible because our

21  equity investment is nonexistent and is a 100-percent loss that

22  we cannot even claim on our taxes because ASP has not even sent

23  -- well, it's not even ASP anymore.

24          We cannot even claim the loss on our taxes because

25  nobody gets sent to 1099.  Some people have gotten theirs; some

1 people have not. But these are all conversations that occur in

2 the community to where we have endless questioning of just

3 needing -- the individual nature of retail severely inhibits

4 our ability to crowdsource finances to pursue these efforts,

5 and that's literally, again, why I started back in April. My

6 non-legal mind was I just wanted to procedurally do the thing

7 that had never been done, which was request an Equity

8 Committee.

9 To my knowledge, the two other shareholders that did

10 bring forth their complaints, not mine, I'm really trying to

11 emphasize that I want nothing to do with Bratya, and I have

12 nothing to do with the other shareholders because they do not

13 have anything to do with me and I do not want the same outcome

14 that they wanted. The point being is we are so decentralized

15 in the way to bring forth these arguments.

16 I did want to reiterate that I feel like I have one

17 of, if not the most all-encompassing knowledge, as well as one

18 of the largest incentives per my position, my share position,

19 to where I feel like I am that guy, to where if there was, by

20 God's grace, an avenue for representation either on the bond

21 side, you know, like a post-confirmation household investor

22 bond committee, so that we can effectively and respectfully

23 bring forth concerns to Mr. Goldberg, so that we can do that.

24 Or if there is an equity complaint or an examiner or whatever,

25 whether it's an individual basis or whether there is a small

 1 group of equity holders, again, I'm just trying to unburden

 2 myself from needing to be the martyr, really.

 3     I feel like I'm going to be put in a firing range for

 4 this, so I'm very much at the mercy of the Court, and I am

 5 trying to emphasize as such that, again, these are not

 6 preposterous and they are not frivolous and they are not

 7 without merit.  And I simply cannot afford to do it myself.

 8 And frankly, just none of the individual investors can afford

 9 to do on their own.

10     So if we need to substantiate our bond position, I

11 simply ask guidance of the Court, like, what's the number that

12 we need to hit?  Do we need to do only (indiscernible) or

13 whatnot?  So thank you.

14     THE COURT:  I only asked that because you only

15 identified yourself as a shareholder, and then you said you

16 were a note holder, but I got it.

17     All right, Mr. Kurzon, please, you've had a number of

18 opportunities to speak and it's been a long hearing so far.

19     MR. KURZON:  Yes.  So thank you, Your Honor.  I

20 appreciate everyone's patience.

21     I just, responding to Mr. Sandler, where he said

22 equity has no interest, if that's the case, then why does the

23 plan have a third-party release?  Certainly in August, before

24 the plan was made final, I tried to opt out of the release.

25 There might be others in my shoes.  I would like to be able to

```
 1  communicate with them to potentially investigate and bring

 2  claims.

 3          And it's troubling to me that Mr. Goldberg and his

 4  attorney don't seem to want to answer my questions regarding

 5  illegal naked short-selling.  Maybe they're still building a

 6  case and we'll see something in the future.  But I just want

 7  the Court to know that I reserve all rights and waive none

 8  because to say that there's no interest is not true when

 9  there's -- I potentially opted out of the release, therefore I

10  do have interest against the defined released parties.

11          But I don't know what the good and valuable

12  consideration is for those who did enter the release.  So I

13  don't even know what, if I did have $50,000 to hire a

14  bankruptcy attorney, I wouldn't know to tell him or her which

15  way to argue.  So maybe I have a claim against Kirkland & Ellis

16  for negligence for drafting an incomprehensible release, and

17  maybe Mr. Sandler is in the same position.  He can't understand

18  it either.

19          So I just, I don't want to waste any further time on

20  this, but you might be hearing from me again, Your Honor, and I

21  thank you again for your patience.

22          THE COURT:  Okay.

23          MR. ML:  Your Honor?  Just to add on to what

24  Mr. Kurzon was saying is that I am more just from my own, from

25  my own unknowing, but everyone keeps saying final.  And I'm
```

73

 1 | confused because I just -- maybe I don't understand.  But the
 2 | final decree hasn't occurred and for a good reason.  And I
 3 | understand that, you know, they're going to do everything in
 4 | their best effort to hit the date that they estimated, which is
 5 | all the way out to 2026 for some of the entities.
 6 |         But I'm just more struggling to understand the word
 7 | "finality," because in my opinion, I look at the ten months
 8 | post-plan confirm, but that's great.  But then there are a
 9 | number of questions with regard to the recoveries and the
10 | clawbacks that have not occurred ten months post-plan confirm.
11 | And I think that's where just looking for an avenue from my
12 | perspective, this isn't final.
13 |         And I just, maybe I'm using the word wrong in terms
14 | of finality and what the Court is saying, whether respect to
15 | the plan being confirmed or the final decree having occurred.
16 | So I apologize if my understanding of that word is all one and
17 | the same.
18 |         THE COURT:  No, they're not one and the same.  It's
19 | the finality of an order that was entered nine months ago.  And
20 | the orders are entitled to finality without there being a final
21 | decree.
22 |         All right.
23 |         MR. ML:  Okay.
24 |         THE COURT:  All right.  So this matter is before the
25 | Court on two motions.  One is a motion to redact personally

1 identifiable information for protective order.  And I ruled on

2 that already, and I'm essentially keeping in place the June

3 12th, 2024 order, but requiring Mr. ML to comply with it.

4 And I did say that several times, so just to comply with it and

5 I'll give you seven days from entry of the order, okay, so that

6 it doesn't have to be in a day.  And then --

7         MR. ML:  Thank you.

8         THE COURT:  All right.  So, and then there's also the

9 motion to appoint an Equity Holders Committee and then some

10 related relief sought, which is to essentially reconstitute the

11 Committee that no longer exists.  And also, well, I guess it's

12 to stay the entire case while the Equity Committee gets up to

13 speed.

14         This Court has jurisdiction over these motions under

15 28 U.S.C. 1334(b) and the standing orders of reference entered

16 by the district court on July 10th, 1984 as amended on

17 September 18th, 2012.  This is a core proceeding under 28

18 U.S.C. 157(b)(2)(A) and (O).  Venue is appropriate in this

19 Court under 28 U.S.C 1408.

20         The Court issues the following findings of fact and

21 conclusions of law pursuant to Bankruptcy Rule 7052.  To the

22 extent any of the findings of fact might constitute conclusions

23 of law, they are adopted as such.  And the reverse is also

24 true.

25         These motions come to the Court in, I would say, an

1  unconventional manner.  And after the Court's June 12th, 2024

2  order, actually an inappropriate manner in that the order that

3  I entered was not complied with.  The movant who we have

4  identified as ML or ML1, as I indicated at the start, did not

5  comply with the court's order and numerous related directives

6  to provide the Plan Administrator and the United States Trustee

7  with an unredacted version of the submissions that included his

8  personal identifying information but was required to be

9  maintained as confidential by those parties pursuant to the

10  order, and provide the Court by mail with an unredacted version

11  of his papers.  I mean, I'm sorry, a redacted version of his

12  papers so that they could be filed on the docket.

13         This lack of compliance has resulted in a confusing

14  and incomplete public docket.  But for the purposes of this

15  motion, I have considered and am considering Mr. ML1's motion

16  to appoint an Equity Committee and for the redaction of

17  personally identifiable information that was sent to the Court

18  on June 14th, 2024, the U.S. Trustee's objection to the motion

19  at Docket 3331, the Plan Administrators objection and

20  opposition to the motion at 3332, ML1's reply in support of the

21  motion for redaction and appointment of a post-effective date

22  committee sent on 7/24/24 after several adjournment requests

23  that were granted by the Court.

24         The noncompliance has also in some respects limited

25  the ability of the counterparties to respond to ML's motions.

1 For example, although ML certifies essentially that -- no, he

2 did certify that he's a shareholder and I tend to believe that

3 he was a shareholder at least, but they couldn't verify his

4 status or notice because they don't have his name, and that's

5 true.  And they also don't know whether he opted out of the

6 release because they don't have his name, and that's also true.

7 So they were affected by that.

8         And then the Plan Administrator filed a surreply,

9 which -- as permitted by the Court, which addressed some of

10 those issues.  There were many, many emails from Mr. ML to the

11 Court that related to various procedural and sometimes

12 substantive matters that the Court spent a significant amount

13 of time responding to or advising that they need -- that Mr. ML

14 just needs to look at the order.

15         But in any event, those are the documents that are

16 involved on this motion.  And as I previously noted,

17 Mr. Kurzon's letter motion -- I'll put it in quotes -- as he

18 describes it, that was dated July 30th is just, as I said,

19 procedurally improper and will not be considered by the Court.

20 But especially since Mr. Kurzon is an attorney, he needs to

21 file a motion or an appropriate complaint to seek relief from

22 the Court.

23         The background facts relevant to this motion are that

24 on April 23rd, 2023, each of these more than 70 debtors filed a

25 voluntary petition under Chapter 11 of the United States

1  Bankruptcy Code. And the cases were procedurally and

2  administratively consolidated pursuant to Rule 1015.

3        Then the debtors, as indicated in the debtors'

4  first-day declaration from Ms. Holly Etlin, the debtors were

5  one of the largest home furnishing retailers in the United

6  States and elsewhere, filed their Chapter 11 cases to affect a

7  "full chain wind-down" that would encompass all their assets,

8  including the liquidation of inventory and all retail stores

9  and distribution centers, contemplated an efficient public and

10  flexible auction process to realize the full value of existing

11  assets.

12        On May 5th, 2023, the United States Trustee's Office

13  appointed an Official Committee of Unsecured Creditors.  And

14  they retained counsel, Mr. Sandler and his firm here.  On July

15  21st, 2023, the debtors filed a motion for conditional approval

16  of the adequacy of the disclosure statement relating to the

17  joint Chapter 11 plan of Bed Bath & Beyond Inc. and its

18  affiliates -- I'll call that the disclosure statement -- in

19  order to commence solicitation of votes on the debtors' joint

20  Chapter 11 plan that was filed a day before, July 20th, 2023,

21  and to schedule a consolidated hearing to consider the adequacy

22  of the disclosure statement on a final basis and confirmation

23  of the plan.

24        In that disclosure statement, the debtors described

25  in detail the status of their case in the proposed terms of the

1  proposed plans and the sale of various assets, including the

2  Bed Bath & Beyond name after the attempt to sell Bed Bath &

3  Beyond as a going concern was not successful and then, also,

4  the sale of byebye Baby name and intellectual property to Dream

5  on Me Industries, Inc., after there were no buyers for that

6  business as a going concern.

7       And the disclosure statement also explained that

8  debtors were continuing to monetize the value of the inventory

9  and their leasehold interests and further indicated that the

10  anticipated dividend to unsecured creditors was zero to 2.5

11  percent on unsecured claims of 1.8 billion to 2.4 billion.  The

12  disclosure statement explained that on the plan's effective

13  date, equity interests in the debtor would be deemed canceled

14  and the debtors' duties and obligations would be deemed

15  satisfied in full, canceled, released, and discharged and no

16  force and effect.

17       The disclosure statement and the plan also indicated

18  very clearly that the holders of equity interests would receive

19  nothing under the plan.  The plan provided that on the plan's

20  effective date, which was September 29th of '23, the debtors'

21  remaining assets would invest in the wind-down debtors under

22  the direction of the Plan Administrator and oversight from the

23  Oversight Committee to monetize and distribute assets to the

24  holders of unsecured claims.

25       As part of the solicitation process approved by the

 1 Court by its August 2nd, 2023 order, the debtors served a

 2 notice of non-voting status to impaired claims and interests

 3 deemed to reject the plan on Class 9 interest holders, which

 4 provided the interest holder with notice of the confirmation

 5 hearing, applicable objection deadlines, and how to obtain free

 6 copies of the plan and disclosure statement, as well as how to

 7 opt out of the release.

 8      This is one area where the objectors were affected

 9 because they couldn't tell whether Mr. ML received the notice

10 package.  But in any event, the debtors also provided a

11 publication notice of the confirmation hearing through an

12 advertisement in the New York Times.  Various objections were

13 filed to the plan, including two holders of common stock in

14 BBB; I'll call them the shareholders objections.  Those holders

15 did not include Mr. ML, one who did not object.

16      On July 31st, 2023, debtors filed an amended plan,

17 which did not alter the treatment of equity interests.  Then on

18 September 11th, the debtors filed their second amended joint

19 plan, which also did not affect the treatment of equity

20 interests.

21      On September 12th, the Court, actually Judge Kaplan,

22 held a hearing on final approval of the disclosure statement

23 and confirmation of the plan.  The Court overruled various

24 shareholders objections.

25      On September 14th, 2023, the Court entered an order

 1 confirming the amended plan.  The objecting shareholders

 2 appealed that order, but that appeal was apparently dismissed.

 3 ML1 did not appeal the confirmation order.

 4       The plan became effective on September 29th, 2023.

 5 As a result, then existing equity was canceled in accordance

 6 with the plan.  As noted, the Plan Administrator became sole

 7 representative of the debtors and assumed responsibility for

 8 resolving claims and prosecuting causes of action, liquidating

 9 debtors' remaining assets, and making distributions in

10 accordance with the plan.

11       The process has been ongoing in the last nine or so

12 months, and more than 200 adversary proceedings have been

13 filed.  Some of them have already been resolved; some have not.

14 And actions against certain directors and officers have been

15 commenced and, also, a 16(b) action, which I'm not sure if

16 that's the same thing that was referred to in New York in the

17 opinion that was attached to the Plan Administrator's reply.

18       But, in any event, BBB or the debtors had publicly

19 traded stock on the NASDAQ.  It was listed on May 3rd, 2023.

20 As previously noted, pursuant to the amended plan, all

21 interests in the debtors, including any owned by Mr. ML1, were

22 classified in Class 9.  The plan provided for the cancellation,

23 release, and extinguishment of all those equity interests which

24 will be of no further force and effects.  It also noted

25 specifically that no holder of interest in BBB shall be

1 entitled to any recovery or distribution on the plan on account

2 of such interests. That's pretty clear to me.

3 It also provides that Class 9 is impaired. Holders

4 of interest in BBB are deemed to have rejected the plan

5 pursuant to 1126(g) and are not entitled to a vote to accept or

6 reject the plan because they're deemed to reject. The plan

7 also stated that and the confirmation order also stated that at

8 Paragraph 15. The plan was always a liquidating plan that

9 cancels equity and does not provide for the issuance of any new

10 equity interests, which was apparently something that was being

11 discussed in the community as it's been called, but that's

12 ill-defined and, in this Court's view quite amorphous, nor

13 would there be any other distribution to credit to equity.

14 Instead, it expressly provided that equity is not entitled to

15 any recovery under the plan.

16 So, the shares were canceled. No distribution to the

17 shares of the interest. An injunction was issued against

18 pursuing any claim relating to the interest. Actually, also

19 the Creditors' Committee was dissolved at Paragraph 138 of the

20 confirmation order. So, that happened as of September 29th,

21 2023. In fact, the CUSIP numbers associated with the interest

22 and the debtors' other securities were also canceled of record.

23 On or about --

24 MR. ML: Your Honor, may I ask a question now?

25 THE COURT: I'm sorry?

1          MR. ML:  I'm sorry to hop in.  I wanted to ask a

2   question or clarifying if it's convenient to do so.  Otherwise

3   I can wait.

4          THE COURT:  I don't know.  I'm issuing my opinion

5   now.  If you have something you want to comment on, I guess you

6   can do it at the end, but I'm issuing my opinion.  Okay?

7          MR. ML:  Okay, thank you.

8          THE COURT:  All right.  On or about April 23rd, 2024,

9   the former shareholder, ML1, submitted a letter to the Court

10  that requested the appointment of an Equity Holders Committee

11  and also the redaction of personal information.  The Court sent

12  a notice back to Mr. ML that the Court would not be taking any

13  action on the letter because it requested relief that it

14  required a motion or an adversary complaint.  That's Docket

15  2991.

16          After that notice and the passage of more than a

17  month, on or about June 5th, the former shareholder filed a

18  motion for the appointment of an Equity Committee and related

19  relief and submitted the motion to the Court under seal.  Also,

20  as I indicated, it included a request for redaction of

21  personally identifying information based on a fear of harm or

22  danger to Mr. ML and his family.

23          Because of the really somewhat convoluted nature and

24  certainly unconventional nature of the proceedings up to that

25  point, and because the motion did not have a return date, the

1  Court scheduled a conference to deal with scheduling issues and

2  at least preliminarily deal with the confidentiality issue and

3  scheduled a conference on June 10th, inviting the various

4  parties and interests to participate, and then subsequently on

5  June 12th entered the order establishing procedures relating to

6  shareholders' motions for redaction of certain information and

7  appointment of Equity Committee.

8       As I previously quoted, the order provided that the

9  former shareholder had to, within two business days of entry of

10  the order, file with the Court a copy of the motions which is

11  personally identified in information redacted and replaced with

12  the information described in Paragraph 2 of the order and serve

13  copies of the motion, without any redactions -- and I'll

14  emphasize that language -- on counsel for the Plan

15  Administrator, the counsel for the former debtors, and counsel

16  for the U.S. Trustee, each by electronic mail.  That was

17  Paragraph 1.

18       A few days later, I think on June 14th, 2024, the

19  former shareholder emailed the redacted versions of the moving

20  papers to counsel for the Plan Administrator in which he did

21  not disclose his name or other identifying information.  And

22  that is still the case, and the Court has ruled already that

23  Mr. ML1 has to comply with the June 12th order within seven

24  days of entry of the order on this motion.

25       Now moving to the law, that's the factual background,

1  Section 1102(a), which was correctly cited by Mr. ML1, permits

2  the appointment of an additional committee of equity security

3  holders only if necessary to assure adequate representation of

4  that class.  It's well established that the appointment of an

5  additional committee is an extraordinary remedy that courts are

6  reluctant to grant.  In re Residential Capital LLC, 480 B.R.

7  550, 557.

8          And, in fact, other courts have said that appointing

9  an equity committee, equity holders committee should be the

10 rare exception.  That is Williams Communications Group, 281

11 B.R. at 223.

12         The movant has the burden of proving that an

13 additional committee is needed for adequate representation.  In

14 re Spansion, Inc., 421 B.R. 151, 156 (Bankr. D. Del. 2009).  In

15 that case, the court held that the movant must show that there

16 is a substantial likelihood that they will receive a meaningful

17 distribution in the case under a strict application of the

18 absolute-priority rule, and that they are unable to represent

19 their interest in the bankruptcy case without an official

20 committee, citing Exide Technology versus State of Wisconsin,

21 202 U.S. Dist. LEXIS 27210, at *1.

22         The court's appointment of an additional committee is

23 considered extraordinary relief and, as noted, should be the

24 rare exception.  Dana Corp., 344 B.R. 38, Exide, 202 U.S. Dist.

25 LEXIS 27210.  In that case, Spansion, the court refused to

1  appoint an official committee of equity holders when the

2  scheduled assets were less than liability, indicating that the

3  debtor corporation is insolvent.

4          Another factor that is also considered is the

5  timeliness, the timing of the request.  Although Section

6  1102(a) has no timeliness in it, the potential for the

7  effectiveness of an official committee is to a large degree

8  determined by the stage of a reorganization proceeding has

9  reached.  In re Johns-Manville, 68 B.R. 155, 161.

10         Because the duties of an official committee include

11  many matters that can only occur prior to plan confirmation,

12  i.e. consulting with a debtor in possession working towards a

13  plan moving for a Chapter 11 Trustee, a committee will most

14  effectively exercise its responsibilities at the beginning of

15  reorganization prior to the formulation of a plan.  That's

16  Johns-Manville at Id.

17         As a result, at least one court has held that once a

18  plan has been submitted for voting, quote, it is far too late

19  for a Committee to exercise its most important function

20  negotiating reorganization plan.

21  That's Mansville at 163.  Also, In re Kalvar Microfilm, 195

22  B.R. 599, 601 (Bankr. D. Del. 1996).

23         The late timing of the motion ties into only the only

24  remaining purpose of an equity committee in this case, which

25  would be to object to confirmation and litigate the value

1  issue.  And the costs associated with the formation of an

2  equity committee cannot be justified in light of this purpose,

3  and so the court didn't appoint a committee there.

4          That is particularly true, whereas, here, the plan

5  proposes no distribution to its existing equity holders whose

6  interests will be canceled.  <u>Expansion</u>, 421 at 154, and the

7  <u>Mansville</u> case at 164, Note 23, where the court said, "At this

8  late time, there's little purpose to forming an official equity

9  committee and requiring the estate to bear its associated

10  costs."

11          Further, whereas here, in this case, a liquidating

12  plan has not only been proposed but has already been confirmed.

13  There is no necessity -- there's "no necessity to appoint a

14  committee of equity or security holders because their interests

15  have been extinguished by the debtor plan and they will receive

16  nothing from the estate."  <u>In re eToys</u>, 331 B.R. 176, 186.

17          I refer to that case not only because its reasoning

18  is persuasive but also because its facts are extremely similar

19  to this case in which there was allegations by the shareholder

20  of conflicts of interest by professionals and wide-ranging

21  frauds and various other problems.  And the court, nonetheless,

22  declined to appoint a committee as not necessary to assure the

23  adequate representation of those parties because their

24  interests have been extinguished and they will receive nothing

25  from the estate.  And, therefore, the court denied the

 1 appointment of the committee because there would be no benefit

 2 and it was simply too late.

 3        The same is true here.  The motion was made some nine

 4 or so months after confirmation and without any appeal being

 5 filed.  It's just too late.  Substantial activity has been

 6 undertaken pursuant to the plan by the Plan Administrator and

 7 counsel, and the equity interests no longer exist.  So there is

 8 really no basis of appointing to appoint a Committee at this

 9 point because -- for the equity holders because there is no

10 equity and equity wouldn't get any distribution in any event.

11 And equity is, and by the only competent evidence submitted

12 here hopelessly insolvent.

13        There's other cases that also hold the same way,

14 including Genesis Health Ventures, Inc., 204 F. App'x 144, 146

15 (3d. Cir. 2006), which affirmed a denial of a post -- for the

16 appointment of a post-confirmation equity holders committee

17 with cert denied at 550 U.S. 167.  In re New Century TRS

18 Holdings, 2013 WL 5377962 (Bankr. D. Del. September 26, 2013),

19 denying the motion for post-confirmation appointment of an

20 equity holders committee because, "At that point in the case,

21 it is well past time to perform those duties that are typical

22 for an Official Committee."

23        And then, Collier's also feels the same way, "Many

24 Chapter 11 cases are hopelessly insolvent.  In such cases, the

25 interests of existing shareholders will be wiped out in the

1 plan, and stockholders do not need a committee to look out for

2 the interest."

3   And then, importantly the post-confirmation

4 appointment of an Equity Holders Committee is looked upon with

5 healthy skepticism because it would result in a disruption of

6 the parties' reliance on the confirmed plan.  And the policy,

7 the strong public policy in favor of supporting the finality of

8 bankruptcy judgements would be upended.  That's <u>Genesis Health</u>

9 <u>Ventures</u>, 204 F. App'x 146.

10   And as I said, the only evidence that I really have

11 about the debtors' solvency or competent evidence that I have

12 about the debtors' solvency or insolvency beside the really

13 unsupported and conclusory speculation by ML1 and Mr. Kurzon as

14 to conflicts of interest that are really not defined or not

15 conflicts as to mass manipulation of the market and destruction

16 of the debtor, intentional destruction of the debtor, these are

17 all conclusions that have no factual support.

18   The things that I have factual support for are in the

19 disclosure statement which says that there's 1.8 to 2.4 billion

20 of unsecured claims and that are only going to get zero or 2.5

21 cents on a dollar when  that plan was filed.  And then, I just

22 have to find Mr. Goldberg's declaration again.

23   And then, Mr. Goldberg lays out an even more

24 pessimistic financial scenario in his declaration, which is

25 evidence.  And even excluding a $10-billion claim, there's 63

 1  million at least of administrative claims, there's 574 million

 2  of priority claims, there's at least 77 million of secured

 3  claims, which, you know, already totals well over -- well,

 4  that's $700 million that are priority claims.  That is before

 5  you get to the administrative, to the unsecured creditor body.

 6          So then, the Plan Administrator goes on to state that

 7  there's really zero dollars right now in the shared proceeds

 8  pool.  And while there have been some distributions on account

 9  of allowed DIP claims and FILO claims, there's still 381

10  million in principal outstanding on those secured claims plus

11  interest before there will be any remaining distributable

12  proceeds to distribute to holders of allowed administrative

13  claim.

14          And then he concludes, and this is very very serious.

15  And Mr. Goldberg is a  highly regarded professional and

16  experienced, and I don't believe he would say these types of

17  things unless he had strong evidence to support it.  He said

18  absent, in Paragraph 13 of Docket Number 2906, "Absent a

19  significant reduction in the assertive administrative claims

20  and meaningful recoveries added to the shared proceed pool,

21  under the distribution waterfall set forth in the plan, it is

22  unlikely that allowed administrative claims will be paid in

23  full."

24          And so that means that the case is likely

25  administratively insolvent.  That means that priority claims

 1 would not be paid at all.  That means that secured claims would

 2 probably not be paid in full.  That means that unsecured claims

 3 would get zero, and there's 1.8 or so or around 2 billion of

 4 them that have been asserted that would have to be paid before

 5 anything got to equity.

 6         Most unfortunately, most unfortunately, I have to

 7 find on the basis of the only competent evidence that is before

 8 me that this debtor is not just insolvent but that it is

 9 hopelessly insolvent.  And I certainly cannot find that there's

10 a likelihood that there will be a recovery to unsecured

11 creditors.  I would say, instead, it's substantially unlikely,

12 extremely unlikely.

13         So on that ground alone, I would deny the motion.

14 And that's sufficient grounds in and of itself to deny the

15 motion for the reasons I previously stated that it was just too

16 late which really ties in with the other reasons, as well.

17 It's just too late.  It's nine months after the case was

18 confirmed.

19         And conducting the broad ranging, seemingly unending

20 investigation that is being proposed into every single aspect

21 of this case by ML and Mr. Kurzon would burden the estate with

22 millions, I can say unequivocally millions of dollars of

23 administrative fees of professionals that would have to be

24 hired to investigate all these things.  And it would not just

25 require lawyers.  It would require financial professional.  It

1   might be other experts.

2          It would be extremely counterproductive, in my view,

3   and make a recovery by let alone unsecured creditors, let alone

4   equity, let alone priority creditors, administrative creditors

5   make their potential recovery most unlikely.  So that's a

6   second separate and independent reason to deny the motion for

7   the reasons I stated.

8          A third and independent and sufficient reason is that

9   there is no equity anymore.  There's no equity holders to

10  represent.  What Mr. ML1 and Mr. Kurzon are proposing would

11  eviscerate the confirmation order and make it really a nullity

12  and say it has no meaning or effect which goes completely

13  against the finality policy that I mentioned earlier.

14         So, you know, there was no appeal filed.  Other

15  parties participated and shareholders, and they appealed.  And

16  so that's another reason.  It's the third and independent

17  reason to deny the motion.

18         Then, you know, the standing argument was raised and

19  made by the Trustee -- the Plan Administrator citing that case

20  from the Southern District.  And the Southern District is a

21  really good court and they held what they held.  I'm not sure

22  that standing is exactly the same in a bankruptcy case as it is

23  in the 16(b) context that was before the court there.  But it

24  doesn't really matter.  I considered all the arguments.

25  Whether they have standing or not, I'm denying the motion.  It

1 might be that they don't have standing. And I know that if

2 there's an appeal, that the Trustee and the Plan Administrator

3 would want to preserve that argument. But I'm not as convinced

4 by that argument as I am of the other three that I just

5 mentioned.

6 And then finally, to the extent that that Mr. ML1

7 and/or Mr. Kurzon are asking for me to upend the confirmation

8 order and redo this case essentially, it's really asking for a

9 do-over. Mr. ML1, during this hearing today, described himself

10 as a data guy, as someone who is expert at reviewing financial

11 information, knows all the details, can help, and has been

12 following this case for years as evidenced by his own

13 statements and the email correspondence or whatever it is, the

14 social media correspondence that was attached.

15 I am thoroughly convinced that Mr. ML1 was following

16 this case directly with significant interest and maybe on a

17 daily basis throughout. And then for him to wait until now to

18 bring this motion, it's simply too late. Whether it's for an

19 Equity Committee, whether it's to undo the confirmation,

20 whatever the purpose is, it's just way too late. And the

21 standards, I'm not saying they're applicable. I'm not saying

22 that this is a Rule 60 or 9024 motion in any way. But there's

23 no newly discovered evidence here. These are things, these

24 theories that have been advanced which are really no more than

25 theories and speculation and not evidential despite pages and

1 pages being produced to the Court, are indications that Mr. ML

2 was aware of all this all along and didn't act.  There's

3 consequences to that, and one of them is that this motion is

4 being denied.

5         That's the Court's ruling.

6         Mr. Sandler, can I ask you to prepare a form of order

7 that you'll circulate to Mr. ML and Mr. Kurzon that reflects

8 the Court's ruling?  Basically, all you have to say is that for

9 the reasons, you know, recite the -- the way I do it always,

10 recite the motion that was brought, the opposition that was

11 filed, and that for the reason set forth on the record, the

12 motion to redact personally identifiable information is granted

13 in part and denied in part, on the terms set forth in the June

14 12th, 2024 order.

15         And you just have to specifically set forth what --

16 just eliminate the extraneous things from that order and say

17 what he has to do and that he has to do it within a week.

18         MR. SANDLER:  Understood, Your Honor.  And then,

19 we'll also share the order with Ms. Steele, as well.

20         THE COURT:  And with Ms. Steele, of course.

21         MS. STEELE:  Thank you.

22         THE COURT:  We can't forget Ms. Steele.  But you guys

23 were on the same side on this one, so I figured you were

24 dealing with each other.  And also, yeah, the denial of the

25 motion for the appointment of the Equity Committee.  And, you

1  know what, I don't want to clutter this order with Mr. Kurzon's

2  thing.  We'll send him the notice that his letter is not being

3  acted upon same way we did with Mr. ML1, because we try to

4  treat everybody the same here.

5        Okay.  I thank the parties for their attention and

6  participation and wish everyone a good rest of the day.  Some

7  people feeling better about it than others, but that's the way

8  it goes when you go to court.  Somebody wins and somebody

9  loses.

10        MR. ML:  Your Honor, I had my hand up.  I have a

11  question, please.

12        MR. SANDLER:  Thank you, Your Honor.

13        MS. STEELE:  Thank you.

14        MR. ML:  Your Honor?

15        THE COURT:  Yes.

16        MR. ML:  Sorry, my one question I had around the

17  facts of the case was I didn't hear anything relating to the --

18  I heard hopelessly insolvent and even beyond that.  However,

19  the facts of the case didn't talk about the third-party causes

20  of action, the board of directors, what the estimate of the

21  recoveries associated that is in excess of a billion dollars

22  according to the complaints that were filed.

23        So I think I was just hoping to ask to we know about

24  the liabilities and the hopelessly insolvent, but it doesn't

25  allude to the ongoing actions.  And so I was just hoping that

1 | it could be potentially amended to include that language.

2 |       THE COURT:  Well, no.  I'm not leaving out that

3 | language because that's what I believe.  There's got to be a

4 | couple of billion collected before -- it sounds like there's

5 | got to be a couple of billion collected before you get to the

6 | unsecured or over a billion.  So I'm sticking with it.

7 |       And, you know, the dollar amounts in a complaint are

8 | not indicative of what will ultimately be recovered.  In fact,

9 | there's much case law that says you cannot base a plan on

10 | recoveries in litigation because it's too speculative.  Nobody

11 | knows how it's going to turn out.  Nobody knows when it's going

12 | to turn out.  Nobody knows how long it's going to take.

13 |       It's just too speculative.  And, you know, it doesn't

14 | turn out the way the plaintiff wants it every time.  So, yeah,

15 | I'm not taking that out.  I actually am finding that.  But I

16 | also found that that's the hopelessly insolvent, but the real

17 | test is whether there's a substantial likelihood that equity

18 | will receive a meaningful distribution.

19 |       And I think there's a substantial likelihood that

20 | equity will not receive a distribution and that appointing the

21 | Committee would be completely counterproductive and push the --

22 | just saddle the estate with an additional undetermined amount

23 | of administrative expense pushing the likelihood of a recovery

24 | to classes below administrative creditors and administrative

25 | creditors even further behind  So I am sticking with it.

1          MR. ML:  I appreciate your time, Your Honor.  Thank

2   you.

3          THE COURT:  Thank you.

4          Okay, good afternoon.  Bye bye.

5          MR. SANDLER:  Thank you, Your Honor.

6             (Proceedings adjourned at 5:32 p.m.)

7                    *  *  *  *  *

8          **C E R T I F I C A T I O N**

9          I, DIPTI PATEL, court-approved transcriber, certify

10  that the foregoing is a correct transcript from the official

11  electronic sound recording of the proceedings in the above-

12  entitled matter, and to the best of my ability.

13

14

15  /s/ Dipti Patel

16  DIPTI PATEL, CET-997

17  J&J COURT TRANSCRIBERS, INC.    DATE:  August 13 2024

18

19

20

21

22

23

24

25

Form tsntc

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
MLK Jr Federal Building
50 Walnut Street
Newark, NJ 07102

Case No.:  23–13359–VFP
Chapter:  11
Judge:  Vincent F. Papalia

In Re: Debtor(s) (name(s) used by the debtor(s) in the last 8 years, including married, maiden, trade, and address):
    Bed Bath & Beyond Inc.
    650 Liberty Avenue
    Union, NJ 07083

Social Security No.:

Employer's Tax I.D. No.:
    11–2250488

### Notice That a Transcript Has Been Filed

        You are Noticed that a Transcript has been filed on 8/13/24. Pursuant to the Judicial Conference Policy on Privacy, access to this transcript is restricted for a period of ninety days from the date of filing. The transcript may be viewed at the Bankruptcy Court Clerk's Office. [For information about how to contact the transcriber, please call the Clerk's Office] All parties have seven business days to file a Request for Redaction of any social security numbers, financial account data, names of minor–age children, dates of birth, and home addresses. If redaction is requested, the filing party has twenty–one calendar days from the date the transcript was filed to file a list of items to be redacted indicating the location of the identifiers within the transcript with the court and to provide the list to the transcriber. The transcriber has thirty–one days from the date the list of items to be redacted was filed to file the redacted version of the transcript with the court . If no request is filed, the transcript will be made electronically available to the general public after the ninety days.

Dated: August 14, 2024
JAN:

                                                Jeanne Naughton
                                                Clerk