IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-13359-VFP |
| | . | |
| BED BATH & BEYOND, INC., | . | MLK Federal Bldg. |
| et al., | . | 50 Walnut Street, 3rd Floor |
| | . | Newark, NJ 07102 |
| | . | |
| Debtors. | . | |
| | . | May 29, 2024 |
| . . . . . . . . . . . . . . | | 11:03 a.m. |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE VINCENT P. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Joseph and Penelope Duczkowski: | Pansini & Pizzica Law Group<br>By:  J. FRED LORUSSO, ESQ.<br>1525 Locust Street<br>15th Floor<br>Philadelphia, PA 19102 |
| | The Law Offices of Richard J. Corbi<br>By:  RICHARD CORBI, ESQ.<br>104 West 40th Street<br>Suite 4th Floor<br>New York, NY 10018 |
| Audio Operator: | Mariela Primo |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For Alfred Zeve:              Wilentz, Goldman & Spitzer, P.A.
                             By:  DAVID H. STEIN, ESQ.
                             90 Woodbridge Center Drive
                             P.O. Box 10
                             Woodbridge, NJ 07095

For Michael Goldberg,        Pachulski Stang Ziehl & Jones
Plan Administrator:          By:  PAUL LABOV, ESQ.
                                  BRADFORD J. SANDLER, ESQ.
                                  COLIN R. ROBINSON, ESQ.
                             919 North Market Street, 17th Floor
                             Wilmington, DE 19801

For Safety and              Husch Blackwell LPP
National Casualty           By:  CALEB T. HOLZAEPFEL, ESQ.
Corporation:                736 Georgia Avenue, Suite 300
                            Chattanooga, TN 37402


                            - - -

THE COURT:  There's other matters on the calendar that I'm not going to take now.  I'm going to take Bed Bath & Beyond.  There's motions for relief from stay by Mr. and Mrs. Duczkowski, and then also by Mr. Stein's client.  I'm missing the name right now.

But, in any event, why don't we get appearances on that?  Let's get the appearances first in the courtroom and then -- and then on the Court Solutions.

MR. LORUSSO:  Good morning, Your Honor.  Fred Lorusso from Panzini & Pizzica, and I'm here on behalf of the movants on the Duczkowski matter.

THE COURT:  Good morning.

MR. CORBI:  Good morning, Your Honor.  Richard Corbi of the Law Offices of Richard J. Corbi, co-counsel for the movants on the Duczkowski matter.

THE COURT:  Good morning as well.

MR. STEIN:  Good morning, Your Honor.  David Stein, Wilentz, Goldman & Spitzer, appearing for Alfred Zeve.  Thank you.

THE COURT:  Right.

MR. STEIN:  Thank you.

THE COURT:  Right.  Good morning.

MR. LABOV:  Good morning, Your Honor.  Paul Labov, Pachulski Stang Ziehl & Jones, on behalf of Michael Goldberg, the plan administrator.  And I believe the plan administrator,

Mr. Goldberg, is on your Court Solution's system.

THE COURT:  I see him right there.  And now we'll get the appearances -- I mean, I know Mr. Sandler's here with you.

MR. LABOV:  Yep.

MR. SANDLER:  Good morning, Your Honor.

THE COURT:  Good morning.  And why don't we get the appearances on the phone?

MR. HOLZAEPFEL:  Good morning, Your Honor.  Caleb Holzaepfel with Husch Blackwell representing Safety and National Casualty Corporation.

THE COURT:  Good morning.  And I see Mr. Robinson, who also represents the plan administrator.  All right.  I don't know.

MR. ROBINSON:  Pachulski Stang Ziehl & Jones.

THE COURT:  Good morning.  And then there's other parties that are appearing, but only on listen only.

So, I guess, on the movants, and I don't know, the issues are extremely similar.  Not exactly identical.  But, on the reply, or sur-reply that was filed yesterday, one of the things that the plan administrator says is that it's telling that you don't address any of the ten cases that they cite that denied this type of relief.

And now I'm going to say, perhaps in similar, but not necessarily at all identical, circumstances.  So, who's going to -- who's going to take that?

MR. LORUSSO:  Your Honor, Fred Lorusso, on behalf of the Duczkowskis.  I'll jump in on that issue specifically.  It alerted myself that we needed to look at those cases a little closer than perhaps they were initially.

And I think it bears noting that the first case that we're redirected to is the In re Jet Florida Systems, Inc. case.  And it's cited in the recently filed sur-reply for the proposition -- if I can, Your Honor, at Paragraph 4.  It was failed -- pardon me.

The movants, collectively, the Zeve and Duczkowski movants, failed to address these cases, which supported the position that the Court should deny relief because the estate will have to incur defense cost.

And now the first, as I said, the first case that's cited is that In re Jet Florida Systems, Inc. case, Citation 883 F.2nd 970.  It's an Eleventh Circuit opinion, Your Honor. And that case actually, it dealt with the circuit court reversing a bankruptcy court order that denied the motion for relief.  And it remanded the case to allow the creditor to proceed against the debtor.

And there are a number of issues that were addressed in that opinion that bear exactly on the issues before Your Honor on the current request for relief, certainly on behalf of the Duczkowskis, and I'll have counsel for the Zeves to speak as well.

There's discussion in that opinion regarding the suggestion by the debtor in In re Jet Florida Systems that there will be a depletion of the assets of the estate due to defense costs.  And I'm going to read, if I may, Your Honor, a section of the opinion.

THE COURT:  I'm just -- I'm looking for the opinion myself.  I know I have it here somewhere, and I'm not finding it for whatever reason.  But, one second.  If I can't get there in a couple of seconds, then we'll move on.  I have Hedgeworth (phonetic).  Yes, Florida Systems.  Got it.  Okay.

MR. LORUSSO:  And, Your Honor, again, there's a discussion within that opinion regarding this shifting responsibility for defense costs and the implications that would have on the debtor versus an insurer.

THE COURT:  Right.

MR. LORUSSO:  And within the opinion, I believe the jump cite would be at Page 975.  Appellees also maintain that appellee's insurer will be prejudiced by the continuation of Appellant's defamation suit.  And that case dealt with a defamation claim.

The reported cases however underscore that the purpose of Section 524 of the Bankruptcy Code is to protect the debtor and not to shield third parties, such as insurers, who may be liable on behalf of the debtor.

The cases we have cited take into account that an

insurer may be liable if the plaintiff prevails in the continuing tort action.  Therefore, the insurer is not considered to be prejudiced under Section 524 when the permanent injunction is modified to permit a pending action to continue for the purpose of seeking recovery from the debtor's insurer, because the insurer's obligation remains commensurate with the underlying insurance contract.  Same position we have taken in this case.  But, that's not the relevance of this section that I wanted to highlight to the Court.

The first start policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.  We are, however, concerned by the prospect that reversing the decision of the bankruptcy court in this case would frustrate the fresh start policy embodied in the Code in one way.  By requiring the bankrupt to spend sums in defending this lawsuit.  The issue that's --

THE COURT:  That's their point, right?

MR. LORUSSO:  -- exactly tabled before Your Honor.

THE COURT:  Right.

MR. LORUSSO:  We are cognizant that in actions such as these, the cost of litigation can sometimes surpass the actual amount of liability.  Therefore, to allow suits of this nature to go forward could possibly have the effect of draining funds that would more properly be used in the revitalization of

the reorganized corporation.  The exact position that the debtor in this case has taken.  Probably, the plan administrator has taken.

Nonetheless, this consideration alone does not require us to affirm the court below for two main reasons.  First, we can determine no effective means of determining at this stage whether the bankrupt or the insurance company will pay the cost of the litigation.  Exactly the proposition that we've cited in our reply in support of our requested relief.

To have our ruling premised on the determination would provide an incentive for the debtor to claim to assume that burden.  If that simple fact barred the plaintiff from going forward on his claim, there would exist no adversarial relationship between the bankrupt and insured, so that we could actually resolve this crucial question, because both of those parties would have an obvious interest in demonstrating that the debtor was liable for litigation costs.  Exactly what's being postured before Your Honor.

And the ruling, again, reversed the bankruptcy court order, and found that Section 524(a) prohibited the plaintiff from proceeding against the debtor who has received a discharge of debt in order to recover from the bankruptcy estate. However, pursuant to Section 524(a), a plaintiff may proceed against the debtor simply in order to establish liability as a prerequisite to recover from another, an insurer, just as in

this case, who may be liable.

Now, obviously, Your Honor, the issues that are, you know, tabled in the Duczkowski's requested relief, and I'll submit in my own humble interpretation, Zeve or Zeves' request for relief, it's pretty complex when you're dealing with this policy that's in play with the SIR and the conflicting, contradictory provisions regarding who will incur or who will be liable for defense costs.

I would submit that this opinion that was -- that we failed to cite in support of our motion, actually it specifically supports what we're requesting this honorable Court to do.

THE COURT:  Well, I mean, they're saying -- I guess they are saying, the plan administrator is saying that it's either going to force them to pay the costs and have those costs come out of the -- come out of the recovery of other parties in interest, or default, and then breach the insurance contract potentially.  Which is, you know, not a -- which could lead to some problems as well.

And so, that -- this is the harm that befalls this debtor plan administrator.  So, I mean, it seems that they were concerned about that.  I mean, the fresh start, and I'll get to -- I don't know whoever is arguing, is pretty inapplicable here.  Like, I think, completely inapplicable.  Because there is no fresh start that we're talking about.

10

And that does seem to be a driving factor in most of the cases.  I know there's the one case that had the liquidating debtor and non-liquidating debtor, and they still held for the liquidating -- that the liquidating debtor couldn't proceed against the liquidating debtor.

MR. LORUSSO:  And I agree with Your Honor.  The fresh start is not specifically before Your Honor, but it's the rationale of weighing the alignment of the insurer and the debtor in this case with respect to who's going to come forward and say, well, we're going to be responsible for the defense costs.

The policy has specific provisions within the endorsement where Safety National can incur the defense cost, assume the handling of the claim, with -- specifically, without the debtor being responsible to reimburse a nickle of the defense cost.

And I guess, appealing to the Court's -- well, the equities of the situation, we've got a -- we've got a claim.  This is not, and I'd submit, we've been -- we've been in discussions with the plan administrator, with counsel, for some time now on trying to figure out a work-around some type of consent order to allow us to continue our action.  And that obviously has led us to here.  We weren't able to reach an agreement in that regard.

THE COURT:  But, just let me ask.  Your client is the

11

one that in the latest submission said that her potential damages are over -- over a million dollars?

MR. LORUSSO:  No, Your Honor.  We have from jump street maintained -- yes.  But, we haven't changed -- it was a $3 million proof of claim.

THE COURT:  Well, I didn't know.  I didn't know.

MR. LORUSSO:  Yes.  Yes.  I'm sorry.

THE COURT:  I'm talking about me.

MR. LORUSSO:  There was notation to serve, apply in a footnote regarding the value of the claim and a suggestion that there was a fluctuation from initially postured positions.

We were told from the very beginning we were the only claim in excess of a million dollars, proof of claim filed.  Which, the implications are significant with respect to the coverage under the policy.

There's a specific provision where Safety National, and perhaps is the issue to be litigated at some point, in their own estimation, if a claim is in excess of a million dollars, we're going to assume the defense, we're going to associate ourselves in the claim.

We have, regardless of an SIR obligation, whether or not the case is within that SIR or above it, we can settle it.  You, debtor, all you have to do is cooperate and bless the settlement.

And so we, from the very beginning, we have a

12

significantly injured woman who has a diagnosed complex regional pain syndrome diagnosis.  We had an effort to put some supported data on the value of these claims.  Our own firm has had significant experience in these claims.  It's a very significant claim, far in excess of a one million dollar SIR.

And in our preliminary discussions with the plan administrator and counsel, I thought there was an acknowledgment that we were -- we kind of had a different fish than a lot of the -- as I understand it, 55 other claims that are there.

It's a different animal and, you know, to the extent that there is an opportunity to potentially figure out what an outlay would be on defending the cost, because we're talking, it is the proverbial drop in the bucket on defending the case.  And there's no -- there's not going to be any depletion of, you know, the plan's assets to defend the case.

I mean, factually, the underlying incident, presumably was captured on video.  The case never got that far in discovery where we received the video.  Liability should be a non-issue.  And then you're talking --

THE COURT:  We're not going to get into that.

MR. LORUSSO:  I know we're not.

THE COURT:  We got enough --

MR. LORUSSO:  I know.

THE COURT:  We got enough to do here.

13

MR. LORUSSO:  I'm just giving you a little color, Your Honor.

THE COURT:  Yes.  Yes.  Yes.  But, Mr. -- is it --

MR. LORUSSO:  Lorusso.

THE COURT:  -- Lorusso?

MR. LORUSSO:  Yes, sir.

THE COURT:  Lorusso?  Not Larusso?

MR. LORUSSO:  Lorusso, correct.

THE COURT:  Lorusso?

MR. LORUSSO:  Yes.

THE COURT:  So, Mr. Lorusso, but your -- your position is that the claim against the debtor is discharged. Your client's claim against the debtor is discharged.  And you're not seeking any recovery, other than maybe whatever proof of claim might be entitled to against the estate, is that fair?

MR. LORUSSO:  Essentially, Your Honor, we're seeking to recover against the proceeds under the policy.

THE COURT:  Well, two things, right?  When lawyers say essentially, that's the legal -- right?

(Laughter)

THE COURT:  Right?  So, I'm asking you, is that your position, that you're just going -- the only recovery against the debtor or the estate is whatever, if anything, maybe recovered on a proof of claim?

14

MR. CORBI:  Your Honor, Richard Corbi, co-counsel for the movant.  If I may?  The recovery would be against the insurance policy and whatever the debtor has under the SIR.  We're not -- that's the bucket that we're going after.

THE COURT:  All right.  I'm still waiting for the answer though.  I'm asking the question as to whether or not Ms. Duczkowski is saying she's not seeking recovery against the estate, except for what may be payable to unsecured creditors under proof of claim.

MR. CORBI:  That would be part of the SIR insurance policy.  That would be the claim against the estate.  Anything excess --

THE COURT:  It's a million bucks, right?  The SIR is a million dollars, right?  Let's say your client hits for a million five and the SIR is a million, so the insurer is on the hook for $500,000.

MR. CORBI:  We'd be going after what the debtor has and then the insurer.

THE COURT:  Okay.  But, the debtor -- I'm just -- I'm doing it one more time.  The debtor is saying they have little or no money for unsecured creditors.  And I'm just looking for the answer -- well, I'm going to -- whatever I do, your recovery, I thought in your papers, you said, was limited to what might be payable under the policies.  Is that another way of saying it?

15

MR. CORBI:  Essentially, Your Honor.  Yeah.  With the recon --

(Laughter)

THE COURT:  There's that word again.  Take that word out.

MR. CORBI:  I'm a creature of habit.  With the reconciliation of the issue being, Safety and National can take a claim, an unsecured claim, for the million dollar SIR.  In a theoretical world, the case sells for $2 million, our clients receive a million dollars, Safety and National has a claim for reimbursement of the SIR.

THE COURT:  Okay.  So then, the answer to my question is yes, that all Ms. Duczkowski -- if that's how you pronounce it, is seeking, is whatever might be payable under the policy after the SIR.

MR. LORUSSO:  Well, there would need to be a reconciliation on how any obligation under the SIR was going to be handled.  And whether that would be an unsecured claim by Ms. Duczkowski against the debtor, or if there's a path based upon the policy for that to be an unsecured claim by the insurer against the debtor.

THE COURT:  These are red herrings in my view.

UNIDENTIFIED ATTORNEY:  Mm-mm.

THE COURT:  What you're talking about are not -- they're not getting at the issue that I'm asking you about.  I

16

am just asking you if Ms. Duczkowski is limiting her recovery to whatever proceeds there may be under the policy, under the SI -- over the SIR.

MR. LORUSSO:  Not to -- and I apologize, Your Honor, if I'm not capturing the depth of what you're asking.  But, essentially, there would still remain an unsecured claim for the SIR amount under what you're posturing.

THE COURT:  Right.

MR. LORUSSO:  Yes.

THE COURT:  I said that too.

MR. LORUSSO:  I apologize.

THE COURT:  I didn't say it that time.

MR. LORUSSO:  I apologize.  Yes.

THE COURT:  Right.  Right.  I said -- yes, yes. Whatever it is, according to the plan administrator, it's nothing.  Or it will be pennies.

MR. LORUSSO:  Right.  Yes, Your Honor.  The answer is yes.

THE COURT:  All right.

MR. STEIN:  And that would -- that would be the same for Zeve.  Zeve would just stipulate the two insurance proceeds only, which is what we put in our papers initially and the proposed order and in the reply.  So, we get what we get.

THE COURT:  Maybe I was thinking of your papers. But, I thought your papers said the same thing.

17

MR. STEIN:  Well, you know what, Judge?  We had also -- we had also referred to two other orders entered by this Court --

THE COURT:  I'm going to get to those.  I'm going to get to those.  But, I want to just -- I just wanted to ask you, Mr. Stein, then how -- your client, I know they, you know, kind of hedged a bit, and even though they said the claim was two hundred and fifty or less --

MR. STEIN:  Less.

THE COURT:  -- they've hedged a bit.  So, you never get to the -- you never get to the million, it doesn't seem like.

MR. STEIN:  I don't know though.  I mean, it would have to be adjudicated in Texas.  So, we're certainly not trying the case now today.  But, at the end of the day, we're stipulating to the insurance proceeds.

THE COURT:  Stipulating to the insurance proceeds?

MR. STEIN:  Yes.

THE COURT:  And how about -- and how about -- I thought you said you would stipulate to a claim of -- or maybe they said that.

MR. STEIN:  No, no.  That's what they want --

THE COURT:  They said.  They want.

MR. STEIN:  That's what they want me to do to dispose of it quickly.  I don't know how it's going to shake out if the

18

insurance company and the debtor believe that they're limited by the CSR.  They could file a DJ action and get it resolved very quickly in the State of Texas.  Maybe that gets everybody --

THE COURT:  I don't know how they do it in Texas.

MR. STEIN:  But, that shouldn't be -- that shouldn't be dispositive today.  We're really looking to limit our recovery to the insurance, which is what the --

THE COURT:  So, your answer is yes to my question?

MR. STEIN:  Yes.  And the insurance is what was designed to cover my client's claim.  My client wasn't scheduled, and we didn't get notice of the bar date.  And that's really not been disputed by anybody.

THE COURT:  Yes.  Okay.  And then the question to both -- both Zeve and Zeve and Duczkowski is, are there other defendants -- I'll start with Mr. Stein, are there other defendants in the state court action?

MR. STEIN:  I don't believe so.

THE COURT:  It's just Bed Bath & Beyond?

MR. STEIN:  Yes, Your Honor.

MR. CORBI:  Same, Your Honor.

THE COURT:  Okay.  All right.  So, who's going to argue?  Mr. Labov?  All right.  I'm going to ask -- I'm going to ask you a couple of questions first.  And I think at the end of your sur-reply, you kind of got to something that I was

19

getting at, I was thinking about as I was reading all the papers. Which is -- I mean, the claims have to be liquidated at some point.

MR. LABOV: They sure do, Your Honor.

THE COURT: And, you know, even if it's just by proof of claim, they get to, you know, even if it's an estimation, which is not binding on them in the sense of whatever might be awarded in a state court action.

So, whether it's in the context of a proof of claim, a state court action, an estimation proceeding, whatever, what is the -- you know, when do these claims get liquidated? They're just in limbo forever?

MR. LABOV: No, Your Honor.

THE COURT: But, your papers suggest, well, wait 'til the case is closed, 'til all the distributions are made. And then we'll deal with it.

MR. LABOV: No. I think -- I think the more appropriate venue and forum to deal with a liquidation of the claim is the claims objection process. And that's what it's designed to do.

And as we go through the cases and as we get to administrative solvency, God willing, and we get to secured creditor payments, and then we get down to unsecured creditor payments, you're right. We're going to have -- and by the existence of a third party, potentially, we're going to have to

20

get to an estimation process.  And we're going to have to get into a room and figure out where these claims are.

But, I think that's actually a red herring.  I don't even think that's relevant at this point.  Because given -- that's the ultimate of what might happen.  But, given what they're asking us to do today, there isn't insurance.  Insurance doesn't exist.

To close the loop on the question that Your Honor asked them earlier, we can't compel Safety National to step up and cover the insurance.  It's in the insurance policy.  The insurance policy says there is no insurance.

THE COURT:  Well, that's not fair.

MR. LABOV:  Until you get to a million.

THE COURT:  That's not fair, especially as to Ms. Duczkowski.  I'm sorry.  That's just not -- I mean, I'm not deciding anything.  But, it says, if the claim is -- may be over a million --

MR. LABOV:  Yes.

THE COURT:  -- which they say it may be over a million, Safety and National can take over the whole thing.

MR. LABOV:  That's right.

THE COURT:  And then not pay -- and not charge the debtor a dime.

MR. LABOV:  They certainly could.  We can't force them to do it.  But, there is --

21

THE COURT:  You can't force them.  But --

MR. LABOV:  But, there is no insurance until you get to a million.  And in order to get to a million, the estate would be required to pay defense costs to get to a million.  And that's --

THE COURT:  That's not the way I read that.  I don't think that's what that provision says.  That provision says, if they decide to undertake the defense, then it's up to them.  Isn't that what it says?

MR. LABOV:  Yes.  But, that's on them.  We can't force them to do it.  The contract says we have to take the defense.

THE COURT:  Right.  So, if I give stay relief, then that's their risk.

MR. LABOV:  That's whose risk?

THE COURT:  Their risk.  The insurance company.

MR. LABOV:  Well, the insurance companies --

MR. HOLZAEPFEL:  Your Honor, Caleb Holzaepfel with Safety and National.  I can shed a little light on this issue.  That the movant cherry picked a section of the policy that allows Safety and National to step in and defend if they wish.  However, debtors are obligated to defend.  If debtors do not defend, there's a separate indemnification and reimbursement agreement.

So, if Safety and National is forced to come in and

protect their rights under the policy to let a default not go through, or to let a claim not get above a million, then debtors -- then Safety and National has a claim against the debtor's estate.

And I think that's the heart of the issue, is Safety and National, if they're compelled to come in and defend, these are assumed policies, so Safety and National will have a -- whether it's an administrative claim or a claim against the reorganized debtor, it's a priority real money claim that will be charged against the reorganized debtors.

THE COURT:  Mm-mm.  Even if Safety and National decides it wants to defend the claim.

MR. HOLZAEPFEL:  If Safety and National exercises its rights under that provision to come in, you know, then they would not charge, but, Safety and National will not do that. That is not in their best interest.

THE COURT:  All right.

MR. HOLZAEPFEL:  These debtors are self-served to a million dollars.

THE COURT:  Well, no.  But, I mean, you know, without being -- without being, you know, I'm not even going to say it. You know, what this is, is, it just feels like, you know, not only is the debtor getting a discharge, but Safety and National is getting a discharge.  That's what it feels like.

And I'm not sure that's what the Code says.  I think

524(e) is all about insurers.  And, you know, whatever the contract rights are, the contract rights are.  But, I'm having trouble -- I'm having trouble with that.  I have to say.  I'm having a lot of trouble with that.  Because, one way or another, the debtor is going to have to address this claim.

And I know, maybe with Duczkowski, however you pronounce it, it's more complicated.  The other $250,000 claim, I don't know how complicated it is.  Even if you go by the statistics that end at 2020, you know, if I did my math right, I don't have it in front of me, but if I did my math right, you know, there was $12 million of claims over eight or nine years.  A million or so --

MR. LABOV:  Three, Your Honor.  Yeah.

THE COURT:  -- of defense costs over that period.  Fifty claims, 55 claims are being filed now -- have been filed.

MR. LABOV:  So, that's the harm, Your Honor.

THE COURT:  Huh?

MR. LABOV:  That's the harm.  The harm is --

THE COURT:  But, if you -- you didn't let me finish then.

MR. LABOV:  Oh, I'm sorry, Your Honor.

THE COURT:  Because if you take that and you divide it, it's like $20,000 a year per claim.  If you divide that by 50, like, the million, whatever it is, by 50, it's $20,000 per claim.  Is that going to make or break this case?  Twenty

24

thousand dollars per claim, per year?

MR. LABOV:  Are you asking me, Your Honor?

THE COURT:  Yes, yes, yes.

MR. LABOV:  Yeah, yeah.  That's exactly the harm, Your Honor.  So, here's the problem.  The problem is, if we're going to modify the plan injunction at this point, what they're really asking you to do is modify the plan.  Now, they had a right to come in and object to the plan.  They didn't do it.  That was certainly something that they could have done and said, wait a minute, there's insurance issues, we need to work that out.

But, the plan is clear.  And the plan says, this is how the waterfall flows, and this is how it works.  And so, if we now open up the plan, we actually amend the plan on a motion of two claimants, one who's got a claim asserted at $250,000, and one who's got a claim asserted at, I think it's $3 million, we then have now opened up a plan, and we are required, the debtor will be required to either, (1) Pay defense cost, or (2) Have an admin claim against it, when it's already administratively insolvent.

And it will push everybody in the plan down.  The administrative claims.  The secured claims.  And the unsecured claims.  And open Pandora's Box to basically eviscerate that provision of the plan.

THE COURT:  But, the Pandora's Box and the

25

floodgates, I get those arguments.  But, in your papers you say 50,000 -- 55 claims, I think, were submitted.

MR. LABOV:  Are pending, yes.

THE COURT:  Are pending?

MR. LABOV:  Yes.

THE COURT:  So, they're being dealt with, right?

MR. LABOV:  No, those claims are not being dealt with.  In fact, Your Honor, that's the problem.  With what very little money we have in the estate, what they're asking us to do is to spend admin dollars defending, because we don't have a choice.  So, we have to spend admin dollars defending those claims that are pre-petition, unsecured claims.

That doesn't mean that we won't get to an estimation process or proceeding somewhere down the road where everybody sits in a room and works out some of the larger claims.  But, in all of the larger cases we've done, whether it's Cineworld or Party City, all of these claims are enjoined from moving forward.  Except and unless until we get to the claims resolution process, which we will get to.

So, here, what they're asking us to do is to say -- well, what they're saying is, is, this is debtor neutral.  I don't think there's any thought or consideration on our side that it's actually debtor neutral.

In fact, in fact, it's -- it's beyond harmful.  It's

26

leap-frogging the priorities that are in the plan and they're asking the debtor on a very limited estate to spend admin dollars for pre-petition unsecured claims.

THE COURT:  But you're reserving your rights as to even whether they're as to Safety National, at least, the insurance company, whether they're really -- any claim they would have or

admin dollars, right?

MR. LABOV:  Well, certainly I'd reserve a right but if what Safety National is then going to do is then take over that claim, which it doesn't sound like they're going to do, they would then most likely have, and again we'd have to look at it, an admin claim against the estates under the assumed policies.  And that would crush everything that's already set forth in the plan.  When in actuality, Your Honor, we have a good process here.  When and if we get to an estimation process, nobody's harmed.  The estate's not harmed, Safety National's not harmed and, most importantly, the movants aren't harmed.

THE COURT:  So -- but what if you get into an estimation process and somebody determines that Duczkowski's claim is 2 million, then what happens?

MR. LABOV:  Then what happens is, putting aside or settlements and everything else, the Duczkowskis get a claim against the estate, it's an unsecured pre-petition claim up to

the value of the self-insured retention and Safety National, I'm assuming this is a settled outcome in the estimation process, and Safety National will have whatever obligations it has under the policy above $1 million.  That's how it works.  And that way everybody's protected.  But if we were to sit here today and say, oh, yes, we'll go spend the limited dollars we have on a pre-petition unsecured claim on an insurance policy, it would completely eviscerate the plan.

THE COURT:  But let's just say that there's discovery that's requested of the debtors that relates to these claims --

MR. LABOV:  Judge, is there a way I could move the camera a little bit maybe or do we have to keep it?

THE COURT:  Oh, no, that's annoying to me too.

(Laughter)

MR. LABOV:  I can't see you.

THE COURT:  This has never happened before.

MR. LABOV:  Can I put it to the side a little bit?

THE COURT:  Yes, you could move it. I never saw it before.  You could it move it even more over.  I don't know.  I don't know if this is my good side or not.

(Laughter)

I don't really have a good side.  I don't have a good side.

MR. LABOV:  That's much better.  I couldn't see you at all.  I was talking to a camera -- the back of a camera.

So, I'm sorry, you were asking me a question, Your

28

Honor.

THE COURT:  I was asking about the, you know, if the estimation proceeding comes out at 2 million.

MR. LABOV:  Yes.

THE COURT:  And then won't there be funds expended to get there as well?

MR. LABOV:  In a controlled, very above board process where everybody's in the room as opposed to one-off discovery and litigation pulling time and attention away from the plan administrator and a staff in one-off litigations.  We would be crushed under 50 or 20 or 10 or 15 one-off litigations.  And that's what the Bankruptcy Code provides.  We have a claims reconciliation process.  What we should do is put together an estimation process and work with the movants and work with Safety National and get them all on the same level because, certainly, we certainly don't want to prefer one set of PI claimants or unsecured creditors for that matter.  That's a whole separate issue.

THE COURT:  And how about there's these two other orders that were entered when I wasn't around that --

MR. LABOV:  Yes, Your Honor.

THE COURT:  -- stay relief to -- well, it looks like it's another one of Mr. Stein's clients.  And --

MR. LABOV:   Yeah, I believe one was Foster, is that right, Your Honor?

29

MR. STEIN:  Angela Foster.

MR. LABOV:  Angela Foster, right.

THE COURT:  Foster and --

MR. STEIN:  Charmelle Moore (phonetic) I think is the other one.

MR. LABOV  Charmagne (sic) Moore?

MR. STEIN:  Yes.

THE COURT:  Charmagne (sic) Moore, yes.

MR. LABOV:  Yeah, so I can tell you at least with Foster, Your Honor, and I -- we were not involved at that point, this was in a transition period.  But I can tell you that I believe that order was entered without argument.  So, I don't think that there was actually any argument on the plan injunction or any findings of fact or conclusions of law made by this Court or any other court with respect to how that could be detrimental to the plan.  The idea would not be to compound the problem, the idea would be to ensure that everybody is treated fairly.

THE COURT:  That was Moore, you said?

MR. LABOV:  I believe that was Foster.

MR. STEIN:  It was Charmelle Moore was 2545 and Foster was 2677  That was fully briefed by Security National. They had opposed it.

THE COURT:  Yes, that's what I thought.

MR. LABOV:  Yeah, we had not had the opportunity to

30

do that and I believe there was no oral argument on that.  I don't know if that was Judge Kaplan who heard that or no.

THE COURT:  Kaplan.

MR. LABOV:  But there was no oral argument on that case.  So, unfortunately --

THE COURT:  Nothing was fully briefed, though?

MR. LABOV  No, I don't think so.  It wasn't briefed by the plan administrator.

MR. STEIN:  It was briefed by Security National.

MR. LABOV:  Yeah and Security National's --

MR. STEIN:  Same lawyers are on the phone.

MR. LABOV:  Yeah, I was going to say they're on the phone so they can tell you what the issue on that brief was.  But there certainly wasn't -- I believe there was an issue on the plan injunction, was there?

MR. HOLZAEPFEL:  Caleb Holzaepfel for Safety and National.  I can confirm those were issued without hearing.  The hearings were cancelled and the orders were issued.  So, those were not argued in front of the court.  But we took a similar position in those cases.

MR. STEIN:  Right.  They argued the plan injunction in that case, as well.

MR. LABOV:  Yeah, and so I that we were not involved in that set of briefing.  But I do know that two wrongs don't make a right.

31

THE COURT:  But --

MR. HOLZAEPFEL:  And I'll note, Your Honor, both of those were, you know, and maybe I'm speaking out of turn, I know at least Charmelle Moore was a, maybe a $75,000 claim on the face.  And the other one was quite small.

And so our discussions with the plan administrator, I believe they thought those could be handled very quickly.  And not with Mr. Labov, I believe we were talking directly to Mr. Goldberg during those cases.  He had just been appointed and very early. That's all.

MR. STEIN:  Yeah, I don't know if Ms. Foster's claim was small.  It was like exploding a pressure cooker in that case, so she had significant damages -- injuries that had occurred.  So, we had briefed it

and the insurance company had also briefed it and Judge Kaplan hear it and there was no argument in that.

MR. HOLZAEPFEL:  There was no hearing.

THE COURT:  I would have to rule differently than Judge Kaplan.

MR. LABOV:  You would, Your Honor.  You would, with the benefit --

THE COURT:  With no law of the case.

MR. LABOV:  With the benefit of -- I don't know, you'll have to ask Safety National, Your Honor, because we were not involved.  But I don't know that there was a discussion of

the priorities and the waterfall in the plan and, basically, amending the plan itself post-effective date to allow unsecured claims to be paid ahead of administrative and secured claims.

As Your Honor will recall, this plan was highly negotiated.  This was a very difficult tricky plan with very capable secured lenders, lawyers and probably the most capable unsecured creditors committee lawyer.  But at the end of the day -- I've got to say that, Your Honor -- but at the end of the day, what they're seeking to do is to basically throw the plan out and say, okay, we're going to play admin dollars -- we're going to play admin dollars to pre-petition unsecured claims.

THE COURT:  Well, I mean, right.  I think they're saying something short of that.  I think both sides are saying we're not going to get anything from the estate.  Whatever defense costs they incur, they incur but we're just limiting a recovery to the insurance policy.  So --

MR. LABOV:  I don't think that's what they're saying, though.  They said essentially.  But I don't think that's what they're saying.  I think what they're saying is, is we know that unsecured dollars are not great dollars, we get it, right.  In the Cineworld case one of the things that had been going around for personal injury claimants was several lawyers said to me, I wish my guy would have fallen or something would have happened that had to have happened at AMC because they didn't

33

file bankruptcy.

But here there was a bankruptcy and, unfortunately, in the bankruptcy, those policies were assumed and the waterfall in the plan was confirmed and went effective and now everybody's operating under it, including the plan administrator who is, I think, in front of Your Honor saying we don't have enough to pay admin claims.  So, now we're seeking to take defense dollars, real dollars under those policies and push everybody back down to the bottom of the line.  Where the harm to the estate is outsized, the harm to the movants doesn't exist because those claims will be liquidated.  They will be dealt with in the appropriate process and procedure.

THE COURT:  And what stages are these state court litigations at with Duczkowski and --

MR. LORUSSO:  Your Honor, Duczkowski's claim is really, in my understanding and recollection is written discovery, had really just kind of gotten off the ground when the petition for bankruptcy was filed.

THE COURT:  And, so, not even responded to?

MR. LORUSSO:  I don't believe in full, Your Honor.  I know we don't have, you know, videos, you know incident reports and the like, so we had not.

THE COURT:  And --

MR. STEIN:  The sample was filed two months before the 11, so I don't think much had taken place.

34

THE COURT:  All right.  And am I wrong on those numbers, Mr. Labov, about what the, you know, what these cases typically cost to litigate?  I have it right here.

MR. LABOV:  I apologize.  I don't remember your numbers, Your Honor.

THE COURT:  Well, Paragraph 15 of your --

MR. LABOV:  Yeah.

THE COURT:  -- says 12.14 million in attorney's fees for an average of 1.5 a year for eight years.  I think that's really, that's really kind of nine years but -- right, isn't it?

MR. LABOV:  Yeah.

THE COURT:  It's nine years.  So, if you do nine years, that's 1.3 million a year and you just say there's 50 claims pending,  which there may be more or less.  I don't know.  I would say Bed, Bath & Beyond, when they were in their hey day might be more, actually.  So, if you do the 12 million divided by nine years, that's 1.3 or so a year divided by 55 or so, that's like 24 thousand per case.  And I'm just --

MR. LABOV:  Yeah -- so, there's a couple -- oh, I'm sorry, did you --

THE COURT:  No, I mean, it just didn't seem like that much money to me.

MR. LABOV:  Well, so this is a different issue, Your Honor.  We can't go back and sort of recreate what those were

and what happened.  What we can say is, is this was a billion dollar company ten years ago and they had whatever course of action they wanted to take to make these things go away and who knows what, you know, you take the plaintiffs as they come, I think, is a famous saying among the PI bar.

So, we don't know what those claims were.  It could have been one claim was 500,000 in defense costs, one claim was 5,000 because they decided to settle early.  I don't think there's any way to really -- I mean, there is a way to go back and figure out what those all were and how they all came out --

THE COURT:  Yes.

MR. LABOV:  -- rather than taking a general average. But I think more importantly the issue is not this cost 30,000 or 40,000 or maybe it's $10,000 in defense costs.  The issue is we don't have the money because that money in the plan was earmarked to administrative claims.  And then it was earmarked to secured claims.  And then it was earmarked to unsecured claims.

And we're nowhere near even admin claims at this point.  Now, we could be in six months, and we're all hoping and praying that we'll get there, but we're not.  And so the big harm here is that we will have taken a plan that was confirmed and gone effective and tossed it because we don't have the money to even pay admins in full.  And that's the problem.

36

THE COURT:  Are you saying to me that if I grant these people stay relief not to collect a judgment that whole cases are going to collapse?

MR. LABOV:  There's a very good possible with the money that's in our account now, Judge, and the ability to pay administrative claims.  Granting these people relief from the stay I would assume the Court would have to take everybody else that came in for the same reason and do the same thing.  But even if you didn't and it was just the two and it was several hundred thousands of dollars to go through discovery and everything else, yeah, we are getting way pushed down the line to where we're not even at unsecured dollars remotely close yet.

So, yeah, I think, and we have the plan administrator here today but that's the very reason that this is such a problem is because we've now taken the plan, turned it on its head and if we were able to modify the stay, turned it on its head and completely pushed everybody down and that's a major problem.  That's what I referred to earlier, Your Honor as Pandora's Box.  Once that's open, we will be in total chaos.

THE COURT:  But these stay relief orders were entered in October and November of '23 and now we're almost in June of '24.  Has Pandora's Box opened?

MR. LABOV:  It's starting to.  We have two right here and we have 55 more right behind them so, yes, it is starting

37

to open up.  And if these go, the next domino falls and the next domino falls.

THE COURT:  Well, I don't know.  Things went -- more than six months ago and it doesn't feel like a calamity.

MR. LABOV:  And I actually don't have an update as to what stages those matters are in or whether they've been settled.  But the point that we're trying to make here is, we can get a process together so that everybody's protected.  We don't have to throw the plan out.  We don't have to upset the priorities in the Code that have already gone effective.

THE COURT:  Well, what is that?  What process is that because they want to get -- I mean, these things happened years ago now.  People -- witnesses die, move, things get lost, what's the -- I need to balance harms.

MR. LABOV:  Yes.

THE COURT:  And the way you want me to decide puts all the harm that way.

MR. LABOV:  No, Your Honor, we actually don't want you to put all of the harm on the movants.  That's not why we're here.  What we're here to do is to balance those things.

THE COURT:  Yes, that's what I want to hear about.

MR. LABOV:  Yeah, and what we're here to do is to basically say, look, September 30th, which is coming up, is the claim objection bar date.  Now, we have the right to extend that but what I would suggest to Your Honor is let's come up

38

with the claims estimation procedures.  Let's get Caleb on the phone, Mr. Holzaepfel on the phone, Safety National, his client, let's come up with these estimation procedures and that way all 55 PI claimants, unsecured creditors, will have a set of procedures that they can go to and we can resolve those claims -- we can try and resolve those claims.  We don't know that they get resolved but at least we have a process to do it.

THE COURT:  But what I'm trying to understand, Mr. Labov, is why is that different than them proceeding in state court.  You know, they're going to say, well, we want to know how often you mopped the floors and how often you did this and how often you did that and I don't know, I'm not a personal injury guy, but they're going to want discovery and they're going to say, I don't know -- .  No, I read somebody -- Ms. Duczkowski maybe had locks fall on her head?

MR. LORUSSO:  Yes, Your Honor.

MR. LABOV:  It was a lock on her -- no, I think on her foot.

MR. LORUSSO:  On her foot.

MR. LABOV:  On her foot.

THE COURT:  I mean on her foot.  Yes.

MR. LABOV:  Right.  So, I think the answer to that is very simple.  When you come up with a uniform set of procedures and you're not one-offing the lawyers all over the place, you're able to control the process in terms of cost.  And

that's exactly what these estimate -- Judge Isgur, right, down in Texas -- estimation procedures.  We know that they have to be liquidated.  We're not trying not to liquidate them, but what we're saying is the cost to liquidate each individual claim, lawyers all over the country in different places and different courts.  That costs an incredible amount of money on a one-off basis.  Just like we have claims objections procedures, omnibus claims objection procedures before Your Honor here on various type of claims.

We certainly, and it's been done before, we can certainly have estimation and claims procedures for PI claimants here and we can work with the various movants to put those procedures into place and the ball keeps rolling and the ball keeps moving, but it does so in an orderly way.  Without upsetting the plan, pushing other creditors further down the line and upsetting the priorities.

THE COURT:  So -- and I guess the debtor, the trust, won't incur expenses then in that or just be -- you're saying it would be less?

MR. LABOV:  It would be significantly less.  It would be controlled and so what I would suggest is, set a status conference for 90 days.  Let us come back and say, okay, we worked with some of the movants, let's get a set of procedures in place to move forward.  Hopefully, we can work that out.

THE COURT:  Well, Mr. Lorusso suggested something

like that.

MR. LABOV: Oh not --

MR. LORUSSO: Yes, Your Honor. Yes, I requested a 45 day status conference. Particularly envisioning this possible scenario where we get our heads together and figure out what we can do. I mean there's --

THE COURT: It's too one-sided now. That's my problem. I need you to give them more consideration.

MR. LABOV: Well, I think we should sit and have an estimation procedures and come together and, you know, put it in front of your court for control purposes.

THE COURT: Yes and Mr. Stein has been involved in this case. Actually, Mr. Corbi has been in this case also.

MR. CORBI: Yes, I have.

THE COURT: You know, they're very reasonable people.

MR. LABOV: Mr. Stein is not, Your Honor.

THE COURT: They work on --

MR. LABOV: Mr. Stein is not.

(Laughter)

THE COURT: They work on -- they resolve -- they resolve stuff. They resolve stuff.

MR. LABOV: Yes. Yes.

THE COURT: They do resolve stuff and they fight when they think they can't resolve it and it's not efficient to resolve it. But I believe that they operate in good faith and

41

I believe that you -- again, I know Mr. Stein for more years then I can --

(Laughter)

THE COURT:  Probably more than 30 I think, I know Mr. Stein.  I don't know you guys, but you seem like good lawyers and fair people to me.  I like that process.  I like that idea. I'm not going to -- I'm thinking right away you said claims objection deadline extended, you know, September 30th.  I'm thinking, as you said that, I'm thinking I'm not extending as to them.  You need tell -- you need to move it along if --

MR. LABOV:  Can I make a suggestion to the Court? We hold these motions in advance.  We come back in 90 days and hopefully we'll have and estimation process or procedure in front of Your Honor.  If we don't we're going to have to get back to square one and argue this, but hopefully that be the case.

THE COURT:  Well, 90 days right?  We're almost in June.  So there's going to be June, July, August and then September is right there.  Well, I'm going to Solomon like and I'm going to say 60 day, okay.

MR. LABOV:  Okay.

THE COURT:  You said 90.  He said 45.  I'm cutting it on the shorter end.

MR. LABOV:  That's fine.  Your Honor, that's fine. That's fine.

42

THE COURT:  But I just think, that has appealed to me because, right, Mr. Lorusso, you're -- are you an injury lawyer?

MR. LORUSSO:  I am, Your Honor.

THE COURT:  Yes, so like bankruptcy cases, 90 plus percent get resolved before they go to trial, right?

MR. LORUSSO:  Probably a higher percentage, yes, yes.

THE COURT:  Probably 101 percent.

(Laughter)

MR. LORUSSO:  Essentially.  Essentially.

THE COURT:  Around 101.  Essentially 101.  But I would say, I like that.  I would like you guys to come up with the procedure in 60 days and deal with it and say this is how we're going to do it and I'm trusting you to be fair and reasonable and do it appropriately.  I am trusting you. Because the claims do need to get liquidated and, you know, there's other issues, like there's, I don't -- you know, who knows.

Insurance policy issues and all those kind of things, whatever.  It behooves even insurance companies, right, they settle a lot of things too.  So, I like that suggestion.  I like that idea.  I just -- I think it really gives everybody an opportunity to be heard and in much more timely way than what I'm hearing here.  Because by the time you -- you've been talking about the waterfall, right, and by the time you guys

43

resolve all the actions, I think there was -- they told me something like, I don't know how many actions got filed --

MR. LABOV:  Yes.

THE COURT:  -- the other day.  When is that going to be 25, 26, when are they going get resolved?

MR. LABOV:  Right.

THE COURT:  You know.

MR. LABOV:  Right.

THE COURT:  That's a long way off.

MR. LABOV:  Right.

THE COURT:  These people want to get their things resolved more quickly and it's more important that it get resolved -- it's important, not more important.  It's important that they get resolved quickly because they, you know, like I said, things happen.  Witnesses move.  Witnesses die. Documents -- especially when they're being transitioned.  You know, the documents get lost and that, you know, we need not to have that happen.  That would not be fair.

So, I could -- here's what I want -- I've been speaking with you for a while and -- but I did pick up on your suggestion that was, initially, made by Mr. Lorusso.  I want to hear from you guys as to like that proposal that I could carry the motion.  I could say that, you know, under whatever 362(e) that it's -- that we need more time to resolve it.

I could deny it without prejudice.  I could do

whatever you are more comfortable with, but I am leaning towards that procedure because I do think it's more balanced and gets to what we're trying to do, which is liquidate the claims and determine whether there's coverage.

MR. LORUSSO:  Mm-mm and I'm in complete agreement, Your Honor.  The plan, to the extent we could have maybe some more concrete guidance on what exactly is contemplated, as opposed to simply holding the motions for 60 days and then we're back in square one.  It's going to be a concerted effort with the plan, with Safety National, with us on getting to an estimation process and trying figuring out some clarity on where we're headed.

MR. LABOV:  I think that's right.  I think what we would do -- oh, I'm sorry.  Go ahead.

MR. CORBI:  And just I think, you know, in other cases where this has gone on that I've been involved with, I think maybe having everyone have a homework assignment, like we file a status report in 30 days to see where things so we're not walking in here saying, well, Your Honor, we all talked, we can't come to an agreement, it's now your problem.  I think that -- so the next --

THE COURT:  How about status reported proposed protocol?

MR. CORBI:  Yes.  I think that should work.

MR. LABOV:  Yes, I don't think 30 days is enough for

45

that, but I think certainly within 60 we can come up with it or 45 or 60 we can come up with a proposed protocol.

THE COURT:  You've got 45.

MR. LABOV:  Okay, we'll take it.

THE COURT:  Forty-five.

MR. LABOV:  So I think the point is, I need to answer Your Honor's direct question, we're okay if you want to hold these in advance as opposed to deny them without prejudice. It's really no -- we're committed to working out this process, so.

THE COURT:  Well, I feel like in part, the reason I hesitated in denying without prejudice is because in part I want to grant them relief.  I want to get them to where they want to go.  I want to help them get to where they want to go, which is liquidate the claims and determine whether there's coverage.

MR. LABOV:  So I think if you hold the motions in advance for 60 days and we have a status conference in 30 and protocol in 45, we're committed to working on that and candidly, Your Honor, I know Safety National can speak for itself, but they'll be part of the process and I would suggest that, you know, the plan administrator will come up with the estimation procedures, run it past the movants to see if they're good with it or have others.

THE COURT:  Well you just mention, you did something

46

like this is Texas?  Is that what you said?

MR. LABOV:  Yes, there are procedures in various other cases.  Mr. Corbi mentioned it as well.  There are procedures for estimating these claims and the only issue is we'd have to look to see, you know, the types of claims, how many claims, so on and so forth.  But, yes, I think we could put something together in relatively short order.

THE COURT:  There's only 50 claims?

MR. LABOV:  Fifty -- just north.

THE COURT:  Fifty-five.

MR. LABOV:  Yes.  That's what we've got so far.  It's a caveat that there could be others.  There's over 18 thousand claims in the case, unsecured claims.

THE COURT:  No, no, no, but I'm saying.

MR. LABOV:  I know.

THE COURT:  The personal injury claims, like that.

MR. LABOV:  Yes, yes, so there's over 18 thousand.  So we've been able to pull out 55.  We think that's probably a solid number, but as is the case with a lot of these, Your Honor, things come out of the wood work, so.

THE COURT:  And then we need to -- I mean, you know, it's principally going to be you guys now, but I think ultimately the goal would be to move a claims estimation process procedure or protocol or whatever you want to call it and so -- and let everyone else know about it and -- but in the

meantime work with these guys and, who knows, maybe you'll talk and things will crystalize a bit.

Who knows, it can only help if you talk, but I mean the goal obviously is being inclusive.  I'm not giving -- I don't want to give special treatment to these particular PI claimants.  I want everybody to be on equal footing.

MR. LABOV:  Well, I think the way I would envision it and of course I'll talk to Mr. Sandler and Mr. Goldberg obviously, but I think the way I would envision it, is we'll come up with a set of estimation procedures.  We'll share it with this group and see if they've got something to add to it and then we'll put it out on notice, Your Honor.  It'll go out on notice and so we might even be able to serve at least the 55 we know about and send it out and come before Your Honor to get it approved.  So at that point everybody would be on notice.

THE COURT:  All right.  Mr. Corbi, Mr. Lorusso?

MR. CORBI:  Richard Corbi, Your Honor.  That sounds like a good process to me, Your Honor.

THE COURT:  Mr. Stein?

MR. STEIN:  It sounds like a reasonable process.  The only issue is I just didn't want to get the motion so far out that maybe you should just track the reporting and the status conference or whatever it is Your Honor is doing.

THE COURT:  Yes.

MR. STEIN:  So and I would assume that everybody is

48

proceeding in good faith, but I just want to keep the motion on the front burner as opposed to the back burner.

THE COURT:  And I'm going to predict that you don't need to use this, but if you feel somebody is not acting in good faith or if you feel that sufficient progress is not being made, then just write a two or three page letter to me.  Tell me what it is that's the problem and you guys get -- I'm assuming the problem would go that way.  I don't know why.

MR. CORBI:  That's not fair, Your Honor.

THE COURT:  The fact that it's not necessarily the case.

(Laughter)

MR. CORBI:  That's not fair.

THE COURT:  It could be either way.  It could be that you filed a two page letter that they're not moving quickly enough or fairly enough and then the other side gets two -- a couple days to respond within two, you know, business days with a two or three page letter and I'll either decide it on the basis of the letter or I'll call you up and we'll have a conference call and I'll decide it, okay?

MR. LABOV:  Absent any problems, which I don't anticipate.  Would you like to have a status conference?  Maybe it's good to have a status conference in 45 days or whatever the case is.

THE COURT:  Yes, I mean, I think we did say 60, but

49

I'm -- right, the status conference is 60?

MR. LABOV:  Oh, 60, the status conference is 60, okay.

THE COURT:  Yes.

MR. LABOV:  Okay.

THE COURT:  So, today is May 29th so June and then July.  We could do like July 23rd?

MR. LABOV:  That works, Your Honor.  I think we're in front of you on some issues then as well.

THE COURT:  It's a little -- it's like eight weeks so.

MR. LABOV:  Yes.

THE COURT:  Yes.

MR. LORUSSO:  That works, Your Honor, thank you.

MR. LABOV:  That works.

THE COURT:  All right so, do we need to put something a little formal on the dockets that -- can I ask that Mr. Labov prepare a letter that says, essentially what we just talked about.  The parties will work together to try to develop a process for claims estimation and resolution.  I should, you know, estimation and resolution and file a status report and proposed, if possible, proposed protocol or process by let's say 15 days before that or like two weeks before that, by July 9th?  Is that good?

MR. LABOV:  That's fine, Your Honor.

50

MR. STEIN:  That's fine and just so I understand the stay relief motions would be tracked to July the 23rd?

THE COURT:  Right.

MR. STEIN:  That's fine, Your Honor.

THE COURT:  Yes.

MR. STEIN:  Yes.  You could put that --

THE COURT:  Should we do, like do you think it makes sense to do the 23rd in the afternoon so that we have some time separate instead of, you know, waiting for Mr. Alvarez to call and, you know, the other matters to go and all that.

MR. STEIN:  That will work.

MR. CORBI:  That works for me, Your Honor, I don't mean to speak for everybody.

THE COURT:  We can do it by phone, also.

MR. CORBI:  Whatever works for the Court.

MR. LABOV:  Well, we're here, Your Honor.  We're happy to come in.

THE COURT:  Yes.

MR. STEIN:  2 p.m.?

THE COURT:  2:30.

MR. STEIN:  2:30 and I assumed since Security National joined to the motions that they're going to participate in this process?

THE COURT:  I would like them to participate in the process.

51

(Laughter)

MR. HOLZAEPFEL:  Yes, we're certainly happy to participate in the process, Your Honor, and would like that.

THE COURT:  Yes.  Yes, I mean it really -- and is it Safety National in both cases or?

MR. LABOV:  It's a Safety National Policy, Your Honor, yes.

THE COURT:  In both, there's not another policy involved?

MR. LABOV:  Not that I'm aware of, no.

THE COURT:  Okay.  So then, yes, just all that same applies to Safety National.  So if you could put that letter together and we'll -- and run it by this side and Safety National and then just tell me that, you know, just say, you know, that everybody signed of on it, or not, and then you'll tell me that -- what I need to address.

Is any of that unclear?  You could even put in parties may attempt to ask the Court to resolve any disputes by short letter and response.  You can put that in too.  You could make it an order if you want, I don't care.  Or I could so order the letter.

MR. LABOV:  Okay.

THE COURT:  I'm giving you a lot of options.

MR. LABOV:  Yes.

THE COURT:  All right?

52

MR. STEIN:  All good.

THE COURT:  All right.

MR. LABOV:  I'm sorry, Your Honor, what was that last, parties may resolve?  Sorry.  The last piece of the letter that you wanted?  Parties may attempt?

THE COURT:  I said, so, anybody that feels that there's an issue that needs to be answered by the Court.

MR. LABOV:  Oh yes, right.

THE COURT:  I don't want to say good faith or whatever, just an issue that needs to be addressed by the Court that you can submit a short letter, two to three pages, with the other side having -- what do you need two business days to respond?  Three business days?

MR. LABOV:  I'll put short notice there.

THE COURT:  Yes, to respond with a letter of the same amount and I'll either decide it on the basis of the letters or I'll ask you to come in or call in for a conference.

MR. LABOV:  Mm-mm.  Thank you, Your Honor.

MR. LORUSSO:  Thanks, Judge.

THE COURT:  Because on the other hand this process is about centralized dispute resolution.

MR. LABOV:  Right.

THE COURT:  And, you know, trying to do efficiently and economically and I hope this is the path forward to reaching that goal, okay?

53

MR. LABOV:  Thank you, Your Honor.

MR. LORUSSO:  Thank you, Your Honor.

MR. CORBI:  Thank you, Your Honor.

THE COURT:  Thank you.  All right.  Anybody else, I guess, I don't know there was only -- there was only Mr. Holzaepfel, if I said his name right.  A lot of pronunciation issues here.  But, all right.

MR. STEIN:  Thanks, Judge.

MR. LABOV:  Thank you, Your Honor.

THE  COURT:  Thank you.

MR. LORUSSO:  Thank you, Your Honor.

THE COURT:  Have a good afternoon.

                    * * * * *

54

# C E R T I F I C A T I O N

        We, KIM WEBER, ALYCE H. STINE and SUE DiPIERRO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Kim Weber
KIM WEBER


/s/ Alyce H. Stine
ALYCE STINE


/s/ Sue DiPierro
SUE DiPIERRO

J&J COURT TRANSCRIBERS, INC.          DATE:    March 25, 2026

**WWW.JJCOURT.COM**